# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
)
JINKO SOLAR IMPORT AND EXPORT CO., )
LTD. ET AL., )
)
    Plaintiffs and ) **Consol. Court No.**
    Consolidated-Plaintiffs, ) **22-00219**
)
  and )
) **Before:**  Hon. Claire R.
JA SOLAR TECHNOLOGY YANGZHOU )     Kelly, Judge
CO., LTD. ET AL., )
)
    Plaintiff-Intervenors, )
)
  v. )
)
UNITED STATES, )
)
    Defendant, )
)
  and )
)
AMERICAN ALLIANCE FOR SOLAR )
MANUFACTURING, )
)
    Defendant-Intervenor. )
_____)

## CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, Consolidated Plaintiffs

Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co.,

Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar

Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., and

Changzhou Trina Hezhong Photoelectric Co., Ltd. (collectively "Trina"), move for judgment on the agency record with respect to its complaint challenging the final results with respect to *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't Commerce June 28, 2022) (final results of antidumping duty administrative review and final determination of no shipments; 2019–2020), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 48,621 (Aug. 10, 2022) (amended final results of antidumping duty administrative review, 2019–2020) ("Amended *Final Results*"), and accompanying Issues and Decision Memorandum.  The Amended *Final Results* cover U.S. entries made from December 1, 2019, through November 30, 2020.

Trina respectfully moves, for the reasons explained in the accompanying memorandum of law, that the Court hold that the contested portions of the Amended *Final Results* are contrary to law, not supported by substantial evidence, arbitrary and capricious, and otherwise not in accordance with law.  Trina further moves for the Court to remand this matter to the U.S. Department of Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Jonathan M. Freed

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Consolidated Plaintiffs
Trina Solar Co., Ltd., Trina Solar
(Changzhou) Science & Technology
Co., Ltd., Changzhou Trina Solar
Yabang Energy Co., Ltd., Turpan
Trina Solar Energy Co., Ltd., Trina
Solar (Hefei) Science & Technology
Co., Ltd., and Changzhou Trina
Hezhong Photoelectric Co., Ltd.

Dated:  March 24, 2023

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————————

JINKO SOLAR IMPORT AND EXPORT CO., LTD. ET AL.,

        Plaintiffs and Consolidated-Plaintiffs,

        and

JA SOLAR TECHNOLOGY YANGZHOU CO., LTD. ET AL.,

        Plaintiff-Intervenors,

        v.

UNITED STATES,

        Defendant,

        and

AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,

        Defendant-Intervenor.

———————————————————————————

**Consol. Court No. 22-00219**

**Before:** Hon. Claire R. Kelly, Judge

## MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF CONSOLIDATED PLAINTIFFS TRINA SOLAR CO., LTD., TRINA SOLAR (CHANGZHOU) SCIENCE & TECHNOLOGY CO., LTD., CHANGZHOU TRINA SOLAR YABANG ENERGY CO., LTD., TURPAN TRINA SOLAR ENERGY CO., LTD., TRINA SOLAR (HEFEI) SCIENCE & TECHNOLOGY CO., LTD. AND CHANGZHOU TRINA HEZHONG PHOTOELECTRIC CO., LTD.

Jonathan M. Freed
Robert G. Gosselink
Kenneth N. Hammer
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Consolidated Plaintiffs
Consolidated Plaintiffs Trina Solar Co.,
Ltd., Trina Solar (Changzhou) Science &
Technology Co., Ltd., Changzhou Trina
Solar Yabang Energy Co., Ltd., Turpan
Trina Solar Energy Co., Ltd., Trina Solar
(Hefei) Science & Technology Co., Ltd.,
and Changzhou Trina Hezhong
Photoelectric Co., Ltd.

Dated: March 24, 2023

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... ii

I.  STATEMENT PURSUANT TO RULE 56.2(c) .................................. 1

    A.  The Administrative Determination Under Review ...................... 1

    B.  Issues Presented ........................................................................ 2

    C.  Standard of Review .................................................................... 3

II. FACTUAL BACKGROUND .................................................................. 8

III. ARGUMENT ...................................................................................... 17

    A.  COMMERCE'S REJECTION OF THE SEPARATE RATE
        CERTIFICATIONS FILED ON BEHALF OF THE TRINA NON-
        EXPORTING COMPANIES WAS AN ABUSE OF DISCRETION
        ............................................................................................... 17

        1.  Commerce Failed to Consider Individualized Facts
            Surrounding Commerce's Conduct of this Administrative
            Review .......................................................................... 18

        2.  Commerce Had Abundant Time To Consider the
            Information Trina Filed Without Prejudicing Its Ability to
            Complete the Administrative Review ............................... 23

        3.  Significant Record Evidence Shows the China-Wide Rate
            Does Not Accurately Reflect Trina's Antidumping Rate ... 31

        4.  Commerce's Failure to Weigh All of the Circumstances
            Surrounding Trina's Conduct Demonstrates that
            Commerce Did Not Undertake Reasoned Decision Making
            ...................................................................................... 33

      5.      Conclusion ............................................................................ 36

    B.     IF COMMERCE DID NOT ABUSE ITS DISCRETION IN
            REJECTING THE SEPARATE RATE CERTIFICATIONS FILED
            ON BEHALF OF THE TRINA NON-EXPORTING COMPANIES,
            APPLYING THE "EXTRAORDINARY CIRCUMSTANCES"
            STANDARD TO ALL RESPONDENTS IS ARBITRARY,
            CAPRICIOUS, AND OTHERWISE CONTRARY TO LAW ........ 37

    C.     COMMERCE'S DENIAL OF A SEPARATE RATE TO TRINA IS
            NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ................. 46

    D.     IF, ON REMAND, COMMERCE GRANTS THE COLLAPSED
            TRINA ENTITY A SEPARATE RATE AND RECALCULATES
            THE SEPARATE RATE, COMMERCE MUST ASSIGN TRINA
            THE RECALCULATED SEPARATE RATE ................................ 53

IV.   **CONCLUSION** ......................................................................... 55

# TABLE OF AUTHORITIES

## Cases

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ...................................................................................................................4

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998).......................4

*Fujitsu General. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ............4

*Solar World Americas, Inc. v. United States,* 962 F.3d 1351 (Fed. Cir. 2020) ...............................................................................................................................4

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ............5

*Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 15 F. Supp. 2d 807 (1998) ...................................................................................................................5

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 636 F. Supp. 961 (1986) ...................................................................................................................5

*Appleton Papers Inc. v. United States*, 37 CIT 1034, 929 F.Supp.2d 1329 (2013) ...................................................................................................................5

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005)................5

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)...................................6

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607 (1966) .................................6

*PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009)................6

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ................6

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008) ...................................................................................................................6

*Rhone-Poulenc, Inc. United States*, 20 CIT 573, 927 F. Supp. 451 (1996)........6

*Asociacion Columbiana de Exportadores de Flores v. United States*, 22 CIT 173, 6 F. Supp. 2d 865 (1998) ............................................................. 6

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995).... 7, 20, 22

*Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ........................................... 7, 8, 38

*Nat'l Ass'n Mfrs. v. United States*, 44 CIT __, 427 F. Supp. 3d 1362 (2020) ....................................................................................................... 7, 38

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) ........................................................................................ 8, 38–39

*Neo Solar Power Corp. v. United States*, 40 CIT __, 190 F.Supp.3d 1255 (2016) ............................................................................................... 19

*Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States*, 36 CIT 98, 815 F.Supp.3d 1342 (2012) ...................................... 20–1, 28–29, 34, 35

*Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990) ........... 20

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) ........... 21

*Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) ............. 21

*Leco Supply, Inc. v. United States*, 47 CIT __, __ F.Supp.3d __, Slip Op. 23-8 (Jan. 24, 2023) .................................................................................. 21

*Xipeng Opeck Foods Co., Ltd. v. United States*, 43 CIT __, 378 F.Supp.3d 1340 (2019) ............................................................................................... 21

*Mid Continent Steel & Wire, Inc. v. United States*, 41 CIT __, 203 F.Supp.3d 1295 (2017) ............................................................................................... 21

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (2000) ............................................................................................... 21

*Dongtai Peak Honey Industry Co., Ltd. v. United States*, 777 F.3d 1343 (Fed Cir. 2015) ...................................................................................... 29–31

**Statutes**

28 U.S.C. § 1581(c) .................................................................3

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................3

5 U.S.C. § 706(2)(A) ...................................................... 4, 7, 38

28 U.S.C. § 2640(b) .................................................................5

19 U.S.C. § 1677e(a) ............................................................ 21

19 U.S.C. § 1677e(b) ............................................................ 21

**Regulations**

19 C.F.R. § 351.302(c) ...................................... 2, 20, 22, 42

19 C.F.R. § 351.303(b) .............................................................9

19 C.F.R. § 351.102(b) .......................................................... 42

**Administrative Determinations**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't Commerce June 28, 2022) (final results of antidumping duty administrative review; 2019–2020) and Accompanying Issues and Decision Memorandum ........................................ 1, 2, 15, 16, 19, 20, 29, 34, 40, 49–51, 55

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 48,621 (Aug. 10, 2022) (amended final results of antidumping duty administrative review, 2019–2020) ........................................................2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed. Reg. 72,923, 72,927 (Dep't Commerce Dec. 23, 2021) (preliminary results of antidumping duty administrative review, partial rescission of antidumping administrative review, and preliminary determination of no shipments; 2019–2020) and accompanying Issues and Decision Memorandum ................................. 14–15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg. 62,275 (Dep't Commerce Oct. 2, 2020) (final results of antidumping duty administrative review and final determination of no shipments; 2017–2018) ............ 26, 32, 50

