## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE CLAIRE R. KELLY

|  |  |  |
|---|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD.; JINKO SOLAR CO., LTD.; JINKOSOLAR TECHNOLOGY (HAINING) CO., LTD.; YUHUAN JINKO SOLAR CO., LTD.; ZHEJIANG JINKO SOLAR CO., LTD.; JIANGSU JINKO TIANSHENG SOLAR CO., LTD.; JINKOSOLAR (CHUZHOU) CO., LTD.; JINKOSOLAR (YIWU) CO., LTD.; and JINKOSOLAR (SHANGRAO) CO., LTD., | : | |
| Plaintiffs, | : | Consol. Court No. 22-00219 |
| TRINA SOLAR CO., LTD., *et al.*, | : | |
| Consolidated-Plaintiffs, | : | |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD, *et al.*, | : | |
| Plaintiff-Intervenors, | : | |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | : | |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | : | |
| Defendant-Intervenor. | : | |

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinksolar (Shangrao) Co., Ltd. (collectively, "Jinko") respectfully move for judgment on the agency record. For the reasons set forth in the accompanying brief in support of its motion, Jinko

requests that this Court determine that the U.S. Department of Commerce's final determination in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 38,379 (June 28, 2022), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review, 2019-2020*, 87 Fed. Reg. 48, 621 (Aug. 10, 2022), is not supported by substantial evidence on the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Ned H. Marshak*
Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd.*

Dated: March 24, 2023

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE CLAIRE R. KELLY

————————————————————————x
:
JINKO SOLAR IMPORT AND EXPORT CO., :
LTD.; JINKO SOLAR CO., LTD.; JINKOSOLAR :
TECHNOLOGY (HAINING) CO., LTD.; :
YUHUAN JINKO SOLAR CO., LTD.; :
ZHEJIANG JINKO SOLAR CO., LTD.; :
JIANGSU JINKO TIANSHENG SOLAR CO., :
LTD.; JINKOSOLAR (CHUZHOU) CO., LTD.; :
JINKOSOLAR (YIWU) CO., LTD.; and :
JINKOSOLAR (SHANGRAO) CO., LTD., :
:
        Plaintiffs, :      Consol. Court No. 22-00219
:
TRINA SOLAR CO., LTD., *et al.*, :
:
        Consolidated-Plaintiffs, :
:
JA SOLAR TECHNOLOGY YANGZHOU :
CO., LTD, *et al.* :
:
        Plaintiff-Intervenors, :
   v. :
:
UNITED STATES, :
:
        Defendant, :
:
AMERICAN ALLIANCE FOR SOLAR :
MANUFACTURING, :
:
        Defendant-Intervenor. :
————————————————————————x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import and
Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar
Technology (Haining) Co., Ltd., Yuhuan Jinko Solar
Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu
Jinko Tiansheng Solar Co., Ltd., Jinkosolar
(Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd.,
and Jinkosolar (Shangrao) Co., Ltd.*

Dated: March 24, 2023

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .................................................................................. 1

ISSUES OF LAW & ARGUMENT SUMMARY ........................................................................ 1

REASONS FOR CONTESTING THE DETERMINATION ........................................................ 3

STANDARD OF REVIEW ......................................................................................................... 4

STATEMENT OF FACTS .......................................................................................................... 4

ARGUMENT .............................................................................................................................. 7

   I.     COMMERCE UNLAWFULLY VALUED ANTI-REFLECTIVE COATING GLASS .... 7

        A.    AR Coating is the Most Significant Product Specificity Attribute of Jinko's Coating Glass .................................................................................................................. 8

        B.    Romanian HTS 7007.1980 Does Not Cover Jinko's AR Coated Glass ................. 11

        C.    Commerce's Rationale for Select HTS 7007.1980 Cannot be Sustained ............... 15

        D.    Commerce in AR9 Did Not Use HTS 7007.1980 ..................................................... 20

        E.    The Superior Product-Specificity of Malaysian HTS 7007.19.9000 is Not Undermined By Unit Reporting ................................................................................ 20

        F.    Malaysia is the Primary Surrogate Country ............................................................ 25

        G.    Commerce Improperly Decided that the Scope of Romania HTS 7007.19.80 was New Factual Information .......................................................................................... 23

   II.    COMMERCE UNLAWFULLY VALUED ELECTRICITY .......................................... 29

  III.   COMMERCE UNLAWFULLY VALUED AIR FREIGHT ............................................ 30

  IV.  COMMERCE UNLAWFULLY VALUED OCEAN FREIGHT ..................................... 33

        A.    Commerce Should have Rejected Maersk Data ....................................................... 34

        B.    Alternatively, Commerce Should Have Included Drewry and Freightos Data ...... 36

   V.    COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS .................................................................................................................................... 37

  VI.  COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM U.S. PRICE ....................................................................................................................... 41

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Allied Pacific Food (Dalian) Co. v. United States*, 435 F.Supp.2d 1295 (CIT 2006) .................. 21

*Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, No. 2021-2097, 2023 WL 2505865 (Fed. Cir. Mar. 15, 2023) ........................................................................................... 44

*Calgon Carbon Corp. v. United States*, 35 CIT 234 (2011) ......................................................... 30

*Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312 (CIT 2016).............................. 25, 28

*Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318 (Fed. Cir. 2020) ......... 10, 18

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ....................................................................... 4

*CP Kelco US, Inc. v. United States*, 2016 WL 1403657 (CIT Apr. 8, 2016) .............................. 21

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)............................................ 4

*Gerson Co. v. United States*, 898 F.3d 1232 (Fed. Cir. 2018)...................................................... 15

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288 (2005) ................... 11

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F.Supp.3d 1308 (CIT 2018) ..................................................................................................................................... 27-28

*Jiaxing Bro. Fastener Co. v. United States*, 11 F.Supp.3d 1326 (CIT 2014) .............................. 24

*Jinan Yipin Corp. v. United States*, 800 F.Supp.2d 1226 (CIT 2011) ......................................... 35

*Longkou Haimeng Mach. Co. v. United States*, 33 CIT 603 (2009).............................................. 13

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ........................................ 30

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)............................... 4

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 4

*Peer Bearing Co.-Changshan v. United States*, 914 F. Supp. 2d 1343 (CIT 2013) .................... 14

*Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292 (CIT 2011) .................. 11, 19, 35

*Vulcan Threaded Prods. Inc. v. United States*, 311 F. Supp. 3d 1357 (CIT 2018) ..................... 14

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) ....................................... 42

*Xiamen Int'l Trade & Indus. Co. v. United States*, 953 F.Supp.2d 1307 (CIT 2013) ................. 21

ii

*Xiping Opeck Food Co. v. United States*, 551 F.Supp.3d 1339 (CIT 2021)................................ 26

*Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011) .......... 13, 14

*Zhengzhou Harmoni Spice Co. v. United States,* 617 F.Supp.2d 1281 (CIT 2009) ..................... 14

**Statutes**

19 U.S.C. § 1516a ............................................................................................................... 4

19 U.S.C. § 1677a ............................................................................................................... 42

19 U.S.C. § 1677b ............................................................................................................... 4

19 U.S.C. § 2411 ................................................................................................................. 43

**Rules**

Fed. Rule Evid. 201 ....................................................................................................... 12, 29

**Regulations**

19 C.F.R. § 351.408 ........................................................................................................... 23

**Administrative Decisions & Publications**

*Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 28, 2021) (final results).............. 15, 41

*Aluminum Foil from China*, 83 Fed. Reg. 9282 (Mar. 5, 2018) (final determination) ................. 36

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997).............. 26, 38

*Chlorinated Isocyanurates from China*, 75 Fed. Reg. 70,212 (Nov. 17, 2010) (final results) 39-40

*Chlorinated Isocyanurates from China*, 81 Fed. Reg. 1167 (Jan. 11, 2016) (final results).......... 34

*Circular Welded Carbon-Quality Steel Pipe from Oman*, 86 Fed. Reg. 18,513 (Apr. 9, 2021) .. 44

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China, from China*, 84 Fed. Reg. 36,886 (July 30, 2019) (final results)............................................ 23

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China, from China*, 85 Fed. Reg. 62,275 (Oct. 2, 2020) (final results)......................................... 16, 25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China, from China*, 86 Fed. Reg. 72,923 (Dec. 23, 2021) (preliminary results)........................... 5, 6, 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 86 Fed. Reg. 58,871 (Oct. 25, 2021) (final results) ................................................................ 23

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 87 Fed. Reg. 38,379 (June 28, 2022) (final results) ........................................................... passim

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China*, 87 Fed. Reg. 48,621 (Aug. 10, 2022) (amended final results) ..................................... 1, 3, 7, 46

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China, from China*, 88 Fed. Reg. 1046 (Jan. 6, 2023) (preliminary results) ....................................... 20

*Diamond Sawblades and Parts Thereof from China*, 79 Fed. Reg. 35,723 (June 24, 2014) (final results) ............................................................................................................... 14, 41

*Diamond Sawblades and Parts Thereof from China*, 79 Fed. Reg. 40,062 (July 11, 2015) (final results) ................................................................................................................ 27, 40

*Diamond Sawblades and Parts Thereof from China,*, 85 Fed. Reg. 78,827 (Dec. 7, 2020) (final results) ........................................................................................................ 27, 28, 38

*Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. 38,985 (July 7, 2010) (final results) ..... 29, 30, 32

*Frozen Fish Fillets from Vietnam*, 85 Fed. Reg. 23,756 (Apr. 29, 2020) (final results) .............. 31

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from China*, 68 Fed. Reg. 53,347 (Sept. 10, 2003) (final results) ........................................................... 27, 28

*Hydrofluorocarbon Blends and Components Thereof from China,* 81 Fed. Reg. 42,314 (June 29, 2016) (final determination) ...................................................................................... 41

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8166 (Feb. 4, 2021) ......................................................................................................................... 4

*Laminated Woven Sacks from China*, 73 Fed. Reg. 35,639 (June 24, 2008) (final determination) ................................................................................................................................................. 32

*Large Residential Washers from Korea*, 82 Fed. Reg. 42,788 (Sep. 12, 2017) (final results) ..... 27

*Mattresses from China*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) (final determination) ............. 26, 32

*Mobile Access Equipment and Subassemblies Thereof from China*, 87 Fed. Reg. 9576 (Feb. 22, 2022) (final determination) ..................................................................... 35-36, 37

*New Pneumatic Off-the-Road Tires from China*, 80 Fed. Reg. 20,197 (Apr. 15, 2015) (final results) ................................................................................................................. 36, 37

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (Apr. 6, 2018) ................................................................................................................. 43, 44

*Passenger Vehicle and Light Truck Tires from Vietnam*, 86 Fed. Reg. 28,559 (May 27, 2021) (final determination) ............................................................................................ 36

*Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 62,914 (Oct. 17, 2022) ............................................... 42

*Seamless Refined Copper Pipe and Tube from China*, 82 Fed. Reg. 27,688 (June 16, 2017) (final results) ................................................................................................................ 36

*Silicon Metal from Russia*, 68 Fed. Reg. 6,885 (Feb. 11, 2003) (final determination)................ 24

*Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153 (Apr. 12, 2004) (final results) ................................................................................................................. 42, 43, 45

*Steel Concrete Reinforcing Bars from Turkey*, 68 Fed. Reg. 53,127 (Sept. 9, 2003) (final results) ................................................................................................................ 27

*Steel Nails from China*, 73 Fed. Reg. 33,977 (June 16, 2008) (final determination) .................. 39

## Other Authorities

Commerce Policy Bulletin 04.1 (Mar. 1, 2004).......................................................................... 29

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I, 1994 U.S.C.C.A.N. 4040....................................................... 43

Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinksolar (Shangrao) Co., Ltd. (collectively, "Jinko") submit this Brief to support their Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

This is an appeal from the final determination by the U.S. Department of Commerce, ("Commerce" or "Department") in the eighth administrative review ("AR8") of the antidumping duty ("ADD") order on *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules* ("*Solar Cells*")*, from the People's Republic of China* ("China"), 87 Fed. Reg. 38,379 (June 28, 2022), P.R. 464 ("*Final Results*"), as amended by *Solar Cells, from China*, 87 Fed. Reg. 48, 621 (Aug. 10, 2022), P.R. 473 ("*Amended Final Results*"). The *Final Results* covered the period of review ("POR") from December 1, 2019 to November 30, 2020. *Id.* The challenged determinations, findings, and conclusions are set out in Commerce's accompanying Issues and Decision Memorandum (June 21, 2022), P.R. 455 ("IDM").

