UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO. LTD., ET AL., <br>     Consolidated Plaintiff, <br><br>  and <br><br> RISEN ENERGY CO., LTD., <br>     Consolidated Plaintiffs, <br><br>  v. <br><br> UNITED STATES, <br>     Defendant, <br><br>  and <br><br> AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, <br>     Defendant-Intervenor. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **PUBLIC VERSION** <br><br> Consol. Court No. 22-00219 |

**CONSOLIDATED PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*

Dated: March 24, 2023

# TABLE OF CONTENTS

I.     **RULE 56.2 STATEMENT** ...................................................................... 1

     A.     **Administrative Determination Subject to Appeal** ......................... 1

     B.     **Issues Presented** ........................................................................... 1

II.    **STANDARDS OF REVIEW** .................................................................. 2

     **ARGUMENT** .......................................................................................... 5

III.   **The Department's Glass Surrogate Value Is Not Supported by Substantial Evidence** ............................................................................. 5

     A.     **The Department's Regulatory Preference and Practice Is to Rely Upon All Surrogate Values in the Primary Surrogate Country** ................................... 5

     B.     **The Department's Determination that the Romania Data is More "Specific" or More "Reliable" Than the Malaysian Data is not Supported by Record Evidence** ....................................... 10

           1.   **The Malaysia and Romania HTS Definitions are Equally Specific** ..... 11

           2.   **The Malaysian Glass Import Data Is More Specific To Solar Glass Used By an Actual Solar Module Manufacturer** ................................... 12

           3.   **Risen's Reported Glass Consumption in KG Was Itself A Conversion At The Request Of The Department and Risen's Glass Consumption in Square Meter is Also On the Record** .................... 15

           4.   **The Department Has An Established History Of Relying Upon Conversions For Surrogate Values And Has A Reliable Conversion For Risen** .......... 16

           5.   **The Romanian Glass Import Data Has Defects** .................................... 20

     C.     **The Department Improperly Relied Upon Information Not On The Record Of This Review** ................................... 20

IV.   **The Department's surrogate value HTS classification for Backsheet and EVA film inputs is Not Supported by Substantial Evidence** ........................................... 23

V.    **The Department's Ocean Freight Surrogate Value is Not Supported by Substantial Evidence** .................................................................... 25

**VI.      The Department's Application of Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Substantial Court Precedent** ....................................................... **27**

**VII.     The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law** .................................................................. **31**

**VIII.    Conclusion and Prayer for Relief** ............................................................ **34**

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316 (Fed. Cir. 2010) ..............26

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (2006).......................... 3-4

*Ass'n of Am. Sch. Paper Suppliers v. United States*, 683 F. Supp. 2d 1317, 1323 (Ct. Int'l Trade 2010)........................................................................................................................... 21-22

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)................................2

*Canadian Solar Int'l Ltd. v. United States*, 2019 Ct. Intl. Trade LEXIS 152 (December 3, 2019) ........................................................................................................................................30

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) ............30

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ........................................................................................................................................30

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003) .......................................2

*Clearon Corporation and Occidental Chemical Corp. v. United States*, Slip Op. 13-22, at 12-14 (CIT 2013) ..................................................................................................................6, 9

*Coal. For Fair Trade in Hardwood Plywood v. United States*, 2022 Ct. Intl. Trade LEXIS 153...........................................................................................................................................7

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)..........................................4

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983)....................................2, 21

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)..........................................3

*Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006) ........................................................................................................................................3

*Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1295 (Fed. Cir. 2011) ...................27

*Itochu Bldg. Prods. Co. v. United States*, 2017 Ct. Intl. Trade LEXIS 74 (Ct. Int'l Trade June 22, 2017)..........................................................................................................................21

*Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) . 22-23

*Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ........................................................................................................................................7

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016) ..................................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).......................4

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ......................31

*MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021).........................................7

*Nippon Steel Corp. & United States*, 337 F.3d 1373 (Fed. Cir. 2003) ...................................29-31

*Peer Bearing Company-Changshan v. United States*, 35 C.I.T. 103, 123 (2011)......................7-8

*Peer Bearing Co.-Changshan v. United States*, SLIP OP. 2008-134, 32 CIT 1307, 1310, 587 F. Supp. 2d 1319, 1325 (2008) ...............................................................................................21

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014) ......................26

*Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020) ..................30-31

*Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ...................................21

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).........................................4

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018).............................19, 22

*United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1354-1355 (Ct. Int'l Trade 2010).......................................................................................................................................33

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ......................................................2

## STATUTES & REGULATIONS

19 U.S.C. § 1516a(b)(1)(B) .......................................................................................................2, 4

19 U.S.C. § 1677e .................................................................................................................. 27-29

19 U.S.C. § 1677b(c)(1)(B) ........................................................................................................27

## ADMINISTRATIVE DECISIONS

*Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 15,297 (2011)........................................................................................................................... 17-18

*Certain Aluminum Foil From the Republic of Armenia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,882 (2021) ......................................................18

*Certain Uncoated Paper From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 3,112 (2016) ........................................................17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791 (Dep't Commerce October 17, 2012) ............................................................................6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 46904 (Dep't Comm. 2016) ........................................................17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019) ...............6, 25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) .................................................................................................13, 26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017*, 85 Fed. Reg. 7,727 (February 11, 2020) .........17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind, in Part: 2018*, 86 Fed. Reg. 21691, 21692 (April 23, 2021).........17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021).......18

*Final Determination of Sales at Less Than Fair Value: Wooden Bedroom Furniture From the People's Republic of China*, 69 Fed. Reg. 67,313 (2004) ......................................................17

*Laminated Woven Sacks from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 35,646 (2008)................................................................................18

*Polyethylene Terephthalate Film, Sheet, and Strip From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 78,333 (Dec. 26, 2013) ...............................................................................23

*Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013)...................................6, 9

**OTHER AUTHORITIES**

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996) ....................................................................................................................5

## I. RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Consolidated Plaintiff Risen Energy Co., Ltd. ("Risen"),

hereby states the administrative decision subject to appeal and the issues of law presented:

### A. Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published the contested final

results in the Federal Register on October 2, 2020. *Crystalline Silicon Photovoltaic Cells,*

*Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of*

*Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*,

87 Fed. Reg. 38,379 (June 28, 2022), **PR464**, *incorporating* Issues and Decision Memorandum

("IDM")*,* **PR455**.  Risen was assigned a weighted average dumping margin of 20.99% *ad*

*valorem* in the Final Results.

### B. Issues Presented

1. Issue One:  Whether the Department relied upon the best available information to

value glass?

2. Issue Two: Whether the Department relied upon the best available information to

value Risen's backsheet and EVA film inputs?

3. Issue Three: Whether the Department relied upon the best available information

to value ocean freight?

4. Issue Four: Whether the Department's application of adverse facts available

("AFA") with respect to unreported factors of production of unaffiliated cell and module

suppliers was supported by substantial evidence and otherwise in accordance with law?

