UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD. *ET AL.*, | ) ) ) |
| Plaintiffs and Consolidated Plaintiffs, | ) ) ) |
| and | ) ) |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *ET AL.*, | ) ) ) |
| Plaintiff-Intervenors, | ) ) Consol. Court No. 22-00219 |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | ) ) ) |
| Defendant-Intervenor. | ) ) |

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment upon the agency record,

defendant's and defendant-intervenor's responses thereto, the administrative record, and all other

pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that judgment is entered in favor of the United States.


_____
JUDGE

Dated: _____, 2023
       New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |  |
|---|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD. *ET AL.*, | ) ) ) | |
| Plaintiffs and Consolidated Plaintiffs, | ) ) ) | |
| and | ) ) | |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *ET AL.*, | ) ) ) | |
| Plaintiff-Intervenors, | ) ) | Consol. Court No. 22-00219 |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

_____

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    JOSHUA E. KURLAND
BRISHAILAH BROWN                               Senior Trial Counsel
Attorney                                       Commercial Litigation Branch
Office of the Chief Counsel                    Civil Division
for Trade Enforcement & Compliance             U.S. Department of Justice
U.S. Department of Commerce                    P.O. Box 480, Ben Franklin Station
                                               Washington, D.C. 20044
                                               Telephone: (202) 616-0477
                                               Email: Joshua E. Kurland@usdoj.gov

September 18, 2023                             *Attorneys for Defendant United States*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ...........................................................................2

    I.    Administrative Determination Under Review ........................................................2

    II.    Issues Presented For Review ................................................................................2

STATEMENT OF FACTS ....................................................................................................3

    I.    Commerce's Administrative Review .....................................................................3

    II.    Preliminary Results ..............................................................................................4

    III.    Final Results.........................................................................................................6

SUMMARY OF THE ARGUMENT ....................................................................................7

ARGUMENT ......................................................................................................................10

    I.    Standard Of Review............................................................................................10

    II.    Commerce's Surrogate Value Selections Are Supported By Substantial
        Evidence And Otherwise Lawful.........................................................................11

        A.  Legal Framework For Surrogate Value Selections..........................................12

        B.  Commerce's Selection Of Romanian HTS 7007.19.80 As The Surrogate
            Value For Solar Glass Is Supported By Substantial Evidence And Lawful ....14

        C.  Commerce's Selection Of Malaysian HTS 3920.62.10 As The Surrogate
            Value For Backsheet Is Supported By Substantial Evidence And Lawful.......26

        D.  Commerce's Selection Of Malaysian HTS 3920.10.19 As The Surrogate
            Value For EVA Is Supported By Substantial Evidence And Lawful ..............29

        E.  Commerce's Selection Of The Descartes And Maersk Data To Value
            Ocean Freight Is Supported By Substantial Evidence And Lawful.................31

        F.  Commerce's Selection Of the Freightos Data To Value Air Freight Is
            Supported By Substantial Evidence And Lawful .............................................37

        G.  Commerce's Selection Of The Surrogate Value For Electricity Is
            Supported By Substantial Evidence And Lawful .............................................41

        H.  Commerce's Selection Of A Surrogate Financial Statement Is Supported
            By Substantial Evidence And Lawful..............................................................43

III.    Commerce Reasonably Deducted Section 301 Duties In Its Calculations ............50

IV.     Commerce's Determination To Apply Partial AFA To Value Risen's
        Unreported Factors Of Production Is Supported By Substantial Evidence
        And Lawful ....................................................................................................59

        A.  Legal Framework ....................................................................................59

        B.  Commerce Lawfully Applied Partial AFA Because Risen Failed To
            Cooperate To The Best Of Its Ability......................................................61

        C.  Commerce's AFA Rate Calculation Is Supported By Substantial Evidence
            And Otherwise Lawful..............................................................................65

V.      Commerce's Denial Of A Separate Rate To Trina Is Supported By Substantial
        Evidence And Lawful .....................................................................................70

        A.  Background ..............................................................................................70

        B.  Legal Framework For Application Of Separate Rates.............................72

        C.  Commerce's Denial Of A Separate Rate Is Supported By Substantial
            Evidence...................................................................................................74

        D.  Commerce's Enforcement Of Its Deadline Was A Lawful Exercise Of
            Discretion ................................................................................................76

        E.  Commerce's Application Of The Extraordinary Circumstances Standard
            Is Not Arbitrary, Capricious, Or Otherwise Unlawful.............................84

        F.  Commerce Lawfully Denied A Separate Rate To Trina Based On Trina's
            Failure To Rebut The Presumption Of Government Control ....................89

VI.     Commerce Lawfully Calculated The Rates For Separate Rate Respondents ........92

CONCLUSION.................................................................................................................92

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   618 F.3d 1316 (Fed. Cir. 2010) ............................................................. 13

*Adv. Tech. & Materials Co. v. United States*,
   938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013),
   *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) .................................... 74, 82, 90

*AK Steel Corp. v. United States*,
   988 F. Supp. 594 (Ct. Int'l Trade 1997) .................................................. 58

*AMS Assocs., Inc. v. United States*,
   719 F.3d 1376 (Fed. Cir. 2013) .................................................. 73, 74, 76

*APEX Exports v. United States*,
   777 F.3d 1373 (Fed. Cir. 2015) ....................................................... 51, 59

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................. 10

*Baoding Mantong Fine Chemistry Co. v. United States*,
   279 F. Supp. 3d 1321 (Ct. Int'l Trade 2017) .......................................... 13

*Bebitz Flanges Works Private Limited v. United States*,
   433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ................................ 80, 81, 91

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021),
   *aff'd on other grounds* 63 F.4th 25 (Fed. Cir. 2023) ....................... 55, 59

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   63 F.4th 25 (Fed. Cir. 2023) .......................................................... *passim*

*Bristol Metals L.P. v. United States*,
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) .......................................... 37

*Canadian Solar Int'l Ltd. v. United States*,
   399 F. Supp. 3d 1379 (Ct. Int'l Trade 2019), *aff'd*, 68 F.4th 1267 (Fed. Cir. 2023) ............... 80

*Canadian Solar Int'l Ltd. v. United States*,
   415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) .......................................... 62

*Changzhou Trina Solar Energy Co. v. United States*,
   975 F.3d 1318 (Fed. Cir. 2020) ............................................................. 13

*China Mfrs. All,, LLC v. United States,*
  1 F.4th 1028 (Fed. Cir. 2021)..................................................................... *passim*

*China Processed Food Imp. & Exp. Co. v. United States,*
  614 F. Supp. 2d 1337 (Court of Int'l Trade 2009) ........................................ 19, 20

*Cleo Inc. v. United States,*
  501 F.3d 1291 (Fed. Cir. 2007) ........................................................................ 11

*Consol. Bearings Co. v. United States,*
  412 F.3d 1266 (Fed. Cir. 2005) ........................................................................ 77

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) .......................................................................................... 10

*Dongtai Peak Honey Indus. Co., Ltd. v. United States,*
  971 F. Supp. 2d 1234 (Ct. Int'l Trade 2014), *aff'd,* 777 F.3d 1343 (Fed. Cir. 2015) .............. 79

*Dongtai Peak Honey Indus. Co., Ltd. v. United States,*
  777 F.3d 1343 (Fed. Cir. 2015)................................................................. *passim*

*Dorbest Ltd. v. United States,*
  604 F.3d 1363 (Fed. Cir. 2010) ........................................................................ 44

*Essar Steel Ltd. v United States,*
  678 F.3d 1268 (Fed. Cir. 2012) ................................................................ *passim*

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .......................................................................................... 67

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
  216 F.3d 1027 (Fed. Cir. 2000) ........................................................................ 68

*Fedmet Res. Corp. v. United States,*
  77 F. Supp. 3d 1336 (Ct. Int'l Trade 2015)...................................................... 84

*FPC v. Transcon. Gas Pipe Line Corp.,*
  423 U.S. 326 (1976) .......................................................................................... 78

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996)..................................................................... 10, 11

*Goldlink Indus. Co. v. United States,*
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)..................................................... 11

*Gov't of Argentina v. United States,*
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .................................................... 16, 28

*Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States,*
    815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ............................................................ 79

*Haixing Jingmei Chem. Prod. Sales Co. v. United States,*
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) .................................................... 16, 28

*Home Meridian Int'l, Inc. v. United States,*
    772 F.3d 1289 (Fed. Cir. 2014) .......................................................................... 14, 20

*Hoogovens Staal BV v. United States,*
    4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) ........................................................ 51, 58

*Huaiyin Foreign Trade Corp. v. United States,*
    322 F.3d 1369 (Fed. Cir. 2003) ................................................................................ 73

*Huvis Corp. v. United States,*
    570 F.3d 1347 (Fed. Cir. 2009) ................................................................................ 67

*Hyundai Steel Co. v. United States,*
    279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ............................................. 37, 40, 48

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) .................................................................................................. 10

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ................................................................................ 11

*Jinan Yipin Corp. v. United States,*
    800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011) ........................................................... 34

*Maverick Tube Corp. v. United States,*
    107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ................................................. *passim*

*Mid Continent Nail Corp. v. United States,*
    712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ........................................................... 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................................... 85

*Nation Ford Chem. Co. v. United States,*
    166 F.3d 1373 (Fed. Cir. 1999) ........................................................................ 14, 35

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005) ................................................................. 77

*Neo Solar Power Corp. v. United States*,
    190 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) .................................. *passim*

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) .............................................................. 13

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ....................................................... 60, 63

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) .............................................................. 11

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) ............................................................... 80

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012) ...................................................... *passim*

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) .................................................... *passim*

*QVD Food Co., Ltd v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) .............................................................. 43

*Repwire LLC v. United States*,
    628 F. Supp. 3d 1288 (Ct. Int'l Trade 2023), *appeal pending*, Fed. Cir. No. 23-1933 ............. 80

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ....................................................... 35, 41

*Risen Energy Co. v. United States*,
    611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022), *appeal pending*, Fed. Cir. No. 23-1550 ....... 29, 31

*SeAH Steel Vina Corp. v. United States*,
    269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) .......................................... 45

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................................ 78

*Shakeproof Assembly Components v. United States*,
    268 F.3d 1376 (Fed. Cir. 2001) .............................................................. 14

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
  203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017)............................................................ 10

*Shanghai Sunbeauty Trading Co., Ltd. v. United States,*
  380 F. Supp. 3d 1328 (Ct. Int'l Trade 2019)............................................................ 82

*Shanghai Tainai Bearing Co., Ltd. v. United States,*
  No. 22-00038, 2023 WL 5974083 (Ct. Int'l Trade Sept. 14, 2023)................... 53, 56

*Sigma Corp v. United States,*
  117 F.3d 1401 (Fed. Cir. 1997)........................................................... 70, 73, 74

*T. T. Int'l Co. v. United States,*
  439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020)............................................................ 44

*Ta Chen Stainless Steel Pipe Inc. v. United States,*
  298 F.3d 1330 (Fed. Cir. 2002)............................................................................. 69

*Taian Ziyang Food Co. v. United States,*
  783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011)...................................................... 33, 34

*Tau-Ken Temir LLP v. United States,*
  587 F. Supp. 3d 1346 (Ct. Int'l Trade 2022), *appeal pending*, Fed. Cir. No. 22-2204...... *passim*

*Tianjin Magnesium Int'l Co. v. United States,*
  844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012)............................................................ 60

*Timken U.S. Corp. v. United States,*
  434 F.3d 1345 (Fed. Cir. 2006)............................................................................. 80

*Tri Union Frozen Prod., Inc. v. United States,*
  161 F. Supp. 3d 1333 (Ct. Int'l Trade 2016) ..................................................... 46, 48

*Tri Union Frozen Prod., Inc. v. United States,*
  163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ..................................................... 12, 14

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009)........................................................................................ 10

*United States v. Williams,*
  553 U.S. 285 (2008)........................................................................................ 18

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
  435 U.S. 519 (1978)........................................................................................ 77

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007) ........................................................................... *passim*

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
    165 F.3d 43 (D.C. Cir. 1999) .............................................................................. 86

*Yantai CMC Bearing Co. v. United States*,
    203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ...................................................... 74

*Yantai Timken Co. v. United States*,
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) .......................................... 77, 79, 81

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) .......................................................................... 14

*Zhejiang Native Produce & Animal By-Prods. Import & Export Grp. Corp. v. United States*,
    227 F. Supp. 3d 1375 (Ct. Int'l Trade 2017) ...................................................... 40

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ...................................................... 90

**Statutes**

5 U.S.C. § 706 .......................................................................................................... 84

19 U.S.C. § 1516a(b) ............................................................................................... 10

19 U.S.C. § 1675(c) ................................................................................................. 57

19 U.S.C. § 1675(d) ................................................................................................. 57

19 U.S.C. § 1677(18) ............................................................................................... 12

19 U.S.C. § 1677a(c) ........................................................................................ *passim*

19 U.S.C. § 1677b(a) ............................................................................................... 12

19 U.S.C. § 1677b(c) ........................................................................................ *passim*

19 U.S.C. § 1677e(a) ........................................................................................... 59, 60

19 U.S.C. § 1677e(b) ........................................................................................ *passim*

19 U.S.C. § 1677e(c) ................................................................................................. 67

19 U.S.C. § 1677e(d) ........................................................................................... 68, 69

19 U.S.C. § 1677m(d) ............................................................................... 60

19 U.S.C. § 2251 ...................................................................................... 52

19 U.S.C. § 2411 ...................................................................................... 53

19 U.S.C. § 2411(a) ............................................................................ 53, 58

19 U.S.C. § 2411(b) .................................................................................. 58

19 U.S.C. § 2417(a) .................................................................................. 57

19 U.S.C. § 2417(c) .................................................................................. 57

**Regulations**

19 U.S.C. § 351.104(a) ............................................................................. 75

19 C.F.R. § 351.302(c) ...................................................................... *passim*

19 C.F.R. § 351.302(d) ............................................................................. 75

19 C.F.R. § 351.308(c) ............................................................................. 61

19 C.F.R. § 351.408(c) .................................................................. 11, 44, 46

**Administrative Determinations**

*Antidumping Duties; Countervailing Duties,*
   61 Fed. Reg. 7,308 (Dep't of Commerce Feb. 27, 1996) ................... 39, 44

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation;*
   *Opportunity To Request Administrative Review,*
   85 Fed. Reg. 77,431 (Dep't of Commerce Dec. 2, 2020) ........................... 3

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic*
   *of China,*
   87 Fed. Reg. 9,576 (Dep.t of Commerce Feb. 22, 2022) ................... *passim*

*Certain Preserved Mushrooms from the People's Republic of China,*
   69 Fed. Reg. 54,635 (Dep't of Commerce Sept. 9, 2004) ........................ 91

*Chlorinated Isocyanurates From the People's Republic of China,*
   81 Fed. Reg. 1,167 (Dep't of Commerce Jan. 11, 2016) ......................... 34

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China,*
85 Fed. Reg. 62,275 (Dep't of Commerce Oct. 2, 2020) ................................. 17, 23, 24

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,*
86 Fed. Reg. 58,871 (Dep't of Commerce Oct. 25, 2021) ..................................... 22

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
86 Fed. Reg. 72,923 (Dep't of Commerce Dec. 23, 2021). ...................................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022). ...................................... 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
87 Fed. Reg. 48,621 (Dep't of Commerce Aug. 10, 2022). ...................................... 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
88 Fed. Reg. 43,302 (Dep't of Commerce July 7, 2023) ................................... 19, 21

*Diamond Sawblades and Parts Thereof from the People's Republic of China,*
71 Fed. Reg. 29,303 (Dep't of Commerce May 22, 2006) ................................. 73, 74

*Diamond Sawblades and Parts Thereof From the People's Republic of China,*
79 Fed. Reg. 35,723 (Dep't of Commerce June 24, 2014) ....................................... 49

*Extension of Time Limits,*
78 Fed. Reg. 57,790 (Dep't of Commerce Sept. 20, 2013) ................................ *passim*

*Hydrofluorocarbon Blends and Components Thereof from China,*
81 Fed. Reg. 42,314 (Dep't of Commerce June 29, 2016) ...................................... 50

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021) ...................................... 3, 70

*Modification of Regulation Regarding the Extension of Time Limits,*
78 Fed. Reg. 3,367 (Dep't of Commerce Jan. 16, 2013) .................................. *passim*

*Stainless Steel Wire Rod from the Republic of Korea,*
69 Fed. Reg. 19,153 (Dep't of Commerce Apr. 12, 2004) ................................. 51, 58

**Executive Actions**

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*,
   82 Fed. Reg. 39,007 (Executive Office of the President Aug. 14, 2017)................................... 53

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
   83 Fed. Reg. 14,906 (USTR Apr. 6, 2018) ................................................................. 54, 56, 58

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
   83 Fed. Reg. 28,710 (USTR June 20, 2018) ...................................................................... 54, 56

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
   83 Fed. Reg. 40,823 (USTR Aug. 16, 2018) ..................................................................... 54, 56

*Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation*,
   87 Fed. Reg. 62,914 (USTR Oct. 17, 2022) ............................................................................ 57

**Legislative History**

S. Rep. No. 67-16 (1921) ................................................................................................................. 51

Statement of Administrative Action accompanying Uruguay Round Agreements Act,
   H.R. Doc. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ................................... 61, 66

**Other Authorities**

33 Fed. Prac. & Proc. Judicial Review § 8411 (2d ed. 2022) ........................................................ 77

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |  |
|---|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD. *ET AL.*, | ) ) ) | |
| Plaintiffs and Consolidated Plaintiffs, | ) ) ) ) ) | |
| and | ) ) | |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *ET AL.*, | ) ) ) | |
| Plaintiff-Intervenors, | ) ) | Consol. Court No. 22-00219 |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

_____

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the

motions for judgment on the agency record filed by plaintiffs Jinko Solar Import and Export Co.,

Ltd., *et al.* (Jinko), Risen Energy Co., Ltd., *et al.* (Risen), Trina Solar Co., Ltd., *et al.*, (Trina), JA

Solar Technology Yangzhou Co., Ltd., *et al*. (JA Solar), and BYD (Shangluo) Industrial Co.,

Ltd. (BYD).  Plaintiffs challenge aspects of the final results of the Department of Commerce's

(Commerce's) eighth administrative review of its antidumping duty order covering crystalline

silicon photovoltaic cells, whether or not assembled into modules, from China.  We demonstrate below that the Court should deny plaintiffs' motions and enter judgment for the United States because Commerce's determination is supported by substantial evidence and otherwise lawful.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is Commerce's eighth administrative review of its antidumping duty order covering solar cells from China, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022) (P.R. 464) (Final Results), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 455), *as amended by* 87 Fed. Reg. 48,621 (Dep't of Commerce Aug. 10, 2022) (P.R. 473) (Amended Final Results).[1]  The period of review is December 1, 2019, through November 30, 2020.

### II.    Issues Presented For Review

1.       Whether Commerce's surrogate valuation for solar glass using Harmonized Tariff Schedule (HTS) data from Romania is supported by substantial evidence and otherwise lawful.

2.       Whether Commerce's surrogate valuation for backsheet using certain Malaysian HTS data is supported by substantial evidence and otherwise lawful.

3.       Whether Commerce's surrogate valuation for ethyl vinyl acetate (EVA) using certain Malaysian HTS data is supported by substantial evidence and otherwise lawful.

4.       Whether Commerce's surrogate valuation for ocean freight is supported by substantial evidence and otherwise lawful.

5.       Whether Commerce's surrogate valuation for air freight is supported by

---

[1] "P.R. __" and "C.R. __" refer to documents in the public and confidential records, respectively.

substantial evidence and otherwise lawful.

6.      Whether Commerce's surrogate valuation for electricity is supported by substantial evidence and otherwise lawful.

7.      Whether Commerce's calculation of the surrogate financial ratios is supported by substantial evidence and otherwise lawful.

8.      Whether Commerce lawfully deducted duties paid by importers under Section 301 of the Trade Act of 1974 as part of its antidumping calculations.

9.      Whether Commerce lawfully applied partial adverse facts available (AFA) to value Risen's unreported factors of production based on its finding that Risen, in addition to its suppliers, failed to cooperate to the best of its ability.

10.     Whether Commerce lawfully declined to assign a separate rate to Trina following its rejection of Trina's untimely questionnaire response regarding separate rate information.

11.     Whether Commerce must revise the antidumping duty rates for separate rate companies that are based on the rates calculated for the mandatory respondents.

## **STATEMENT OF FACTS**

### I.      **Commerce's Administrative Review**

In December 2020, Commerce issued a notice of opportunity to request an administrative review for the period from December 2019 to November 2020.  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 85 Fed. Reg. 77,431 (Dep't of Commerce Dec. 2, 2020).  At the request of interested parties, Commerce initiated a review of 38 companies, and subsequently selected Jinko and Risen as mandatory respondents.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021) (P.R. 37);

Respondent Selection Memorandum (Feb. 25, 2021) (P.R. 43; C.R. 5).  Risen had participated as

a respondent in numerous previous segments of the proceeding, including participating in the

2011 antidumping duty investigation and as a mandatory respondent in the three preceding

administrative reviews.  IDM at 9, 11.

In May 2021, Commerce issued a list of potential surrogate countries at the same level

of economic development as China based on 2019 per capita gross national income (GNI) data,

including Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.  Surrogate Country List (May

5, 2021) (P.R. 156) (containing surrogate country memorandum for antidumping proceedings for

merchandise from China).  Commerce invited comment and the submission of surrogate value

data.  *Id*.  Jinko and Risen, as well as domestic industry petitioner American Alliance for Solar

Manufacturing (Alliance or petitioner), submitted surrogate value information.  *E.g.*, Jinko First

SV Cmts. (June 28, 2021) (P.R. 201-243; C.R. 314-351); Jinko Final SV Cmts. (Aug. 3, 2021)

(P.R. 304-320; C.R. 404-421); Risen Final SV Cmts. (Aug. 3, 2021) (P.R. 321-323); Petitioner

Pre-Prelim. Cmts. and Submission of Surr. Values (Aug. 3, 2021) (P.R. 326-336; C.R. 424-435).

