NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JINKO SOLAR IMPORT AND EXPORT CO. LTD.**, *et al.*,<br><br>           **Plaintiffs**,<br><br>**TRINA SOLAR CO., LTD.**, *et al.*,<br><br>           **Consolidated Plaintiffs**,<br>     **and**<br>**JA SOLAR TECHNOLOGY YANGZHOU CO., LTD.**, *et al.*,<br><br>           **Plaintiff-Intervenors**,<br>     **v.**<br>**UNITED STATES,**<br><br>           **Defendant**,<br>     **and**<br>**AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,**<br><br>           **Defendant-Intervenor.** | **Before:**  Hon. Claire R. Kelly,<br>          Judge<br><br>**Consol. Court No. 22-00219**<br><br><u>**NON-CONFIDENTIAL VERSION**</u><br><br>**Business Proprietary Information Removed from Pages 14-15, 58-60** |

## <u>DEFENDANT-INTERVENOR AMERICAN ALLIANCE FOR SOLAR MANUFACTURING'S RESPONSE BRIEF</u>

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the American Alliance for Solar Manufacturing*

Dated: September 18, 2023

Consol. Ct. No. 22-00219                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

                                                                          Page

I.      INTRODUCTION ...................................................................................... 1

II.     RULE 56.2 STATEMENT .......................................................................... 2

        A.      Administrative Decision Under Review.......................................... 2

        B.      Issues Presented.............................................................................. 3

III.    ARGUMENT ............................................................................................... 7

        A.      Commerce's Selection of the Solar Glass Surrogate Value Was
                Supported by Substantial Evidence and Otherwise Lawful ........... 7

                1.      Commerce Reasonably Found the Romanian HTS Data to
                        Be Superior as to Product Specificity ................................ 7

                2.      Commerce Reasonably Found the Romanian HTS Data to
                        Be Superior Because It Did Not Require a Distortive Unit
                        of Measure Conversion ..................................................... 13

                3.      Commerce Did Not Improperly Rely on Evidence from a
                        Prior Review in the Final Results ..................................... 18

                4.      Commerce Justifiably Departed from Its Primary Surrogate
                        Country to Value Solar Glass ........................................... 19

                5.      Commerce Properly Rejected Respondents' Untimely New
                        Factual Information Regarding the Solar Glass Input
                        Surrogate Value ................................................................ 22

        B.      Commerce Lawfully Valued Electricity......................................... 24

                1.      Commerce's Determination to Limit its Electricity
                        Surrogate Value Calculation to Peak Rates is Reasonable
                        and Supported by Substantial Evidence............................ 26

                2.      Commerce's Determination to Limit its Electricity
                        Surrogate Value Calculation to Peak Rates is Lawful and
                        does not Confer "De Facto" Adverse Facts onto Plaintiffs ...... 28

                3.      Commerce's Determination to Limit its Electricity
                        Surrogate Value Calculation to Peninsular Malaysia Rates
                        is Reasonable and Supported by Substantial Evidence........... 31

                4.      Commerce's Electricity Surrogate Value Calculation
                        Methodology is Not Distortive and is Reasonable .................. 34

                5.      The Exhaustion Principle Requires the Court to Reject
                        Jinko's Argument on Weight Averaging Peak and Off-Peak
                        Rates from All Three Regions ......................................... 34

C.   Commerce's Valuation of Air Freight is Lawful and Supported by Substantial Evidence ..................................................................36

    1.   Commerce's Determination to Use Freightos Data Was Supported by Substantial Evidence and Otherwise in Accordance With Law ...............................................................37

    2.   Commerce's Determination to Decline Use of IATA Was Supported by Substantial Evidence and in Accordance with Law ...................................................................................38

D.   Commerce Lawfully Valued Respondents' Ocean Freight.....................41

E.   Commerce Lawfully Calculated Surrogate Financial Ratios ................45

F.   Commerce Lawfully Valued Respondents' Backsheet and EVA Film Inputs ....................................................................................50

G.   Commerce Lawfully Deducted Section 301 Duties from U.S. Price ....................51

H.   Commerce Lawfully Applied Adverse Facts Available to Fill the Gaps in the Record from Risen's Failure to Report Certain Factors of Production ...............................................................................57

    1.   Commerce's Decision to Apply Adverse Facts Available Was Supported by Substantial Evidence and Otherwise Lawful .......................................................................................57

    2.   Commerce Employed a Lawful Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs ..........................62

I.   Commerce Lawfully Denied Trina a Separate Rate.................................63

IV.   CONCLUSION ..................................................................................... 72

Consol. Ct. No. 22-00219                                    NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aluminum Extrusions Fair Trade Comm. v. United States*,
    37 CIT 1482, 938 F. Supp. 2d 1337 (2013)............................................................35

*Ass'n of Am. Sch. Paper Suppliers v. United States*,
    34 CIT 31, 683 F. Supp. 2d 1317 (2010)...............................................................43

*Calgon Carbon Corp. v. United States*,
    145 F. Supp. 3d 1312 (Ct. Int'l Trade 2016) ........................................................19

*Calgon Carbon Corp. v. United States*,
    35 CIT 234 (2011) .............................................................................28, 29, 30

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*,
    37 CIT 1116, 929 F. Supp. 2d 1352 (2013)...........................................................19

*Carbon Activated Tianjin Co. v. United States*,
    547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ..........................................................7

*Catfish Farmers of Am. v. United States*,
    33 CIT 1258, 641 F. Supp. 2d 1362 (2009).....................................................41, 45

*Cisco Sys., Inc. v. Int'l Trade Comm'n*,
    873 F.3d 1354 (Fed. Cir. 2017).............................................................................31

*Diamond Sawblades Mfrs.' Coal. v. United States v. United States*,
    No. 17-00167, slip op. 18-146 (Ct. Int'l Trade Oct. 23, 2018)................................19

*Dongtai Peak Honey Indus. Co. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)......................................................................22, 66

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015).............................................................................41

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012).............................................................................24

*Essar Steel, Ltd. v. United States*,
    753 F.3d 1368 (Fed. Cir. 2014).......................................................................35, 47

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
    36 CIT 98, 815 F. Supp. 2d 1342 (2012).......................................................22, 68, 70

*Hebei Metals & Mins. Imp. & Exp. Corp. v. United States,*
   28 CIT 1185 (2004) ............................................................................................32

*Home Meridian Int'l, Inc. v. United States,*
   772 F.3d 1289 (Fed. Cir. 2014) ...........................................................................12

*Itochu Bldg. Prods., Co. v. United States,*
   163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ................................................41, 44

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ...........................................................................48

*Jiaxing Bro. Fastener Co. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016) ...........................................................................21

*Maverick Tube Corp. v. United States,*
   107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) .......................................................22

*Maverick Tube Corp. v. United States,*
   857 F.3d 1353 (Fed. Cir. 2017) ...........................................................................62

*Mittal Steel Point Lisas Ltd. v. United States,*
   548 F.3d 1375 (Fed. Circ. 2008) .....................................................................35, 48

*Mueller Commercial de Mexico, S. De R.L. De C.V. v. United States,*
   753 F.3d 1227 (Fed. Cir. 2014) ...........................................................................61

*Nation Ford Chem. Co. v. United States,*
   166 F.3d 1373 (Fed. Cir. 1999) .....................................................................12, 41

*Neuweg Fertigung GmbH v. United States,*
   16 CIT 724, 797 F. Supp. 1020 (1992) ................................................................24

*Parkdale Int'l, Ltd. v. United States,*
   31 CIT 1229, 508 F. Supp. 2d 1338 (Ct Int'l Trade 2007) ..................................69

*Peer Bearing Co.-Changshan v. United States,*
   35 CIT 103, 752 F. Supp. 2d 1353 (2011), *vacated on other grounds,* 766 F.3d
   1396 (Fed. Cir. 2014) ...........................................................................................20

*PSC VSMPO–Avisma Corp. v. United States,*
   688 F.3d 751 (Fed.Cir.2012) ..........................................................................24, 33

*Qingdao Sea-Line Trading Co. v. United States,*
   766 F.3d 1378 (Fed. Cir. 2014) ........................................................................7, 47

*QVD Food Co. v. United States,*
   658 F.3d 1318 (Fed. Cir. 2011) ...........................................................................25

*Risen Energy Co. v. United States*,
  477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) ..........................................................61

*Shandong Huarong Gen. Corp. v. United States*,
  25 CIT 834, 159 F. Supp. 2d 714 (2001) .................................................... *passim*

*Shandong Huarong Mach. Co. v. United States*,
  29 CIT 484 (2005) ................................................................................................43, 44

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997)...................................................................41, 45, 64

*Suntec Indus Co. v. United States*,
  951 F. Supp. 2d 1341 (Ct Int'l Trade 2013) ..........................................................69

*Suntec Indus. Co. v. United States*,
  No. 13-00157, slip op. 16-40 (Ct. Int'l Trade Apr. 21, 2016) ...............................69

*Taian Ziyang Food Co. v. United States*,
  35 CIT 863, 783 F. Supp. 2d 1292 (2011) ...................................................8, 46, 47

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
  16 CIT 931, 806 F. Sup. 1008, 1015 (1992) ..........................................................29

*Timken Co. v. United States*,
  354 F.3d 1334 (Fed. Cir. 2004).............................................................................25

*Trinity Mfg. Inc. v. United States*,
  549 F. Supp. 3d 1370 (Ct Int'l Trade 2021) ........................................................66

*Yantai Timken Co. v. United States*,
  31 CIT 1741, 521 F. Supp. 2d 1356 (2007) ...........................................................22

## Statutes

28 U.S.C.A. § 2637(d) ........................................................................................35

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................24, 36

19 U.S.C. § 1516a(b)(2)......................................................................................49

19 U.S.C. § 1677a(c)(2)(A) ..............................................................................51

19 U.S.C. § 1677b(c) ..........................................................................................7

19 U.S.C. § 1677b(c)(1).....................................................................................20

19 U.S.C. § 1677b(c)(4).....................................................................................19

Consol. Ct. No. 22-00219                                   NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677e(a)(2) ....................................................................................57

19 U.S.C. § 1677e(b) ........................................................................................63

19 U.S.C. § 1677e(b)(1) ...................................................................................57

19 U.S.C. § 1677e(b)(2) ...................................................................................63

Trade Preferences Extension Act of 2015,
     P.L. 114-27 Sec. 502, 129 Stat. 362, (June 29, 2015) ..............................63

**Regulations**

19 C.F.R. § 351.102(b)(21) ..............................................................................48

19 C.F.R. § 351.104 ..........................................................................................49

19 C.F.R. § 351.301(c) ................................................................................22, 48

19 C.F.R. § 351.301(c)(1) ................................................................................22

19 C.F.R. § 351.301(c)(3)(i) ............................................................................30

19 C.F.R. § 351.301(c)(5) ................................................................................30

19 C.F.R. § 351.302(c) ...............................................................................65, 66

19 C.F.R. § 351.302(d) ...............................................................................65, 66

19 C.F.R. § 351.302(d)(1)(i) ............................................................................22

19 C.F.R. § 351.302(d)(2) ................................................................................22

19 C.F.R. § 351.401(f) ......................................................................................63

19 C.F.R. § 351.408(c)(2) ................................................................................19

19 C.F.R. § 351.408(c)(4) ................................................................................45

**Administrative Materials**

*Aluminum Extrusions From the People's Republic of China,*
     79 Fed. Reg. 96 (Dep't Commerce Jan. 2, 2014) ...................................71

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and
     the People's Republic of China,* 74 Fed. Reg. 13,178 (Dep't Commerce Mar.
     26, 2009) ...................................................................................................68

Case 1:22-cv-00219-CRK   Document 53   Filed 09/19/23   Page 8 of 82

Consol. Ct. No. 22-00219                                    NON-CONFIDENTIAL VERSION

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 85 Fed. Reg 62,275 (Dep't Commerce Oct. 2, 2020) ...................................................................................... *passim*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017)...................................................................................................16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed. Reg. 58,871 (Dep't Commerce Oct. 25 2021) ................................................................16, 17, 50, 51, 64

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) ...............................................................................................17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China*, 81 Fed Reg 39,905 (Dep't Commerce June 20, 2016)............................................................................................17, 58

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017)............................................................................................18, 58

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019)...............................................................................................57

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018)...............................................................................................58

*Extension of Time Limits*, 78 Fed. Reg. 57,790 (Dep't Commerce Sept. 20, 2013)...................................66, 67

*Fresh Garlic From the People's Republic of China*, 78 Fed. Reg. 36,168 (Dep't Commerce June 17, 2013) ......................................18

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166 (Dep't Commerce Feb. 4, 2021).........................................64, 68

*Oil Country Tubular Goods, Other Than Drill Pipe, from Argentina*, 68 Fed. Reg. 13,262 (Dep't Commerce Mar. 19, 2003) ........................................16

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China*, 87 Fed. Reg. 1,120 (Dep't Commerce Jan 10, 2022) .............................................................................................52, 56

**NON-CONFIDENTIAL VERSION**

*Uncovered Innerspring Units From the People's Republic of China*,
   78 Fed. Reg. 17,635 (Dep't Commerce Mar. 22, 2013) ............................................1

*Xanthan Gum from China the People's Republic of China*,
   86 Fed. Reg. 16,189 (Dep't Commerce Mar. 26, 2021) ........................................55

*Xanthan Gum From the People's Republic of China*,
   82 Fed. Reg. 11,428 (Dep't Commerce Feb. 23, 2017)..........................................8

## Other Authorities

Commission Regulation 471/2014, art. 15, 2014 O.J. (L 142)......................................9

Enforcement & Compliance, U.S. Dep't of Commerce, Separate Rate
   Certification for Firms Previously Awarded Separate Rate Status,
   https://enforcement.trade.gov/nme/sep-rate-files/cert-20150323/prc-sr-cert-
   20150323.pdf (last accessed September 18, 2023) ................................................64

Policy Bulletin No. 04.1: Non-Market Economy Surrogate Country Selection
   Process (Mar. 1, 2004) .........................................................................................26

Uruguay Round Agreements Act, Statement of Administrative Action,
   H.R. Doc. No. 103-316, vol. I (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................62

## I.   **INTRODUCTION**

On behalf of Defendant-Intervenor the American Alliance for Solar Manufacturing ("the

Alliance"), we respectfully submit the following response to the March 24, 2023 opening briefs

filed by Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology

(Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko

Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and

Jinksolar (Shangrao) Co., Ltd. (collectively, "Jinko"); JA Solar Technology Yangzhou Co., Ltd.

and Shanghai JA Solar Technology Co., Ltd. (collectively, "JA Solar"); Trina Solar Co., Ltd.,

Trina Solar (Changzhou) Science & Technology Co., Ltd., Changzhou Trina Solar Yabang

Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science &

Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd. (collectively,

"Trina"); Risen Energy Co., Ltd. ("Risen"); and BYD (Shangluo) Industrial Co., Ltd. ("Shangluo

BYD").[1]  *See* Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. (Mar. 24, 2023), ECF

No. 37 ("Jinko Br."); Consol. Pl.'s Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R.

(Mar. 24, 2023), ECF No. 39 ("Risen Br."); Br. in Supp. of Rule 56.2 Mot. for J. on the Agency

R. of Consol. Pls. and Pl.-Intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA

Solar Technology Co., Ltd. and Jingao Solar Co., Ltd. (Mar. 24, 2023), ECF No. 36; Pl.-Int.

BYD (Shangluo) Indus. Co., Ltd.'s Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the

Agency R. (Mar. 24, 2023), ECF No. 41 ("Shangluo Br."); Mem. Supp. of Mot. for J. Upon the

Agency R. of Consol. Pls. Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology

Co., Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., Changzhou Trina Solar

---

[1]      Shangluo BYD's opening brief simply supports and incorporates by reference the
arguments in Jinko's and Risen's opening briefs.   Thus, Defendant-Intervenor does not
separately respond to Shangluo BYD's arguments in this brief, but the responses herein to
Jinko's and Risen's opening briefs also apply in response to Shangluo BYD's brief.

Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science and Technology Co., Ltd., and Changzhou Trina Hezhong Photoelectric Co., Ltd. (Mar. 24, 2023), ECF No. 35 ("Trina Br.")

For the reasons discussed below, Plaintiffs' motions should be denied, and the Court should enter judgment for Defendant United States.

## II.   RULE 56.2 STATEMENT

### A.   Administrative Decision Under Review

The administrative determination challenged in this case is the Department of Commerce's ("Commerce") final affirmative determination in the eighth administrative review of the antidumping duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't Commerce June 28, 2022) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2019-2020), P.R. 464, as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 87 Fed. Reg. 48,621 (Dep't Commerce Aug. 10, 2022) (amended final results of antidumping duty admin. Review, 2019-2020), P.R. 473 ("Final Determination") and accompanying Issues and Decision Memorandum, P.R. 471 ("I&D Memo").[2]

---

[2]     Throughout this brief, references to confidential and public record documents listed in the administrative record indices filed on September 14, 2021 are designated by "C.R.," or "P.R.," followed by the appropriate record number.

