UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO. LTD., ET AL.,<br>Consolidated Plaintiff,<br><br>and<br><br>RISEN ENERGY CO., LTD.,<br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>Defendant,<br><br>and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,<br>Defendant-Intervenor. | Consol. Court No. 22-00219 |

**CONSOLIDATED PLAINTIFF'S REPLY BRIEF**

Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 1101
1156 15th St., N.W. 20005
Tel: (202) 783-6900
email: gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*

Dated: November 13, 2023

## TABLE OF CONTENTS


**I. The Department's Glass Surrogate Value Is Not Supported by Substantial Evidence ... 1**

**II. The Department's surrogate value HTS classification for Backsheet and EVA film inputs is Not Supported by Substantial Evidence ... 6**

**III. The Department's Ocean Freight Surrogate Value is Not Supported by Substantial Evidence ... 10**

**IV. The Department's Application of Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Substantial Court Precedent ... 11**

**V. The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law ... 13**

**VI. Conclusion and Prayer for Relief ... 15**

## TABLE OF AUTHORITIES

### CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316 (Fed. Cir. 2010) .............10

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) .......................................................9

*Clearon Corporation and Occidental Chemical Corp. v. United States*, Slip Op. 13-22, at 12-14 (CIT 2013) ....................................................................................................................5

*Coal. For Fair Trade in Hardwood Plywood v. United States*, 2022 Ct. Intl. Trade LEXIS 153..................................................................................................................... 1-2

*Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ........................................................................................................................1

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016)...............................................................................................1

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) .................. 12-14

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)........................10

*Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020) .................. 11-13

### STATUTES & REGULATIONS

19 U.S.C. § 1677b(c)(1)(B) ..................................................................................................... 9-11

19 C.F.R. 315.408(c)........................................................................................................................6

### ADMINISTRATIVE DECISIONS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) ..................................................................................................................4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind, in Part: 2018*, 86 Fed. Reg. 21691, 21692 (April 23, 2021)...........2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021).........2

*Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013).......................................5

**OTHER AUTHORITIES**

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996) .......................................................................................................................6

Consolidated Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files its reply brief to Defendant United States' and Alliance's response briefs. *See* U.S. Br. (September 18, 2023); ECF 51; Alliance Br. (September 18, 2023); ECF 52.

## I. The Department's Determination to Rely Upon the Romanian Glass Value is Not Supported by Substantial Evidence.

In the Final Results, the Department relied upon Malaysia as the primary surrogate country. However, the Department relied on a Romanian value for glass. The United States properly stated that the Department has a preference—indeed a regulatory preference upheld by the Court's—to value all surrogate values from a single surrogate country unless the data is unavailable or unreliable for a particular input. U.S. Br. at 15. However, the United States then failed to justify how the Malaysian glass value was unreliable as to justify departure from the primary surrogate country.

Ultimately, the Department's decision, as also reiterated by the United States in its brief, to depart from the primary surrogate country is its understanding that the Malaysian surrogate value was less reliable because it was reported in square meters. First, being potentially *less* reliable is not the standard the Department itself applies when determining whether to depart from the primary surrogate country, the standard is if the surrogate value is actually unreliable. *Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ("A reasonable mind could likewise conclude that Commerce's regulatory preference to value all inputs from a single surrogate country favors using Thai data to value all of Plaintiffs' inputs despite some apparent relative superiority of the Philippine financial and HC1 data.") *affirmed Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016); *MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021) (upholding this practice) *Coal. For Fair Trade in Hardwood Plywood v. United States*, 2022 Ct.

Intl. Trade LEXIS 153, *54 (discussing Department language that it would rely on the primary surrogate country unless the import data was "aberrational or demonstrably unreliable" or "unusual or unreliable" as substantiated by the record) (upholding the Department's determination not to resort to a secondary surrogate country, finding that respondents arguments that the "Malaysian GTA data must be inaccurate because they demonstrate impossible log densities" does not demonstrate the data is unreliable).

In this case, the United States has not found the Malaysian surrogate value for glass is unreliable and indeed cannot make such a finding given the numerous times the Department has relied on a Respondent's conversion factor for a surrogate value and found the resulting surrogate value was reliable. Risen provided numerous examples of this in its R56.2 brief, including for the very same glass input in earlier reviews of this Order in the antidumping and countervailing reviews. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 Fed. Reg. 58,871 (October 25, 2021) and accompanying IDM at Comment 11; *see also* Risen Final SVs (August 3, 2021) at Exhibit SV2-2 (SV summaries for AR1 through AR5, showing the need for glass conversion), **PR321**; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind, in Part: 2018*, 86 Fed. Reg. 21691, 21692 (April 23, 2021) (relying on Respondents' glass conversion for the benchmark as it has in the prior reviews); *see also* Risen R56.2 Br. at 16-18 (discussing the Department's use of conversion factors without finding it made the surrogate value any less reliable).

