# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE CLAIRE R. KELLY

————————————————————————x
                           :

JINKO SOLAR IMPORT AND EXPORT CO.,
LTD.; JINKO SOLAR CO., LTD.; JINKOSOLAR
TECHNOLOGY (HAINING) CO., LTD.;
YUHUAN JINKO SOLAR CO., LTD.;
ZHEJIANG JINKO SOLAR CO., LTD.;
JIANGSU JINKO TIANSHENG SOLAR CO.,
LTD.; JINKOSOLAR (CHUZHOU) CO., LTD.;
JINKOSOLAR (YIWU) CO., LTD.; and
JINKOSOLAR (SHANGRAO) CO., LTD.,

        Plaintiffs,         :       Consol. Court No. 22-00219

        v.

UNITED STATES,

        Defendant,

        and

AMERICAN ALLIANCE FOR SOLAR
MANUFACTURING,

        Defendant-Intervenor.

————————————————————————x

## PLAINTIFFS' REPLY TO DEFENDANT AND DEFENDANT-INTERVENOR'S RESPONSES TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*599 Lexington Ave FL 36,
New York, NY 10022
(212) 557-4000

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd.*

Dated: November 13, 2023

# TABLE OF CONTENTS

I.   COMMERCE UNLAWFULLY VALUED ANTI-REFLECTIVE ("AR") COATING GLASS ................................................................................................................ 1

  A.   Romanian HTS 7007.1980 is Not Product-Specific to AR-Coated Glass ........................... 3

  B.   Product-Specific Malaysian HTS 7007.1990 with Per-m$^2$ Reporting Yields a Corroborated and Reliable Per-kg SV ................................................................ 9

  C.   Commerce Improperly Rejected Publicly-Available Romanian HTS 7007 ...................... 11

  D.   Jinko's Arguments to Reject Romanian HTS 7007.1980 Do Not Reweigh Evidence ...... 12

II.  COMMERCE UNLAWFULLY VALUED ELECTRICITY ................................................ 13

III. COMMERCE UNLAWFULLY VALUED AIR FREIGHT ................................................ 15

IV.  COMMERCE UNLAWFULLY VALUED OCEAN FREIGHT ......................................... 17

V.   COMMERCE UNLAWFULLY VALUED SURROGATE FINANCIAL RATIOS ........... 20

VI.  COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM U.S. PRICE ................................................................................................................... 21

CONCLUSION ........................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Algoma Steel Corp. v. United States,*
   865 F.2d 240 (Fed. Cir. 1989)................................................................22

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,*
   515 U.S. 687 (1995)............................................................................4

*Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States,*
   63 F.4th 25 (Fed. Cir. 2023)................................................................22

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962)........................................................................8, 18

*China Processed Food Import & Export Co. v. United States,*
   614 F.Supp.2d 1337 (CIT 2009)...........................................................7

*Essar Steel Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012)......................................................11, 12

*Gerson Co. v. United States,*
   898 F.3d 1232 (Fed. Cir. 2018).....................................................12, 13

*Government of Argentina v. United States,*
   542 F.Supp.3d 1380 (CIT 2021).........................................................13

*Haixing Jingmei Chemical Products Sales Co. v. United States,*
   335 F.Supp.3d 1330 (CIT 2018).........................................................13

*Home Meridian Int'l, Inc. v. United States,*
   772 F.3d 1289 (Fed. Cir. 2014)....................................................3, 7, 8

*Jiaxing Brother Fastener Co. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016).............................................................2

*Jining Yongjia Trade Co. v. United States,*
   34 CIT 1510 (2010) ...........................................................................14

*Neuweg Fertigung GmbH v. United States,*
   16 CIT 724 (1992) .............................................................................12

*Qingdao Sea-Line Trading Co. v. United States,*
   766 F.3d 1378 (Fed. Cir. 2014)..............................................................1

*Russell Motor Car Co. v. United States,*
   261 U.S. 514 (1923)............................................................................4

*SeAH Steel VINA Corp. v. United States,*
    950 F.3d 833 (Fed. Cir. 2020)..................................................................14

*Shanghai Tainai Bearing Co. v. United States.*
    2023 WL 5974083 (CIT Sept. 24, 2023) .........................................22, 23

*Since Hardware (Guangzhou) Co. v. United State*s,
    911 F. Supp. 2d 1362 (CIT 2013)...............................................................17

*SKF USA, Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001)..................................................................20

*Taian Ziyang Food Co v. United States,*
    783 F.Supp.2d 1292 (CIT 2011).............................................................2, 18

*Ticaret A.S. v. United States,*
    63 F.4th 25 (Fed. Cir. 2023) ......................................................................22

*United States v. Williams,*
    553 U.S. 285 (2008)......................................................................................4

*Wheatland Tube Co. v. United States,*
    495 F.3d 1355 (Fed. Cir. 2007)..................................................................22

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013)..................................................................23

**Statutes**
19 U.S.C. § 1673 .............................................................................................23

19 U.S.C. § 1677a ...........................................................................................22

19 U.S.C. § 1677b ...........................................................................................15

**Federal Register Notices & Publications**
*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from*
    *the People's Republic of China,* 87 Fed. Reg. 38,379 (June 28, 2022) (final results).... *passim*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from*
    *the People's Republic of China,* 86 Fed. Reg. 58,871 (Oct. 25, 2021) (final results) ............16

*Frozen Fish Fillets from the Socialist Republic of Vietnam,* 75 Fed. Reg. 38,985
    (July 7, 2010) (final results)........................................................................18

*Laminated Woven Sacks from the People's Repblic of China,* 73 Fed. Reg. 35,639
    (June 24, 2008) (final determination) ......................................................17

*Mobile Access Equipment and Subassemblies from the People's Republic of China,*
    87 Fed. Reg. 9576 (Feb. 22, 2022) (final determination) ...........................18, 19, 20

Plaintiffs Jinko Solar Import and Export Co., Ltd., *et al.* (collectively Jinko") reply to the Responses filed on September 18, 2023, by Defendant United States, ECF51 ("Def. Br.") and Defendant-Intervenor American Alliance for Solar Manufacturing ("Alliance"), ECF 52-53 ("D-I Br."), opposing Jinko's Rule 56.2 Motion for Judgement on the Agency Record (Mar. 24, 2023), EC F37 ("Pl. Br."). Plaintiffs established that the U.S. Department of Commerce ("Commerce or "Department") erred in the eighth administrative review ("AR8") of the antidumping duty ("ADD") order on *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules* ("*Solar Cells*")*, from the People's Republic of China* ("*China*"), 87 Fed. Reg. 38,379 (June 28, 2022), PR 464 ("*Final Results*"), Issues and Decision Memorandum ("IDM"), PR 455. Pl. Br. at 7-45. Commerce's legal errors in AR8 are not undermined by the Defendant and Alliance (collectively, "Defendants") arguments, as detailed below.