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018) (final results of antidumping duty administrative review and final determination of no shipments; 2015–2016 .................. 26, 32

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017) (final results of antidumping duty administrative review and final determination of no shipments; 2014–2015) ....................... 32

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 39,905 (Dep't Commerce June 20, 2016) (final results of antidumping duty administrative review and final determination of no shipments; 2013–2014) ....................... 32

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 80 Fed. Reg. 40,998 (Dep't Commerce July 14, 2015) (final results of antidumping duty administrative review and final determination of no shipments; 2012–2013) ....................... 32

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed. Reg. 58,871, (Dep't Commerce Oct. 25, 2021) (final results of antidumping duty administrative review and final determination of no shipments; 2018–2019) ....................... 33

*Extension of Time Limits*, 78 Fed. Reg. 57790, 57793 (Sept. 20, 2013) (final rule) .......................................................................................... 39, 40

*Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 59,987 (Dep't Commerce Oct. 29, 2021) (final results of antidumping duty administrative review, final successor-in-interest determination, and final determination of no shipments; 20182019) and accompanying Issues and Decision Memorandum ....................................................... 44–45

*Certain Mechanical Transfer Drive Components from the People's Republic of China*, 81 Fed. Reg. 75,032 (Dep't Commerce Oct. 28, 2016) (final affirmative determination of sales at less than fair value) and accompanying Issues and Decision Memorandum .................................................................................... 45

*Certain Preserved Mushrooms from the People's Republic of China*, 69 Fed. Reg. 54635 (Dep't Commerce Sept. 9, 2004) (final results of sixth antidumping duty new shipper review and final results and partial rescission of the fourth antidumping duty administrative review) and accompanying Issues and Decision Memorandum ........................................................... 50, 51

## Other Authorities

People's Republic of China Separate Rate Certification for Firms Previously Awarded Separate Rate Status ............................................... 24, 25, 35, 48, 49

Import Administration Policy Bulletin 05.1, re: "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries" .................................................. 47, 48, 52, 53

**MEMORANDUM IN SUPPORT OF CONOLIDATED
PLAINTIFFS' MOTION FOR
JUDGMENT UPON THE AGENCY RECORD**

## I. STATEMENT PURSUANT TO RULE 56.2(c)

Consolidated Plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd. ("Trina Exporting Companies"), and Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd. ("Trina Non-Exporting Companies") (collectively "Trina"), submits this brief in support of their Motion for Judgment upon the Agency Record pursuant to USCIT Rule 56.2.

### A. THE ADMINISTRATIVE DETERMINATION UNDER REVIEW

This action is an appeal from the U.S. Department of Commerce's ("Commerce") final results in the eighth antidumping duty ("AD") administrative review of the AD order on crystalline silicon photovoltaic cells from the People's Republic of China ("PRC"), which covered entries produced and/or exported during the period of review ("POR") from December 1, 2019 to November 30, 2020. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't Commerce June 28, 2022) (final results of antidumping duty administrative review; 2019–2020), P.R. 464 (*Final Results*), as

amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 48,621 (Aug. 10, 2022) (amended final results of antidumping duty administrative review, 2019–2020), P.R. 473 ("Amended *Final Results*"), and accompanying Issues and Decision Memorandum for the Final Results of the 2019–2020 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, P.R. 455 (June 21, 2022) ("*Final Decision Memo*").

**B.    ISSUES PRESENTED**

Plaintiffs seek judgment on the agency record with respect to the following issues:

1) Whether Commerce's rejection of the separate rate certifications ("SRC") submitted on behalf of the Trina Non-Exporting Companies—and its related denial of a separate rate to the Trina collapsed entity—was an abuse of discretion where Commerce fails to consider the overall impact of the delayed submission on its ability to complete the administrative review within its statutory deadlines.

2) Whether the standard in 19 C.F.R. § 351.302(c), which requires a party to demonstrate "extraordinary circumstances" before Commerce will consider a request for an extension of time

received after the applicable time limit expires, is arbitrary and capricious.

3)      Whether Commerce's determination to deny the collapsed Trina entity separate rate status based upon its decision to reject the SRCs filed by the Trina Non-Exporting Companies is unsupported by substantial evidence and otherwise not in accordance with law.

4)      If Commerce's determination to deny the Trina Non-Exporting Companies a separate rate is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, whether Commerce must adjust Trina's weighted average AD rate to that assigned to separate respondents based upon the weighted average AD rate assigned to the mandatory respondents, after any remand ordered in this action.

## C.    STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  In reviewing the final results of an antidumping duty ("AD") administrative review, the Court holds as unlawful agency determinations that are not supported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  To determine whether Commerce's interpretation and application of the AD statute is "in

accordance with law," the Court undertakes the two-step analysis prescribed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Under *Chevron*'s first prong, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." *Id.* at 842. "To ascertain whether Congress had an intention on the precise question at issue, {the Court} employ{s} the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). The first tool is the statute's text; "if the text answers the question, that is the end of the matter." *Id.* If the Court determines that the statute is silent or ambiguous with respect to the specific issue, the Court next examines whether Commerce's construction of the statute is permissible. *See Chevron*, 467 U.S. at 843. This is an inquiry into the reasonableness of Commerce's interpretation. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

Commerce's exercise of discretion in cases brought pursuant to 19 U.S.C. § 1516a are subject to the default standard of the Administrative Procedure Act ("APA") which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also Solar World Americas, Inc. v. United States,* 962 F.3d

1351, 1359 n.2 (Fed. Cir. 2020) (noting that, in cases reviewed under 28 U.S.C. § 2640(b), APA § 706 review applies "since no law provides otherwise"). "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). In determining whether Commerce's interpretation is reasonable, the Court considers "the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole." *See Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998). The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). Moreover, an abuse of discretion occurs where the decision is "based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or an unreasonable judgment in weighing relevant factors." *Appleton Papers Inc. v. United States*, 37 CIT 1034, 1037, 929 F.Supp.2d 1329, 1334 (2013) (*citing Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)).

Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (*quoting Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)); *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008).

The Court has found Commerce's determinations unlawful "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); *see also Asociacion Columbiana de Exportadores de Flores v. United States*, 22 CIT 173, 184–85, 6 F. Supp. 2d 865, 879–80 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence). Finally, even where Commerce has acted in conformity with its statutory and regulatory

6

obligations, the resulting duty rate must be examined for its accuracy and fairness. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

Section 706(2) of the APA specifically instructs a reviewing court to "hold unlawful and set aside" agency actions that are contrary to law, unsupported by fact, or otherwise arbitrary. 5 U.S.C. § 706(2). A court reviewing Commerce's application of its regulations and resulting determination is empowered to "hold unlawful and set aside" agency actions that are contrary to law, including by vacating an arbitrary rule. *See, e.g., Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 41 (1983), *Nat'l Ass'n Mfrs. v. United States*, 44 CIT __, __, 427 F. Supp. 3d 1362, 1375 (2020) (setting aside Commerce's regulation relating to "substitution drawback" as unsupported by both the statute and the legislative history and holding the Commerce's Final Rule as unlawful as to the challenged provision).

Commerce is required to "articulate a satisfactory explanation for its regulatory choice, which includes making 'a rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. Normally, an agency rule would be set aside as "arbitrary and capricious" where the agency has "entirely failed to consider an important aspect of the problem" or the rule "is so implausible that it could not be ascribed to a difference in view of

the product of agency expertise." *Id.* Courts will require an agency to engage

in more reasoned decision making in promulgating a regulation where its

decisional rationale has failed to consider relevant alternatives. *See*, *e.g.*,

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C.

Cir. 1983) ("an 'artificial narrowing of options,' is antithetical to reasoned

decision making and cannot be upheld.")

## II. FACTUAL BACKGROUND

After receiving requests from Defendant-Intervenor, the American

Alliance for Solar Manufacturing (the "Petitioner"), Trina, and other

interested parties, on February 4, 2021, Commerce published a notice

initiating the eighth AD administrative review of solar cells from the PRC

covering the POR, for 35 Chinese producers and exporters during the POR,

including Trina. *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 86 Fed. Reg. 8,166, 8,168 (Dep't Commerce Feb. 4,

2021), P.R. 37 ("*Initiation Notice*"), as amended by *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 12,599, 12,606 (Dep't

Commerce Mar 4, 2021).[1]  In the *Initiation Notice*, Commerce established a

---

[1] On March 4, 2021, Commerce published a notice correcting the end date of
the POR from November 31, 2020 to November 30, 2020. *Initiation of Antidumping
and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 12,599, 12,606 n.6
(Dep't Commerce Mar 4, 2021) (stating that Commerce inadvertently listed the
wrong POR in the initiation notice published on February 4, 2021).

deadline of March 7, 2021, for all entities for whom a review was requested that were assigned a separate rate in the most recently completed segment of this proceeding in which they participated, to certify that "they continue to meet the criteria for obtaining a separate rate."[2] *Initiation Notice* 86 Fed. Reg. at 8,167. On February 8, 2021, Commerce extended the deadline to submit SRCs to March 15, 2021. *See* Memorandum to The File, re "Request for Extension of Time to Submit Separate Rate Applications," P.R. 52 (Feb 25, 2021).

On February 25, 2021, Commerce selected the following two PRC exporters/producers as mandatory respondents for individual examination: Jinko Solar Co., Ltd. ("Jinko") and Risen Energy Co. ("Risen"). *See* Memorandum to Abdelali Elouaradia, Director, Office IV, AD/CVD Operations, Enforcement and Compliance, re: "Respondent Selection" at 5, P.R. 53 (Feb. 25, 2021).