## ISSUES OF LAW & ARGUMENT SUMMARY

**1. Did Commerce lawfully value solar glass using Romanian Harmonized Tariff Schedule ("HTS") 7007.19.80?**

No. Commerce should not have valued solar glass using Romanian HTS 7007.1980 and instead should have relied on HTS 7007.19.90 data from Malaysia, the primary surrogate country. The most significant attribute of Jinko's coating glass is its anti-reflective ("AR") coating. Malaysia HTS 7007.19.90 covers Jinko's coated glass; Romania HTS 7007.1980 does not. Commerce's rationale that the Romania subheading was more specific is based on a tariff misreading from the preceding review. When correctly construed, using information available in

the public realm, Malaysian HTS 7007.19.90 clearly is more specific to Jinko's input. In contrast, HTS 7007.1980 is an unsuitable choice – as Commerce correctly recognized in the subsequent AR9 review. Malaysian HTS 7007.19.90 superiority is not undermined by the cubic meter ("cum") unit of reporting, as the record contains all necessary cum to kg conversion information.

**2. Did Commerce lawfully value electricity?**

No. Commerce should not have used only peak hours reported from the Peninsular Malaysian Region. Commerce's improper exclusion of off-peak rates and Sabah/Sarawak rates, which resulted from improper speculation and a *de facto* adverse inference, led to a distorted SV calculation. Instead, to obtain the most accurate and representative SV, Commerce should have averaged the electricity industrial tariffs for factories corresponding to the highest voltage from all three regions in Malaysia for which data were available, for both peak and off-peak hours.

**3. Did Commerce lawfully value Jinko's Air Freight?**

No. Commerce should have used air freight rates from the International Air Transportation Association ("IATA"). Contrary to Commerce's finding, the route-specific air freight data was in fact publicly available on the record. The remaining IATA data also are publicly available per Commerce practice because they were obtained through a subscription service available to all. As the IATA data provides detailed information from the preeminent trade association, it constitutes the best available information.

**4. Did Commerce lawfully value Jinko's Ocean Freight?**

No. Commerce should have rejected Maersk data that represent price quotes from a single shipping company – contradicting its established policy to favor actual transaction-based prices that comprise a broad market average. Contrary to Commerce's claim, the rejected Descartes data, in fact, represent actual transactions, as confirmed by multiple Commerce

decisions in other proceedings. Alternatively, if this Court agrees that Commerce correctly relied on Maersk data, Commerce erred by not including the Drewry and Freightos data in its calculations. These data are more reliable than Maersk and provide the appropriate cost of ocean freight for Jinko's goods. Such averaging, which Commerce has relied on in prior proceedings, yields a broader market average SV, as required by Department practice.

**5. Did Commerce lawfully calculate surrogate financial ratios?**

No. Commerce unlawfully valued surrogate financial ratios using only JA Solar Malaysia SDN ("JA Solar"), instead of averaging that financial data with that of Flextronics Shah Alam SDN. BHD. ("Flextronics"). Contrary to Commerce's finding, Flextronics produces identical and comparable merchandise – as evidenced by the record and information in the public realm – and should not have been eliminated based on presumed tolling or smaller production volumes, factors that are unsupported by Commerce's practice. The Flextronics data are superior in terms of detail and disaggregation to the JA Solar data, and at the very least should have been averaged with the JA Solar data, in accordance with Commerce practice to rely on multiple financial statements whenever possible.

**6. Did Commerce lawfully deduct Section 301 duties from U.S. price?**

No. Commerce should not have deducted Section 301 duties paid by its importers from U.S. prices – as it did for Section 201 duties, in accordance with applicable precedent. There is no basis to distinguish these remedial, special duties intended to offset specific harm to domestic companies from Section 201 duties. Deducting 301 duties from U.S. prices constitutes improper double-counting.

## REASONS FOR CONTESTING THE DETERMINATION

Jinko's reasons for contesting the *Final Results/Amended Final Results* are set out below.

## STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). For decisions to be supported by substantial evidence, "Commerce may not base that determination 'on the basis of mere conjecture or supposition.' {19 U.S.C.} § 1677(7)(F)(ii). Commerce, as any agency, must 'cogently explain why it has exercised its discretion in a given manner.'" *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

"In valuing {FOPs, Commerce} . . . shall utilize, to the extent possible, the prices or costs of {FOPs} in one or more market economy countries that are – (A) at a level of economic development comparable to that of the nonmarket economy; and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4) (emphases added). Such "valuation . . . shall be based on the best available information regarding the values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1)(B).

## STATEMENT OF FACTS

Commerce, in February 2021, initiated AR8 of the ADD order on Solar Cells from China for designated exporters, including Jinko. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8166, 8172 (Feb. 4, 2021), P.R. 37. Jinko was selected as a

mandatory respondent that month. Respondent Selection Memorandum (Feb. 25, 2021), C.R. 5, P.R. 53. Jinko fully participated in AR8, submitting responses to Commerce questionnaires, including: Jinko's Section A & Appendix XI Questionnaire Responses (April 8, 2021), C.R. 77-106, P.R. 20-26 ("AQR"); and Jinko's Section D, E, Appendices XIII Additional Section D, and Double Remedies Responses (May 4, 2021), C.R. 186-268, P.R. 148-52 ("DEQR").

Jinko provided surrogate value ("SV") information to value the factors of production ("FOP") and calculate surrogate financial ratios that included:

- Malaysian HTS subheading 7007.19.9000 import data to value solar glass;

- IATA data to value air freight;

- Descartes, Drewry, and Freightos data to value ocean freight;

- Malaysian Investment Development Authority data to value electricity; and

- financial statements from Flextronics to calculate surrogate financial ratios.

Jinko First SV Submission (June 28, 2021), C.R. 314-51, P.R. 201-43, Exhibits 1, 2, 6, 9A-F, 10A-F, 11C; Jinko Final SV Submission (Aug. 3, 2021), C.R. 404-21, P.R. 304-20, Exhibits 1-2, 5A-F.

Commerce, in December 2021, issued its preliminary results of AR8, in which Jinko was assigned a 32.69% ADD rate. *Solar Cells from China*, 86 Fed. Reg. 72,923, 72,925 (Dec. 23, 2021), P.R. 408 ("*Preliminary Results*"). Preliminary Decision Memorandum (Dec. 16, 2021), P.R. 396 ("PDM"). Commerce preliminarily selected Malaysia as the primary surrogate market economy county for China, and generally used Malaysian SV information as the basis for normal value to calculate Jinko's ADD rate. PDM at 16-19, 23-28; Preliminary SV Memorandum (Apr. 16, 2021) ("Prelim SV Memo"), P.R. 403-04. Commerce preliminarily valued electricity using the rate at peak hours for high voltage customers in Peninsular Malaysia; and calculated

surrogate financial ratios using JA Solar's financial statements. Prelim SV Memo at 4, 9-10; Jinko Initial SV Submission Exhibits 6, 11A.

Commerce preliminarily valued solar glass using Romanian HTS 7007.19.90 data submitted by Defendant-Intervenor American Alliance for Solar Manufacturing ("Alliance"). Prelim SV Memo at 3, Alliance Pre-Preliminary Comments and Submission of SVs (Aug. 3, 2021), C.R. 424-35, P.R. 326-336 ("Alliance Final SV Submission"), Exhibit 9. To value Jinko's ocean freight, Commerce preliminarily used Maersk and Descartes data. Prelim SV Memo at 8; Alliance Ocean Freight SV Data (Dec. 8, 2021), P.R. 393, Exhibit 1.

Jinko in January 2021 submitted its case brief challenging aspects of the *Preliminary Results*. Jinko Case Brief (Jan. 31, 2022), C.R. 486-91, P.R. 424-28 ("Jinko Rejected Case Brief"). This brief was rejected by Commerce in May 2022 for allegedly containing untimely new factual information ("NFI"). *Id*. at 1, 17-25, 72-23, Attachments 2-3. Rejection Memorandum (May 25, 2022), P.R. 442. Jinko thereafter refiled its Case Brief with portions redacted and requested reconsideration. Jinko's Redacted Case Brief (May 27, 2022), C.R. 494-99, P.R. 446-50 ("Jinko Case Brief"); Jinko's Request for Consideration (May 26, 2022), P.R. 445. Jinko in its Case Brief and at a June 2022 hearing challenged the *Preliminary Results* with respect to, *inter alia*, Commerce's preliminary decisions to:

- value solar glass using Romanian HTS 7007.1980 instead of Malaysian HTS 7007.19.9000;

- value electricity using only peak hours reported from the Peninsular Malaysian region, instead of averaging that data with other Malaysian electricity data;

- value Jinko's air freight using Freightos data instead of IATA data;

- value Jinko's ocean freight using Maersk data;

- value financial ratios using only JA Solar data instead of averaging that data with Flextronics data; and

- deduct Section 301 duties from its U.S. price calculations.

Jinko Case Brief at 1-31, 50-62, 70-90; Hearing Transcript (June 1, 2022), P.R. 452 at 24-35.

Commerce declined to modify its *Preliminary Results* with respect to these issues in its June 2022 *Final Results*, assigning Jinko a 15.71% ADD rate. 87 Fed. Reg. at 38,380; IDM Comments 3, 8, 9, 22, 31. Jinko's final ADD rate was less than its preliminary rate because of Commerce's decisions on other issues raised by Jinko. Jinko's ADD rate increased to 20.99% in August 2022 when Commerce published its *Amended Final Results*, 87 Fed. Reg. at 48,621. Jinko initiated this appeal in July 2022. Summons (July 27, 2022); Complaint (Aug. 26, 2022). This Court, in September 2022, enjoined Jinko's AR8 entries from liquidation and consolidated Jinko's AR8 appeal with those of other respondents. Order (Sept. 2, 2022); Order (Nov. 2, 2022).

## ARGUMENT

### I. COMMERCE UNLAWFULLY VALUED ANTI-REFLECTIVE COATING GLASS

In its *Final Results*, Commerce valued Jinko's M_COATING_GLASS, an AR coated glass, using Romanian HTS 7007.1980, proposed by the Alliance, rather than Malaysian HTS 7007.19.90 proposed by Jinko. Preliminary SV Memo at 3. The competing HTS subheadings are:

- <u>Romania HTS 7007.19.80</u> – Toughened {Tempered} Safety Glass (Excl. Enamelled, Coloured Throughout The Mass, Opacified, Flashed Or With An Absorbent Or Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other). Preliminary SV Memo at 3; Alliance Final SV Submission Exhibit 9; and

- <u>Malaysia HS 7007.19.90</u> – Safety glass, consisting of toughened (tempered) or laminated glass. Toughened (tempered) safety glass: Other than Of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels: Other than Suitable for machinery of heading 84.29 or 84.30. Jinko Final SV Submission Exhibit 1.

Commerce advanced several reasons for selecting Romanian HTS 7007.1980. IDM Comment 3.