5.     <u>Issue Five</u>:  Whether the Department's new methodology for the application of adverse facts available ("AFA") was supported by substantial evidence and otherwise in accordance with law?

## II.     STANDARDS OF REVIEW

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law."[1]  Different standards of review are applicable to the issues in this case.

### A.  Substantial Evidence Standard for Non-Market Economy Cases

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."[3]  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"[4]

In cases involving non-market-economy ("NME") countries, although "the standard of review precludes the court from determining whether Department's choice of surrogate value was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."[5]  While the statute "'grants to Commerce broad

---

[1] 19 U.S.C. § 1516a(b)(1)(B)(i).

[2] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).

[3] *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

[4] *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

[5] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).

discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible.[6] "'This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.'"[7]

The courts have elaborated on the meaning of "best available" in the NME normal value statute. The *Dorbest* court wrote a seminal opinion summarizing the law:

> The term "best available" is one of comparison, i.e., the statute requires Commerce to select, from the information before it the best data for calculating an accurate dumping margin. The term "best" means "excelling all others." II Oxford English Dictionary 139 (2d 1989); Webster's II new Riverside University Dictionary 168 (1988) ("{e}xceeding all others in excellence, achievement, or quality").

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006) *citing Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006). The *Dorbest* Court thus concluded that "{o}n factual issues, the court's role 'is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Dorbest* at 1269 (citations omitted).

According to *Dorbest*, "Commerce needs to justify its selection of data with a reasoned explanation." *Dorbest* at 1269 (citation omitted). The *Dorbest* Court further cautioned that "{i}n doing so, Commerce must 'conduct a fair comparison of the data sets on the record' with regard to its announced method or criteria." *Id*., citing *Allied Pac. Food (Dalian) Co. v. United*

---

[6] *Id. at* 365, n.12 (citations omitted).
[7] *Id.* (citations omitted).

*States*, 435 F. Supp. 2d 1295, 1313-14 (2006). Finally, *Dorbest* warned: "Commerce's findings or conclusions rendered in equations or numeric form are not beyond scrutiny." *Id*.

### B. Arbitrary & Capricious Standard

This Court will hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted). Thus, when the administering agency's actions are internally inconsistent and self-contradictory, and the agency treats similarly situated parties differently or fails to consider an important aspect of a problem, the agency's decisions are arbitrary and capricious and subject to reversal.

**ARGUMENT**

**III.** **The Department's Determination to Rely Upon the Romanian Glass Value is Not Supported by Substantial Evidence.**

In the Final Results, the Department relied upon Malaysia as the primary surrogate country. However, the Department relied on a Romanian value for glass. The reliance on a Romania value for this input, instead of the Malaysian value, is not supported because it 1) is contrary to the Department's strong regulatory preference to rely upon all surrogate values in the primary surrogate country and related interests in accuracy, 2) fails to support any finding that there is an increase in reliability or specificity by relying on the Romanian glass value, and 3) is also based on information not on this record. Accordingly, the Court should find the Department's reliance on the Romanian glass value is not supported by substantial evidence.

**A.** **The Department's Regulatory Preference and Practice Is to Rely Upon All Surrogate Values in the Primary Surrogate Country.**

Reliance on the Malaysian HTS 7007.19.90.00, instead of the Romanian HTS, is consistent with the Department's strong regulatory preference, upheld by the Court, to source all surrogate values from the same primary surrogate country. 19 C.F.R. 315.408(c) directs that the Department "normally will value all factors in a single surrogate country." In the Department's explanation while promulgating the regulations, it was explained that "[t]he preference for using a single country... is meant to prevent parties from **'margin shopping'**: i.e., to prevent parties from arguing that the Department combine input prices from different surrogates to achieve the highest or lowest valuations of those inputs." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996) (emphasis added). The Department has explained, "[t]he Court of International Trade has held this preference for valuing FOPs with information from a single surrogate country reasonable because deriving surrogate data from one

surrogate country **limits the amount of distortion** introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market." *Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013) and accompanying IDM at Cmt 2(emphasis added); citing *Clearon Corporation and Occidental Chemical Corp. v. United States*, Slip Op. 13-22, at 12-14 (CIT 2013). The Department's practice flows from the basis of the surrogate country process, which is a foundational part of the nonmarket economy methodology for determining normal value. The Department is seeking costs in a market economy cost center, and the costs work together. One economy may have advantages in some raw materials or some financial costs, but not in other areas. Valuing costs in different cost centers, rather than one, introduces potential distortions that are not present if relying on one single economy's market costs.

The Department's determination in this case runs contrary to its established practice. The Department has consistently explained that "it is Commerce's well-established practice to rely upon the primary surrogate country for all surrogate values, whenever possible, and to only resort to a secondary surrogate country if data from the primary surrogate country are **unavailable or unreliable."** *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019) and accompanying IDM at Cmt. 2 (refusing to depart from the primary surrogate country for silver paste); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791 (Dep't Commerce October 17, 2012) and accompanying IDM at Cmt

2A (where the Department declined to rely upon financial statement from identical producers in a secondary surrogate country because the Department had usable financial statements from producers of comparable merchandise in the primary surrogate country); *Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ("A reasonable mind could likewise conclude that Commerce's regulatory preference to value all inputs from a single surrogate country favors using Thai data to value all of Plaintiffs' inputs despite some apparent relative superiority of the Philippine financial and HC1 data.") *affirmed Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016); *MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021) (upholding this practice). Relying on the Malaysian glass value follows this consistent regulatory practice.

While the Department acknowledged its "practice is to rely, where possible, on the primary surrogate country for all SVs" it then stated "it will resort to a secondary surrogate country for SVs if SV data from the primary surrogate country are **unavailable or unreliable**." IDM at Comment 3. The glass surrogate value in Malaysia is **not unavailable**, no party has disputed that. So according to the Department's own statement of its practice, only concerns of **unreliability** should result in departing from Malaysia for this input. *Id.*; *see also Coal. For Fair Trade in Hardwood Plywood v. United States*, 2022 Ct. Intl. Trade LEXIS 153, *54 (discussing Department language that it would rely on the primary surrogate country unless the import data was "aberrational or demonstrably unreliable" or "unusual or unreliable" as substantiated by the record) (upholding the Department's determination not to resort to a secondary surrogate country, finding that respondents arguments that the "Malaysian GTA data must be inaccurate because they demonstrate impossible log densities" does not demonstrate the data is unreliable); *cf. Peer Bearing Company-Changshan v. United States*, 35 C.I.T. 103, 123

(2011) (finding the preference for a single surrogate country could not uphold relying on an aberrant surrogate value with "enormous disparity" with other values for the input).