## II.    **Preliminary Results**

In December 2021, Commerce published the preliminary results.  *Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 86 Fed. Reg. 72,923

(Dep't of Commerce Dec. 23, 2021) (P.R. 408) (Preliminary Results), and accompanying

Preliminary Decision Memorandum (P.R. 396) (PDM).  Commerce selected Malaysia as the

primary surrogate country, and used Malaysian data as the surrogate values for inputs such as

backsheet, EVA, and electricity.[2]  PDM at 16-19, 23-28; Prelim. SV Memo (Apr. 16, 2021) (P.R.

403-407).  Commerce, however, determined that import data under Romanian HTS 7007.19.80

---

[2] In valuing electricity, Commerce excluded rates reported for off-peak hours and from the
remote Sabah and Sarawak regions.  IDM at 58-59.

were the best information to value the respondents' solar glass because they were more specific to that input.  Prelim. SV Memo at 3 (P.R. 403).  Commerce selected Descartes and Maersk Line data to value ocean freight, while selecting Freightos data to value air freight.  *Id*. at 6-8; PDM at 27.  Commerce next selected financial statements from Malaysian solar cell and module producer JA Solar Malaysia SDN BHD to calculate the surrogate financial ratios.  PDM at 28; Prelim. SV Memo at 9-10 (P.R. 403) (citing Jinko First SV Cmts. at Ex. 11A (P.R. 238; C.R. 346); Risen First SV Cmts. at Ex. 11 (June 28, 2021) (P.R. 197-198)).

As in previous reviews, Commerce also addressed issues stemming from the need to apply the facts otherwise available to account for missing factor of production data that were not reported by the mandatory respondents' unaffiliated suppliers.  PDM at 14-16.  With respect to Jinko, Commerce preliminarily granted Jinko's request to be excused from reporting factor of production data for certain of its solar cell and solar module suppliers, indicating that Jinko had only a limited amount of missing data and that "there is usable information on the record that can be substituted for the missing FOP information (Jinko's own production information) without undue difficulties."  *Id.* at 15.  Hence, Commerce used the facts otherwise available, without any adverse inference, in place of the missing factor of production data for Jinko.  *Id.*  For Risen, however, Commerce preliminarily determined to apply partial adverse facts available (AFA) to value Risen's missing factor of production data because it determined that Risen, in addition to its suppliers, had failed to cooperate to the best of its ability by continuing to utilize suppliers who did not cooperate with Commerce's proceedings, resulting in a failure to provide information relating to a material amount of its merchandise.  *Id.* at 15-16.

In addition, in performing its dumping comparisons, Commerce deducted duties paid by importers under Section 301 of the Trade Act of 1974 from the United States prices.  IDM at 72.

Finally, Commerce recounted that the entities comprising Trina did not timely respond to Commerce's request regarding the incomplete separate rate information Trina had previously provided.  PDM at 13.[3]  Hence, Commerce rejected Trina's untimely supplemental questionnaire response regarding the separate rate information, as well as Trina's untimely extension of time request for the questionnaire response.  *Id.*  As a result, Commerce preliminarily determined that Trina had failed to demonstrate its continued eligibility to obtain a separate rate and thus would be considered part of the China-wide entity for the review.  *Id.*

## III.   <u>Final Results</u>

In October 2020, after considering the parties' administrative case briefs, Commerce issued its final results.  Commerce continued to value the respondents' backsheet and EVA inputs using Malaysian HTS data corresponding to "sheet" rather than "film" because it was the subheading most specific to the respondents' input.  IDM at 44-47.  Likewise, Commerce continued to rely on Malaysian data for electricity, while excluding rates reported for off-peak hours and from the remote Sabah and Sarawak regions.  *Id*. at 58-60.  Commerce also continued to rely on Romanian import data to value solar glass using the same HTS subheading as it did in the preliminary results.  *Id*. at 13-19.

Although Commerce revised its calculations for ocean freight, it continued to rely on a combination of Maersk Line and Descartes data to provide the best information available to value the respondents' ocean freight.  *Id*. at 19-25.  Likewise, Commerce continued to rely on the

---

[3] To demonstrate whether they are sufficiently independent to be entitled to a separate, company-specific dumping margin, Commerce requires entities that are subject to review, and that were assigned a separate rate in a previous segment of the proceeding, to submit a timely separate rate certification stating that they continue to meet the separate rate criteria.  PDM at 10.  In this case, Trina submitted separate rate certifications for only two of eight entities comprising Trina (the ones that exported subject merchandise during the review), and Commerce requested that Trina provide separate rate certifications for all individual entities that make up Trina.  IDM at 67.

Freightos data to value air freight.  *Id.* at 40-44   Commerce also continued to rely on the JA

Solar Malaysia SDN BHD financial statements to calculate the financial ratios.  *Id*. at 34-39.

With respect to non-surrogate value issues, Commerce continued to apply partial AFA in

calculating Risen's dumping margin.  *Id*. at 6-12.  Commerce also continued to deduct Section

301 duties from United States prices in calculating respondents' dumping margins.  *Id.* at 72-74.

Additionally, Commerce continued not to accept Trina's untimely separate rate submission, and

as a result, continued to find that the entire Trina entity was ineligible for a rate separate from the

China-wide entity.  *Id.* at 63-72.

Based on its determinations in the final results, Commerce calculated antidumping duty

margins of 20.99 percent for Jinko, 12.24 percent for Risen, 14.79 percent for separate rate

companies, and 238.95 percent for the China-wide entity (including Trina).  Amended Final

Results, 87 Fed. Reg. at 48,621-22.  This action followed.

## SUMMARY OF THE ARGUMENT

Commerce's determinations should be sustained because they are supported by

substantial evidence and otherwise lawful.

First, Commerce lawfully selected Romanian HTS data (rather than Malaysian data) to

value the respondents' solar glass because it reasonably found that the Romanian HTS data cover

solar glass, and are the best information available on the record, whereas the Malaysian data that

the respondents advocate present reliability issues because they lack thickness information and

are measured in square meters instead of kilograms.  Plaintiffs merely disagree with Commerce's

weighing of the record, which is not a valid basis to overturn Commerce's determination.

Second, Commerce lawfully valued Risen's backsheet input using Malaysian HTS data

corresponding to "plates and sheets" rather than "film" because it reasonably determined that the

record—including American Society for Testing and Materials (ASTM) abstracts distinguishing between sheet and film based on the product's thickness—indicates that Risen's input meets the ASTM definition of polyethylene plastic "sheet" having a thickness of 0.25 mm or greater, as opposed to "film" having a thickness no greater than 0.25 mm.

Third, and likewise, Commerce lawfully valued Risen's EVA input using Malaysian HTS data covering sheet rather than film because, at greater than 0.5 mm thick, Commerce reasonably determined that Risen's EVA meets the ASTM definition of "sheet" having a thickness of 0.25 mm or greater, as opposed to "film" having a thickness no greater than 0.25 mm.

Fourth, Commerce lawfully valued the respondents' ocean freight expenses using both Maersk Line and Descartes data (rather than the Descartes data alone, or in combination with other less-specific sources) because Commerce reasonably found that the Maersk and Descartes data are similarly specific to the respondents' ocean freight costs and that, taken together, they best meet Commerce's criteria for selecting surrogate values.

Fifth, Commerce reasonably determined that Freightos data are the best information on the record to value the air freight services used by Jinko because they meet a number of Commerce's surrogate value criteria while being specific to the inputs being valued, whereas various portions of the proposed alternative International Air Transport Association (IATA) data are not publicly available on the record of this review.

Sixth, Commerce lawfully valued electricity using data from the Malaysian Investment Development Authority's *Costs of Doing Business*, while excluding rates from Malaysia's remote Sabah and Sarawak regions and for off-peak hours, because it reasonably determined that using rates for these regions and hours would reduce (rather than increase) the accuracy of its calculations, given the lack of evidence of solar production occurring at those rates.

Seventh, Commerce lawfully calculated the surrogate financial ratios using the financial statements of JA Solar Malaysia SDN BHD (JA Solar Malaysia), without including financial statements from Flextronics Shah Alam SDN BHD (Flextronics), because Commerce reasonably determined that the Flextronics financial statements are not as specific to solar cell and module production because Flextronics produces comparable rather than identical merchandise.

Eighth, Commerce lawfully deducted Section 301 duties in its calculations, consistent with the statutory directive to deduct "United States import duties" from United States prices, because Commerce reasonably determined that Section 301 duties—which are additional duties imposed to address a foreign country's unfair act, policy, or practice—are more akin to normal customs duties than the special remedial duties such as Section 201 and antidumping duties that Commerce declines to deduct in its calculations.

Ninth, Commerce lawfully applied partial adverse facts available (AFA) in calculating Risen's factor of production consumption rates because Commerce reasonably determined that Risen (in addition to its uncooperative suppliers) failed to cooperate to the best of its ability by continuing to work with suppliers that it knew were unlikely to cooperate with Commerce's requests without securing their agreement to cooperate *before* conducting business with them— even for suppliers who were previously uncooperative—and by not providing Commerce with evidence that it made efforts beyond those that failed to induce cooperation in the past.

Tenth, Commerce lawfully declined to assign the collapsed Trina entity a separate rate in this review, following its rejection of Trina's untimely separate rate supplemental questionnaire response, because Commerce reasonably determined that Trina's untimely extension of time request for the questionnaire response did not meet the "extraordinary circumstances" standard

established in Commerce's regulations, and that Trina had therefore failed to rebut the presumption of Chinese government control necessary to obtain a separate rate.

Finally, Commerce lawfully calculated the rates for separate rate respondents in this review based on the lawful determinations described above.

## ARGUMENT

### I.   Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."). Substantial evidence connotes "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and quotation marks omitted). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing "tremendous" deference to Commerce factual findings).

It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).  Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Additionally, the Court affords Commerce "tremendous deference" when Commerce exercises its technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (citations omitted).  Likewise, when a statute fails to make clear "any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation omitted).

## II.     Commerce's Surrogate Value Selections Are Supported By Substantial Evidence And Otherwise Lawful

Consistent with the statute and governing regulations, Commerce selected surrogate values for solar glass, backsheet, ethylene vinyl acetate sheet (EVA), ocean freight, air freight, and electricity from certain Malaysian Harmonized Tariff Schedule (HTS) import subheadings or other appropriate data sources, and from a Romanian HTS subheading in the case of solar glass. *See* IDM at Cmts. 3-22; 19 U.S.C. § 1677b(c); 19 C.F.R. § 351.408(c).  Commerce's selections are supported by substantial evidence because Commerce reasonably considered the record, the

parties' arguments, and the available HTS subheadings to select the best available information. Plaintiffs' contrary arguments inappropriately ask this Court to reweigh the evidence, when "{i}n reviewing Commerce's determination of what constitutes the best available information with respect to a particular {factor of production}, it is not for the court to reweigh the evidence, . . . but rather, to determine if the evidence relied upon by Commerce was sufficient to support its determination while considering detracting evidence." *Tri Union Frozen Prod., Inc. v. United States*, 163 F. Supp. 3d 1255, 1269 (Ct. Int'l Trade 2016) (citations omitted).  Because Commerce relied on substantial evidence and considered detracting evidence for each input, the Court should affirm Commerce's surrogate valuations as reasonable exercises of Commerce's wide discretion to select the best available information.

### A.  <u>Legal Framework For Surrogate Value Selections</u>

Because this administrative review involves a nonmarket economy, China, Commerce must determine the subject merchandise's "normal value" based on factors of production, and not on sales in China, because "sales of {the product} in {an NME} country do not reflect the fair value." 19 U.S.C. § 1677(18)(A); *see also* 19 U.S.C. § 1677b(a)(1)(A)-(C).  The Tariff Act of 1930, as amended, directs Commerce to use the "best available information" from a market economy surrogate country that Commerce considers appropriate to derive surrogate values for the nonmarket economy's factors of production. 19 U.S.C. § 1677b(c)(1).  Factors of production include raw materials, labor, and utilities. *Id*.  Factors to produce solar cells and modules, distinct from those to assemble solar cells and modules, are large in number and include hundreds of inputs, such as solar glass, backsheet, EVA, and others. *See* IDM at Cmts. 3-22. Commerce adds to these factors "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1).

In valuing factors of production, Commerce relies upon prices or costs of the factors of production (also referred to as inputs) from a surrogate market economy country that is at a comparable level of economic development to that of the non-market economy country at issue and is a significant producer of comparable merchandise.  19 U.S.C. § 1677b(c)(4).  Commerce selects a surrogate value for each input used in production of the subject merchandise, consistent with the statute's instruction that valuation of the factors of production shall be based on the "best available information" regarding the values of the inputs in an appropriate market economy country.  19 U.S.C. §1677b(c)(1); *see generally Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009).  In addition, "Commerce values certain factors of production, such as selling, general, and administrative {SGA} expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010) (citation omitted).

Commerce's practice when selecting the best available information to value factors of production is to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and free of any taxes or duties.  *See*, *e.g.*, *Baoding Mantong Fine Chemistry Co. v. United States*, 279 F. Supp. 3d 1321, 1328 (Ct. Int'l Trade 2017); *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1331 (Fed. Cir. 2020); *see also* Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process," (2004), *available at* http://enforcement. trade.gov/ policy/bull04-1.html (visited Aug. 9, 2023) (Policy Bulletin 04.1).

Within this general framework, the statute "accords Commerce wide discretion in the valuation of factors of production in the application of {the statute's} guidelines."  *Shakeproof*

13

*Assembly Components v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (quoting *Nation*

*Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  Indeed, the Court of

Appeals for the Federal Circuit has recognized that "{t}he process of constructing foreign market

value for a producer in a non-market economy country is difficult and necessarily imprecise."

*Id.*  The data that Commerce utilizes need not be perfect, *Home Meridian Int'l, Inc. v. United*

*States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014), nor is Commerce required to duplicate a non-

market economy producer's experience.  *Nation Ford*, 166 F.3d at 1377.  Instead, Commerce

relies on record data that "most accurately represents the fair market value" of the inputs.  *Id.*

Ultimately, given Commerce's discretion and the fact-specific nature of this inquiry, the question

for the Court is "not to evaluate whether the information Commerce used was the best available,

but rather whether a reasonable mind could conclude that Commerce chose the best available

information."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed.

Cir. 2011) (citation omitted); *see also Tri Union*, 163 F. Supp. 3d at 1269.

## B. Commerce's Selection Of Romanian HTS 7007.19.80 As The Surrogate Value For Solar Glass Is Supported By Substantial Evidence And Lawful

Commerce's determination to value solar glass based on import prices under Romanian

HTS 7007.19.80 (Toughened (Tempered) Safety Glass (Excl. Enamelled, Coloured Throughout

The Mass, Opacified, Flashed Or With An Absorbent Or Reflecting Layer, Glass Of Size And

Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other

Vehicles)) should be sustained because Commerce reasonably considered the record evidence

and the parties' arguments.  *See* IDM at 13-19; Petitioner Pre-Prelim. Cmts. and Submission of

Surrogate Values at Ex. 9 (P.R. 334; C.R. 433) (Romanian HTS data).

Commerce's preference is to select all surrogate values from a single surrogate country,

when possible; however, it will resort to a secondary surrogate country if it finds that data from

the primary surrogate country are unavailable or unreliable for a particular input.  In this case, although Commerce selected Malaysia as the primary surrogate country, Malaysian solar glass import data are for products measured in square meters and do not specify the thickness of the glass.  Prelim. SV Memo at 3 (P.R. 403).  By contrast, both mandatory respondents in this review reported the quantity of glass that they consumed in kilograms, consistent with the unit of measure for Romanian imports under HTS 7007.19.80.  *See id*.  Because these factors affect the Malaysian data's reliability for valuing solar glass in this case, Commerce selected the Romanian HTS data as the information most specific to the respondents' input.  *See id.*; IDM at 18; *id.* at 19 ("we find that the Romanian data yield a more reliable SV"); *id.* at 18-19 ("the large differences in the thicknesses and weights of one square meter of solar glass were the overriding factors that led us {in the sixth review} to value solar glass using the value of imports under Romanian HTS 7007.19.80 rather than the value of imports under Malaysian HTS 7007.19.90").

Moreover, in maintaining its determination in the final results, Commerce made clear that its practice when valuing factors of production is to carefully consider the available evidence in light of the particular facts of each industry, while recognizing that it must weigh the available information with respect to each input value and make a product- and case-specific decision as to the "best" available surrogate value for each input.  IDM at 16.  Commerce likewise recognized the importance of specificity in selecting surrogate values, and the paramount consideration of calculating dumping margins as accurately as possible.  *See id.* at 16, 16-17.

Jinko and Risen (joined by JA Solar, BYD, and Trina) claim that, instead of Romanian HTS 7007.19.80, Commerce should have valued solar glass using Malaysian HTS 7007.19.90 (Safety Glass, Consisting Of Toughened (Tempered) Or Laminated Glass other than of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels).  *See* Jinko Br. 7-28;

Risen Br. 5-23; *see also* JA Solar Br. 10; BYD Br. 13; Trina Br. 53-54 (incorporating arguments by reference).  Their arguments focus on the specificity and reliability/accuracy of the two HTS categories under consideration, but amount to mere disagreement with Commerce's weighing of the record evidence with respect to solar glass.  *See Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement" with Commerce's weighing of evidence is insufficient basis for challenge); *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (same).

Risen, for example, disputes Commerce's departure from its preference for using data from the primary surrogate country, Risen Br, 5-10, but its objection boils down to disagreement with Commerce's findings that the Malaysian data's lack of information about the glass imports' thickness, and its measurement by square meters rather than weight in kilograms, created issues affecting the Malaysian data's reliability.  *See id.* at 8, 10 (disputing whether such factors should be considered "reliability" issues rather than merely "specificity" concerns); *but see* IDM at 18 (explaining why lack of thickness and weight information created reliability issues).  Likewise, Jinko's argument that Commerce should have relied on data from Malaysia because it is the primary surrogate country stems from Jinko's disagreement with Commerce's findings about the Malaysian data's reliability and Romanian data's superiority.  *See* Jinko Br. 23-25.  Risen's and Jinko's disagreement that Commerce's concerns rise to the level of a reliability issue is not a valid basis to overturn Commerce's determination.

More generally, Jinko's and Risen's allegations of flaws in Commerce's findings with respect to the two surrogate value options at issue lack merit.  Jinko describes its solar glass as "ultra white coated tempered glass" with "Anti-reflecting Coating, High Transmission, Low iron, Tempered Glass" and a key feature described as "Low-Light Performance" providing "Advanced

glass technology improv{ing} light absorption and retention." Jinko Br. 8-9 (citing Jinko Sec.

D-E, App'x XIII Add'l Sec. D, and Double Remedies Questionnaire Resp. at Ex. AD-30 (May 4,

2021) (P.R. 151; C.R. 213) (Jinko DEQR); Jinko Sec. A & App'x XI Questionnaire Resp. at Exs.

A-8, A-12, A-28 (April 8, 2021) (P.R. 122-123, 126; C.R. 79-90, 91-93, 102-103) (Jinko AQR)).

Jinko also asserts that the Federal Circuit has recognized that other solar producers use tempered

glass with anti-reflective coating. *Id.* at 10.  In this way, Jinko emphasizes that anti-reflective

coating that improves light absorption and retention constitutes a significant attribute of its solar

glass input and that "its accurate valuation can be achieved only by relying on a data source

covering such {anti-reflective} coated glass." *Id.* at 10-11.

Contrary to Jinko's claims, however, Commerce reasonably found that the Romanian

HTS 7007.19.80 data that Commerce selected as the solar glass surrogate value covers solar

glass. *See* Jinko Br. 11-15; IDM at 17.  Indeed, Commerce explained that it had made a specific

finding in the preceding sixth review of its China Solar antidumping duty order that "Romania

HTS 7007.19.80 covers tempered glass used in solar panels; the specific type of glass used by

solar panel producers." *Id.* (quoting *Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules, from the People's Republic of China*, 85 Fed. Reg. 62,275 (Dep't of

Commerce Oct. 2, 2020), at IDM Cmt. 3 (*AR6 Final Results*)).  Commerce further explained that

it had based its finding in the sixth review, in part, on information that Risen had placed on the

record indicating that Romanian HTS 7007.19.80 covers solar glass, and that neither Jinko nor

Risen had provided evidence in this review showing that Romanian HTS 7007.19.80 no longer

covers solar glass. *See id.*

Jinko nonetheless argues that HTS 7007.19.80 is not an appropriate choice to value its

solar glass input because it excludes absorbent or anti-reflective coated glass, thereby failing the

product-specificity criterion.  Jinko Br. 11-15.  According to Jinko, Romanian HTS 7007.19.80

not only fails to cover anti-reflective coated glass used for solar products, but expressly excludes

tempered glass coated with an absorbent or anti-reflective layer.  *See id.* at 11, 13-14, 15, 18.