**B.**     **Issues Presented**

**1.**     **Did Commerce lawfully value solar glass using Romanian Harmonized Tariff Schedule ("HTS") 7007.19.80?**

Yes.  Commerce reasonably concluded that the Romanian data for solar glass was the best information available to value this critically important input, because it was more specific to respondents' input than the Malaysian data and because, unlike the Malaysian data, it did not require the use of an estimated and thus distortive conversion factor.  The record of the review justified Commerce's departure from its primary surrogate country to value solar glass, consistent with its practice, and the agency properly rejected untimely filed new factual information from the respondents with regard to the valuation.

**2.**     **Did Commerce lawfully value electricity?**

Yes.  Commerce's determination to value electricity using the rate for peak hours of high voltage consumers located in peninsular Malaysia, and to reject Plaintiffs' request to include values from the Sabah and Sarawak regions, is supported by substantial evidence and is otherwise in accordance with law.  In particular, Commerce reasonably limited the electricity surrogate value to peak rates, as there was no record evidence that Jinko actually operated during off-peak hours and because the off-peak rates from Sabah and Sarawak did not appear to include high voltage industrial use rates (which would be the rates applicable to a solar manufacturer in Malaysia).  In addition, Commerce reasonably limited the surrogate value to peninsular Malaysia to enhance its specificity, given that Jinko Solar Malaysia is located on peninsular Malaysia and the record did not support a finding that solar cell and module manufacturers would be located in the relatively remote regions of non-peninsular Malaysia.  Finally, Commerce employed a reasonable calculation methodology to derive the electricity surrogate value, and Jinko's

arguments for which it did not exhaust its administrative remedies should be rejected by the Court.

### 3.      Did Commerce lawfully value Jinko's Air Freight?

Yes.   Commerce's determination to use Freightos data rather than International Air Transport Association ("IATA") data to value respondent Jinko's air freight is supported by substantial evidence and is otherwise in accordance with law.  The Freightos data met all of the agency's surrogate value selection criteria, including being publicly available, and Commerce found that Freightos has the world's largest global database of multimodal freight rates, therefore reflecting broad market averages), and that the Freightos rates include all applicable surcharges. To the contrary, only a subset of the IATA data were submitted onto the record as public, with no details about the rates and or about how the data were obtained.  As such, Commerce reasonably determined, within its discretion, to rely only on the Freightos data to value Jinko's air freight.

### 4.      Did Commerce lawfully value Jinko's Ocean Freight?

Yes.  Commerce reasonably valued Jinko's ocean freight using data from two sources, Maersk and Descartes, and the Court should decline to reweigh the evidence as Plaintiff suggests.  In particular, Commerce acted reasonably in including the Maersk data in the ocean freight value, including because the Maersk data includes only shipments for products similar to subject merchandise, is sufficiently detailed, and provides port-specific data, which allowed Commerce to calculate ocean freight values based on the actual ports used by the Plaintiffs. Commerce also appropriately averaged the two data sources in calculating the benchmark, and Plaintiffs fail to persuade that Commerce's methodology was unreasonable.

### 5.    Did Commerce lawfully calculate surrogate financial ratios?

Yes.  Commerce lawfully calculated the surrogate financial ratios based only on the financial statements of JA Solar Malaysia, a Malaysian manufacturer of solar cells and modules, and the Court should reject Jinko's argument that Commerce was required to also include the financial ratios of Flextronics in that calculation.  Unlike JA Solar Malaysia, the record does not establish that Flextronics is a producer of identical merchandise, and thus Commerce reasonably determined not to add its less representative data into the calculation.  In making its arguments, Jinko also improperly relies on new factual information, which was not on the administrative record below and with regard to which Jinko failed to exhaust its administrative remedies.

### 6.    Did Commerce lawfully value respondents' backsheet and EVA film inputs?

Yes.  Commerce appropriately valued respondents' backsheet and EVA film inputs using HTS numbers 3920.62.10 and 3920.10.19 – both of which refer to plate and sheet.  Risen's argument that Commerce should have valued its inputs based on Malaysian HTS numbers 3920.62.90 and 3920.10.90 – both "other" categories – is unsupported by the record. Commerce's valuation of respondents' backsheet and EVA film inputs is consistent with its valuation in multiple prior reviews and was supported by substantial evidence on this review record, including the thicknesses of Risen's inputs, which established them to be sheet, rather than film.

### 7.    Did Commerce lawfully deduct Section 301 duties from U.S. price?

Yes.   Commerce's determination to deduct Section 301 duties from U.S. price is supported by substantial evidence and is otherwise consistent with law, including very recent U.S. Court of International Trade ("CIT") precedent.  Jinko's argument that Section 301 duties are "special duties" rather than normal import duties has been consistently rejected by

Commerce and was recently rejected by this Court in an unrelated appeal. *Shanghai Tainai Bearing Co. v. United States*, Ct. No. 22-00038, slip op. 23-132 (Ct. Int'l Trade Sept. 14, 2023). For the same reasons here, the Court should find that Section 301 duties are "United States import duties" and are therefore properly deducted from U.S. prices, consistent with the statute.

### 8.   Did Commerce lawfully apply adverse facts available to Risen due to its failure to supply full factors of production data?

Yes.  It is undisputed that Risen failed to provide factors of production ("FOP") data for certain solar cells and modules supplied to it by unaffiliated suppliers, leaving a gap in the record.  Commerce lawfully determined that both Risen and its solar cell and module suppliers failed to cooperate with the agency's investigation by this reporting failure, justifying the application of adverse facts available ("AFA").  Commerce also employed a reasonable method in applying that AFA, which ensured that the statutory purposes of AFA – to induce cooperation and to ensure that a company does not receive a more favorable result from failing to comply than it would have from full compliance – were met.

### 9.   Did Commerce lawfully calculate Shangluo BYD's dumping margin based on the rates calculated for mandatory respondents Jinko and Risen?

Yes.  For the reasons otherwise set forth in this response brief, Commerce lawfully calculated dumping margins for mandatory respondents Jinko and Risen.  In accordance with its well-established practice, Commerce appropriately based the margin for the separate rate companies, including Shangluo BYD, on the dumping margins for the mandatory respondents.

### 10.   Did Commerce lawfully deny Trina a separate rate?

Yes.  Certain Trina entities filed their requested separate rate certifications approximately one-and-a-half months after the deadline for such submissions, and Commerce appropriately rejected the late certifications, reasonably and consistent with its established practice.  As such,

with no separate rate certification on the record for the current review period, Commerce lawfully denied the combined Trina entity a separate rate in this review.  Trina has identified no extraordinary circumstances to justify its extremely late submissions, and the Court should uphold Commerce's denial of the company's separate rate.

## III.    ARGUMENT

### A.    Commerce's Selection of the Solar Glass Surrogate Value Was Supported by Substantial Evidence and Otherwise Lawful

Commerce acted lawfully in valuing respondents' solar glass input in the underlying review using Romanian HTS number 7007.19.80, *see* I&D Memo at 15-19, and the Court should uphold the agency's determination.

#### 1.    Commerce Reasonably Found the Romanian HTS Data to Be Superior as to Product Specificity

Commerce's solar glass surrogate value (or "SV") determination was consistent with the statutory directives regarding the selection of surrogate values and with agency precedent.  To calculate costs in an antidumping proceeding for a non-market economy country like China, the statute instructs Commerce to value a respondent's FOP using the best available information. 19 U.S.C. § 1677b(c). To implement this statutory directive, when selecting among possible surrogate values, it is Commerce's practice to consider a number of criteria including whether surrogate value data are publicly available, contemporaneous with the period under consideration, broad-market averages, tax and duty-exclusive and specific to the inputs being valued.   "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute."  *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  *See also Carbon Activated Tianjin Co. v. United States*, 547 F. Supp. 3d 1310, 1314 (Ct. Int'l Trade 2021).

In selecting surrogate values according to the above criteria, Commerce finds product specificity to be particularly important.  *See, e.g.*, I&D Memo at 16; Issues and Decision Memorandum accompanying *Xanthan Gum From the People's Republic of China*, 82 Fed. Reg. 11,428 (Dep't Commerce Feb. 23, 2017) (final results of antidumping duty admin. rev.; 2013-2014) at 69.  The CIT has confirmed that "{i}n sum, 'product specificity' logically must be the primary consideration in determining 'best available information.'  If a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1." *Taian Ziyang Food Co. v. United States*, 35 CIT 863, 907, 783 F. Supp. 2d 1292, 1330 (2011).

Following this practice, Commerce here relied on Romanian import data to value the respondents' solar glass input – a key input into the production of solar modules.  As Commerce explained in this review and a prior review of this order, Romanian HTS 7007.19.80 specifically covers the glass used to manufacture solar panels.  *See* I&D Memo at 17; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 85 Fed. Reg 62,275 (Dep't Commerce Oct. 2, 2020) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2017-2018) and accompanying Issues and Decision Memorandum at cmt. 3 ("AR6 Final Results").[3]  In fact, the EU Customs Tariff information provided at Attachment 3 of Plaintiff Jinko's own case brief to the agency demonstrates that the 10-digit subclassifications under 7007.19.80 are specific to "solar glass." Jinko Case Br. (Jan. 31, 2022), P.R. 424-428, C.R. 486-491 at Attachment 3 (emphasis added) (referencing "Solar glass

---

[3]     Jinko briefly notes that, in the preliminary results of the ninth administrative review of this antidumping duty order, Commerce did not value respondents' solar glass using Bulgarian HTS 7007.19.80.  Jinko Br. at 20.  Jinko provides no reasoning as to why the Court should find persuasive a fact-intensive decision that Commerce made, preliminarily, in a separate review with a wholly different factual record, after the review under consideration in the instant appeal.

Case 1:22-cv-00219-CRK   Document 53   Filed 09/19/23   Page 18 of 82

Consol. Ct. No. 22-00219                                      NON-CONFIDENTIAL VERSION

consisting of tempered soda lime flat glass, with an iron content of less than 300 ppm, a solar transmittance of more than 88% (measured according to AM1, 5 300 2500nm), a resistance to heat up to 250 degrees C (measured according to EN 12150), a resistance to thermal shocks of delta 150 K (measured according to EN 12150) and having a mechanical strength of 90 N/mm 2 or more (measured according to EN 1288-3)").   Moreover, the European Union ("EU") maintains trade remedy orders against solar glass imports from China, which specifically identifies HTS 7007.19.80 as the applicable HTS subheading for solar glass.   Commission Regulation 471/2014, art. 15, 2014 O.J. (L 142) 23, 65.  Jinko reported that it purchased its solar glass input from Chinese suppliers, and the EU's AD/CVD orders confirm that such solar glass produced in China specifically falls under HTS number 7007.19.80 of the EU/Romanian schedule.   Jinko DEQR (May 4, 2021), P.R. 148-152, C.R. 186-268 at Exhibit D-6 ; Jinko Redacted Case Br. (May 27, 2022), P.R. 446-450, C.R. 494-499 at Attachment 4.  The record did not contain similar evidence showing that the Malaysian HTS subheading 7007.19.90 contained solar glass, which plainly contradicts Risen's contention that the two datasets were equally specific.  *See* Risen Br. at 11-12.

In light of the substantial record evidence that glass for use in solar manufacturing is classified under HTS 7007.19.80, and because the Romanian data used the same unit of measure as respondents' data, as discussed further below, Commerce correctly determined data under that subheading to be the best available information to value respondents' solar glass.  Because there was no data available under that subheading from the primary surrogate country, Malaysia, Commerce appropriately decided to value the input using import data from Romania under the correct subheading.

Jinko argues that Commerce's surrogate value selection was not supported by substantial evidence because the solar glass it uses in production is a coated, tempered glass.  *See* Jinko Br. at 8-9.  Jinko claims that the anti-reflective or absorbent nature of its glass required valuation of its solar glass under Malaysian HTS 7007.19.90, despite the lack of evidence that solar glass is actually captured under this subheading (unlike the Romanian HTS data).  *See id.* at 9-11.  Jinko argues that Romanian HTS subheading 7007.19.80 specifically excludes glass with an absorbent or reflective "layer."  *Id.*  In so arguing, Jinko wrongly assumes that the terms "layer" and "coating" are interchangeable for purposes of the EU tariff schedule.  Yet the plain language of the Romanian tariff schedule shows that this is not the case.  The 7007.19.80 exclusion does not use the term "coating" or "coated" – only the term "layer" – and the other glass products covered by the exclusion (*i.e.*, enameled, flashed glass) have layers of materials substantively different from chemical coatings.  For example, flashed glass is glass to which additional layers of colored glass are applied.  Commerce considered this argument in its final determination and fully explained its reasoning, concluding that "the record does not support that the anti-reflective coating on Jinko's glass is the same as the toughened safety glass with an 'absorbent or reflecting layer' specifically excluded from Romanian HTS 7007.19.80."  I&D Memo at 17.

Furthermore, as shown by the excerpt contains on page 12 of Jinko's Opening Brief, the ten-digit breakouts <u>within Romanian HTS 7007.19.80</u> refer specifically to "uncoated" and "single or double-side <u>coated</u>."  The specific use of the term "coated" within these 10-digit sub-classifications clearly demonstrates that "coating" is a separate concept from "layer,"[4] and that

---

[4]     In the underlying review, Jinko repeatedly referred to its solar glass as "coated."  Not until its case brief, where Commerce had already made this surrogate value selection, did Jinko use the term "layer" – the term is not used anywhere else on the record in reference to its solar glass input. *See, e.g.*, Jinko DEQR at 16 and Exhibits D-6, D-17A, D-17B, D-17C, D-17D, D-17E, Section E Response at 7; The Appendix XIII Response ("JINKO DQR App. XIII") at 36,

"coating" is a quality specifically applicable to solar glass.  In other words, "coated" solar glass is explicitly covered by Romanian HTS 7007.19.80.  Despite excerpting this Romanian tariff schedule in its brief, Jinko never addresses the explicit inclusion of coated solar glass within the Romanian HTS subheading.

That Romanian HTS 7007.19.80 specifically includes coated solar glass, and thus does not explicitly exclude the type of glass used by Jinko, renders irrelevant Jinko's discussion of agency and court precedent "where competing HTS subheadings mirror the bright line divisions of a critical product specificity attribute underlying the goods," such as the distinction between alloy steel and non-alloy steel.  *See* Jinko Br. at 14-15.  The factual record supports no such "bright line division" here.  Jinko uses coated solar glass, and the Romanian HTS subheading includes coated solar glass.  While Jinko now describes its anti-reflective solar glass and how it functions at length, *see id.* at 18, it fails to cite record evidence supporting that description, and it fails to explain why the glass it describes could not be considered "coated" solar glass of the type covered by Romanian HTS 7007.19.80.

Jinko next states that data under the relevant Romanian HTS subheading "is distorted by a wide range of disparate glass products that are materially different from Jinko's" glass.  *Id.* at 12.  Risen and Jinko both acknowledge that Romanian HTS 7007.19.80 contains "solar glass," but argue that it also includes non-solar glass.  *Id.* at 12, 16-17; Risen Br. at 11-12.  First, Jinko fails to explain how Commerce's decision to value an input based on the exact subheading where that input is actually classified was unreasonable, regardless of whether that subheading also included some level of additional products.  Second, Jinko provides no basis for its claim that the data was distorted

37 and Exhibits AD-28 and AD-3030.  *See also* Jinko Case Br. at Attachments 1 and 4.  While Jinko now claims that "{t}he AR layer on Jinko's glass input is synonymous with and identical to an absorbent layer provided in the exclusion," Jinko Br. at 18, Jinko failed to establish that claim on the underlying record.

by this.  For example, Jinko does not claim that the volume of data points under 7007.19.80.95 (for

"other" glass) was so significant or the pricing so different as to result in a distorted overall dataset

for 7007.19.80.  "The data on which Commerce relies to value inputs must be the 'best available

information,' but there is no requirement that the data be perfect."  *Home Meridian Int'l, Inc. v.*

*United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014).  *See also Nation Ford Chem. Co. v. United*

*States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("The 'best available information' . . . may constitute

information from the surrogate country that is directly analogous to the production experience of the

NME producer . . . or it may not").  Jinko's vague claim that the inclusion of data for other products

distorted the Romanian data is unsupported by the record and thus unpersuasive.