Second, the United States' claim that Malaysia's reporting in square meters is less

accurate is factually incorrect. Throughout the United States' brief, it states that Risen's arguments fail because relying on the Malaysian import value could only be an estimate of the value of glass per kilogram because the record does not specify the Malaysian import glass thickness. In contrast, the United States argues that the Romanian import value requires no estimation because it is reported on a kilogram basis. However, this completely fails to understand Risen's reporting. Risen actually purchases solar glass on a "piece" basis, not on a kilogram basis. Risen Section D (April 30, 2021), **CR126-185**, **PR147** (showing that Risen purchases glass in "PC" or pieces). Risen, in its normal business, purchases and records its solar glass on a piece basis and not on a KG or M2 basis. Thus, relying on KG (the Romanian surrogate value) or M2 (the Malaysian surrogate value) both equally require Risen to convert its pieces of solar glass into another quantity. Risen converted its solar glass to KG in its FOP database only because the Department requested Risen do so. *Id*. at Appendix XIII, Q9. Risen also converted its solar glass to M2. Both conversions are equally accurate and fully substantiated from the same reliable records that Risen provided. Accordingly, relying on M2 or KG in Risen's database are equally reliable and thus a surrogate value based on either metric are equally reliable. It would be wholly arbitrary for the selection of the surrogate value source to be predetermined and limited by a data reporting requirement by the Department itself, when the Department could have just as easily requested the reporting in M2.

Since the Department has Risen's glass consumption in M2 on the record, the Department can simply apply the Malaysian glass value in M2 to Risen's glass consumption in M2 without even applying any conversion ratio to convert the surrogate value in Malaysia from M2 to KG. There is no added accuracy in relying on the KG consumption and KG surrogate value in Romania rather than relying on the M2 consumption and M2 Malaysian surrogate value.

Therefore, the sole reason proffered by the United States to prefer the Romanian glass HTS over its selected surrogate country source or other surrogate values (Malaysia) must fail.

Risen also notes that, throughout the United States' brief, it cites from the sixth administrative review, particularly drawing attention to the fact that Risen made arguments in that review to rely on the Romanian import value. However, each review stands alone with its own record and facts. As explained in Risen's R56 brief, this record and the sixth review record are not the same. The record is different and the parties' understanding of the Malaysian and Romanian glass values has developed over the course of two reviews such that Risen and Jinko both now understand that there is no increased specificity in the Romanian glass value. The fact that Risen argued for something different in a different review with different facts has no bearing on this review.

Lastly the United States and Alliance continue to overlook the other inaccuracies in Romania—namely the lack of identical production in Romania and the fact that Romania is not the primary surrogate country. The Department has explained that it prefers to value surrogate values from a country with identical production because the import data would then reasonably consist of actual inputs used in producing subject merchandise. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) and accompanying IDM at Cmt 4. There is no evidence of actual solar cell or module production in Romania, there is only a small amount of exports (and not net exports) of a broad categories of "Photosensitive Semiconductor Devices" products under HTS 854140 and even more general battery HTS categories. Jinko SC Comments (June 2 2021) at Attachment; **PR165-166**. In contrast, the

record establishes that Malaysia is a significant producer of both solar cells and solar modules. *See*, .e.g., Risen Prelim. SVs (June 28, 2021) at Exhibit 12 (NREL Report), **PR197-198** (discussing Malaysia, China, and South Korea as the most dominant in the world market for the production of solar modules).

Therefore, following the Department's own reasoning, only the costs in Malaysia are reasonably connected to the costs that an actual producer of solar modules and cells would pay. Malaysia, as a documented significant producer of solar modules, would import solar glass under HTS 7007.19.90. However, with no known producers of solar modules in Romania, it can only be presumed that Romania would not import solar glass at all under HTS 7007.19.80. Thus, the Romanian glass imports would not reflect the costs of solar glass used in solar production, while the Malaysian imports reasonably would.

Most critically, the United States and Alliance downplay the Department's well-established practice not to depart from the primary surrogate country unless strictly necessary. The Department has explained, "[t]he Court of International Trade has held this preference for valuing FOPs with information from a single surrogate country reasonable because deriving surrogate data from one surrogate country **limits the amount of distortion** introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market." *Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013) and accompanying IDM at Cmt 2(emphasis added); citing *Clearon Corporation and Occidental Chemical Corp. v. United States*, Slip Op. 13-22, at 12-14 (CIT 2013). The Department's practice flows from the basis of the surrogate country process, which is a foundational part of the nonmarket economy methodology for determining normal value. The

Department is seeking costs in a market economy cost center, and the costs work together. One economy may have advantages in some raw materials or some financial costs, but not in other areas. Valuing costs in different cost centers, rather than one, introduces potential distortions that are not present if relying on one single economy's market costs.