## I. COMMERCE UNLAWFULLY VALUED ANTI-REFLECTIVE ("AR") COATING GLASS

In selecting Romanian Harmonized Tariff Schedule ("HTS") 7007.1980 over Malaysian HTS 7007.1990 as its surrogate value ("SV") for Jinko's AR-coated glass, Commerce employed product-specificity as its principal criterion. IDM at 15-19. Commerce underscored the "**product-specificity as 'more important factor' than other criteria**." *Id*. (emphasis added) (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)). Commerce's linchpin for SV selection was "product-specificity" — "that Romanian HTS 7007.1980 covers solar glass," *id*. at 17—which the agency conflated with the AR-coated glass used by Jinko. As a subsidiary criterion, Commerce explained that the per-kg Romanian HTS 7007.1980 reporting matched Jinko's per-kg consumption reporting, thereby obviating unit conversion, unlike the Malaysian HTS 7007.1990 per-$m^2$ reporting, which required conversion to per-kg. *Id*. at 16-19.

Jinko refuted Commerce's product-specificity findings, establishing that Romanian HTS 7007.1980 expressly excludes absorbent-layered (aka AR-coated) glass and is also distorted by disparate noncomparable types of glasses, Pl. Br. at 11-20, while Malaysian HTS 7007.1990 covers Jinko's AR-coated glass input. Jinko also established that the Malaysian per-m$^2$ reporting is insufficient to outweigh its superior product-specificity over Romanian HTS 7007.1980. *Id*. at 20-25. As discussed below, Defendants do not salvage Commerce's choice.

Defendant endeavors to sidestep the preeminent product-specificity criterion, unpersuasively elevating the subsidiary unit conversion criterion required when using Malaysian data: "Because these factors affect the Malaysian data's reliability for valuing solar glass in this case, Commerce selected the Romanian HTS data as the information most specific to the respondents' input." Def. Br. at 15. This argument erroneously conflates Malaysian HTS 7007.1990's unit conversion aspect, Commerce's subsidiary rationale, with the product-specificity criterion—the primary rationale employed to select Romanian HTS 7007.1980. Even assuming that the Malaysian data's conversion from per-m$^2$ to per-kg affects the accuracy of the resulting Malaysian per-kg SV data, Defendant fails to explain how any allegedly lessened accuracy of an otherwise product-specific Malaysian SV data could mutate the Romanian data, which is not product specific, into "the information most specific to the respondents' input." *Id*. To the contrary, because Romanian HTS 7007.1980 fails the preeminent product-specificity criterion, while Malaysian HTS 7007.1990 does not, the unit conversion aspect of Malaysian data cannot elevate Romanian over Malaysian HTS. *Taian Ziyang Food Co v. United States*, 783 F.Supp.2d 1292 (CIT 2011) ("If a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria.") *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1297 (Fed. Cir. 2016) ("Though the data may be imperfect, the

administrative record supports the conclusion that the Thai data identified a low carbon variety that matches more closely to the main input of the subject merchandise than the data that Jiaxing proposes. *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ('The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.").

### A.    Romanian HTS 7007.1980 is Not Product-Specific to AR-Coated Glass

Jinko impugned Commerce's choice of Romanian HTS 7007.1980. Pl. Br. at 11-15. That subheading expressly excludes tempered glass with an absorbent or reflecting layer:

> Toughened {Tempered} Safety Glass (**Excl.** Enamelled, Coloured Throughout The Mass, Opacified, Flashed Or **With An Absorbent Or Reflecting Layer**, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Vehicles.

IDM at 13 n.41 (emphases added). Because Jinko's glass is AR or absorbent-coated, it is expressly excluded from that subheading.

Defendants' first response is that "{t}he record . . . does not support Jinko's claims that Romanian HTS 7007.19.80 excludes *{AR-}*coated glass and that the *{AR-}*layer on Jinko's glass input is synonymous with an 'Absorbent or Reflecting Layer' referenced as an exclusion to Romanian HTS 7007.19.80." Def. Br. at 18; D-I Br. at 10. For support, Defendant parrots Commerce that "the phrase 'absorbent or reflecting layer' is listed in the HTS exclusion with other light-limiting treatments" and then contrasts the allegedly light-limiting absorbent-layered glass with "the *{AR-}*coating on Jinko's glass, which acts to *increase* the light passing through the glass." Def. Br. at 18; IDM at 17-18. Defendant's argument ignores that Jinko had already rebutted Commerce's rationale.

1) AR and absorbent layer are synonymous;

2) "Absorbent" and "reflecting" are polar opposites, and accordingly cannot share a common attribute of "light limiting glass treatment";

3) Because absorption of light by AR/absorbent coating is a necessary precondition that facilitates the transmittance of light through glass to the underlying cells, absorption and transmittance are complementary, are not in opposition to each other; and

4) "absorbent" coating by absorbing light maximizes rather than limits the amount of light passing through the glass.

Pl. Br. at 18-19. Defendants fail to address Jinko's factual rebuttals, thereby implicitly conceding the accuracy of these four critical facts—all of which support Jinko's position that AR-coated glass is not classified in Romanian HTS 7007.1980.