On March 5, 2021, Trina notified Commerce that the Trina Non-Exporting Companies had no exports, sales, or entries during the POR. *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: "Notice of No Sales"

---

[2] Specifically, the *Initiation Notice* set a deadline of 30 calendar days after the publication date, for parties to submit SRCs. Because 30 calendar days from the publication of the *Initiation Notice* fell on a non-business day (*i.e.*, Saturday, March 6, 2021), the deadline was extended to the next business day (*i.e.*, Monday, March 8, 2021), in accordance with 19 C.F.R. § 351.303(b).

at 1, P.R. 75 (Mar. 5, 2021). On March 15, 2021, Trina timely submitted SRCs on behalf of the Trina Exporting Companies. *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: "Separate Rate Certification," P.R. 89, C.R. 14 (Mar. 15, 2021) ("Trina Exporting Companies SRC"). Commerce made no further inquiry into any of the separate rate certifications submitted on behalf of the Trina Exporting Companies.

On June 28, 2021, Commerce issued a supplemental questionnaire to Trina. *See* Letter to Trina, re: "June 28, 2021 Supplemental Questionnaire," P.R. 183 (June 28, 2021) ("Supp. Questionnaire"). In the supplemental questionnaire, Commerce acknowledged Trina's timely submission of SRCs on behalf of the Trina Exporting Companies. *Id.* at 3. Commerce requested that Trina "provide the appropriate separate rate certifications for all individual entities that make up the single-entity Trina." *Id.* In other words, Commerce requested that Trina submit SRCs on behalf of the Trina Non-Exporting Companies, on behalf of which Trina had filed "No Shipment" letters on March 5, 2021. Commerce established a deadline of July 6, 2021 (i.e., five business days, and the day after the 2021 observed July 4th holiday) for Trina to respond to the June 28th supplemental questionnaire on behalf of the Trina Non-Exporting Companies. *Id.* at 1. Trina did not initially respond because Trina was unaware of the issuance of the June 28th supplemental questionnaire.

10

On August 24, 2021, Trina filed complete SRCs on behalf of the six Trina Non-Exporting Companies. *See* Letter from Trade Pacific PLLC, re: "Separate Rate Certifications for Non-Exporting Trina Companies," C.R. 441–443 (Aug. 24, 2021). In a letter accompanying the submission of the SRCs on behalf of the Trina Non-Exporting Companies, Trina noted that it submitted no shipment letters on behalf of the Trina Non-Exporting Companies early in the review. *Id.* at 2. Trina further noted that it was filing the SRCs *despite* the fact that "question 9 and question 21 of the separate rate certification requires the submitter to certify that it *made at least one sale of subject merchandise to an unaffiliated purchaser in the United States.*" *Id.* (emphasis added).

On the same date, Trina filed a letter requesting that Commerce accept the SRCs filed the same date on behalf of the Trina Non-Exporting Companies and/or extend the deadline to respond to Commerce's June 28th supplemental questionnaire to August 24, 2021. Letter from Trade Pacific PLLC, re: "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Separate Rate Certifications for Non-Exporting Trina Companies," P.R. 358 (Aug. 24, 2021) ("Trina Request to Accept SRCs"). In the same letter, Trina's counsel explained that Trina was unaware of the issuance of the June 28th supplemental questionnaire until Friday, August 20, 2021, when Trina's

counsel began reviewing the electronic record on ACCESS in anticipation of the preliminary results. *Id.* at 3, 9. Trina's counsel explained that it could not possibly have filed a timely extension request before the deadline had passed because it was unaware of the deadline to respond to the June 28th supplemental questionnaire until August 20, 2021, which was weeks after the deadline for responding had passed. *Id.*

Trina's counsel stated that, before the opening of business on August 23, 2021 (i.e., the next business day after discovering that a supplemental questionnaire had been issued to Trina), it sent an e-mail to Commerce to advise that Trina intended to file SRCs at the earliest possible time after discovery of Commerce's supplemental information request. *Id.* Trina argued that Commerce should accept the SRCs filed on behalf of the Trina Non-Exporting Companies and that failing to do so would be an abuse of discretion considering the minimal burden of reviewing the SRCs because of Commerce's familiarity with Trina's structure from its participation in past reviews. *Id.* at 5–6. Trina also cited the minimal burden of reviewing the SRCs filed on behalf of Commerce did not immediately respond to Trina's request. *Id.* Commerce did not immediately respond to Trina's request.

On August 25, 2021, Commerce extended the preliminary results by 42 days (i.e., until October 14, 2021). Memorandum to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations,

re: "Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review; 2019–2020" at 2, P.R. 359 (Aug. 25, 2021).

On August 30, 2021, the Petitioner filed a letter requesting that Commerce reject the Trina Non-Exporting Companies' SRCs on the following grounds: (1) Trina did not respond or request an extension to respond to Commerce's June 28th supplemental questionnaire until 49 days after the deadline to respond; and (2) rejecting Trina's SRCs would be not represent an abuse of discretion because the request and the SRCs were filed "a mere *nine days* before the deadline for the preliminary results." Letter from Wiley Rein LLP to Sec'y Commerce, re: "Request to Reject Trina's Late Questionnaire Response and Untimely Extension Request" at 2–3, P.R. 363 (Aug 30, 2021).

On September 14, 2021, Trina renewed its request that Commerce accept the SRCs filed on behalf of the Trina Non-Exporting Companies, highlighting that—in light of Commerce's extension of the preliminary results, which gave Commerce 114 days from the date the SRCs were submitted on behalf of the Non-Exporting Trina Companies to review the SRCs—rejecting the SRCs would be an abuse of discretion. Letter from Trade Pacific PLLC to Sec'y Commerce, re: "Renewed Request to Accept Separate Rate Certifications" at 4–12, P.R. 368 (Sep. 14, 2021) ("Trina Renewed Request to Accept SRCs"). Commerce did not immediately respond to Trina's renewed request.

On October 7, 2021, Commerce further extended the due date for the preliminary results by an additional 63 days (*i.e.*, until December 16, 2021). Memorandum to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: "Second Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review; 2019–2020" at 2, P.R. 373 (Oct. 7, 2021).

More two months later, on December 16, 2021, Commerce rejected the SRCs filed on behalf of the Trina Non-Exporting Companies, and it denied Trina's request to extend the deadline because "the circumstance described in the request for an extension of the deadline (i.e., the supplemental questionnaire was overlooked) does not qualify as an extraordinary circumstance as contemplated by the regulation." Letter to Trina Solar Co., Ltd., re: "Rejection of Separate Rate Certifications in the 2019-2020 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China" at 2, P.R. 397 (Dec. 16, 2021), at 2. On the same date, Commerce issued the preliminary results of the administrative review, in which it denied the Trina Exporting Companies and the Trina Non-Exporting Companies a separate rate, and assigned the collapsed Trina entity the China-wide rate of 238.95%. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed.

Reg. 72,923, 72,927 (Dep't Commerce Dec. 23, 2021) (preliminary results of antidumping duty administrative review, partial rescission of antidumping administrative review, and preliminary determination of no shipments; 2019–2020), P.R. 395 ("*Prelim. Results*") and accompanying Decision Memorandum for the Preliminary Results of the 2019–2020 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From the People's Republic of China at 13, P.R. 396 (Dec. 16, 2021) ("Prelim. Decision Memo"). Commerce made no findings to support its determination to collapse Trina.

On January 28, 2022, Trina filed a case brief arguing, in relevant part, that: (1) the standard in 19 C.F.R. § 351.302, which Commerce applied to rejecting Trina's SRCs is unreasonable, arbitrary, and capricious; (2) Commerce abused its discretion by rejecting the SRCs filed on behalf of the Trina Non-Exporting Companies; and (3) Commerce's assignment of the China-wide Rate to a collapsed Trina entity is contrary to law. *See* Letter from Trade Pacific PLLC, re: "Case Brief," P.R. 423 (Jan. 28, 2022) ("Trina Case Br.")

On June 21, 2022, Commerce issued the *Final Results*. *See Final Results*, 87 Fed. Reg. at 38,379. In the *Final Results*, Commerce continued to treat the Trina Exporting Companies and the Trina Non-Exporting Companies as a single entity, and it found the entire collapsed Trina entity

ineligible for a separate rate. Final Decision Memo at 67, 71. Moreover, Commerce stood by its decision to reject Trina's request for an extension of time to respond to Commerce's supplemental questionnaire requesting that Trina file SRCs on behalf of the Trina Non-Exporting Companies because it found that its regulation provides no basis to consider the extension request filed after the deadline had expired to be excusable. *Id.* at 68. Therefore, in the *Final Results*, Commerce continued to assign the collapsed Trina entity the China-wide rate of 238.95%. *See Final Results*, 87 Fed. Reg. at 38,380 (excluding Trina from the companies entitled to a review-specific average separate rate).

In the *Final Results*, Commerce calculated the following weighted-average dumping margins to the respondents participating in the administrative review: (1) 15.71% to Jinko; (2) 8.00% to Risen; and (3) 10.24% to the respondents found to be entitled to a separate rate that were not individually examined.

This appeal followed.