First, Commerce rejected Jinko's argument that the Romanian HTS 7007.19.80 exclusion of "Toughened {Tempered} Safety Glass . . . With An Absorbent Or Reflecting Layer," applied to Jinko's glass, reasoning that "the record does not support that the {AR} coating on Jinko's glass is the same as the toughened safety glass with an 'absorbent or reflecting layer' specifically excluded from Romanian HTS 7007.19.80." *Id*. at 17. Second, Commerce claimed authority to depart from its practice of valuing all inputs from the primary surrogate country (here, Malaysia), finding that the Malaysian glass average unit value ("AUV") data were unreliable. *Id*. at 18. Commerce supported this subsidiary rationale because, unlike the Romanian HTS 7007.1980 AUV reported on a per-Kg basis, the Malaysian HTS 7007.19.90 AUV was based on per-m$^2$ that according to Commerce could not be accurately converted to a per-Kg basis which was required to value Jinko's glass FOP (reported in Kg). *Id*. Finally, Commerce noted that it had relied on Romanian HTS 7007.19.80 in the sixth administrative review ("AR6"), based on the information provided by Consolidated Plaintiff Risen Energy Co. Ltd. ("Risen") in that review, and that "neither Jinko nor Risen provided evidence in this review showing a change in the coverage of Romanian HTS 7007.19.80 such that it no longer covers solar glass." *Id*. at 17.

Commerce's use of Romanian HTS 7007.19.80 is unsupported by substantial evidence and contrary to Department practice, as discussed below.

A.     **AR Coating is the Most Significant Product Specificity Attribute of Jinko's Coating Glass**

The essential linchpin of Commerce's decision was that the AR coating on Jinko's glass was not "the same as the toughened safety glass with an 'absorbent or reflecting layer' specifically excluded from Romanian HTS 7007.19.80." IDM at 17. This conclusion is not supported by record evidence.

The record in this case shows that Jinko's input M_COATING_GLASS is an ultra white

coated tempered glass. Jinko DEQR Exhibit AD-30. Jinko's "<u>Master Purchase Agreements</u>" with its customers provides that Jinko's "front glass" input has the following specificity attributes: "Anti-reflecting Coating, High Transmission, Low iron, Tempered Glass." Jinko AQR Exhibits A-8 & A-12. The glass' key feature is described as its: "Low-Light Performance" – "Advanced glass technology improves light absorption and retention." *Id*. Likewise, Jinko's "<u>Brochures</u>" confirm the identical specificity attribute of its "front glass": "Anti-reflecting Coating, High Transmission, Low iron, Tempered Glass." *Id.* Exhibit A-28; *see* Jinko Case Brief Attachment 4 (summarizing Jinko's Master Purchase Agreements and Brochures). Further, Jinko's "<u>User Manual</u>" reveals that it uses "PV modules with anti-reflection (AR) coating technology." Jinko DEQR Exhibit AD-28 at 3.

As such, Jinko's glass input undeniably has an AR or absorbent coating that improves the light absorption and retention capability of the glass, which is an essential prerequisite for Jinko's solar panel's optimal performance. Indeed, record evidence underscores the significance of the maximum initial receipt of sunlight and thereafter its retention by coated glass. To maximize the receipt of direct sunlight, Jinko's User Manual contains instructions for the installation of solar modules:

> Jinko Solar PV modules should be installed in a location where they will receive maximum sunlight throughout the year. . . .
>
> The PV module generates maximum output power when it faces the sun directly . . . where the PV modules are attached to a permanent structure, the tilt angle of the PV modules should be selected to optimize the performance based on seasonal load and sunlight.

*Id.* at 5-6.

Likewise, for bifacial modules, to maximize the receipt of indirect sunlight, Jinko's User Manual explains that "for different ground cover conditions, like snow, grass, desert, water surface, cement land and so on, the expectation generation energy gain varied from 4% to 24%."

*Id.* at 6. These energy gains, in turn, depend on the "reflectivity" of the ground surface. For example, since "the reflectivity of snow is 80-85%, generation energy will be increased by 17-24%." *Id.* In comparison, since "the reflectivity of water is 2-5%, generation energy will be increased by 4-7%." *Id.*

These facts establish that a solar module's power output is directly proportional to the amount of sunlight it receives and retains, which, in turn, is contingent upon the: (a) location of its installation; (b) tilt angle of glass surface; (c) reflectivity of the ground cover; and, finally, (d) the AR coating of the glass input. The record, therefore, confirms that AR coating constitutes a significant product specificity attribute of Jinko's coating glass input.

Significantly, the U.S. Court of Appeals for the Federal Circuit ("CAFC") in *Changzhou Trina Solar Energy Co. v. United States,* recognized that the coating on tempered glass used to produce solar modules imparts an AR or absorbent layer:

> **Trina advertising material describing Trina's module glass as "{anti-reflective} coated tempered glass**. . . . Examination of **other producers' publicly available data** indicated **use of "tempered glass" with "antireflection surface treatment"** . . . . Trina confirmed that there was no "significant difference between the glass referred to in" the publicly available information and "the glass Trina consumed during the {POR} to produce the subject merchandise."

975 F.3d 1318, 1331-32 (Fed. Cir. 2020) (emphasis added).

In sum, the glass input used by solar panel producers, including Jinko, is characterized by two signature properties:

    (a) tempered; and

    (b) coated with AR or absorbent layer.

Further, because AR coating is the most significant product specificity attribute of the glass input, its accurate valuation can be achieved only by relying on a data source covering such AR

coated glass.

### B.   <u>Romanian HTS 7007.1980 Does Not Cover Jinko's AR Coated Glass</u>

Romanian HTS 7007.19.80 expressly excludes AR coated glass:

Toughened {Tempered} Safety Glass (**Excl.** Enamelled, Coloured Throughout
The Mass, Opacified, Flashed Or **With An Absorbent Or Reflecting Layer**,
Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft,
Spacecraft, Vessels And Other.

Preliminary SV Memo at 3; Alliance Final SV Submission Exhibit 9 (emphases added).

The scope of residual subheading HTS 7007.19.80, "Other," is a sub-set of tempered

glass (other than automotive glass) ***other than***:

(a)  Enamelled; and

(b)  Coloured throughout the mass (body tinted), opacified, flashed or ***having an
absorbent*** or reflecting ***layer***.

As such, HTS 7007.1980 expressly ***<u>excludes</u>*** tempered *glass coated with an absorbent* or

AR *layer*. Since HTS 7007.1980 does not cover Jinko's AR layered glass it fails to satisfy

Commerce's paramount criteria of product specificity. *Taian Ziyang Food Co. v. United States*,

783 F.Supp.2d 1292, 1330 (CIT 2011) ("'product specificity' logically must be the primary

consideration in determining 'best available information.' If a set of data is not sufficiently

'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth

in Policy Bulletin 04.1.") (citing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,

29 CIT 288, 300 (2005)).

The publicly-available HTS 7007 breakouts in the Integrated Community Tariff

("TARIC") adopted by Romania provides detailed breakouts under HTS 7007.1980.[1]

---

[1] This information was provided in Jinko's Case Brief but Commerce improperly required Jinko
to redact it. *See* Section I.G, *infra* (explaining why this Court should consider this information).

| Romania - Chapter 70 - Glass and glassware | |
|---|---|
| **HTS Number** | **Description** |
| **7007** | **Safety glass, consisting of toughened (tempered) or laminated glass:** |
| | - Toughened (tempered) safety glass: |
| 7007.19.80 | - - - Other: |
| | - - - - Solar glass consisting of tempered soda-lime-flat-glass, with an iron content of less than 300 ppm, a solar transmittance of more than 88% (measured according to AM1,5 300-2500nm), a resistance to heat up to 250 degrees C (measured according to EN 12150), a resistance to thermal shocks of delta 150 K(measured according to EN 12150) and having a mechanical strength of 90 N/mm 2 or more (measured according to EN 1288-3): |
| | - - - - - Having no more than 4.5 mm of thickness: |
| 7007.19.80.12 | - - - - - - Uncoated |
| 7007.19.80.18 | - - - - - - Single or double-side coated |
| | - - - - - Other: |
| 7007.19.80.95 | - - - - Other |

These breakouts are judicially noticeable because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. Rule Evid. 201(b)(2); Notes 4-5, *infra*.

In addition to its express exclusion of absorbent layered glass, HTS 7007.1980 is distorted by a wide range of disparate glass products that are materially different from Jinko's AR layered, 2-4 mm thick glass. Jinko DEQR, Exhibit AD-9.

HTS 7007.1980 consists of the following two sub-subheadings:

- - - -　Solar glass consisting of tempered soda-lime-flat-glass (which is qualified by certain defined technical specifications)
- - - -　Other

The first sub-sub heading covers "solar glass" of a precisely defined technical specification. Because it is not layered by an absorbent material, this solar glass is distinguishable from Jinko's AR coated glass input. The second sub-sub heading – "Other" – covers glass other than solar glass of the said defined specification. As such, the Romanian HTS 7007.19.80 import data is a hybrid of: (a) solar glass; and (b) non-solar glass. **Critically, the**

**glass classified in both of these breakouts does not have an AR coating.**

Further breakouts under the first sub-subheading of HTS 7007.19.80 show that it is comprised of a sub-sub-sub heading covering glass with thickness up to 4.5 mm <u>and</u> another sub-sub-sub heading covering glass above 4.5 mm. Finally, the sub-sub-sub heading covering glass up to 4.5 mm thickness includes uncoated as well as single and double coated glasses.

In sum, the Romanian HTS 7007.19.80 is an unsuitable choice for Jinko's AR coated glass because it:

- excludes absorbent or AR coated glass, thereby failing the product-specificity criteria;

- includes non-solar glass;

- includes glass with thickness above 4.5 mm (*i.e.*, outside of Jinko's glass thickness range of 2-4 mm. Jinko DEQR, Exhibit AD-9); and

- includes double coated and uncoated glasses.

Therefore, HTS 7007.19.80 is a broad basket category which encompasses myriad disparate glasses that are distinguishable from Jinko's AR coated glass and which does not encompass any glass with an AR layer. Where "**the HTS heading**, **by definition, included materials that . . . {are} . . . not representative of the inputs** utilized by the manufacturer . . . calculating a {SV} on the basis of every material imported under the HTS heading . . . might well conflict with Commerce's obligation to use the best available evidence for its calculation of {SV}." *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1343 (Fed. Cir. 2011) (emphasis added); *see Longkou Haimeng Mach. Co. v. United States*, 33 CIT 603, 609 (2009) ("{I}f Commerce selects a particular set of data that is demonstrably unrepresentative . . . , a reasonable mind may rightly question how such a selection could be considered the 'best'").

Because HTS 7007.19.80 "by definition" excludes absorbent layer coated glass, this HTS

subheading covers goods that obviously are "not representative of the inputs utilized by" Jinko.

*Zhejiang Dunan Hetian*, 652 F.3d at 1343. Consequently, HTS 7007.19.80 import AUV does not

bear a rational and reasonable relationship to Jinko's AR coated glass input. *See Zhengzhou*

*Harmoni Spice Co. v. United States,* 617 F.Supp.2d 1281, 1297 (CIT 2009) ("The statutory

objective of calculating dumping margins as accurately as possible can be achieved only when

Commerce's choice as to what constitutes the best available *information evidences a rational*

*and reasonable relationship to the factor of production that it represents.*") (emphasis added).

　　To the contrary, because HTS 7007.19.80 covers the exactly opposite type of glass – *i.e.*,

glass not coated with an absorbent layer, "calculating a {SV} on the basis of every material

imported under the HTS heading . . . might well conflict with Commerce's obligation to use the

best available evidence for its calculation of {SV}." *Zhejiang Dunan Hetian*, 652 F.3d at 1343.