There is nothing on the instant record, however, suggesting that the import value from Malaysian HTS 70071990 is **unreliable**, or aberrant or unusual. The Malaysian glass import value is from official customs import data, and it is clear that the relevant Malaysian HTS 7007.19.90 covers solar glass.

The Department asserted that it had "concerns regarding the reliability of SVs derived from Malaysian HTS 7007.19.90 compared to SVs derived from Romanian HTS 7007.19.80." IDM at Comment 3, page 18. However, the subsequent discussion by the Department actually shows the sole factor the Department analyzed is the thickness of the glass or unit of measurement in the Malaysian glass import data, which is relating to "specificity", not "reliability" of the Malaysian data. Risen submits that the Department's analysis on the specificity issue is flawed, but addresses this further below. Here, the Department conflated the test of "reliability," which the Department has stated is its test whether to deviate from the primary surrogate country, and a test of further "specificity" which would only arise if the Department has already determined to deviate from the surrogate country due to reliability concerns.

The Department's misapplication of modes of analysis is made abundantly clear by its conclusion that the Romanian import data "yield a **more** reliable SV." IDM at Comment 3, page 19. In order to deviate from the primary surrogate country, the Department has established that the test is whether the data of the primary surrogate country itself is reliable or not. The Department's established approach is not to determine input by input whether a secondary country's data for each input has a higher degree of reliability than the primary surrogate

country. Indeed, such an approach is completely inapposite to the reasoning behind selecting a primary surrogate country, which is to prevent margin shopping and distortion of cherry-picked data from different countries.

Further, while the Department reasoned "**accuracy** is a paramount consideration" (IDM at 16)) and "reliability and **accuracy** are primary concerns when calculating dumping margins." (IDM at 18), the Department did not actually engage in any separate analysis of "accuracy." Rather apparently the Department's "accuracy" analysis was simply the same as its "specificity" analysis. But, in fact the Department has found a paramount aspect of the accuracy of a dumping margin calculation is to select all surrogate values from the same primary surrogate country, the purpose of which is precisely to "**limits the amount of distortion** introduced into the calculations." *See Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013) and accompanying IDM at Cmt 2 (emphasis added); *citing Clearon Corporation and Occidental Chemical Corp. v. United States*, 37 C.I.T. 220, 229 (2013) (the preference is also reasonable because, as Commerce points out, deriving the surrogate data from one surrogate country limits the amount of distortion introduced into its calculations because a domestic producer would be more likely to purchase a product available" in that country."). The overarching consideration for accuracy is why the Department relies on a primary surrogate country and does not engage in an input-by-input comparison for each input.

Otherwise, the Department's regulatory preference and long-established practice, upheld by the Court, to source all data from the same primary surrogate country would be simply void. The selection of a primary surrogate country would be rendered meaningless if after the determination of a primary surrogate country, the parties would still need to engage in an input-

by-input comparison of data from primary surrogate country and any other country to determine for a particular input whether which data is more "specific" or "accurate", as if there were no primary surrogate country at all. This is precisely the **'margin shopping'** which the Department has explained should be prevented by relying on data from a single primary surrogate country. In this case, the Department accommodated precisely this margin shopping by petitioner and after selecting Malaysia, which has an available, reliable glass value that the Department has previously relied upon, still chose to engage in an input-specific analysis of whether the Romanian glass should be used.

To summarize, the Department conflated the test of "reliability" with the test of "specificity," claiming the Romanian glass value was more specific and therefore more accurate, while directly contradicting to the Department's stated paramount consideration of accuracy as related to relying upon all surrogate values from the primary surrogate country. The Department improperly deviated from relying on the all data from the primary surrogate country when it was not "unreliable." As such, no further analysis on specificity is required, to determine that it was improper to depart from Malaysia for this data. Nonetheless for completeness of argument, Risen also analyzes the Department's flawed determination that the Romanian glass was more specific.

   **B.      The Department's Determination that the Romania Data is More "Specific"
            or More "Reliable" Than the Malaysian Data is not Supported by Record
            Evidence.**

In the Final Results, the Department explained it was relying on the Romanian glass value "[g]iven the specificity of the Romanian imports to solar glass, and the fact that no conversion is required in order to use the value of the Romanian imports to value solar glass" and therefore it would "yield a more reliable SV." IDM at 19. This finding is not supported by

record evidence. First, the Romanian HTS is not more specific than the Malaysian HTS for glass. Second, according to the Department practice, the Malaysian glass actually should be considered more specific to the solar industry because Malaysia has a solar industry, unlike Romania. Third, it is no more reliable to rely on a KG surrogate value than an M2 surrogate value, because Risen had to convert its glass purchases from "pieces" to KG or M2 in any event. Fourth, the Department has a history of using a conversion for surrogate values without finding that the mere fact of a conversion impacts the reliability of the surrogate value.

**1. The Malaysia and Romania HTS Definitions are Equally Specific.**

In the Final Results, the Department discusses its finding in the sixth administrative review that HTS 7007.19.80 covers solar glass. IDM at 17. Risen does not dispute that HTS 7007.19.80 includes solar glass, but clarifies that the Malaysian HTS also covers solar glass, so there is no added specificity by relying on the Romania HTS. In the Final Results, the Department generally references that Romanian HTS 7007.19.80 covers solar glass, i.e. that it includes solar glass; but to the extent that the Department's conclusion may imply the Romanian HTS is *more* specific to solar glass, we clarify here that it is not. *See* IDM at 19 (Given the specificity of the Romanian imports to solar glass…).

The description provided by petitioner for Romanian HTS 7007.19.80 was "Toughened [Tempered] Safety Glass (Excl. Enamelled, Coloured Throughout The Mass, Opacified, Flashed Or With An Absorbent Or Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Ve." Pet. Prelim. Cmts & SVs (August 3, 2021) at Exhibit 9, **PR326**. Likewise, the description the Department provided when it downloaded the Romania data itself to calculation in the preliminary results provided the very same definition for Romanian HTS 7007.19.80: "Toughened [Tempered]

Safety Glass (Excl. Enamelled, Coloured Throughout The Mass, Opacified, Flashed Or With An Absorbent Or Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Ve")." *See* Prelim. SV Memo (December 23, 2021) at Excel Attachment "Original Download, **PR403-407**.

The Malaysian definition for glass under HTS 7007.19.90 is: "Safety glass, consisting of toughened (tempered) or laminated glass. Toughened (tempered) safety glass: Other than Of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels: Other than Suitable for machinery of heading 84.29 or 84.30." *See* Jinko Prelim. SVs (June 28, 2021) at Exhibit 1, **PR201-241**. The Malaysian HTS has the same coverage as the Romanian HTS. These HTS are broader categories of "other" tempered safety glass, that include solar glass, but are not specific only to solar glass. Indeed, under the EU tariff schedule the ".80" HTS are the "other category" and under the Malaysian schedule the ".90" are the "other category." In other words, these are both of the countries' HTS for tempered safety glass that are not elsewhere specified in the earlier HTS under 7007.19. In sum, the Malaysian and Romanian HTS descriptions are *equally* specific to solar glass. There is no added specificity in the Romania description, but as elaborated below, given the existence of Malaysian solar industry, the Department should actually consider the Malaysian import data is more specific.