 The record, however, does not support Jinko's claims that Romanian HTS 7007.19.80

excludes *anti-reflective* coated glass and that the *anti-reflective* layer on Jinko's glass input is

synonymous with an "Absorbent or Reflecting Layer" referenced as an exclusion to Romanian

HTS 7007.19.80.  *See* IDM at 17.  Although the record does not define "Absorbent or Reflecting

Layer" as used in the Romanian HTS, that phrase is part of a larger exclusion in the description

of Romanian HTS 7007.19.80 that covers glass that is "Enamelled, Coloured Throughout The

Mass, Opacified, Flashed Or With An Absorbent Or Reflecting Layer."  IDM at 17.  Enameled,

colored, opacified (made opaque), and flashed (colored) are all treatments that *limit* the amount

of light that passes through the glass.  *Id.*  Given that the phrase "absorbent or reflecting layer" is

listed in the HTS exclusion with other light-limiting treatments, and given the plain meaning of

absorbent (*i.e.*, something that takes in without releasing) and reflecting (*i.e.,* to cast back from a

surface), the record indicates that the "Absorbent Or Reflecting Layer" listed in Romanian HTS

7007.19.80 is not the same as the *anti-reflective* coating on Jinko's glass, which acts to *increase*

the light passing through the glass.  *Id.* at 17-18; *cf. United States v. Williams*, 553 U.S. 285, 294

(2008) ("{T}he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more

precise content by the neighboring words with which it is associated." (citations omitted)).

 Jinko disputes Commerce's analysis of the Romanian HTS language, Jinko Br. 17-19, but

Jinko's disagreement is not a valid basis to overturn Commerce's finding, especially in light of

Commerce's citation to corroborating information such as its sixth review finding regarding the

Romanian HTS's inclusion of solar glass (which Jinko suggests commonly features anti-

reflective coating).  *See* Jinko Br. 10.  Indeed, Commerce explained that the European Union
(EU) maintains trade remedy orders against solar glass imports from China that specifically
reference HTS 7007.19.80 as the HTS for solar glass.  *See* IDM at 17 (citation omitted).[4]

      Jinko further argues that HTS 7007.19.80 "is an unsuitable choice" because it is a broad
basket category that includes non-solar glass, glass with a thickness above 4.5 mm (outside of
Jinko's glass thickness range of 2-4 mm), and double-coated and uncoated glass.  Jinko Br. 13.
The fact that HTS 7007.19.80 includes other types of glass does not automatically exclude it
from consideration.  *See*, *e.g.*, *China Processed Food Imp. & Exp. Co. v. United States*, 614 F.
Supp. 2d 1337, 1345-46 (Court of Int'l Trade 2009) (holding that Commerce lawfully calculated
surrogate value for glass jars using basket HTS category that included other glass articles, when
there was a lack of more suitable data on record).  Jinko and Risen also acknowledge that their
preferred Malaysian HTS category is itself a basket category that Commerce in the sixth review
found to be "broader, covering all types of tempered glass other than automotive glass."  Jinko
Br. 15-16 (citation omitted); *see also* Risen Br. 12.  Jinko argues that Commerce in the sixth
review "overlooked the fact that the other sub-sub-heading ('Other') {in the Romanian HTS}
covers glass other than those used for solar application."  Jinko Br. 16.  However, Commerce has
discretion to choose the surrogate value that it determines is the most specific to the input.  *See*

---

[4] Jinko also relies on non-record information from the Integrated Community Tariff (TARIC),
which Jinko claims that Commerce improperly rejected from Jinko's administrative case brief.
Jinko Br. 11-12, 25-28.  Although Commerce properly rejected Jinko's submission of this new
factual information, Rejection Memo (May 25, 2022) (P.R. 442), the information does not negate
the reasonableness of Commerce's finding that Romanian HTS 7007.19.80 includes anti-
reflective solar glass.  *See* IDM at 17-18; *cf. Crystalline Silicon Photovoltaic Cells, Whether or
Not Assembled Into Modules, From the People's Republic of China*, 88 Fed. Reg. 43,302 (Dep't
of Commerce July 7, 2023), at IDM Cmt. 6 (*AR9 Final Results*) (addressing TARIC information
in again finding that Romanian HTS data cover anti-reflective glass).  Consequently, Jinko's
arguments regarding whether Commerce lawfully rejected the non-record information and
whether the Court can take judicial notice of it are beside the point.

*China Processed Food*, 614 F. Supp. 2d at 1344-45; *Home Meridian*, 772 F.3d at 1296

(surrogate value data need not be perfect).  And even Jinko concedes that a portion of Risen's

solar glass input consists of *uncoated* glass that would not be excluded from Romanian HTS

7007.19.80.  *See* Jinko Br. 19 n.2.  Thus, Commerce reasonably selected Romanian HTS

7007.19.80 as the surrogate value for solar glass.

 Jinko improperly dismisses Commerce's reliability concerns with respect to Jinko's

preferred Malaysian data, based on allegedly supervening issues stemming from the Romanian

data's inclusion of some thicker glass and purported exclusion of solar glass with anti-reflective

coating.  *See* Jinko Br. 19-20, 20-21.  Because these assertions are derivative of the arguments

we have addressed above, they neither alter the salience of Commerce's reliability concerns with

respect to the Malaysian data nor negate the reasonableness of Commerce's determination.

 Jinko additionally argues that Commerce's determination in the *preliminary* results of its

ninth administrative review of its China Solar order supports Jinko's position in this case because

Commerce in that review preliminarily relied on Bulgarian import data, rather than data under

Romanian HTS 7007.19.80, to value anti-reflective solar glass.  *See* Jinko Br. 20.  Commerce,

however, is entitled to reach a different determination based on the different record of that case

(Bulgaria was not on the surrogate country list in this case).  *See Qingdao Sea-Line Trading Co.

v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate

exercise of Commerce's authority that allows for different conclusions based on different facts in

the record").  Indeed, Jinko omits that in the ninth review preliminary results Commerce *declined*

to use Malaysian data for much the same reasons as in this review—namely the lack of thickness

information and reporting in square meters rather than kilograms.  *See* Jinko Br. 20 (citing AR9

Prelim. SV Memo, ACCESS Barcode 4331360-01, at 3 (Dec. 30, 2022)).  Moreover, consistent

with the fact that Commerce's preliminary results are subject to change, Commerce in the *final* results of the ninth review concluded that Romanian HTS 7007.19.80 was the best available information for valuing anti-reflective solar glass, and also addressed at length a respondent's arguments (similar to those raised in this case) disputing the specificity of the Romanian data. *See AR9 Final Results*, 88 Fed. Reg. 43,302, at IDM Cmt. 6 ("The Appropriate SV for Anti-Reflective Glass").  Thus, Jinko's reliance on the ninth review lacks merit.

Next, Jinko and Risen dispute substantively Commerce's rationale that the Malaysian data's lack of thickness information and reporting in square meters create reliability issues. Jinko Br. 21-23; Risen Br. 15-16.  Commerce thoroughly addressed these arguments in its decision memorandum.  *See* IDM at 18.  Specifically, Commerce explained that the missing information meant that "{w}e do not know the various thicknesses of the glass imported into Malaysia during the {review period}." *Id.*  That is problematic because the thickness of solar glass can vary widely, and one square meter of glass may be many times thicker, and heavier, than another.  *Id.*  Thus, using the respondents' kilogram per square meter conversion factors to express the value of the Malaysian imports on a per kilogram basis, as Jinko and Risen advocate, results in only an estimate of the value of glass per kilogram, even if the respondents' conversion factors accurately reflect the weight of their solar glass per square meter.  *Id.*

There is no evidence that the thickness of the glass imported into Malaysia is the same as that of the respondents' glass.  *Id.*  And although Jinko claims that the weight per square meter of its glass is similar to that of internationally traded glass, it bases this conclusion on a comparison of its glass to *Romanian* imports.  *Id.*  Jinko relies on speculative extrapolation to claim that the Malaysian data, although lacking such information, involve the same weight to surface area values.  *See* Jinko Br. 22 (claiming, without basis, that "{i}t is reasonable to infer" that values

21

are the same).  Therefore, Jinko is incorrect in asserting that its speculative analysis refutes Commerce's statement that "there is nothing on the record of this review indicating that the weight per square meter of glass imported into Malaysia during this POR is in any way comparable to that of the glass imported into Romania used in Jinko's comparison or to that of Jinko and Risen."  *See id.*; IDM at 18.  Indeed, in the sixth review, Risen observed that the potential inaccuracies from using per square meter glass values was particularly great with regard to solar glass, given that solar glass is relatively thin, while the thicknesses of tempered glass can vary dramatically.  *See* IDM at 18; *id.* at 18-19 (explaining that "large differences in the thicknesses and weights of one square meter of solar glass" were "overriding factors" leading Commerce to use Romanian data in sixth review) (citations omitted).

Jinko's and Risen's related argument that Commerce engaged in conversion of Malaysian data from square meters to kilograms in the seventh review is similarly unpersuasive.  *See* Jinko Br. 22-23; Risen Br. 18-19.  Although it is true that Commerce did so, Romania was not on the list of potential surrogate countries for the seventh review, and hence Commerce did not have the opportunity to rely on Romanian import data as a better surrogate value because they were not on the record.  *See* IDM at 19.  In fact, Commerce in the seventh review explained that:

> Unlike the prior {sixth} administrative review in this proceeding, no parties placed a surrogate value for glass that is expressed in a price per weight on the record of this review.  All of the surrogate values for glass that are on the record are expressed in a price per square meter.

*Id.* (quoting *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 86 Fed. Reg. 58,871 (Dep't of Commerce Oct. 25, 2021), at IDM Cmt. 11).  As such, Commerce did not consider the relative suitability of Malaysian HTS 7007.19.90 compared to Romanian HTS 7007.19.80 in the seventh review.  *Id.*

Risen, for its part, does not dispute that Romanian HTS 7007.19.80 includes solar glass, but argues that the Romanian HTS is no more specific to the respondents' glass inputs than the Malaysian subheading because they are both basket categories that include solar glass.  *See* Risen Br. 10-12.  This ignores Commerce's explanation that the lack of weight and thickness information makes the Malaysian data inferior to the Romanian data.  *See* IDM at 18 ("One square meter of glass may be many times thicker, and heavier, than another square meter of glass" and converting Malaysian data to a per kilogram basis "only results in an estimate of the value of glass per kilogram").  Indeed, as Commerce observed, Risen expressed concerns about a particularly great potential for inaccuracies resulting from using per square meter data to value solar glass in the sixth administrative review.  *See id.*; *AR6 Final Results*, 85 Fed. Reg. 62,275, at IDM Cmt. 3 (text surrounding nn.105-108).

Risen next argues that the Romanian data are less preferable than Malaysia data because the record allegedly lacks information about whether Romania produces solar products.  *See* Risen Br. 12-14.  This, again, ignores Commerce's reasonable concerns about the Malaysian data's reliability for surrogate value purposes due to the missing thickness and size versus weight reporting issues.  In any event, Commerce explained that "{w}hile the respondents contend that the lack of evidence of manufacturers of solar modules in Romania indicates imports under Romanian HTS 7007.19.80 do not include imports of solar glass, in the sixth administrative review in this proceeding, we noted that 'Romania HTS 7007.19.80 covers tempered glass used in solar panels; the specific type of glass used by solar panel producers.'"  IDM at 17 (quoting *AR6 Final Results*, 85 Fed. Reg. 62,275, at IDM Cmt. 3).

Moreover, this finding was based in part on information that Risen placed on the sixth review record indicating that Romanian HTS 7007.19.80 covers solar glass.  *Id.* (referencing

*AR6 Final Results* text surrounding n.104).  Risen attempts to invoke a separate statement from the sixth review proceedings in which Commerce expressed a preference to rely on Malaysian data based on that country's production of solar products.  *See* Risen Br. 12-13.  But this omits that Commerce—in the same review—ultimately determined to value solar glass based on Romanian rather than Malaysian data due to Commerce's reliability concerns and determination that the Romanian data do include solar glass.  *See AR6 Final Results*, 85 Fed. Reg. 62,275, at IDM Cmt. 3.  Like Commerce's preference for valuing factors of production from Malaysia as the primary surrogate country, Commerce's preference to rely on data from Malaysia based on its solar production must yield when (as in this case) the Malaysian data present reliability issues and the Romanian data include solar glass.  *See* IDM at 18.

In a further slant on Jinko's and Risen's argument that Commerce could have relied on conversion factors to use the Malaysian data, Risen argues that its own books and records list solar glass purchases "on a piece basis" such that Risen's reporting in kilograms was itself a conversion based on Commerce reporting requirements.  Risen Br. 15-16.  However, this ignores Commerce's explanation regarding the estimating and inaccuracies that would be introduced by the Malaysian's data's lack of thickness information and the need to convert square meters to weight without knowing such information.  *See* IDM at 18 (highlighting Risen's similar concerns in sixth review); *cf. Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1377 n.7 (Ct. Int'l Trade 2010) (observing potential "inaccuracies" if data require adjustment).  Similarly, Risen's contention that Commerce has relied on conversions in the seventh review and other instances is unpersuasive because it does not negate Commerce's cogent explanation why— *based on the record for solar glass in this case*—the need to convert Malaysian data from size to

24

weight without knowing the glass's thickness would create reliability issues that make Romanian data a better choice.  *See* Risen Br. 16-20; IDM at 19 (addressing seventh review).

Commerce also addressed Risen's argument that the Romanian data is defective because several line items have a listed quantity of zero attributable to rounding.  *See* Risen Br. 20.  As Commerce stated, Risen fails to quantify, or otherwise to establish any distortion, generated by the zero-quantity Romanian data.  IDM at 19.  Risen claims that the distortion is "self-evident," but "agrees that this rounding is not a significant impact on the {average unit value (AUV)}." Risen Br. 20.  Indeed, in previous segments of this proceeding, Commerce found that zero-quantity import data attributable to rounding small import quantities to zero does not distort the overall AUV.  IDM at 19 (citations omitted).  Thus, Risen's argument lacks merit.

Finally, Risen criticizes Commerce for allegedly relying on information not on the record of this review because Commerce, in observing that the thickness of solar glass can vary widely, cited its finding to that effect in the sixth review.  *See* Risen Br. 20-23.  Risen's argument does not change that the Malaysian HTS data on the record of this case lack thickness information and are reported in square meters rather than kilograms—which is the primary basis for Commerce's finding that the Malaysian data present reliability issues.  *See* Prelim. SV Memo at 3 (P.R. 403); IDM at 18 ("We do not know the various thicknesses of the glass imported into Malaysia during the POR.").  Thus, Risen is incorrect to argue that "there is no information on this record to suggest that any potential conversion concerns in the sixth administrative review would be present in the eighth administrative review."  Risen Br. 22.  Further, that Commerce cited the sixth review finding in support of the subsidiary proposition that thickness can vary considerably does not render Commerce's determination dependent on the specific details discussed in the sixth review.  *See* IDM at 18.  Commerce merely highlighted its sixth review finding in relation

to the similar lack of thickness information on the record in this case.  *See* IDM at 18.  Nor does

Risen identify any record evidence suggesting that the nature of solar glass, in terms of its

varying thickness, has changed for purposes of this review.  Additionally, contrary to Risen's

claims, Risen both received and availed itself of the opportunity to address the notion of varying

solar glass thickness in this review.  *See* IDM at 13-14 (discussing Risen's arguments concerning

sixth review variance finding).  Consequently, it was neither unreasonable nor unlawful for

Commerce to reference its sixth review finding in explaining why the defects in the Malaysian

data on the record in this case create reliability issues.

### C.  Commerce's Selection Of Malaysian HTS 3920.62.10 As The Surrogate Value For Backsheet Is Supported By Substantial Evidence And Lawful

To value backsheet, Commerce selected between Malaysian HTS 3920.62.1000 (Of

Polyethylene Terephtalate: plates and sheets), proposed by the Alliance, and Malaysian HTS

3920.62.9000 (Of Polyethylene Terephtalate: other – *i.e.*, not plates and sheets), proposed by

Risen.  *See* IDM at 44-46.  The key issue, as in previous litigation, concerns whether Risen's

backsheets are film or sheet.  *See* IDM at 45.

After evaluating the record evidence, Commerce ultimately determined that the backsheet

best corresponds to Malaysian HTS 3920.62.1000 covering "plates and sheets."  *Id*. at 45-46.  On

this issue, Commerce placed on the record American Society for Testing and Materials (ASTM)

abstracts consisting of ASTM D6988, a "Standard Guide for Determination of Thickness of

Plastic Film Test Specimens," and ASTM D4801, a "Standard Specification for Polyethylene

Sheeting in Thickness of 0.25 mm (0.010 in.) and Greater."  *Id.* at 45 (citing Commerce Letter

re: Documents Concerning the Classification of Certain Inputs at 1, Att. IV, VI (Mar. 8, 2021)

(P.R. 78-79) (Commerce Classification Documents)).  The ASTM abstracts indicate that plastic

film is less than 0.25 mm thick. whereas plastic sheet is 0.25 mm thick or greater.  *Id.*

Commerce explained that, although there were no explanatory notes for Malaysian HTS numbers on the record that described the difference between "sheet" and "film" in the tariff classifications, the ASTM abstracts distinguish "film" and "sheet" based on thickness.  *See id.* Specifically, they indicate that film is an "optional term for sheeting having a nominal thickness no greater than 0.25 mm (0.010 in)" and that polyethylene plastic materials with a thickness of 0.25 mm or greater are considered sheets.  Commerce Classification Documents at Att. IV, VI (P.R. 79).  Further, Commerce cited record information regarding the thickness of Risen's backsheet, which shows that Risen's backsheet meets the ASTM definition of polyethylene plastic "sheet" having a thickness of 0.25 mm or greater, as distinguished from "film" having a thickness no greater than 0.25 mm.  *See* IDM at 45 (citing Risen Second Supp. Questionnaire Resp. at Ex. SQ2-1 (July 15, 2021) (P.R. 271; C.R. 363); Risen Fourth Supp. Questionnaire Resp. at 1 (Aug. 5, 2021) (P.R. 337; C.R. 436); Risen Sec. D Resp. at XIII-38, Ex. D-32 (Apr. 30, 2021) (P.R. 147; C.R. 122, 124-125)).  Thus, Commerce determined that Risen's backsheet is sheet, not film, and best categorized under Malaysian HTS 3920.62.1000, which includes sheets.

Nonetheless, Risen (joined by JA Solar, BYD, and Trina) contends that Commerce's selection of Malaysian HTS 3920.62.1000 to value backsheet is not grounded in record evidence because (1) the ASTM specifications placed on the record are general guides for plastic film and polyethylene sheeting, and (2) the polyethylene sheeting ASTM specifications state only that the standard is for a particular type of extruded and compression-molded sheeting made from certain materials with a thickness of 0.25 mm. which is not the same product as used by Risen or in the solar industry.  *See* Risen Br. 24.  In Risen's view, Commerce should have placed greater weight on information that Risen provided from its own records and from the solar industry, indicating that backsheet used in the solar industry is described as film.  *See id.* at 24-25; *see also* JA Solar

Br. 9; BYD Br. 14; Trina Br. 53-54 (incorporating Risen's arguments by reference).  Risen's

arguments lack merit because the materials that Risen submitted do not invalidate the weight that

Commerce placed on the ASTM standards.  *Cf. Haixing Jingmei*, 335 F. Supp. 3d at 1346; *Gov't*

*of Argentina*, 542 F. Supp. 3d at 1395 ("mere disagreement" with Commerce's weighing of

evidence insufficient basis for challenge).

First, contrary to Risen's claims that the ASTM abstracts are less specific to backsheets

used in solar modules than its purchasing records and the solar industry marketing materials it

submitted, ASTM's definition of film does not originate from ASTM D6988 or D4801, but from

ASTM "Terminology D883."  Commerce Classification Documents at Att. IV (P.R. 79).

Terminology D883 applies to plastics in general, and Risen fails to cite to any information to

support that this standard would not cover plastic materials used by the solar industry as

backsheet in solar modules.  *See id.* (listing D883 as "Terminology Relating to Plastics").

A precise definition is critical when the record contains two surrogate value options for

products distinguished by millimeters.  Unlike the materials that Risen placed on the record, the

ASTM abstracts are from an authoritative standards organization and provide a clear technical

definition of film, based on thickness.  Therefore, Risen's information does not negate the weight

of the ASTM evidence, showing that between two measurably close options the specifications

for Risen's backsheet are consistent with the record definition of sheet rather than film.

Second, although Risen would prefer that Commerce rely solely on the information that

Risen provided, Commerce explained that it did not find this information dispositive of the issue.

IDM at 46.  For example, Commerce explained with respect to 3M specifications that Risen had

provided that the specifications state "{t}his technical information and data should be considered

representative or typical only and should not be used for specification purposes."  *Id.* (quoting

Risen Final SV Cmts. at Ex. SV2-5 (P.R. 321).  Moreover, to the extent that the 3M

specifications refer to backsheet as film, it is not clear that this is based on a technical definition

and there is no evidence that terms in the 3M specifications correspond to the term "film" in the

Malaysian HTS or other generally recognized authoritative sources (such as an industry or trade

association, professional organization, or standards organization).  *Id.*  Indeed, the marketing

materials appear to distinguish multilayered "backsheet" from the "film" components comprising

the backsheet.  Risen Final SV Cmts. at Ex. SV2-5 (P.R. 321).

Further, the specifications that Risen provided from its own purchase records do not

identify the backsheet as sheet or film, but simply describe the product as multilayered

"backsheet."  *See* Risen Sec, D Resp. at XIII-38, Ex. D-32 (P.R. 147; C.R. 122, 124-125)).

Risen's materials provide no indication that companies in the solar industry adhere to the

technical definitions of "film" and "sheet," as distinguished from using "film" based on the

general notion that it connotes thin flexible plastic.  Thus, Risen's information is not dispositive

of the matter.  Indeed, this Court sustained Commerce's similar determination in a previous

review, holding that Risen's materials "provide a competing definition at best" that does not

negate Commerce's reasonable determination.  *Risen Energy Co. v. United States*, 611 F. Supp.

3d 1384, 1392 (Ct. Int'l Trade 2022), *appeal pending*, Fed. Cir. No. 23-1550.