Finally, Risen argues that Malaysia is a significant world producer of solar cells and solar

modules, and so the Malaysian data must be more specific to the respondents' solar glass input than

the Romanian data.  Risen Br. at 12-14.  Risen's argument that there was "no evidence on the record

of any solar manufacturing industry in Romania," *id.* at 13, is incorrect.  In fact, respondent Jinko, in

its initial surrogate country comments, submitted data on exports and imports of solar products from

each proposed surrogate country.  Based on this data, Jinko concluded with regard to all proposed

surrogate countries, including Romania: "all of them had significant exports {of subject

merchandise} during the POR." Jinko Surrogate Country Comments (June 2, 2021), P.R. 165-166

at 5. Indeed, Jinko explained that, "to determine whether these countries are significant producers,"

Commerce typically looks at trade data for subject merchandise, as exports from a potential

surrogate country are understood to represent production of the subject merchandise in that country.

*Id.* at 4.  While Romania was not a net exporter, it exported approximately <u>$36.2 million</u> in solar

cells and modules during the period of review ("POR"), indicating that it does, in fact, have a solar

manufacturing industry.  Risen's claims to the contrary contradict the record.

In sum, substantial evidence supports the conclusion that the Romanian data on which Commerce relied more specifically reflects solar glass, including coated solar glass, like that used by the respondents, than the Malaysian data.

> **2.     Commerce Reasonably Found the Romanian HTS Data to Be Superior Because It Did Not Require a Distortive Unit of Measure Conversion**

The Malaysian import data under HTS 7007.19.90 were reported in square meters, while respondents' FOP data – and the Romanian import data under HTS 7007.19.80 – were both reported in kilograms.  *See, e.g.*, Jinko DEQR at Exhibit D-6; Risen DQR (Apr. 30, 2021), P.R. 147, C.R. 122-185 at Exhibit D-7; Alliance Pre-Preliminary Submission (Aug. 3, 2021), P.R. 326-336, C.R. 424-435 at Exhibit 9; Jinko SV Submission (June 28, 2021), P.R. 201-243, C.R. 314-351 at Exhibit 1; Risen SV Submission (June 28, 2021), P.R. 197-200 at Exhibit SV-1.  This was another important factor supporting the agency's selection of the Romanian data as the solar glass surrogate value.  Particularly given the nature of solar glass, the accuracy of its valuation requires reporting unit consistency between the surrogate value and respondents' per-unit consumption rates.  As Commerce recognized in this review and has recognized in the past, the thickness, and thus the weight, of a square meter of solar glass varies.  *See* AR6 Final Results at cmt. 3.  Thus, calculating the weight of the square meters of solar glass imported into Malaysia using a conversion factor would require the individual weights of the actual imports into Malaysia.  This would be necessary to accurately calculate the per-kg surrogate value to apply to a per-kg glass FOP.  However, such weight data was not available on the record of this review.  As such, any conversion of the Malaysian data would necessarily be estimated, and the significance of the distortion in the converted data would be impossible to measure.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED                    NON-CONFIDENTIAL VERSION

However, Jinko and Risen argue that Commerce should have selected the Malaysian HTS 7007.19.90 data, despite it being reported using a different unit of measure than the respondents' reporting.  *See* Jinko Br. at 20-23; Risen Br. at 15-20.  Many of respondents' arguments here again center around the alleged lack of specificity of the Romanian data, which, as discussed above, is not supported by the record.   Jinko's only additional argument is that "the record contains reliable information to accurately convert the per-m$^2$ Malaysian SV into the equivalent per-Kg SV."  Jinko Br. at 21.  This is incorrect.  The record contained the dimensional specifications of the glass inputs that <u>the respondents' used</u>.  *See, e.g.*, *id.* at 22; Jinko DEQR at Exhibit AD-9; Jinko Redacted Case Br. at Attachment 4.  But this is not the information that is required for an accurate conversion. What is needed is not the details of the respondents' glass, not even of the Romanian glass, but the details of the glass imported into Malaysia under HTS 7007.19.90, in order to convert that data from square meters to kilograms.   There was no information on the weight of those Malaysian glass imports that would establish any correlation between the respondents' proposed conversion factor and the Malaysian data.

The  [                                                                                    ]  further demonstrate the distortion that would result from converting the Malaysian data to kilograms without details on the dimensions of the specific glass covered by that data.  The record indicates the respondents  [                                                              ];  both indicate  [

].  Jinko DEQR at App. XIII, p. 36  [

].  Risen indicates a  [                                 ].  *See* Risen DQR at Appendix XIII Response, p. XIII-35.[5]  Yet, Jinko initially proposed converting the Malaysian average unit value to a per-kg basis using a factor of 0.06 m2/kg, which it later expressed on a kg/m2 basis as 15.63 kg/m2.

---

[5]      While Risen indicates  [                     ],  it appears this is a typo, which should read [        ].  **{Risen's BPI}**  [                                        ].  **{Risen's BPI}**

Jinko SV Submission at Exhibit 1; Jinko Aug. 3, 2021 SV Submission (Aug. 3, 2021), P.R. 304-320, C.R. 404-421 at Exhibit 1.  Risen reported [

        ].  Risen Aug. 3, 2021 SV Submission (Aug. 3, 2021), P.R. 321-324, C.R. 422-423 at Exhibit SV2-1.  When applied to the Malaysian surrogate value of 21.18 MYR/m2 – *i.e.*, 5.06 USD/m2 – these conversions [                                    ].  Jinko's conversion results in a final surrogate value of 0.324 USD/kg, [

                            ].  Although Jinko later proposed a new conversion factor [

        ], Jinko Case Br. at 27, [                                    ] made evident the potential for distortion through an estimated solar glass conversion methodology.

        Jinko's argument that its later-proposed conversion factor was "in the same range" as the conversion factor for the Romanian data (*i.e.*, 7.88 kg per m2 for the Romanian data and 7.19 kg per m2 for Jinko) is similarly unavailing.  Jinko Br. at 22.  If anything, the "similar weight to surface area correlation" of Jinko's glass and the glass imported under Romanian HTS 7007.19.80 serves to further prove that the Romanian data accurately reflects respondents' inputs.  *See id.*  It provides no information about the glass captured under Malaysian HTS 7007.19.90 and thus, contrary to Jinko's assertion, it is <u>not</u> "reasonable to infer . . . that the Malaysian imported glass" would also "exhibit a similar weight to surface area correlation."  *Id.*  In other words, as Commerce explained in the final determination, "there is nothing on the record of this review indicating that the weight per square meter of glass imported into Malaysia during this POR is in any way comparable to that of the glass imported into Romania used in Jinko's comparison or to that of Jinko and Risen."  I&D Memo at 18.

        Risen argues that it actually tracks its solar glass purchases in pieces, rather than kilograms or square meters.  It states that it only reported its data in weight because Commerce requested that

it do so and that it could accurately have reported its data in square meters instead.  *See* Risen Br. at

15.  Even assuming that is the case, this appears to be the case only for Risen, given that Jinko has

not made the same argument.  As such, the data for the other mandatory respondent could not be

accurately adjusted in the same way, leading to substantial distortions in the margin calculation.

Moreover, Risen did not adequately establish that the conversion of its data, tracked in pieces, to

square meters was in fact reliable, and the burden is on the respondent to demonstrate that a

requested adjustment to its data is appropriate.    Issues and Decision Memorandum

accompanying *Oil Country Tubular Goods, Other Than Drill Pipe, from Argentina*, 68 Fed. Reg.

13,262 (Dep't Commerce Mar. 19, 2003) (notice of final results and recission in part of

antidumping duty admin. rev.) at 21; *see, e.g.*, Issues and Decision Memorandum accompanying

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the*

*People's Republic of China*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017) (final results

of antidumping duty admin. rev. and final deter. of no shipments; 2014-2016) at 26.   While

Commerce has occasionally relied on converted surrogate values when they are the best

information available, *see* Risen Br. at 16-18, Commerce is certainly not required to do so,

particularly when accurate, reliable data that does not require conversion is available on the

record.

Indeed, respondents' references to the seventh administrative review of the antidumping

duty order are inapposite.  In that review, <u>all</u> of the potential surrogate value prices on the record

were expressed on a square meter basis.  Issues and Decision Memorandum accompanying

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the*

*People's Republic of China*, 86 Fed. Reg. 58,871 (Dep't Commerce Oct. 25 2021) (final results

of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019) at cmt. 11 ("AR7

Final Results"). As such, Commerce had no choice but to use a potentially distortive conversion factor to derive its glass surrogate value. Romania was not on the list of potential surrogate countries for that review, and import data for Romanian HTS 7007.19.80 were not on the record. *Id.* To the contrary, in the review underlying this appeal, Commerce had surrogate value on the record expressed in kilograms (*i.e.*, the Romanian data), and it acted reasonably in determining that such product-specific data, which required no conversion using an estimated conversion factor, was the best information available to value respondents' input. And, as Risen itself explained in its case brief in the underlying review with regard to the sixth administrative review, "{e}ach review stands alone, and the relevant record in the current review is different compared with the record in AR{7} with respect to this input." Risen Case Br. (Jan. 28, 2022), P.R. 421-422, C.R. 481-485 at 11.

Finally, Risen's argument that the Romanian data were distorted by the inclusion of certain data with zero quantities is unfounded. *See* Risen Br. at 20. Risen fails to quantify or otherwise establish any distortion allegedly generated by the zero-quantity data, and Commerce has found in numerous previous proceedings that the impact of zero-quantity trade data attributable to rounding is negligible and does not distort the derivation of the overall average unit value. *See, e.g.,* Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791, 63,795 (Dep't Commerce Oct. 17, 2012) (final deter. of sales at less than fair value, and affirmative final deter. of critical circumstances, in part) at cmt. 8; Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China*, 81 Fed Reg. 39,905 (Dep't Commerce June 20, 2016) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2013-2014) at

cmt. 22 ("AR2 Final Results"); Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2014-2015) ("AR3 Final Results") at cmt. 23; Issues and Decision Memorandum accompanying *Fresh Garlic From the People's Republic of China*, 78 Fed. Reg. 36,168 (Dep't Commerce June 17, 2013) (final results of antidumping duty admin. rev.; 2010-2011) at cmt. 8.  This is particularly the case given that, here, the values attributable to the zero-quantity instances are an extremely small portion of the total values.  *See* Alliance Pre-Preliminary Submission at Exhibit 9.

### 3.   Commerce Did Not Improperly Rely on Evidence from a Prior Review in the Final Results

Risen further alleges that Commerce "improperly relied upon information not on the record of this review" to find that the Malaysian solar glass surrogate value was less specific than the Romanian value.  Risen. Br. at 20.  Risen's entire argument is based on Commerce's citation to the Solar I sixth administrative review for a single point: "tempered glass has a large range of thickness."  *Id.* at 22.  First, Commerce's determination with regard to the solar glass surrogate value was not solely, or even predominantly, based on this fact.  *See* I&D Memo at cmt. 3. Moreover, the simple, basic fact that solar glass varies in thickness was also supported by the record of the underlying review, as Commerce also cited in its final results.  *See id.* (citing Jinko Redacted Case Br. at Attachments 4 and 5).  Risen's implication that evidence unsupported by the record of the underlying review was determinative in Commerce's solar glass surrogate value determination in the final results is unsupported and misleading.

### 4. Commerce Justifiably Departed from Its Primary Surrogate Country to Value Solar Glass

Jinko and Risen further argue that Commerce improperly departed from its regulatory practice by selecting a solar glass surrogate value from a source outside of the primary surrogate country of Malaysia. *See* Jinko Br. at 23-25; Risen Br. at 5-10.

Commerce's regulations state that it "normally will value all factors {of production in a non-market economy case} in a single surrogate country." 19 C.F.R. § 351.408(c)(2). However, it is also well established that Commerce will resort to a secondary country for surrogate values if surrogate value data from the primary surrogate country are unavailable or unreliable. *See* I&D Memo at 16. Indeed, the statute specifically contemplates that Commerce may rely on multiple market economy countries as the source for surrogate values. 19 U.S.C. § 1677b(c)(4) (Commerce "shall {value the factors of production} to the extent possible . . . in <u>one or more market economy countries</u> that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise") (emphasis added).

As the Court has explained, Commerce's regulatory preference for a single surrogate country may be relied on when it is used to support the selection of one set of data where the other available data are fairly considered to be equal. *See Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327-28 (Ct. Int'l Trade 2016). However, "it is not sufficient . . . to cite the policy of using a single surrogate country where," as here, "there is reason to believe that the primary surrogate country may not provide the best available information for a particular FOP." *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 37 CIT 1116, 1120, 929 F. Supp. 2d 1352, 1355 (2013). *See also, e.g., Diamond Sawblades Mfrs.' Coal. v. United States*, No. 17-00167, slip op. 18-146 at 11 (Ct. Int'l Trade Oct. 23, 2018) ("The regulatory preference

for valuing inputs for an NME respondent's production using data from a single 'primary' surrogate country has been held insufficient to explain decisions to reject data from a non-primary surrogate country if questions remain unanswered as to the suitability of the primary surrogate country data"). Indeed, to rely on the primary surrogate country's data based on this preference notwithstanding the data's shortcomings would run contrary to Commerce's statutory obligation to rely on the best available information in valuing the FOPs in a non-market economy. *See Peer Bearing Co.-Changshan v. United States*, 35 CIT 103, 124-25, 752 F. Supp. 2d 1353, 1373 (2011), *vacated on other grounds*, 766 F.3d 1396 (Fed. Cir. 2014). *See also* 19 U.S.C. § 1677b(c)(1).

Here, prioritizing the statutory obligation to rely on the best available information for surrogate values and calculate the most accurate dumping margin possible, Commerce justifiably departed from the primary surrogate country of Malaysia to value respondents' solar glass inputs using Romanian import data. The cases cited by Jinko do not support its argument to the contrary. For example, Jinko cites *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014). Jinko Br. at 24. As Jinko quotes in its brief, in that case, the Court concluded:

> The administrative record contained available, but imperfect, surrogate data for all major inputs sourced from both Thailand and the Philippines . . . . When comparing the carbon content of steel contained in the Thai and Philippine import data to the carbon content of the steel wire rod input Plaintiffs actually used, however, Commerce found that the Thai data turned out to be more specific to Plaintiffs' steel inputs than the Philippine data. . . . The Thai steel data's superior quality therefore supports Commerce's choice of Thailand as the primary surrogate country and Commerce's use of Thai data to calculate Plaintiffs' normal value.

*Id.* (citing *Jiaxing Bro. Fastener*, 11 F. Supp. 3d at 1332-33). Thus, this case is not analogous to Jiaxing Bro. Fastener, where the Court (on remand) found that Commerce properly selected Thailand as the primary surrogate country, in part because of the superiority of Thai data quality. The case did not address the question of whether, and under what circumstances, Commerce may

depart from its primary surrogate country to value a single input.  However, in affirming the CIT's decision, the Court of Appeals for the Federal Circuit ("CAFC") emphasized that "{t}he question here is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1300-01 (Fed. Cir. 2016).  Thus, *Jiaxing Bro. Fastener*, to the extent relevant, supports deferring to Commerce's discretion to rely on surrogate value data from outside of the primary surrogate country in this case.

For its part, Risen argues that the glass surrogate value data from Malaysia is not unavailable nor unreliable.  Risen Br. at 7-8.  This is not the case.  Given that the Malaysian data was not explicitly product-specific (as the Romanian data was), and that the Malaysian data would have required conversion that could not be done accurately, it was reasonable for Commerce to conclude that the Malaysian data was unavailable and, to the extent available, unreliable.  Regardless, as Commerce noted in its final results, "accuracy is a paramount consideration."  I&D Memo at 16.  Risen's claim that Commerce "did not actually engage in any separate analysis of 'accuracy,'" Risen Br. at 9, is unfounded.  Commerce's analysis of the product specificity of the data and the conversion required to the data was exactly that.  *See* I&D Memo at 17-19.  Data that does not reflect the specific input at issue and cannot be accurately converted to apply to respondents' inputs is not accurate nor reliable.

Thus, Commerce's determination that the Romanian data was superior to the Malaysia data was supported by substantial evidence for the reasons discussed above.  Having so determined, Commerce was justified in its decision to depart from its primary surrogate country and value the solar glass input using Romanian data, and the respondents' arguments to the contrary should be rejected.

Consol. Ct. No. 22-00219                                    NON-CONFIDENTIAL VERSION

     **5.**      **Commerce Properly Rejected Respondents' Untimely New Factual Information Regarding the Solar Glass Input Surrogate Value**

Finally, Jinko argues that Commerce acted improperly in rejecting its new factual information, which it provided for the first time in its case brief (*i.e.*, more than two months after the deadline for submission of new factual information). *See* Jinko Br. at 25-28. Commerce properly rejected the information cited by Jinko, and the Court should deny Jinko's requests to consider such information.