19 C.F.R. 315.408(c) directs that the Department "normally will value all factors in a single surrogate country." In the Department's explanation while promulgating the regulations, it was explained that "[t]he preference for using a single country... is meant to prevent parties from **'margin shopping**': i.e., to prevent parties from arguing that the Department combine input prices from different surrogates to achieve the highest or lowest valuations of those inputs." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996) (emphasis added).

In sum, the Department's decision to depart from its established regulatory preference to rely on all surrogate values from the primary surrogate country, Malaysia, is not supported by this record. The Department has pointed to no information on this record to support a finding that the Malaysian data is not reliable. Accordingly, the Court should find the Department decision to rely on the Romanian data is not supported by substantial evidence and is contrary to Department practice.

## II. The Department's surrogate value HTS classification for Backsheet and EVA film inputs is Not Supported by Substantial Evidence.

The Department relied upon the incorrect Malaysian HTS classifications to value Risen's backsheet and EVA film input. The Department's sole basis for its classification of both of these inputs is the Department's unsubstantiated difference between the thickness of a "film" or a "sheet." The United States' argument in response to Risen's brief is essentially that the ASTM abstracts include technical definitions of film compared to sheet, and thus the Department's HTS

classification of these inputs is reasonable and supported by the record. The United States says the ASTM abstracts "provide a clear technical definition of film" and clearly distinguish film and sheet based on thickness. U.S. Br. at 28. However, this completely misinterprets the ASTM abstracts. The ASTM abstracts are <u>not</u> about defining sheet compared to film. One is a guide for measuring plastic and the other defines the specifications of a particular type of plastic.

More specifically, the first standard, ASTM D6988, is entitled "Standard Guide for Determination of Thickness of Plastic Film Test Specimens." The standard is a "guide" for <u>measuring</u> the thickness of plastic films where the thickness is used to test for various properties. *See* Dep't Surrogate Value Documents (March 8, 2021), **PR78-79**. The guide merely notes that "film" is an "*optional* term for sheeting having a nominal thickness no greater than 0.25 mm." *Id*. (emphasis added). The guide is not about defining a film compared to a sheet, but is about how to measure the thickness of plastic. The second standard, ASTM D4801 is entitled "Standard Specification for Polyethylene Sheeting in Thickness of 0.25 mm (0.010 in.) and Greater." *Id*. This describes the standard for a very particular type of extruded and compression-molded sheeting made from low-, medium-, high-density polyethylene and copolymers that has a thickness of 0.25mm. This is not the same product as EVA or Backsheets. The abstract does not discuss that all polyethylene sheets must be over 0.25mm or anything about the terms "film" versus "sheet." This is merely the specification for that particular product, which is not the same product as used by Risen or in the solar industry at all for that matter.

Neither of these specifications pretend to define the difference between the term sheet and film. Nonetheless, the United States' brief argues that these ASTM abstracts are technical definitions. This is clearly not supported by the titles or abstract themselves, as explained above. Contending that a "precise definition is critical," the United States continues on that the ASTM

abstracts provide this definition, submitting that the information provided by Risen does not. U.S. Br. at 28.

The information Risen submitted on the record addresses the thickness of solar EVA film and solar backsheet film—namely the use of the term film for the precise inputs Risen used and in the solar industry generally. Specifically, Risen provided information from its own suppliers, the Chinese National standard specific to EVA film used in solar modules, as well as various solar manufacturers or groups describing the EVA and backsheet used in the solar industry (including 3M, a worldwide and Malaysian manufacturer) in the exact same way as Risen—i.e., as "film." The United States contends these are not technical definitions, but again, the ASTM abstracts are also not technical standards for the inputs in question or for a more general definition of plastic sheet compared to film. The United States characterizes the information provided by Risen as "marketing materials" as if that made it less informative, but this information is concrete evidence of terminology used in the very industry in question for selling and buying the precise inputs in question. The HTS being debated are used for import statistics after all—i.e. the result of selling and buying in the market. Moreover, the Chinese National Standard is a technical standard and uses the term film to describe the EVA film used in solar modules. Risen Supp Qre Response (July 15, 2021) at Exhibit SQ-8, **CR363**, **PR271.**

Further, the United States also faults this information because there is no evidence that the terms used in the marketing materials correspond to the terms 'sheet' and 'film' in the Malaysian HTS. U.S. Br. at 29. Of course, there is no evidence that Commerce's definition of sheet compared to film, or the ASTM abstracts supposed definition, correspond to terms in the Malaysian HTS. Risen has demonstrated that the solar industry, including a Malaysian manufacturer of solar EVA and solar backsheet, uses the term "film" for these products. This is

reasonably more informative of the use of this term when a Malaysian solar company is importing these products.