Further, Defendant misplaces reliance on *United States v. Williams*, 553 U.S. 285 (2008), invoking *noscitur a sociis* to support Commerce's rationale that all excluded glass types in HTS 7007.1980 share a common attribute of light-limiting treatment. Def. Br. at 18. *Noscitur a sociis* is a permissible interpretative aid only when context permits. However, the AR8 record is devoid of "any evidentiary support for . . . Commerce's threshold premise that all other excluded glass types share the attribute of 'light limiting glass treatment.'" Pl. Br. at 18. To the contrary, "absorbent" and "reflective" are polar opposites, undermining Commerce's presumption. Indeed, the U.S. Supreme Court cautioned against an untrammeled application of this maxim:

That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association. Rules of statutory construction are to be invoked as aids to the ascertainment of the meaning or application of words otherwise obscure or doubtful. They have no place, as this court has many times held, except in the domain of ambiguity. . . . They may not be used to create but only to remove doubt.

*Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 702 (1995). Absent the factual predicate for its application and given Jinko's unrebutted arguments to the contrary, Defendant improperly

invokes *noscitur a sociis*.

Defendant next argues "that the Romanian HTS 7007.19.80 data that Commerce selected as the solar glass {SV} covers solar glass." Def. Br. at 17. In support, Defendant recites Commerce's rationale based on "finding in the preceding sixth review {'AR6'} of its China Solar {ADD} order that 'Romania HTS 7007.19.80 covers tempered glass used in solar panels; the specific type of glass used by solar panel producers.'" Def. Br. at 17 (citing IDM at 17). Reasoning that Commerce's AR6 findings were based "on information that Risen had placed on the record indicating that Romanian HTS 7007.19.80 covers solar glass," Defendant notes the lack of "evidence in this review showing that Romanian HTS 7007.19.80 no longer covers solar glass." *Id*. Defendant is wrong. Jinko established that Romanian HTS 7007.19.80 does not encompass solar glass by analyzing its language. Romanian eight-digit HTS 7007.19.80 is comprised of two 10-digit sub-subheadings (four dashes):

- - - - **Solar glass consisting of tempered soda-lime-flat-glass** . . . .

- - - - Other.

Pl. Br. at 12. The first sub-subheading ("solar glass . . . flat-glass"), in turn, is broken down into two sub-sub-subheadings (five dashes), the first of which is further disaggregated (six dashes):

- - - - - **Having no more than 4.5 mm of thickness**

- - - - - - Uncoated

- - - - - - Single or double-side coated

- - - - - Other.

*Id*.

As Jinko demonstrated Commerce in AR6 "misconstrued the scope of HTS 7007.19.80 as 'solar glass consisting of tempered soda-lime-flat-glass . . . having no more than 4.5 mm of thickness'" through a "flawed construction combining one cherry-picked sub-sub heading and

5

one sub-sub-sub heading covered under HTS 7007.19.80 sub-heading." *Id*. at 16. Contrary to Commerce's claim, "HTS 7007.19.80 is a broad basket sub-heading comprising of myriad types of solar **and non-solar glass** of all thickness levels – **none of which has an AR-coating**." *Id*. at 17 (emphasis added). Thus, because it is not layered by an absorbent material, Romanian eight-digit HTS 7007.19.80 solar glass is not the same as Jinko's AR-coated glass input. Further, the Romanian HTS subheading covers disparate non-comparable glasses: (1) non-solar glass; (2) glass with thickness above 4.5 mm (*i.e.*, outside Jinko's glass thickness range of 2-4 mm); and (3) double coated and uncoated glasses. *Id*. at 13. Therefore, contrary to Defendant's assertions, Jinko established that Commerce's AR6 selection of Romanian HTS 7007.1980 does not control its AR8 decision.

Notwithstanding the foregoing, Defendant attempts to muddy the water by rehashing Commerce's "{AR6} finding regarding the Romanian HTS's inclusion of solar glass (which Jinko suggests commonly features anti-reflective coating)." Def. Br. at 18-19 (citing Pl. Br. at 10). Defendant's discussion of Jinko's alleged concession is misleading. To clarify, Jinko stated that "the glass input used by solar panel producers, including Jinko, is characterized by" coating of AR or absorbent layer material. Pl. Br. at 10. Contrary to Defendant's meritless claim, Jinko proved that "solar glass" as described in Romanian HTS 7007.1980 is ***not*** AR-coated. And since Jinko's solar glass is AR-coated, it cannot be classified in this HTS subheading.

Defendant then argues "that the European Union (EU) maintains trade remedy orders against solar glass imports from China that specifically reference HTS 7007.19.80 as the HTS for solar glass." Def. Br. at 19. The Alliance adds: "Jinko reported that it purchased its solar glass input from Chinese suppliers, and the EU's AD/CVD orders confirm that such solar glass produced in China specifically falls under HTS number 7007.19.80 of the EU/Romanian

schedule." D-I Br. at 9. These arguments are contradicted by Jinko's demonstration that its "solar glass with an AR coating is expressly excluded from HTS 7007.1980." Pl. Br. at 17. Further, the Alliance's obverse argument that "{t}he record did not contain similar evidence showing that the Malaysian HTS subheading 7007.19.90 contained solar glass," D-I Br. at 9, is unavailing absent a copy of the EU order—which is not on the record. Therefore, Defendant's EU arguments fail.

Defendant's claim that the fact that "HTS 7007.19.80 includes other types of glass does not automatically exclude it from consideration," Def. Br. at 19, ignores the essential point of Jinko's position: **Romanian HTS 7007.1980**—besides being distorted by disparate non-comparable glass types—**expressly excludes Jinko's AR/absorbent coated glass**. Defendant's false equivalence that Jinko's "preferred Malaysian HTS category is itself a basket category," *id*., is unavailing because unlike Romanian HTS 7007.1980, Malaysian HTS 7007.1990 does not exclude Jinko's AR-coated glass. Selection of the Malaysian subheading is therefore supported by the product-specificity criterion.