## III.  ARGUMENT

### A.  COMMERCE'S REJECTION OF THE SEPARATE RATE CERTIFICATIONS FILED ON BEHALF OF THE TRINA NON-EXPORTING COMPANIES WAS AN ABUSE OF DISCRETION

Commerce abused its discretion in rejecting the SRCs filed on behalf of the Trina Non-Exporting Companies because it failed to weigh the actual burden of accepting the late-filed SRCs and the need for finality against the accuracy of the China-wide rate assigned to Trina in this administrative review.  Trina acknowledges that the SRCs were submitted beyond the deadline established in Commerce's June 28th supplemental questionnaire.  However, Commerce abused its discretion by failing to justify the accuracy the punitive application of the China-wide rate to Trina despite the significant time remaining to review the SRCs and other mitigating factors.

For the reasons discussed below in greater detail below, because the burden imposed upon Commerce and the interest in finality was minimal, the strong interests of accuracy and fairness embodied in the AD statute necessarily outweigh the burden placed upon Commerce and finality interests.  Therefore, Commerce abused its discretion in denying Trina's request for an extension of time and should accept the SRCs filed on behalf of the Trina Non-Exporting Companies.  Because Commerce abused its discretion in refusing to consider the SRCs filed on behalf of the Trina Non-

Exporting Companies, the Court should direct Commerce to either accept the SRCs and reconsider its separate rate determination or remand to Commerce to reconsider its rejection of those SRCs while giving due consideration to these facts relevant to the conduct of the instant administrative review.

In the discussion below, Trina first addresses Commerce's failure to consider the specific individualized impact of Trina's omission on its conduct of this administrative review. Next, Trina discusses the minimal temporal and substantive prejudice that accepting the late-filed SRCs would have had upon Commerce's ability to complete this administrative Review . Third, Trina highlights the absence of record evidence seriously undermining the accuracy of the China-wide rate Commerce assigned to the Trina collapsed entity as a result of its rejection of the SRCs filed on behalf of the Trina Non-Exporting Companies. Finally, Trina underscores Commerce's failure to consider the totality of the circumstances surrounding the late submission, which reflects that Commerce cannot have undertaken reasoned decision making.

### 1. Commerce Failed to Consider Individualized Facts Surrounding Commerce's Conduct of this Administrative Review

Commerce's justifies the rejection of the SRCs based on the text of the regulation, which requires a party to demonstrate that "extraordinary circumstances" exist before Commerce will consider an extension request

filed beyond the deadline established by Commerce. *See* Final Decision Memo at 69. Specifically, Commerce states that the regulation provides no exception based upon the party's level of participation in the administrative review, or whether the party anticipated it would be asked to provide information or was unaware of the deadline in advance. *Id.* While Commerce's observation may be true in the narrow sense, it unlawfully ignores the broader context of Commerce's underlying policy justification for promulgating the "extraordinary circumstances" standard and the fact that Commerce's application of that standard in this case fails to further those policy goals in any meaningful way.

Additionally, Commerce argued it has a broad, and essentially unchecked, prerogative to strictly enforce deadlines in an administrative review based upon the potential that accepting submissions filed beyond the deadline may create consequences in other cases. Specifically, Commerce argued that it has broad discretion to strictly enforce time limits and requirements so long as it provides "a reasoned explanation for its decision." *Id.* at 70 (*citing Neo Solar Power Corp. v. United States*, 40 CIT __, __, 190 F.Supp.3d 1255, 1261 (2016)). Yet, Commerce failed to analyze the actual impact of accepting the late-filed SRCs upon its ability to complete the instant administrative review. Instead, Commerce based its determination solely upon the *potential* that accepting the SRCs would cause for its conduct

in future administrative reviews. *See id.* (stating that it "would disrupt case planning" and "could limit Commerce's ability to fully analyze the information" if it were to allow "parties to provide requested information whenever they were able to do so, or when they became aware of the need to submit the information after the deadline.")

Undoubtedly, Commerce has discretion to set and enforce deadlines in order to fulfill its statutory mandate to administer the AD law. *See NTN Bearing*, 74 F.3d at 1206–07. However, because the AD law is remedial and not punitive, Commerce's discretion to enforce those deadlines is inherently greater in circumstances where a missed deadline has a significant capacity to affect the finality of the proceeding or poses a significant burden. *See Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States*, 36 CIT 98, 122, 815 F.Supp.3d 1342, 1365 (2012) (*citing Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103–04 (Fed. Cir. 1990)); *see also NTN Bearing*, 74 F.3d 1206–07 (stating that the tension between finality and correctness did not exist where it occurs at a time in the administrative review would not have required Commerce to begin anew or delay making the final determination). Thus, Commerce's discretion to set and enforce deadlines, and its potential abuse thereof, must be balanced on a case-by-case basis against whether the "interests of accuracy and fairness outweigh the burden placed on {Commerce} and the interest in finality." *Grobest*, 36 CIT at 123, 815 F.

Supp.3d at 1365 (*citing Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) and *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006)).[3]

More importantly, even where Commerce has statutory authority to punish a non-cooperating party—as in the context of applying facts available with an adverse inference pursuant to 19 U.S.C. § 1677e(a) and (b) (i.e., the application of "AFA")—Commerce's discretion to punish is tempered by the overall goal of the AD statute, which is remedial and not punitive. *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (2000) (stating that Commerce's discretion is "not unbounded," and reasoning that the deterrent effect must be balanced against the statutory goal of selecting AD rates that are a reasonably accurate estimate of the respondents' actual rate). Here, Congress did not empower Commerce with any statutory authority to punish late filers. Rather Commerce's authority to specify procedures to obtain information stems from its regulatory power in the absence of a contrary statutory directive. Therefore, Commerce's

---

[3] The court has frequently required Commerce and other agencies to weigh the burden of accepting late submissions against the statute's goals of accuracy and fairness in reviewing rejections of late submissions for abuse of discretion. *See, e.g.*, *Leco Supply, Inc. v. United States*, 47 CIT __, __ F.Supp.3d __, Slip Op. 23-8 (Jan. 24, 2023) at *34–35, *Xipeng Opeck Foods Co., Ltd. v. United States*, 43 CIT __, 378 F.Supp.3d 1340, 1343 (2019), *Mid Continent Steel & Wire, Inc. v. United States*, 41 CIT __, 203 F.Supp.3d 1295, 1313 (2017).

discretion to apply deadlines and set consequences for missing deadlines pursuant to 19 C.F.R. § 351.302(c) is necessarily tempered by at least the same concerns and limitations upon its exercise of discretion as where it explicitly empowered by statute to punish. *See NTN Bearing*, 74 F.3d at 1207 (stating that since Commerce's power to promulgate regulations specifying procedures to obtain information are not required by statute, those procedures "may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion").

For the reasons discussed below, Commerce cannot reasonably have concluded—nor did it obviously undertake any effort to evaluate the evidence as to—whether the China-wide rate was a reasonably accurate estimate of Trina's actual rate. Therefore, Commerce's refusal to accept the SRCs filed by the Trina Non-Exporting Companies was necessarily an abuse of discretion.

Commerce failed to analyze the specific impact of considering the SRCs filed on behalf of the Trina Non-Exporting Companies on its ability to analyze the specific information contained therein or upon its ability complete this specific administrative review. This is not reasoned decision making. Therefore, Commerce abused its discretion in rejecting the SRCs filed on behalf of the Trina Non-Exporting Companies.

### 2. Commerce Had Abundant Time To Consider the Information Trina Filed Without Prejudicing Its Ability to Complete the Administrative Review

First, the temporal burden placed upon Commerce if it had accepted the SRCs filed by the Trina Non-Exporting Companies was minimal. Commerce's rejection was an abuse of discretion because it was overwhelmingly intended to be punitive rather than remedial. In denying Trina's request to accept the SRCs filed on behalf of the Trina Non-Exporting Companies, Commerce arbitrarily focused exclusively on the missed deadline—and on the consequent delay in time between issuance of the supplemental questionnaire and Trina's request for an extension of time— without considering the time remaining in the administrative review to potentially evaluate the SRCs on their merits or the consequences of the absence of those SRCs on calculating accurate margins for Trina. Specifically, while Commerce notes that Trina's SRCs were submitted "forty-nine days after the deadline," *id.* at 67, it ignored the fact that 114 days (nearly four months) elapsed between the date that Trina filed the SRCs on behalf of the Trina Non-Exporting Companies (i.e., August 24, 2021) and the date it issued the *Preliminary Results* (i.e., December 16, 2021). Even if that time frame could have proved insufficient—a finding that Commerce never made—nothing prevented Commerce from considering the SRCs during the remaining 187 days before Commerce issued the *Final Results* on June 21,

2022. In other words, the temporal burden placed upon Commerce if it had accepted the SRCs filed on behalf of the Trina Non-Exporting Companies was negligible.

Second, the substantive burden of reviewing Trina's submission of the SRCs submitted on behalf of the Trina Non-Exporting Companies was equally insignificant. Indeed, SRCs are only filed on behalf of firms that currently hold a separate rate. People's Republic of China Separate Rate Certification for Firms Previously Awarded Separate Rate Status at 1, available at: https://enforcement.trade.gov/nme/sep-rate-files/cert-20150323/prc-sr-cert-20150323.pdf ("*SRC Instructions*") (last visited March 24, 2023) (instructing that "firms that do not currently hold a separate rate *may not* use this Certification and *must* instead submit an Application for separate rate status."). In other words, by their nature, SRCs are only submitted by respondent parties with which Commerce is already very familiar and has already concluded are entitled to a separate rate in a prior segment.