　　Established administrative practice and judicial precedent support the proposition that

where competing HTS subheadings mirror the bright line divisions of a critical product

specificity attribute underlying the goods, Commerce is required to value the input based on the

HTS subheading that covers that attribute. Examples include:

- chemical composition: alloy steel v. non-alloy steel. *Diamond Sawblades and Parts Thereof from China* ("*DSB*"), 79 Fed. Reg. 35,723(June 24, 2014) (final results), IDM Comment 17 (selecting HTS subheadings specific to alloy hot-rolled and non-alloy cold-rolled steel inputs);

- cross-section profile: hot rolled steel v. cold rolled steel. *Peer Bearing Co.-Changshan v. United States*, 914 F.Supp.2d 1343, 1349-50 (CIT 2013) (Commerce's SV "was unsustainable without a finding of fact, supported by substantial record evidence, that the input being valued was not of a circular cross-section.");

- diameter: *Vulcan Threaded Prods. Inc. v. United States*, 311 F.Supp.3d 1357, 1364-65 (CIT 2018) ("Commerce selected the Bulgarian data, in part, because they were more specific with regard to diameter for steel wire rod."); and

- thermal property: higher heat value coal v. lower heat value coal. *Activated Carbon from China*, 86 Fed. Reg. 73,731-02 (Dec. 28, 2021) (final results), IDM Comment 4 ("As HTS 2701.19 is for heat values below 5,833 kcal/kg, it is necessarily more product-specific than HTS 2701.12. As the bituminous coal used . . . supplier fit that singular criterion, we will use HTS 2701.19 to value the mandatory respondents' bituminous coal").

Determining how merchandise should be categorized is a mixed question of law and fact:

Classifying articles under the HTSUS is a two-step process. A court first determines the proper meaning of specific terms in the tariff provisions, which is a question of law that we review without deference. *Otter Prods.*, 834 F.3d at 1375. Next, the court determines under which subheading the subject merchandise is most appropriately classified, which is a question of fact that we review for clear error. *Id.* But when, as here, there is no dispute as to the nature of the merchandise, the two-step classification analysis "collapses entirely into a question of law." *Id.*

*Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed. Cir. 2018) (Internal citations omitted.)

Here too, the question of fact – that Jinko's AR layered glass input's most essential attribute is its AR or absorbent layer coating – is undisputed. Thus, the categorization of this input "collapses entirely into a question of law" – *i.e.*, based on the correct interpretation of the scope of HTS 7007.1980. *Id.*

In sum, Commerce's selection of Romanian HTS 7007.19.80, which, by its terms, excludes glass containing an absorbent layer of coating, is contrary to controlling administrative practice and judicial precedent.

## C.    <u>Commerce's Rationale for Selecting HTS 7007.1980 Cannot be Sustained</u>

Commerce's initial rationale for selecting Romanian HTS 7007.19.80 is that in AR6 Commerce selected this subheading primarily based on its opinion that it was more product specific than Malaysian HTS 7007.19.9000:

Bulgaria and Romania HTS 7007.19.80 covers tempered glass used in solar panels; the specific type of glass used by solar panel producers. In contrast, Malaysia HTS 7007.19.9000 is broader, covering all types of tempered glass other than automotive glass.

*Solar Cells from China*, 85 Fed. Reg. 62,275 (Oct. 2, 2020) (final results), IDM ("AR6 IDM") at 26. This rationale was premised on an incorrect interpretation of HTS 7007.1980 scope language as "solar glass consisting of tempered soda-lime-flat-glass. . . having no more than 4.5 millimeters (mm) of thickness." *Id.* at 24.

Romanian HTS 7007.19 breakouts, Section I.B *supra* show that HTS 7007.19.80 expressly excludes "Toughened {Tempered} Safety Glass **With An Absorbent Layer**" – *i.e.*, Jinko's AR coated glass input. *Id*. Further, HTS 7007.19.80 is comprised of two sub-sub headings:

    - - - -   **Solar glass consisting of tempered soda-lime-flat-glass** . . . .

    - - - -   Other.

The first sub-sub heading, in turn, is broken down into two sub-sub-sub headings:

    - - - - - **Having no more than 4.5 mm of thickness**

    - - - - - Other.

In AR6, Commerce improperly construed the scope of Romanian HTS 7007.19.80 sub-heading by arbitrarily amalgamating the above two highlighted line items, situated at different levels of disaggregation. Through this flawed construction combining one cherry-picked sub-sub heading and one sub-sub-sub heading covered under HTS 7007.19.80 sub-heading (while ignoring the remaining sub-sub and sub-sub-sub headings), Commerce misconstrued the scope of HTS 7007.19.80 as "solar glass consisting of tempered soda-lime-flat-glass . . . having no more than 4.5 mm of thickness." AR6 IDM at 24.

Commerce incorrectly presumed that the first sub-sub heading covering solar glass encompassed the entirety of HTS 7007.19.80. Commerce overlooked the fact that the other sub-sub heading ("Other") covers glass other than those used for solar application. As such, the

Romanian HTS 7007.19.80 import data encompasses both solar glass <u>and</u> non-solar glass. In addition, the first sub-sub heading of HTS 7007.19.80 is subdivided into glass with thickness up to 4.5 mm <u>and</u> glass above 4.5 mm.

Accordingly, Romanian HTS 7007.19.80 is not limited to solar glass; it is also not limited to glass with thickness up to 4.5 mm (Jinko's glass thickness range); rather, HTS 7007.19.80 is a broad basket sub-heading comprising of myriad types of solar and non-solar glass of all thickness levels – none of which has an AR-coating.

Commerce's alibi that "neither Jinko nor Risen provided evidence in this review showing a change in the coverage of Romania HTS 7007.19.80 such that it no longer covers solar glass," IDM at 17, was a direct result of its unlawful redaction of publicly available and administratively noticeable Romanian HTS 7007.19 excerpts that Jinko provided in its case brief. Section IE, *infra*. Therefore, contrary to Commerce's AR6 finding and based on the AR8 record, Romanian HTS 7007.19.80 is not a product-specific subheading for Jinko's AR coated glass input and, consequently, should have been disqualified as a SV choice to value Jinko's absorbent layer.

Commerce's second rationale is that "the EU maintains trade remedy orders against solar glass imports from China which specifically reference HTS 7007.19.80 as the HTS for solar glass." IDM at 17. This basis is meritless in the context of AR coated glass because solar glass with an AR coating is expressly excluded from HTS 7007.1980.

Third, Commerce asserts that "the record does not support that the anti-reflective coating on Jinko's glass is the same as the toughened safety glass with an 'absorbent or reflecting layer' specifically excluded from Romanian HTS 7007.19.80." *Id*. To support this rationale, Commerce advanced two interrelated justifications.

Commerce claimed that the other excluded glass types in HTS 7007.19.80, *i.e.*,

"Enameled, colored, opacified (made opaque), and flashed (colored), are all treatments to the glass that limit the amount of light that passes through the glass." *Id*. Commerce, however, did not provide any evidentiary support for this claim. Consequently, Commerce's threshold premise that all other excluded glass types share the attribute of "light limiting glass treatment{}" is not supported by substantial evidence. Commerce's related subsidiary justification is that "'absorbent or reflecting layer' is listed in the HTS exclusion with other light limiting glass treatments, and given the plain meaning of absorbent (*i.e.*, something that takes in without releasing) and reflecting (*i.e.*, to cast back from a surface), the record indicates that the 'Absorbent Or Reflecting Layer' identified in the description of Romanian HTS 7007.19.80 is not the same as the anti-reflective coating on Jinko's glass which acts to increase the amount of light passing through the glass." IDM at 17-18.

Commerce's attempt to contrast Jinko's AR coating from the absorbent layer exclusion in HTS 7007.1980 is without merit for several reasons:

(1) The AR layer on Jinko's glass input is synonymous with and identical to an absorbent layer provided in the exclusion.

(2) Since "absorbent" and "reflecting" layer coatings enumerated in the exclusion are polar opposites, they *ipso facto* cannot share a common alleged attribute of "light limiting glass treatment." This fact, in turn, impeaches the previous subsidiary rationale that vainly attempts to tie disparate glass coatings by a common underlying "light limiting glass treatment" attribute.

(3) Commerce's premise that an "absorbent" coating limits the amount of light passing through the glass is directly contrary to the experiences of Jinko as well as other solar panel producers. *See Changzhou Trina*, 975 F.3d at 1331-33. Moreover, this finding lacks record support. To the contrary, because an absorbent coating enhances the amount of light initially absorbed, the amount of light passing through the glass is augmented instead of being limited.

(4) Contrary to Commerce's presumptions, "absorption" of light by glass and its onward "transmittance" to the cells underneath are not in opposition; rather they are complementary and mutually reinforcing phenomena. In other

words, absorption of light by an AR glass is a necessary pre-condition for its onward transmittance to the solar cells. The record does not support the conclusion that the purpose of absorption of light rays is to simply store it within the AR glass.

In sum, the record is devoid of evidence supporting Commerce's new twin subsidiary rationale to distinguish Jinko's AR coated glass from the excluded absorbent layered glass in HTS 7007.19.80.

Commerce's fourth rationale is that "given the specificity {by thickness} of the Romanian imports to solar glass, and the fact that no conversion is required in order to use the value of the Romanian imports to value solar glass, we find that the Romanian data yield a more reliable SV." IDM at 19. However, again, because HTS 7007.19.80 is distorted by thickness levels (>4.5 mm) outside of Jinko's glass thickness range (<4.5 mm), this rationale is directly contradicted by substantial record evidence. Section I.B, *supra*. Moreover, since the AR coating product-specificity criteria impeaches the choice of Romanian HTS 7007.19.80, the fact that a subsidiary criterion – the quantity unit of reporting – arguably favors Romania, is unavailing.

Commerce and reviewing courts have held that "if a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria" – including whether the per-unit quantity reporting of SV conforms to the FOP reporting. *Taian Ziyang*, 783 F.Supp.2d at 1330. For these reasons, Romanian HTS 7007.19.80 fails to qualify as a viable choice to value Jinko's AR coated glass input.[2]

In sum, Commerce's selection of HTS 7007.1980 for AR layered glass input in both AR6

---

[2] While Jinko used only one type of glass input, *i.e.*, M_COATING_GLASS which is an AR coated and tempered glass, Risen used two types of glass inputs: M_CGLASS (Coated glass); and M_TGLASS (Tempered glass). Risen DEQR (Apr. 30, 2021), C.R. 107-85, P.R. 147, Exhibit D-7. Risen further reported that for dual glass modules, the back material it used was uncoated tempered glass (M_TGLASS); Risen SQR (June 21, 2021), C.R. 294-311, P.R. 179, at 2-3. Such uncoated tempered glass could be potentially covered in Romanian HTS 7007.1980. In contrast, coated tempered glass like Jinko's M_COATING_GLASS is expressly excluded from Romanian HTS 7007.1980.

and AR8 is unsupported by substantial record evidence.

### D.    Commerce in AR9 Did Not Use HTS 7007.1980

Commerce in the subsequent, ninth administrative review ("AR9") preliminarily

jettisoned HTS 7007.1980 when valuing similar AR coated glass based on Bulgarian import

data. *Solar Cells from China*, 88 Fed. Reg. 1046 (Jan. 6, 2023) (preliminary results), Prelim SV

Memo (Dec. 30, 2022), ACCESS Barcode 4331360-01, at 3, Attachment I Tabs: "SVSummary";

"Glass HTS Raw Data"; "Glass HTS Excluded Removed."

Since Bulgarian and Romanian HTS 7007 have identical breakouts as both are

harmonized with the EU TARIC schedule, Commerce's AR9 rejection of Bulgarian HTS

7007.19.80 supports Jinko's arguments to reject Romanian HTS 7007.19.80 in AR8.