> ## 2. The Malaysian Glass Import Data Is More Specific To Solar Glass Used By an Actual Solar Module Manufacturer.

Not only is the Romanian data less preferable because Romania is not the primary surrogate country, but it is also less preferable than Malaysia according to Department practice because the record lacks information on whether Romania produces identical merchandise. As the Department noted in an earlier review:

The importance we place on the fact that Malaysia produces solar cells and panels, and no other surrogate country does so, is that the surrogate data provided by Malaysia will consist of actual inputs used in producing subject merchandise, as opposed to the data of the other surrogate countries which have no reason to import inputs used specifically to produce solar cells and panels.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) and accompanying IDM at Cmt 4. There is no evidence on the record of any solar manufacturing industry in Romania. Indeed, no party argued that Romania should be selected as the surrogate country. There is no evidence otherwise demonstrating that Romanian glass imports would actually reflect the costs of solar glass used in solar production by Risen.

In contrast, Malaysia is a significant world producer of solar cells and solar modules. For example, one report on the record discussing the global supply chain of solar cells and modules, lists Malaysia, China, and South Korea as the most dominant in the world market for the production of solar modules. Risen Prelim. SVs (June 28, 2021) at Exhibit 12 (NREL Report), **PR197-198**. The report discusses Malaysia in several places but makes no mention of Romania. *See also* Jinko Prelim. SVs at Exhibit 4Y (Report on Malaysian Silver Paste discussing the robust Malaysian solar cell and panel manufacturing industry), **PR201-241**. The record also contains financial statements from several Malaysian manufacturers of solar cells and modules that actively manufacture identical merchandise in Malaysia. Jinko Prelim. SVs at Exhibit 11 **PR201-241**. In contrast, no party submitted any financials from Romanian producers of identical or even comparable merchandise.

Therefore, only the costs in Malaysia are reasonably connected to the costs that an actual producer of solar modules and cells would pay. Accordingly, this established preference to

source surrogate data from countries that actually produce identical merchandise is also only fulfilled by relying on the Malaysia surrogate value for glass. Notably, the Department did not actually address this argument at all but rather just merely stated that the Romanian HTS covers solar glass. IDM at Comment 3. The Department failed to analyze and explain the clear discrepancy of how Romania, a country with no evidence of solar module production at all, would import solar glass under the broader tariff heading while it is reasonable that a Malaysian solar producer would do so.

Indeed, as shown in the HTS descriptions on the record for the Malaysian HTS for glass and the Romanian HTS for glass, they are basket categories for a variety of toughened safety glass and are not specific *only* to solar glass. Evidence on the record suggests that the glass imports into Malaysia under the HTS would contain actual solar glass used by manufacturers of solar modules in Malaysia (by the presence of a robust Malaysian solar module industry), while glass imports into Romania under the HTS would not contain solar glass because there is no evidence of any solar module production in Romania at all. On balance, the records suggest that the Malaysian glass import data is more specific to the solar glass used by Risen and other respondents than the Romanian glass import data. Therefore, the Malaysian glass HTS is not only specific to solar glass (in that it covers solar glass), but is more specific than the Romanian class because the Malaysian glass imports would reasonably include actual solar glass. Thus, even putting aside the Department's preference to use one surrogate country, a reasonable administrator could only conclude that the Malaysian glass import data is the "best available information" of record for the surrogate value of this factor of production. *See* 19 U.S.C. § 1677b(c)(1)(B) ("the valuation of the factors of production shall be based on the best available information."); *see also* discussion of the nonmarket economy standard of review, above.

**3. Risen's Reported Glass Consumption in KG Was Itself A Conversion At The Request Of The Department and Risen's Glass Consumption in Square Meter is Also On the Record.**

The Department stated that because Risen reported glass on a KG basis, it was more reliable to rely upon the Romanian import value which was reported in tons. However, Risen actually purchases solar glass on a "piece" basis, not on a kilogram basis. As shown in Step 8.1 of the cost reconciliation reported in Risen Sec D at Exhibit D-34, under the column titled "unit", the unit of measurement recorded in the inventory system of Risen for solar glass is "PC" or pieces. Risen Section D (April 30, 2021), **CR126-185**, **PR147**. Risen, in its normal business, purchases and records its solar glass on a piece basis and not on a KG or M2 basis. In Question 9 of "Reporting Consumption Amounts" in Appendix XIII of Section D questionnaire, the Department required Risen to either report its input consumption in Section D FOP database by weight or report a conversion into weight. Following this request, Risen converted its solar glass consumption from pieces (its normal business unit) into kilograms and reported the consumption in kilograms in the FOP database, as reflected in Step 8.1 of Risen cost reconciliation. Risen's reporting of glass consumption in KG was the result of direction by the Department. **It would not be reasonable that the selection of surrogate value source is predetermined and limited by data reporting requirement by the Department itself, when the Department could have just as easily requested the reporting in M2.**

Risen provided a conversion for its glass from pieces to KG and to M2, both are fully substantiated by Risen's records reported to the Department, discussed further below. Thus, it is equally as reliable to use an M2 surrogate value and use Risen's M2 reporting for solar glass. Risen's glass consumption in M2 for the FOP database can be obtained by simply applying Risen's reported conversion ratio from KG to M2 to the glass consumption reported in KG in

Risen's FOP database. Indeed, Risen would have reported its glass consumption in M2 if the Department had required Risen to report the glass consumption in M2. Since the Department has Risen's glass consumption in both KG and M2 in its records, the fact that the Romanian data is in KG (through actually in tons) cannot be a factor making it a preferable source over the Malaysian data source in M2. Since the Department has Risen's glass consumption in M2 on the record, the Department can simply apply the Malaysian glass value in M2 to Risen's glass consumption in M2 without even applying any conversion ratio to convert the surrogate value in Malaysia from M2 to KG. There is no added accuracy in relying on the KG consumption and KG surrogate value in Romania rather than relying on the M2 consumption and M2 Malaysian surrogate value. Therefore, this supposed reason to prefer the Romanian glass HTS also must fail.

> **4. The Department Has An Established History Of Relying Upon Conversions For Surrogate Values And Has A Reliable Conversion For Risen.**

In addition, even if conversion ratio is required for the Malaysian glass value, the Department's determination that the need for a conversion made the Malaysian surrogate value somehow less preferable runs contrary to Department practice and the particular facts of this review and this input.