Accordingly, Commerce reasonably found that the ASTM standards are the best

information on the record to distinguish film from sheet in selecting an appropriate surrogate

value for backsheet, and its determination should be sustained.

### D.  Commerce's Selection Of Malaysian HTS 3920.10.19 As The Surrogate Value For EVA Is Supported By Substantial Evidence And Lawful

Risen, JA Solar, BYD, and Trina likewise challenge Commerce's surrogate valuation of

EVA as sheet rather than film.  Risen Br, 25; JA Solar Br. 9; BYD Br. 14; Trina Br. 53-54.  To

value this input, the available Malaysian HTS subheadings included the Alliance's submission of

Malaysian HTS 3920.10.1900 (Polymers of ethylene: plates and sheets (other than rigid)), and

Risen's submission of Malaysian HTS 3920.10.9000 (Polymers of ethylene: other than plates

and sheets).  IDM at 46.  Commerce ultimately selected HTS 3920.10.1900 (Polymers of

ethylene: plates and sheets (other than rigid)) based on the record evidence and the EVA's

thickness of more than 0.5 mm.  *Id*. at 46-47.

As for backsheet, the only definitions of "sheet" and "film" on the record stem from the

ASTM abstracts indicating that plastic film is less than 0.25 mm thick, whereas plastic sheet is

0.25 mm thick or greater.  *See id.* (citing Commerce Classification Documents at Att. IV, VI

(P.R. 79)).  At greater than 0.5 mm thick, based on Risen's description of the EVA's physical

characteristics, Commerce reasonably determined that Risen's EVA is sheet rather than film.

*See id.* at 47 (citing Risen Second Supp. Questionnaire Resp. at Ex. SQ2-1 (P.R. 271; C.R. 364)

(native spreadsheet)).  Thus, Commerce valued EVA using the more specific HTS subheading

for sheet, rather than the basket category for "other than plates and sheets."  *Id.* at 46-47.

Similar to its submission for backsheet, Risen cited information from the solar industry as

well as the Chinese National standard for EVA, arguing that these materials are specific to the

EVA used in solar modules and indicate that the EVA is film.  *See* Risen Br. 25 (referencing

Commerce Supp. Questionnaire at Att. II, Exs. SQ-8, SQ-9 (July 1, 2021) (P.R. 255; C.R. 355);

Risen Final SV Cmts. at Ex. SV2-4 (P.R. 321)).  As Commerce explained, however, neither the

solar industry materials nor the Chinese national standard specifically define film or sheet, nor

do they include specifications for film.  IDM at 47.  There is also no evidence that these

materials correspond to use of the terms "sheet" and "film" in the Malaysian HTS or generally

recognized authoritative sources such as an industry or trade association, professional

organization, or standards organization.  Hence, the materials do not negate the reasonableness of Commerce's determination.  *See Risen Energy*, 611 F. Supp. 3d at 1393-94, *appeal pending*, Fed. Cir. No. 23-1550 (rejecting Risen's arguments regarding EVA in previous review). Commerce's determination regarding EVA should thus be sustained.

### E.  Commerce's Selection Of The Descartes And Maersk Data To Value Ocean Freight Is Supported By Substantial Evidence And Lawful

Commerce valued the respondents' ocean freight expenses using Maersk Line and Descartes data that, taken together, were publicly available, representative of a broad market average, contemporaneous with the period of review, aligned with the container size used by the respondents, and inclusive of product-specific rates for similar shipping routes to those used by the respondents.  *See* IDM at 19-25; *see also* Policy Bulletin 04.1 (discussing Commerce's preferences in selecting surrogate value data).  In this regard, specificity is particularly important in selecting surrogate values and logically must be a significant consideration in determining the "best available information" on the record.  *See* at 22 & n.104 (citations omitted).

Although the record contained ocean freight rates from Maersk Line, Descartes, Freightos, and Drewry, Commerce valued the respondents' ocean freight expenses using contemporaneous Maersk Line and Descartes data because those sources provided data for shipments of electronic goods that were the same size and in the same type of container as those used by the respondents.  *See* IDM at 22-23; Prelim. SV Memo at 8 (P.R. 403-404).  Commerce further explained that it was able to confirm that the Descartes data excluded rates for shipments of hazardous materials and those in temperature controlled containers, which do not apply to the respondents (while also understanding that the detailed Maersk data would identify such charges if they were included).  *See* IDM at 23; *see also* Risen Final SV Cmts. at Ex. SV2-7 (P.R. 321)

(Descartes data); Jinko First SV Cmts. at Ex. 10B (P.R. 236; C.R. 345) (Descartes data);

Petitioner Ocean Freight SV Cmts. at Ex.1 (Dec. 8, 2021) (P.R. 393) (Maersk data).

Commerce additionally explained that the Descartes and Maersk Line data provide more

detailed information regarding the types of charges that make up the overall ocean freight rate

than the Freightos and Drewry data, which included only an overall ocean freight rate and lacked

the brokerage and handling charges.  IDM at 23.  Moreover, the Drewry and Freightos rates do

not identify the type of material shipped and whether it is hazardous material, while the Freightos

data also do not identify whether the container is temperature controlled.  *Id.*; *see also* Jinko First

SV Cmts. at Exs. 10C-D (P.R. 236-237; C.R. 345) (Drewry and Freightos data).  Commerce

further explained in detail why it found that the Descartes and Maersk data provide comparable

levels of specificity (meaning that it was unnecessary to rely exclusively on the Descartes data

merely because that data included one route specific to shipping solar modules).  *See* IDM at 23-

24.  Thus, Commerce chose the best available information to value ocean freight expenses.

Jinko (joined by Risen, JA Solar, BYD, and Trina) argues that Commerce should have

rejected the Maersk data and instead relied on the Descartes prices or, alternatively, an average

of Descartes, Maersk, Drewry, and Freightos data.  Jinko Br. 33-37; Risen Br. 25-27; JA Solar

Br. 8; BYD Br. 13; Trina Br. 53-54.  According to Jinko, the Maersk data should be excluded

because it is not based on actual shipments and represents price quotes rather than transaction-

based prices.  *See* Jinko Br. 34.  Specifically, Jinko contends that the Maersk price quotes are

"created through online research by inputting various unknown shipment parameters{.}"  *Id.*

Jinko also quotes language from the Maersk price sheets stating that the "Maersk prices are 'not

covered by a service contract,' but merely provide 'tariff rates' and are 'an indication only."  *Id.*

(quoting Petitioner Ocean Freight SV Data at Ex.1 (P.R. 393)).

32

Although Jinko claims that the Maersk data merely represent a quote, the Maersk data repeatedly state that because the query is not covered by a service contract "tariff rates have been applied."  Petitioner Ocean Freight SV Data at Ex.1 (P.R. 393).  Given that Maersk is a one of the world's largest shipping companies, the data are more in the nature of offered prices than abstract quotes.  Further, similar to the disclaimer language that Jinko quotes from the Maersk data, Descartes reported that its data are "{e}stimates of freight charges . . . furnished as a convenience to the shipping public . . . ."  IDM at 24 (quoting Jinko First SV Cmts. at Ex. 10B (P.R. 236; C.R. 345)).  Jinko asserts that Commerce relies on a "false equivalence" between the disclaimers made by Maersk and Descartes because the Descartes disclaimer "is to simply caution the public against relying, for current shipments planning, on a historical transaction-specific price data."  Jinko Br. 34.  This misses Commerce's point that both sources provide disclaimers without making their data unreliable.  Indeed, Commerce has found Maersk rates to be a reliable source for valuing ocean freight expenses in multiple segments of this proceeding.  IDM at 24 (citations omitted).  Thus, Risen's and Jinko's citations to certain segments of this and other proceedings in which Commerce relied on Descartes data fail to render Commerce's determination unreasonable.  *See* Risen Br. 25-26; Jinko Br. 36.

Jinko next argues that "since Maersk data represent price quotes of a single shipping company, they fail to satisfy the necessary broad market average criteria for selecting SVs," and claims that its position is supported by Commerce's rejection of Maersk data in favor of Descartes data allegedly on similar grounds in *Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011).  Jinko Br. 35 (emphasis omitted).  Commerce explained, however, that the facts in *Taian Ziyang Food Co*. are distinguishable from the circumstances in this case.  *See* IDM at 24.  The Court in *Taian Ziyang Food Co.* found that the "Maersk data

33

reflect a route that no respondent used, that the Maersk data reflect additional charges that no respondent incurred, that the Maersk data are limited to a single freight carrier, and that unlike the other rates available on the record the Maersk data are not specific to the shipment of fresh garlic." 783 F. Supp. 2d at 1342. The great weight of the defects described in the above quotation do not apply in this case. Because the Maersk data were not similarly deficient in this case, Commerce found the Maersk data reliable. *See* IDM at 24.[5]

Similarly, the facts and circumstances in *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 87 Fed. Reg. 9,576 (Dep.t of Commerce Feb. 22, 2022), at IDM Cmt. 1 (*MAE from China*), differ from this case. In *MAE from China*, Commerce observed that the Maersk ocean freight data at issue represented "price quotes rather than actual transaction-based prices." Jinko Br. 35. The circumstances in *MAE from China* were different, however, because Commerce prefers to rely on publicly available information to select surrogate values, and declined to use the Maersk data in *MAE from China* primarily because it was non-public in that case. 87 Fed. Reg. 9,576, at IDM Cmt. 1.

More generally, it is Commerce's preference to use published prices that are widely available, rather than price quotes from a limited number of suppliers that can be obtained only through direct inquiry. *See Chlorinated Isocyanurates From the People's Republic of China*, 81 Fed. Reg. 1,167 (Dep't of Commerce Jan. 11, 2016), at IDM Cmt. 2. The fact that the Maersk data relies on information from a single company does not alone render Commerce's decision to rely on data from Maersk (one of the world's largest shipping companies) unreasonable. That is

---

[5] Likewise, in *Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011), despite observing that Maersk data stemmed from a single carrier, Commerce selected Descartes data primarily because it found that they "present contemporaneous data that better match the product in question," whereas the Maersk data were "less reflective of the {Chinese producers'} experience than the Descartes data." *Id.* at 1278-79 (citations omitted).

especially so because Commerce determined to use the Maersk data in *combination* with the Descartes data, which certainly constitutes a broad market average.

Indeed, Commerce explained why it found the Descartes and Maersk data comparable with respect to the key metric of specificity.  IDM at 23-24.  The Descartes data include one route for shipping monocrystalline modules from Shanghai, China to Los Angeles, U.S.A.  *See id.*  The other Descartes rates are for shipping solar water heaters, LED panels, and electronic goods, while the Maersk rates are also for shipping electronic goods.  *See id.*  Thus, although the Descartes data include rates for shipping monocrystalline modules, a product specific to the subject merchandise, there is no record evidence that doing so is more or less expensive than shipping electronic goods (*e.g.,* that shipping modules requires special handling or containers, or incurs special charges such that the rates for the modules are more specific than the rates for electronic goods).  *See id.*; *Nation Ford*, 166 F.3d at 1377 ("Commerce need not duplicate the exact production experience of the Chinese manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of {subject merchandise} in a hypothetical market-economy" (citation, bracketing, and internal quotation marks omitted)).  Risen's attempt to distinguish the Descartes and Maersk data on this basis is thus meritless.  *See* Risen Br. 26; IDM at 23-24 (rejecting argument).

Additionally, Commerce selected both the Maersk and Descartes data because it needed to value ocean freight expenses for multiple routes.  *See* IDM at 23, 24-25.  Consistent with its mandate to determine the dumping margins as accurately as possible, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990), Commerce applied shipping rates in a destination- and product-specific manner based on the relevant region, and concluded that using both the Descartes and Maersk data provided the best information to do so for the various routes

they cover.  *See* IDM at 23-24, 25.  Thus, Commerce found that it was not appropriate to rely

solely on the Descartes data when the two data sets were at similar levels of specificity.  *See id*.

Relatedly, Risen also contends that Commerce should have averaged the Descartes and Maersk

data on a monthly basis to account for the fact that the Maersk data do not cover every month of

the review period, which Risen inaccurately characterizes as a lack of contemporaneity (Risen

Br. 26-27); however, Commerce explained that averaging the rates as Risen requested would

result in a less specific surrogate freight cost and that doing so on a monthly basis would

improperly overweight the Descartes data.  *See* IDM at 25.

 Finally, Jinko also challenges Commerce's decision not to include the Drewry and

Freightos data.  *See* Jinko Br. 36-37.  Commerce declined to rely on the Drewry and Freightos

rates because they did not identify the type of material shipped, whether they exclude shipment

rates for hazardous materials, and whether they exclude temperature-controlled containers (the

latter two of which do not apply to the respondents in this case).  *See* IDM at 23 (citing Jinko

First SV Cmts. at Ex. 10C-D (P.R. 236-237; C.R. 345)).  Moreover, Commerce explained that

the Drewry and Freightos data provided less detailed information regarding the types of charges

included in the total ocean freight rate, such as brokerage and handling charges, when it is

important to know the charges included in the ocean freight rate so Commerce does not double

count the charges in its calculations.  *See id.*  Jinko argues that Commerce's concerns are

addressed by *MAE from China*, which states that "there is no evidence . . . that the Freightos and

Drewry freight rates do not include all the appropriate ocean freight charges."  Jinko Br. 37

(quoting 87 Fed. Reg. 9,576, at IDM Cmt. 1).  Unlike *MAE from China*, however, Commerce's

concern is not that *appropriate* ocean freight charges will be excluded, but that *inappropriate*

charges will be included.  By contrast, Commerce found that the Descartes and Maersk data

include rates for electronic goods of the same type shipped by Jinko and exclude rates for hazardous material and temperature-controlled shipments. *See* IDM at 23; *Qingdao Sea-Line*, 766 F.3d at 1386 (upholding Commerce's surrogate value selection when Commerce considered product specificity a key factor.).

Regarding Commerce's decision not to exclude the Drewry and Freightos data based on their lack of specificity in *MAE from China*, as we explained above, the competing Maersk data in that case were *not* publicly available. *See* 87 Fed. Reg. 9,576, at IDM Cmt. 1. Thus. Jinko's argument runs afoul of the core principle that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line*, 766 F.3d at 1387 (citation omitted); *cf. Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) ("Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." (citation omitted)). Ultimately, in asserting that Commerce's determination is "unsupported" (Jinko Br. 37), Jinko asks this Court to "substitute its own judgment for the agency's in considering and weighing the relative importance of the various criteria applied." *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (citation omitted). That is not a valid basis to overturn Commerce's reasonable determination.

### F.  Commerce's Selection Of the Freightos Data To Value Air Freight Is Supported By Substantial Evidence And Lawful

Next, Commerce reasonably determined that Freightos data were the best information on the record to value the air freight services used by Jinko. *See* IDM at 40-44. Commerce selected the Freightos data because they met a number of Commerce's surrogate value criteria, namely being publicly available, contemporaneous with the review period, broad-market averages, tax and duty-exclusive, and specific to the inputs being valued. IDM at 43. Freightos has the

world's largest global database of multimodal freight rates, with more than two billion price

points.  *See* IDM at 43 (citing Jinko First SV Cmts. at Ex. 9H (P.R. 233; C.R. 342)).  The

Freightos data provide weekly rates from all service providers who allow their information to be

used for market intelligence.  *Id*.  Of the publicly available and contemporaneous air freight data

sources on the record, Freightos was the only data that covered shipments to the destination

where Jinko shipped its merchandise.  Specifically, Freightos provided rates for air-cargo

shipments of more than 1,000kg from Shanghai to Atlanta, which is specific to Jinko's air

freight.  *Id.* at 43-44.  The Freighos data also include all airline surcharges, such as fuel, security,

or costs associated with COVID-19, while excluding origin and destination surcharges and being

tax and duty-exclusive.  *Id.* at 44.  Moreover, the record includes detailed information on

Freightos's collection methodology and the contents of the data.  *Id.* at 44 & n.240.

  Jinko (joined by JA Solar, BYD, and Trina) challenges Commerce's reliance on the

Freightos data rather than International Air Transport Association (IATA) data.  Jinko Br. 30-33;

JA Solar Br. 8; BYD Br. 14; Trina Br. 53-54.  Unlike the Freightos data, the IATA data that

Jinko proposes is not publicly available on the record of this case.  *See* IDM at 43 ("We did not

value Jinko's air freight expenses using IATA data because the data were treated as proprietary

information on the record of this review.").  The only public IATA information on the record is a

monthly average of its rates.  *Id.*  Further, the public information for IATA lacks details about the

rates or how the data were obtained, meaning that "almost none of the underlying IATA data and

information regarding the IATA data collection are publicly available."  *Id.* (citing Jinko First

SV Cmts. at Exs. 9A-9F (P.R. 233; C.R. 341-342); Jinko Final SV Cmts. at Exs. 5A-5F (Aug. 3,

2021) (P.R. 314; C.R. 414-416)).  This is apparent from the public version of Jinko's August 3,

2021 surrogate value filing, in which almost all of the IATA information aside from the monthly

average rates is redacted.  *See* Jinko Final SV Cmts. at Ex. 5A-5E (P.R. 314; C.R. 414-415 )
(redacting significant portion of information).

Jinko argues that the public IATA rates provide certain details for each month of the
review period, such as origin and destination ports, total number of shipments, total weight of the
cargo, total amount of air freight charged, and average freight charges in USD/Kg.  Jinko Br. 32.
However, this is for the *monthly* information that is public.  *See id*.  It does not alter Commerce's
finding that almost none of the underlying IATA data and information regarding collection of
that data are publicly available.  *See* IDM at 43.  Indeed, Jinko concedes that it submitted the
"data underlying the IATA analysis" as proprietary information subject to the administrative
protective order in this case.  Jinko Br. 31.  Commerce, as we established above, prefers to rely
on publicly available information when selecting surrogate values.  *See* Policy Bulletin 04.1,
"Data Considerations," http://enforcement.trade.gov/policy/bull04-1.html (visited Aug. 9, 2023);
*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,344 (Dep't of Commerce Feb.
27, 1996) ("The public availability standard is aimed at promoting transparency . . .").  Because
Commerce found that the IATA data were not publicly available, whereas the detailed Freightos
data were publicly available, it reasonably did not rely on the IATA data.  *Cf. MAE from China*,
87 Fed. Reg. 9,576, at IDM Cmt. 1 (declining to use data that were not publicly available).

Jinko's arguments that the data underlying the IATA rates are available to any person, for
a fee, and that Commerce "has a longstanding practice of relying on data maintained in fee-based
sources" misstates Commerce's reasoning.  *See* Jinko Br. 31 (citation omitted).  Commerce did
not reject the IATA rates because the IATA database required a subscription; it rejected the
IATA rates because the IATA data were not publicly available on the record of this case.  *See*
IDM at 43, 44.  As shown above, Jinko concedes that it submitted most of the IATA data and

related information as business proprietary information in this case.  *See* Jinko Br. 31.  Record

evidence also indicates that Jinko has an agreement with IATA that limits the disclosure of

certain IATA data, and that permission was required to allow Jinko's counsel to disclose the

monthly Shanghai-Atlanta sector data.  *See id.* (citing Jinko First SV Cmts. at Ex. 9E (P.R. 233;

C.R. 342)).  This limits the public availability of the IATA data.

Moreover, notwithstanding Jinko's citations to cases in which Commerce has expressed a

willingness to rely on fee-based information in other circumstances, Commerce explained in this

case that "the Freightos data satisfy Commerce's SV selection criteria and almost none of the

underlying data and information regarding IATA data collection are publicly available."  IDM at

44.  Thus, the record in this case provided a robust source that was publicly available (in that it

was neither proprietary on the record nor subject to a fee).  In such circumstances, Commerce

has discretion to choose between equally reliable alternatives: "After comparing the available

data sets, where there exist on the record alternative sources of data that would be equally or

more reliable . . . it is within Commerce's discretion to use either set of data."  *Zhejiang Native*

*Produce & Animal By-Prods. Import & Export Grp. Corp. v. United States*, 227 F. Supp. 3d

1375, 1381 (Ct. Int'l Trade 2017) (citation and quotation marks omitted).  That Commerce could

make a different choice under other circumstances does not alter the reasonableness of its

decision in this case.  *See Qingdao Sea-Line*, 766 F.3d at 1387; *Hyundai Steel*, 279 F. Supp. 3d at

1372 (discussing independent nature of separate administrative proceedings).

Jinko does not argue that the Freightos data are inaccurate or unreliable—and it would be

improper for it to do so for the first time on reply.  *See* Jinko Br. 30-33.  Therefore, plaintiffs'

preference for IATA data notwithstanding, Commerce's selection of the Freightos data to value

Jinko's air freight is supported by substantial evidence and otherwise lawful.

### G.  Commerce's Selection Of The Surrogate Value For Electricity Is Supported By Substantial Evidence And Lawful

Commerce valued electricity using data from the Malaysian Investment Development Authority's *Costs of Doing Business* publication because it includes electricity rates that are specific to industrial users based on size, location, and rates for peak and off-peak hours.  IDM at 58-60; Prelim. SV Memo at 4 (P.R. 403-404); *see* Jinko First SV Cmts. at Ex. 6 (P.R. 231-232; C.R. 340).  No party disputes Commerce's reliance on this data source.