Commerce's authority to reject untimely filed new factual information in its proceedings is well-established. Commerce's regulations specify that it will reject any untimely filed factual information, written argument, or other material with a written notice explaining the reasons for the rejection. 19 C.F.R. §§ 351.302(d)(2); 351.301(c)(1). Commerce will not consider nor retain such information, argument, or other material in the official record of the subject proceeding. *Id.* § 351.302(d)(1)(i). The courts have confirmed that "Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings." *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 98, 122, 815 F. Supp. 2d 1342, 1365 (2012) (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206-07 (Fed. Cir. 1995)). *See also Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015) ("Strict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision"). Indeed, "{i}n order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations." *Yantai Timken Co. v. United States*, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1371 (2007). *See also Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015).

Thus, Jinko's challenge to Commerce's rejection of its untimely filed factual information cannot succeed.  While Jinko argues that the information should not be considered new factual information because it is publicly available, that is the case with a good deal of new factual information submitted to Commerce (*e.g.*, nearly all submissions of potential surrogate value data). The public nature of information does not render it not new factual information for purposes of Commerce proceedings.  As Commerce explained when rejecting Jinko's untimely new factual information:

> Although you claimed that the information in, and related to, Attachments 2 and 3 is not new factual information because it is widely available in the public domain, this is often the case with factual information, such as import values, provided to value factors of production under 19 CFR 351.408(c). 19 CFR 351.301(c)(3)(ii) requires that all submissions of such factual information under 19 CFR 351.408(c) to value factors of production in an administrative review, be submitted to the Department of Commerce (Commerce) no later than 30 days before the scheduled date of the preliminary results of review. While the information that you submitted regarding Harmonized Tariff Schedules does not include values, it is nonetheless factual information to value factors of production as demonstrated by your use of this information to support a particular surrogate value.

Rejection of Case Brief (May 25, 2022), P.R. 442.

Similarly, that the information may be available on ACCESS because it was timely submitted in a prior segment of the proceed does not help Jinko's cause.  Factual information from prior segments still must be timely submitted onto the current record to be considered by Commerce in a later segment.  Multitudes of new factual information submissions are available via ACCESS from prior administrative reviews of orders, particularly in proceedings like the instant one, which is currently undergoing its tenth administrative review.  That does not mean that each of those submissions should be considered properly on the record of each subsequent administrative review. As both the CAFC and this Court have held, the record of a specific administrative review does not include documents and factual information from other Commerce proceedings unless those

documents are separately placed on the record in a timely fashion. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012); *see also Neuweg Fertigung GmbH v. United States*, 16 CIT 724, 726, 797 F. Supp. 1020, 1022 (1992).

For this reason, the Court should reject Jinko's request that it "take judicial notice" of the information that was rejected from Jinko's case brief. *See* Jinko Br. at 25-26. "This Court's review of a final determination in an administrative review is limited to a review of the administrative record developed in that administrative review." *Neuweg Fertigung GmbH*, 16 CIT at 726, 797 F. Supp. at 1022. *See also Essar Steel*, 678 F.3d at 1277 (quoting 19 U.S.C. § 1516a(b)(2)(A)). Absent constitutional constraints or extremely compelling circumstances, "courts will defer to the judgment of an agency regarding the development of the agency record." *PSC VSMPO–Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed.Cir.2012). The Court should therefore decline to consider plaintiffs' claims to the extent that they are rooted in the non-record information.

**B.     Commerce Lawfully Valued Electricity**

Commerce's determination to value electricity using the rate for peak hours of high voltage consumers located in peninsular Malaysia, and to reject Plaintiffs' request to include values from the Sabah and Sarawak regions, is supported by substantial evidence and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Commerce's determination should be upheld.

Plaintiffs raise four primary challenges to Commerce's electricity valuation. First, that Commerce's determination to limit its electricity valuation methodology to peak hour rates is unreasonable because it distorts the value of electricity to only peak hours when Jinko allegedly operates on both peak and off-peak hours. Jinko Br. at 29; Shangluo Br. at 5. Second, that Commerce's determination to limit its electricity valuation methodology to peak hours is

unlawful because it results in *de facto* adverse inference that Jinko only operates during peak hours. Jinko Br. at 29; Shangluo Br. at 5.  Third, that Commerce's determination to limit its electricity valuation to rates in peninsular Malaysia amounts to "speculation" and is not supported by substantial evidence.  Jinko Br. at 29-30; Shangluo Br. at 5.  And fourth, Plaintiffs detail the calculations that Commerce should undertake to "obtain the most accurate and representative electricity SV" – taking a simple average of the highest voltage industrial energy rate from all three regions for both peak and off peak-hours, or "by weight-averaging the peak and off-peak rates from all three regions." Jinko Br. at 30; Shangluo Br. at 5.  However, as we detail below, each of Plaintiffs arguments are flawed and Commerce's electricity surrogate value selection is consistent with section 773(c) of the Tariff Act of 1930 (the "Act"), was reasonable and supported by substantial evidence, and furthermore, no provision of law required Commerce to use the surrogate values suggested by Plaintiffs.

In valuing FOP, section 773(c)(1) of the Act instructs Commerce to use "the best available information" from the appropriate market economy country.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce is granted broad discretion under the statute when selecting FOP values so long as Commerce's determination in selecting those surrogate values is reasonable. *Id.* (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010) and *Nation Ford Chem.*, 166 F.3d at 1377 ("Commerce has broad discretion to determine the best available information for an antidumping review, given that the term 'best available information' is not defined by statute."); *see also Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citing *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996) ("{a}ny reasonable construction of the statute is a permissible construction.").  Consistent with Commerce's broad discretion, Commerce's practice

in selecting the most appropriate surrogate value, has been to consider several factors, including the quality, specificity, and contemporaneity of the source information. *See* Policy Bulletin No. 04.1: Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004); *see also* I&D Memo at 59. As Commerce stated in its Final I&D Memo, "{o}f these criteria, specificity is particularly important." I&D Memo at 59 (citing *Taian Ziyang Food Co.*, 35 CIT at 907, 783 F. Supp. 2d at 1330).

Consistent with section 773(c) of the Act, Commerce correctly rejected Plaintiffs' arguments to include electricity rates from the Sabah and Sarawak regions and to derive a surrogate value for electricity that was specific to the only known Malaysian solar manufacturer – Jinko Solar Malaysia – operating in peninsular Malaysia. *See, e.g.*, *id.* As we detail below, Commerce's determination was properly based on the following findings: (1) peak hour electricity rates are more representative than off-peak rates because Plaintiffs did not provide evidence of their hours of operation, but did provide evidence that peak hour electricity rates in all three regions are in effect the majority of the day; (2) substantial evidence revealed that including Sabah and Sarawak electricity rates in its calculation to achieve a broad-market average would result in a less specific surrogate value, and (3) a simple average of peak hour rates and off-peak hour rates would result in a distorted value because there are more peak hours in a day than off peak hours. *See, e.g.*, *id.* at 59-60.

1.   **Commerce's Determination to Limit its Electricity Surrogate Value Calculation to Peak Rates is Reasonable and Supported by Substantial Evidence**

Plaintiffs claim that Commerce's determination to limit its electricity surrogate value calculation methodology to peak rates is unreasonable. First, Plaintiffs assert that "Commerce's practice is to select a SV that is 'specific to the input in question,'" and that since Jinko operates

24-hours a day, thereby consuming both peak and off-peak electricity that a surrogate value would only "fulfill the specificity criteria only" if the rates included "both peak and off-peak hours." Jinko Br. at 29; Shangluo Br. at 5 ("Shangluo BYD supports and incorporates by reference the arguments submitted by Jinko with respect to {electricity surrogate value selection}."). As an initial matter. Plaintiffs fail to address the broad discretion afforded to Commerce under section 773(c) of the Act and misstate Commerce's FOP selection process as a bright line rule. However, the fatal flaw of Jinko's claim is that it does not address two key facts that led to Commerce's determination: (1) that there is no record evidence that Jinko actually operates during off peak hours, because during the administrative review, Jinko provided no evidence that it operates 24-hours a day or during off-peak hours. *See e.g.*, I&D Memo at 59-60; and (2) that off-peak rates from Sabah and Sarawak do not appear to include high voltage industrial use rates (which Commerce views as the rates applicable to a solar manufacturer in peninsular Malaysia), and would thus not be representative to the only known Malaysian manufacturer, located in peninsular Malaysia. *Id.* Given that there is no evidence that Jinko actually operates during off-peak hours, but there is evidence that the majority of the operating day is attributed to peak hours, Commerce's determination to exclude off-peak hours is reasonable. Plaintiffs fail to demonstrate otherwise and would instead have this Court determine that Commerce's determination is unreasonable based on Jinko's unconfirmed and unsupported statement that it also operates during off-peak hours.

Second, Plaintiffs argue that Commerce did not "explain how excluding the off-peak hour rates . . . . does not result in a distortive SV calculation". Jinko Br. at 29; Shangluo Br. at 5. This is incorrect. Commerce in fact explained that given the evidentiary record, peak hours are more representative than off peak hours. Specifically, Jinko provided no evidentiary support that

it operated 24-hours a day and thus consumed some off-peak electricity.  *See* I&D Memo at 60.

Additionally, Plaintiffs provided evidence that peak hour electricity rates are in effect for the

majority of the day – 14 hours a day in peninsular Malaysia, and 17 hours a day in the Sabah and

Sarawak regions – meaning that for the majority of the day, operations run during peak hours.

*See* I&D Memo at 60 (citing Jinko SV Submission at Exhibit 6).   And finally, Sabah and

Sarawak's rates do not include high-voltage industrial rates – as Commerce notes, "a solar cells

and module manufacturer in Malaysia would require high voltage electricity."  *See* I&D Memo

at 59-60 (citing Jinko SV Submission at Exhibits 6-7, and 11B; *see also* Risen SV Submission at

Exhibits SV-6 and SV-7; and Petitioners' June 28, 2021 SV Submission (June 28, 2021), P.R.

184-196 at Exhibit 6).  Given that there is no evidence that Plaintiffs operate 24-hours a day, and

given that the peak hour rates are in effect the majority of the day, Commerce's determination

that peak hour electricity rates are more representative of the rates that Plaintiffs "would have

incurred had they operated in the surrogate country" is reasonable and Plaintiffs fail to

demonstrate otherwise.  I&D Memo at 60.

### 2.   Commerce's Determination to Limit its Electricity Surrogate Value Calculation to Peak Rates is Lawful and does not Confer "De Facto" Adverse Facts onto Plaintiffs

Plaintiffs next attempt to characterize Commerce's determination to limit its electricity

surrogate value calculation to peak rates as unlawful.   Jinko Br. at 29; Shangluo Br. at 5.

Specifically, Jinko boldly states that "since {Commerce} did not require Jinko to report its hours

of operations, Commerce unlawfully drew a '*de facto* adverse' inference that Jinko only operated

during peak hours." Jinko Br. at 29  (citing *Calgon Carbon Corp. v. United States*, 35 CIT 234,

244 (2011)); Shangluo Br. at 5.  This claim fails for two reasons, which we detail below.

First, Jinko attempts, and fails, to impermissibly shift the evidentiary burden to Commerce to distract from the total lack of evidence that it allegedly operates 24-hours a day. Jinko Br. at 29; Shangluo Br. at 5.  Indeed, as Defendant-Intervenor raised in its rebuttal brief in the underlying administrative review, Commerce and the CIT have recognized that the burden lies on the respondent to create an adequate record and provide sufficient data to establish a position that they want Commerce to take. Alliance Rebuttal Br. (Feb. 11, 2022), P.R. 433, C.R. 493 at 42 (citing *NSK Ltd. v. United States*, 20 CIT 361, 369, 919 F. Supp. 442, 449 (1996); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936-937, 806 F. Sup. 1008, 1015 (1992)).

Second, the underlying facts of *Calgon Carbon Corp. v. United States* – the only legal support provided by Plaintiffs – are distinguishable from the facts here.  Accordingly, *Calgon* is inapposite to Commerce's determination here and does not support Plaintiffs' assertion.  Jinko Br. at 29; Shangluo Br. at 5.  In *Calgon*, Commerce used two different datasets to value the two respondents' (Jacobi and Cherishmet) hydrochloric acid inputs, resulting in valuing hydrochloric acid inputs for Cherishmet significantly higher.  *See Calgon*, 35 CIT at 243-44.  More specifically, in the preliminary results, Commerce determined to use WTA data as the best available information for all respondents. *Id.*  However, at verification Jacobi "voluntarily . . . provided supplemental information" on hydrochloric acid purity, which Commerce accepted and then used to value Jacobi's hydrochloric acid inputs. *Id.*  Cherishmet did not provide Commerce with supplemental data, nor did Commerce request such data. *Id.*  In the final results, Commerce used for the first time in the proceeding, Chemical Weekly data to value Jacobi's hydrochloric inputs because it was "more specific" based on the unsolicited data that Jacobi provided during verification. *Id.*  However, Commerce continued to use WTA data to

value Cherishmet's hydrochloric acid inputs, which resulted in "valuing Cherishment's HCL

input fourteen times higher than Jacobi's HCL input." *Id.* at 243. The Court remanded the issue

for Commerce to provide Cherishmet an opportunity to submit hydrochloric acid purity data or

to "reach some other fair result." *Id.* at 244. The court reasoned that once Commerce accepted

Jacobi's supplemental data, it "had an obligation to treat Cherishmet fairly by giving it a similar

opportunity" and that Commerce's failure to do so led to arbitrary and unfair treatment, and

"{i}n essence {. . . .} imposed a de facto adverse facts available rate through the application of

two different surrogate values." *Id.*

Unlike in *Calgon*, Commerce's determination here did not result in unfair treatment

between respondents, nor in any unfair treatment of all respondents. As detailed above,

Commerce was under no obligation to solicit information from respondents concerning their

operating hours. To the contrary, respondents had ample time and opportunities to provide

information concerning their operating hours. For example, respondents could have submitted

hours of operation information with their surrogate value information and comments to support

their position that Commerce should use the Sabah and Sarawak rates. Additionally, respondents

also could have submitted such information within 30 days of the preliminary results. *See*

19 C.F.R. § 351.301(c)(3)(i) ("factual information to value factors of production under

§ 351.408(c) in an antidumping investigation {. . . .} are due no later than 30 days before the

scheduled date of the preliminary determination."); *see also id.* § 351.301(c)(5) (establishing that

Parties have "30 days before the scheduled date of the preliminary results in an administrative

review, or 14 days before verification, whichever is earlier" to file "{f}actual information not

directly responsive to or relating to paragraphs (c)(1)–(4) of this section"); *see, e.g.*, Preliminary

Decision Memorandum ("PDM"), P.R. 396, accompanying *Crystalline Silicon Photovoltaic*

*Cells, Whether or not Assembled into Modules, From the People's Republic of China*, 86 Fed. Reg. 72,923 (Dep't Commerce Dec. 23, 2021) (prelim. results of antidumping duty admin. rev., partial recission of antidumping admin. rev., and prelim. deter. of no shipments; 2019-2020), P.R. 408. Finally, respondents were put on notice of Commerce's determination in the preliminary surrogate value results and could have asked Commerce for another opportunity to voluntarily provide information concerning their operating hours following these results. Respondents did not do so. Commerce did not use any new data to value electricity that was not already on the record. Rather, Commerce used the only information on the record available to it (information provided by Plaintiffs) when selecting the best available information (*i.e.*, electricity rates from peninsular Malaysia) to value electricity. Therefore, Commerce's determination did not constitute an unlawful application of de facto AFA.

### 3.    Commerce's Determination to Limit its Electricity Surrogate Value Calculation to Peninsular Malaysia Rates is Reasonable and Supported by Substantial Evidence

Jinko claims that Commerce's determination to limit electricity rates to peninsular Malaysia was based on, "speculative presumptions from certain record facts" Jinko Br. at 29-30; Shangluo Br. at 5. Plaintiffs' claims are simply wrong. Commerce made its determination based on record facts that reasonably and adequately support Commerce's determination. *See, e.g.*, *Cisco Sys., Inc. v. Int'l Trade Comm'n*, 873 F.3d 1354, 1361 (Fed. Cir. 2017) (citation omitted) (providing that substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). As Jinko admits, these facts are that:

> "Jinko Solar Malaysia, is located on peninsular Malaysia"; "Sabah and Sarawak regions are on the island of Borneo, not peninsular Malaysia"; and "it is not clear that solar cell and module manufacturers would be located in these relatively remote regions," since "rates for the Sabah and Sarawak regions do not include high voltage industrial rates."

Jinko Br. at 29; Shangluo Br. at 5.