As seen in the United States' brief, Commerce desires a concrete specific definition difference between film and sheet, but the record does not actually contain such evidence. Nonetheless, Commerce must rely upon the best available information to value these inputs; not merely any reasonable argument for the definitions. *See* 19 U.S.C. 1677b(c)(1)(B). Congress used the extreme superlative "best" uniquely in the section of the statute dealing with constructed normal value in NME cases like this one. In other words, Commerce does not have discretion to use any merely "reasonable" choice among reasonable data alternatives. Rather, Commerce must establish, supported by substantial evidence on the record, that its choice is the "best" information on the record for the valuation of that factor.

The information provided by Commerce does not define plastic film compared to sheet and is not related to the solar industry or Malaysia. Surely, the terms used in the actual industry, by Risen itself and the other manufacturer information placed on the record, are the most informative "best available information" for that industry. The record taken as a whole, including the information most specific to Risen's purchases, supports a finding that these inputs are films. *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (The agency must "articulate any rational connection between the facts found and the choice made."); *Atlantic Sugar, Ltd.*, 744 F.2d at 1562 (Commerce is obligated to support its determination based on the record as a whole, including whatever "fairly detracts" or is "evidenced opposed to its view." ). Therefore, the "best available" information to value Risen's backsheet input is HTS 3920.62.90.00 and Risen's EVA input is HTS 3920.10.9000, both of which include "film".

Alternatively, if the Court finds that the record is ambiguous as to whether these inputs are films or sheets, then the best available information would still not be to value them as sheets, as Commerce did. The HTS Commerce relied upon are specific to "plates and sheets" only and thus any products considered a film would definitively not be included under these HTS. If the record shows that the inputs may be a sheet or film, then the most specific HTS would include both film and sheet. In other words, Commerce can average the two competing HTS together to appropriately account for this ambiguity, if perceived. This Court should find that Commerce's determination of the best available information to value Risen's backsheet and EVA inputs is not supported by substantial evidence.

**III. The Department's Ocean Freight Surrogate Value is Not Supported by Substantial Evidence.**

In the Final Results, the Department relied on ocean freight data from Maersk and Descartes. IDM at Comment 4. However, as in the previous several reviews, the Department should rely solely on the Descartes data which is the most specific ocean freight data on the record. *See* Risen R56.2 Br. at 25-26. The United States essentially argues that the Maersk data is specific enough, but that does not comport with the Department's long-established preference for specificity. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than other criteria); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of "product-specific data" as "best available information"). The Descartes data on this record is product specific, covering solar panels or other solar products while the Maersk data is for general category of electronic appliances. *See* Risen Final SVs at Exhibit SV2-7 (providing Descartes data), **PR321**; Petitioner Ocean Freight Submission (December 8, 2021), **PR393**.

In response to Risen's averaging arguments, the United States merely restated in one sentence the Department's finding in the IDM that proposing to average by contemporaneity would improperly overweight the Descartes data. U.S. Br. at 36. However, the Department's selection of surrogate values is not to equally give weight to two parties' suggested surrogate values, but to rely upon the best available information for each surrogate value. *See* 19 U.S.C. § 1677b(c)(1)(B). And this does not address that the Maersk data only covers four months of the POR and thus weight averaging it equally with the Descartes data from every month of the POR would give undue weight to certain months of the POR. This results in a less accurate margin that does not appropriately account for freight over the entire POR. Accordingly, the Court should order the Department to consider contemporaneity and recalculate the freight, if it still continues to rely on Maersk data at all.

## IV. The Department's Application of Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Substantial Court Precedent.

The Department's application of adverse facts available for certain FOPs from unaffiliated solar cell and module suppliers to Risen is not supported by the record. The United States maintains that Risen did not put forth its maximum efforts to the best of its ability to obtain these FOPs and it is appropriate to apply AFA. U.S. Br. at 59-65.