Defendant misplaces reliance on distinguishable precedents. *Id*. at 19-20. In *China Processed Food Import & Export Co. v. United States*, "Commerce's valuation of glass jars using WTA Indian import data instead of the Jagatjit information" was affirmed because "although the 'HTS category is a basket category which may include glass articles besides glass jars, it nevertheless includes glass jars'" (akin to Malaysian HTS 7007.1990). 614 F.Supp.2d 1337, 1344-46 (CIT 2009). In contrast, "the glass container value obtained from {the Jagatjit's} financial report is non-specific for purposes of valuing the input in question." *Id*. (akin to Romanian HTS 7007.1980). Likewise, in *Home Meridian*, "though the HTS wooden basket category used to value poplar, birch, and elm lumber inputs does not address each type of input individually, it was not unreasonable for Commerce to find the category more reliable than the

{non-contemporaneous} market economy purchases because the category was contemporaneous." 772 F.3d at 1296.

Accordingly, judicial precedent supports Commerce's selection of basket category HTS subheadings that cover the input over qualitatively inferior SV data, such as HTS subheadings in which the input is not classified. And judicial precedent does not allow Commerce to select Romanian HTS 7007.1980, which expressly excludes AR-coated glass, over the alternative Malaysian HTS 7007.1990, which is product-specific.

Defendant misconstrues Jinko's argument in claiming that "even Jinko concedes that a portion of Risen's solar glass input consists of *uncoated* glass that would not be excluded from Romanian HTS 7007.19.80." Def. Br. at 20. Jinko contrasted two types of glass used in solar applications: Risen's uncoated glass that is identified in Romanian HTS 7007.1980; and Jinko's absorbent/AR-coated glass that is expressly excluded therefrom. Pl. Br. at 19 n.2. This illustrated that Romanian HTS 7007.1980 covers only a subset of "solar glass."

The Alliance advances a red herring to improperly retain AR-coated glass in Romanian HTS 7007.1980. It juxtaposes the fact that "{t}he 7007.19.80 exclusion does not use the term 'coating' or 'coated' – only the term 'layer'" against "the ten-digit breakouts within Romanian HTS 7007.19.80 {that} refer specifically to 'uncoated' and 'single or double-side coated.'" D-I Br. at 10. It deduces "that 'coating' is a separate concept from 'layer,' and that 'coating' is a quality specifically applicable to solar glass." *Id*. at 10-11. Not only is the Alliance argument a *post hoc* rationalization which cannot support Commerce's decision, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962), its attempt to separate "coating" from "layering" is irreconcilable with the plain dictionary meaning of "coating":

- a layer of a particular substance that covers a surface;[1]

---

[1] https://dictionary.cambridge.org/us/dictionary/english/coating.

- a coating of a substance is a thin layer of it spread over a surface;[2]

- a thin layer of a substance covering a surface;[3] and

- a layer of a substance spread over a surface as for protection or decoration;
  a covering layer.[4]

In short, "coating" and "layering" are interchangeable synonyms. Thus, the Alliance's

reliance on the fact "that Romanian HTS 7007.19.80 specifically includes coated solar glass" to

infer that the said subheading "does not explicitly exclude the type of glass {*i.e.*, AR- coated

glass} used by Jinko" is a *non sequitur*. *Id*. at 11. Based on its invented coating-layering

semantic chasm, the Alliance then faults Jinko for "fail{ing} to explain why the glass it describes

could not be considered 'coated' solar glass of the type covered by Romanian HTS 7007.19.80."

*Id*. The Alliance ignores the crux of Jinko's argument—it is not the coating *per se*, but the

***material applied for coating*** or layering of glass surface that determines the scope of the coated

solar glass subheading. To reiterate, because glass layered (or, coated) with an absorbent AR

material is expressly excluded from Romanian HTS 7007.1980, this subheading cannot cover

Jinko's AR-coated glass input.

**B.    Product-Specific Malaysian HTS 7007.1990 with Per-m$^2$ Reporting Yields a Corroborated and Reliable Per-kg SV**

Jinko established that Malaysian HTS 7007.1990 per-m$^2$ instead of per-kg reporting does

not undermine its superior product-specificity. Pl. Br. at 20-23. Defendant, echoing

"Commerce's rationale that the Malaysian data's lack of thickness information and reporting in

square meters create reliability issues," alleges that "Jinko relies on speculative extrapolation to

claim that the Malaysian data, although lacking such information, involve the same weight to

---

[2]    https://www.collinsdictionary.com/us/dictionary/english/coating.
[3]    https://www.oxfordlearnersdictionaries.com/us/definition/english/coating
[4]    https://www.thefreedictionary.com/coating

surface area" as those of the glass used by respondents or reported in Romanian imports. Def. Br. at 21. The Alliance adds there is a "potential for distortion through an estimated solar glass conversion methodology." D-I Br. at 15. These arguments are unsupported.

Jinko's "conversion factor {7.19 per-m$^2$} is corroborated by the conversion factor underlying the Romanian import data HTS 7007.19 and 7007.19.80 . . . average conversion factor of 7.88 Kg per m$^2$," Pl. Br. at 22, and Risen's conversion factor. D-I Br. at 15.[5] Further, Defendants fail to impugn Jinko's reasonable inference "that the Malaysian imported glass, being a subset of internationally traded glass, would exhibit a similar weight to surface area correlation." Pl. Br. at 22. As such, Jinko's extrapolation of its well-corroborated conversion factor to the Malaysian import data is neither speculative nor distortive.

Defendant unpersuasively advances a subsidiary argument that in AR6 "Risen observed that the potential inaccuracies from using per square meter glass values was particularly great with regard to solar glass, given that solar glass is relatively thin, while the thicknesses of tempered glass can vary dramatically." Def. Br. at 22. Jinko's kg-per-m$^2$ conversion factor based on its relatively thinner glass yields a lower value in kg, which when applied in the denominator to convert Malaysian SV from per-m$^2$ to per-kg, yields a relatively higher per-kg SV. As such, Jinko's computed Malaysian SV of 2.95 RM/kg, is a conservative overestimate of the SV—its margins are not lowered even assuming any potential inaccuracies.