Moreover, the information requested in an SRC is very straightforward for Commerce to evaluate. Specifically, each SRC consists of 22 questions, of which 16 merely require the certifier to check a box certifying that no conditions upon which the certifier was granted a separate rate in prior proceedings have changed. *SRC Instructions; see also* Trina Exporting

Companies SRCs. The remaining six questions request basic information such as the company's contact information and requests for basic documentation such as the firm's business license that was valid during the POR and export certificate approval valid during the POR. *Id.*

In addition, Trina had already submitted SRCs on behalf of the only Trina companies that *exported* subject merchandise during the POR (i.e., the Trina Exporting Companies). *See* Trina Exporting Companies SRCs. Commerce waited until June 28, 2021 to request SRCs on behalf of the Trina Non-Exporting Companies. *See* Supp. Questionnaire. Commerce requested that those certifications be filed on July 6, 2021—or 58 days before the scheduled preliminary results at the time it issued the supplemental questionnaire setting the deadline for submission. *Id.* Obviously, Commerce viewed 58 days as sufficient time to evaluate the substance of Trina's eligibility for a separate rate and to consider whether it needed to follow up with a supplemental questionnaire. Thus, Commerce cannot claim that the 114 days between Trina's filing of the SRCs and the extended preliminary results was insufficient to review the SRCs filed on behalf of the Trina Non-Exporting Companies or delay its completion of this administrative review.

There is no basis to speculate that Commerce would have followed up by issuing a supplemental questionnaire with regard to the Trina Non-Exporting Companies because Commerce issued no supplemental

questionnaires requesting further information regarding the Trina Exporting Companies—on behalf of which Trina did file timely SRCs—or to any other respondent that filed SRCs during the POR. Moreover, where Trina has filed SRCs on behalf of Trina companies that made shipments during previous administrative reviews, Commerce granted Trina a separate rate without requiring further clarification or issuing supplemental questionnaires in response to any of the SRCs filed by Trina. *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 85 Fed. Reg. 62,275, 62,276 (Dep't Commerce Oct. 2, 2020) (final results of antidumping duty administrative review and final determination of no shipments; 2017–2018) *("AR5 Final Results")*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 83 Fed. Reg. 35,616, 35,617 (Dep't Commerce July 27, 2018) (final results of antidumping duty administrative review and final determination of no shipments; 2015–2016 ("*AR4 Final Results*"). Nevertheless, even if Commerce had decided that it was necessary to inquire further after considering accepting the late-filed SRCs on behalf of the Trina Non-Exporting Companies, it had ample time to do so for the reasons discussed above.

Evaluating the SRCs submitted on behalf of the Trina Non-Exporting Companies cannot have added materially to Commerce's workload or caused

Commerce to be unable to complete the administrative review considering the ample time remaining to do so, their lack of complexity, Commerce's familiarity with Trina from prior administrative reviews, and the more limited relevance of the Trina Non-Exporting Companies to Trina's *export* activities. Indeed, Commerce had already evaluated the SRCs filed on behalf of the Trina Exporting Companies, which were of primary relevance to evaluating Trina's entitlement to a separate rate (*i.e.*, the absence of *de jure* and *de facto* government control over Trina's *export* activities).

Third, for the same reasons discussed above, Commerce could not have had any concerns that evaluating the additional SRCs submitted on behalf of the Trina Non-Exporting entities would impact the finality of this administrative review. As an initial matter, as discussed above, the SRCs were filed 114 days before Commerce issued the *Preliminary Results.* Likewise, because Trina was a separate rate applicant and not a mandatory respondent, evaluating Trina's eligibility for a separate rate would not have impacted the finality of the AD rates assigned to any other respondent in the administrative review. Commerce calculated the AD rate assigned to separate rate respondents by weight-averaging AD rates assigned to Jinko and Risen. Reviewing the SRCs would only have impacted whether Commerce assigned Trina the separate rate or the China-wide rate, and this determination could not have impacted any of Commerce's AD rate

calculations. Had Commerce accepted the late SRC submission it would only have had to decide whether to assign the separate rate assigned to other separate rate respondents or the China-wide rate.[4] Therefore, accepting the SRCs submitted on behalf of the Trina Non-Exporting Companies could not have had any impact upon the finality of this administrative review.

Commerce reached no contrary conclusion in its Final Decision Memorandum. Instead, Commerce justified the rejection based upon the general potential for "untimely extension requests, such as that filed by Trina," to impede its ability to conduct AD and countervailing duty proceedings in a timely and orderly manner. Final Decision Memo at 69–70. While Trina acknowledges that the Court is unlikely to assume that the consideration of an SRC by Commerce is perfunctory, Commerce makes no effort to explain what actual burden accepting the late submission posed in the instant administrative review. Therefore, Commerce abused its discretion by considering only the generalized deterrent (i.e., punitive) effect of rejecting Trina's SRCs on future proceedings, but failing altogether to weigh the burden imposed upon it or the effects upon the finality in this individual administrative review. *See Grobest*, 36 CIT at 124, 815 F.Supp.3d

---

[4] Trina also stated that the SRCs submitted on behalf of the Trina Non-Exporting Companies reflect no shipments of subject merchandise and "do not differ materially from those filed on behalf of these entities in prior reviews." Trina Request to Accept SRCs at 9.

at 1366–67 (stating that, while the Court will not suggest or assume that consideration of an SRC is perfunctory, "a wholly hypothetical burden does not carry compelling weight").

Given the insignificant burden upon Commerce, and the related lack of impact upon the finality of the AD rates, Commerce would have had to have found that substantial evidence supported assigning Trina the China-wide rate without materially undermining accuracy and fairness. However, Commerce declined to undertake this weighing in the first instance. *See* Final Decision Memo at 70 (*citing Dongtai Peak Honey Industry Co., Ltd. v. United States*, 777 F.3d 1343, 1352 (Fed Cir. 2015)) (stating that if "Commerce were to allow parties to provide requested whenever they are able to do so, or when they became aware of the need to submit the information after the deadline, it *would* disrupt case planning and, *depending upon the timing of the submission and Commerce's workload*, could limit Commerce's ability to analyze the information") (emphasis added).

Commerce misleadingly quotes *Dongtai Peak Honey* for the proposition that Commerce has some generalized authority to enforce its deadlines in all circumstances without abusing its discretion. *See* Final Decision Memo at 70 n.401. The Court's holding in *Dongtai Peak Honey* is limited to the notion that Commerce did not abuse its discretion in declining to consider a mandatory respondent's request for a retroactive extension of the deadline to

submit its supplemental Section A questionnaire response where it had not so requested in a timely manner, the record demonstrates the respondent had actual notice and a meaningful opportunity to be heard, and the respondent acknowledged it was aware of the established deadline but failed to request a timely extension of time in advance of the deadline. *Dongtai Peak Honey*, 777 F.3d at 1353.

Moreover, there are several critical factual distinctions that render Commerce's reliance upon *Dongtai Peak Honey* particularly problematic. First, Commerce was evaluating the respondent's request under a different "good cause" standard under the previous version of the regulation. *Id.* at 1351. Second, the respondent in question was a mandatory respondent, which means that its data was critical to calculating other AD rates in the proceeding. *Id.* at 1349. Third, the respondent in question had previously been warned after reporting challenges in filing on time in the proceeding to request further extensions in a timely manner. *Id.* at 1347. Fourth, Commerce found that the missing information was particularly important to its completion of the administrative review because Commerce had found in prior reviews that the respondent's sales to the United States were not bona fide, which is a complex consideration requiring a careful evaluation of the totality of the circumstances. *Id.* at 1352. Lastly, and most critically, Commerce found that the reasons the respondent gave in support of its late-

filed extension request were known prior to the deadline, and nothing prevented the respondent from filing its request in a timely manner. *Id.* at 1351.

In sum, the Court did not find that Commerce had not abused its discretion based upon some generalized deference or reluctance to evaluate Commerce's actions in enforcing its deadlines for abuse of discretion despite accuracy and fairness concerns. On the contrary, the Court reached its conclusion by evaluating Commerce's actions based upon the actual record and concluding that Commerce had legitimate concerns as to finality that were sufficient to outweigh concerns as to the accuracy of the AD rate assigned to the respondent in question. *See id.* at 1353.

### 3. Significant Record Evidence Shows the China-Wide Rate Does Not Accurately Reflect Trina's Antidumping Rate

Critically, significant record evidence undermines the notion that assigning Trina the China-wide rate in this administrative review would accurately reflect Trina's AD rate. Specifically, the Trina companies, including the two Trina Exporting Companies and the six Trina Non-Exporting Companies, were previously granted separate rates by Commerce in all administrative reviews in which they participated and had shipments. Further, the Trina companies have maintained separate rates since their participation in the original investigation in each segment in which they had

shipments. *See, e.g.*, *AR5 Final Results*, 85 Fed. Reg. at 62,276, *AR4 Final Results* , 83 Fed. Reg. at 35,617, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033, 29,035 (Dep't Commerce June 27, 2017) (final results of antidumping duty administrative review and final determination of no shipments; 2014–2015), *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 39,905, 39,906 (Dep't Commerce June 20, 2016) (final results of antidumping duty administrative review and final determination of no shipments; 2013–2014); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 80 Fed. Reg. 40,998, 41,000 n.33 (Dep't Commerce July 14, 2015) (final results of antidumping duty administrative review and final determination of no shipments; 2012–2013).