### E.    The Superior Product-Specificity of Malaysian HTS 7007.19.9000 is Not Undermined By Unit Reporting

Commerce discarded Malaysian HTS 7007.19.9000 data based on its unit of reporting in

$m^2$ instead of Kg. IDM at 18. Commerce's cursory rejection of the Malaysian data based on a

subsidiary criterion is unsupported by record evidence. The residual Malaysian HTS

7007.19.9000 residual subheading covers:

> Safety glass, consisting of toughened (tempered) or laminated glass. Toughened
> (tempered) safety glass: Other than Of size and shape suitable for incorporation in
> vehicles, aircraft, spacecraft or vessels: Other than Suitable for machinery of
> heading 84.29 or 84.30.

Jinko Final SV Submission Exhibit 1. It excludes tempered glass used in two applications:

(a) automotive sector; and (b) machineries of heading 84.29 or 84.30. *Id*.

Since Jinko's tempered AR coated glass is used in solar panels, instead of vehicles or

specified machineries, Malaysian HTS 7007.19.9000 is demonstrably product-specific.

Therefore, in contrast to Romanian HTS 7007.19.80, Malaysian HTS 7007.19.9000 affords a

reliable SV to value Jinko's AR coated tempered glass input.

At a minimum, when both datasets are imperfect, Commerce must "conduct a fair comparison of the data sets on the record." *Allied Pacific Food (Dalian) Co. v. United States*, 435 F.Supp.2d 1295, 1313-14 (CIT 2006). This Court cautions that:

> To support a {SV} with substantial evidence, Commerce "must do more than simply identify flaws in the data sets it rejects." *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 1412, 1417 . . . (2006); *see also Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 495 . . . (2004) (noting that Commerce errs by "discard{ing} the alternatives as flawed" without "evaluat{ing} the reliability of its own choice"). "Commerce must also apply the same criteria to the data upon which it relies, and explain how the preferred data meet these criteria, or why a given criterion should not apply to the preferred data." *Guangdong Chems.*, 30 CIT at 1417 . . . .

*Xiamen Int'l Trade & Indus. Co. v. United States*, 953 F.Supp.2d 1307, 1316 (CIT 2013).

In its *Final Results*, Commerce overlooked the fact that the Romanian data was fundamentally flawed as it was not specific to the absorbent coated glass input. Consequently, Commerce erred by resorting to a disjunctive analysis rather than the judicially mandated conjunctive "side-by-side" comparative analysis of available data choices and "explain, why, on the whole," despite "different flaws," one was "a better source." *CP Kelco US, Inc. v. United States*, 2016 WL 1403657, *2 (CIT Apr. 8, 2016) ("Commerce, by bifurcating its analysis into two steps, end-ran its obligation to base its decision in substantial evidence. . . . Given that both sets of financial statements had different flaws, Commerce 'should have compared the two side-by-side.'").

A conjunctive evaluation of the Romanian and the Malaysian SV choices reveals that Malaysian HTS 7007.19.9000, while reported in terms of per-m$^2$ instead of per-Kg, specifically covers Jinko's absorbent or AR coated glass input. Unlike Romanian HTS 7007.19.80, it satisfies Commerce's critical product-specificity criteria. Moreover, the record contains reliable information to accurately convert the per-m$^2$ Malaysian SV into the equivalent per-Kg SV.

Specifically, the record contains detailed dimensional specifications, *i.e.*, length and width (and therefore the $m^2$ surface area) of each of the coated glass input grades Jinko used. Jinko DEQR Exhibit AD-9; Jinko Case Brief Attachment 4 (providing a detailed computation of the average conversion factor of 7.19 kg-per $m^2$ for the coated glass Jinko used during the POR).

This conversion factor is corroborated by the conversion factor underlying the Romanian import data. Jinko established that glass imported in Romanian HTS 7007.19 and 7007.19.80 had an average conversion factor of 7.88 Kg per $m^2$ – in the same range as Jinko's conversion factor of 7.19 Kg per s $m^2$. Jinko Case Brief Attachment 5. This fact demonstrates that Jinko's coating glass input had similar weight to surface area correlation as the glass internationally traded during the POR. It is reasonable to infer, therefore, that the Malaysian imported glass, being a subset of internationally traded glass, would exhibit a similar weight to surface area correlation. This fact confirms that Jinko's Kg-to-$m^2$ conversion factor can be reliably applied to the Malaysian per sqm SV data. Applying Jinko's conversion factor to the Malaysian SV of 21.18 RM/ $m^2$ yields an equivalent SV of <u>2.95 RM/Kg</u>. Thus, Malaysian HTS 7007.19.900 is not only product-specific to Jinko's absorbent layer coated glass input, but also yields a SV on an accurate and reliable per-Kg basis, consistent with the unit of FOP reporting.

The discussion above refutes Commerce's claim that "there is nothing on the record of this review indicating that the weight per square meter of glass imported into Malaysia during this POR is in any way comparable to that of the glass imported into Romania used in Jinko's comparison or to that of Jinko and Risen." IDM at 18. Moreover, the proposed conversion methodology is consistent with Commerce action in the seventh administrative review ("AR7") of the ADD Order on Solar Cells from China:

> All of the {SVs} for glass that are on the record are expressed in a price per square meter. However, Risen reported the precise weight of a square meter of the

tempered glass that it consumed. Risen based this weight on its POR inventory records, which reconcile to its income statements. The glass that we are valuing was consumed by Risen. Thus, while the weight of a square meter of the glass imported into Malaysia during the POR is not on the record of this review, **we have a very complete and accurate measurement of the weight of a square meter of the solar glass consumed by Risen**. This is the only relevant conversion formula on the record and, as noted above, **there are no glass {SVs} on the record that are expressed in a price per weight**. Hence, we used the best available information in valuing glass.

*Solar Cells from China*, 86 Fed. Reg. 58,871 (Oct. 25, 2021) (final results), IDM Comment 11

(emphases added).

Likewise, the AR8 record contains only one product-specific SV choice for AR coated glass – Malaysian HTS 7007.19.9000 – and "there are no glass {SVs} on the record {encompassing products with the critical absorbent physical characteristic} that are expressed in a price per weight." *Id*. In addition, as was the case in AR7, the AR8 record affords a "complete and accurate measurement of the weight of a square meter of the solar glass consumed by {Jinko}." *Id*. Therefore, Commerce should apply the same methodology used in AR7 to obtain the SV of Jinko's absorbent coated glass based on Malaysian HTS 7007.19.9000.

In sum, Malaysian HTS 7007.19.9000 proffers not only a qualitatively superior (*i.e.*, product-specific) and reliable SV choice but also one that is reported from within the primary surrogate country. Section I.G, *infra*.

### F.    Malaysia is the Primary Surrogate Country

Malaysian HTS 7007.19.9000 is favored over Romanian HTS 7007.19.80 by Commerce's regulatory preference that it "normally will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2). "{I}t is Commerce's well-established practice to rely upon the primary surrogate country for all surrogate values, whenever possible, and to **only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable**." *Solar Cells from China*, 84 Fed. Reg. 36,886 (July 30, 2019), IDM Comment 13

(emphasis added). The exceptional conditions required to apply SV data from Romania, a secondary surrogate country, are not triggered here. Section I.A-F, *supra*. In AR8, valuing Jinko's absorbent coated glass using Malaysian HTS 7007.19.9000 results in applying SV data which is product-specific and reliable. In contrast, Romanian HTS 7007.19.80 fails product-specificity since it does not encompass Jinko's absorbent coated glass. Moreover, it is also broad based (not limited to solar glass), and accordingly is unreliable.

Judicial precedent supports the Department's single country regulatory preference, especially when the primary surrogate country SV data is qualitatively superior. *See, e.g., Jiaxing Bro. Fastener Co. v. United St*ates, 11 F.Supp.3d 1326, 1332-33 (CIT 2014) ("The administrative record contained available, but imperfect, surrogate data for all major inputs sourced from both Thailand and the Philippines . . . . When comparing the carbon content of steel contained in the Thai and Philippine import data to the carbon content of the steel wire rod input Plaintiffs actually used, however, Commerce found that the Thai data turned out to be more specific to Plaintiffs' steel inputs than the Philippine data. . . . The Thai steel data's superior quality therefore supports Commerce's choice of Thailand as the primary surrogate country and Commerce's use of Thai data to calculate Plaintiffs' normal value.").

Even if Romanian SV data was deemed comparable to the Malaysian SV data (which it is not), Commerce policy supports selecting Malaysian data rather than Romanian SV data. *See, e.g., Silicon Metal from Russia*, 68 Fed. Reg. 6,885 (Feb. 11, 2003) (final determination), IDM Comment 7 ("The Egyptian rail rate is also comparable to the South African rail rate submitted by respondents. While there is a Thai rail rate on the record, since we have a useable rail rate from Egypt, our primary surrogate country, we have continued to use this value for the final determination.")

In sum, Commerce should have relied on Malaysian HTS 7007.19.9000 because it proffers the best available information on the record to value Jinko's absorbent coated glass input. Additionally, relying on Malaysian data is consistent with Commerce's regulatory preference to value all FOPs in the primary surrogate country, Malaysia.

### G. Commerce Improperly Decided that the Scope of Romania HTS 7007.19.80 was New Factual Information

In AR8, Commerce refused to consider Jinko's analysis of the scope of Romania HTS 7007.19.80, reasoning that the text of Romania HTS 7007.19.80 was NFI not previously on the record. Rejection Memorandum. Commerce's characterization of these breakouts as NFI was wrong. As an initial matter, the Romanian HTS 7007 breakout referenced by Jinko is publicly available since it can be directly downloaded from ACCESS in AR6. Specifically, Commerce's source, AR6 IDM n.104, for Romanian HTS 7007.19 tariff breakouts, was Risen's January 2, 2020, SV Submission Exhibit SV2-5, which is publicly available on Commerce's ACCESS through Barcode 3926048.[3]

The Romanian HTS 7007.19 tariff breakouts available on the AR6 record mirror those excerpted from the TARIC database, specified above. Section I.B, *supra*. TARIC database is also publicly available,[4] and HTS 7007.19 breakouts can be accessed following certain steps:[5]

Judicial precedent supports taking judicial notice of the publicly-available tariff

---

[3] This Court can and should take judicial notice of documents posted on Commerce's ACCESS website. *See, e.g.*, *Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312, 1327 (CIT 2016) (relying on SV memorandum from preceding review by citing its ACCESS barcode number).

[4] Available at https://ec.europa.eu/taxation_customs/business/vat/telecommunications-broadcasting-electronic-services/content/romania_en.

[5] This result is obtained using the following steps:
  1. Under "Online Services," Click on TARIC (Integrated Community Tariff)
  2. Under "Goods Code" box, type 700719 and Click on "Browse the Nomenclature".
  3. Click on "70071980 - - - Other"
  4. Click on the first 4-dash breakout under "70071980 - - - Other."
This results in two 5-dash breakouts and under the first 5-dash breakout, two 6-dash breakouts.

provisions to arrive at the correct classification. In *Xiping Opeck Food Co. v. United States*, this Court supported its findings by taking judicial notice of the full HTS description:

> {B}ecause . . . Commerce provided only a narrative description of the products TARIC subheading 0306.39.10 . . . covers, the determination was unsupported by substantial evidence. . . . It is well established that courts may take judicial notice of the texts of statutes both domestic and foreign. *See, e.g., Micron Tech., Inc. v. United States*, 31 C.I.T. 2031, 2038 n.9 . . . (2007) (taking judicial notice of Korean law). The court, having done so, finds that Commerce's claims of the contents of the products described by TARIC subheading 0306.39.10 . . . are supported by substantial evidence.