> **a. The Department Frequently Relies Upon Conversions for Surrogate Data.**

The Department has frequently used conversions for surrogate values, without finding that it impacted the reliability or quality of the surrogate value. In this very review, the Department used conversion data for several inputs for both respondents. *See* Dep't Prelim. SV Memo at Attachment 1 (relying on conversion for argon, alcohol, gas, hydrochloric acid, nitrogen, oxygen, diode, wood board, wood case, wood corner, and wood pallet), **PR403-407**. In

prior reviews, the Department also relied upon conversion factors for several inputs, including, as mentioned above, glass in the seventh review. *See Risen Final SVs (August 3, 2021)* at Exhibit SV2-2 (SV summaries for AR1 through AR5, showing the need for conversions), **PR321**. Even in the companion CVD reviews, the Department consistently relies upon a conversion for solar glass in its benchmarks. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 46904 (Dep't Comm. 2016) and accompanying IDM at Comment 6 (discussing the glass conversion used); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017*, 85 Fed. Reg. 7,727 (February 11, 2020); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind, in Part: 2018*, 86 Fed. Reg. 21691, 21692 (April 23, 2021).

Indeed, relying on a conversion for units of measurements in surrogate values is very common. *Final Determination of Sales at Less Than Fair Value: Wooden Bedroom Furniture From the People's Republic of China*, 69 Fed. Reg. 67,313 (2004) and accompanying IDM at Comment 54 (Discussing using the respondent's own conversions as ratios for converting surrogate values for veneer, polyester fabric, and glass.); *Certain Uncoated Paper From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 3,112 (2016) and accompanying IDM at Comment 14 (Discussing the conversion factor used for the nitrogen surrogate value); *Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative*

*Review*, 76 Fed. Reg. 15,297 (2011) and accompanying IDM at Comment 6 (Discussing the conversion factor for the cotton surrogate value); *Laminated Woven Sacks from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 35,646 (2008) and accompanying IDM at Comment 9 (Discussing relying on the respondent's data for a conversion factor for various surrogate values); *Certain Aluminum Foil From the Republic of Armenia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,882 (2021) and accompanying IDM at Comments 3&4 (Discussing the conversion factor used for sawn timber and polyether packing tape).

The Department relies upon conversion rates for inputs frequently in its normal practice, including for solar glass, without finding it impacts the quality or selection of the surrogate value or benchmark. This well-established practice only supports the other reasons to rely upon the Malaysian HTS for glass, namely that Malaysia is the primary surrogate country and is a significant producer of identical merchandise, as discussed further below.

### b. The Department Had A Complete and Accurate Solar Glass Conversion Ratio For Risen.

In the prior review, the Department relied upon Malaysian HTS 7007.19.90.00 to value glass and used Risen's reported weight as a conversion. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021) and accompanying IDM at Comment 11. In that review, petitioner had argued that the Department should rely upon Bulgarian HTS for solar glass because it did not require conversion, arguing that Risen's conversion for solar glass was not supported. *Id*. However, the Department found:

> Risen reported the precise weight of a square meter of the tempered glass that it consumed. Risen based this weight on its POR inventory records, which reconcile to its income statements. The glass that we are valuing was consumed by Risen. Thus, while the weight of a square meter of the glass imported into Malaysia during the POR is not on the record of this review, **we have a very complete and accurate measurement of the weight of a square meter of the solar glass consumed by Risen**.

*Id*. (emphasis added). The Department made this conclusion and then relied upon the Malaysian glass and Risen's conversion rate[8]. The instant record contained the same complete and accurate information from Risen. *See* Risen Final SVs at Exhibit 1, **PR321**; *see also See* Risen Sec D at Exhibit D-34 (cost reconciliation supporting this conversion rate), **CR126-185**, **PR147**. No parties questioned the reliability of the conversion ratio reported by Risen. Accordingly, like in the previous review, the Department had "a very complete and accurate measurement of the weight of a square meter of the solar glass consumed by Risen" to convert the Malaysian glass surrogate value, in the same manner it did in the prior review. The Department should find, as it did in the prior review, that the fact that "the glass thickness is not specified" in the Malaysia HTS for glass is not relevant because the Department has a complete and accurate conversion for Risen.

Moreover, the reliance on a conversion ratio to the surrogate value derived from the respondent's own data is also normal practice rather than using a more generic surrogate value conversion. For example, in this review, as in prior reviews, the Department relies upon Risen's own purchase/usage data for conversion for other inputs including diode, argon, nitrogen, oxygen, boards, pallets, and cases. Likewise, for Jinko, the Department relied upon Jinko's own data for conversion for various inputs. This is also commonly seen in many cases for packing

---

[8] Risen acknowledges that this review had a further issue in that the Romania glass value was not actually place on the record. However, this does not impact the Department's determination that it was accurate and reliable to rely on the Malaysian glass surrogate value and use Risen's conversion rate.

materials. The Department commonly has the respondent weigh the packing materials (such as boxes, pallets, etc) and relies upon that weight for a conversion ratio for the surrogate values. Accordingly, the Department has consistently found that relying on a conversion derived from a respondent's own data is reliable.

### 5. The Romanian Glass Import Data Has Defects.

While the Romania data is discussed as needing no conversion to KG, the Romanian data is actually reported on an MT basis, rather than a KG basis. This is less precise than on a KG basis, and has resulted in the rounding of quantities in the Romanian data. For example, there are several line items (monthly totals by trading partner) in the underlying data where while there is a value for the imports, the quantity is "0" because the data was smaller than the unit of measurement. *See* Prelim SV Memo at Excel Attachment "Original Download", **PR403-407**. Therefore, a certain quantity is missing when relying on the Romanian HTS. The Department faulted Risen with failing to quantify or establish the distortion of the zero-quantity Romanian import data. IDM at Comment 3. However, it is self-evident by the fact that there is zeroed-quantity instead of a precise amount. While Risen agrees that this rounding is not a significant impact on the AUV, it undermines the apparent assertion by the Department that the Romania data had no flaws. The rounding introduces inconsistencies in the Romanian data that are not present in the Malaysian data—or at the very minimum are no greater than any perceived inconsistencies with the use of a conversion in Malaysia.

### C. The Department Improperly Relied Upon Information Not On The Record Of This Review.

A further defect in the Department's analysis is that the Department's conclusions that the Malaysia glass surrogate value is less specific is not supported by the record of this review, but rather relies on information <u>not</u> on this record. In the Final Results, the Department raised

reliability concerns over needing to convert the Malaysian glass value.  The Romanian glass surrogate value is reported on a ton basis, while the Malaysian glass surrogate value is reported on an M2 basis.  The Respondents reported their glass on a kilogram basis, thus a conversion was needed for the Malaysian glass surrogate value.  As already discussed above, in fact, Risen actually purchased glass on a "piece" basis and reported a conversion to both M2 and KG, so there is no need to convert the surrogate value itself.  Nonetheless, we also address the conversion concerns raised by the Department.