Instead, Jinko (joined by JA Solar, BYD, and Trina) argues that Commerce's decision not to use electricity rates from Malaysia's relatively remote Sabah and Sarawak regions, as well as for off-peak hours, resulted in a distorted surrogate value calculation.  Jinko Br. 29-30; JA Solar Br. 8; BYD Br. 14; Trina Br. 53-54.  Jinko claims that, to obtain the most accurate electricity surrogate value, Commerce should have taken an average of the electricity industrial tariffs for factories corresponding to the highest voltage from all three regions during both peak and off-peak hours, resulting in a rate of 22.88 Sen/Kwh.  *See* Jinko Br. 30.  However, the Sabah and Sarawak regions are located on the island of Borneo, which is not on peninsular Malaysia.  *See* IDM at 59.  There is no evidence that any solar cell or module manufactures are located in these relatively remote regions.  *See id*.  Thus, the electricity rates in these regions would not reflect the high-voltage industrial rates used by solar cell or module manufacturers.  *See id.*

Although Commerce does prefer surrogate values that represent a broad-market average, the overriding purpose is to calculate dumping margins as accurately as possible.  *See Rhone Poulenc*, 899 F.2d at 1191.  In this case, including the electricity rates from the remote Sabah and Sarawak regions would result in a less specific surrogate value.  *See* IDM at 59-60.  Any solar cells and modules manufactured in Malaysia would require high-voltage electricity and the rates for the Sabah and Sarawak regions do not include high-voltage industrial rates.  *See id.*;

Jinko First SV Cmts. at Ex. 6 (P.R. 231-232; C.R. 340).  The inclusion of the rates for the Sabah and Sarawak regions would therefore result in a distorting discrepancy between the rates in peninsular Malaysia and in those regions.  Jinko's contention that Commerce's determination is based on speculation (Jinko Br. 29-30) is inaccurate because there is no dispute that the Sabah and Sarawak regions are on the island of Borneo, that there are no known Malaysian producers of solar cells and modules located in these relatively remote regions, and that the rates for the Sabah and Sarawak regions lack high-voltage industrial rates for such manufacturing.  *See* IDM at 59.  Including the rates from the Sabah and Sarawak regions would thus be distortive when a solar cell and module manufacturer in Malaysia would require high-voltage electricity and thus pay the electricity rates charged in peninsular Malaysia.  IDM at 60.

Regarding Jinko's argument that Commerce should have relied on data for both peak and off-peak hours, Commerce explained why doing so would not be appropriate.  *See* IDM at 60. Although Jinko claims that it operated twenty-four hours a day, neither Jinko nor Risen provided any evidence to support such extended hours of operation.  *See id.*  Moreover, there were more peak hours reported than off-peak hours—14 hours a day in peninsular Malaysia and 17 hours a day in the Sabah and Sarawak regions—such that a simple average of peak and off-peak hour electricity rates, as Jinko requested, would not be appropriate.  *See id.*  As Commerce explained, "{g}iven that peak hour electricity rates are in effect for the majority of the day in all of the regions, in the absence of any information regarding the hours of Jinko and Risen's operations, we find it reasonable to conclude that peak hour electricity rates are more representative of the rates that Jinko and Risen would have incurred had they operated in the surrogate country."  *Id.* Thus, Commerce provided a reasonable explanation for its determination to exclude the off-peak hour rates.

Jinko claims that Commerce's determination is unreasonable because Commerce did not require Jinko to report its hours of operation. *See* Jinko Br. 29. However, "the burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co., Ltd v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citation omitted). Commerce invited interested parties to submit relevant factual information for valuing factors of production, and cannot rely on information that Jinko and Risen failed to place on the record. *See* Surrogate Country List at 2 (P.R. 156). In the absence of any information supporting the hours of operation for Jinko and Risen, and given that the peak electricity rates made up the majority of the day in all of the regions, it was reasonable for Commerce to conclude that the peak hour rates were more representative of the rates that Jinko and Risen would have incurred in Malaysia.

### H. Commerce's Selection Of A Surrogate Financial Statement Is Supported By Substantial Evidence And Lawful

Commerce lawfully calculated the surrogate financial ratios for this review using the financial statements of JA Solar Malaysia SDN BHD (JA Solar Malaysia). *See* IDM at 34-39. Jinko (joined by JA Solar, BYD, and Trina) challenges Commerce's financial ratios calculation, arguing that Commerce should have included financial statements from Flextronics Shah Alam SDN BHD (Flextronics), but Commerce reasonably determined that the Flextronics financial statements were not as specific because Flextronics produces comparable rather than identical merchandise. *See id.*; Jinko Br. 37-41; JA Solar Br. 8; BYD Br. 13-14; Trina Br. 53-54.

As we explained above, after calculating the total value of the factors of production, Commerce adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1). Commerce does this by calculating surrogate financial ratios that it "derives from the financial statements of one or more companies that produce identical or comparable merchandise, preferably in the primary surrogate country."

43

*T. T. Int'l Co. v. United States*, 439 F. Supp. 3d 1370, 1382 (Ct. Int'l Trade 2020) (citing 19

C.F.R. § 351.408(c)(4); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).

Commerce distinguishes among financial statements based on the specificity, contemporaneity,

and quality of the data.  IDM at 37 (citation omitted).  Specifically, Commerce's practice is to

select financial statements that are completely translated, publicly available, contemporaneous

with the review period, free from countervailable subsidies, sufficiently detailed to calculate

financial ratios, show a profit before taxes, and are from the primary surrogate country.  *Id.*

    Further, Commerce's preference in selecting financial statements is to match a surrogate

company's production experience with that of the respondents, and whenever possible, to select

surrogate country producers of identical merchandise (so long as their data are not distorted or

otherwise unreliable).  *Id.*  Hence, Commerce prefers to use financial statements from companies

that produce identical merchandise, rather than those that produce comparable merchandise.  *Id.*;

*see also Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,345-46 (quoted at IDM at

38, discussing the importance of product specificity).

    The financial statements from JA Solar Malaysia best met these criteria.  Both Jinko and

Risen produce solar cells and solar modules, and Commerce explained that JA Solar Malaysia

likewise produced identical products—a determination Jinko does not challenge.  *See* IDM at 37

(citing Jinko First SV Cmts. at Ex. 11A (P.R. 238; C.R. 346); Risen First SV Cmts. at Ex. 11

(P.R. 197-198)).  As a result, Commerce reasonably found that JA Solar's production/financial

experience is more representative of the respondents' experience than the financial statements of

companies that do not produce solar cells or solar modules.  *Id.* at 38.

    Conversely, there was no record evidence to indicate that Flextronics produced solar cells

or solar modules.  IDM at 38-39.  Commerce explained that Flextronics' principal activities are

"manufacturing of assembled printed circuit boards," as well as "contract manufacturing for electronic products and trading of electronic goods and related products." *Id.* (quoting Jinko First SV Cmts. at Ex. 11C (P.R. 239; C.R. 347)).  In other words, in contrast to JA Solar Malaysia's highly relevant production experience, Flextronics' financial statements specify only that Flextronics produces circuit boards, while performing contract manufacturing of unspecified electronic products.  *See id.*  Because the record does not support that Flextronics produced solar cells in the review period, its financial statements would not reflect the materials, labor, and energy expenses, or the associated factory overhead and general and administrative expenses, for producing solar cells and modules.  *See id.*  Hence, Commerce did not rely on Flextronics' financial statements in addition to JA Solar Malaysia's statements because JA Solar's experience was "far more specific to the respondents' experience than is Flextronics' experience."  *Id.* at 39; *cf. SeAH Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1350-51 (Ct. Int'l Trade 2017) (sustaining Commerce determination to rely on financial statements from producer of identical merchandise, despite imperfections, over producers of comparable merchandise).

Jinko argues that Flextronics is, in fact, a producer of both identical and comparable merchandise because its financial statements refer to "contract manufacturing for electronic products."  Jinko Br. 38 (quoting Jinko First SV Cmts. at Ex. 11C, pg.13 (P.R. 239; C.R. 347)).  Jinko also argues—relying on factual information that it did not place on the record, and that Commerce rejected in Jinko's case brief—that Commerce ignored information from European Commission solar proceedings that "Flextronics is a contract manufacturer" and an "Exporting producer{} in Malaysia."  *Id.*  However, in addition to the fact that these arguments improperly

go beyond the administrative record,[6] Commerce addressed Flextronics' alleged involvement in

contract manufacturing of solar cells, stating that,

> While Flextronics is referred to as a contract manufacturer for electronic products, *even if those electronic products are, or relate to, solar modules, which is not indicated in its financial statements*, it is unclear whether Flextronics may have simply produced parts of solar modules or whether it is a toller of solar modules that did not purchase the inputs used in assembling solar modules.  If Flextronics is a toller of solar modules, its financial statements would not reflect the materials expenses and associated factory overhead and general and administrative expenses, related to producing solar modules. Thus, *even if Flextronics assembled solar modules*, its financial ratios may not reflect the respondents' production experience as closely as those of JA Solar.

IDM at 39 (emphasis added).  Thus, notwithstanding Jinko's claims, Commerce's analysis

accounts for the possibility that Flextronics' contract manufacturing work may include work

relating to solar modules.  However, that still would not establish that Flextronics produces solar

modules, as distinguished from producing parts of such products or serving as a toller that

assembled the products without purchasing the inputs.

Moreover, contrary to Jinko's claims, information about raw material and staffing costs

in the Flextronics financial statements does not establish that Flextronics manufactured solar

cells or modules.  *See* Jinko Br. 38-39.  The financial statements specifically state that the

company is "*principally involved in the manufacturing of assembled printed circuit boards*," in

---

[6] As Commerce explained, although the materials that Jinko references may be available in the public domain, that is often the case with factual information provided to value factors of production under 19 C.F.R. § 351.408(c).  *See* Rejection Memo at 1 (P.R. 442); Surrogate Country List at 2 (P.R. 156) ("interested parties may submit publicly-available information to value factors of production no later than 30 days before the scheduled date of the preliminary results").  Further, unlike recognition of an intervening U.S. Government decision, Jinko seeks to use this non-record information from European trade proceedings as factual material to support a contested surrogate value (even though, as we discuss below, the information is hardly definitive and Jinko's characterization of it is open to dispute).  *See* Rejection Memo at 1-2; *cf. Tri Union Frozen Prod., Inc. v. United States*, 161 F. Supp. 3d 1333 (Ct. Int'l Trade 2016) (refusing judicial notice of non-record materials that plaintiffs failed to show were beyond reasonable dispute).

addition to "contract manufacturing for electronic products and trading of electronic goods and related products."  Jinko First SV Cmts. at Ex. 11C (P.R. 239; C.R. 347) (quoted in IDM at 38-39 (emphasis added)).  There is no evidence that the input costs that Jinko highlights pertain to work on solar cells or modules, as distinguished from Flextronics' stated business of manufacturing circuit boards, or even its generic contract manufacturing business.  *See id.*

Likewise, although Jinko claims that the European Commission information that it improperly cites supports its contentions, Jinko omits that the materials listed Flextronics as a solar "producer" only because "Flextronics is a contract manufacturer, {and} the Commission also verified the {*original equipment manufacturer (OEM)*} company SunEdison Products Singapore Pte Ltd."  European Commission Implementing Regulation (EU) 2016/184 (Feb. 11, 2016), *available at* https://www.legislation.gov.uk/eur/2016/184/introduction (visited Aug. 26, 2023) (emphasis added).  This indicates that Flextronics *is not* the original manufacturer for any solar products it may have exported from Malaysia (consistent with Commerce's explanation that Flextronics may have served as a toller that assembled such products without purchasing the inputs).  *See id*.  Indeed, the whole thrust of the proceedings that Jinko cites concerns potential circumvention of European Commission trade remedy orders on Chinese solar cells and modules by consigning Chinese origin products through Malaysia and Taiwan.  *See id.*  In addition, none of the materials that Jinko cites are contemporaneous with this review because they stem from 2016 and 2018, whereas the review period is from December 2019 to November 2020.  *See id.*

Thus, although it would be inappropriate for the Court to look to the non-record European Commission materials, they should be characterized accurately and do not support Jinko's position.  Further, the fact that the substance of these factual materials is open to dispute underscores why they constitute untimely submitted new factual information that Commerce

properly rejected and why the Court should not consider them in the first instance in litigation.

*See* Rejection Memo (P.R. 442).  As this Court explained in *Tri Union*, taking judicial notice in

such circumstances would "run counter to a fundamental principle of administrative law, namely

that the focal point for judicial review should be the administrative record already in existence,

not some new record made initially in the reviewing court."  161 F. Supp. 3d at 1339-40 (citation

and quotation marks omitted).

In any event, the materials that Jinko highlights do not negate Commerce's reasonable

concern that Flextronics does not produce solar cells in a way that makes its financial statements

specific to the subject merchandise produced by Jinko and Risen.  *See* IDM at 39.  Relatedly,

Jinko's argument that Commerce has, in other instances, relied on data from companies with

relatively less production of identical merchandise based on the circumstances in those cases

does not alter the reasonableness of Commerce's determination in this case to rely solely on the

JA Solar Malaysia financial statements when Commerce found them to be the distinctly better

option.  *See* Jinko Br. 39-40; *see also Qingdao Sea-Line*, 766 F.3d at 1387; *Hyundai Steel*, 279 F.

Supp. 3d at 1372 (discussing independent nature of separate administrative proceedings).  As

Commerce stated, "we have not calculated surrogate financial ratios by averaging JA Solar's

financial data with those of Flextronics because we believe that would result in financial ratios

that are *less representative* of the respondents' operations{.}"  IDM at 39 (emphasis added).

Jinko also argues that data quality considerations support using Flextronics' financial

statements because they are more detailed and provide breakouts for cost components such as

overhead and SGA.  *See* Jinko Br. 40.  Commerce explained, however, that these contentions do

not outweigh the fact that the record lacks evidence that Flextronics produced solar cells in the

period covered by the financial statements, given the importance of product specificity when

selecting data for the surrogate financial ratios.  *See* IDM at 39.  Nor do Jinko's claims of greater

detail outweigh Commerce's questions regarding whether Flextronics' financial ratios reflect the

experience of a producer of solar modules versus a toller with operations related to solar

modules.  *See id.*  Further, although it is Commerce's preference to use multiple financial

statements, this preference does not override Commerce's responsibility to use the information

most specific to the product.  *See Qingdao Sea-Line*, 766 F.3d at 1386  (upholding Commerce's

selection of data that was less contemporaneous over data that was less product-specific).

Indeed, Commerce explained that it typically uses multiple financial statements when they are

equal in quality, but in this case "we do not consider JA Solar and Flextronics' financial

statement to be equal in quality, rather we consider JA Solar's financial statements to be superior

in quality because of their specificity."  IDM at 39.

       For similar reasons, Jinko's citations to other cases in which the particular circumstances

prompted Commerce to rely on financial statements from a producer of comparable merchandise

are unpersuasive.  *See* Jinko Br. 40-41.  Unlike the diamond sawblades proceeding Jinko cites, in

which Commerce found that the financial statements concerning identical merchandise lacked

*necessary* details and thus were not usable, no party has argued in this case that the JA Solar

Malaysia financial statements are so undetailed as to be unusable.  *See id.* at 40 (quoting

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 79 Fed. Reg.

35,723 (Dep't of Commerce June 24, 2014), at IDM Cmt. 16).  Indeed, Commerce found the JA

Solar Malaysia financial statements—which the respondents themselves submitted—readily

usable.  *See* Prelim. SV Memo at 9-10 & n.55 (P.R. 403-404).  Likewise, Jinko's reliance on

*Hydrofluorocarbon Blends and Components Thereof from China* is unpersuasive because the

companies at issue in that case were both producers of Mexican refrigerant gases (even though

one did produce some identical merchandise), and Commerce's determination focused on whether to include the company with some identical production due to an alleged lack of detail, rather than whether the solely comparable producer should be excluded. *See* Jinko Br. 41 (quoting 81 Fed. Reg. 42,314 (Dep't of Commerce June 29, 2016), at IDM Cmt. 30). In this case, by contrast, Commerce found JA Solar Malaysia's financial statements to be the distinctly better alternative, and that *adding Flextronics* would be distortive. *See* IDM at 39.

Overall, because the record does not support Jinko's claim that Flextronics produces solar cells, Flextronics' financial statements would not reflect the cost structure of producing solar products. IDM at 39. Because JA Solar Malaysia's experience is specific to the production of solar cells and modules, while Flextronics' production experience is not, Commerce reasonably relied on JA Solar Malaysia's financial statements for the surrogate financial ratios.

## III.    **Commerce Reasonably Deducted Section 301 Duties In Its Calculations**

Jinko (joined by JA Solar, BYD, and Trina) next claims that Commerce improperly deducted Section 301 duties in its calculations, allegedly in violation of the statutory directive to deduct "United States import duties" from U.S. prices. *See* Jinko Br. 41-45 (citing 19 U.S.C. § 1677a(c)(2)(A)); *see also* JA Solar Br. 9; BYD Br. 14; Trina Br. 53-54. Contrary to this claim, Commerce reasonably deducted Section 301 duties because it does not consider Section 301 duties "special duties" warranting exclusion, and thus they must be deducted from the United States prices in calculating dumping margins under section 1677a(c)(2)(A). *See* IDM at 72-74.

Section 1677a(c)(2)(A) states that the price used to establish export price and constructed export price shall be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, *and United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to

the place of delivery in the United States." (emphasis added).  The key issue is whether Section 301 duties are excluded from the statutory requirement to deduct "United States import duties."

In this regard, Commerce considers antidumping duties to be distinct from normal selling expenses and customs duties because (unlike antidumping duties) normal customs duties have no remedial purpose.  *See APEX Exports v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015). Antidumping duties, on the other hand, are "special duties" that implement a trade remedy.  *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1358, 1361 (Fed. Cir. 2007) (recognizing Commerce's exclusion of antidumping duties under § 1677a(c)(2)(A) as "special duties" distinct from "United States import duties"); *Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19,153, 19,159 (Dep't of Commerce Apr. 12, 2004) (*SWR Korea*).  Moreover, "{a}lthough the {antidumping duty} law does not define the term 'United States import duties,' the Senate Report that accompanied the Antidumping Act of 1921 (the '1921 Act') contrasts antidumping duties (which it refers to as 'special dumping duties') with normal customs duties (which it refers to as 'United States import duties') . . . Thus, Congress has long recognized that at least some duties implementing trade remedies—including at least antidumping duties—are special duties that should be distinguished from ordinary customs duties."  *SWR Korea*, 69 Fed. Reg. at 19,159 (citing S. Rep. No. 67-16 at 4 (1921), discussed by *Wheatland*, 495 F.3d at 1361).

As this Court stated, antidumping duties are "an element of a fair and reasonable price," not an import duty or cost associated with importation.  *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998).  "It is therefore reasonable for Commerce not to treat antidumping duties as costs of importation when calculating {export price}."  *APEX Exports*, 777 F.3d at 1379.

Likewise, in *Wheatland*, the Federal Circuit sustained Commerce's determination that safeguard duties imposed under Section 201 of the Trade Act of 1974 constitute special duties that do not fall within the ambit of section 1677a(c)(2)(A).[7]  In *Wheatland*, Commerce compared Section 201 safeguard duties both to normal customs duties and to antidumping duties in order to determine how Congress would have intended Section 201 duties to be treated in achieving the antidumping statute's purposes.  495 F.3d at 1361-62.  Commerce identified several similarities between Section 201 safeguard duties and antidumping duties, and determined that Section 201 duties are "special dumping duties" because they are "more like {antidumping duties} in purpose and function than they are like ordinary customs duties."  *Id*. at 1362 (citation omitted).  The Federal Circuit agreed, stating that "{g}iven the similarities between antidumping duties and Section 201 safeguard duties and given the fact that Section 201 safeguard duties were not enacted until 1974 and therefore could not have been considered either 'United States import duties' under § 1677a(c)(2)(A) as originally enacted in 1921 or 'special dumping duties,' it was reasonable for Commerce to conclude that Section 201 safeguard duties are more like antidumping duties 'in purpose and function than they are like ordinary customs duties.'"  *Id.*

Conversely, the Federal Circuit affirmed this Court's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, and held that Commerce lawfully treated duties imposed by the President under Section 232 of the Trade Expansion Act of 1962 as "United States import duties" under section 1677a(c)(2)(A).  63 F.4th 25, 34-36 (Fed. Cir. 2023).  In its decision, the Federal Circuit held that the language of the Presidential proclamation imposing the

---

[7] Section 201, 19 U.S.C. § 2251, "permits the President of the United States to impose safeguard duties on imported merchandise if the merchandise 'is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.'"  *Wheatland*, 495 F.3d at 1357 (quoting § 2251).

Section 232 duties "makes clear that the duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty." *Id*. at 34. Moreover, the Federal Circuit distinguished its holding from *Wheatland*, which this Court had relied upon in sustaining Commerce's decision to deduct the Section 232 in its calculations pursuant to section 1677a(c)(2)(A). *Id*. at 34-36. The court also held that it was not necessary to analyze the "distinction between 'normal duties' and 'special duties'" and relied instead on the language of the Presidential proclamation. *Id*. at 36.

Applying the approach articulated in *Borusan*, this Court recently sustained Commerce's equivalent decision to deduct Section 301 duties in an administrative review of Commerce's antidumping duty order covering tapered roller bearings from China. *See Shanghai Tainai Bearing Co., Ltd. v. United States*, No. 22-00038, 2023 WL 5974083, at *15-17 (Ct. Int'l Trade Sept. 14, 2023). The Court's reasoning in *Shanghai Tainai* applies equally to this case.

This Court should sustain Commerce's determination to deduct Section 301 duties, as it does for Section 232 duties, because the Section 301 duties in question are likewise an additional *ad valorem* duty imposed on the Chinese origin goods that should be deducted from United States prices. The purpose of Section 301 is to authorize the Office of the United States Trade Representative (USTR) to investigate and to enforce domestic rights under trade agreements and to respond to certain foreign trade practices. *See* 19 U.S.C. § 2411. It thus permits USTR, subject to direction by the President, to take action "to enforce such rights or to obtain the elimination of such act, policy, or practice {of a foreign country}." *Id*. § 2411(a)(1).