Again, these are the record <u>facts,</u> and Jinko and other Plaintiffs provided no information to the contrary.  It was reasonable for Commerce to exclude the Sabah and Sarawak rates. Specifically, as Commerce explained, Jinko Solar Malaysia is the <u>only known</u> Malaysian solar manufacturer and is located in peninsular Malaysia. *See* I&D Memo at 59 (citing Jinko SV Submission at Exhibit 11B).  There are no known solar manufactures in the Sabah and Sarawak regions, which are very remote, nor is there the availability of high voltage industrial rates in those regions.  *See id.* (citing Jinko SV Submission at Exhibits 6 and 7; *see also* Risen SV Submission at Exhibits SV-6 and SV-7; and Petitioners' June 28, 2021 SV Submission at Exhibit 6).  Because of these facts, Commerce reasoned that,

> including the Sabah and Sarawak electricity rates in our calculation would result in a less specific SV because we believe that a solar cells and module manufacturer in Malaysia would require high voltage electricity and thus pay the electricity rates charged in peninsular Malaysia not that rates charged in the Sabah and Sarawak regions.

*See id.* at 59-60.

Accordingly, unlike Sabah and Sarawak rates, peninsular Malaysian electricity rates have a "rational and reasonable relationship" to the electricity rates that a Malaysian solar producer would use (because Jinko Solar Malaysia is located in peninsular Malaysia) and is accordingly the "best available information".  *Hebei Metals & Mins. Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1191 (2004) (providing that the Court's role is not to evaluate whether information selected by Commerce was actually the objective "best" information, but rather whether Commerce's choice has a "rational and reasonable relationship to the factor of production it represents."); *see also Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 839, 159 F. Supp. 2d 714, 720 (2001) (holding that the "Court may judge whether Commerce's selection was reasonable" but not whether Commerce's choice was the "absolute best available").

Plaintiffs further state that Commerce's use of Jinko Solar Malaysia's location to "delimit the boundaries of the surrogate country to Peninsular Malaysia . . . . is based on conjecture" and that Commerce does not cite support for "its conclusion that only high voltage industrial tariff rates should be applicable to Jinko." Jinko Br. at 30 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009)) Plaintiffs' claims are without merit.  First, the burden was on the Plaintiffs to create an adequate record and provide sufficient data to establish a position that they want Commerce to take.

Second, it is Jinko that is asking Commerce to make speculative presumptions based on an <u>absence of facts</u> concerning the location of other solar manufactures and the type of industrial tariff electricity rates that should be applicable to Jinko.  As a competitor in the Malaysian market, Jinko is presumably aware of the Malaysian solar manufacturing industry, including industrial electricity rates and the existence of any competitors.  Notably, Jinko had several opportunities during the course of the administrative review to provide information on the type of electricity tariffs that Jinko Malaysia used, and the locations of other {hypothetical} Malaysian solar manufacturers, but failed to do so.  As a result, the evidentiary record before Commerce showed that the only Malaysian solar manufacturer – Jinko Solar Malaysia – was located in peninsular Malaysia.  Plaintiffs' arguments do not overcome the substantial evidence supporting Commerce's conclusion. Faced with the evidence before it, Commerce made a reasonable decision to limit its calculation methodology to values in peninsular Malaysia. *See also PSC VSMPO-Avisma*, 688 F.3d at 764 ("{Commerce's} deference is both <u>greater than</u> and <u>distinct</u> from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute") (emphasis added).

### 4.   Commerce's Electricity Surrogate Value Calculation Methodology is Not Distortive and is Reasonable

Plaintiffs claim that Commerce's exclusion of off-peak rates from Sabah and Sarawak resulted in a distorted surrogate value calculation and that "to obtain the most accurate and representative electricity SV" Commerce should have taken a simple average of the highest voltage industrial energy rate from all three regions for both peak and off peak-hours, or "weight-averaging the peak and off-peak rates from all three regions." Jinko Br. at 30. However, as this Court has held, "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production." *Shandong Huarong*, 25 CIT at 840, 159 F. Supp. 2d at 721. Rather, Commerce's methodology only needs to be reasonable. Plaintiffs fail to demonstrate that Commerce's methodology was unreasonable.

In its final determination, Commerce properly rejected Jinko's request to calculate the surrogate value based on a simple average of the highest voltage rates from all three regions. Commerce reasoned that such a calculation would result in a distorted surrogate value. I&D Memo at 60. Specifically, because there are more peak hours in a day than off-peak hours, calculating a surrogate value based on a simple average would "incorrectly weight peak and off-peak rates." *Id.*; *see also* Alliance Rebuttal Br. at 46 ("Given the significant difference between peak and off-peak rates, a surrogate value based on a simple average is highly distortive unless Jinko production occurs equally during peak and non-peak hours"). Accordingly, Commerce's electricity surrogate value calculation was reasonable.

### 5.   The Exhaustion Principle Requires the Court to Reject Jinko's Argument on Weight Averaging Peak and Off-Peak Rates from All Three Regions

In the underlying administrative review, Jinko did not raise its new claim that "Commerce could have reasonably addressed its concerns regarding unequal peak and of-peak

hours by computed the SV by weight-averaging the peak and off-peak rates from all three regions" in its case or rebuttal brief.  *Compare* Jinko Br. at 30, *with* Jinko Case Br. at 50-52, *and* Jinko Rebuttal Br. (Feb. 10, 2022), P.R. 430 (showing that Jinko's rebuttal brief does not address any electricity surrogate value arguments).  Per the exhaustion doctrine, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998)).  "Absent a strong contrary reason, the {CIT} should insist that parties exhaust their remedies before the pertinent administrative agencies" before it reviews an agency's decision.  *Aluminum Extrusions Fair Trade Comm. v. United States*, 37 CIT 1482, 1485, 938 F. Supp. 2d 1337, 1341 (2013) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)); *see* 28 U.S.C.A. § 2637(d).  The doctrine ensures fairness to litigants and promotes both agency authority and judicial efficiency.  *See Aluminum Extrusions*, 37 CIT at 1485, 938 F. Supp. 2d at 1341.  ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383-84 (Fed. Circ. 2008)) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).

Accordingly, the Court should reject Jinkos's argument based on the exhaustion doctrine. Jinko was put on notice of Commerce's surrogate value selection for electricity at the time of the preliminary results.  *See* Prelim SV Memo (Dec. 23, 2021), P.R. 399, C.R. 470-477.  Indeed, Jinko submitted a case brief and raised several issues with Commerce's electricity surrogate

value selection, as detailed above.  These issues even included arguments on how Commerce should calculate the surrogate value using either a simple average or a broad-market average. Jinko Case Br. at 52. However, Jinko failed to raise its argument concerning a weighted average in its case brief and consequently abandoned its opportunity to challenge the denial before the Court.

For the reasons detailed above, the Court should uphold Commerce's methodology for calculating the electricity surrogate value as it is supported by substantial evidence and otherwise in accordance with law.

### C.  Commerce's Valuation of Air Freight is Lawful and Supported by Substantial Evidence

Commerce's determination to use Freightos data rather than IATA data to value air freight is supported by substantial evidence and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Commerce's determination should be upheld.

Plaintiffs broadly claim that Commerce's determination to reject IATA data for its valuation of air freight is unlawful.  However, there is no discussion in Plaintiffs' opening briefs concerning why Commerce's determination was "unlawful."  Rather, Plaintiffs simply take issue with Commerce's choice of the source data Commerce uses in its air freight surrogate value calculation.  That a party is not satisfied with Commerce's selection of data for use in a surrogate value calculation methodology does not amount to that determination being "unlawful" and is not a sufficient reason to warrant a remand of the issue.  As this Court has found, Commerce is granted broad authority when choosing FOPs for surrogate value calculations, Commerce's determination must simply be reasonable. *Shandong Huarong*, 25 CIT at 839, 159 F. Supp. 2d at 720 (noting that the court's role when reviewing Commerce's FOP surrogate value calculations is to "judge whether Commerce's selection was reasonable" not whether Commerce's selection

was the "absolute best available."). Accordingly, the only reason that the Court could remand this issue is if it was either unlawful, or unreasonable. As neither of these are true here, the Court should uphold Commerce's determination to use Freightos data when calculating the surrogate value for air freight.

In their opening briefs, Plaintiffs provide two reasons as to why IATA are appropriate: the IATA data are publicly available, and the data contain "detailed particulars." Jinko Br. at 31-33. Plaintiffs, however, provide no argument as to why Commerce's use of Freightos data was unreasonable or unlawful. As noted above, the question before this Court is whether Commerce's determination to use Freightos data was reasonable and in accordance with the law. As detailed below, Commerce's determination to use Freightos data and to reject IATA was reasonable and in accordance with law.

### 1. Commerce's Determination to Use Freightos Data Was Supported by Substantial Evidence and Otherwise in Accordance With Law

Within its broad authority under section 773(c) of the Act Commerce's practice is to consider several factors when selecting FOP values. As Commerce notes, these include using,

> investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

I&D Memo at 43 (citing Policy Bulletin 04.1).

In its final results, Commerce provides a reasonable explanation for why Freightos data satisfy a number of Commerce's surrogate value selection criteria:

> Freightos data {are} publicly available, contemporaneous with the period under consideration, broad-market averages, tax and duty-exclusive and specific to the inputs being valued. The Freightos data, and the details regarding the source of the data, are publicly available. Moreover, the Freightos data are weekly rates from all service providers who permit use of their data for market intelligence, which is the vast majority of providers (Freightos has the world's largest global

> database of multimodal freight rates, with more than 2 billion price points – thus it contains broad market averages), for air-cargo shipments over 1,000 kg. from Shanghai to Atlanta International Airport (hence specific to the service being provided). The Freightos rates include all airline surcharges, such as fuel, security or COVID-19 and exclude origin and destination surcharges, duties, and taxes (which is one of our SV selection criteria – being tax and duty-exclusive).

*Id.* at 43-44 (internal citations omitted) (citing Jinko SV Submission at Exhibit 9H).

Accordingly, Commerce's determination was reasonable as it explained how Freightos data met several of Commerce's surrogate value selection criteria, and cited supporting documentation. It is not the role of this Court to determine whether IATA data would have been the "best" data, as the Court only reviews whether Commerce's determination was reasonable. *Shandong Huarong*, 25 CIT at 839, 159 F. Supp. 2d at 720. As provided above, Commerce's determination to use Freightos data was reasonable, supported by substantial evidence, and is in accordance with section 773(c) of the Act. As we detail in the next section, Commerce's determination to reject IATA was likewise reasonable, supported by substantial evidence, and in accordance with law.

### 2. Commerce's Determination to Decline Use of IATA Was Supported by Substantial Evidence and in Accordance with Law

Commerce reasonably declined to use IATA data in its final results because Freightos data met several of Commerce's criteria and was the appropriate choice, and in any event "almost none" the IATA data were publicly available. I&D Memo at 44.

Plaintiffs claim that all of the IATA data, including underlying data, are publicly available. Specifically, the route-specific Shanghai-Atlanta monthly air freight data for the AR8 POR were publicly disclosed to Commerce and the parties to the administrative review, Jinko Br. at 31; and that data underlying the IATA analysis are available through a fee-based subscription to any person, and Commerce has a practice of relying on data from fee-based sources. *Id.* at 31-32.

Jinko's arguments that this amounts to "public availability" are without merit.   As Commerce explained in its final results, when placing IATA data on the record for this proceeding, Jinko treated only a subset of the data – the monthly average of its rates – as public. I&D Memo at 43; *see also* Alliance Case Br. (Jan. 28, 2022) P.R. 429, C.R. 492 at 19 (citing Jinko Aug. 3, 2021 SV Submission at Exhibit 5A-5F).   As Commerce explained, the public IATA data contained "no details about the rates and no details about how the data were obtained."   I&D Memo at 43.   Contrary to Plaintiffs' attempt, a third-party recollection on how the data were obtained is not sufficient.   The company treated the entirety of the remaining data as proprietary, accessible only through its subscription to obtain the data. *See* Alliance Case Br. at 19 (citing Jinko Aug. 3, 2021 SV Submission at Exhibit 5A-5F).

Commerce's established practice is to consider only surrogate value data that are wholly public, and it acted in accordance with this practice in the preliminary results. For example, in AR7, Commerce rejected the use of even public averages based on proprietary data points:

> The underlying Maersk data are not publicly available on the record of this review. While the petitioner urged Commerce to use the public average of the Maersk route-specific ocean freight rates in its calculations, or to aggregate the Maersk route-specific ocean freight rates in a manner that it deems appropriate to derive public rates, manipulating the data to produce public rates does not change the fact that the underlying Maersk ocean freight rates are not publicly available on the record of this review. Having the Maersk data publicly available on the record would have increased transparency in the selection of surrogate values. The public availability standard is aimed at promoting transparency.

*See id.* (citing AR7 Final Results at cmt. 10).

As Defendant Intervenor explained in the underlying administrative review, in this case, all but a few select data points are proprietary. Because Commerce and the interested parties cannot publicly evaluate the details of the IATA data in general or the details that underlie the compilation of specific rates – to include the rates Jinko made public – the overall transparency

of the data and its source is critically limited. Indeed, Jinko asserts any person can freely access the data with subscription, yet it treats the subscription agreement under which it obtained data from IATA as proprietary. Alliance Rebuttal Br. at 19 (citing Jinko Case Br. at 58; Jinko Aug. 3, 2021 SV Submission at Exhibit 5A).   Given the lack of transparency, Jinko attempts to corroborate the IATA rates with actual publicly available rates obtained from Drewrey, Freightos, TAC and the FIS Weekly Air Freight Report.  *Id.* at 19-20 (citing Jinko Case Br. at 59-61). While these sources are publicly available, Jinko provides little to no explanation of the methodologies these reporting services use to compile air freight rates, and fails to identify any of the specific forwarders that underlie the rate datasets. *Id.* (citing Jinko Case Br. at 59-61). Lacking an understanding of the methods used to sample, select and compile the datasets, Commerce cannot validate the accuracy and applicability of the rate data from these sources or effectively corroborate the allegedly high quality, reliable nature of the proprietary IATA freight rates. *Id.*

Furthermore, there is a lack of transparency inherent to partially public data sets like that Jinko provided for IATA, which opens the door to potential manipulation. Were Commerce to accept such data, respondents would be able to cherry pick which data points to make public and which data points to keep proprietary, thereby ensuring only the most favorable data are made public on the record. Commerce correctly and reasonably excluded the IATA data from the air freight surrogate value calculation in its final results.   In fact, even Jinko recognized that Freightos data is reliable.  Even though Jinko argued that IATA data "affords the best quality and most reliable SV data" it provided that in its view, this was "followed by Freightos data." Jinko Redacted Case Br. at 55.

Again, Commerce reasonably determined that Freightos data was appropriate and the preferred dataset for Commerce's air freight surrogate value calculations, and Plaintiffs fail to demonstrate otherwise.  As detailed in D, Commerce is afforded significant discretion when selecting FOPs for surrogate values as well as its surrogate value calculation methodology.  *Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009); *Shandong Huarong*, 25 CIT at 840, 159 F. Supp. 2d at 721.  *Sigma Corp. v. United States*, 117 F.3d 1401, 1407-08 (Fed. Cir. 1997) (recognizing Commerce's discretion given that "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise").  Commerce gave multiple reasoned explanations for its determination, and therefore Commerce's determination must be upheld.

### D.    Commerce Lawfully Valued Respondents' Ocean Freight

Commerce determined the ocean freight FOPs based on data from two sources, Maersk and Descartes.  I&D Memo at 22.  Respondents raise three related challenges to this determination: Commerce's inclusion of the Maersk data, Jinko Br. at 34-36; Risen Br. at 25-26, Commerce's exclusion of other data, Jinko Br. at 36-37, and Commerce's averaging methodology, Risen Br. at 26-27.

Each of these arguments suffer from the same fatal flaw: Plaintiffs "invite this court to reweigh {the} evidence," yet, "this court may not do so").  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015); *see also Itochu Bldg. Prods., Co. v. United States*, 163 F. Supp. 3d 1330, 1333-34 (Ct. Int'l Trade 2016) (the court "may not reweigh the {record} evidence or substitute its own judgment for that of the agency" (citation omitted)).  Commerce has wide discretion in selecting and calculating FOPs.  *See Nation Ford Chem.*, 166 F.3d at 1377.  The court's role here is to "judge whether Commerce's selection was reasonable,"

not whether Commerce's choice was the "absolute best available." *Shandong Huarong*, 25 CIT at 839, 159 F. Supp. 2d at 720.  Commerce articulated a reasonable explanation for its decisions, and therefore the ocean freight determination must be upheld.

Plaintiffs erroneously present the Maersk data issue as a choice between the selection of Descartes data and Maersk data.  This mischaracterization implies that the questions before the Court are whether the Descartes data is both reliable and a better choice than the Maersk data. Yet Commerce agrees that the Descartes data is reliable and relevant to the ocean freight FOPs because Commerce included the Descartes data in the calculations.  I&D Memo at 22.  The actual question presented by Plaintiffs' challenge is whether Commerce's determination to also use the Maersk was so unreasonable as to render its determination unsupported by substantial evidence.