As explained in Risen's opening brief, Risen documented several attempts to obtain this data from its suppliers, including threatening to stop purchasing from the suppliers. Despite these attempts to induce cooperation from completely unaffiliated suppliers, the United States holds this was not adequate. The United States' position is essentially that Risen should have ensured in advance that it could get this information from its suppliers or should have refused to purchase from them. Such a standard is wholly unreasonable, as this Court has previously found

on several occasions. *See*, e.g., *Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020). Risen has no control over these unaffiliated suppliers in a large competitive market where Risen is not in a particular situation to leverage cooperation. The large variety of suppliers, each providing only a small amount of Risen's production data, that Risen must rely upon to meet its supply needs is not one where the purchasers have the leverage. And Risen's extensive but largely unsuccessful attempts to garner cost data from different suppliers in multiple reviews only indicates that even if Risen terminates its business with its suppliers, Risen will have no better luck inducing cooperation with the next suppliers. Critically, the Court has emphasized that it is unfair and contrary to law for the Department to employ an adverse inference when the cooperating party has no control over the non-cooperating supplier. *See* Risen R56.2 Br. at 45-46 (discussing caselaw on this precise issue in multiple solar appeals).

While the United States does not discuss *Mueller*, its arguments fail under the logic of *Mueller* that this Court has already addressed. *Risen Energy* at 1343-44 (addressing how *Mueller*'s policy interests are not applicable to Risen's situation). Unlike *Mueller*, the application of AFA to Risen has no legitimate effect to incentivize these suppliers to cooperate. *Mueller*'s accuracy interests are certainly not met by using the highest FOP consumption rates. The United States infers that potentially Risen is benefitting from the suppliers not providing their FOP data, presuming therefore that their consumption rates may be higher than the partial AFA. U.S. Br. at 65. This completely misconstrues business reality. These suppliers have not cooperated because they simply do not have to. They are not dependent on Risen for their business. Unfounded speculation is not substantial evidence on this record. *Bowen v. American Hospital Asso.*, 476 U.S. 610, 626 (1986) ("Agency deference has not come so far" that agency action is upheld "whenever it is possible to 'conceive a basis' for administrative action.")

In sum, as the Court has found in several cases now, the Department's application of AFA for the FOPs of uncooperative cell providers is contrary to law as well as unsupported by substantial evidence in light of the specific context of the unaffiliated suppliers in this review.

## V. The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law.

The Department had a consistent practice for calculating adverse facts available for unreported FOPs in the reviews of this Order. In this review, for the first time the Department used a new methodology claiming that the normal methodology is not appropriately adverse. U.S. Br. at 66-68. However, for the reasons discussed above and in Risen's R56.2 brief, this does not properly view Risen's cooperation or the concerns of accuracy as raised in *Mueller*, that do apply even when applying partial AFA.

Risen did cooperate to the best of its ability in this review. The Department demands unreasonable and unlawful standards on Risen, which exceed any concept of the best of its ability. As explained, Risen cannot ensure cooperation from all suppliers in advance or refuse to buy from any supplier that did not provide FOP information in the past because it would not be able to keep the necessary supply for its business. Risen is not in a position in the market to demand such cooperation, rather the suppliers have numerous customers to choose from and it would not impact their business to lose Risen as a customer. Rather, Risen would be the one to lose business. Risen has exercised its best and maximum efforts. Accordingly, the Department has no basis to apply an adverse inference to Risen and the normal methodology of partial AFA is certainly adverse enough.

Second, the Department's calculation improperly overstates consumption in contradiction to the *Mueller* concerns. The Department calculated a single average AFA adjustment factor for

all solar cell inputs, one AFA factor for solar modules, and another one AFA factor for packing materials, rather than calculating individual adjustment factors as it had done in the past. This resulted in a higher and less specific AFA calculation. There is no justification for calculating and applying AFA on a much broader basis than the record allows. It serves only to distort the AFA factors and the resulting dumping margin. Inputs have significantly different reported factors of production and have significantly different surrogate values assigned to them. Applying an input-specific AFA more accurately reflects the AFA for each input.

The calculation of ratios used to determine the applied AFA is also flawed, resulting in an overstated AFA rate that exceeds the total AFA for each input if the highest FOP for each input was used. The exclusion of the CONNUM with the highest per-unit consumption from the calculation of the average overstated the result because the resulting average is applied to all multi-crystalline CONNUMs, including the CONNUM with the highest FOP. The Department's methodology results in the total AFA FOP for each input that is higher than the total AFA for each input where the highest FOP been used. If the Court does not find that the application of partial AFA at all to the unreported FOPs is unlawful, then the Court should at a minimum find that this more adverse, and less accurate, application of partial AFA is unlawful because it is not tailored to the gap in the record that Commerce is attempting to fill.

## VI. Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law. Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth Street N.W. 20005
Tel: (202) 783-6900
email: gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*

Date: November 13, 2023

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **4,491** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth Street., N.W. 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*