Finally, Defendant acknowledges "Commerce's preference({s} for valuing factors of production {'FOP'} from Malaysia as the primary surrogate country," and "to rely on data from Malaysia based on its solar production." *Id*. at 24. Defendant argues such preference "must yield

---

[5]    The Alliance's argument that unlike Risen, Jinko did not argue that it could have reported glass data in m$^2$ instead of kg, is directly contradicted by the m$^2$ data of each glass piece used by Jinko available on the record. Pl. Br. at 22.

when . . . Malaysian data present reliability issues and the Romanian data include solar glass." *Id*. Contrary to Defendant's claims, and as detailed by Jinko: unlike Jinko's AR-coated glass, the solar glass in Romanian HTS 7007.1980 is not AR-coated; and the Malaysian 2.95 RM/kg SV is reliable because Jinko's conversion factor is well-corroborated. Pl. Br. at 7-19; Section I.A, *supra*; Jinko's Malaysian HTS 7007.1990 choice to value solar glass is therefore supported by substantial evidence; the Department's selection of Romanian HTS 7007.1980 is not.

### C.    Commerce Improperly Rejected Publicly-Available Romanian HTS 7007

The Alliance contests Jinko's reliance on well-established administrative and "judicial notice of the publicly-available tariff provisions to arrive at the correct classification," echoing Commerce's rationale that "while the information . . . does not include values, it is nonetheless factual information to value {FOPs}." Pl. Br. at 25-26; D-I Br. at 23; Def. Br. at 19 & n.4. This argument should be summarily rejected. HTS descriptions should not be conflated with SV data, since acting in that manner would result in even dictionary definitions being categorized as factual information in the FOP valuation context.

The Alliance further argues "that the information may be available on ACCESS because it was timely submitted in a prior segment . . . does not help Jinko's cause." *Id*. Such argument is irreconcilable with this Court's practice to take "judicial notice of documents posted on Commerce's ACCESS website." Pl. Br. at 25 & n. 3. It is also directly contradicted by the *Final Results*' reliance on an off-the-record "Commission Regulation 471/2014, art. 15, 2014 O.J. (L 142/23), p. 20 at Art. 1(1)" to support glass valuation under HTS 7007.1980, reasoning that "EU maintains trade remedy orders against solar glass imports from China which specifically reference HTS 7007.19.80 as the HTS for solar glass." IDM at 17, n.75.

The Alliance relies upon precedent that is distinguishable or inapposite. In *Essar Steel Ltd. v. United States*, the U.S. Court of Appeals for the Federal Circuit ("CAFC") endorsed

Commerce's denial of "supplementation of the record" with "Essar's request for benefits under the CIP" and "the government of Chhattisgarh's denial of those benefits." 678 F.3d 1268, 1277 (Fed. Cir. 2012). Unlike HTS subheadings, neither document qualifies as publicly-available information. *Neuweg Fertigung GmbH v. United States*, involved rejection of "submissions made by plaintiff after July 11, 1991"—when those final results published. 16 CIT 724, 727 (1992). In contrast, Jinko timely submitted on the record publicly-available Romanian tariff excerpts whose provenance is unimpeachable.

### D. Jinko's Arguments to Reject Romanian HTS 7007.1980 Do Not Reweigh Evidence

Defendant argues that Plaintiffs' "arguments focus on the specificity and reliability/accuracy of the two HTS categories under consideration, but amount to mere disagreement with Commerce's weighing of the record evidence with respect to solar glass."

Def. Br. at 16. Defendant is wrong. As the CAFC held in *Gerson Co. v. United States*:

> Classifying articles under the HTSUS is a two-step process. **A court first determines the proper meaning of specific terms in the tariff provisions, which is a question of law** that we review without deference. *Otter Prods.*, 834 F.3d at 1375. Next, the court determines under which subheading the subject merchandise is most appropriately classified, which is a question of fact that we review for clear error. *Id.* But when, as here, there is no dispute as to the nature of the merchandise, the two-step classification analysis "collapses entirely into a question of law."

898 F.3d 1232, 1235 (Fed. Cir. 2018) (emphasis added).

Jinko's argument that Commerce improperly interpreted the Romanian HTS 7007.1980 scope raises a "question of law." This Court is not being asked to reweigh the evidence to invalidate Commerce's incorrect interpretation of the Romanian HTS 7007.1980 scope. Indeed, "when, as here, there is no dispute as to the nature of the merchandise," the court's analysis of Commerce's decision "collapses entirely into a question of law." *Id*. As such, Commerce's reliance on HTS 7007.1980 cannot be salvaged by agency deference limited to factfinding.

Defendant relies on distinguishable precedents involving Commerce factfinding. In *Haixing Jingmei Chemical Products Sales Co. v. United States*, "Commerce examined the payment terms . . . and reasonably concluded that . . . the sales were not bona fide." 335 F.Supp.3d 1330, 1346 (CIT 2018), Likewise, in *Government of Argentina v. United States*, Commerce analyzed "export tax differential between soybeans and biodiesel . . . {and} numerous changes to Argentina's export tax regime." 542 F.Supp.3d 1380, 1395 (CIT 2021). These cases required that Commerce examine the facts. By contrast, in AR8, the question whether Romanian HTS 7007.1980 covers Jinko's AR/absorbent-coated glass is based on the "**proper meaning of specific terms in the tariff provisions**"— a question of law which this Court considers without reweighing evidence. *Gerson*, 898 F.3d at 1235 (emphasis added).

In sum, since Romanian HTS 7007.1980 excludes AR/absorbent-coated glass, it cannot be used to value Jinko's glass. In contrast, the alternative product-specific Malaysian HTS 7007.1990, proposed by Jinko, yields a reliable SV from the primary surrogate country, Malaysia, thereby requiring that this Court reverse Commerce's SV choice and remand for reconsideration.