There is no record evidence to support the notion that the Trina Non-Exporting Companies' dumping would be accurately reflected by the China-wide rate of 238.95%, which is 23 times greater than the rates assigned to separate rate respondents in this administrative review. Nor could there possibly be any record basis considering that Trina was not individually investigated in this administrative review. The China-wide rate is also an incalculable order of magnitude greater than the rates assigned to separate rate respondents in the most recently completed AD administrative review

(i.e., 0%).  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed. Reg. 58,871, 58,873 (Dep't Commerce Oct. 25, 2021) (final results of antidumping duty administrative review and final determination of no shipments; 2018–2019).  Therefore, accuracy and fairness are severely undermined by applying the China-wide rate to Trina.

Moreover, as discussed above, Trina has maintained the separate rate status initially granted in the initial investigation throughout each subsequent administrative review prior to this eighth administrative review. Therefore, the only possible rationale for Commerce to apply the China-wide rate is to punish Trina and to maximize deterrence to future separate rate applicants from not requesting extensions of time to respond to supplemental questionnaires in advance of the deadline set forth in the questionnaire. Because Commerce failed to temper these goals against concerns for accuracy and fairness, it necessarily abused its discretion.

### 4. Commerce's Failure to Weigh All of the Circumstances Surrounding Trina's Conduct Demonstrates that Commerce Did Not Undertake Reasoned Decision Making

Commerce focused on Trina's "inattentiveness" to the exclusion of other mitigating factors relating to Trina's conduct.  Specifically, Commerce faulted Trina for its inattentiveness in "not attending to a supplemental

questionnaire." Final Decision Memo at 69. But, Commerce failed to consider Trina's explanation for its inattentiveness or Trina's prompt correction of its mistake after discovery. Commerce cannot engage in reasoned decision making while ignoring the facts preceding and following the late filing.

In evaluating Commerce's abuse of discretion on a case-by-case basis, the Court has considered such mitigating factors as whether the late-filed SRC maintained the status quo as to the respondent in questions corporate structure and the extent to which the respondent promptly and diligently sought to correct the omission as soon as it was discovered. *See Grobest*, 36 CIT at 124–125, 815 F.Supp.2d at 1366–67.

As an initial matter, the overall context of Trina's late submission of the SRCs on behalf of the Trina Non-Exporting shows that Trina exercised good faith and diligence in filing SRCs on behalf of the Trina Exporting Companies, and in promptly rectifying its oversight, as soon as Trina's counsel discovered the omission. Trina also acted in accordance with Commerce's instructions by filing SRCs on behalf of the Trina Exporting Companies in the first instance.[5] In fact, Trina's omission was materially

---

[5] As discussed in greater detail above, Commerce's instruction for SRCs focus on *exporters* of subject merchandise during the POR, and Commerce instructs that "*{e}ach* firm seeking separate rate status must submit a separate Certification regardless of any common ownership or affiliation between firms and regardless of

less significant and more excusable than that of the respondent in *Grobest*.

Specifically, Trina did not miss the deadline for filing SRCs altogether, but,

rather, only missed the deadline to respond to a supplemental questionnaire,

which requested additional SRCs to be filed on behalf of the Trina Non-

Exporting Companies. *Compare with Grobest*, 36 CIT at 122, 815 F. Supp.2d

at 1364–65 (stating that the respondent filed the initial SRCs ninety-five

days after the deadline). Trina also stated that it had reassessed its system

for reviewing ACCESS electronic digests to ensure such an oversight never

happens again.[6]

Critically, Trina's counsel exercised prompt and diligent care in seeking

to correct the omission of the SRCs requested on behalf of the Trina Non-

Exporting Trina Companies. Specifically, Trina's counsel became aware of

---

foreign ownership." SRC Instructions at 2 (emphasis added). Read together, Trina acted under the good faith belief that Commerce's instructions direct that an entity that was collapsed in a previous segment of the proceeding should file SRCs on behalf of *each exporter* that previously was assigned a separate rate, *but not* on behalf of individual firms that did not export or sell subject merchandise in the United States during the POR.

[6] Trina explained that its failure to calendar the unanticipated supplemental questionnaire that was released by electronic digest amongst 9 digest releases on the AD cases concerning shrimp from Vietnam, Thailand, and India occurred through human error and, in part, due to the lack of doubly redundant responsibilities for calendaring. Trina Renewed Request to Accept SRCs at 9–10. Since the time of this oversight Trina's counsel states that it implemented measures to ensure that two attorneys are responsible for calendaring deadlines in all cases before Commerce, in addition to the administrative staff normally responsible for calendaring all deadlines. *Id.*

the issuance of the June 28th supplemental questionnaire only after close-of-business of Friday, August 20, 2021 when the undersigned began reviewing the electronic record of the eighth AD administrative review on ACCESS in anticipation of the then-upcoming preliminary results. *See* Trina Request to Accept SRCs at 3, 9, Trina Renewed Request to Accept SRCs at 4–12. Before the opening of business on the next business day (i.e., August 23, 2021), Trina's counsel sent a message to Commerce to advise of the oversight and to request a meeting to discuss available steps to remedy this omission immediately. Trina Request to Accept SRCs at 9.

Commerce abused its discretion by failing to consider the totality of the circumstances surrounding Trina's late submission, including its prompt remedial conduct after the omission was discovered. Commerce failed to consider whether Trina's conduct in timely rectifying its mistake after discovery outweighed the harm done through its error.

### 5.    Conclusion

Commerce abused its discretion by declining to weigh accuracy and fairness concerns against the burden of accepting the late-filed submission and any finality concerns. Because Commerce only considered Trina's stated reasons for missing the deadline—which it considered inadequate—and refused to consider accuracy and fairness, the burden upon it in accepting the late submission, or finality concerns in any meaningful way, the Court must

order Commerce to accept the SRCs filed on behalf of the Trina Non-Exporting Companies or, on remand, to explain how these factors support its determination to reject the late-filed SRCs.

## B. IF COMMERCE DID NOT ABUSE ITS DISCRETION IN REJECTING THE SEPARATE RATE CERTIFICATIONS FILED ON BEHALF OF THE TRINA NON-EXPORTING COMPANIES, APPLYING THE "EXTRAORDINARY CIRCUMSTANCES" STANDARD TO ALL RESPONDENTS IS ARBITRARY, CAPRICIOUS, AND OTHERWISE CONTRARY TO LAW

Commerce arbitrarily and capriciously applies the same "extraordinary circumstances" standard before it will consider extensions of time filed after the applicable time lime limit has expired regardless of the level of participation of the respondent and the significance of the information collected from that respondent to the completion of the administrative review. Setting a single very stringent standard for all respondents is an unreasonable, arbitrary, and capricious application of Commerce's authority to set and enforce deadlines for its conduct of an administrative review.

Commerce's regulation arbitrarily assumes that all deadlines and information are of equal complexity and relevance and complexity in completing the relevant investigation or review. Commerce justifies this strict standard exclusively through a policy goal of encouraging timely extension requests. But, Commerce's regulation fails to consider the significance or nature of the information requested. Therefore, it arbitrarily

and capriciously sets the same rigorous standard for all participants without considering that some information may be more critical earlier in the proceeding.

Any court reviewing Commerce's application of its regulations, and resulting determination, is empowered to "hold unlawful and set aside" agency actions that are contrary to law, including by vacating an arbitrary rule. *See*, *e.g.*, *State Farm*, 463 U.S. at 41, *Nat'l Ass'n Mfrs.*, 44 CIT at __, 427 F. Supp. 3d at 1375. In order for the "extraordinary circumstances" standard to be upheld, Commerce must "articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. Normally, an agency rule would be set aside as "arbitrary and capricious" where the agency has "entirely failed to consider an important aspect of the problem" or the rule "is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Id.* In other words, where a rule fails to respond to any material comment submitted during notice-and-comment proceedings or otherwise suffers from a serious analytical gap, the offending regulation shall be set aside. 5 U.S.C. § 706(2). Courts require an agency to engage in more reasoned decision making where its decisional rationale has failed to consider relevant alternatives. *See*, *e.g.*, *Int'l Ladies' Garment Workers' Union*, 722

F.2d at 815 ("an 'artificial narrowing of options,' is antithetical to reasoned decisionmaking and cannot be upheld.")

Commerce failed to consider or explain why it is reasonable to demand that all parties—even those that are unaware of the deadline in question— request an extension of time before the deadline has passed. This standard allows Commerce to bypass a reasonable weighing of the practicability of granting a respondent's request simply because the request is filed after the deadline has passed.

Commerce justifies the strict "extraordinary circumstances" standard because it considers this standard necessary to encourage timely extension requests. However, Commerce fails to explain why it applies the same stringent standard to parties whose information does not impact its overall ability to complete the administrative review or Commerce's ability to calculate an AD rate for any respondent.

Commerce did not explain why the adoption of a "bright line" rule requiring every party to demonstrate "extraordinary circumstances" without any consideration of the impact of the missed deadline on the conduct of the administrative review is necessary to further its stated policy goal of encouraging timely extension requests. The preamble to Commerce's regulation justifies the "extraordinary circumstances" standard exclusively based on a deterrence rationale while ignoring the likelihood that a party

that is unaware of the deadline in question until after the deadline has passed cannot be deterred from filing an extension after the deadline has passed. *See Extension of Time Limits*, 78 Fed. Reg. 57790, 57793 (Sept. 20, 2013) (final rule) ("*19 C.F.R. § 351.302 Preamble*"). Specifically, Commerce argues that setting a more forgiving standard may create "no incentive for filing timely extension request." *Id*. Commerce accepts that, in at least some situations, a party may be unaware of the deadline in question—and thus unable to request an extension before the applicable time limit expires. *Id*. at 57,791 (stating that parties should be able to request an extension before the time limit expires in "the vast majority of situations"). Yet, the regulation adopts an identically narrow avenue for relief for a party that may be unaware of a deadline without addressing why it is necessary to do so without compromising the policy goal of promoting filing timely extension requests.