551 F.Supp.3d 1339, 1350-51 (CIT 2021) (footnote omitted). The CIT undertook steps to access the online TARIC Database. *Id.* at 1347 n.17. HTS 7007, available on the European Commission TARIC website, is likewise judicially noticeable. Note 4-5, *supra*.

Further, identical scope language for Romanian HTS 7007 breakouts is provided in WorldTariff,[6] a subscription-based database that Commerce considers publicly available. *See Mattresses from China*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) (final determination), IDM Comment 7 (a subscription service is publicly-available when "{t}here is no evidence on the record indicating that the subscription service is not available to the public at large").

Commerce, when enacting its regulations, enunciated its policy that certain information may be presented any time that arguments are solicited: "**In making their arguments, parties** . . . **may draw on information in the public realm**." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,332 (May 19, 1997) ("*Final Rule*") (emphasis added). Accordingly, Commerce has held that:

> Exhibit 1 of Huarong's case brief is a compilation of information in the public realm, in the format of a chart. Respondents state that they obtained their **statistics from the International Trade Commission (ITC) website, the Department's Subsidies Enforcement Office, and the USTR's NTE Reports.**

---

[6] WorldTariff, available at www.worldtariff.com, is a global online database for HTS classification numbers and tariff descriptions covering over 208 countries.

> **These sources are in the public realm, and Huarong uses the sources to "highlight perceived inaccuracies.**" *Id.* **The Department does not consider this to be {NFI} under the Department's regulations**.

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from China*, 68 Fed. Reg. 53,347 (Sept. 10, 2003) (final results) ("*HFHT*"), IDM Comment 16 (emphasis added).

Likewise, in *Steel Concrete Reinforcing Bars from Turkey*, Commerce held that it "views **ICDAS's citation to publicly available Turkish GAAP requirements** as a reference to information in the public realm rather than as the submission of {NFI}." 68 Fed. Reg. 53,127 (Sept. 9, 2003) (final results), IDM Comment 13 n.9 (emphasis added). In *Large Residential Washers from Korea* Commerce reached the same result:

> As we explained in response to LGE's allegation**, the number of states that comprise the divisions established by the U.S. Census Bureau are widely understood and publicly available.** Accordingly, the Department does not consider this type of information to be new factual information.

82 Fed. Reg. 42,788 (Sep. 12, 2017) (final results), IDM Comment 1 (emphasis added).

These decisions reveal that Commerce's settled practice is to accept as reference materials in a case brief publicly available tariff schedules, whose provenance is unimpeachable, even when these statutory provisions had not been previously placed on the record. Commerce itself cites to similar data sources such as ITC publications that are not on the record by stating that the documents "**can be accessed directly**" on the agency website. *DSB from China*, 85 Fed. Reg. 78,827 (Dec. 7, 2020) (final results), IDM n.13; *DSB from China*, 79 Fed. Reg. 40,062 (July 11, 2015) (final results), IDM n.8 (emphasis added).

Judicial precedent supports Commerce's practice. In *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, this Court expressly rejected Commerce's decision that Explanatory Notes ("ENs") to the Harmonized System of Nomenclature ("HSN") published by the World Customs Organization ("WCO") constituted NFI:

> **Commerce was wrong to reject the case brief with the EN references** . . . . **As a legal reference** on the interpretation of the GIRs and the HS nomenclature, including the scope of headings and six-digit subheadings, **the WCO's Explanatory Notes are in this context essentially no different than any other legal reference a party may cite in a case brief before Commerce or argue before a court, such as a statute, judicial precedent, or restatement of the law**. For these reasons, the court concludes that **Commerce misapplied its regulation in rejecting Senmao's case brief**.

322 F.Supp.3d 1308, 1324 (CIT 2018) (emphases added). This Court further references non-record documents such as Commerce's SV memoranda from ACCESS. *Calgon*, 145 F.Supp.3d at 1327 (CIT 2016).

This administrative and judicial precedent establishes that the Romanian HTS 7007.19 breakouts were properly briefed. Jinko Rejected Case Brief Attachments 2 (available on ACCESS), 3 (published by WorldTariff). Such information qualified as the type whose provenance is unquestionable and which "can be accessed directly" from agency websites. *DSB from China*, 85 Fed. Reg. 78,827, IDM n.13 Jinko properly appended the Romanian HTS 7007.19 breakouts as "an international legal reference essential to the proper interpretation of" HTS 7007.19.80, and to "draw on information in the public realm to highlight any perceived inaccuracies in" the AR6 IDM. *Senmao*, 322 F.Supp.3d at 1324; *HFHT from China*, 68 Fed. Reg. 53,347, IDM Comment 16.

In sum, Commerce improperly rejected Jinko's Romanian HTS 7007.19 breakouts, especially since this information was on the AR6 record. Even if this information were not on the AR6 record, this Court can and should take judicial notice of Romanian HTS 7007.19 breakouts from TARIC website whose provenance cannot be questioned. Fed. Rule Evid. 201(b)(2); Notes 4-5, *supra*.

To conclude, Commerce should have valued Jinko's AR coated glass input by using Malaysian HTS 7007.19.9000 instead of Romanian HTS 7007.1980.

## II. COMMERCE UNLAWFULLY VALUED ELECTRICITY

In its *Final Results*, Commerce valued electricity based only on the high voltage peak hour electricity rates and limited to Peninsular Malaysia region. IDM at 59-60. Conversely, Commerce declined to use rates reported for off-peak hours and from the geographical region of Sabah and Sarawak. *Id*. Commerce's choice is unsupported by substantial evidence and not in accordance with law as set forth below.

Commerce's practice is to select a SV that is "specific to the input in question." Commerce Policy Bulletin 04.1 (Mar. 1, 2004); *Frozen Fish Fillets from Vietnam* (final results), 75 Fed. Reg. 38,985, 38,986 (July 7, 2010). An electricity price is specific to Jinko if it mirrors the type of electricity Jinko consumes. In its normal course of business, Jinko manufactures goods 24 hours a day – *i.e.*, it consumes electricity at both peak and off-peak hours. As such, an electricity SV choice for a round-the-clock operational factory would fulfill the specificity criteria only if the electricity tariff rates reported in "Industrial tariffs – for factories" are included for <u>both</u> peak and off-peak hours. Jinko First SV Submission Exhibit 6.

To support its peak hour rate limitation, Commerce's rationale is "that peak hour electricity rates are in effect for the majority of the day in all of the regions" and that there is an "absence of any information regarding the hours of Jinko and Risen's operations." IDM at 60. Commerce fails to explain how excluding the off-peak hour rates, in effect for the remaining part of the day, does not result in a distortive SV calculation. Further, since it did not require Jinko to report its hours of operations, Commerce unlawfully drew a "*de facto* adverse" inference that Jinko operated during only peak hours. *Calgon Carbon Corp. v. United States*, 35 CIT 234, 244 (2011). Consequently, Commerce improperly excluded the off-peak hours tariff from SV calculation.

Likewise, Commerce supports its regional limitation through speculative presumptions

from certain record facts that: "Jinko Solar Malaysia, is located on peninsular Malaysia"; "Sabah and Sarawak regions are on the island of Borneo, not peninsular Malaysia"; and "**it is not clear** that solar cell and module manufacturers would be located in these **relatively remote regions**," since "rates for the **Sabah and Sarawak regions do not include high voltage industrial rates**." IDM at 59 (emphasis added).

Commerce's strawman employment of Jinko Solar Malaysia's regional location to delimit the boundaries of the surrogate country to Peninsular Malaysia, excluding Sabah and Sarawak regions, is based on conjecture. "**It is well established that speculation does not constitute substantial evidence**." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009) (emphasis added) (internal citation omitted). Similarly, Commerce fails to cite any record evidence to support its conclusion that only the high voltage industrial tariff should be applicable to Jinko. Therefore, Commerce errs by improperly excluding Sabah and Sarawak rates from its SV calculation, which results in a SV that fails to "represent{s} a broad market average." *Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. at 38,986.

In sum, Commerce's improper exclusion of off-peak rates and Sabah/Sarawak rates results in a distorted SV calculation. Instead, to obtain the most accurate and representative electricity SV, Commerce should have taken a simple average of the electricity industrial tariffs for factories corresponding to the highest voltage from all three regions for both peak and off-peak hours, resulting in 22.88 Sen/Kwh. Jinko Case Brief at 52. Alternatively, Commerce could have reasonably addressed its concerns regarding unequal peak and off-peak hours by computing the SV by weight-averaging the peak and off-peak rates from all three regions. *Id*.; IDM at 60.

### III.  COMMERCE UNLAWFULLY VALUED AIR FREIGHT

In its *Final Results*, Commerce valued air freight using Freightos data. IDM Comment 9. Commerce rejected IATA data because the vast majority of such "data were treated as

proprietary information on the record of this review," and "the only public IATA information

on the record is a monthly average of its rates," which "contains no details about the rates and

no details about how the data were obtained." *Id*. at 43.

This Court should reverse Commerce's decision. Contrary to Commerce's claim, the

route-specific Shanghai-Atlanta monthly air freight data was publicly disclosed. Initially,

Jinko had submitted these data as a business proprietary information ("BPI"). Jinko First SV

submission Exhibit 9A – as required by its agreement with IATA. *Id*. Exhibit 9E. However,

after receiving IATA's consent, Jinko resubmitted the monthly Shanghai-Atlanta IATA air

freight data as public information. Jinko Final SV Submission Exhibit 5A.

The comprehensive data underlying the IATA analysis are readily available, for a fee, to

any person. *Id*. Exhibit 5A-D; Jinko First SV Submission Exhibit 9A-D. Jinko submitted this

IATA report for review by Commerce officials and by counsel for all interested parties subject to

an administrative protective order. Jinko Final SV Submission Exhibit 5A-D; Jinko First SV

Submission Exhibit 9A-D. Thus, Commerce and counsel had the right to analyze these data in

the same manner as they analyze all BPI. Alliance's counsel could have obtained the identical

report directly from the IATA, and its members could have reviewed identical data by paying a

fee to IATA for a report on air cargo rates, including rates for the Shanghai-Atlanta route.

**Jinko publicly disclosed the entire AR8 POR Shanghai-Atlanta monthly air freight**

**data on this record**. Jinko Final SV Submission Exhibit 5A. Further, even the remaining IATA

data are publicly available for the following reasons. First, Commerce "has a longstanding

practice of relying on data maintained in fee-based sources" like IATA data. *Frozen Fish Fillets*

*from Vietnam*, 85 Fed. Reg. 23,756 (final results) (Apr. 29, 2020), IDM Comment 2C. Second,

Commerce "consider{s} the appropriate indication of public availability to be whether any entity

can obtain the data," and will consider a subscription service to be publicly available when "{t}here is no evidence on the record indicating that the subscription service is not available to the public at large." *Mattresses from China*, 84 Fed. Reg. 56,761, IDM Comment 7; *Laminated Woven Sacks from China*, 73 Fed. Reg. 35,639 (June 24, 2008) (final determination), IDM Comment 15 ("This information satisfies the Department's requirement of public availability because the data has intentionally been made available, through paid subscription or otherwise, to the general public by its publisher. We consider the appropriate indication of public availability to be whether any entity can obtain the data."). Indeed, IATA data is freely available and can be purchased by any person.

Third, the fact that IATA data are publicly available to any person allows "both domestic and foreign" parties, "in evaluating whether to petition for an investigation or request a review, find and make their evaluations on the same data" and "provides a preliminary reliability check." *Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. 38,985, IDM Comment 1. Thus, the IATA data are publicly available, as that term has been construed by Commerce and reviewing courts, and are as reliable as the summary Global Trade Atlas import data upon which Commerce normally relies as the SV for material inputs. *See* Preliminary SV Memo at 1.