Each of the concerns the Department raised are actually based on information on the record of the sixth administrative review and not on this eighth review.  The Department must make a determination based on the record of this particular review.  Substantial evidence standard necessarily involves the record of the proceeding itself.  *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (Ct. Int'l Trade 1983) ("In searching the entire record for substantial evidence, a reviewing court must take into account whatever in the record fairly detracts from the ITA's fact  finding as well as evidence that supports it.") (citations omitted); *Itochu Bldg. Prods. Co. v. United States*, 2017 Ct. Intl. Trade LEXIS 67, *13 (Refusing to consider information from a prior review on the public availability of a surrogate financial statement because "this evidence was not submitted in the instant review, and "each administrative review is a separate segment of proceedings with its own unique facts.") quoting *Peer Bearing Co.-Changshan v. United States*, SLIP OP. 2008-134, 32 CIT 1307, 1310, 587 F. Supp. 2d 1319, 1325 (2008); *see also Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ("each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews."); *Ass'n of Am. Sch. Paper Suppliers v. United States*, 683 F.

Supp. 2d 1317, 1323 (Ct. Int'l Trade 2010) ("This court has repeatedly held that judicial review must be based solely upon the administrative record made during the particular review proceeding which resulted in the determination subject to judicial review.). *See e.g. Beker*, 7 CIT at 313-18 (Plaintiff sought to add information and documents from proceedings before or during the review in question; this court denied the request because Plaintiff could have sought access to most, if not all, of this information and attempted to introduce it into the record at the agency level.).").

Specifically, the Department argues that relying on a conversion for this particular surrogate value would not be reliable because tempered glass has a large range of thickness. IDM at 18. This finding is based on information not on this record. The Department cites to the AR6 IDM, where information on that record showed a range of weight variations in the UN Comtrade import data for that particular year. No such evidence was submitted on this record. Therefore, there is no information on this record to suggest that any potential conversion concerns in the sixth administrative review would be present in the eighth administrative review.

It runs contrary to the administrative basis to rely on record evidence not on this review, information the parties were not permitted the opportunity to confront or rebut during the review. Further, it runs contrary to the administrative burden on the parties to develop the record that the Department would be allowed to rely on such extra record evidence. Petitioner failed to justify its suggested HTS for glass, the Romanian HTS, and it is not the Department's job to supplement the record with information to support petitioner's argument. *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018) (quoting *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)) (It is well established that "'[T]he burden of creating an adequate record lies with interested parties and not with Commerce.'"); *Jinan Farmlady Trading*

*Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (Ct. Int'l Trade 2017) ("It is the parties to a proceeding that bear the burden of building an adequate record."); *Polyethylene Terephthalate Film, Sheet, and Strip From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 78,333 (Dec. 26, 2013) and accompanying Prelim. Decision Memo ("Any party advocating a specific surrogate country has the burden of creating an adequate record to support its selection.").

In sum, the Department's decision to depart from its established regulatory preference to rely on all surrogate values from the primary surrogate country, Malaysia, is not supported by this record. The Department has pointed to no information on this record to support a finding that the Malaysian data is not reliable. The Department can rely upon Risen's reporting of its glass on an M2 basis and not convert the Malaysian surrogate value at all. Alternatively, the record contains a reliable conversion for the Malaysian glass surrogate value and the Department has an established history of relying on conversions, even for this input, without finding it impacted the quality of the surrogate value. The record also does not support a finding that the Romanian HTS is more specific to solar glass than the Malaysian glass HTS. Accordingly, the Court should find the Department decision to rely on the Romanian data is not supported by substantial evidence and is contrary to Department practice.

## IV. The Department's surrogate value HTS classification for Backsheet and EVA film inputs is Not Supported by Substantial Evidence.

The Department relied upon the incorrect Malaysian HTS classifications to value Risen's backsheet and EVA film input. The Department's sole basis for its classification of both of these inputs is the Department's unsubstantiated difference between the thickness of a "film" or a "sheet." The Department placed ASTM Abstracts on the record indicating that a plastic film may be less than 0.25mm thick while plastic sheet would be 0.25mm or thicker. *See* Dep't

Surrogate Value Documents (March 8, 2021), **PR78-79**.  Using this definition, the Department considered the thickness of Risen's backsheet and EVA inputs and classified them as sheets under HTS 3920.62.10.00.

The Department treated the ASTM Abstracts as definitions for film and sheet, and this is a mischaracterization of these documents. The ASTM specifications placed on the record are general guides for plastic film and polyethylene sheeting.  The plastic film ASTM is about determining thickness, and only notes that film is an *optional* term for sheeting with a thickness less than 0.25mm.  This ASTM specification sheet is not focused on film compared to sheet or providing definitive, necessary differences between the two terms.  The specification is about how to measure plastic sheeting, not about these terms.  Likewise, the polyethylene sheeting ASTM specifications only state that the standard is for a very particular type of extruded and compression-molded sheeting made from low-, medium-, high-density polyethylene and copolymers with a thickness of 0.25mm.  It does not discuss that all polyethylene sheets must be over 0.25mm or anything about the terms film versus sheet.  The ASTM is merely the specification for that particular product, which is not the same product as used by Risen or in the solar industry at all.  The ASTM specifications are not informative of when sheet or film is used in the solar industry or in the Malaysian HTS schedule for that matter.

In contrast, Risen has provided information on backsheet and EVA film from its own records and from the solar industry that indicates these inputs, at these thicknesses, are described as films in the industry.  Risen provided specifications of its backsheet, which demonstrate it is a thin flexible film.  Risen Sec. D at Exhibit D-32, **CR126-185**, **PR147**.  Risen also submitted other solar companies' backsheet specifications for solar modules where the input was even called backsheet <u>film</u>.  *See* Risen Final SVs at Exhibit SV2-5, **PR321**.  These both establish it is

common in the industry for backsheet used on a solar module to be a thin flexible film. Accordingly, the most specific HTS for this input is HTS 3920.62.90, which covers film.

Likewise for EVA, Risen has consistently called this input a film and provided photos of the input showing that it is extremely flexible and can be easily twisted into different shapes. Risen Supp Qre Response (July 15, 2021) at Exhibit SQ-9, **CR363**, **PR271**. The record also contains the Chinese National standard specific to EVA film used in solar modules, which specifically refers to the input as film. *Id*. at Exhibit SQ-8. Risen also submitted the EVA film specification sheet for use in solar modules from an international company, 3M, which likewise calls this input "film". Risen Final SVs (August 3, 2021) at Exhibit SV2-4, **PR321**. Notably, 3M operates in the United States and Malaysia. The evidence on the record of this review demonstrates that EVA film input used in the solar industry is <u>film</u>. There is no evidence to the contrary. Accordingly, the most specific HTS for this input is HTS 3920.10.90, which covers film. The Department's classification of these inputs is not supported by substantial evidence on the record.