Relevant to this case, the President in August 2017 directed USTR to initiate a Section 301 investigation. *See Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Executive Office of the

President Aug. 14, 2017).  After a notice and comment period, USTR determined that "the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation covered in the investigation are unreasonable or discriminatory and burden or restrict U.S. commerce." *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (USTR Apr. 6, 2018) (*Section 301 Determination*).  As a result, as directed by the President and pursuant to sections 301(b) and (c), USTR proposed an increase in tariffs on certain goods of Chinese origin, and included a list of tariff subheadings for the products of Chinese origin that would be covered by this action.  *Id.* at 14,907-10.  In June 2018, USTR implemented that action and proposed an additional action of imposing a 25 percent tariff increase on a second tranche of products.  *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (USTR June 20, 2018) (*Section 301 Implementation Notice*).  Further actions also followed.  *E.g.*, *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (USTR Aug. 16, 2018) (*August 2018 Notice*) (increasing tariffs on additional products).

When comparing Section 301 duties to generic United States customs duties for purposes of this review, Commerce found that Section 301 duties are similar to normal United States customs duties in that they may continue indefinitely.  *See* IDM at 73-74 (citations omitted). This determination is consistent with the Federal Circuit's holding in *Wheatland* that normal

United States customs duties are indefinite, whereas antidumping duties provide only temporary relief from the injurious effects of imports.  *See id.* (citing *Wheatland*, 495 F.3d at 1362-63).[8]

Moreover, contrary to Jinko's claims, the Section 301 duties at issue in this case are akin to the Section 232 duties at issue in *Borusan*.  In affirming Commerce's decision to deduct Section 232 duties in *Borusan*, the Federal Circuit held that the language of Proclamation 9705, which authorized the Section 232 duties, "makes clear that the duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty."  63 F.4th at 34.  Specifically, Proclamation 9705 states that "imports . . . shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered or withdrawn from warehouse for consumption . . . *in addition to any other duties*{.}"  *Id.* (emphasis added by Federal Circuit; citation omitted).  The Federal Circuit also observed that "{t}he context confirms the evident meaning of this declaration—that the duty should be charged on top of otherwise-determined antidumping duties" (meaning it should be deducted in the antidumping calculations)  *Id.* at 34-35.  Otherwise, "Proclamation 9705 would offset substantially or completely by a reduction in the antidumping duty itself (through an increase in the U.S. price and therefore a decrease in the dumping margin), defeating the evident 'in addition to' prescription of Proclamation 9705."  *Id.* at 35 (citation omitted).

Similarly, the language promulgating the Section 301 duties is clear in its intention. Indeed, the initial *Section 301 Determination* states that Section 301 duties are intended to increase the tariffs on certain goods of Chinese origin by imposing *an additional duty*:

---

[8] We recognize that this Court held in *Borusan* that "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties."  *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1374-75 (Ct. Int'l Trade 2021), *aff'd on other grounds* 63 F.4th 25 (Fed. Cir. 2023).  Notwithstanding the Court's statement, however, it sustained Commerce's determination to treat Section 232 duties as United States import duties, *id.* at 1375-76, and the Court should do so for Section 301 duties as well.

> {T}he proposed action is *an additional duty* of 25 percent on a list
> of products of Chinese origin identified in the Annex to this
> Notice.  For example, if a good of Chinese origin is currently
> subject to a zero *ad valorem* rate of duty, the product would be
> subject to a 25 percent *ad valorem* rate of duty; if a good of
> Chinese origin were currently subject to a 10 percent *ad valorem*
> rate of duty, the product would be subject to a 35 percent *ad
> valorem* rate of duty; and so on.

83 Fed. Reg. at 14,907 (emphasis added); *see id.* at 14,908 (seeking comment on "whether

maintaining or imposing *additional duties* on a particular product would cause disproportionate

economic harm to U.S. interests"); *Section 301 Implementation Notice*, 83 Fed. Reg. at 28,710

("The U.S. Trade Representative (Trade Representative) has determined that appropriate action

in this investigation includes the imposition of an *additional ad valorem duty* of 25 percent on

products from China . . . ." (emphasis added)); *August 2018 Notice*, 83 Fed. Reg. at 40,823

(same).  Indeed, similar to the proclamation in *Borusan*, USTR's *Section 301 Implementation

Notice* states that the Section 301 duties "apply *in addition to all other applicable duties, fees,

exactions, and charges*."  83 Fed. Reg. at 28,711; *August 2018 Notice*, 83 Fed. Reg. at 40,824

(same).  This clearly indicates that Section 301 duties are intended to be imposed *in addition* to

any other duties.  Therefore, in line with the reasoning in *Borusan*, the Section 301 duties are

intended to be additional to other existing duties.  *See Borusan*, 63 F.4th at 34-36.  Jinko's claim

that *Borusan* is "readily distinguishable" from this case is unpersuasive.  *Compare* Jinko Br. 44

*with Shanghai Tainai*, 2023 WL 5974083, at *17 ("This principle, as elucidated in *Borusan*,

extends beyond Section 232 duties and applies to other statutory duties.").

Jinko argues that "the supposed indefinite nature of Section 301 duties is refuted by

{USTR} having solicited comments concerning their effectiveness and continued need to

address China's actions to technology transfer, intellectual property, and innovation that were

found to have been unreasonable or discriminatory and burden or restrict U.S. commerce."  Jinko

Br. 42 (citing *Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation*, 87 Fed. Reg. 62,914 (USTR Oct. 17, 2022)); *see Wheatlan*d, 495 F.3d at 1362 (distinguishing time-limited "special duties" under Section 201 from normal customs duties, which are permanent unless modified by Congress).  However, USTR's authority to modify or terminate Section 301 duties is different from the strict limitations on special duties, such as the antidumping statute provisions providing that the duties will terminate after five years, *unless* relevant agencies affirmatively determine that revocation of the order would lead to dumping *and* that material injury to the domestic industry would be likely to continue or recur.  *See* 19 U.S.C. § 2417(a)(1); 19 U.S.C. §§ 1675(c)(1), (d)(2); *Wheatlan*d, 495 F.3d at 1362.  Section 301 duties, by contrast, may continue if USTR receives a written request for continuation of the duties.  *See* 19 U.S.C. § 2417(c).  Therefore, Section 301 duties are more akin to normal United States import duties under section 1677a(c)(2)(A).  *See* IDM at 74.

Jinko next argues, inaccurately, that the purpose of Section 301 duties—obtaining the elimination of a foreign country's act, policy, or practice that is unreasonable or discriminatory and burdens or restricts United States commerce—confirms that Section 301 duties are remedial in the same manner as Section 201 and antidumping duties, as distinguished from normal import duties.  *See* Jinko Br. 42-43.  That is incorrect.  As the Federal Circuit recognized in *Wheatland*, Section 201 and antidumping duties are similarly remedial because they are "directed at the same overarching purpose—protecting the bottom line of domestic producers."  495 F.3d at 1363-64.  That is not the case for Section 301 duties (as the materials that Jinko cites demonstrate).

Section 301 duties are not remedial in the AD/CVD sense of providing relief to an injured domestic industry, nor in the Section 201 sense of facilitating positive adjustment by a domestic industry being subjected to serious injury or the threat thereof by foreign imports.  *See*

*SWR Korea*, 69 Fed. Reg. at 19,159 (finding that Section 201 duties were similar to antidumping duties, and therefore special remedial duties, because they are intended to provide "temporary relief for an industry suffering from serious injury" (citation omitted)).  Rather—as the materials that Jinko cites illustrate—Section 301 focuses on enforcing the United States' rights under trade agreements and eliminating improper foreign practices.  19 U.S.C. § 2411(a)(1), (b).  Indeed, the stated purpose of the Section 301 duties at issue in this case is to curb "certain acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation" that are damaging to United States economic interests.  *Section 301 Determination*, 83 Fed. Reg. at 14,906.  Although the practices may burden United States Commerce, that does not make the overarching purpose of Section 301 to provide a remedy to the domestic industry.  Thus, contrary to Jinko's claims, Section 301 duties *do not* have the same remedial purpose of addressing domestic injury as AD/CVD and Section 201 duties.  *See* Jinko Br. 43-44.

Lastly, Jinko claims that deducting Section 301 duties constitutes double counting.  Jinko Br. 44-45, referencing Jinko Case Brief at 87-88 (May 27, 2022) (P.R. 446; C.R. 494) (citing *Hoogovens*, 4 F. Supp. 2d at 1220; *AK Steel Corp. v. United States*, 988 F. Supp. 594 (Ct. Int'l Trade 1997)).  Notwithstanding Jinko's disagreement, Commerce correctly explained that *Hoogovens* and *AK Steel* are inapplicable because they concern remedial antidumping duties that serve a different function than Section 301 duties.  *See* IDM at 74.  Likewise, *SWR Korea*, which Jinko also cites, does not concern Section 301 duties.  *See* Jinko Br. 45.  Because Section 301 duties seek to enforce treaty rights and eliminate foreign country practices, rather than to make an injured domestic industry whole, they are more properly considered an import duty or cost associated with importation than "an element of a fair and reasonable price," like antidumping duties.  *Hoogovens*, 4 F. Supp. 2d at 1220.  Indeed, Jinko claims that Section 301 duties are

"counted" the first time when they are applied as an enforcement tool to "remed{y} China's practices," Jinko Br. 45, but that has little to do with whether they are appropriately considered a pricing element (as distinguished from additional import expenses) for antidumping purposes.

Moreover, as the Federal Circuit recognized in both *Borusan* and *APEX*, deducting antidumping duties presents a unique double-counting issue because they pertain to the very thing being calculated. Thus, deducting antidumping duties would prompt a circular calculation, in which each deduction changes the dumping rate, which in turn prompts further deduction, and so on. *See Borusan*, 63 F.4th at 35 ("Antidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity." (citing *APEX Exports*, 777 F.3d at 1379 & n.2)). As a result, the double-counting concerns that have led Commerce not to deduct remedial special duties in the antidumping context do not have the same force in the context of Section 301 duties. *Cf. Borusan*, 494 F. Supp. 3d at 1375 ("There is a clear statutory interplay between Section 201 duties and antidumping duties, while Section 232 does not reveal any such coordination concerns."). Consequently, Commerce's calculation methodology should be sustained.

## IV.    Commerce's Determination To Apply Partial AFA To Value Risen's Unreported Factors Of Production Is Supported By Substantial Evidence And Lawful

Commerce lawfully resorted to adverse facts available (AFA) pursuant to 19 U.S.C. §§ 1677e(a) and (b) to fill the gaps in the record created by Risen's unreported factor of production information because it reasonably determined that Risen had failed to cooperate to the best of its ability in reporting its factor of production information. *See* IDM at 6-10.

### A.    Legal Framework

Commerce applies facts available to fill informational gaps when necessary information is unavailable or when an interested party withholds information requested by Commerce, fails

to provide the information by the deadline, significantly impedes the proceeding, or provides information that cannot be verified.  *See* 19 U.S.C. § 1677e(a).  Before applying facts available, Commerce must inform a respondent of the deficiency and allow the respondent an opportunity to explain or to remedy the deficiency.  *See* 19 U.S.C. §§ 1677e(a)(2), 1677m(d).

Commerce may apply an adverse inference in selecting facts otherwise available if it finds that a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b).  A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {the} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Thus, the statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*."  *Id.* at 1383 (emphasis added).  Although this standard does not require perfection and recognizes that mistakes sometimes occur, "it does not condone inattentiveness, carelessness, or inadequate record keeping" and it requires that importers "take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce."  *Id.* at 1382.  To determine whether AFA is warranted, Commerce examines a "respondent's actions and assesses the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information."  *Id.*  Ultimately, "Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings."  *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).

The AFA statute is meant to "provide respondents with an incentive to cooperate" with Commerce's investigation.  *Essar Steel Ltd. v United States*, 678 F.3d 1268, 1276 (Fed. Cir.

2012) (citation omitted).  Hence, in applying AFA, Commerce considers the extent to which a

party may benefit from its lack of cooperation.  Specifically, the Statement of Administrative

Action explains that Commerce may use an adverse inference in selecting available facts "to

ensure that the party does not obtain a more favorable result by failing to cooperate than if it had

cooperated fully."  Statement of Administrative Action (SAA) accompanying Uruguay Round

Agreements Act, H.R. Doc. 103-316, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199.

When selecting an AFA rate, Commerce may rely on information from (1) the petition; (2) the

final determination in the investigation; (3) any previous administrative review; or (4) any other

information placed on the record.  *See* 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c).

## B.  Commerce Lawfully Applied Partial AFA Because Risen Failed To Cooperate To The Best Of Its Ability

In this case, Commerce applied partial AFA because Commerce determined that Risen

failed to cooperate to the best of its ability in responding to Commerce's requests for information

by failing to provide Commerce with a substantial portion of the information concerning Risen's

factor of production consumption that Commerce requires to calculate Risen's dumping margin.

*See* IDM at 8-9.  In particular, Commerce found that certain of Risen's solar cell and module

suppliers—who as foreign manufacturers of subject merchandise constitute interested parties in

the proceeding—withheld requested information, failed to provide requested information in a

timely manner, and significantly impeded the proceeding.  *Id.* at 8.[9]  Importantly, moreover, the

record shows that, by choosing to do business without requiring its suppliers' cooperation (even

among those that were previously uncooperative) and subsequently failing to report factor of

---

[9] Specifically, Risen's unaffiliated suppliers failed to act to the best of their abilities because they failed to respond to Commerce's multiple requests for factor of production information.  *See id.* at 8-9 (citing Risen Sec. D Resp. at App'x XIII-20- 21 and Exs. D-25, D-26 (P.R. 147; C.R. 122-123); Risen Supp. Questionnaire Resp. at 15 (June 21, 2021) (P.R. 179; C.R. 294-311));  Letter re: Sec. C&D Supp. Questionnaire at Sec. D, Items 4-11 (June 1, 2021) ((P.R. 163; C.R. 289).

production information, Risen both withheld necessary information and failed to cooperate by not acting to the best of its ability in response to Commerce's requests. *See* IDM at 8-10.

Risen does not dispute that necessary information is missing from the record. Risen Br. 27, 29. Instead, Risen (joined by JA Solar, BYD, and Trina) argues that Commerce's application of AFA to Risen's unreported factors of production from unaffiliated suppliers is not supported by the record and contrary to this Court's precedent. *See id.* at 27-31; JA Solar Br. 9; BYD Br. 13; Trina Br. 53-54. More specifically, Risen argues that this Court has emphasized that it is unfair and contrary to law for Commerce to apply an adverse inference when the party has no control over the non-cooperating supplier. *See* Risen Br. 30 (citing *Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019)). Risen further contends that it cooperated with Commerce's requests for information, and indeed used its *maximum* market leverage to secure its unaffiliated suppliers' cooperation, by stating in its letters to the suppliers that, if they refused to provide factor of production (FOP) data, Risen would be forced to refuse to purchase any products from them and would only purchase from the companies that would cooperate with Risen on this issue. *See id.* at 28. At the same time, Risen concedes that "the non-cooperation for providing FOPs are prevalent among the large number of unaffiliated cell suppliers," while representing that it "needs to purchase solar cells from a large number of cell suppliers" and that "it is not a viable business option for Risen to simply stop purchasing cells from whichever unaffiliated supplier refused to provide FOPs." *Id.*

Commerce persuasively addressed these arguments in its determination. Although Risen claims that it acted to the best of its ability because it requested factor of production information from its unaffiliated solar cell and module suppliers, Commerce explained why Risen had failed to put forth its "maximum" effort to obtain the information in this review. IDM at 8-9; *Nippon*

*Steel*, 337 F.3d at 1382 (discussing "maximum effort" requirement).  Commerce also explained that the amount of information that has been withheld, and is therefore missing from the record, is both substantial and multiple times higher than the amount of missing data in prior segments of this proceeding in which Commerce did not apply partial AFA.  *See* IDM at 9-10.

Risen is a knowledgeable respondent with extensive experience in this proceeding.  *See id.* at 9, 11-12.  It was well aware that Commerce needs factor of production data to calculate dumping margins and of Commerce's practice for dealing with missing information because these issues have been addressed repeatedly in prior reviews.  *See id.*  Indeed, Commerce has applied AFA in calculating the weighted-average margin for respondents, including Risen, based on their failure to provide factor of production information from unaffiliated suppliers since the second period of review.  *See id.* (citing fifth, sixth, and seventh reviews as examples).  Given this history, by not requiring its unaffiliated producers to agree to cooperate with Commerce's requests in antidumping proceedings *before* engaging in business with them and by not providing Commerce with evidence that it made efforts beyond those that failed to induce cooperation in the past, Risen failed to demonstrate that it did the maximum it was able to do to obtain the factor of production information in this segment of the proceeding.  *See id.* at 9.

Further, Risen knew from its participation in prior segments of the proceeding that Commerce specifically requires factor of production data from Risen's unaffiliated solar cell and module suppliers.  *See id.*  Risen also acknowledges that there is a high incidence of solar cell and module producers who will not provide data.  *See id.*; Risen Br. 28.  Yet, again, Risen neither secured agreement from prospective suppliers to cooperate with Commerce's requests *before* it agreed to conduct business with them, nor made starting to do business with them contingent upon the suppliers' cooperation—even for suppliers who were previously

63

uncooperative.  *See* IDM at 9.  In other words, as Risen essentially admits, Risen chose to do business with suppliers knowing that they would be subject to Commerce's reporting requirements, that its past efforts to obtain information were unsuccessful, and that the suppliers were unlikely to cooperate in this review.

The record shows that Risen continued to do business with numerous suppliers who had withheld requested information in one or more previous reviews.  *See* Risen Supp. Questionnaire Resp. at 17-19, Ex. SQ-8 (P.R. 179; C.R. 294, 296) (discussing and listing uncooperative suppliers with whom Risen has continued to do business, while failing to report requested information); *see also* Risen Sec. D Resp. at Exs. D-20, D-24 (P.R. 147; C.R. 122) (listing length of supplier relationships).  And prior to doing business with these uncooperative suppliers, Risen well knew the potential consequences of failing to provide the requested information.

Still further, even if Risen does not control its producers, given its history as a respondent in this proceeding and its past inability to secure information from its suppliers after the fact, or when the administrative review is underway, taking proactive steps to avoid its suppliers' non-cooperation is within the realm of actions that Risen should have taken to demonstrate that it put forth its maximum effort to comply with its reporting responsibilities.  *See* IDM at 9 (citations omitted).  Yet, the record shows that Risen had long-term relationships with its uncooperative suppliers and chose to continue to do business with them even after they failed to cooperate in one or more previous reviews.  *See* Risen Supp. Questionnaire Resp. at Ex. SQ-8 (P.R. 179; C.R. 296); Risen Sec. D Resp. at Exs. D-20, D-24 (P.R. 147; C.R. 122).  Thus, it was reasonable for Commerce to determine that, by choosing to do business with uncooperative suppliers and subsequently failing to report factor of production information, Risen failed to cooperate to the best of its ability.  *See* IDM at 9-10.

Finally, Commerce's application of partial AFA to Risen is consistent with the purpose of 19 U.S.C. § 1677e(b) "to provide respondents with an incentive to cooperate" with Commerce's requests for information. *Essar Steel*, 678 F.3d at 1276. Risen all but admits that, absent the incentives created by AFA, and despite its contrary statements, it intends to continue purchasing solar cells and modules from uncooperative suppliers. *See* Risen Br. 28 (claiming "it is not a viable business option for Risen to simply stop purchasing cells from whichever unaffiliated supplier refused to provide FOPs"). At the same time, this proceeding and Commerce's efforts to incentivize cooperation from Risen and its suppliers have continued long enough that Risen clearly knew prior to this review that it needed to work with cooperative suppliers to provide Commerce with necessary information. Indeed, Commerce indicated that the missing factor of production data are substantial, and it has no way of knowing what the correct consumption rates are absent the parties' cooperation. *See* IDM at 9-10. Commerce also acted reasonably by requesting key information, issuing deficiency questionnaires, and using data available on the record in applying partial AFA to account for the gap created by the information that has been withheld. Surely, after all of that, it is lawful for Commerce to incentivize parties' full cooperation by applying partial AFA, whereas the opposite result would incentivize non-cooperation by making it clear that there are no consequences (and potentially benefits) to Risen and its suppliers from failing to provide necessary information. Commerce's determination to apply partial AFA should therefore be sustained.

## C. Commerce's AFA Rate Calculation Is Supported By Substantial Evidence And Otherwise Lawful

Commerce applied partial AFA to Risen by calculating average ratios tallying Risen's reported consumption quantities as a proportion of the highest consumption quantities for three separate groups of inputs: all solar modules, all solar cells, and all packing factors of production.

IDM at 11.  Commerce then multiplied the reported per-unit consumption quantity of each factor

of production for each of the three types of inputs by the relevant average adjustment ratio to

increase the reported quantities.  *Id.*  By doing so, Commerce applied AFA in a manner that is

consistent with the statute, while ensuring that Risen and its producers do not obtain a more

favorable dumping margin by not cooperating and serving as a deterrent to non-cooperation.  *See*

*id.* (citing SAA at 870; *Essar Steel*, 678 F.3d at 1276).

      Commerce also explained that it had considered applying the same AFA rate

methodology that it had employed in prior administrative reviews in this proceeding—which

would involve separately adjusting each factor of production and applying the highest per-unit

consumption quantity reported for each such factor.  *See id.*  But because Risen's consumption

rates varied only minimally across certain inputs, Commerce explained that merely applying the

highest per-unit consumption quantity would be similar to applying neutral facts available to the

missing factor of production consumption quantities.  *See id.*  In other words, use in this

proceeding of the method that Commerce used in prior administrative reviews would not

constitute use of an adverse inference.  *See id.*; *see also id.* at 12 (finding that application of prior

methodology "fails to result in an AFA adjustment that is sufficiently adverse to effectuate the

statutory purpose").  Thus, Commerce revised its methodology for this review.