Commerce's decision was reasonable and should be upheld.  Commerce articulated several reasons that the Maersk data is appropriate to include in the final calculations:

- The Maersk data includes only shipments for electronic goods, which is sufficiently similar, if not identical, to charges for shipping solar products. I&D Memo at 23.

- The Maersk data is of comparable product specificity to the Descartes data, which contains shipping charges for electronic goods for most shipping routes.  I&D Memo at 23.

- The Maersk data provides specific data by port, which allowed Commerce to calculate specific ocean freight FOPs based on the actual ports used by the Plaintiffs. I&D Memo at 24-25.

- The Maersk data is detailed and has price breakouts, including charges for brokerage and handling.  This level of detail ensures Commerce avoids double counting certain charges. I&D Memo at 23.

- The Maersk data enables Commerce to confirm the prices do not include irrelevant shipments, such as shipments of hazardous materials or shipments in temperature-controlled containers.  I&D Memo at 23.

- Both the Descartes and Maersk data are based on estimates of freight charges during the POR.  I&D Memo at 24.[6]

Rather than challenging these reasonable findings, Plaintiffs simply argue the Descartes data is better.  For example, Jinko argues the Maersk data is inappropriate because it comes from a single shipper, and therefore does not provide broad coverage. Jinko Br. at 35.  This argument goes to the criteria in selecting the FOPs, which is a decision reserved to the discretion of Commerce.  Moreover, the Jinko fails to acknowledge the plain fact that its concern is remedied by the averaging of the Maersk data and Descartes data, which Commerce did.  The argument that Descartes data is marginally better than the Maersk data is a distraction and a question reserved for the discretion of Commerce.

Jinko also selectively cites cases where Commerce has not relied upon Maersk data.  *Id.* This line of argument collapses under scrutiny.  Jinko fails to acknowledge any of the preceding administrative reviews where Commerce did rely on Maersk data. *See* I&D Memo at 24 n.114. The fact that Commerce uses Maersk data in some reviews and not in others highlights that each administrative review stands on its own, and the determination is a fact-specific inquiry best left to the sound expertise of Commerce. *Ass'n of Am. Sch. Paper Suppliers v. United States*, 34 CIT 31, 37, 683 F. Supp. 2d 1317, 1323 (2010) ("This court has repeatedly held that judicial review must be based solely upon the administrative record made during the particular review proceeding which resulted in the determination subject to judicial review."); *see also Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ("each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the

---

[6]     Defendant-Intervenor also notes that the Maersk data is publicly available online, and therefore is distinguishable from price quotes "that can only be obtained through direct enquiry." Jinko Br. at 34 (citing *Chlorinated Isocyanurates from China*, 81 Fed. Reg. 1,167 (Dep't Commerce Jan. 11, 2016) (final results) and accompanying Issues and Decision Memorandum at cmt. 2).

same from period to period, there would be no need for administrative reviews."). Commerce's decision to include the Maersk data must be judged by the information on the record, and Commerce's reasoned explanation. The decision to include the Maersk data in the calculation is supported by multiple reasons, and therefore must stand.

Jinko argues in the alternative that Commerce's determination is not supported by substantial evidence because Commerce excluded other record data from the calculation of the ocean freight FOPs. Jinko Br. at 36-37. This challenge is nothing more than a request that the court reweigh the evidence and the criteria for selecting FOPs, which this court cannot do. *Itochu Bldg. Prods.*, 163 F. Supp. 3d at 1333-34. Moreover, as Commerce found, the other data lacked product specificity, which is the most important criteria of selecting a source of information as a FOP. I&D Memo at 22-23 (citing *Taian Ziyang Food Co.*, 35 CIT at 907, 783 F. Supp. 2d 1330) ("product specificity logically must be the primary consideration in determining best available information.") (internal quotations omitted). The other data has significantly less detail; it does not identify the material shipped, or whether the data include shipments of hazardous material or shipments in temperature-controlled containers. *Id.* at 23. Furthermore, the other data lacks a breakout of charges, such as brokerage and handling, such that Commerce cannot be sure of what is included in the price and whether certain expenses are double counted. *Id.* The remaining argument relying on determinations in other proceedings are irrelevant because each review stands on its own. *Shandong Huarong*, 29 CIT at 491. Commerce provided multiple reasons for not including the data, and its determination should be upheld.

Finally, Risen takes issue with Commerce's methodological decision regarding the averaging of the Maersk and Descartes data. To succeed, Risen must show that Commerce's

methodology is unreasonable; "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production." *Shandong Huarong*, 25 CIT at 840, 159 F. Supp. 2d at 721.  Risen does not argue that Commerce's methodology was unreasonable, but only that it is less accurate.  Risen Br. at 26.  Even if true, this allegation is facially insufficient for a remand.   Furthermore, Risen's request that Commerce aggregate all data together rather than calculate port-specific rates contravenes Commerce's preference for a more specific calculation.  I&D Memo at 25.

In short, Plaintiffs quibble with Commerce's selection of data and Commerce's calculation methodology, but fail to articulate how Commerce's determinations of the ocean freight FOPs were unreasonable. Given that "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise," *Sigma Corp.*, 117 F.3d at 1408, Commerce has the discretion to select both the sources of information for ocean freight and the methodology for calculating the surrogate value.  *Ca.fish Farmers cf Am.*, 33 CIT at 1273, 641 F. Supp. 2d at 1377; *Shandong Huarong*, 25 CIT at 840, 159 F. Supp. 2d at 721.  Commerce gave multiple reasoned explanations for its determination, and therefore, must be upheld.

### E.    Commerce Lawfully Calculated Surrogate Financial Ratios

To calculate the FOPs for overhead, selling and general and administrative expenses, and profit, Commerce relies on public information of identical or comparable merchandise in the surrogate country.  19 C.F.R. § 351.408(c)(4).  Commerce has a clear and established preference for producers of identical merchandise where available; only where producers of identical merchandise are not available does Commerce look to producers of comparable merchandise.

I&D Memo at 37-39; *see also Taian Ziyang Food Co.*, 35 CIT at 907, 783 F. Supp. 2d at 1330 (holding that "first among {the criteria to determine FOPs} must be product 'specificity'").

Commerce calculated the financial ratios for this review based on the financial statements of JA Solar Malaysia, a Malaysian manufacturer of solar cells and modules. I&D Memo at 37. As an initial matter, Jinko does not challenge whether the financial statements of JA Solar are appropriate for the financial ratios; Jinko only challenges the exclusion of Flextronics Shah Alam SDN, BHD ("Flextronics") financial statements from the calculations.  Jinko Br. at 37, 39; *see also* Jinko Redacted Case Brief at 71 (arguing Flextronics is an "equally suitable choice" as JA Solar).  Jinko's challenge is therefore a challenge to Commerce's methodology.  Jinko's challenge can only succeed if it can demonstrate that the exclusion of Flextronics' statements from the calculation was unreasonable. *Shandong Huarong*, 25 CIT at 840, 159 F. Supp. 2d at 721. ("Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was reasonable."). Jinko's challenge fails to meet this burden for four reasons:

*First*, Jinko's concedes that JA Solar's financial statements are a reasonable calculation methodology because Jinko's request is that Flextronics' financial data be averaged with JA Solar's financial data to calculate the financial ratios. Jinko Br. at 41. A foundational condition of Jinko's request is that the use of JA Solar's financial data is reasonable and appropriate. Where Commerce's valuation of FOPs is reasonable, the Court must affirm Commerce's determination.

*Second*, Jinko has not established that Flextronics is a producer of identical merchandise. This failure eliminates Flextronics' financial statements from consideration as a source of information for the financial ratios.  Flextronics' financial statements do not indicate that it

manufactures solar cells or solar modules.   Rather, it is "principally involved in the manufacturing of assembled printed circuit boards, contract manufacturing for electronic products and trading of electronic goods and related products."  Jinko SV Submission at Exhibit 11C, pp. 1, 13.  Jinko cannot point to any record evidence that Flextronics is a manufacturer of solar cells or solar modules, but the record is clear that JA Solar is a manufacturer of photovoltaic solar cells.  *Id.* at Exhibit 11A, p. 2.  On this basis alone, JA Solar's statements are clearly superior. As Commerce explained, Commerce prefers to use "financial statements from companies that produce identical merchandise over companies that produce comparable merchandise."  I&D Memo at 37.  This hierarchy has been upheld by this court.  *Taian Ziyang Food Co.*, 35 CIT at 907, 783 F. Supp. 2d at 1330; *see also Qingdao Sea-Line*, 766 F.3d at 1386 (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than other criteria).

Jinko argues that the "high cost to procure raw materials" is proof positive that Flextronics produced solar modules.  Jinko Br. at 38-39.  This is an unfounded assumption, and Jinko does not connect the incurred costs to solar modules in any meaningful way.   The Flextronics financial statements were inappropriate for use in calculating the financial ratios because its financial statements are devoid of any indication that Flextronics produced identical merchandise.  Therefore, the statements were inferior to JA Solar's statements, and Commerce's determination is reasonable and supported by substantial evidence.

*Third*, Jinko relies on extra-record evidence from the EU that it failed to put before Commerce in a timely manner.  *Id.* at 38. Jinko failed to exhaust its administrative remedies with regard to this evidence and argument.  Under this doctrine, a party may not raise an issue before the court when the party failed to raise the arguments before Commerce.  *Essar Steel*, 753 F.3d at

1374-75. A party fails to exhaust its administrative remedies where it fails to raise an issue before the agency at the appropriate time. *Mittal Steel Point*, 548 F.3d at 1384. The exhaustion requirement enables Commerce "to perform functions within its special competence — to make a factual record, to apply its expertise, and to correct its own errors," *Sandvik Steel Co.*, 164 F.3d at 600 (citing *Parisi v. Davidson*, 405 U.S. 34, 37 (1972)). This Court generally "takes a strict view" of the exhaustion requirement "before {Commerce} in trade cases." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) (citations and quotations omitted). Furthermore, "{s}imple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred <u>against objection made at the time appropriate under its practice</u>." *Mittal Steel Point*, 548 F.3d at 1383-84 (citing *L.A. Tucker Truck Lines*, 344 U.S. at 37).

Jinko attempted to rely on this extra-record evidence in its case brief to bolster its arguments regarding the appropriateness of Flextronics' financial statements as a basis for the financial ratios. Jinko Case Br. at 72-73. The information was appropriately rejected as untimely new factual information. Rejection of Case Brief. Factual information includes "statements of fact {and} documents." 19 C.F.R. § 351.102(b)(21). Commerce's regulations set deadlines for factual information. *Id.* § 351.301(c). Jinko did not comply with any of these deadlines, but rather attempted to slip the information into its case brief. Jinko Case Br. at 72-73. The Court should not consider the extra-record evidence because Jinko failed to place the evidence on the record at the appropriate time. Even if the Court did consider the extra-record evidence, Jinko has cited to no authority establishing that Commerce is bound to a factual determination by a foreign body.[7]

---

[7]     We also note that the claim that Commerce has a practice of accepting "information in the public realm" is unsupported by the cited federal register notice. Moreover, the claim is

*Fourth*, Jinko argues that Flextronics' statements are preferable because they contain more detail than JA Solar, but Jinko mischaracterizes Commerce's practice.  When selecting financial statements, Commerce looks for sufficient and usable detail, not the most detail.  The quote from Jinko's brief undermines its very argument:

> When we have two sets of financial statements – one with comparable products and <u>useable details</u> and another with identical and/or more comparable products but <u>lacking necessary details</u> – we find it reasonable for us to use the set of financial statements with comparable products and useable details.

Jinko Br. at 40 (quoting Issues and Decision Memorandum accompanying *Diamond Sawblades and Parts Thereof from the People's Republic of China*,79 Fed. Reg. 35,723 (Dep't Commerce June 24, 2014) (notice of court decision not in harmony with the final results of review and amdended final results of the antidumping duty admin. rev. 2011-2012) at cmt. 16) (emphasis added).  A closer look at the determination cited by Jinko demonstrates that Commerce explained its departure from its normal practice of preferring a producer of identical merchandise over a producer of comparable merchandise.  Commerce explained the departure was reasonable because the producer of identical merchandise did not have sufficiently detailed financial statements to calculate the ratios.  Here, the circumstances are different – the producer of identical merchandise has sufficiently detailed financial statements to calculate financial ratios, and thus Commerce could reasonably adhere to its normal practice.

In short, Commerce provided a reasonable explanation for its determination of selecting JA Solar, and Commerce's decision should be upheld.

---

incorrect because it conflicts with both the statute and regulations.  *See* 19 U.S.C. § 1516a(b)(2); 19 C.F.R. § 351.104.

### F.      Commerce Lawfully Valued Respondents' Backsheet and EVA Film Inputs

Risen argues that Commerce should have valued its backsheet "film" input based on Malaysian HTS number 3920.62.90 – an "other" category – as opposed to HTS number 3920.62.10 – which refers to plate and sheet. Risen Case Br. at 14-15; Risen Br. at 23-25.  Risen further argues that its EVA input is a film that should have been classified under Malaysian HTS number 3920.10.90 – also an "other" category – rather than HTS number 3920.10.19 – which refers to plates and sheets. Risen Br. at 25.   These arguments should be rejected, and Commerce's valuations for Risen's backsheet and EVA inputs should be upheld.

Risen asserts that the flexibility of both its backsheet and EVA materials define the inputs as film. *Id.* at 24.  Commerce, however, has repeatedly determined Risen's backsheet input to be best defined as sheet and appropriately classified under HTS number 3920.62.10. *See, e.g.*, AR6 Final Results at cmt. 9. For example, in sixth administrative review of the underlying order, Commerce explained that "backsheet serves to protect solar cells in a solar module," whereas "{f}ilm refers to a lighter, less rigid product than plates and sheets, and thus would not serve as a protective backsheet." *Id.* In the seventh administrative review, Commerce again explained why HTS number 3920.62.10 best captures Risen's backsheet, as follows:

> Risen purchased backsheets that consist of multiple layers of plastics that were joined together into a single item. Based on ASTM standards (indicating that plastic film is less than 0.25mm thick while plastic sheet is 0.25mm thick or thicker), and the thickness of Risen's backsheet (which has been treated as business proprietary information), we consider Risen's backsheet to be plastic sheet, not plastic film. Hence, we valued Risen's backsheet using import values under Malaysian HTS 3920.62.10 ("Polyethylene Terephthalate: plates and sheets").

AR7 Final Results at cmt. 14 (citations omitted).

Like backsheet, Commerce has repeatedly determined Risen's EVA input to be sheet material best classified under HTS number 3920.10.19. AR6 Final Results at cmt. 9; AR7 Final Results at cmt. 12.  In the seventh administrative review, Commerce explained:

> Risen's EVA input is between 0.5mm and 0.8mm thick. ASTM identifies plastic film as being no thicker than 0.25mm, while plastic sheet has a thickness of 0.25mm or more. Thus, Risen's EVA input would be considered sheet under ASTM standards. Because we find that Risen's EVA input is a sheet, we also find that Malaysia HTS 3920.10.19, ("Polymers of Ethylene, Plates and Sheets, other than Rigid") is more specific to the input because it is stated to consist of sheets and, thus, more appropriate to use in valuing the EVA input.

AR7 Final Results at cmt. 12 (citations omitted).

Commerce also has consistently disagreed that Risen's 3M backsheet specification is evidence of the "film" nature of its EVA input.  As Commerce noted in the seventh administrative review, the 3M specification sheet does not "directly address the difference between film and sheet," and "it is not clear whether the word 'film' was used because the products meet the precise definition of film or simply because a practice has developed in the industry over time to refer to all similar products as film." *Id.*  Risen provided no basis for Commerce to reverse it previous determinations, and therefore, the agency did not err when relying on HTS classifications 3920.62.10 and 3920.10.19 to value Risen's inputs.

## G.    Commerce Lawfully Deducted Section 301 Duties from U.S. Price

Commerce's determination to deduct Section 301 duties from U.S. price is supported by substantial evidence and is otherwise consistent with law, including very recent CIT precedent. Commerce is required by statute to deduct from U.S. price "the amount, if any, included in such price, attributable to any . . . United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A).  The purpose of this requirement is to help "ensure an 'apples {to} apples' comparison between merchandise sold in the home market

and the U.S. market by deducting costs associated with transporting merchandise to the United States." *Shanghai Tainai*, slip op. 23-132 (citing *Smith-Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983)).

Confusingly, Jinko claims that Commerce's common practice of deducting Section 301 duties from U.S. price is a "violation of the statutory directive <u>not</u> to deduct 'United States import duties' from U.S. prices," when in fact the statute mandates that United States import duties <u>should be</u> deducted. Jinko Br. at 42 (emphasis added). *See also* 19 U.S.C. § 1677a(c)(2)(A). Beyond misstating the law, Jinko's brief argues that Section 301 duties are not normal customs duties, but "special remedial duties" outside the scope of 19 U.S.C. § 1677a(c)(2)(A). Jinko Br. at 42-44. Jinko also argues that deducting Section 301 duties from U.S. prices constitutes double-counting. *Id.* at 44. Neither argument is persuasive.