## II.    <u>COMMERCE UNLAWFULLY VALUED ELECTRICITY</u>

Jinko demonstrated that Commerce improperly valued electricity using only a fragment of MIDA data circumscribed by high voltage peak hour rates from the Peninsular Malaysia region. Pl. Br. at 29-30. Defendants support exclusion of "Sabah and Sarawak regions" electricity data parroting Commerce: "There is no evidence that any solar cell or module manufactures are located in these relatively remote regions," Def. Br. at 41; and "the only Malaysian solar manufacturer . . .  was located in peninsular Malaysia." D-I Br. at 33. Defendant echoes Commerce's speculation that "{a}ny solar cells and modules manufactured in Malaysia would require high-voltage electricity" whereas "Sabah and Sarawak regions do not include

high-voltage industrial rates." Def. Br. at 41. Contrary to Defendants' position, Commerce's SV selection is based on the FOP **required** by a hypothetical producer in a surrogate country ***mirroring the situation of the nonmarket economy ("NME") producer***, **not** the FOP **used** by a surrogate country's producer. *SeAH Steel VINA Corp. v. United States* is instructive:

> SeAH further argues that, in selecting {SVs}, "Commerce was required to determine the cost in India of an agreement in which a carrier undertook to transport merchandise and to bear the cost of any losses during transport" and that Commerce's finding any additional cost "is directly contrary to Indian law." . . . This, however, misapprehends what Commerce was required to do. Commerce was required to "construct a hypothetical market value of {SeAH's} product" using {SVs}, . . . , not a hypothetical price using surrogate laws, *see Nation Ford*, 166 F.3d at 1377 ("**{SV} must be as representative of the situation in the NME country** as is feasible{.}" . . . *id.* at 1378 ("**There is no reason . . . to incorporate the distortions in the {surrogate} market into a hypothetical {respondent} market**{.}").

950 F.3d 833, 845 (Fed. Cir. 2020) (emphases added).

Defendants fail to show that a Chinese solar producer is prohibited by law from operating in a remote region or must require high voltage electricity. Conversely, the Malaysian solar producers' location and voltage rating that Defendants lean on are irrelevant to the proper SV choice for the Chinese Plaintiffs-respondent. Further, *Jining Yongjia Trade Co. v. United States*, undermines Defendants' arguments by endorsing "Commerce's practice to use country-wide data instead of regional data." 34 CIT 1510, 1527 (2010).

Defendant also argues for peak-hour rate limitations: "Although Jinko claims that it operated twenty-four hours a day," there is no "evidence to support such extended hours of operation." Def. Br. at 42. However, "since it did not require Jinko to report its hours of operation," Pl. Br. at 29, Commerce lacked any basis to base its decision on such truncated hours of operation. Defendant nonetheless claims that Jinko could have "submit{ted} factual

information for valuing {FOP}." Def. Br. at 43 (citing Commerce Memorandum (May 5, 2021), PR 156, at 2). Yet the cited memorandum solicited only "publicly available information"—not Jinko's business proprietary information ("BPI") as Defendant claims. Accordingly, Commerce's "*de facto* adverse" inference to discredit off-peak electricity rates is unlawful.

## III.    COMMERCE UNLAWFULLY VALUED AIR FREIGHT

Jinko demonstrated that Commerce unlawfully valued air freight in AR8 using Freightos data when it should have used the superior freight rates from the International Air Transportation Association ("IATA"). Pl. Br. at 30-33. Reasoning that "Jinko does not argue that the Freightos data are inaccurate or unreliable" Def. Br. at 40, Defendant ignores the applicable legal standard whether the SV constitutes "the best available information." 19 U.S.C. § 1677b(c)(1)(B). With the Freightos data failing this statutory standard, "Commerce's use of Freightos data was unreasonable or unlawful"—despite the Alliance's claim that Jinko made no such allegation. D-I Br. at 37. The IATA data are manifestly superior, as recounted by an industry expert in unrebutted evidence:

> IATA{ . . . } **best represents the fair market value of air freight** . . . as it is based on . . . **the actual transactional rates supplied by airlines to IATA**. . . .

> IATA{ . . . } represents **the broadest coverage of the entire market** of air cargo buyers and suppliers.

Jinko First SV Submission (June 28, 2021), CR 314-51, PR 201-43, Exhibit 9N at 1 (emphases modified).

Defendant argues that "Freightos provided rates for all-cargo shipments of more than 1,000kg from Shanghai to Atlanta, which is specific to Jinko's air freight." Def. Br. at 38. Yet the industry expert explains that IATA "also provides the desired granular detail at the lane level for Shanghai {}– Atlanta  . . . . Shanghai-Atlanta traffic represented several million dollars in air freight value across **several million kilograms** of goods covering thousands of shipments."

Jinko First SV Submission Exhibit 9N at 3 (emphasis added). Accordingly, the IATA data source is far superior, covering more than three orders of magnitude greater volumes than Freightos, with an industry expert attesting it as the "best." *Id*. at 1.

Commerce's lone claimed defect with the IATA data is that these data are not publicly available. IDM at 43. However, it is undisputed that **Jinko publicly disclosed the entire AR8 Shanghai-Atlanta monthly air freight data**. Jinko Final SV Submission, (Aug. 3, 2021), CR 404-21, PR 304-20, Exhibit 5A. The Alliance, therefore, improperly relies on the preceding review where limited public data was "not specific to the routes used . . . during the POR." *Solar Cells from China*, 86 Fed. Reg. 58,871 (Oct. 25, 2021) (final results), IDM at 37; D-I Br. at 39. Defendants repeat Commerce's finding that "{t}he only public IATA information on the record is a monthly average of its rates" that "contained no details." Def. Br. at 38; D-I Br. at 39 (citing IDM at 43). These claims are not accurate. The public Shanghai-Atlanta IATA data are identical to the data submitted as BPI; they are not a monthly average of more disaggregated data. Jinko Final SV Submission Exhibits 5A–B. Moreover, the public data for each month provides:

1. origin and destination ports;

2. total number of shipments;

3. total weight of cargo;

4. total amount of air freight charged; and

5. average freight charge in USD/kg.

*Id*. Exhibit 5A. Contrary to Defendants' claim, the record contained extensive public IATA data to value air freight.

Commerce's rejection of route-specific IATA data is not supported by the fact that other data had been submitted as BPI, per Jinko's agreement with the subscription service. *Id*. Exhibit

5E. Commerce routinely considers subscription services to be publicly available provided—as with IATA in AR8— "any entity can obtain the data." *Laminated Woven Sacks from China*, 73 Fed. Reg. 35,639 (June 24, 2008) (final determination), IDM Comment 15. There is accordingly no merit to the Alliance claim that "Commerce's established practice is to consider only {SV} data that are wholly public." D-I Br. at 39. Despite Commerce's allegation, there is ample public "information regarding IATA data collection" on the record, IDM at 43, from IATA itself and an industry expert. Jinko First SV Submission Exhibits 9F, 9N. Moreover, all underlying data was available to Commerce and Alliance counsel as BPI. *Id*. Exhibits 9A–E.