Commerce argues that its regulation addresses the circumstances surrounding Trina's request because the Preamble to the regulation states that "inattentiveness is unlikely to be considered an extraordinary circumstance." Final Decision Memo at 69. But, Commerce adopted this standard to discourage last-minute extension requests and to avoid situations where Commerce would not have sufficient time to respond. *See 19 C.F.R. § 351.302 Preamble*, 78 Fed. Reg. at 57,791. The regulation

unreasonably treats all levels of neglect identically even where the party in question could not have been encouraged to file a timely request because it was unaware of the deadline.

Commerce has the technological capability to determine whether a party has downloaded and accessed any document from ACCESS. Therefore, Commerce likewise can effectively verify the facts underlying a party's claim that it is unaware of a deadline in advance. Trina stated in its request that Commerce accept the SRCs filed on behalf of the Trina Non-Exporting Companies that it did not become aware of the issuance of the June 28th supplemental questionnaire until August 20, 2021. S*ee* Trina Request to Accept SRCs at 3, 9. Further, Trina raised the technical point that Commerce could verify as much in its case brief filed before Commerce. *See* Trina Case Br. at 17. It can reasonably be inferred that Commerce does not contest that Trina had not downloaded or accessed the June 28th supplemental questionnaire until August 20, 2021.

While Trina does not dispute that parties participating in an administrative review may be charged with diligently monitoring the docket, the level of diligence that Commerce may require must take the individualized circumstances of the party into account. Trina was unaware of the deadline in advance. Moreover, Trina had been granted a separate rate in all the preceding administrative reviews and timely filed SRCs on behalf of

all exporting companies in the instant administrative review.  Commerce

offers no explanation for why the same "extraordinary circumstances"

standard is necessary to encourage a party in Trina's position to file a timely

extension request as for parties on whose data Commerce relies to calculate

the AD rates applicable in the administrative review.

Put differently, a party that is unaware that a deadline exists cannot

be encouraged to file a timely extension request by the fact that its request

will be evaluated under the less stringent "good cause" standard applied to

requests for extensions of time filed before the applicable time limit has

expired.  *See* 19 C.F.R. § 351.102(b) (stating that Commerce may, "for good

cause" extend any time limit unless precluded by statute).  Trina could not

possibly have filed a request before the deadline in question had expired

because it was unaware of that deadline before it passed.  Creating incentive

for filing timely extension requests, or deterring filing untimely extension

requests, cannot possibly explain why the "extraordinary circumstances"

standard is reasonable and necessary in all cases.

Likewise, the regulation arbitrarily provides for the same consequences

for all parties regardless of the extent of their participation in the proceeding

because it provides for only one result:  non-consideration.  See 19 C.F.R.

§ 351.302(c) (stating that the extension request *will not be considered* unless

"extraordinary circumstances" exist).  Commerce did not consider the

possibility that a significant deterrent effect could be promoted by granting shorter extensions where the party requests an extension after the deadline has passed. Even where Commerce extends deadlines before the deadline has passed, it rarely does so for more than a few days to one week.

Any concern that a party would view an e-mailed ACCESS digest referencing an issued supplemental questionnaire and deliberately decline to download the questionnaire so as not to foreclose the possibility of filing an extension request after the deadline had passed is implausible. The overwhelming majority of parties appearing in proceedings before Commerce are represented by counsel—usually experienced counsel. No counsel representing a party before Commerce would risk the significant consequences to its client and negative effect on its reputation of purposely ignoring a questionnaire it knows was issued simply to preserve the unlikely possibility that Commerce would extend the deadline after the fact.

No party, or its counsel, would ignore a deadline, and deliberately truncate the time to respond by ignoring an ACCESS digest notification that a supplemental questionnaire was issued, then deliberately decline to download the questionnaire via ACCESS, and, finally, file an extension request after the deadline has expired. The regulation fails to explain why the reasonable alternative of discouraging late filings by providing shorter

extensions for requests filed after the deadline could not serve equally to encourage the filing of timely extension requests.

Finally, the regulation unreasonably ignores the consequences of the missed deadline on Commerce's overall conduct of the proceeding in question by evaluating only the circumstances relating to the party's ability to file a timely request while ignoring the reality that the absence of some information will not significantly prejudice Commerce's ability to complete the administrative review. As discussed in the preceding section, where, as here, the missing SRC is relevant—if at all—only to make a binary determination of whether Commerce assigns a separate rate or the China-wide rate—which was not under review during this administrative review. A separate rate is generally based on the calculated rates of mandatory respondents. The regulation ignores the potential prejudice to Commerce. The regulation fails to consider that a deterrence rationale carries more weight when the consequences of non-compliance are greater.

In practice, Commerce has consistently interpreted and applied its regulation to foreclose a party that was excusably unaware of a deadline from meeting the "extraordinary circumstances" standards. *See*, *e.g.*, *Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 59,987 (Dep't Commerce Oct. 29, 2021) (final results of antidumping duty administrative review, final successor-in-interest determination, and final

determination of no shipments; 20182019) and accompanying Issues and

Decision Memorandum at Cmt. 4 (wherein Commerce declined to accept a

respondent's basic entry documentation and assigning the respondent, which

had been assigned a separate rate in prior administrative reviews, the NME-

wide rate because it did not request an extension of time before the deadline

had expired to respond to a supplemental questionnaire requesting entry

documentation that respondent's counsel did not discover until three weeks

after the request was uploaded to the ACCESS system because the

circumstances do not qualify as "extraordinary circumstances" as

contemplated by Commerce's regulation), *Certain Mechanical Transfer Drive*

*Components from the People's Republic of China*, 81 Fed. Reg. 75,032 (Dep't

Commerce Oct. 28, 2016) (final affirmative determination of sales at less than

fair value) and accompanying Issues and Decision Memorandum at Cmt. 10

(finding that a separate rate applicant, arguing that it did not receive

notification of the issuance of a supplemental questionnaire uploaded onto

ACCESS, did not provide an adequate explanation demonstrating

"extraordinary circumstances" that prevented it from filing a timely

extension request because electronic automatic dissemination via ACCESS's

emailed digests placed the party's counsel on notice of the existence of the

supplemental questionnaire and created an opportunity to timely request an

extension before the deadline had passed).

Therefore, if Commerce did not abuse its discretion in rejecting the SRCs filed on behalf of the Trina Non-Exporting companies, then the "extraordinary circumstances" standard itself must be set aside, as applied to parties that are unaware of a deadline in advance, because Commerce failed to justify why its standard must never accommodate considering extension requests under this fact pattern. The "extraordinary circumstances" standard arbitrarily and capriciously sets an identical standard for non-individually investigated respondents—that appear in a proceeding only for the purposes of securing a separate rate or finding of "no shipment"—as for mandatory respondents, as discussed in greater detail in the preceding section. As such, applying the "extraordinary circumstances" standard to all respondents in all contexts is arbitrary, capricious, and otherwise contrary to law.

### C. COMMERCE'S DENIAL OF A SEPARATE RATE TO TRINA IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Even if Commerce did not abuse its discretion in rejecting the SRCs filed on behalf of the Non-Exporting Trina Companies and the "extraordinary circumstances standard" is not arbitrary and capricious, Commerce's denial of separate rate status to Trina based on its rejection of the SRCs untimely filed on behalf of the Trina Non-Exporting Companies is not supported by substantial evidence because those SRCs demonstrate that Trina's export

activities continue to be free of both *de jure* and *de facto* government control over Trina's export activities.

Commerce points to no record evidence undermining that the Trina Exporting Companies continued to be free of both *de jure* and *de facto* government control. Even if Commerce had authority to reject the SRCs filed on behalf of the Trina Non-Exporting Companies, Commerce's determination to deny Trina a separate rate is not supported by substantial evidence. Moreover, Commerce has not explained why it is reasonable to deny a collapsed entity separate rate status where the record lacks SRCs from companies within a collapsed entity that had no shipments during the POR.

Separate rates "are assigned only to exporters, and this assigned rate applies to all of the firm's exports regardless of the entity that produces subject merchandise." Import Administration Policy Bulletin 05.1, re: "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries" at 3, *available at* https://enforcement.trade.gov/policy/bull05-1.pdf (last visited March 24, 2023) ("*Policy Bulletin 05.1*"). Further, Commerce's separate rate analysis "is limited to addressing a firm's independence in its *export* activities." *Id.* (emphasis added).

Commerce concedes that the separate rate application gives explicit instructions that the application "is limited to addressing a firm's

independence in its export activities." *Id.* at 4. Even in investigations, firms filing initial separate rate applications must identify only "affiliates in the NME country that *exported* to the United States . . . as well as any affiliates located in the United States involved in the sale of the subject merchandise." *Id.* at 4–5 (emphasis added). Commerce assigns one rate for any exporter receiving a separate rate "and all the producers which supplied subject merchandise to it during the period of investigation." *Id.* at 5. And, Commerce emphasizes that "*each* applicant must submit a separate individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership." *Id.*

Commerce's instructions for filing SRCs mirror the same focus on exporters of subject merchandise during the POR. Commerce instructs that "firms that do not currently hold a separate rate *may not* use this Certification and *must* instead submit an Application for separate rate status." Further, Commerce states that it:

> assigns a separate rate in {NME} cases only if the firm can demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*) over its *export* activities in accordance with the separate rate test criteria. The Department limits its separate rate consideration to firms that *exported or sold* subject merchandise to the United States during the {POR} in a commercial transaction.