Moreover, contrary to Commerce's insinuation, the public Shanghai-Atlanta IATA data, are not a monthly average of more disaggregated data submitted as BPI. Instead, the BPI contains identical Shanghai-Atlanta monthly data. Jinko Final SV Submission Exhibit 5B. Also, the public data provides multiple details for each month of the POR: (1) origin and destination ports; (2) total number of shipments; (3) total weight of cargo; (4) total amount of air freight charged; and (5) average freight charge in USD/Kg. *Id.* Exhibit 5A. The resulting SV is 4.08$/Kg weighted average and 5.21$/Kg simple average. Jinko Case Brief at 56.

Further, record evidence provides information about IATA's coverage: "IATA is the trade association for the world's airlines, representing 290 airlines, responsible for 82% of total air traffic." Jinko Final SV Submission Exhibit 5F at 1/2. As to "how the {IATA} data were obtained," IDM at 43, an industry expert opines:

> **IATA's Cargo IS data best represents the fair market value of air freight for the time period in question as it is based on the IATA Cargo Accounts Settlement System, which reports <u>the actual transactional rates supplied by airlines to IATA</u>. . . .**
>
> There are a limited number of data sources on air freight costs for heavier weight shipments in the China-U.S. market. In my professional experience, the best of those currently available is the CargoIS data provided by {IATA}. That **data is sourced from IATA's clearinghouse where nearly all freight forwarders and airlines settle charges in net prices on thousands of air freight shipments each month**. These include nearly all of the major China market participants. . . .
>
> IATA's CargoIS data represents the <u>broadest coverage of the entire market of air cargo buyers and suppliers,</u> including both contract and spot market rates, especially considering that for air cargo the spot market may represent up to 50% of the cargo moving at times. CargoIS also provides the desired <u>granular detail at the lane level</u> for Shanghai (PVG) – Atlanta (ATL). . . .
>
> Shanghai-Atlanta traffic represented several million dollars in air freight value across several million kilograms of goods covering thousands of shipments.

Jinko First SV Submission Exhibit 9N at 1, 3 (emphases modified).

In sum, since the route specific Shanghai-Atlanta monthly air freight data are publicly available and contain detailed particulars, this Court should remand for Commerce to reconsider its air freight SV.

## IV.  COMMERCE UNLAWFULLY VALUED OCEAN FREIGHT

In its *Final Results*, Commerce based the SVs for ocean freight expenses on Maersk Line and Descartes data, rejecting Drewry and Freightos data. IDM Comment 4. Commerce should have rejected the Maersk price quotes – and instead relied on the Descartes transaction-based prices or, alternatively, on an average of Descartes, Maersk, Drewry, and Freightos data.

### A.    Commerce Should Have Rejected Maersk Data

Maersk data represent price quotes rather than actual transaction-based prices. They are not based on actual shipments. Alliance Final SV Submission Exhibit 1. Maersk prices are "not covered by a service contract," but merely provide "tariff rates" and are "an indication only." *Id*. That each of the Maersk price quotes are formatted identically and contain boilerplate inscriptions suggests they were created through online research by inputting various unknown shipment parameters, and do not represent actual ocean freight charges incurred by shippers. In contrast, Descartes data are based on actual arm's length, consummated transactions.

Commerce's well-established policy favors actual transaction-based price data over mere price quotes:

> The Thai domestic price quotes for urea from the ISS study are not contemporaneous with the POR and do not represent actual prices paid for urea (*i.e.*, **these are quotes/offers, not the results of consummated transactions**). **The Department's preference**, also stated above, **is to use published prices that are widely available**, rather than price quotes from a limited number of suppliers that can only be obtained through direct enquiry. Publicly available, published prices generally do not suffer from potential biases compared to those price quotes obtained through research by private firms.

*Chlorinated Isocyanurates from China*, 81 Fed. Reg. 1167 (Jan. 11, 2016) (final results), IDM Comment 2 (emphases added). This distinction constitutes a sufficient, stand-alone basis to reject the Maersk price quotes in favor of the Descartes, Drewry, and Freightos actual transaction-based price data.

Commerce improperly defends Maersk quotes through a false equivalence that Descartes "data are '{e}stimates of freight charges . . .  furnished as a convenience to the shipping public.'" IDM at 24. This declaration on Descartes price sheets is to simply caution the public against relying, for current shipments planning, on a historical transaction-specific price data. The fact that each Descartes sheet bears a unique Transshipment Local Instruction ("TLI") number of the

licensed freight forwarder and the name of the carrier establishes that all Descartes price data represent actual transactions on those dates. Therefore, Commerce's reliability concerns regarding Descartes data are unsupported.

Second, since Maersk data represent price quotes of a <u>single shipping company</u>, they fail to satisfy the necessary broad market average criteria for selecting SVs. In contrast, Descartes is a well-known international data provider, who publishes ocean freight data, drawing from hundreds of shipping lines and freight forwarders. Consequently, the resulting Descartes SVs represent a broad market average.

Commerce has rejected Maersk data in favor of Descartes data on this ground, a rationale approved by this Court. *Taian Ziyang*, 783 F.Supp.2d at 1342 ("Commerce acknowledges that— contrary to its findings in the Final Results—'the Maersk data . . . do not 'reflect a broad based market rate,' because 'Maersk provides a general cargo rate from only a single carrier. . . . Commerce thus concluded . . . the Descartes database as the best source on the record for ocean freight {SVs}.'"). Commerce's claim that "none of the deficiencies cited in *Taian Ziyang* . . . are present with regards to the Maersk Line data that we used to value ocean freight expenses in this review," IDM at 24, is directly contradicted by Maersk data themselves. Maersk data indisputably constitutes single carrier data – not a broad market average. *Jinan Yipin Corp. v. United States*, 800 F.Supp.2d 1226, 1278-79 (CIT 2011) ("The Remand Determination acknowledges that the Maersk data provide rates for only a single carrier . . . . The Remand Determination therefore concluded that the Descartes data are preferable to the Maersk data").

In *Mobile Access Equipment and Subassemblies Thereof* ("*MAE*") *from China*, Commerce rejected Maersk in favor of Descartes: "Maersk ocean freight data . . . are price quotes rather than actual transaction-based prices, which are not data Commerce prefers to use to

value ocean freight. Unlike the Maersk ocean freight data, the Descartes data for ocean freight charges represent actual, consummated transactions." 87 Fed. Reg. 9,576 (Feb. 22, 2022) (final determination), IDM Comment 1.

In fact, Descartes data have been Commerce's longstanding SV data choice in multiple proceedings. *See, e.g.*, *Passenger Vehicle and Light Truck Tires from Vietnam*, 86 Fed. Reg. 28,559 (May 27, 2021) (final determination), IDM Comment 7; *Seamless Refined Copper Pipe and Tube from China*, 82 Fed. Reg. 27,688 (June 16, 2017) (final results), IDM Comment 1; *Aluminum Foil from China*, 83 Fed. Reg. 9282 (Mar. 5, 2018) (final determination), IDM Comment 2; *New Pneumatic Off-the-Road Tires from China*, 80 Fed. Reg. 20,197 (Apr. 15, 2015) (final results), IDM Comment 11.

In sum, unlike boilerplate Maersk price quotes from one shipping line, Descartes data provide reliable and multi-shipping lines-based actual consummated China-U.S. ocean freight costs during the POR, and also constitute fully loaded costs inclusive of all applicable charges.

### B.     Alternatively, Commerce Should Have Included Drewry and Freightos Data

The unreliable Maersk data should not have been used in the *Final Results*. Section IV.A, *supra*. However, if this Court agrees that Commerce can continue to rely upon the Maersk data, it should also remand this issue to Commerce so that Commerce can reconsider its decision to exclude Drewry and Freightos data from the analysis. These data sources are more reliable than Maersk and provide an all-in, fully loaded cost of ocean freight for goods shipped from China to Jinko's U.S. destination ports in 40-ft. containers. In *MAE from China*, Commerce valued ocean freight based on an average of Descartes, Drewry and Freightos, while rejecting the Maersk data. 87 Fed. Reg. 9,576, IDM Comment 1. This recent precedent reveals that Commerce is of the opinion that Drewry and Freightos data are reliable.

Commerce claims that "the record contains nothing about the source of the Drewry and Freightos data." IDM at 24. The Court should reject this justification for rejecting these data sources. The data provider names are not inscribed because Drewry data were printed from an Excel document downloaded from the Drewry website, while Freightos data were printed from an Excel transmitted by the data provider. Notably, the Alliance never questioned the authenticity of the data sources, and Commerce has relied on Drewry and Freightos data in the past. Therefore, Commerce's reliability concerns about Drewry and Freightos are unsupported.

Commerce's specificity-related concern that "the Drewry and Freightos rates do not identify the type of material shipped," IDM at 23, is allayed by *MAE from China* – "we find this fact does not render the ocean freight rates unusable because we find that Drewry and Freightos' published ocean freight rates suggest that the ocean rates are representative of, and equally applicable to, all types of merchandise, including {solar panels}." 87 Fed. Reg. 9,576, IDM Comment 1. Commerce's concern that Drewry and Freightos do not breakout the ocean freight charges, IDM at 23, is likewise allayed by *MAE from China* – "there is no evidence . . . that the Freightos and Drewry freight rates do not include all the appropriate ocean freight charges." *Id*.

Accordingly, for these reasons, this Court should remand this issue to Commerce ordering Commerce to reject the Maersk data and use only Descartes data, or, alternatively, include the Drewry and Freightos data in its calculation of ocean freight.

## V.     COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS

In its *Final Results*, Commerce calculated surrogate financial ratios using only financial statements from JA Solar, and not Flextronics. IDM Comment 8. According to Commerce:

> Record evidence does not indicate that Flextronics produced solar cells, nor does it clearly show that Flextronics assembled solar modules. . . .

> Because JA Solar produced solar cells, its experience is far more specific to the

respondents' experience than is Flextronics' experience, whose financial statements only specify that it produces circuit boards and electronic products. . . .

{I}t is unclear whether Flextronics may have simply produced parts of solar modules or whether it is a toller of solar modules that did not purchase the inputs used in assembling solar modules. . . .

{W}e do not find that greater detail of the financial statements outweighs the fact that there is no evidence that Flextronics produced solar cells, as the respondents do, given the importance of specificity to respondents' production experience in the selection of surrogate financial statements. Nor does it outweigh questions regarding whether Flextronics' financial ratios reflect the experience of a producer of solar modules or a toller with operations related to solar modules.

*Id*. As discussed below, this decision should be reversed.

First, Flextronics is a producer of identical and comparable merchandise. Note 1 to Flextronics' financial refers to "contract manufacturing for electronic products." Jinko First SV Submission Exhibit 11C at 13. Indeed, the European Commission's Antidumping findings on "crystalline silicon photovoltaic modules and key components (i.e. cells) consigned from Malaysia" determined that "Flextronics is a contract manufacturer" and an "Exporting producer(s) in Malaysia." Jinko Rejected Case Brief at 70 & n.127. Commerce improperly redacted the European Commission decision from the record, by failing to follow the principle that such "information in the public realm" has long been accepted by Commerce in case briefs. *Final Rule*, 62 Fed. Reg. at 27,332. Indeed, these EU Commission decisions "can be accessed directly" from that government agency website – as Commerce itself has recognized. *DSB from China*, 85 Fed. Reg. 78,827, IDM n.13.

Under contract manufacturing, a manufacturer, under the overall supervision of a principal, produces the finished goods. Contract manufacturing encompasses the entirety of manufacturing processes to produce the finished goods. Indeed, Note 5 to Flextronics' financial statement shows that Flextronics incurred a very high cost to procure raw materials and consumables, and also incurred staff costs and other operating expenses. Jinko First SV

Submission Exhibit 11C at 23. This fact confirms that Flextronics undertakes the entirety of production process of solar modules, and accordingly incurs manufacturing overhead and selling, general, and administrative ("SGA") expenses that are representative of Jinko's production experiences. Thus, Flextronics is a producer of in-scope and comparable merchandise – with its financial ratios mirroring those of the respondents.