## V. The Department's Ocean Freight Surrogate Value is Not Supported by Substantial Evidence.

In the Final Results, the Department relied on ocean freight data from Maersk and Descartes. IDM at Comment 4. However, as in the previous several reviews, the Department should rely solely on the Descartes data which is the most specific ocean freight data on the record. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–2017*, 84 Fed. Reg. 36,886 (July 30, 2019) and accompanying IDM at 59 (relying solely on Descartes freight data which was product specific "rates for shipping solar panels and other solar products"); s*ee Crystalline Silicon Photovoltaic*

*Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (October 2, 2020) and accompanying IDM at Comment 5 (relying solely on Descartes freight data). The Descartes data on this record is likewise product specific, covering solar panels or other solar products. Risen Final SVs at Exhibit SV2-7 (providing Descartes data), **PR321**. In contrast, the Maersk data is for general category of electronic appliances. Petitioner Ocean Freight Submission (December 8, 2021), **PR393**. The Department has a long-established preference for specificity. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than other criteria); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of "product-specific data" as "best available information"). Accordingly, the Department's determination to rely upon the Maersk data is contrary to this practice.

Further, Risen submits that the Department's method for averaging the two source rates together does not properly consider contemporaneity. The Maersk data placed on the record only covers four months of the POR (December 2019, March 2020, June 2020, and September 2020). **PR393**. In contrast. the Descartes data provided by Respondents cover every single month of the POR. By equally averaging the data together, the Department has given additional weight to the months where there was Maersk data. This results in a less accurate margin that does not appropriately account for freight over the entire POR. Accordingly, to account for contemporaneity, the Department should average the data available for each month of the POR for various routes before averaging the data together. In considering but rejecting this argument, the Department explained that it gave more weight to Respondents' submitted freight data over

petitioner's submitted freight data.  IDM at 25.  However, the Department's selection of surrogate values is not to equally give weight to two parties' suggested surrogate values, but to rely upon the best available information for each surrogate value.  *See* 19 U.S.C. § 1677b(c)(1)(B).  Contemporaneity is one of the key factors the Department considers (along with specificity, which also should result in relying on Descartes data) in selecting the best available information.  Accordingly, averaging the sources to account for contemporaneity follows the Department's own preferences for selecting surrogate values.  *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1295 (Fed. Cir. 2011)  ("Commerce has a longstanding practice of favoring contemporaneous surrogate values over non-contemporaneous market economy purchases because, according to Commerce, those surrogate values more accurately reflect the respondent's actual market cost experience during the relevant period of review.").

**VI.  The Department's Application of Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Substantial Court Precedent.**

In the Final Results, the Department applied partial AFA to the missing FOP data not reported by Risen's unaffiliated solar cell and solar module producers.  IDM at Comment 1.  The Department found the missing information represents a material amount of the necessary FOP information.  *Id*.  The Department application of adverse facts "AFA" to Risen's unreported FOPs from unaffiliated suppliers is not supported by the record and contrary to established Court precedent.

The Department resorts to facts available when information is missing from the record.  *See* 19 U.S.C. § 1677e(a).  In this case, the factors of production ("FOPs") for certain solar cells and solar modules that *unaffiliated* suppliers sold to Risen during the POR are missing from the administrative record.  For both the unaffiliated cell and module suppliers for which Risen did

27

not have the usable FOPs, Risen requested the information multiple times and provided evidence of its efforts on the record.  *See* Risen Sec D at Exhibit D-16, **CR126-185**, **PR147**.  In order to make its best efforts to obtain the FOP data from the unaffiliated module suppliers, Risen stated clearly in its letters to the suppliers that if the unaffiliated suppliers refuse to provide the FOP data, Risen would be forced to refuse to purchase any products from these companies and would only purchase from the companies that would cooperate with Risen on this issue.  *Id*.  In other words, Risen used its maximum market leverage to secure the cooperation of unaffiliated suppliers.  Nonetheless, Risen has no control over these unaffiliated suppliers particularly when the purchase quantity from each of them is not significant.

The Department's dismissal of these attempts fails to understand the market.  The solar cell market is not a buyer's market and Risen's own cell production capacity cannot not meet its requirements for module production.  *See* Risen Supp Qre (June 21, 2021) at 16, **CR294-296**, **PR179**.  The significant number of unaffiliated cell suppliers that Risen had is, itself, evidence that Risen had to try hard to explore all sources to purchase sufficient cells to meet its module production needs.  Therefore, when Risen needs to purchase solar cells from a large number of cell suppliers to meet its module production requirements and the non-cooperation for providing FOPs are prevalent among the large number of unaffiliated cell suppliers, it is not a viable business option for Risen to simply stop purchasing cells from whichever unaffiliated supplier refused to provide FOPs.  This would disrupt Risen's module production.  This also illustrates that Risen does not have a position in the solar industry to be able to control or influence its unaffiliated suppliers to force their cooperation.  Risen has put forth its best efforts to warn the unaffiliated suppliers of the possibility of ceasing purchasing if the suppliers refused to cooperate, so any unaffiliated suppliers that did value Risen's purchasing would be induced to

cooperate. Further, in instances where it was possible to stop purchasing from certain uncooperative unaffiliated suppliers of cells and modules, Risen stopped purchasing from them. Risen reported such details. *Id*. at 17-18.

Risen acted to the best of its ability to obtain this information from unaffiliated suppliers. Risen does not dispute that information is missing from the record for the unaffiliated suppliers nor does Risen dispute that resort to facts available is justified. Rather, Risen challenges the Department's decision to resort to *adverse* inferences, whether in accordance with 19 U.S.C. § 1677e(b) or 19 U.S.C. § 1677e(a).

The Department has the general discretion to draw adverse inferences in filling gaps in the record when the party responsible for providing the information does not provide all of it, but the Department must establish "that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). However, As explained by the Federal Circuit in *Nippon Steel*, "{b}efore making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. . . . ." *Nippon Steel Corp. & United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Risen provided all of its *own* FOP data and records that the Department requested, which was a very substantial amount of data. Specifically, the record is only missing FOPs for [      ] percent of the solar cells that were used in the solar modules that Risen produced during the period of review and only [      ] percent of the solar modules that Risen produced during the POR. Risen Prelim. Analysis Memo at 3; **CR462**, **PR398**. Rather than failing to diligently maintain a production record of its *own* (*i.e.,* like Nippon Steel's simple single weight conversion factor), this case is about whether, in context, Risen's efforts to obtain the *unaffiliated* supplier

FOPs, the sensitive cost records of unrelated suppliers, were reasonable such that Risen cooperated to the best of its ability.