      Risen argues that Commerce's methodology for calculating the AFA rate is flawed and

inaccurate because it (i) failed to explain why it grouped module inputs, cell inputs, and packing

materials each into a single input; and (ii) the ratio calculation that Commerce used to determine

the AFA rate is overstated because it exceeds what Commerce would calculate if it used the

highest consumption quantity for each input.  Risen Br. 31-34.  These arguments are misplaced.

First, to the extent that Risen criticizes Commerce for revising its AFA calculation methodology, that argument is meritless.  Commerce is at liberty to "deviate from a past practice when 'the new policy is permissible under the statute, . . . there are good reasons for it, and . . . . the agency *believes* it to be better, which the conscious change of course adequately indicates.'" *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  "Thus, Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology." *Id.*  In doing so, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute . . . and that the agency *believes* it to be better{.}" *Fox Television*, 556 U.S. at 515.  In this case, Commerce's methodology is consistent with the statute, which authorizes Commerce to base an AFA rate on "any other information placed on the record" and states that Commerce is not required to corroborate "information obtained in the course of an investigation or review."  19 U.S.C. §§ 1677e(b)(2)(D, (c)(1).  Commerce also explained why its change in methodology was both appropriate and necessary.  IDM at 11-12 (finding methodology "more appropriate" because "it results in an adjustment . . . which is more likely to effectuate the statutory purpose").  Accordingly, Commerce's methodological change is lawful and is not a valid basis for Risen to challenge its AFA rate.

Risen's other arguments criticizing Commerce's methodology are equally meritless. When a respondent fails to cooperate by not acting to the best of its ability, as Risen did in this case, the statute permits Commerce to use an inference *adverse* to the interests of that party in selecting among facts otherwise available.  *See* 19 U.S.C. § 1677e(b).  Likewise, when selecting the AFA rate, it is well-established that Commerce seeks to use a rate that is sufficiently *adverse*

to effectuate the statutory purpose of section 1677e(b) to incentivize respondents to cooperate (*i.e.*, to provide Commerce with complete and accurate information in a timely manner). *See Essar Steel*, 678 F.3d at 1276.  Indeed, an AFA rate is intended to be "a reasonably accurate estimate of the respondent's actual rate, *albeit with some built-in increase intended as a deterrent to non-compliance*." *Id.* (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (emphasis added)).  Choosing an AFA methodology that actually incorporates an adverse inference is thus consistent with the AFA statute's purposes and ensures that the AFA rate is sufficiently adverse.  *See* IDM at 12.

Risen asserts that Commerce's methodology "fails to consider Risen's cooperation and the concerns of accuracy, even when applying partial AFA," Risen Br. 32, but the flaws in its assertion are evident.  Commerce calculated an AFA rate *precisely because* it found that Risen had *failed to cooperate* to the best of its ability under 19 U.S.C. § 1677e(b).  IDM at 9-10. Risen's disagreement with Commerce's finding is not a valid basis to challenge the resulting AFA rate.  Moreover, as we demonstrate above, an AFA rate is intended to include a "built-in increase intended as a deterrent to non-compliance." *Essar Steel*, 678 F.3d at 1276. Correspondingly, the statute explicitly states that Commerce, when applying AFA, has "no obligation" either (a) to estimate what a party's dumping margin would have been if it had cooperated or (b) to demonstrate that the AFA rate reflects an alleged commercial reality of the interested party.  19 U.S.C. § 1677e(d)(3).

Accordingly, despite Risen's assertions, Commerce's objective in applying AFA was not to replicate as closely as possible Risen's reported consumption.  The intent of AFA is to calculate a reasonably accurate estimate of Risen's rate while effectuating section 1677e(b)'s statutory purpose by incorporating some built-in increase to deter noncooperation.  IDM at 12.

Commerce explained that it did so because it based the AFA adjustment on differences between Risen's actual consumption of factors of production. *Id.* Moreover, contrary to Risen's claims that Commerce "failed to explain," provided "no justification" for, and "distorted" the AFA rate, Risen Br. 32-33, we establish above that Commerce explained why it took the approach it did in this case to ensure that the AFA rate is actually adverse and accomplishes the statutory purpose. *See*, *e.g.*, IDM at 12-13 ("We find this approach results in a reasonably accurate representation of the missing FOP consumption quantities, but with an amount added to induce cooperation, which Risen's preferred approach lacks."). Risen's focus on accuracy as an overriding consideration in selecting AFA is thus misplaced. *See* 19 U.S.C. § 1677e(d)(3); *Ta Chen Stainless Steel Pipe Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) ("While Commerce may have chosen the {} rate with an eye toward deterrence, Commerce acts within its discretion so long as the rate chosen has a relationship to the actual sales information available.").

Risen additionally claims that the AFA rate is inaccurate because it results in an "AFA rate that exceeds the total AFA for each input if the highest FOP for each input was used." Risen Br. 33-34. Again, however, Risen's complaint that Commerce's methodology results in a higher rate than what Risen would receive under its preferred methodology is not a basis to overturn Commerce's lawful determination. Further, Commerce explained that Risen's assertion that Commerce's approach is inaccurate is based on an over-simplification of what Commerce did. IDM at 12. For each type of input, Commerce averaged the difference between the highest consumption quantity and the average consumption quantity among the other control numbers for each factor of production and averaged these differences by input category (in other words, it averaged all solar cell input differences and did the same for modules and packing costs). *See id.*; Risen Prelim. Analysis Memo at 3, Att. III (Dec. 16, 2021) (P.R. 398; C.R. 462, 469). In

addition to the fact that this was necessary to apply an adverse inference to Risen's withheld information, Commerce disagreed that this method results in any distortion.  IDM at 12.  Indeed, Commerce applied this increase on a discrete basis—that is, to the weighted average per-unit consumption quantities Risen reported for each factor of production.  *See id.* (citation omitted).

Thus, in addition to being based on Risen's own information reported in the review, Commerce's selected methodology results in an adjustment to Risen's factor of production consumption quantities that is more likely to effectuate the statutory purpose by inducing the cooperation of Risen and its unaffiliated suppliers, and it should thus be sustained.

**V.     Commerce's Denial Of A Separate Rate To Trina Is Supported By Substantial Evidence And Lawful**

**A.  Background**

For non-market economies, such as China, Commerce presumes that a respondent is government-controlled and therefore subject to a single country-wide rate unless the respondent can establish the absence of government control.  PDM at 13; Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (Apr. 5, 2005), *available at* https://enforcement.trade.gov/ policy/bull05-1.pdf (visited Sept. 2, 2023); s*ee also, e.g., Sigma Corp v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997).  A company that wishes to overcome this presumption that it is government-controlled, and therefore subject to a country-wide rate, must provide certain information to Commerce.  *See id.*

In this proceeding, Commerce's initiation notice contained instructions on what information Commerce would need from an entity to evaluate whether it could qualify for a separate rate from the country-wide rate.  *Initiation Notice*, 86 Fed. Reg. at 8,167.  Specifically, the notice instructed firms that wished to qualify for separate rate status in the administrative

review to "complete, as appropriate, either a separate rate application or certification." *Id.* It also explained that, in order to demonstrate separate rate eligibility, Commerce requires entities for which a review was requested and that were assigned a separate rate in the most recent segment of the proceeding in which they participated to certify that they continue to meet the criteria for obtaining a separate rate. *Id.*

In March 2021, Commerce received separate rate certifications for Trina Solar Co., Ltd. and Trina Solar (Changzhou) Science and Technology Co., Ltd.—two of the eight individual entities that make up the overall entity, Trina. Trina Entities Separate Rate Certification (Mar. 15, 2021) (P.R. 89; C.R. 14). In a June 2021 supplemental questionnaire, Commerce notified Trina that its separate rate certifications were incomplete and that Commerce required additional information. Commerce June 2021 Supp. Questionnaire (June 28, 2021) (P.R. 183). Commerce requested that Trina "{p}lease provide the appropriate separate rate certifications for all individual entities that make up the single-entity, Trina" on or before July 6, 2021. *Id.* Trina, however, failed to respond to the supplemental questionnaire or to request an extension of time to respond to the supplemental questionnaire by the July 6, 2021 deadline.

Trina ultimately filed its response containing the remaining separate rate certifications 49 days after the July 6 deadline and simultaneously requested an extension of the original deadline to submit its response. Trina Request to Accept Separate Rate Certifications and for Extension of Time to Respond to June 28th Supp. Questionnaire (Aug. 24, 2021) (P.R. 358) (Trina Extension Request). Trina explained that the reason for its late filing was that "Trina's counsel became aware of the issuance of the June 28th supplemental questionnaire only after close-of-business of Friday, August 20, 2021 when the undersigned began reviewing the electronic record of the eighth AD administrative review on ACCESS in anticipation of the upcoming preliminary

results." *Id.* at 3.  On August 30, 2021, the petitioner requested that Commerce reject Trina's

untimely submission and extension request.  Petitioner Request to Reject Trina's Late

Questionnaire Resp. and Untimely Extension Request (Aug. 30, 2021) (P.R. 363).  Trina, for its

part, again requested that Commerce accept the untimely separate rate certifications in response

to Commerce's June 28, 2021 request for additional information.  Trina Renewed Request to

Accept Separate Rate Certifications (Sept. 14, 2021) (P.R. 368).

On December 16, 2021, Commerce rejected Trina's additional separate rate certifications

and extension request because they were untimely.  Rejection of Separate Rate Certifications in

the 2019-2020 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic

Cells, Whether or Not Assembled into Modules, from China (Dec. 16, 2021) (P.R. 397).

In its preliminary results, Commerce explained that Trina had failed to establish its

eligibility for a separate rate because it failed to respond timely to Commerce's request seeking

separate rate certifications from all of the companies constituting the Trina entity.  PDM at 13.

Commerce thus found that Trina did not rebut the presumption of government control.  *Id.* at 12;

IDM at 71-72.  Because Trina failed to rebut the presumption of government control, Commerce

determined that Trina was part of the China-wide entity and assigned Trina the China-wide rate.

PDM at 13; IDM at 72.  Because no party requested a review of the China-wide entity, that entity

was not under review and its antidumping duty rate remained at 238.95 percent.  PDM at 12.

Commerce made no changes to this determination in its final results.  IDM at 63-72.

**B.  Legal Framework For Application Of Separate Rates**

In proceedings involving a non-market economy country such as China, Commerce

maintains a rebuttable presumption that all companies within the country are subject to

government control, and thus should be assessed a single antidumping duty rate.  *See Sigma*

*Corp.*, 117 F.3d at 1405; *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003).  Commerce's policy is to assign all exporters of the subject merchandise in a non-market economy a single antidumping duty rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities or functions.  *See Sigma*, 117 F.3d at 1405.  If an exporter cannot make such a demonstration, it will not qualify for a separate rate and receives the rate assigned to the non-market economy country-wide entity.  The Federal Circuit has sustained the lawfulness of Commerce's non-market economy presumption and application of a single antidumping duty rate to the non-market economy country-wide entity.  *See id.* at 1405-06; *China Mfrs. All,, LLC v. United States,* 1 F.4th 1028, 1030-31 (Fed. Cir. 2021).

Under Commerce's longstanding practice, the company applying for a separate rate bears the burden of demonstrating that its export activities are free from either *de jure* or *de facto* government control.  *See AMS Assocs., Inc. v. United States*, 719 F.3d 1376, 1379-80 (Fed. Cir. 2013); *Sigma Corp.*, 117 F.3d at 1405-06.  Commerce's practice allows a party to establish the absence of *de jure* control by reference to legislation and other governmental measures that demonstrate a company's legal independence.  *See AMS Assocs.*, 719 F.3d at 1379.  Specifically, Commerce considers (1) whether there is an absence of restrictive stipulations associated with the individual exporter's business and export licenses, (2) the applicable legislative enactments decentralizing control of the company, and (3) any other formal measures by the government decentralizing control of the company.  *See Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303, 29,308 (Dep't of Commerce May 22, 2006) (*Diamond Sawblades from China*).

A party may demonstrate the absence of *de facto* government control by providing evidence that the exporter (1) sets its prices independently of the government and other exporters, (2) negotiates its own contracts, (3) retains the proceeds of its sales (not including taxes), and (4) selects its management autonomously.  *See AMS Assocs.*, 719 F.3d at 1379 (citing *Sigma Corp.*, 117 F.3d at 1405); *Diamond Sawblades from China*, 71 Fed. Reg. at 29,308.  In addition, "an exporter in a nonmarket economy country must 'affirmatively demonstrate' its entitlement to a separate, company-specific margin."  *Sigma Corp.*, 117 F.3d at 1405.

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria.  *See Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017); *Adv. Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1348-49 (Ct. Int'l Trade 2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014).  Further, if an applicant fails to establish any one of the *de jure* or *de facto* criteria, Commerce is not required to continue its analysis and determine whether the applicant has (or has not) established the other applicable criteria, but may instead find the applicant ineligible for a separate rate.  *See Yantai*, 203 F. Supp. 3d at 1326-27.

## C.  Commerce's Denial Of A Separate Rate Is Supported By Substantial Evidence

As a respondent, Trina's separate rate eligibility depended on its submission of separate rate certifications for all of the companies constituting the Trina entity.  Commerce explained in its determination that "{b}ecause we collapsed certain Trina companies in prior segments of this proceeding, and there was no basis for revisiting that determination in this review, we continued to treat the {eight} Trina companies as a single entity in the instant review."  IDM at 67.

Trina, however, failed to provide Commerce with the full complement of needed

certifications in a timely manner, despite Commerce's request for this information.  *See* PDM at

13; IDM at 67-68.  In this regard, pursuant to 19 C.F.R. § 351.302(d)(1):

> Unless the Secretary extends a time limit under paragraph (b) of
> this section, the Secretary will not consider or retain in the official
> record of the proceeding: (i) Untimely filed factual information,
> written argument, or other material that the Secretary rejects,
> except as provided under § 351.104(a)(2) {listing exceptions
> related to retaining documents to establish the basis for their
> rejection and to proprietary information issues}.

Further, pursuant to 19 C.F.R. § 351.302(c):

> An extension request will be considered untimely if it is received
> after the applicable time limit expires or as otherwise specified by
> the Secretary. . . . *An untimely filed extension request will not be
> considered unless the party demonstrates that an extraordinary
> circumstance exists*. . . . An extraordinary circumstance is an
> unexpected event that: (i) could not have been prevented if
> reasonable measures had been taken, and (ii) precludes a party or
> its representative from timely filing an extension request through
> all reasonable means.

(emphasis added).  Additionally, Commerce explained in the preamble to its regulations that,

> Examples of extraordinary circumstances include a natural
> disaster, riot, war, force majeure, or medical emergency. Examples
> that are unlikely to be considered extraordinary circumstances
> include insufficient resources, inattentiveness, or the inability of a
> party's representative to access the Internet on the day on which
> the submission was due.

IDM at 68-69 (quoting *Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't of

Commerce Sept. 20, 2013)).

Because Trina's untimely separate rate certifications did not meet these criteria,

Commerce lawfully rejected and did not consider the untimely factual information.  Accordingly,

Commerce did not have necessary information to complete a separate rate analysis for the Trina

entity to determine whether its export operations were free from *de facto* and *de jure* government

75

control.  PDM at 12-13; IDM at 71-72.  Therefore, Commerce determined that Trina failed to rebut the presumption of government control and was not eligible for a separate rate.  *Id.*

Moreover, because a company's corporate structure, ownership, or relationship with the government may change from one segment of a proceeding to the next, Commerce requires companies to establish their separate rate eligibility in each segment of a proceeding through re-certification, including by submitting certifications for previously collapsed companies.  In addition, what may have constituted a sufficient showing for separate rate eligibility in a segment at an earlier stage of the proceeding may not be sufficient without additional information at a later stage, given that circumstances may be different at different stages.  Although Trina earlier provided Commerce with a separate rate certification, it failed to provide certifications for all of the companies constituting the single Trina entity in this review.  *See* IDM at 67-68.

Commerce, therefore, appropriately applied the China-wide rate to Trina.  *See AMS Assocs.*, 719 F.3d at 1379 (holding that, when mandatory respondent is not separate from China-wide entity, and thus does not qualify for separate rate, Commerce may apply China-wide rate.).

### D.  <u>Commerce's Enforcement Of Its Deadline Was A Lawful Exercise Of Discretion</u>

Trina raises three issues in challenging Commerce's determination: (1) whether Commerce was required to accept Trina's untimely response to the supplemental questionnaire (or to retroactively extend the deadline for that response); (2) whether Commerce's application of the "extraordinary circumstances" standard in 19 C.F.R. § 351.302(c) to Trina is arbitrary and capricious; and (3) whether Commerce was required to no longer treat the exporting and non-exporting Trina companies as a single entity and to grant the exporting entities a separate rate. Commerce addressed each of these issues in its determination.

In this context, this Court reviews Commerce's determinations regarding the agency's deadlines for abuse of discretion. *See Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citation omitted); *see also Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) ("An abuse of discretion is a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." (citation and quotation marks omitted)). "Judicial review of agency discretionary decisions . . . is supposed to be highly deferential." *Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346, 1352 (Ct. Int'l Trade 2022), *appeal pending*, Fed. Cir. No. 22-2204 (quoting 33 Fed. Prac. & Proc. Judicial Review § 8411 (2d ed. 2022)); *see also Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007) (emphasizing Commerce's broad discretion to establish and to enforce procedural rules, including time limits (citation omitted)).

Indeed, when reviewing Commerce's procedural decisions, "{a}bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO-Avisma*, 688 F.3d at 760 (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543-44 (1978)). Courts will thus "defer to the judgment of an agency regarding the development of the agency record." *Id.* "To do otherwise would run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency." *Id.* (quoting

*FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (bracketing and quotation marks omitted)).  Hence, "{s}trict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision." *Tau-Ken Temir*, 587 F. Supp. 3d at 1352 (quoting *Maverick Tube*, 107 F. Supp. 3d at 1331); *Neo Solar Power Corp. v. United States*, 190 F. Supp. 3d 1255, 1261 (Ct. Int'l Trade 2016).

Trina first claims that Commerce abused its discretion by failing to consider the individualized circumstances surrounding Trina's untimely submission and extension of time request.  Trina Br. 18-22.  Contrary to this claim, however, Commerce analyzed the facts and explained why the "extraordinary circumstances" standard for accepting untimely extension requests does not excuse the circumstances in Trina's case.  IDM at 69.  Section 351.302(c) of Commerce's regulations provides that "untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists." *Id.* (quoting 19 C.F.R. § 351.302(c)).  The preamble to the regulation states that inattentiveness—which aptly describes the circumstances in this case—is *unlikely to be considered an extraordinary circumstance. See id.* (referencing *Extension of Time Limits*, 78 Fed. Reg. at 57,793).  Commerce also explained, regarding the particular facts of this case, that it considers inattentiveness to include a respondent not attending to a supplemental questionnaire. *Id.*  Moreover, as Commerce elaborated, Trina requested a review of itself, was aware that Commerce had initiated that review, and had entered an appearance. *Id.*  Commerce relatedly explained that Trina bears the burden of monitoring the record to respond to informational requests, and that Commerce's supplemental questionnaire was specifically directed to Trina and clearly stated what information Commerce requested as well as the deadline for Trina to respond. *Id.*  Thus, Commerce simply disagreed with Trina's

position that the untimely nature of both its filings was excusable under Commerce's regulation, and Trina's arguments concerning a lack of individualized consideration lack merit.

Further, Commerce explained that its ability to set and enforce deadlines is critical to its ability to conduct AD/CVD proceedings in a timely and orderly manner.  IDM at 70.  Hence, if Commerce were to allow parties to provide requested information whenever they were able to do so, or when they became aware of the need to submit the information after the deadline, it would disrupt case planning and, depending on the submission's timing and Commerce's workload, could limit Commerce's ability to fully analyze the information.  *Id.*  Trina criticizes Commerce's explanation for being too general in tone, *see* Trina Br. 19-20, 29, but taken in context, it is clear from the record that Commerce considered both the specific and the general circumstances surrounding Trina's untimely submission and extension request.  *See* IDM at 69-70.  Moreover, Commerce is allowed to look at the broader implications of granting an untimely extension well after the deadline in its proceedings and is "not required to demonstrate good cause for rejecting {respondent's} untimely submissions."  *Dongtai Peak Honey Indus. Co., Ltd. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015); *see also Yantai Timken*, 521 F. Supp. 2d at 1371 ("In order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations.").

Additionally, although Trina cites *Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012)—which pre-dates Commerce's adoption of the extraordinary circumstances standard in the 2013 revision to its regulations—multiple subsequent decisions have upheld Commerce's discretion to enforce its deadlines and to reject untimely submissions.  *See*, *e.g.*, *Dongtai Peak*, 971 F. Supp. 2d 1234, 1242-43 (Ct. Int'l Trade

2014), *aff'd*, 777 F.3d at 1351-52; *Tau-Ken Temir*, 587 F. Supp. 3d at 1358; *Maverick Tube*, 107 F. Supp. 3d at 1331-32; *Neo Solar*, 190 F. Supp. 3d at 1260-61; *Bebitz Flanges Works Private Limited v. United States*, 433 F. Supp. 3d 1297, 1305-07 (Ct. Int'l Trade 2020); *cf. Canadian Solar Int'l Ltd. v. United States*, 399 F. Supp. 3d 1379, 1383 (Ct. Int'l Trade 2019), *aff'd*, 68 F.4th 1267, 1273 (Fed. Cir. 2023) (rejecting respondent's untimely attempt to submit separate rate information before Court). Trina's reliance on *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995), and *Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006), is also misplaced because *NTN* and *Timken* concern the submission of information to *correct* errors in information already on the record, not the untimely submission of information in the first instance. Likewise, Trina's reliance on jurisprudence concerning the remedial rather than punitive nature of Commerce's AFA authority is inapposite because Commerce denied Trina a separate rate based on its failure to submit the necessary separate rate certifications. *Compare* Trina Br. 21-22 *with Repwire LLC v. United States*, 628 F. Supp. 3d 1288, 1293-94 (Ct. Int'l Trade 2023), *appeal pending*, Fed. Cir. No. 23-1933 (Commerce lawfully applied China-wide rate when party failed to submit separate rate application or certification); *China Mfrs. All.*, 1 F.4th at 1039-40 (sustaining Commerce's non-market economy presumption).