First, Jinko's argument that Section 301 duties are "special duties" outside the scope of 19 U.S.C. § 1677a(c)(2)(A) is not novel; this exact argument has been thoroughly litigated, is consistently rejected by Commerce, and was recently rejected by this Court in an unrelated appeal. Commerce has routinely determined that Section 301 duties are distinguishable from certain "special duties" that the agency declines to deduct from U.S. prices. *See, e.g.*, Issues and Decision Memorandum accompanying *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China*, 87 Fed. Reg. 1,120 (Dep't Commerce Jan 10, 2022) (final results and partial recission of rev.; 2019-2020) at cmt. 7 ("*Tapered Roller Bearings from China* IDM"). In an appeal of one such determination, last week this Court upheld Commerce's decision to deduct Section 301 duties from U.S. price—in precisely the same manner the agency did in the proceeding underlying this appeal—over the appellant's objection

that the Section 301 duty was a "special duty" outside the ambit of 19 U.S.C. § 1677a(c)(2)(A). *See Shanghai Tainai*, slip op. 23-132 at 15-17.

In *Shanghai Tainai*, this Court reasoned that Section 301 duties are "United States import duties," and are therefore properly deducted from U.S. prices, for the very same reason the CAFC ruled earlier this year that Section 232 duties are "United States import duties" and are properly deductible. *See id.* Specifically, this Court noted that the CAFC affirmed Commerce's deduction of analogous Section 232 duties from U.S. price because the implementing Presidential Proclamation "makes clear that the {Section 232} duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty." *Id.* at 15 (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 34 (Fed. Cir. 2023)). In other words, not deducting the Section 232 duties would reduce the dumping margin by effectuating a greater U.S. price of the subject producer's merchandise. The CAFC found that this would violate the implementing instrument's requirement that the new Section 232 duties add rather than subtract from antidumping duties. *Id.* at 15-17.

This Court determined in *Shanghai Tainai* that, by virtue of the CAFC's reasoning in *Borusan Mannesmann v. United States*, the Notice of Action that enacted Section 301 duties demands the same response *i.e.*, deduction from U.S. price. *Id.* Specifically, this Court noted that the Notion of Action also refers to the Section 301 duty as an "additional duty" and, in fact, directly instructs that the duty "apply in addition to all other applicable duties." *Id.* at 16 (citing *Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018)). Jinko attempted to distinguish this case, but completely misses the crux of the CAFC's opinion. Jinko Br. at 44. Jinko argues that the decision is inapplicable because the Section 232 duties concern national security. *Id.* Jinko fails to acknowledge that the CAFC's opinion centered on

the court's interpretation of the duty's enacting legal text and not on the court's assessment of the nature of the duty itself.

Importantly, in *Shanghai Tainai* this Court found on the basis of the "text of the legal order levying duties" alone that Section 301 duties are deductible from U.S. price and that arguments concerning other factors for determining what constitutes a "special duty" are moot. *Shanghai Tainai*, slip op. 23-132 at 17. To be clear, the exact same legal order enacting the Section 301 duties is at issue here, and the same conclusion is warranted. Jinko argues that this Court should engage in a robust analysis of whether the Section 301 duties are special or not, pursuant to the CAFC's decision in *Wheatland Tube Co. v. United States*. Jinko Br. at 41-44. But as this Court found in *Shanghai Tainai*, that analysis is unnecessary. "*Borusan* instructs that it is the text of the legal order levying duties that is paramount; and it is unnecessary for a reviewing court to apply the Wheatland Tube factors where that text has spoken clearly." *Shanghai Tainai*, slip op. 23-132 at 17. The text of implementing legal order is clear: Section 301 duties are meant to impose an additional burden and are not designed to offset antidumping duties. The only way to accomplish that clear intent is to deduct Section 301 duties from U.S. price when calculating a dumping margin.

Alternatively, if this Court decided to abandon precedent and conduct a full analysis of Section 301 duties to determine whether they qualify as "special duties" outside the scope of 19 U.S.C. § 1677a(c)(2)(A), the outcome would be the same. Section 301 duties are not "special duties" within the meaning of Commerce's established practice, as demonstrated above, and they fail the CAFC's four-factor *Wheatland Tube* test that Jinko argues should be applied to determine whether Section 301 duties are normal duties or special remedial duties. In *Wheatland Tube Co. v. United States*, the CAFC devised three factors for helping to determine whether

duties are non-deductible special duties: whether the duties are remedial, whether they are imposed as a result of a finding of injury to the U.S., and whether the duties provide only temporary relief. 495 F.3d 1355 (Fed. Cir. 2007).

Section 301 duties were implemented pursuant to concerns that certain acts, policies, and practices of the Government of China are unreasonable or discriminatory and burden or restrict U.S. commerce; they were not implemented to protect a particular injured U.S. enterprise or industry, like antidumping or Section 201 safeguard duties.  Furthermore, unlike antidumping duties or the Section 201 duties examined by the court in *Wheatland Tube*, Section 301 duties are indefinite – they have no automatic termination provision. *Wheatland Tube*, 495 F.3d at 1362-64. Thus, in cases like *Xanthan Gum from China*, Commerce explained that Section 301 duties meet the definition of normal duties and, like normal duties, are correctly deducted from U.S. prices under section 772(c)(2)(A) of the Act. Issues and Decision Memorandum accompanying *Xanthan Gum from China the People's Republic of China*, 86 Fed. Reg. 16,189 (Dep't Commerce Mar. 26, 2021) (final results of antidumping duty admin. rev.; 2018-2019 at cmt. 3. Commerce, recently clearly articulated the rational underlying its position in *Tapered Roller Bearings from China*:

> We disagree with Tainai that Section 301 duties constitute "special duties" and are not considered normal U.S. import duties. Therefore, in the *Preliminary Results*, we properly deducted them from U.S. price, pursuant to section 772(c)(2)(A) of the Act, in calculating Tainai's weighted-average dumping margin. Section 301 duties are imposed without a termination provision. These duties are imposed to address a variety of unfair trading acts, policies, and practices of U.S. trading partners. As explained in *Wheatland Tube*, special dumping duties are intended to provide temporary relief, while normal U.S. customs duties have no termination provision and are indefinite. Section 301 duties have no specified termination provision. Therefore, because they are indefinite, Section 301 duties meet the definition of normal U.S. import duties under section 772(c)(2)(A) of the Act. Additionally, as a factual matter, Section 301 duties were imposed during the POR and, pursuant to the Act, Commerce considers these normal U.S. import duties in its dumping margin calculations.

> Pursuant to section 772(c)(2)(A) of the Act, "{U.S. price} shall be reduced by the amount, if any, included in such price, attributable to any . . . United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." Section 301 duties are United States import duties; thus, where applicable, Commerce shall reduce the U.S. sale price by the amount of Section 301 duties.

*Tapered Roller Bearings from China* IDM at cmt. 7 (internal citations omitted).

Jinko's second argument, that deducting Section 301 duties would result in double counting, is easily dispensed. For reasons discussed above and described in detail in this Court's opinion in *Shanghai Tainai*, Section 301 duties were purposefully designed to impose an additional burden. As this Court explained in *Shanghai Tainai*,

> {t}he instrument that {enacted the Section 301 duties}, the Notice of Action Pursuant to Section 301, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018), also refers to the Section 301 duty as an "additional duty." *Id.* at 40,824. Indeed, the Notice of Action contains even stronger language than the Notice of Determination {for Section 232 duties}, providing that "{p}roducts of China that are provided for in new HTSUS heading 9903.88.02, as established by Annex A of this notice . . . will be subject to an additional ad valorem duty of 25 percent. The rates of duty applicable to products of China that are provided for in new HTSUS heading 9903.88.2 apply in addition to all other applicable duties, fees, exactions, and charges."

*Shanghai Tainai*, slip op. 23-132 at 16. Thus, the layering of Section 301 duties on top of other applicable duties, including antidumping duties, is a feature and not a bug of the Section 301 enacting legal text.

In conclusion, both persuasive precedent from this Court and binding precedent from the CAFC support Commerce's determination below that Section 301 duties should be deducted from U.S. price pursuant to 19 U.S.C. § 1677a(c)(2)(A). Thus, for the reasons highlighted above, this Court should find that Commerce's decision to deduct Section 301 duties from U.S. price is supported by substantial evidence and is otherwise in accordance with law.

**H.**   **Commerce Lawfully Applied Adverse Facts Available to Fill the Gaps in the Record from Risen's Failure to Report Certain Factors of Production**

**1.**   **Commerce's Decision to Apply Adverse Facts Available Was Supported by Substantial Evidence and Otherwise Lawful**

Risen argues that Commerce's application of facts available with adverse inferences was unsupported by the record and contrary to court precedent.  Risen Br. at 27-31.  To the contrary, Commerce acted within its discretion in applying AFA, as Risen and its suppliers have consistently failed to supply the agency with requested information in many reviews, and the Court should uphold the agency's application of AFA.

Where information necessary to calculate a respondent's dumping margin is not available on the record, Commerce uses "facts otherwise available" in place of the missing information. *See* 19 U.S.C. § 1677e(a)(2).  If Commerce further "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may apply "an inference that is adverse to the interests of that party in selecting among the facts otherwise available{.}" *Id.* § 1677e(b)(1).  In *Nippon Steel Corp. v. United States*, the CAFC held that the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.  337 F. 3d 1373, 1382-83 (Fed. Cir. 2003).

As in at least three prior administrative reviews of the Solar proceeding, in the underlying review, Risen's unaffiliated suppliers of solar cells and modules again failed to report their FOPs, which are required for Commerce to accurate value those FOPs and calculate Risen's dumping margin.  I&D Memo at cmt. 1.  *See also* AR6 Final Results at cmt. 1; Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Commerce July 30, 2019) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2016-2017) at cmt. 1; Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016) at cmt. 1; AR3 Final Results at cmt. 1; AR2 Final Results at cmt. 19.  Because of this reporting failure, the underlying record was "missing FOP data . . . for [     ] percent of the solar cells that were used in the solar modules that Risen produced during the {POR} and [     ] percent of the solar modules that Risen produced during the POR."  Preliminary Results Analysis Memorandum - Risen (Dec. 16, 2021), P.R. 398, C.R. 462-469 at 3 (citing Risen DQR at Exhibits D-25 and D-26).

As a result, Commerce found that Risen's unaffiliated suppliers – interested parties in the proceeding – "did not act to the best of their abilities because they failed to respond to Commerce's multiple requests for FOP information."  I&D Memo at cmt. 1.  In addition, Commerce found that Risen itself also "failed to cooperate by not acting to the best of its ability because it failed to do the maximum that it is able to do to obtain FOP data from its unaffiliated solar cell and solar module producers."  *Id.*  As such, Commerce applied AFA in valuing the missing FOPs.

Risen argues that the agency's application of AFA was inappropriate, in part because it shows that Commerce "fails to understand the market."  Risen claims that it "does not have a position in the solar industry to be able to control or influence its unaffiliated suppliers to force their cooperation."  Risen Br. at 28.  But Commerce analyzed this issue at length in the underlying review and, as the finder of fact, reasonably concluded otherwise.  Given the extent of its business with the relevant suppliers and Risen's position in the market overall, it is

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

reasonable to conclude that Risen is in a position to exercise leverage over its suppliers to induce

them to cooperate.  Indeed, by virtue of its selection as a mandatory respondent in the underlying

review and multiple prior reviews in this proceeding, it is clear that Risen is one of the largest

solar producers in China, if not the world.  Yet, as Commerce explained:

> Risen neither secured agreement from potential producers that they would
> cooperate with Commerce's informational requests in AD proceedings before it
> agreed to conduct business with them, nor made starting to do business with them
> contingent upon the potential producers' cooperation in any manner.  Even if
> Risen does not control its producers, given its history as a respondent in this
> proceeding and its past inability to secure FOP information from its producers of
> solar cells and solar modules after the fact, or when the administrative review is
> underway, we believe that taking steps to preemptively avoid non-cooperation of
> producers is within the realm of actions it should have taken to demonstrate that it
> put forth its maximum effort to comply with its reporting responsibility.

I&D Memo at cmt. 1.

Commerce's decision in the underlying review was all the more reasonable given the

history of this proceeding.  Commerce has applied partial AFA to suppliers' missing FOP data

since the second administrative review of this proceeding. The underlying review was the <u>eighth</u>

administrative review.  Risen has been active in reviews since the original investigation; indeed,

it was a separate rate or mandatory respondent in five reviews preceding the eighth review,

including being a mandatory respondent in three of those reviews.  *See, e.g.*, AR6 Final Results

at cmt. 1.  There is no doubt Risen was aware of the importance of its suppliers' FOPs, and it

"could have communicated this importance to their suppliers and made their purchases

contingent on cooperation should the FOPs be required for reporting to Commerce."  *Id.*  While

Risen provided correspondence that indicates it [


].  *See, e.g.*, Alliance Pre-Preliminary Submission at 37-38.

While Risen claims that, "in instances where it was possible to stop purchasing from certain

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

uncooperative unaffiliated suppliers of cells and modules, Risen stopped purchasing from them," Risen. Br. at 29, it failed to establish that on the record.  Risen simply provided information on [

].  *See* Risen Supp. Questionnaire Response (June 21, 2021), P.R. 179, C.R. 294-296 at 17.  Risen did not establish, or even claim, that those [

].

Risen further argues that prior CIT decisions have held that Commerce cannot employ AFA "where the rate would affect only the cooperating party."  Risen Br. at 30 (citing *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019)).   But in the underlying review, Risen was not a "cooperating party."  As outlined above, Commerce properly found that Risen itself did not do the "maximum it was able to do" to induce compliance from its suppliers and thus that it failed to fully cooperate.  *See* I&D Memo at cmt. 1.  Moreover, even if the cited case law was applicable, it is untrue that the AFA rate here affects only Risen.  The application of AFA serves to mitigate the possibility of respondents' solar cell and module suppliers evading the antidumping rates that would apply to their own exports of subject merchandise by selling their goods through Risen, with a lower rate.  In this way, the partial AFA has a direct impact on the non-cooperating suppliers and works to induce the unaffiliated supplier's cooperation.  Indeed, this is Commerce's only statutory means by which it ensures its ability to obtain more accurate information from Risen's and other respondents' uncooperative suppliers in the future.

Risen also cites *Risen Energy Co. v. United States*, 477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020), an appeal of the fifth administrative review of the Solar antidumping duty order.  Risen

Br. at 31.  The facts of that review are distinguishable from those in the current review.  In the fifth review, Commerce found that only Risen's suppliers had failed to cooperate, and its application of AFA was thus grounded in the CAFC's decision in *Mueller Commercial de Mexico, S. De R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014), holding that, under certain circumstances, Commerce may incorporate an adverse inference under § 1677e(a) in calculating even a cooperative respondent's margin when another interested party has failed to cooperate, if doing so will yield an accurate rate, promote cooperation, and thwart duty evasion. *See Mueller*, 753 F.3d at 1232-36.  As such, much of the Court's analysis in *Risen Energy* focused on interpreting *Mueller* and the policy considerations outlined therein.  *See Risen Energy*, 477 F. Supp. 3d at 1342-43.

Given the history of this proceeding, and Risen's extensive involvement in it, Risen undoubtedly understood that, as a mandatory respondent, it was responsible to take the steps necessary to ensure compliance with Commerce's information requests.  Risen was in a position to take a proactive approach to its cell suppliers' ability and willingness to provide required information.  The company understood the reporting requirements, and by choosing to continue to do business with suppliers that would not cooperate, Risen failed to cooperate to the best of its ability in responding to Commerce's requests for information.

By applying partial AFA to the transaction between Risen and its uncooperative suppliers, Commerce appropriately makes the transaction less attractive for Risen and incentivizes the respondent to source from and conduct business with cooperative suppliers.  Risen's uncooperative suppliers, in turn, are affected by their own failure to provide the necessary FOP data.  Accordingly, in light of the record evidence, and consistent with past

practice, Commerce properly applied partial AFA to Risen's missing FOPs, and the Court should uphold Commerce's determination.

### 2. Commerce Employed a Lawful Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs

In addition to erring by deciding to apply AFA to its unreported FOPs, Risen argues that Commerce further erred in <u>how</u> it applied AFA. Rather than utilizing the input-specific highest consumption amount, Commerce calculated average ratios of the reported consumption quantities to the highest consumption quantities for three separate groups of inputs (all solar module FOPs, all solar cell FOPs, and all packing FOPs). It then multiplied the reported per-unit consumption quantity of each solar module FOP, each solar cell FOP, and each packing FOP, by the relevant average adjustment ratio to increase the reported quantities, as AFA. *See* I&D Memo at cmt. 2.