"{P}ublicly available information addresses the concern that a lack of transparency about the source of the data could lead to proposed data sources that **lack integrity or reliability**." *Since Hardware (Guangzhou) Co. v. United State*s, 911 F. Supp. 2d 1362, 1367 (CIT 2013) (emphasis added). Here, Commerce and Alliance counsel had full access to all IATA data and did not allege that it "lack{ed} integrity or reliability." *Id*. The Alliance speculates that the BPI data "opens the door to potential manipulation" through which "respondents . . . cherry pick which data points to make public." D-I Br. at 40. Yet it does not identify any AR8-specific manipulation concerns, as route-specific public IATA data are precisely what are necessary to value air freight and not "cherry pick{ed}." *Id*. Since the IATA data were publicly available, and the BPI data did not yield any concerns, IATA unquestionably "**best represents the fair market value of air freight**." Jinko First SV Submission Exhibit 9N at 1 (emphases modified). Accordingly, Commerce unreasonably relied upon unfounded concerns in declining to use public IATA data, rendering its valuation of air freight unsupported by substantial evidence.

## IV. COMMERCE UNLAWFULLY VALUED OCEAN FREIGHT

Jinko demonstrated that Commerce unlawfully valued ocean freight in AR8 using Maersk data. Pl. Br. at 33-37. Contrary to the Alliance allegation, Jinko did in fact "articulate

how Commerce's determinations of the ocean freight FOPs were unreasonable." D-I Br. at 45.

First, "**Maersk . . . data . . . are price quotes rather than actual transaction-based prices, which are not data Commerce prefers** . . . . Unlike . . . Maersk . . . data, **Descartes data** . . . **represent actual, consummated transactions**" Pl. Br. at 35-36 (quoting *Mobile Access Equipment and Subassemblies from China* ("*MAE*"), 87 Fed. Reg. 9576 (Feb. 22, 2022) (final determination), IDM at 10 (emphases added)). Rather than dispute this deficiency, Defendant claims that Maersk "data are more in the nature of offered prices" on account of its status as "one of the world's largest shipping companies." Def. Br. at 33. This Court should reject such "post hoc rationalizations for agency action" that in any event does not address the Maersk data deficiency. *Burlington Truck Lines*, 371 U.S. at 168-69.

The fundamental flaw, recognized by this Court, is that "Maersk provides a general cargo rate from only **a single carrier**." *Taian Ziyang*, 783 F.Supp.2d at 1342 (emphasis added). Defendant attempts to distinguish this precedent by emphasizing that the "weight of the defects described" in *Taian Ziyang* "do not apply." Def. Br. at 34. Defendant is wrong. Maersk's overarching defect of relying on a single carrier persists in AR8. By contrast, Descartes data consolidates rates from myriad shippers, thereby satisfying Commerce's preference for SVs that "represent a broad market average." *Frozen Fish Fillets from the Socialist Republic of Vietnam*, 75 Fed. Reg. 38,985, 38,986 (July 7, 2010) (final results). Defendant further tries minimizing the on-point *MAE* by emphasizing that Maersk data there "was non-public." Def. Br. at 34. Yet in *MAE*, among "many reasons" including Maersk being BPI (not implicated in AR8), the critical basis for rejection was because "Maersk . . data are based on **only one source**." 87 Fed. Reg. 9576, IDM at 9 (emphasis added).

Defendant unpersuasively argues that the defective Maersk data were cured because it was averaged with Descartes. Def. Br. at 34-35; D-I Br. at 43. However, the manifest deficiency with "Maersk data rel{ying} on information from a single company" is not "remedied by the averaging of the Maersk data and Descartes data." D-I Br. at 43. This supposed remedy introduces distortion by treating a single carrier as co-equal with the multi-carrier consolidated Descartes data; the only reasonable averaging is weight-averaging—an impossibility on this record, without the number of carriers reflected in Descartes. Defendant's claim that "us{ing} the Maersk data in *combination* with the Descartes data . . . constitutes a broad market average," Def. Br. at 35 (emphasis in original) lacks merit. The Maersk data standing alone are not the best available information and its core single carrier deficiency is not cured by averaging with the consolidated Descartes data that "Commerce agrees . . . is reliable and relevant." D-I Br. at 42.

In response to Jinko's emphasis on precedent in which Commerce rejected Maersk, Defendants cites precedent where Maersk data was used. Def. Br. at 33; D-I Br. at 43. Such incoherent Department precedent underscores Commerce's arbitrariness. Jinko agrees that "the determination is a fact-specific inquiry" and "each review stands on its own," D-I Br. at 43-44, but AR8 did not afford a reasoned basis to use the manifestly inferior Maersk data when compared with Descartes.

Jinko further demonstrated that if this Court affirms Commerce's reliance on Maersk, it should also require that Commerce use Drewry and Freightos ocean freight data. Pl. Br. at 36-37. Undermining Defendants' claim that these sources are less specific, Def. Br. at 36; D-I Br. at 44, Commerce in *MAE* used them after "find{ing} that Drewry and Freightos' published ocean freight rates suggest that the ocean rates are representative of, and equally applicable, to all types of merchandise . . . . There is no evidence on the record to the contrary." 87 Fed. Reg. 9576,

IDM at 10. There being also no such contrary evidence in AR8, Commerce unlawfully deviated

from *MAE*; "An agency action is arbitrary when the agency offer{s} insufficient reasons for

treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382

(Fed. Cir. 2001).