*SRC Instructions* at 1. Commerce further clarifies that "*{e}ach* firm seeking separate rate status must submit a separate Certification regardless of any

48

common ownership or affiliation between firms and regardless of foreign ownership." *Id.* (emphasis in original). Read together, Commerce instructs an entity that was collapsed in a previous segment of the proceeding to file SRCs on behalf of *each exporter* that previously was assigned a separate rate, *but not* on behalf of individual firms that did not export or sell subject merchandise in the United States during the POR. In fact, firms that may be partially government-owned are only required to "identify any affiliates that *exported* subject merchandise to the United States during the period of investigation/review and any U.S. affiliates involved in the *sale* of the subject merchandise." *Id.* at 3 (emphasis added).

Commerce claims that it will not grant a respondent that was collapsed in a prior administrative review a separate rate unless it files SRCs on behalf of all companies that comprise the collapsed entity. Final Decision Memo at 71. As an initial matter, if Commerce has such a practice, it is not reflected in Commerce's own instructions outlined above. Moreover, Commerce has not consistently required that a previously collapsed respondent applying for a separate rate file SRCs on behalf of companies that comprise the collapsed entity that filed "no shipment" certifications. For example, in the sixth administrative review of this proceeding, Commerce assigned three firms on behalf of which Canadian Solar filed "no shipment" certifications the same rate as was assigned to the collapsed entity. *See*, *e.g.,* Trina Renewed

Request to Accept SRCs at Attachment C (containing a cover letter submitting SRCs on behalf of certain affiliated firms of within the collapsed entity Canadian Solar, but not on behalf of CSI Cells Co., Ltd., CSI-GCI Solar Manufacturing (YanCheng) Co., Ltd., CSI Solar Power (China) Inc., and Canadian Solar USA Inc., which Canadian Solar certified had no exports or sales of subject merchandise to the United States) , *see also AR5 Final Results*, 85 Fed. Reg. at 62,276 (assigning a separate rate to the Canadian Solar collapsed entity, including the three entities for which Canadian Solar did not file SRCs).

More importantly, Commerce does not explain why it is reasonable to deny Trina a separate rate simply because Trina was collapsed in a prior administrative review.  Instead Commerce cites a prior determination in which it assigned all firms within a collapsed mandatory respondent the same separate rate based on its fact-specific collapsing determination based on the record in the same administrative review.  *See* Final Decision Memo at 70 (*citing Certain Preserved Mushrooms from the People's Republic of China*, 69 Fed. Reg. 54635 (Dep't Commerce Sept. 9, 2004) (final results of sixth antidumping duty new shipper review and final results and partial rescission of the fourth antidumping duty administrative review) and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty New Shipper and Administrative Reviews on Certain Preserved

Mushrooms from the People's Republic of China – February 1, 2002, through January 31, 2003 at Cmt. 1 ("Preserved Mushrooms AR4 IDM")).

In the Preserved Mushrooms AR4 IDM, Commerce found that COFCO met its criteria for collapsing based upon the record information in the same administrative review, and Commerce assigned all firms within the collapsed COFCO entity the same calculated AD rate. Preserved Mushrooms AR4 IDM at 13. Specifically, where Commerce calculates an AD rate based upon a mandatory respondents own data, Commerce assigns all firms within the collapsed entity a single rate to avoid a respondent manipulating its operations in a subsequent administrative review to take advantage of a lower rate assigned to a single entity within a larger entity that Commerce found meets its criteria for collapsing in the first instance. *See id.* However, Commerce assigned the collapsed entity a separate rate based upon the facts of that proceeding, and not based upon the fact that the respondent filed SRCs on behalf of all companies that comprise the collapsed entity. *See id.*

Here, Commerce explicitly stated that it did not conduct an individualized collapsing determination for Trina, but rather carried that determination forward from prior administrative review. Final Decision Memo at 71 (stating that Commerce would not reverse its collapsing decision from prior segments for Trina and then separately analyze the separate rates status of the non-exporting and exporting Trina companies that had been

51

treated as a single entity). But Commerce fails to cite precedent for this alleged practice or explain why it is reasonable to carry forward a collapsing determination from a prior administrative review. Likewise, Commerce fails to justify the reasonableness of requiring Trina to file SRCs on behalf of each company that comprises the Trina collapsed entity even where those companies' activities are irrelevant to demonstrating the absence of *de jure* or *de facto* control over the collapsed Trina entity's export activities.

Unlike a mandatory respondent—for which Commerce calculates an AD rate based on the respondent's actual data—a separate rate respondent is generally assigned a weighted average of the AD rates calculated for the mandatory respondents. Likewise, whereas assigning different companies that comprise a collapsed *mandatory* respondent multiple rates may create potential for manipulation of the collapsed mandatory respondent's assessment rate, no such potential exists for a collapsed *separate rate* respondent because a separate rate respondent's rate is calculated based on other respondents' data.

Commerce acknowledges that only "one rate is calculated for the exporter and all producers which supplied subject merchandise to it." *Policy Bulletin 05.1* at 6. Commerce will not assign "combination rates to an exporter and *individual* producers, but rather to an exporter and its producers *as a group*. *Id.* (emphasis in original). Commerce states that this

practice avoids payment of antidumping duties by firms shifting exports through exporters with the lowest assigned cash-deposit rates." *Id.* at 7.  In other words, even though the SRCs filed on behalf of the Trina Non-Exporting Companies were rejected, Trina's separate rate would be applied to merchandise it exported regardless of whether it is sourced from producers that are collapsed in the Trina entity.  Therefore, there is no potential for manipulation of Trina's assessment rate if Commerce were to assign the Trina collapsed entity a separate rate based on the SRCs filed on behalf of the Trina Exporting Companies.

Commerce's determination to deny the Trina collapsed entity a separate rate based upon its failure to respond to the June 28th supplemental questionnaire, which requested that Trina file SRCs on behalf of the Trina Non-Exporting Companies, is not supported by substantial evidence and otherwise contrary to law.

### D. IF, ON REMAND, COMMERCE GRANTS THE COLLAPSED TRINA ENTITY A SEPARATE RATE AND RECALCULATES THE SEPARATE RATE, COMMERCE MUST ASSIGN TRINA THE RECALCULATED SEPARATE RATE

Plaintiff Jinko and Consolidated Plaintiff Risen each presented compelling arguments on each of their individual motions for judgment upon the agency record.  To avoid needlessly expending the time and resources of the Court, Trina does not repeat those arguments.  Instead, Trina supports,

incorporates, and adopts by reference all of Jinko's and Risen's arguments to the extent they challenge the weighted-average AD rates assigned to them by Commerce in this administrative review. Trina further joins in the requests of Jinko and Risen that the Court issue a decision remanding this case to Commerce with instructions to recalculate Jinko's and Risen's weighted-average AD rates. Likewise, Trina requests that, in the event Commerce assigns Trina a separate rate and the weighted average AD rates assigned to Jinko and Risen after remand, the AD rate assigned to Trina as a separate rate respondent should be revised in accordance with any correction to the final weighted-average AD rates redetermined for Jinko and Risen.

## IV.  CONCLUSION

For the reasons set forth above, Commerce abused its discretion in denying Trina a separate rate in the *Final Results* issued by Commerce. Likewise, Commerce's assignment of the China-Wide Rate to the Trina collapsed entity was contrary to law and/or not supported by substantial evidence.  Consolidated Plaintiffs, Trina, respectfully request that this Court reverse and remand this case to Commerce with instructions to assign Trina a separate rate and recalculate Trina's AD rate after making changes necessary to reflect the errors in the *Final Results* discussed in the memoranda of law filed by Jinko and Risen.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiffs Trina Solar Co.,
Ltd., Trina Solar (Changzhou) Science &
Technology Co., Ltd., Changzhou Trina
Solar Yabang Energy Co., Ltd., Turpan
Trina Solar Energy Co., Ltd., Trina Solar
(Hefei) Science & Technology Co., Ltd.,
and Changzhou Trina Hezhong
Photoelectric Co., Ltd.

Dated:  March 24, 2023

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|                                                   |   |
|---------------------------------------------------|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD. ET AL.,  | ) |
| Plaintiffs and Consolidated-Plaintiffs,           | ) |
| and                                               | ) |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD. ET AL.,    | ) |
| Plaintiff-Intervenors,                            | ) |
| v.                                                | ) |
| UNITED STATES,                                    | ) |
| Defendant,                                        | ) |
| and                                               | ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,        | ) |
| Defendant-Intervenor.                             | ) |

**Consol. Court No. 22-00219**

**Before:**  Hon. Claire R. Kelly, Judge

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Memorandum of Law in Support of Consolidated Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record, dated March 24, 2023, complies with the word-count limitation described in the Standard Chambers Procedures.  The memorandum of law contains 12,062 words according to the

word-count function of the word-processing software used to prepare the

memorandum.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Consolidated Plaintiffs
Trina Solar Co., Ltd., Trina Solar
(Changzhou) Science & Technology
Co., Ltd., Changzhou Trina Solar
Yabang Energy Co., Ltd., Turpan
Trina Solar Energy Co., Ltd., Trina
Solar (Hefei) Science & Technology
Co., Ltd., and Changzhou Trina
Hezhong Photoelectric Co., Ltd.

Dated:  March 24, 2023