Given Flextronics' sizeable expenses incurred on raw materials, labor, and other operating expenses, the mere fact that it is a contract manufacturer of solar modules instead of being a principal manufacturer has little, if any, bearing on its overhead and SGA ratios. In both situations, Flextronics' manufacturing of solar modules would result in almost identical overhead and SGA. Moreover, any uncertainty with regard to Flextronics' production *per se* of solar modules is allayed by successive European Commission's findings (*supra*) affirming Flextronics' production of subject merchandise. Commerce's exclusive reliance on a lack of information on solar panel production in Flextronics' financial statement is rebutted by European Commission's unambiguous findings. As such, substantial evidence establishes that Flextronics is a producer of identical and comparable merchandise.

As to Flextronics' level of production of comparable merchandise, even assuming that it is not as robust as JA Solar's, Commerce practice is to accord equal weight to all producers, regardless of their production volume. *Steel Nails from China*, 73 Fed. Reg. 33,977 (June 16, 2008) (final determination), IDM Comment 11 ("We disagree with Petitioners' contention that, because Nasco's and Bandishar's respective production of nails accounts for relatively small percentages of their overall production, their financial ratios are not representative of a producer of nails."); *Chlorinated Isocyanurates from China*, 75 Fed. Reg. 70,212 (Nov. 17, 2010) (final results), IDM Comment 3 ("The mere fact that Aditya produces less overall SBP than Kanoria

does not automatically suggest that Aditya's or Kanoria's financial statements are more appropriate. Consistent with the Department's decision in . . . *Steel Nails from {China}*, the mere fact that SBP only accounts for a small percentage of Aditya's overall operations alone does not mean Aditya's financial statements are not representative of a producer of SBP. Therefore, Aditya's low levels of SBP production do not necessarily indicate Aditya's financial statements are unsuitable for calculating surrogate financial ratios.").

<u>Second</u>, data quality considerations support the choice of Flextronics. Note 5 provides a discrete breakout for raw materials and labor cost. Jinko First SV Submission Exhibit 11C at 23. Flextronics' financial statement is more detailed than that of JA Solar, which itemizes "Cost of sales," Preliminary SV Memo, Excel Workbook Tab: "JA Solar Financials Attach XIV" – aggregating material, labor and energy and potentially non-depreciation overhead costs. Flextronics, accordingly, yields more accurate overhead, SGA, and profit ratios. Further, Flextronics financial provides additional breakouts for overheads (*e.g.*, "rental of equipment") and SGA (*e.g.*, "rental of premises," "allowance for obsolete inventories," "fair value loss (gain) in respect of cash flow hedge") cost elements. Jinko First SV Submission Exhibit 11C. Flextronics' data is also undistorted by countervailable subsidies.

Therefore, even if JA Solar's production experience was more comparable to Flextronics' experience, which is not so, Commerce should have selected Flextronics because of its superior data quality. Commerce's claim that Jinko's position on this issue is not supported by Commerce precedent, IDM at 38, is undermined by *DSB from China* where Commerce reasoned:

> When we have two sets of financial statements – one with comparable products and useable details and another with identical and/or more comparable products but lacking necessary details – we find it reasonable for us to use the set of financial statements with comparable products and useable details.

79 Fed. Reg. 35,723 (June 24, 2014), IDM Comment 16.

Finally, Commerce has in the past averaged a less detailed financial statement of an identical merchandise producer and a more detailed statement of a producer with lesser comparable production experiences. In *Hydrofluorocarbon Blends and Components Thereof* ("*HFC*") *from China*, Commerce explained its rationale for this hybrid selection:

> While we agree that the SG&A expenses shown on CYDSA financial statements are not detailed, we disagree with TTI that the SG&A ratio derived from these expenses is necessarily distorted and that the financial statements are unusable as a result. TTI has provided no evidence showing that freight expenses are definitively included in CYDSA's SG&A, but rather it merely speculates that these expenses may be captured. Given that CYDSA produces some identical merchandise (while Mexichem produces only comparable merchandise), we find that the lack of detail with respect to SG&A expenses is outweighed by the increase in product specificity.

81 Fed. Reg. 42,314 (June 29, 2016) (final determination), IDM Comment 30.

*DSB from China* and *HFC from China* reveal that in its selection of financial statements, Commerce does not accord less weight to the financial data quality than the comparable production experiences of surrogate producers. Finally, Commerce's well-established policy is to rely on <u>multiple financial statements</u> in order to derive surrogate ratios mirroring broader industry representation and a broader market average. *Id*. ("Using both . . . financial statements in this investigation is consistent with the Department's preference for using multiple financial statements to determine surrogate financial ratios."); *Activated Carbon from China*, 86 Fed. Reg. 73,761 (Dec. 28, 2021) (final results), IDM Comment 6. This administrative precedent reveals that Commerce's decision to calculate surrogate financial ratios in AR8 using financial data from only JA Solar contradicts Department precedent, and accordingly, is unlawful.

## VI. COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM U.S. PRICE

Jinko challenged Commerce's preliminary deduction of Section 301 duties from U.S. price. Jinko Case Brief at 83-90. The *Final Results* improperly continued this deduction, in

violation of the statutory directive not to deduct "United States import duties" from U.S. prices. 19 U.S.C. § 1677a(c)(2)(A). Commerce's longstanding policy not to deduct Section 201 duties because they "are special remedial duties" was first announced in 2004, affirmed by the CAFC, and implemented in AR8. *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153, 19,159-61 (Apr. 12, 2004) (final results) ("*SSWR*"); *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007); IDM Comment 23.

Commerce declined to deduct Section 301 duties, finding that it does "not consider section 301 duties to be 'special duties,' because like normal U.S. customs duties and unlike {ADDs} and section 201 duties, section 301 duties do not have a termination provision." IDM at 74. Commerce's sole basis was, "because they are indefinite, section 301 duties meet the definition of normal U.S. import duties." *Id*. Yet the supposed indefinite nature of Section 301 duties is refuted by the U.S. Trade Representative ("USTR") having solicited comments concerning their effectiveness and continued need to address China's actions to technology transfer, intellectual property, and innovation that were found to have been unreasonable or discriminatory and burden or restrict U.S. commerce. *Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation*, 87 Fed. Reg. 62,914 (Oct. 17, 2022). With USTR currently reviewing comments and considering appropriate action, these Section 301 duties should not be considered "indefinite." IDM at 74.

Moreover, the underlying purpose of Section 301 duties confirms they are remedial in the same manner as Section 201 duties and ADD, as distinguished from normal import duties. The statute itself instructs that USTR, upon finding that:

> an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce . . .

> **shall take all appropriate and feasible action** . . . to **obtain the elimination of that act, policy, or practice**. Actions may be taken that are within the power of

the President **with respect to trade in any goods or services**, or with respect to any other area of pertinent relations with the foreign country.

19 U.S.C. § 2411(b) (emphases added). The Statement of Administrative Action accompanying the Uruguay Round Agreements Act confirms the remedial nature of Section 301 duties:

> Since it was enacted, section 301 has been the principal U.S. statute **for addressing foreign unfair practices that adversely affect U.S. exports of goods and services**. Section 301 authorizes {USTR} to take action, subject to the direction of the President, against acts, policies, or practices that are inconsistent with, or deny benefits under, trade agreements or that are unreasonable, unjustifiable, or discriminatory and burden or restrict U.S. commerce.

H.R. Doc. No. 103-316, Vol. I, 1994 U.S.C.C.A.N. 4040, 4319-19 (emphasis added).

In assessing the Section 301 duties at issue, USTR had the remedial objective of eliminating harmful Chinese government practices with respect to technology transfer, intellectual property, and innovation, finding that China's actions:

1. "require or pressure technology transfer from U.S. companies";

2. "force U.S. companies seeking to license technology to Chinese entities to . . . favor Chinese recipients";

3. "transfer . . . technology to Chinese companies" through "investment in, and acquisition of, U.S. companies and assets"; and

4. constitute "intrusions into, and theft from . . . U.S. companies".

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018) ("USTR Determination").

Accordingly, using Commerce's own longstanding findings, Section 301 duties should be considered "**special remedial measures**." *SSWR*, 69 Fed. Reg. at 19,159-61. "Although they are not identical to AD duties, they are more like them in purpose and function than they are like ordinary customs duties." *Id*. at 19,159. Indeed, Commerce, when declining to deduct Section

232 duties from U.S. prices, used language underscoring the necessity of doing so for Section 301:

> The objective of section 201 duties is to "**remedy the injurious effect** on the U.S. industry **of significant surge in imports**." In addition, the objective of AD duties is to "**remedy sales** by a foreign exporter in the U.S. market **at less than fair value**." . . . As such, these types of duties "are all directed at **the same overarching purposes - protecting the bottom line of domestic producers**."

*Circular Welded Carbon-Quality Steel Pipe from Oman*, 86 Fed. Reg. 18,513 (Apr. 9, 2021)

("*CWP from Oman*"), IDM Comment 1.

Thus, the recent CAFC decision affirming Commerce's action with respect to Section 232 duties, because they addressed the "national security . . . threat{} by the unsustainably low utilization of domestic steel-producing capacity" is readily distinguishable from the Section 301 duties at issue in this case. *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, No. 2021-2097, 2023 WL 2505865, *7 (Fed. Cir. Mar. 15, 2023). Like Section 201 duties, Section 301 duties serve a trade related, remedial purpose. This Court, therefore, is not bound by the CAFC decision affirming Commerce's practice with respect to Section 232 duties.

The Section 301 duties at issue remedy the specific types of harm to domestic companies that USTR found was caused by China's actions concerning technology transfer, intellectual property, and innovation. *USTR Determination*, 83 Fed. Reg. at 14,907. This remedial nature makes Section 301 akin to Section 201 and ADD, the assessment of which "are all directed at **the same overarching purposes - protecting the bottom line of domestic producers**." *CWP from Oman*, IDM Comment 1. There is no basis to distinguish these types of remedial duties, none of which should be deducted from U.S. price.

Jinko further demonstrated that deducting Section 301 duties would constitute double-counting. Jinko Case Brief at 87-88. Commerce distinguished the precedent relied upon by Jinko "because those decisions applied to {ADDs}." IDM at 74. Yet Commerce disregarded the

broader demonstration that deducting the remedial trade remedy duties from United States prices – whether Section 201, Section 301, or ADD – would improperly count that duty twice: "first as {the applicable} duties, and a second time as an increase in that dumping margin." *SSWR from Korea*, 69 Fed. Reg. at 19,160. Assessing Section 301 duties remedies China's practices with respect to technology transfer, intellectual property, and innovation; in the ADD context, "**to make such a deduction effectively would collect the** . . . **duties a second time**." *Id*. (emphasis added). The remedial nature of Section 301 duties makes domestic companies whole from the harm that USTR found caused by China, and deducting them from U.S. prices constitutes improper double-counting that puts affected domestic companies in a superior position. "Accordingly, to the extent that {301} duties may reduce dumping margins, this is not a distortion of any margin to be eliminated, but a legitimate reduction in the level of dumping." *Id*.

## CONCLUSION

For the foregoing reasons, Jinko respectfully requests that this Court remand the *Final Results/Amended Final Results* for reconsideration by Commerce.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs*

Dated: March 24, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

      Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of Rule 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 13,996 words, – less than the 14,000 word limit.

                                      */s/ Ned H. Marshak*
                                        *Counsel for Plaintiffs*

Dated: March 24, 2023