Several Court of International Trade opinions have supported that this factual scenario does not warrant applying adverse-facts available. The Court has emphasized that it is unfair and contrary to law for the Department to employ an adverse inference when the party has no control over the non-cooperating supplier. *See Canadian Solar Int'l Ltd. v. United States*, 2019 Ct. Int'l Trade LEXIS 152 (Dec. 3, 2019) at 13. Both this Court and the CAFC are adamant that "there is no justification for an AFA rate based in deterrence where the rate would affect only the cooperating party." *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) ("*Canadian Solar I*"), citing to *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012). In this review, the Department is faulting Risen more with its inability after several reviews to obtain cooperation from suppliers. This fails to understand the market realities already discussed above.

While the Department did not rely on Mueller in this review for justification to apply AFA to Risen, the Court's analysis in Mueller and prior reviews of this Order is relevant to the goals of AFA and whether the Department has a legal basis to apply AFA under these circumstances. For example, in an opinion addressing Risen specifically, the Court found the Department's past justification of applying AFA to the cooperating Risen wholly unreasonable and unsupported by the statute and caselaw:

> Commerce's determination is unsupported by substantial evidence. The evidence that Commerce cites does not support its claim that using partial AFA furthers its policy objectives. Regarding the threat of duty evasion, unlike the supplier at issue in Mueller, the unaffiliated suppliers in this case are not mandatory respondents refusing to participate in the review, *see Mueller*, 753 F.3d at 1229-30, 1235, and Commerce does not point to substantial evidence to otherwise support its concern that the unaffiliated suppliers intend to evade their own potential duties by exporting subject merchandise into the U.S. through Risen. *See id*. Moreover,

regarding Commerce's aim of deterring non-cooperation, Commerce cites no evidence of a mechanism or relationship that Risen could use to induce the cooperation of their unaffiliated suppliers. *Compare id.*, 753 F.3d at 1234-35 (explaining how Commerce's policy objective of inducing cooperation may be advanced where there is an existing relationship between the mandatory respondent and uncooperative supplier) with Final Decision Memo at 13 (determining that a plausible threat that the mandatory respondent may refuse to purchase subject merchandise from the suppliers is sufficient to induce cooperation). Commerce observes that Risen is a large producer that may refuse to purchase subject merchandise from the non-cooperating, unaffiliated suppliers, see id. at 12, but such observations do not demonstrate that Risen had leverage over its unaffiliated suppliers under a more searching § 1677e(a) analysis.

Commerce also fails to adhere to Mueller's emphasis on accuracy above all else. *See Mueller*, 753 F.3d at 1233… Commerce does not cite record evidence that using the highest FOP consumption rates on the record result in accurate dumping margins for Risen. *See Mueller*, 753 F.3d at 1232-33.

*Risen Energy*, 477 F. Supp. 3d 1343-44. For the same reasons as prior reviews, and the facts of this case, applying adverse facts available under these circumstances does not support any policy objective and is contrary to law.

As the Court has found in several cases now, applying AFA to the unreported FOPs in this situation does not lead to a more accurate rate and there is no justification of policy considerations for the particular circumstances of unaffiliated suppliers. The Department's determination is therefore contrary to law as well as unsupported by substantial evidence in light of the specific context of the unaffiliated suppliers.

## VII. The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law.

The Department had a consistent practice for calculating adverse facts available for unreported FOPs in the reviews of this Order. The Department used an input-specific methodology to apply the highest consumption amount of an input in one CONNUM to the input consumption of the same input for all other CONNUMs. *See* IDM at 11 (acknowledging this

past practice).  However, in this review, for the first time the Department used a new methodology:

> applied AFA by calculating average ratios of the reported consumption quantities to the highest consumption quantities for three separate groups of inputs, all solar module FOPs, all solar cell FOPs, and all packing FOPs. We then multiplied the reported per-unit consumption quantity of each solar module FOP, each solar cell FOP, and each packing FOP, by the relevant average adjustment ratio to increase the reported quantities, as AFA

*Id*.  The Department stated that it considered applying its normal methodology, but because Risen's consumption rates varied little across certain inputs, applying the highest per-unit consumption quantity would be similar to neutral facts available and is not appropriately adverse. *Id*.  This fails to consider Risen's cooperation and the concerns of accuracy, even when applying partial AFA.

As discussed above, Risen did cooperate to the best of its ability in this review.  The Department has no basis to apply an adverse inference to Risen.  Accordingly, the normal methodology of partial AFA is certainly adverse enough.  Second, the Department failed to consider the accuracy concerns, also discussed above in *Mueller*. The Department's methodology is significantly flawed in two ways, resulting in an overstatement of the AFA application.

First, the Department calculated AFAs on the "average of ratios" that were calculated for each input.  Specifically, the Department calculated a single average AFA adjustment factor for all solar cell inputs, one AFA factor for solar modules, and another one AFA factor for packing materials.  The Department failed to explain why it grouped 76 module inputs into a single AFA factor, 50 cell inputs into another single factor, and all the packing material inputs into yet another single AFA factor when each input specific factor has been submitted to the Department and included in the Department's own AFA calculation spreadsheet.  *See* Risen Prelim. Analysis

Memo at Attachment III, **CR462**, **PR398**. The Department has calculated and applied input specific AFA factors for Risen in the AD reviews when certain tollers failed to report factors. There is no justification for calculating and applying AFA on a much broader basis than the record allows. It serves only to distort the AFA factors and the resulting dumping margin. Inputs have significantly different reported factors of production and have significantly different surrogate values assigned to them. Applying an input-specific AFA more accurately reflects the AFA for each input. An average AFA factor calculated over a large number of inputs only distorts the actual input specific AFA factors that are just as easily calculated from the AFA calculation spreadsheet. An input specific methodology leads to a more accurate margin calculation—i.e. it more accurately fills the gap on the record. *United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1354-1355 (Ct. Int'l Trade 2010) ("It is well-established that Commerce is required to calculate antidumping duty margins as accurately as possible in each segment of a proceeding.").

Second, the calculation of ratios used to determine the applied AFA is flawed, resulting in an overstated AFA rate that exceeds the total AFA for each input if the highest FOP for each input was used. The Department stated that it divided the average of the consumption figures for each input that was reported for multi-crystalline CONNUMs, other than the multi-crystalline CONNUM with the highest per-unit consumption of the input. The exclusion of the CONNUM with the highest per-unit consumption from the calculation of the average overstated the result because the resulting average is applied to all multi-crystalline CONNUMs, including the CONNUM with the highest FOP. The Department used the highest reported FOP for all multi-crystalline CONNUMs in past AD reviews where AFA was applied. The Department's methodology results in the total AFA FOP for each input that is higher than the total AFA for

each input where the highest FOP been used.  If the Court does not find that the application of partial AFA at all to the unreported FOPs is unlawful, then the Court should at a minimum find that this more adverse, and less accurate, application of partial AFA is unlawful because it is not tailored to the gap in the record that Commerce is attempting to fill.

## VIII.   Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth Street N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*

Date: March 24, 2023

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **10,551** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth Street., N.W. 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*