Trina next claims that Commerce's rejection of its extension of time request is an abuse of discretion because the burden it placed on Commerce allegedly was negligible. Trina Br. 23-31. Specifically, Trina argues that evaluating the untimely separate rate certifications could not materially affect Commerce's workload given their lack of complexity, Commerce's familiarity with Trina from prior administrative reviews, the allegedly limited relevance of Trina's non-exporting producers, and the amount of time remaining before Commerce issued the preliminary and final results. *See* Trina Br. 23-27. As this Court and the Federal Circuit have recognized,

however, "{i}t is not for {the respondent} 'to establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information.'" *Bebitz Flanges Works*, 433 F. Supp. 3d at 1305 (quoting *Dongtai Peak*, 777 F.3d at 1352).  Moreover, Commerce explained that the purpose of its time limits is to aid in the administration of the antidumping laws, and that it promulgated its regulations clarifying the circumstances in which it will accept untimely extension requests because "{u}ntimely-filed extension requests often result in confusion among the parties, difficulties in {Commerce's} organization of its work, and undue expenditure of Departmental resources in addressing such requests."  IDM at 69-70 (quoting *Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. 3,367, 3,368 (Dep't of Commerce Jan. 16, 2013)).

Thus, as Commerce explained, untimely extension requests such as Trina's "can impede {Commerce's} ability to conduct AD and {countervailing duty (CVD)} proceedings in a timely and orderly manner." *Id.*  Indeed, the Court has observed that "{d}ue to stringent time deadlines and the significant limitations on Commerce's resources, it is vital that accurate information be provided promptly to allow the agency sufficient time for review." *Yantai Timken*, 521 F. Supp. 2d at 1371 (citation and quotation marks omitted).  In this case, Commerce requested the information and set a deadline for Trina to provide a response, but Trina did not respond by the deadline and instead responded 49 days after the deadline had passed.

Trina relatedly emphasizes that Commerce did not request further information from Trina's exporting entities or other companies that submitted separate rate certifications in this review, and that Trina has filed separate rate certifications on behalf of companies that made shipments during previous reviews without Commerce requiring further information.  Trina Br. 25-26.  However, that Commerce did not require additional follow-up in a previous proceeding

does not mean that none would have been necessary in this case.  Moreover, separate rates apply to collapsed entities as a whole, and Commerce must determine whether there is an absence of *de jure* and *de facto* government control with respect to all of the companies comprising the collapsed entity, whether exporting or not.  *See* IDM at 71; *cf. Adv. Tech. & Materials*, 938 F. Supp. 2d at 1348-49 (rejecting similar argument that state-owned entity was not involved in exporting).  Given that Trina never submitted timely separate rate certifications for six entities, it is speculation *on Trina's part* to argue that Commerce would not have required any significant follow-up.  *See Shanghai Sunbeauty Trading Co., Ltd. v. United States*, 380 F. Supp. 3d 1328, 1336 (Ct. Int'l Trade 2019) ("The burden to create the administrative record demonstrating entitlement to separate rate status lies primarily with the parties." (citation omitted)).

Next, contrary to Trina's assertions, *Dongtai Peak* supports Commerce's determination that Trina was not entitled to a separate rate.  *See* Trina Br. 29-31.  In *Dongtai Peak*, an importer of honey from China challenged Commerce's determination to assign the China-wide entity rate to its Chinese exporter, the mandatory respondent in that review.  *See* 777 F.3d at 1349.  During the review, Dongtai filed an untimely extension of time request to respond to a supplemental questionnaire.  *Id*. at 1350.  As the Court observed, "{i}t is fully within Commerce's discretion to 'set and enforce deadlines' and this court 'cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.'"  *Id*. at 1352 (quoting *PSC VSMPO-Avisma*, 688 F.3d at 760-61).  Further, the Court explained that Commerce is "not required to demonstrate good cause for rejecting Dongtai Peak's untimely submissions" and that "{i}t is not for Dongtai Peak to establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information."  *Id.*  Trina tries to distinguish *Dongtai Peak* based on certain

aggravating factors present in that case, Trina Br. 30-31, but this does not render the principles articulated in *Dongtai Peak* inapplicable in this case.  *See* IDM at 70 & nn.399, 401.

Moreover, the fact that *Dongtai Peak* reviewed Commerce's rejection of an untimely extension of time request under a different, less-stringent "good cause" standard pursuant to the *previous version* of Commerce's regulation only underscores that Commerce since then (and since *Grobest*) has made clear that it will grant untimely extension of time requests only under "extraordinary circumstances" that are unlikely to include general inattentiveness.  *See* 19 C.F.R. § 351.302(c); *Extension of Time Limits*, 78 Fed. Reg. at 57,792-93.  In doing so, Commerce has explained that such requests cause difficulties in Commerce's organization of its work and undue expenditure of departmental resources in addressing such requests, which impedes Commerce's ability to complete its work in accordance with its statutory deadlines.  *See* IDM at 69-70 (citing *Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. at 3,368).  Thus, Trina's efforts to dismiss the principles articulated in *Dongtai Peak* lack merit.

Trina further argues that Commerce's inclusion of Trina in the China-wide entity and assignment to Trina of the entity's 238.95 percent dumping margin does not accurately reflect Trina's antidumping rate.  Trina Br. 31-33.  That argument, however, contradicts the established principle that a court "cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *Dongtai Peak*, 777 F.3d at 1352 (quoting *PSC VSMPO-Avisma*, 688 F.3d at 760-61).  Courts have also repeatedly affirmed Commerce's authority to apply the China-wide rate to a company that fails to rebut the presumption of government control.  *E.g.*, *China Mfrs. All.*, 1 F.4th at 1040 ("where a respondent in an NME country cooperates with an investigation or review but fails to rebut the presumption of government control, Commerce may permissibly

apply the country-wide NME entity rate").  Indeed, in *China Manufacturers Alliance*, the Federal

Circuit upheld Commerce's shift within the same review from calculating a *de minimis* rate of

0.14 percent to a China-wide rate of 105.31 percent, based on a company's failure to rebut the

presumption of Chinese government control.  *Id.* at 1031-33.

Finally, Trina accuses Commerce of focusing on Trina's "inattentiveness" (consistent

with the terms of Commerce's regulation) to the exclusion of other mitigating factors relating to

Trina's conduct.  *See* Trina Br. 33-36.  It is clear, however, that Commerce considered the full

scope of Trina's arguments about mitigating circumstances.  *See* IDM at 63-66 (documenting

consideration of Trina's arguments).  That Trina disagrees with Commerce's weighing of these

circumstances in relation to the agency's "extraordinary circumstances" standard is not a valid

basis to overturn Commerce's determination.  *See Tau-Ken Temir*, 587 F. Supp. 3d at 1352

("Strict enforcement of time limits and other requirements is neither arbitrary nor an abuse of

discretion when Commerce provides a reasoned explanation for its decision."); *Neo Solar*, 190 F.

Supp. 3d at 1261 (same); *Maverick Tube*, 107 F. Supp. 3d at 1331 (same).

### E.   Commerce's Application Of The Extraordinary Circumstances Standard Is Not Arbitrary, Capricious, Or Otherwise Unlawful

Trina alternatively contests the validity of Commerce's untimely extension regulation as

applied to Trina's circumstances.  Trina Br. 37-46.  Specifically, Trina argues that it is arbitrary

and capricious for Commerce to apply the strict terms of its regulation uniformly "regardless of

the level of participation of the respondent and the significance of the information collected from

that respondent to the completion of the administrative review."  *Id.* at 37.

In reviewing an agency action under the "arbitrary or capricious" standard of review, the

Court must consider whether the decision was based on relevant factors and whether there has

been a clear error of judgment.  *See* 5 U.S.C. § 706; *Fedmet Res. Corp. v. United States*, 77 F.

Supp. 3d 1336, 1345 (Ct. Int'l Trade 2015) (citations omitted).  Trina correspondingly asserts

that "Commerce must 'articulate a satisfactory explanation for its action including a rational

connection between facts found and the choice made'" for the "extraordinary circumstances"

standard in the regulation to be upheld.  Trina Br. 38 (quoting *Motor Vehicle Mfrs. Ass'n of U.S.,*

*Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted)).

Section 351.302(c) of Commerce's regulations provides that "untimely filed extension

request will not be considered unless the party demonstrates that an extraordinary circumstance

exists."  19 C.F.R. § 351.302(c).  The regulation defines an "extraordinary circumstance" as "an

unexpected event that:  (i) Could not have been prevented if reasonable measures had been taken,

and (ii) Precludes a party or its representative from timely filing an extension request through all

reasonable means."  *Id.*  Commerce's rulemaking also provides specific examples of types of

extraordinary circumstances—including "a natural disaster, riot, war, force majeure, or medical

emergency"—while making clear that generic inattentiveness is unlikely to meet the standard.

*Extension of Time Limits*, 78 Fed. Reg. at 57,793.

Moreover, in promulgating its regulation, Commerce addressed the comments it received

and considered potential alternatives.  *See Modification of Regulation Regarding the Extension*

*of Time Limits*, 78 Fed. Reg. at 3,369-70 (analyzing potential alternatives); *Extension of Time*

*Limits*, 78 Fed. Reg. at 57,792-93 (declining proposal to adopt "good cause" rather than

"extraordinary circumstances" standard for untimely extension of time requests).  Commerce

also articulated a rational connection between the issues caused by untimely requests for an

extension of time and its adoption of an extraordinary circumstances standard, explaining that

such requests pose difficulties for the agency, cause undue expenditure of resources and impede

Commerce's ability to conduct AD/CVD proceedings in a timely and orderly manner.

*Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. at 3,368; *see also id.* at 3,370 (explaining that standard disallowing untimely extension requests altogether would be "too inflexible" to effectively and fairly administer unfair trade statutes).

In this case, Trina sought to justify its untimely request for an extension of time for tis supplemental questionnaire response by asserting that "Trina's counsel became aware of the issuance of the June 28th supplemental questionnaire only after close-of-business of Friday, August 20, 2021 when the undersigned began reviewing the electronic record of the eighth AD administrative review on ACCESS in anticipation of the upcoming preliminary results." Trina Extension Request at 3 (P.R. 358). Commerce rejected Trina's untimely questionnaire response after finding that the cause of its late filing did not meet the regulatory standard of "extraordinary circumstances" because there was no unexpected or unpreventable event that precluded Trina from timely filing an extension request. *See* IDM at 68-69; 19 C.F.R. § 351.302(c)(2).

Trina's reason for the late filing is a circumstance that Commerce explicitly excluded from the "extraordinary circumstances" standard in the preamble to its regulations. *Extension of Time Limits*, 78 Fed. Reg. at 57,793 (excluding inattentiveness from examples of extraordinary circumstances); *see Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) (although "language in the preamble of a regulation is not controlling over the language of the regulation itself, {courts} have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules" (internal citation omitted)). As Commerce stated, the regulation "does not provide any exceptions based on the reasons Trina provided, including whether the party filing the submission is a mandatory respondent or anticipated that it would be asked to provide information." IDM at 69.

Trina claims that Commerce's determination adopting the extraordinary circumstances standard is inadequate because it fails to address circumstances like Trina's in which the party submitting an untimely extension of time request is unaware of the deadline in question. *See* Trina Br. 39-43. But Trina's argument omits that the reason it was "unaware" of the deadline was due to Trina's own inattentiveness—which Commerce has specifically stated is not an extraordinary circumstance. *See Extension of Time Limits*, 78 Fed. Reg. at 57,793. Therefore, Commerce reasonably determined that the untimely nature of Trina's questionnaire response is not excusable because Trina's lack of awareness is not an "extraordinary circumstance."

Trina also mischaracterizes Commerce's stated rationale for adopting the extraordinary circumstances standard as focused solely on the "deterrence rationale" of adopting a standard "necessary to encourage timely extension requests." Trina Br. 39-43 (citing *Extension of Time Limits*, 78 Fed. Reg. at 57,793). Although that may be part of Commerce's rationale for its regulation, Trina ignores Commerce's explanation of the administrative difficulties caused by untimely extension of time requests. *See Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. at 3,368; *see also id.* at 3,370 (explaining that adopting a "good cause" standard for untimely requests "will not serve the objective of the proposed rule to avoid confusion, will perpetuate the current difficulties in the Department's organization of its work, and will perpetuate the undue expenditure of Departmental resources in addressing extension requests"). Trina may prefer that Commerce had adopted a more lenient standard, but that does not make Commerce's rulemaking invalid.

Trina additionally argues that Commerce has the technological capability to determine whether a party has downloaded and accessed documents from ACCESS, and therefore, "can effectively verify the facts underlying a party's claim that it is unaware of a deadline in

advance." Trina Br. 41.  This argument is misguided.  Commerce does not dispute the veracity of Trina's claim that it was unaware of the deadline; instead, Commerce found that it was Trina's obligation to be aware.  *See* IDM at 69 (discussing Trina's burden of monitoring the record and responding to Commerce's informational requests).  Trina also suggests, unpersuasively, that Commerce's alleged focus on deterrence would be best served by granting short extensions when Commerce receives untimely extension requests, *see* Trina Br. 43-45, but this argument suffers from the same flaws discussed above, in addition to the fact that no commenter raised this suggestion in the rulemaking (though Commerce did reject a more lenient "good cause" standard for untimely requests).  *See Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. at 3,370; *Extension of Time Limits*, 78 Fed. Reg. at 57,793.

Reprising earlier themes, Trina argues that Commerce's "extraordinary circumstances" standard is arbitrary and capricious because it fails to weigh the consequences of rejecting a submission like Trina's separate rate questionnaire responses versus the prejudice to Commerce of accepting it.  *See* Trina Br. 44-45.  But this ignores both the jurisprudence making clear that Commerce may apply the China-wide rate to a company that fails to rebut the presumption of Chinese government control through a timely separate rate submission and the jurisprudence making clear that strict enforcement of time limits is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision, as Commerce did in both its rulemaking and final results.  *See*, *e.g.*, *China Mfrs. All.*, 1 F.4th at 1040; *Neo Solar*, 190 F. Supp. 3d at 1261; *see also* PDM at 13; IDM at 70 & n.400.  Moreover, Trina acknowledges that Commerce's determination in this case is consistent with its past determinations in other cases. *See* Trina Br. 44-45.  Again, Trina may prefer that Commerce had adopted a more lenient standard, but that does not make Commerce's rulemaking invalid.

Finally, Trina claims that applying the "extraordinary circumstances" standard for late filings to all respondents in all contexts is arbitrary and capricious.  Trina Br. 46.  But this again ignores that Commerce articulated a rational connection for its decision to adopt an extraordinary circumstances standard in its regulation, as well as the jurisprudence that strict enforcement of time limits is neither arbitrary nor an abuse of discretion under such circumstances.  Thus, this Court should find Commerce application of its regulation lawful.

## F.  Commerce Lawfully Denied A Separate Rate To Trina Based On Trina's Failure To Rebut The Presumption Of Government Control

Trina's final claim is that, even if Commerce lawfully denied Trina's request to respond untimely to Commerce's supplemental separate rate questionnaire, Commerce's denial of a separate rate to Trina is not supported by substantial evidence because Commerce should have distinguished between the two exporting Trina sub-entities for whom Trina submitted timely separate rate certifications and the six remaining sub-entities for which it did not, to find that Trina's export activities remain free of Chinese government control.  *See* Trina Br. 46-53.

Commerce thoroughly addressed this argument in its determination.  IDM at 70-71.  For example, contrary to Trina's claim that "Commerce has not explained why it is reasonable to deny a collapsed entity separate rate status where the record lacks {separate rate certifications} from companies within a collapsed entity that had no shipments during the {period of review}," Commerce explained why it required separate rate certifications from all companies within the collapsed entity to determine whether there is an absence of government control.  *See id.*; Trina Br. 47.  Because separate rates apply to collapsed entities as a whole, Commerce must determine whether there is an absence of *de jure* and *de facto* government control with respect to all of the companies comprising the collapsed entity.  IDM at 71.  To make that determination, Commerce required information from each company within the collapsed entity regarding the relationships

that each company's shareholders have with Chinese government entities, whether the company has autonomy from all levels of the Chinese government, and whether it can independently negotiate and sign agreements and appoint managerial candidates. *Id.* In the absence of such information, given the nature of collapsed entities, Commerce may miss ways in which state-owned entities exert control over the collapsed entity. *Cf. Adv. Tech. & Materials*, 938 F. Supp. 2d at 1348-49 (rejecting arguments that state-owned entity was not involved in exporting and that Commerce had failed to "explain why the 'shareholder of the shareholder of the exporter' can be said to be influencing exports within the meaning of the separate rates test"); *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1315 (Ct. Int'l Trade 2018) (sustaining separate rate denial rooted in "Commerce's reliance on indirect majority ownership to find that Plaintiffs failed to rebut the presumption of government control"). Trina's argument that Commerce did not request separate rate certifications for certain entities in past solar reviews does not change the fact that Commerce in *this review* determined that it needed the information, requested it, and did not receive a timely response. *See* Trina Br. 49-50.

Moreover, because Trina was collapsed in a previous segment of this proceeding, Commerce needed to determine whether there was an absence of *de jure* and *de facto* government control with respect to the collapsed Trina entity *as a whole*, not with respect to certain parts of the collapsed entity. IDM at 71.[10] Hence, consistent with its practice, Commerce did not separately determine whether the exporting and non-exporting Trina companies are entitled to a separate rate as Trina suggests; rather, it examined whether the Trina entity as a whole was entitled to a separate rate. *See id.*; *see also Certain Preserved Mushrooms from the*

---

[10] Commerce does not normally conduct a collapsing analysis (to include reversing a prior collapsing decision) with respect to separate rate companies. Thus, a previously collapsed single entity that is currently a separate rate respondent generally remains a collapsed entity. *Id.*

*People's Republic of China*, 69 Fed. Reg. 54,635, at IDM Cmt. 1 (Dep't of Commerce Sept. 9, 2004) (*Certain Preserved Mushrooms from China*) ("implicit in the Department's decision to collapse the above-referenced companies is that the resulting rate would apply to all of the companies in the collapsed entity, provided that the entity as a whole is eligible for a separate rate, because to do otherwise would defeat the purpose of collapsing them in the first place"). Indeed, as Commerce explained in *Certain Preserved Mushrooms from China*, "{g}iven the unique relationships which arise in NMEs between individual companies and the government, a separate rate will be granted to the collapsed entity only if the facts, taken as a whole, support such a finding."  69 Fed. Reg. 54,635, at IDM Cmt. 1 (cited in IDM at 71).[11]  Trina's assertions that it was not a mandatory respondent and that Commerce's separate rate instructions concern government control of exporting activity do not change Commerce need for information from the entity as a whole.  *See* Trina Br. 47-49, 52-53; IDM at 69 (regulations do not provide exception based on "whether the party filing the {untimely} submission is a mandatory respondent").

    The separate rate certifications from Trina entities that Commerce requested, and that Trina failed to timely provide, contain the information Commerce required for its determination. *See Bebitz Flanges Works*, 433 F. Supp. 3d at 1305 (quoting *Dongtai Peak*, 777 F.3d at 1352 ("It is not for {respondent} 'to . . . dictate to Commerce whether and when Commerce actually needs the requested information.'")).  Consequently, Trina's claim that the separate rate certifications that Commerce requested from non-exporting companies are irrelevant and unnecessary lacks merit, and Commerce's determination is supported by substantial evidence.

---

[11] Trina attempts to distinguish *Certain Preserved Mushrooms from China* based on its specific facts, but this does not diminish the relevance of the principles articulated in that case.  *See* Trina Br. 50-51.  Indeed, Trina's distinction appears to stem from its inaccurate assumption that its non-exporting component companies are "irrelevant to demonstrating the absence of *de jure* or *de facto* control over the collapsed Trina entity's export activities."  *Id.* at 52.

VI.     **Commerce Lawfully Calculated The Rates For Separate Rate Respondents**

Because Commerce lawfully calculated the rates for the mandatory respondents, Jinko

and Risen, Commerce also lawfully calculated the rates for the separate rate companies.  *See* JA

Solar Br. 7-8; BYD Br. 15; Trina Br. 53-54 (challenging Commerce's calculation of separate rate

based on alleged errors in mandatory respondent rates).  The Court should thus sustain the

separate rates as well.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motions for

judgment on the agency record and sustain Commerce's determination in its entirety.

<div style="margin-left: 50%">

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

</div>

OF COUNSEL:                                          /s/ Joshua E. Kurland
BRISHAILAH BROWN                          JOSHUA E. KURLAND
Attorney                                               Senior Trial Counsel
Office of the Chief Counsel                   Commercial Litigation Branch
for Trade Enforcement & Compliance    Civil Division
U.S. Department of Commerce             U.S. Department of Justice
                                                           P.O. Box 480, Ben Franklin Station
                                                           Washington, D.C. 20044
                                                           Telephone: (202) 616-0477
                                                           Email: Joshua E. Kurland@usdoj.gov

September 18, 2023                               *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1), as modified by the Court's order of September 13, 2023, and contains approximately 29,216 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Joshua E. Kurland