Commerce used this alternative methodology because its prior method would not have increased Risen's dumping margin. *See id.* To the extent that a certain AFA methodology would not impact a respondent's margin, the "AFA" would fail to incentivize or induce cooperation by the respondent or its uncooperative suppliers. In other words, the AFA would be nullified, with no adverse impact whatsoever. Legislative history explains that Commerce's ability to apply AFA allows it "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. Put differently, "{t}he purpose of the adverse facts statute is to provide respondents with an incentive to cooperate with Commerce's investigation." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017). With no actual adverse impact, there is no incentive to cooperate. Thus, Commerce reasonably developed an

alternative calculation methodology that was sufficiently adverse to have an impact.  *See* I&D Memo at cmt. 2.

Risen claims that Commerce's methodology was flawed because it resulted in "an overstated AFA rate that exceeds the total AFA for each input if the highest FOP for each input was used."  Risen Br. at 33.  But that is the entire point.  As explained above, Commerce utilized a methodology that would <u>have</u> an adverse impact, unlike the highest-FOP per input methodology, which may have been appropriate based on prior factual records but was not here. Risen's claim does not show that Commerce's methodology was flawed, only that it was different.

The statute grants Commerce a significant amount of discretion in choosing among information to use to apply AFA.  19 U.S.C. § 1677e(b); *see also* Sec. 502 of the Trade Preferences Extension Act of 2015, P.L. 114-27, 129 Stat. 362, 383-84 (June 29, 2015).  Indeed, the statute states that "{a}n adverse inference under paragraph (1)(A) may include reliance on information derived from . . . any other information placed on the record."  19 U.S.C. § 1677e(b)(2).  Commerce appropriately exercised its discretion in the underlying review to select information on which to base its AFA rate that would result in an actual adverse impact and effectuate the statutory intent of applying AFA, and the Court should uphold Commerce's exercise of that discretion.

## I.      Commerce Lawfully Denied Trina a Separate Rate

In certain circumstances, Commerce treats affiliated companies as a single entity when determining antidumping duty margins.  19 C.F.R. § 351.401(f).  In the review on appeal, Commerce treated Trina Solar Co., Ltd. and seven of its affiliates as a single entity, as in prior reviews. *See, e.g.*, PDM at 13; AR7 Final Results; AR6 Final Results.

In proceedings involving non-market economies like China, Commerce applies a rebuttable presumption that all companies in the subject country are part of a government-controlled, "country-wide" entity. *See, e.g.*, *Sigma Corp.*, 117 F.3d at 1405. To overcome this presumption, companies must provide certain data regarding their operations. For companies that were found independent of government control in prior segments of a proceeding, this information takes the form of a "separate rate certification" or "SRC." *See, e.g.*, Enforcement & Compliance, U.S. Dep't of Commerce, Separate Rate Certification for Firms Previously Awarded Separate Rate Status, https://enforcement.trade.gov/nme/sep-rate-files/cert-20150323/prc-sr-cert-20150323.pdf (last accessed September 18, 2023).

Commerce's initiation notice for the 2019-2020 review identified all eight companies previously found to comprise the Trina entity as subject to the review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166, 8,167 (Dep't Commerce Feb. 4, 2021) ("*Initiation Notice*"). In initiating the review, Commerce set a deadline of March 6, 2021 for SRCs. *Id.* Commerce also explained its regulations regarding requests for extension of time. *Id.* at 8,176.

Pursuant to a timely extension request, Commerce extended the deadline for SRCs to March 15, 2021. Request for Extension of Time to Submit Separate Rate Applications (Feb. 25, 2021), P.R. 52. Two Trina affiliates filed SRCs by the extended deadline; the remaining affiliates represented that they did not export during the review period. Trina's Separate Rate Certification (Mar. 15, 2021), P.R. 89, C.R. 14; Trina's Notice of No Sales (Mar. 5, 2021), P.R. 75. Commerce subsequently requested SRC data for these affiliates, setting a deadline of July 6, 2021 for this information. Supplemental Questionnaire (June 28, 2021), P.R. 183.

Trina did not respond until August 24, 2021, nine days before the then-scheduled preliminary results; it explained that its counsel overlooked the questionnaire and requested that its late response be accepted. Separate Rate Certifications for Non-Exporting Trina Companies (Aug. 24, 2021), P.R. 357, C.R. 441-443; Request to Accept Separate Rate Certifications and for Extension of Time to Respond to June 28th Supplemental Questionnaire (Aug. 24, 2021), P.R. 357.[8] Commerce refused this request pursuant to regulations stating that it will reject untimely information, and accept post-deadline extension requests only where the requestor demonstrates that an "extraordinary circumstance" prevented a pre-deadline request. Letter to Trina Solar Co., Ltd from Howard Smith, Program Manager, AD/CVD Operations, Office IV (Dec. 17, 2021), P.R. 397; 19 C.F.R. §§ 351.302(c) & (d). Ultimately, Commerce treated the Trina single entity as government-controlled because it did not provide timely SRCs for all entity members. PDM at 13; I&D Memo at 63-72.

Trina argues that Commerce abused its discretion in refusing to accept the late supplemental SRC submission. Trina Br. at 18-36. Trina further argues that, even if Commerce did not abuse its discretion, it applied an improper standard in rejecting the late-filed SRCs. *Id.* at 37-46. Finally, it argues that the rejection was unsupported by substantial evidence. *Id.* at 46-53.[9] As explained below, Trina's claims are not compelling.

Trina argues that Commerce abused its discretion in refusing to consider the late-filed supplemental SRC submission. *See id.* at 18-36. But Trina did not timely request extension of the

---

[8]     Trina renewed its request for acceptance of the late-filed SRCs after Commerce extended the preliminary results. *See, e.g.*, Renewed Request to Accept Separate Rate Certifications (Sept. 14, 2021), P.R. 368.

[9]     Trina additionally argues that if Commerce both grants Trina a separate rate and recalculates the rate, the recalculated rate must be applied to Trina. Trina Br. at 53-55. The Alliance does not contest that, if Trina obtains a separate rate on remand but that rate also is changed on remand, Trina should be assigned the updated separate rate.

deadline, and its only justification for retroactive extension was its counsel's failure to notice the questionnaire. This failure is not an "extraordinary circumstance," *i.e.*, an "unexpected event" that "could not have been prevented if reasonable measures had been taken." 19 C.F.R. § 351.302(c); *see also Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't Commerce Sept. 20, 2013) (final rule) ("*Preamble*") (identifying "a natural disaster, riot, war, force majeure, or medical emergency" as examples of extraordinary circumstances, while explaining that "inattentiveness" would not normally be considered such a circumstance).

Trina claims that Commerce could not reasonably apply 19 C.F.R. §§ 351.302(c) & (d) here, because considering the late-filed SRCs would have avoided negative impacts for Trina while increasing accuracy, without causing any meaningful burden or delay. Trina Br. at 21-29. The courts have affirmed Commerce's enforcement of 19 C.F.R. §§ 351.302(c) & (d) in the face of similar arguments. For example, this court affirmed Commerce's rejection of late-filed data despite the palpably negative impact for the submitter, where the submitter failed to demonstrate that extraordinary circumstances prevented a timely extension request. *Trinity Mfg. Inc. v. United States*, 549 F. Supp. 3d 1370 (Ct Int'l Trade 2021) (affirming revocation of antidumping duty order after domestic interested party failed to timely file substantive response to initiation of sunset review). And in a situation reminiscent of that here, the CAFC affirmed Commerce's rejection of late-filed supplemental data relevant to separate rate status, and subsequent treatment of the submitter as part of the China-wide entity. *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343.

Trina argues that *Dongtai Peak Honey* is inapposite because it arose under a prior regulation regarding untimely filings, which incorporated a "good cause" standard rather than the present "extraordinary circumstance" standard. Trina Br. at 30. But the "good cause" standard

was in fact more favorable to late filers. *Preamble*, 78 Fed. Reg. at 57,793 (stating that the "extraordinary circumstance" standard requires more than "good cause.") Given that the CAFC approved Commerce's rejection of late-filed separate rate information even where the standard for accepting such data was more lenient, *Dongtai Peak Honey* supports Commerce's treatment of Trina.

Trina also argues that, distinctly from the proceeding underlying *Dongtai Peak Honey*, Commerce here failed to appropriately consider the overall circumstances of Trina's participation in the review. Trina Br. at 33-36. But Commerce explained that it had previously included eight affiliated companies within the single, collapsed Trina entity. I&D Memo at 67. Trina was aware of the agency's prior treatment based on its participation in past segments of the proceeding; it was also on notice that the 2019-2020 review covered all eight affiliates, as they were named in the *Federal Register* notice of the review's initiation. And although Trina argues that its counsel believed in good faith that SRCs were required only for the two affiliates with exports during the review period, Trina Br. at 34-35, Commerce explained that it could not conclude that the collapsed entity was free from government control based on data concerning only two entity members. I&D Memo at 70-71. Moreover, Commerce's supplemental questionnaire both clarified that it required SRCs for all entity members and gave Trina another chance to provide them. Trina filed its response to this supplemental opportunity seven weeks late, for no better reason than its counsel's failure to implement sufficient calendaring measures. Trina Br. at 35 n.6.

These factors all support Commerce's rejection of Trina's late submission; they also indicate why Trina's reliance on *Grobest & I-Mei Indus. (Vietnam) Co. v. United States* is unavailing. Trina Br. at 20-21, 28-29, 34. There, the court rejected Commerce's refusal to accept

an SRC filed 95 days beyond the deadline set in Commerce's initiation notice. *See Grobest*, 36 CIT at 122, 815 F. Supp.2d at 1365; *see also Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China*, 74 Fed. Reg. 13,178 (Dep't Commerce Mar. 26, 2009) (notice of initiation of admin. revs. and requests for revocation, in part, of the antidumping duty orders). As an initial matter, *Grobest* was issued before Commerce's 2013 amendment of its regulations to expressly address late-filed extension requests, and subject them to the "extraordinary circumstance" standard. And while *Grobest* involved a company that evidently failed to notice the *Federal Register* publication of a review's initiation, Trina's counsel was expressly notified of the supplemental questionnaire. Trina Br. at 35. Even so, Trina responded seven weeks after the deadline, nine days prior to the then-scheduled preliminary results, and more than 160 days after March 15.

Trina argues that because it had never previously been found government controlled, applying the China-wide rate to it here was unfairly punitive. Trina Br. at 32-33. But as Commerce explained in its initiation notice, "all firms" listed in the notice "that wish to qualify for separate rate status in the administrative review { } must complete" an SRC. *Initiation Notice*, 86 Fed. Reg. at 8,167. Eight Trina firms were listed in the notice. *Id.* at 8,168. In requiring all eight to provide SRCs, Commerce treated Trina's members no differently than any other firm subject to the review. Moreover, reasonably Commerce explained that it could not conclude that the full, collapsed group was free from government control during the review period based on information concerning only two members. I&D Memo at 70-71.

Trina next raises a quasi-facial challenge to 19 C.F.R. § 351.302(c), arguing that the "extraordinary circumstance" standard is arbitrary and capricious where parties demonstrate that they were unaware of a deadline, or were not mandatory respondents. Trina Br. at 37-46; *see*

*also Parkdale Int'l, Ltd. v. United States*, 31 CIT 1229, 1236 n.5, 508 F. Supp. 2d 1338, 1347 n.5 (Ct Int'l Trade 2007) (stating that a facial challenge "must establish that no set of circumstances exists under which the regulation would be valid.") But Trina's arguments only demonstrate that the regulation is facially reasonable, providing a single, easily understandable standard for untimely extension requests. And as Trina itself concedes, that standard has been applied uniformly and impartially since it was adopted ten years ago. Trina Br. at 44-45.

Moreover, Trina here had notice of the deadline for its supplemental SRC submission. Commerce's supplemental questionnaire was a public document, posted to the agency's docket for the 2019-2020 review. *See* Supplemental Questionnaire. Trina's counsel also received an email "digest" on the day that the questionnaire was issued, advising counsel of new docket entries in the cases in which counsel had entered an appearance, including the supplemental questionnaire. Trina Br. at 35. Just as a company that has previously participated in administrative reviews "has a continuing obligation to monitor the Federal Register for actions that affect its interests," Trina (through its counsel) had a continuing obligation to monitor the docket of the proceeding, and to read Commerce's docket notifications in the review. *Suntec Indus Co. v. United States*, 951 F. Supp. 2d 1341, 1351 (Ct Int'l Trade 2013); *see also Suntec Indus. Co. v. United States*, No. 13-00157, slip op. 16-40 (Ct. Int'l Trade Apr. 21, 2016) (finding that an exporter received constructive notice of the deadline for filing SRCs through *Federal Register* publication of an initiation notice). Having received notice of the questionnaire, Trina is not the kind of "unaware" party as to which it argues that 19 C.F.R. § 351.302(c) is unreasonable.

Nor can Trina plausibly argue that 19 C.F.R. § 351.302(c) is facially unreasonable as to all non-mandatory respondents. While Commerce typically requires much less information from

non-mandatory respondents than from mandatory respondents, this is not the same as no information. Nor can it be assumed that Commerce's review of such information is so "perfunctory" that adherence to the "extraordinary cause" standard for late-filed submissions is unreasonable. *Grobest*, 36 CIT at 124, 815 F. Supp. 2d at 1367. Indeed, Commerce's review of Trina's initial SRC data here resulted in a supplemental questionnaire.

Trina goes on to argue that application of the China-wide rate was unsupported by substantial evidence, because the March 15, 2021 SRCs filed by two members of the Trina entity confirmed the full entity's continued eligibility for a separate rate. Trina Br. at 46-53. Trina argues that Commerce's separate rates analysis focuses on export activities; because only the two Trina affiliates that timely filed SRCs had exports during the POR, Trina reasons that SRCs from the remaining entity members were superfluous. *Id.* Trina further argues that Commerce has previously granted a collapsed entity a separate rate despite the lack of SRCs from non-exporting members, and avers that no manipulation could result by reason of continuing to grant the entire Trina entity a separate rate. *Id.*

Trina fails to understand the purposes behind Commerce's separate rate and affiliation/collapsing policies. In its separate rate analysis, Commerce must confirm that companies are free to make their own production and pricing decisions regarding sales of subject goods to the United States. In its collapsing analysis, Commerce must ensure that affiliates' control over one another's operations does not permit them to switch production or exports amongst each other, thus manipulating the margin calculations and funneling future exports through the affiliate with the lowest margin. The two analyses are similar, in that they are meant to ensure that margins reflect, and are applied to, the entire entity whose production and pricing decisions are under review.

As such, it is reasonable for Commerce to require all members of a collapsed entity to demonstrate their independence from government control in order for any entity member to receive a separate rate. *See, e.g.*, I&D Memo at 70-71. Otherwise, a non-exporting member that was government-controlled (or became so controlled) could take advantage of an exporting member's margin to funnel exports at government-set prices. *See, e.g.*, *id.* And here, while various Trina affiliates did not export subject goods during the review period, Commerce has previously found that all eight Trina members have "production facilities" for subject goods or similar goods. *See* PDM at 6.

While Trina argues that Commerce has previously accorded a separate rate to collapsed entities despite lacking SRCs for all entity members, it points only to the cover letter for an SRC filed for a different group of companies in a prior review. Trina Br. at 49-50. Even if this document established that Commerce granted that group a separate rate despite lacking SRCs for non-exporting group members, it does not establish the reasonableness of such treatment, or that a practice of granting such treatment exists. Here, Commerce's treatment of Trina makes sense given the underlying aims of both the separate rate and collapsing policies; it is also consistent with other situations in which Commerce has denied separate rate status to a group based on lacking relevant information for member affiliates. *See, e.g.*, Issues and Decision Memorandum accompanying *Aluminum Extrusions From the People's Republic of China*, 79 Fed. Reg. 96 (Dep't Commerce Jan. 2, 2014) (final results admin. review and rescission in part; 2010-2012) at cmt. 6; Issues and Decision Memorandum accompanying *Uncovered Innerspring Units From the People's Republic of China*, 78 Fed. Reg. 17,635, 17,636 (Dep't Commerce Mar. 22, 2013) (final results of antidumping duty admin. rev.; 2011-2012) at cmt 1.

Consol. Ct. No. 22-00219                                   NON-CONFIDENTIAL VERSION

IV.   **CONCLUSION**

For the reasons detailed above, the Alliance respectfully submits that this Court should affirm in full the final results of Commerce's eighth administrative review of the Solar I antidumping duty order.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the American Alliance for Solar Manufacturing*

Dated: September 18, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the American Alliance for Solar Manufacturing's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 22,729 words.

<u>*/s/ Timothy C. Brightbill*</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>American Alliance for Solar Manufacturing</u>
(Representative Of)

<u>September 18, 2023</u>
(Date)