## V.   COMMERCE UNLAWFULLY VALUED SURROGATE FINANCIAL RATIOS

Jinko established that Commerce unlawfully excluded the more detailed financial

statement of Flextronics Shah Alam, an identical merchandise producer, which yielded more

accurate ratios than that of JA Solar Malaysia. Pl. Br. at 37-41. Jinko showed the "European

Commission's {'EC'} Antidumping findings on 'crystalline silicon photovoltaic modules and

key components (i.e. cells) consigned from Malaysia' determined that 'Flextronics is a contract

manufacturer' and an 'Exporting producer(s) in Malaysia'" Pl. Br. at 38. Defendant argues that

"Flextronics' financial statements specify only . . . manufacturing of unspecified electronic

products" but that "the record does not support that Flextronics produced solar cells" and

modules. Def. Br. at 45. Defendant minimizes the EC evidence with a strawman: "'the

Commission also verified the {*original equipment manufacturer*} company SunEdison Products

Singapore.'" Def. Br. at 47. Defendant's inference "that Flextronics *is not* the original

manufacturer for any solar products it may have exported from Malaysia," *id*. (emphasis in

original), misconstrues SunEdison's generic "original equipment manufacturer" labelling—

which does not disturb the EC findings that Flextronics is an exporting producer of cells and

modules. Defendant speculates that "Flextronics may have served as a toller that assembled such

products without purchasing the inputs" and raises a red herring that "proceedings that Jinko

cites concerns potential circumvention of European Commission trade remedy orders on Chinese

solar cells and modules." Def Br. at 47. These arguments are unavailing given that the EC

determined Flextronics to be an exporting **producer of solar cells/modules**.

Defendant's arguments to reject the 2016 and 2018 EC orders based merely on its slight non-contemporaneity with AR8, Def Br. at 47, are unpersuasive absent any record evidence indicating any change in Flextronics' production activity from 2018 to 2019. Defendants object to "Jinko rel{ying} on extra-record evidence from the EU," D-I Br. at 47; Def. Br. at 45. Yet such "information in the public realm" was verifiable, Pl. Br. at 38—as demonstrated by Commerce's own reliance on another off-the-record EC regulation. IDM at 17, n.75. As such, this Court should take judicial notice of the EC order.

Defendants claim that Flextronics' "generic contract manufacturing business" cannot be tied to "evidence that the input costs {in Flextronics' statement} . . . . pertain to work on solar cells or modules." Def. Br. at 47, D-I Br. at 47. This contention was already "rebutted by {EC}'s unambiguous findings." Pl. Br. at 39.

Finally, Defendants unpersuasively attempt to distinguish *Diamond Sawblades from China* and *Hydrofluorocarbon Blends from China*, asserting that JA Solar's statement is "sufficiently detailed" and not "so undetailed as to be unusable." Def. Br. at 49; D-I Br. at 49. However, Defendants fail to rebut the demonstrated need for averaging the two financial statements—given that JA Solar's statement is undisputedly less detailed than that of Flextronics, whose production of solar cells/modules is affirmed by the EC.

## VI.   COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM U.S. PRICE

Jinko demonstrated that Commerce unlawfully deducted Section 301 duties from U.S. price, violating the statutory directive to deduct only normal "United States import duties," 19 U.S.C. § 1677a(c)(2)(A), not special duties, as Section 301 duties are; not indefinite and being revisited; and remedial with the objective of eliminating certain harmful Chinese government

practices. Jinko Br. at 41-45. At issue is whether Section 301 duties are special duties, alongside ADD and Section 201 duties, subject to *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007)), or whether they are normal duties such as Section 232 duties subject to *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 63 F.4th 25, 35 (Fed. Cir. 2023). As set forth below, this Court should decline Defendants' invitations to extend *Borusan* and endorse *Shanghai Tainai Bearing Co. v. United States*. 2023 WL 5974083, *16-17 (CIT Sept. 24, 2023). Def. Br. at 52-59; D-I Br. at 53-54.

The CAFC decision affirming Commerce's action with respect to Section 232 duties—because they addressed the "national security . . . threat{} by the unsustainably low utilization of domestic steel-producing capacity"—is readily distinguishable from Section 301 duties. *Borusan*, 63 F.4th at 35. Like Section 201 duties, Section 301 duties serve a trade-related, remedial purpose. Jinko Br. at 43. Further, this Court should not follow *Shanghai Tainai*, which is not binding. *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 n.4 (Fed. Cir. 1989). *Shanghai Tainai* affirmed Commerce's deduction of Section 301 duties by improperly extending *Borusan* despite Section 232 duties having the materially different purpose of safeguarding national security as contrasted with providing trade remedies instead. 2023 WL 5974083, *16.

*Shanghai Tainai* also sidestepped analyzing Section 301 duties per the *Wheatland Tube* factors—whether ordinary or special, whether permanent or temporary—by relying on *Borusan*, which focused on Section 232 duties driven by national security concerns:

> *Borusan* instructs that it is the text of the legal order levying duties that is paramount; and it is unnecessary for a reviewing court to apply the *Wheatland Tube* factors where that text has spoken clearly. . . . **This principle, as elucidated in *Borusan*, extends beyond Section 232 duties and applies to other statutory duties.** . . . Here, "the particular exercise of the authority" to enact the Section 301 duties at issue intended for these duties to be additional to {ADD}.

*Id*. *17 (emphasis added).

Defendants attempt to extend *Borusan* to Section 301 duties is contrary to controlling law. For example, ADD is assessed pursuant to statutory language similar to that for imposing Section 301 duties. *See* 19 U.S.C. § 1673 ("there shall be imposed upon such merchandise an {ADD}, *in addition to any other duty* imposed") (emphasis added). Yet ADD is not deducted from the U.S. sale price, based on the purpose underlying the imposition of such special duties (trade remedies) and effects of deducting them from the U.S. sale price (double-counting). Indeed, the CAFC instructs that, in determining ADD margins, "{f}orm should be disregarded for substance." CAFC ruling *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Accordingly, this Court should not follow *Shanghai Tainai*.

## **CONCLUSION**

For the foregoing reasons, Jinko respectfully requests that this Court remand the *Final Results* for reconsideration by Commerce.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*599 Lexington Avenue FL 36
New York, NY 10022 -and-
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: November 13, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Reply contains 6,985 words including footnotes, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's Microsoft Word processing system, and is less than the 7,000 word limit.

*/s/ Ned H. Marshak*
Ned H. Marshak
*Counsel for Plaintiffs*

Dated: November 13, 2023