Slip Op. 24-53

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JINKO SOLAR IMPORT AND EXPORT CO., LTD., ET AL.,** | |
| **Plaintiffs,** | |
| **and** | |
| **JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., ET AL.,** | |
| **Plaintiff-Intervenors,** | Before: Claire R. Kelly, Judge |
| **v.** | Consol. Court No. 22-00219 PUBLIC VERSION |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination of the 2019–2020 administrative review of the antidumping duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: May 1, 2024

Ned H. Marshak, Dharmendra N. Choudhary, and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY and Washington, D.C., for plaintiffs Jinko Solar Import and Export Co. Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang

**PUBLIC VERSION**

Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd.

Robert G. Gosselink, Jonathan M. Freed, and Kenneth N. Hammer, Trade Pacific PLLC, of Washington D.C., for consolidated plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., Changzhou Trina Hezhong Photoelectric Co., Ltd.

Jeffrey S. Grimson, Sarah M. Wyss, Bryan P. Cenko, and Jacob M. Reiskin, Mowry & Grimson, PLLC, of Washington D.C., for consolidated plaintiffs and plaintiff-intervenors JA Solar Technology Yangzhou Co., Ltd., and Shanghai JA Solar Technology Co., Ltd.

Craig A. Lewis, and Nicholas W. Laneville, Hogan Lovells US LLP, of Washington D.C., for plaintiff-intervenor BYD (Shangluo) Industrial Co., Ltd.

Gregory S. Menegaz, and Alexandra H. Salzman, DeKieffer & Horgan, PLLC, of Washington D.C., for consolidated plaintiff-intervenor Risen Energy Co., Ltd.

Joshua E. Kurland, Senior Trial Attorney, and Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for the defendant United States. On the brief were Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General. Of counsel was Brishailah Brown, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill, Laura El-Sabaawi, and Paul A. Devamithran, Wiley Rein, LLP, of Washington D.C., for defendant-intervenor American Alliance for Solar Manufacturing.

    Kelly, Judge: This consolidated action is before the Court on motions for

judgment on the agency record. See Consol. Pls.' [Trina Solar Co. LTD][1] Mot. J.

---

[1] Consolidated Plaintiffs Trina Solar Co., Ltd.; Trina Solar (Changzhou) Science & Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; Trina Solar (Hefei) Science & Technology Co., Ltd.; and Changzhou Trina Hezhong Photoelectric Co., Ltd.

Agency R., Mar. 24, 2023, ECF No. 35 ("Trina Mot."); Mot. J. Agency R. Of Consol. Pls. and Pl.-Int. JA Solar Technology Yangzhou Co., Ltd. and Shanghai JA Solar Technology Co., Ltd. (collectively, "JA Solar"), Mar. 24, ECF No. 36 ("JA Solar Mot."); Pls.' [Jinko Solar Import and Export Co.][2] Mot. J. Agency R., Mar. 24, 2023, ECF No. 37; [Consolidated Pl. Risen Energy Co., Ltd.'s] Mot. J. Agency R. & Memo. Supp'n, Mar. 24, 2023, ECF Nos. 38–39 ("Risen Mot."); Pl.-Int. BYD (Shangluo) Industrial Co., Ltd.'s ("BYD") Mot. J. Agency R., Mar. 23, 2023, ECF No. 41 ("BYD Mot.").

Plaintiffs challenge 12 determinations in the United States Department of Commerce's ("Commerce") 2019–2020 final determination concerning crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("PRC" or "China"). See 87 Fed. Reg. 38,379 (Dep't Commerce June 28, 2022), as amended by Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 87 Fed. Reg. 48,621 (Dep't Commerce Aug. 10, 2022) (amended final results) ("Final Results") and accompanying issues and decision memo. ("Final Decision Memo."). Plaintiff Trina challenges (1) Commerce's rejection of its certifications for a review-specific rate ("Separate Rate"), and Commerce's application of the extraordinary circumstances standard from its regulations. Plaintiffs Jinko, Risen, JA Solar, BYD, and Trina

---

[2] Plaintiffs Jinko Solar Import and Export Co., Ltd.; Jinko Solar Co., Ltd.; Jinkosolar Technology (Haining) Co., Ltd.; Yuhuan Jinko Solar Co., Ltd.; Zhejiang Jinko Solar Co., Ltd.; Jiangsu Jinko Tiansheng Solar Co., Ltd.; Jinkosolar (Chuzhou) Co., Ltd.; Jinkosolar (Yiwu) Co., Ltd.; and Jinkosolar (Shangrao) Co., Ltd.

challenge the (2) selection of surrogate glass data from Romania and (3) valuation of

ocean freight.  Jinko, JA Solar, BYD, and Trina challenge Commerce's (4) calculation

of surrogate financial ratios; (5) deduction of Section 301 duties from U.S. sales prices;

(6) valuation of air freight; and (7) valuation of electricity.  Risen, JA Solar, BYD, and

Trina further challenge (8) the valuation of backsheet; (9) the valuation of EVA; (10)

Commerce's application of adverse facts available in connection with unaffiliated

producers to provide their factors utilized to produce the subject merchandise

("factors of production" or "FOPs"); and (11) Commerce's adverse facts available

methodology.  Trina, JA Solar, and BYD further argue that (12) Commerce should

recalculate the separate rate because the rates calculated for the mandatory

respondents are not supported by substantial evidence.

## BACKGROUND

Commerce published the antidumping duty order on solar cells from the PRC

on December 7, 2012.  See generally Crystalline Silicon Photovoltaic Cells, Whether

or Not Assembled Into Modules from the People's Republic of China, 77 Fed. Reg.

73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination).  On February

4, 2021, in response to timely requests, Commerce initiated its eighth administrative

review of the antidumping duty order.  See generally Initiation of Antidumping and

Countervailing Duty Administrative Reviews, 86 Fed. Reg. 8,166, 8,168–69 (Dep't

Commerce June 8, 2020).  Commerce chose Jinko and Risen as mandatory

respondents.  Respond. Select. Memo. at 1–5, PD 53, CD 5, bar code 4092029-01 (Feb.

25, 2021).[3]   On December 23, 2021, Commerce published its preliminary determination.  See generally Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2019–2020, 86 Fed. Reg. 72,923 (Dep't Commerce Dec. 23, 2021) (preliminary results and partial rescission) ("Preliminary Results") and accompanying preliminary issues and decision memo. ("Prelim. Decision Memo.").  Commerce issued its Final Results in October 2020.  See generally Final Results; Final Decision Memo.

Given that Commerce considers the PRC to be a nonmarket economy ("NME") when calculating the dumping margin for the mandatory respondents, Commerce determined the surrogate value ("SV" or "normal value") of the respondents' entries of subject merchandise by using data from a surrogate market economy country ("surrogate country") to value FOPs.  See Section 773(c)(4) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(c)(4).[4]   Commerce chose Malaysia as the primary surrogate country for purposes of valuing all FOPs.  Prelim. Decision Memo. at 16–19, 23–28; Final Decision Memo. at 18.  However, Commerce determined that import data under Romanian Harmonized Tariff Schedule ("HTS") 7007.19.80 was the best

---

[3]  On October 5, 2022, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination.  See ECF No. 24-2–3. Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "CD" to denote public or confidential documents.
[4]  Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

information to value the respondents' solar glass because it was more specific, reliable, and accurate to that input.  [Commerce] Prelim. [SV] Memo. at 3, PD 403, bar code 4194750-01 (Apr. 16, 2021) ("Commerce Prelim. SV Memo."); Final Decision Memo. at 15–19.

Commerce selected Descartes and Maersk Line data to value ocean freight; Freightos data was selected to value air freight.  Commerce Prelim. SV Memo. at 8; Prelim. Decision Memo. at 27; Final Decision Memo. at 22–25, 41–44.  To calculate the surrogate financial ratios, Commerce selected JA Solar Malaysia SDN BHD ("JA Solar Malaysia"), a Malaysian solar cell and module producer.  Prelim. Decision Memo. at 28; Final Decision Memo. at 37–39; Commerce Prelim. SV Memo. at 9–10 (citing [Jinko's] First [SV] Cmts. at Exh. 11A,  PDs 201–241, CDs 314–351, bar codes 4137975-36–37 (June 28, 2021) ("Jinko First SV Cmts."); [Risen] First SV Cmts. at Ex. SV-11, PDs 197–98, bar code 4137935-01 (June 28, 2021) ("Risen First SV Cmts.")).  Commerce used Malaysian HTS data to value Jinko and Risen's EVA and backsheet using the Malaysian HTS data corresponding to "sheet" rather than "film" because it was the subheading most specific to Jinko and Risen's inputs.  Final Decision Memo. at 44–47.  Commerce also used Malaysian data for electricity, but excluded rates from the Sabah and Sarawak regions and off-peak hours.  Id. at 58–60.

Commerce granted Jinko's request to be excused from reporting FOP data for some of its solar module and solar cell suppliers.  Prelim. Decision Memo. at 15.  Commerce reasoned that Jinko had a limited amount of missing data that could be remedied by substitution of evidence already on the record.  Id.  Thus, Commerce made no adverse inference in place of the missing factor of production data for Jinko.  Id.  Conversely, Commerce determined to apply partial facts available with an adverse inference to value Risen's missing data.  Id. at 15–16; Final Decision Memo. at 8–10.  Commerce determined that Risen, by virtue of continuing to utilize suppliers who did not cooperate with Commerce's requests, failed to cooperate with the proceeding to the best of its ability, and calculated a facts otherwise available with an adverse inference rate that was "sufficiently adverse" so as to incentivize cooperation.  Prelim. Decision Memo. at 15–16; Final Decision Memo. at 8–13.  Furthermore, Commerce, in performing its comparison of normal value and export price, deducted Section 301 duties from U.S. prices when calculating dumping margins pursuant to 19 U.S.C. § 1677a(c)(2)(A).  Final Decision Memo. at 73–74.

The entities comprising Trina did not timely respond to Commerce's request regarding the incomplete separate rate information Trina had previously provided.  Prelim. Decision Memo. at 13; Final Decision Memo. at 67–71.  Commerce rejected Trina's untimely supplemental questionnaire response and separate rate certifications ("SRCs") regarding the separate rate information, as well as Trina's untimely extension of time request for the questionnaire response.  Prelim. Decision

Memo. at 13; Final Decision Memo. at 69–70.  As a result, Commerce determined that Trina had failed to demonstrate its continued eligibility to obtain a separate rate and thus would be considered part of the China-wide entity for the review.  Prelim. Decision Memo. at 13; Final Decision Memo. at 71.  Given the <u>Final Results</u>, Commerce, calculated antidumping duty margins of 20.99 percent for Jinko, 12.24 percent for Risen, 14.79 percent for separate rate companies, and 238.95 percent for the China-wide entity (including Trina).  <u>Final Results</u> at 48,621–22.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an administrative review of an antidumping duty order. The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Huaiyin Foreign Trade Corp. (30) v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

## DISCUSSION

## I.    Separate Rate

Trina makes several claims challenging Commerce's denial of a separate rate based on its failure to submit timely SRCs for all its collapsed entities.  First, Trina

challenges Commerce's rejection of its response to Commerce's supplemental questionnaire as untimely. Trina Mot. at 18–22. Further, Trina claims that Commerce abused its discretion by declining to extend time for Trina to submit its SRCs. Id. at 23–31. Moreover, Trina argues that Commerce's assignment of the China-wide rate to Trina does not accurately reflect its antidumping rate. Id. at 31–33. Trina also contends Commerce's regulation governing time extensions under the "extraordinary circumstances" standard should be invalidated as arbitrary and capricious. Id. at 37–46. Finally, Trina contends Commerce's determination is not supported by substantial evidence because Commerce failed to distinguish the two sub-entities for which Trina submitted timely SRCs and the remaining sub-entities for which it submitted untimely SRCs. Id. at 46–53. Defendant argues that Commerce decisions are in accordance with law, within its discretion, and supported by substantial evidence. Def. Resp. at 70–92.

Commerce presumes that a respondent in an NME is government-controlled and thus subject to a single country-wide rate unless the respondent can establish de jure and de facto independence from the central government. Prelim. Decision Memo. at 13; Import Admin., [Commerce], Separate-Rates Prac. & Appl. Combin. Rates In Antidumping Invest. [In re NMEs], Pol'y Bulletin 05.1 at 1–2 (Apr. 5, 2005), available at https://access.trade.gov/Resources/policy/bull05-1.pdf (last visited Apr. 22, 2024) ("Policy Bulletin 05.1"). To overcome this presumption, companies submit certain information to Commerce in an application or SRC. See Policy Bulletin 05.1 at 3–6

(outlining separate rate application procedure); <u>Diamond Sawblades Manufacturers</u>

<u>Coal. v. United States</u>, 866 F.3d 1304, 1311 (Fed. Cir. 2017) ("We have consistently

sustained Commerce's application of a rebuttable presumption of government control

to exports and producers in NME countries").

Each entity seeking separate rate treatment must complete either a separate

rate application or SRC.   <u>Initiation of Antidumping and Countervailing Duty</u>

<u>Administrative Reviews</u>, 86 Fed. Reg. 8,166, 8,167 (Dep't Commerce Feb. 4, 2021).[5]

An entity submits an SRC to certify that it continues to meet the criteria for obtaining

a separate rate that was previously assigned by Commerce through a separate rate

application.  <u>Id.</u>  Those certifications are due 30 days following the date of the federal

register notice initiating the review.  <u>Id.</u>

Where there are affiliated companies seeking separate rate treatment in an

antidumping analysis comparing export price in the U.S. with normal value in the

foreign market, Commerce will "collapse" or treat closely related companies as a

single entity.  <u>See</u> 19 C.F.R. § 351.401(a), (f)(1).[6]  Commerce's regulations provide that

when two or more affiliated producers "have production facilities for similar or

identical products that would not require substantial retooling of either facility in

---

[5] An entity submits a separate rate application when it does not have a separate rate
from a completed segment of the proceeding to demonstrate eligibility for a separate
rate.  <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>,
86 Fed. Reg. at 8167.
[6]  All references to the Code of Federal Regulations refer to the most recent version
in effect at the time of the period of review.

order to restructure manufacturing priorities and the [agency] concludes that there

is a significant potential for the manipulation of price or production," then Commerce

will treat those affiliated producers as a single entity.  Id.  Commerce applies a

separate rate to collapsed entities as a whole, regardless of whether the individual

companies export the subject merchandise.  See Certain Preserved Mushrooms From

The People's Republic of China, 69 Fed. Reg. 54,635 (Dep't of Commerce Sept. 9, 2004)

(final results) and accompanying issues and decision memo. at Cmt. 1; Final Decision

Memo. at 70–71.[7]

     Commerce's regulations govern filing deadlines and requests for extensions of

time.  Commerce has discretion to extend any time limit established by 19 C.F.R.

§ 351.302 for good cause, either on its own accord or at the request of a party.  19

C.F.R. § 351.302(b)–(c).  Generally, Commerce will not consider untimely submitted

extension requests or materials, see 19 C.F.R. § 351.302(c), (d)(1)(i), but may consider

an untimely extension request by a party if "extraordinary circumstances exist."  19

---

[7]  The antidumping statute "does not address the consequences of finding entities
affiliated in terms calculating the dumping margin."  Jinko Solar Co., Ltd. v. United
States, 229 F.Supp.3d 1333, 1344 (Ct. Int'l Trade 2017) (citing 19 U.S.C.
§§ 1675(a)(2)(A)(ii), 1677b(a)).  Commerce has determined that

> implicit in the Department's decision to collapse [a respondent and its
> affiliated companies] is that the resulting rate would apply to all of the
> companies in the collapsed entity, provided that the entity as a whole is
> eligible for a separate rate, because to do otherwise would defeat the
> purpose of collapsing them in the first place.

Certain Preserved Mushrooms From the People's Republic of China, 69 Fed. Reg. at
54,635 and accompanying issues and decision memo. at Cmt. 1; see also Final
Decision Memo. at 70–71.

C.F.R. § 351.302(c).  An extraordinary circumstance in this context is "an unexpected event that: (i) [c]ould not have been prevented if reasonable measures had been taken, and (ii) [p]recludes a party or its representative from timely filing an extension request through all reasonable means."  Id.

This Court reviews Commerce's determinations regarding its deadlines for abuse of discretion.  See Ajmal Steel Tubes & Pipes Indus. LLC v. United States, No. 21-00587, 2022 WL 15943670, at *3 (Ct. Int'l Trade Oct. 28, 2022).  An abuse of discretion occurs where "the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors."  Consol. Bearings Co. v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (internal citation omitted).

Here, Commerce reasonably rejected Trina's SRC response to its supplemental questionnaire as untimely.  Trina initially submitted incomplete SRCs in March of 2021, accounting for only two of the eight individual entities that make up the "single-entity Trina."  See [Trina] [SRCs], PD 89, CD 14, bar code 4098387-01 (Mar. 15, 2021).  Commerce sent Trina a supplemental questionnaire, dated June 28, 2021, identifying its deficient submission and requesting Trina to correct and supplement its SRCs by July 6, 2021.  Final Decision Memo. at 67; Trina Mot. at 10.  Trina did not respond until August 24, 2021—49 days after the deadline provided by Commerce—when it requested, for the first time, an extension of the deadline to submit its response.  Final Decision Memo. at 67; Trina Mot. at 11.  This significantly belated response led

Commerce to reasonably reject Trina's untimely SRCs and extension request on December 16, 2021, pursuant to 19 C.F.R. § 351.302(d)(1)(i).  <u>See</u> Final Decision Memo. at 68; <u>see also</u> Trina Mot. at 14–15.

There are no "extraordinary circumstances" here that warrant an extension of Trina's deadline.  <u>See</u> 19 C.F.R. § 351.302(c).  As Commerce explains, the preamble to its regulations illustrates what constitutes an extraordinary circumstance, including: "natural disaster, riot, war, force majeure, or medical emergency." Final Decision Memo. at 68–69 (citing <u>Extension of Time Limits</u>, 78 Fed. Reg. 57,790, 57,793 (Dep't Commerce Sept. 20, 2013)).  The preamble also explicitly anticipates circumstances that are unlikely to fall within the exception, including "inattentiveness[] or the inability of a party's representative to access the Internet on the day on which the submission was due." <u>Id.</u> at 69 (citing <u>Extension of Time Limits</u>, 78 Fed. Reg. at 57,793).  Therefore, Commerce reasonably determined that Trina's general inattentiveness here should not constitute an extraordinary circumstance under 19 C.F.R. § 351.302(c).  <u>Id.</u>

Trina's challenge to the regulation's "extraordinary circumstance" standard as arbitrary and capricious lacks merit.  Trina argues that "[s]etting a single very stringent standard for all respondents is an unreasonable, arbitrary, and capricious application of Commerce's authority." Trina Mot. at 37.  Trina appears to argue that this single standard is arbitrary because it does not take account for complex

scenarios or differentiate between those circumstances where one party was aware of the deadline and another was not. Id. at 37–39.

Trina's challenge to the regulation is unpersuasive. A rule is arbitrary where it ignores or relies on factors outside of Congress' intent, fails to consider key aspects of the problem, or when the agency does not "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal citation omitted). As explained in the request for comments and final ruling on the proposed modification to 19 C.F.R. § 351.302, Commerce considered alternatives and justified the modification it made by reasonably explaining its decision to be consistent with Commerce's policies. See Modification of Regulation Regarding the Extension of Time Limits, 78 Fed. Reg. 3,367, 3,369–70 (Dep't Commerce Jan. 16 2013) ("[a proposed alternative] will not serve the objective of the proposed rule to avoid confusion, will perpetuate the current difficulties in the Department's organization of its work, and will perpetuate the undue expenditure of Departmental resources in addressing extension requests"); Extension of Time Limits, 78 Fed. Reg. at 57,792–93 (considering comments to proposed rule modification). That Trina would prefer a different rule does not render Commerce's regulation arbitrary or capricious.

Trina also argues that Commerce's assignment of the China-wide rate does not accurately reflect its antidumping rate. Trina Mot. at 31–33. However, the Court will not "set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 761 (Fed. Cir. 2012). Trina lost its ability to argue for the separate rate when it missed the deadline to return its SRCs. See 19 C.F.R.§ 351.302(d) (explaining Commerce's ability to reject untimely filed material).

Lastly, Trina's argument that Commerce fails to distinguish the two sub-entities for which Trina submitted timely SRCs and the remaining sub-entities for which it submitted untimely SRCs is unpersuasive. See Trina Mot. at 46–53. Commerce explains that it must determine whether there is de jure or de facto control with respect to all companies making up the collapsed entity. See Final Decision Memo. at 71; Policy Bulletin 05.1 at 2. To make this determination, it is necessary for each company to respond to the supplemental questionnaire issued by Commerce and provide information on their relationship with the Chinese government. Final Decision Memo. at 71. Therefore, Commerce reasonably determined that timely responses from each of the companies making up the collapsed entity, both exporting and non-exporting, are relevant and necessary. Id. Accordingly, Commerce's decision to deny Trina a separate rate is reasonable and thus sustained.

**PUBLIC VERSION**

## II.   Valuation of Solar Glass

Plaintiffs Jinko and Risen challenge Commerce's solar glass import valuation under Romanian HTS 7007.19.80, rather than Malaysian HTS 7007.19.90. Jinko Mot. at 7–28; Risen Mot. at 10–23. Jinko and Risen argue that Commerce should have relied on the Malaysian HTS—as data from the primary surrogate country—to value solar glass SV, and that Commerce's claim that the Malaysian data is unreliable is without merit.[8] Jinko Mot. at 7–28; Risen Mot. at 10–23. Jinko also argues that the Romanian HTS "does not cover" the glass it produces. Jinko Mot. at 11–19. It further argues that Commerce incorrectly rejected its submission of the Tarif Intégré Communautaire ("TARIC"),[9] of which this Court should take judicial notice. Id. at 25–28; Letter [Commerce] to Grunsfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP at 1–2, PD 442, bar code 4245339-01 (May 25, 2022) ("Rejection Memo."). Defendant contends that Commerce's use of Romanian HTS 7007.19.80 is lawful and supported by substantial evidence, and that judicial notice of the TARIC was not appropriate. Def. Resp. at 14–50. For the following reasons, Jinko's request for judicial notice of the TARIC is denied; nevertheless, Commerce's determination to

---

[8] Plaintiffs Trina, JA Solar, and BYD incorporate and adopt both Jinko and Risen's arguments regarding the proper HTS subheading for valuing solar glass. See Trina Mot. at 53–54; JA Solar Mot. at 10; BYD Mot. at 13.

[9] TARIC is the database implemented by the Taxation and Customs Union of the European Commission, integrating all measures relating to the European Union's customs tariff, commercial, and agricultural legislation. TARIC, Tax'n and Customs Union, https://taxation-customs.ec.europa.eu/customs-4/calculation-customs-duties/customs-tariff/eu-customs-tariff-taric_en (last visited Apr. 22, 2024).

value solar glass based on import prices under the Romanian HTS is remanded for

further explanation or reconsideration.

### A.    Judicial Notice

Commerce refused to consider Jinko's arguments regarding the scope of

Romanian HTS 7007.19.80, based on the TARIC, because the TARIC was not timely

placed on the record.  See Def Resp. at 19 n.4.  Jinko disputes Commerce's decision

and requests the Court take judicial notice of the TARIC because it is publicly

available and can be accurately and readily confirmed.  Jinko Mot. at 25–28.  The

Court will not take judicial notice of the TARIC.

Pursuant to 19 U.S.C. § 1516a(b), the Court must review the record made

before the agency.  19 U.S.C. § 1516a(b)(1)–(2) (limiting review to the record before

the agency and establishing what constitutes that record).  Thus, "the focal point for

judicial review should be the administrative record already in existence, not some

new record made initially in the reviewing court."  Tri Union Frozen Prod., Inc. v.

United States, 161 F. Supp. 3d 1333, 1339 (Ct. Int'l Trade 2016) (citing Camp v. Pitts,

411 U.S. 138, 142 (1973)).  Nonetheless, in some instances a court may take judicial

notice of certain facts.  See Brown v. Piper, 91 U.S. 37, 42 (1875) ("Facts of universal

notoriety need not be proved. . . . Among the things of which judicial notice is taken

are the law of nations; the general customs and usages of merchants; the notary's

seal; things which must happen according to the laws of nature; the coincidences of

the days of the week with those of the month . . .").

Consol. Court No. 22-00219                                                    Page 18

**PUBLIC VERSION**

Here, Commerce's rejection of the TARIC information was in accordance with law and within its discretion, and the Court will not take judicial notice of the information. Commerce has discretion over the acceptance of untimely filed materials. See 19 C.F.R. § 351.301 (governing time limits for factual information); 19 C.F.R. § 351.302 (governing time extensions). Commerce rejected the TARIC information because it was factual information, and thus subject to the timelines set forth in Commerce's regulations. See 19 C.F.R. § 351.301(c)(ii); Rejection Memo. at 1–2; see also Digit. Audio File re Oral Arg. Proc. at 1:19:00, Feb. 28, 2024, ECF No. 73 ("Oral Arg."). Jinko does not dispute that the information is factual or that it was not submitted within the timeframe required by Commerce's regulations.[10] See

---

[10] What constitutes "factual information" in an antidumping review is defined by Commerce's regulations, including:

> (i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;
>
> (ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;
>
> (iii) Publicly available information submitted to value factors under [Section] 351.408(c) or to measure the adequacy of remuneration under [Section] 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;
>
> (iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and

(footnote continued)

generally Jinko Mot.; Oral Arg.; see also Rejection Memo. at 1 (containing the submission date of Jinko's agency brief with the appended TARIC information as well as submission deadlines for the review). Thus, Commerce acted within its authority and discretion to reject Jinko's untimely TARIC submissions by enforcing its deadlines pursuant to its regulations. See Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT 98, 123 (2012) (citing NTN Bearing Corp. v. United States, 74 F.3d 1204, 1206–07 (Fed. Cir. 1995)).

Jinko's argument that the Court should take judicial notice of the TARIC is unpersuasive. Even assuming the materials are those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," see Fed. R. Evid. 201(b)(2), considering the TARIC information on review would undermine the Court's role.[11] Jinko's invocation of the Federal Rules of Evidence is

---

(v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

19 U.S.C. § 351.102(b)(22).

[11] Jinko's citation to Xiping Opeck Food Co. v. United States to support its request for judicial notice of the TARIC is unpersuasive. Jinko Mot. at 25–26 (citing 551 F. Supp. 3d 1339, 1350–51 (Ct. Int'l Trade 2021). In Xiping Opeck, there was no claim that information was missing from the record. The parties disputed the proper TARIC heading to value the FOPs of live freshwater crawfish. Xiping Opeck, 551 F. Supp. 3d at 1346. The government valued the product under a TARIC heading—already placed on the record—without producing a direct quote, printout, or photocopy of the TARIC description itself in the final results or final decision memorandum. See Freshwater Crawfish Tail Meat From The People's Republic Of China; 2017–2018,

(footnote continued)

misplaced. Jinko cites Rule 201(b) to argue that a court may, at any stage of the proceeding, take judicial notice of any fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), (d), to support its request for judicial notice of the TARIC. Jinko Mot. at 12 (citing Fed. R. Evid. 201(b)(2)); id. at 25–26 (citing 551 F. Supp. 3d 1338, 1350–51 (Ct. Int'l Trade 2021)). Although there may be "facts of universal notoriety" of which the Court can and should take notice, see Brown, 91 U.S. at 42, administrative law principles generally caution against considering factual information which was not placed on the record before the agency and which the agency did not consider even though it may otherwise satisfy the criteria of Rule 201. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("in dealing with a determination or judgment which an administrative agency alone is authorized to make, [the reviewing court] must judge the propriety of such action solely by the grounds invoked by the agency"); see also 28 U.S.C. § 2637 (requiring exhaustion of administrative remedies before an issue may be reviewed by the Court).

---

84 Fed. Reg. 58,371 (Dep't Commerce Oct. 31, 2019) (final results) and accompanying issues and decision memo. at Cmt. 2. Rather, Commerce provided a narrative description and "incorporated [the heading] by reference in the [final results and final decision memorandum]." Id. The Court rejected what it viewed as the plaintiff's argument "that Commerce could only satisfy the substantial evidence requirement by reproducing a direct quote, printout, or photocopy of the product description from the TARIC database itself." 551 F. Supp. 3d at 1346.

Further, as a general matter, the Federal Rules of Evidence do not apply where the Court conducts record review. <u>Nat'l Min. Ass'n v. Sec'y, U.S. Dep't of Lab.</u>, 812 F.3d 843, 875 (11th Cir. 2016) (disfavoring the ability of a court to "go outside the administrative record" unless the requesting party makes a "strong showing of bad faith or improper behavior"). <u>But see</u> <u>New Mexico ex rel. Richardson v. Bureau of Land Mgmt.</u>, 565 F.3d 683, 702 n.21 (10th Cir. 2009) (taking judicial notice of a document included in the record before that court in another case). Thus, where the Court reviews the record compiled before the agency, it would generally be inappropriate to invoke the Federal Rules of Evidence to admit new evidence not previously before the agency. Although one might conceive of situations where there are "facts of universal notoriety" of which both the agency and the Court should take notice, <u>see</u> <u>Brown</u>, 91 U.S. at 42, there is no argument here that the TARIC contains such facts. Accordingly, Jinko's request to take judicial notice of the TARIC is denied.

## B.    Commerce's Determination

Commerce values FOPs "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1); <u>see also</u> <u>Qingdao Sea-Line Trading Co. v. United States</u>, 766 F.3d 1378, 1386 (Fed. Cir. 2014). Commerce selects the best available information by evaluating data sources based on their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market

average; and (5) public availability.  <u>See</u> Import Admin., [Commerce], [NME]

Surrogate Country Selection Process, Pol'y Bulletin 04.1 at 1 (Mar. 1, 2004), <u>available</u>

<u>at</u> https://enforcement.trade.gov/policy/bull04-1.html (last visited Apr. 22, 2024)

("Policy Bulletin 04.1");[12] <u>see also</u> Prelim. Decision Memo at 21.  To value a

respondent's FOPs and expenses, Commerce uses data from surrogate market

economy countries that are: "(A) at a level of economic development comparable to

that of the nonmarket economy country, and (B) significant producers of comparable

merchandise."  19 U.S.C. § 1677b(c)(4).  To the extent possible, Commerce's

regulatory preference is to "value all factors in a single surrogate country."  19 C.F.R.

§ 351.408(c)(2).  Commerce's determination must be supported by substantial

evidence, meaning "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  <u>Huaiyin Foreign Trade Corp.</u>, 322 F.3d at 1374

(quoting <u>Consol. Edison Co.</u>, 305 U.S. at 229).

    Plaintiffs challenge the use of the Romanian HTS subheading by Commerce to

value Jinko and Risen's solar glass.  Romanian HTS 7007.19.80, used by Commerce

in its determination, reads: "Toughened (Tempered) Safety Glass (Excl. Enamelled,

Coloured Throughout The Mass, Opacified, Flashed Or With An Absorbent Or

---

[12] When choosing a primary surrogate country, Commerce considers: (1) each country's economic comparability with the NME country; (2) each country's production of comparable merchandise; (3) whether the potential surrogate countries that produce comparable merchandise are significant producers of comparable merchandise; and (4) the quality and availability of FOP data for the countries.  Policy Bulletin 04.1.

Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation In Motor
Vehicles, Aircraft, Spacecraft, Vessels And Other Vehicles)." <u>See</u> Am. Alliance for
Solar Mfr. Pre-Prelim. Cmts. & Subm. [SV] at Exh. 9, PD 334, CD 433, bar code
4149598-03 (Aug. 3, 2021) ("Pets. Pre-Prelim SV Cmts") (containing Romanian HTS
heading); <u>see also</u> Final Decision Memo. at 13 n.42; Def. Resp. at 14.  Both Jinko and
Risen allege Commerce should use Malaysian HTS 7007.19.90 import values to value
their solar glass.  The Malaysian HTS reads: "Safety glass, consisting of toughened
(tempered) or laminated glass, Toughened (tempered) safety glass: Other than Of size
and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels: Other
than Suitable for machinery of heading 84.29 or 84.30." <u>See</u> [Jinko's] Final [SV]
Cmts. at Exh. 1, PDs 304–20, CDs 404–21, bar code 4149126-01 (Aug. 3, 2021) ("Jinko
Final SV Cmts."); <u>see also</u> Jinko Mot. at 7; Risen Mot. at 12; Final Decision Memo. at
13 n.43.

     Here, Commerce's determination must be remanded for further consideration
or explanation because Commerce's choice to value solar glass using import values
under the Romanian HTS is unsupported on this record.  Commerce fails to explain
how the data from Malaysia, as the primary surrogate country, is unreliable such
that departure from its standard practice of using the data from the primary
surrogate country is justified. <u>See</u> 19 C.F.R. § 351.408(c)(2) (explaining Commerce's
regulatory preference to "normally value all factors in a single surrogate country").
First, Commerce concludes that the Malaysian data is not suitable even though

Malaysia is the primary surrogate country, because "both respondents reported the quantity of glass they consumed in manufacturing solar modules in kilograms." Commerce Prelim. SV Memo. at 3; see also Final Decision Memo. at 18; Def. Resp. at 15. However, the respondents reported their glass consumption in kilograms because Commerce specifically requested Jinko and Risen's consumption measurements to be based on weight in their Section D responses for this review. See [Jinko] Sect. D, E, App'xs XIII, Add'l Sect D, & Doubl. Remedies Resps. At App'x XIII:8, PDs 148–52, CDs 186–68 (May 4, 2021) ("Jinko DEQR"); [Risen's] Sect. D Questionnaire Resp. at App'x XIII:7, PD 147, CD 122, bar code 4116609-01 (Apr. 30, 2021) ("Risen Sect. D Resp."); see also Oral Arg. at 1:08:03–1:09:30.

Commerce's rationale that conversion considerations render the Malaysian data unreliable fails to acknowledge record information that detracts from its conclusion. Risen purchases solar glass "on a 'piece' basis," meaning that its glass consumption measured in kilograms, relied upon by Commerce in its determination, was itself a conversion. See generally Final Decision Memo.; see also Risen Sect. D Resp. at Exh. D-34; Risen Mot. at 15–16. Although Jinko tracked its glass consumption in kilograms, see Commerce Prelim. SV. Memo. at 3, Commerce fails to acknowledge Jinko's proposed conversion methodology based upon the factors contained in the record, such as the dimensional specifications of Jinko's coated glass input grades, that could establish reliable conversions using Malaysian data. See generally Final Decision Memo.; see Jinko DEQR at Exh. AD-9 (containing Jinko's

**PUBLIC VERSION**

glass conversion factors); [Jinko] Redacted Admin. Case Br. at Attach. 4, PD 450, CD

499 (May 27, 2022) ("Jinko Admin Br.") (containing Jinko's glass dimension

specifications and kilogram conversion ratios); see also Jinko Mot. at 21–22.  These

gaps in Commerce's final determination undermine a finding that its solar glass

valuation is supported by substantial evidence.

      Further, Commerce did not adequately address record evidence which detracts

from its determination that the Romanian HTS is specific to valuing Jinko's glass.

Jinko contends that the Romanian HTS heading expressly excludes Jinko's anti-

reflective coated glass.[13]  Jinko Mot. at 11–15.  Commerce rejected Jinko's argument

based on the wording of the exclusion, which it determined encompassed glass that

was "light limiting" or glass with an "[a]bsorbent or [r]eflecting [l]ayer" through the

words "Enameled, colored, opacified (made opaque), and flashed (colored)." Final

Decision Memo. at 17.  Thus, Commerce concluded Jinko's glass, which has an "anti-

reflective layer," was not encompassed by the exclusion.  Id.[14]

---

[13]  Jinko and Risen argue in their briefs before the Court that the Romanian HTS is
a basket category covering numerous types of glass unspecific to solar glass.  Jinko
Mot. at 13; Risen Mot. at 14.  Although Commerce does not explicitly address this
argument, it is reasonably discernible that Commerce found that the solar glass was
nonetheless specific despite the inclusion of other types of glass within the heading
when it compared the Romanian HTS data to the Malaysian HTS data. Final Decision
Memo. at 18-19.
[14]  Further, Commerce responds to the argument that the record lacks evidence of
Romanian manufacturers of solar modules by stating that Risen itself argued for use

(footnote continued)

Consol. Court No. 22-00219                                                Page 26
**PUBLIC VERSION**

It is unclear how Commerce can reasonably view the list of exemplars in Romanian HTS 7007.19.80 as light limiting.  The exclusion includes glass with an absorbent layer.  Commerce itself defines absorbent as "something that takes in without releasing" light.  See Final Decision Memo. at 17.  Jinko submitted evidence that its glass captures and retains light.  See [Jinko's] Sect. A & App'x XI Questionnaire Resps at Exh. A-8C, A-12, PD, bar code 4108239 (Apr. 8, 2021) ("[Jinko's polycrystalline module features] new glass technology [that] improves light absorption and retention"); id. at Exh. A-12C ("[Jinko's mono perc module features] advanced glass technology [that] improves light absorption and retention").[15]  Thus, the record indicates that the function of Jinko's anti-reflective glass places it within both Commerce's definition of "absorbent" and also the Romanian HTS exclusion.  Commerce explanation fails to consider Jinko's record submissions and arguments which detract from its determination.   See Final Decision Memo. at 17–18.  Accordingly, Commerce's solar glass valuation is unsupported, and its determination on the issue is remanded for reconsideration or further explanation.

of the Romanian HTS in the prior review.  Final Decision Memo. at 17.  However, "each administrative review is a separate segment of proceedings with its own unique facts" and thus stands on its own record.  See Peer Bearing Co.-Changshan v. United States, 32 CIT 1307, 1310 (2008).

[15] Commerce does not address the remainder of the exclusionary language contained in Romanian HTS 7007.19.80, reading "Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Vehicles." Pets. Pre-Prelim SV Cmts. at Exh. 9.

## III.    Valuation of Electricity

Jinko challenges Commerce's valuation of electricity in its final determination.[16]  Jinko Mot. at 29.  Jinko argues that Commerce's decision to exclude off-peak hour rates as well as rates from the Sabah and Sarawak regions renders its decision unsupported by substantial evidence.[17]  Id.  Defendant argues that Commerce's choice is supported by substantial evidence.  Def. Resp. at 41–43.  For the reasons that follow, the Court sustains Commerce's electricity valuation.

Here, Commerce's decision is reasonable.  When determining the best available information, Commerce determined that its interest in specificity would be better served by using the electricity rate from peninsular Malaysia—the location of the only known Malaysian producer of solar cells and modules.  Final Decision Memo. at 59.  Commerce reasoned that although it generally prefers SVs that represent broad-market averages, the inclusion of rates from regions where solar cells are not manufactured—such as the Sabah and Sarawak regions—would produce a less specific SV.  Final Decision Memo. at 59–60.  Commerce's determination is reasonable given the high-voltage electricity rates required for solar cell and module

---

[16]  Plaintiffs Trina, JA Solar, and BYD each support, incorporate, and adopt Jinko's arguments concerning Commerce's valuation of electricity.  See Trina Mot. at 53–54; JA Solar Mot. at 8; BYD Mot. at 13.

[17]  The Sabah and Sarawak regions are located on the Island of Borneo, which is east of the Malaysian peninsula that connects to the mainland.  See Final Decision Memo. at 59.

manufacturing that is present in Peninsular Malaysia and absent from areas without

known producers.  See id.; Def. Resp. at 41–42.

Jinko's challenge to Commerce's exclusion of the Sabah and Sarawak regions,

which it claims is based upon "speculative presumptions," fails to persuade.  See

Jinko Mot. at 29.  Commerce inferred that there were no solar cell manufacturers in

these regions.  See Final Decision Memo. at 59; Def. Resp. at 42.  Record evidence

suggests peninsular Malaysia contains the only known solar cell and module

manufacturer in the country.  Jinko First SV Cmts. at Exh. 11B.  Commerce explains

that rates in the Sabah and Sarawak regions "do not include high voltage industrial

rates" of electricity use that would be indicative of solar cell and module

manufacturing.  See id. at Exh. 6 (containing electricity rates for peninsular Malaysia

and the Sabah and Sarawak regions); Final Decision Memo. at 59.  In the absence of

submissions by Jinko to the contrary, Commerce's inferences from the record

evidence are reasonable.  See State Farm Mut. Auto. Ins. Co., 463 U.S. at 43

(requiring a demonstration of a rational connection between the agency's conclusion

and the facts found); Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933

(Fed. Cir. 1984) (determining that Commerce may draw reasonable inferences from

the record).

Moreover, and contrary to Jinko's contention, see Jinko Mot. at 29–30,

Commerce's decision to exclude off-peak hour rates is also reasonable.  See Final

Decision Memo. at 60.  Both Jinko and Risen provided information indicating that

the peak hour electricity rates in peninsular Malaysia were in effect 14 hours a day. See Jinko First SV Cmts. at Exh. 6 (containing electricity rates for peninsular Malaysia and the Sabah and Sarawak regions); Risen First SV Cmts. at Exh. SV-6–SV-7 (same); see also Final Decision Memo. at 60. Although Jinko argues that Commerce's selection is not specific because Jinko operates during both peak and non-peak hours, neither Jinko nor Risen submitted their hours of operation. See Final Decision Memo. at 60; Def. Resp. at 42; see also Jinko Mot. at 29 (stating the record does not contain Jinko's hours of operation); QVD Food Co., Ltd., 658 F.3d at 1324 (noting it is the parties' burden to develop the record). Thus, Commerce reasonably selected peak hour electricity rates as they are in effect for the majority of the day in all of the regions. Final Decision Memo. at 60. Accordingly, Commerce's electricity valuation is sustained.

## IV.    Ocean Freight

Jinko challenges Commerce's use of Descartes and Maersk Line data to value ocean freight, claiming: (1) they are unreliable because the rates used by Commerce are price quotes and do not reflect broad market averages; and (2) alternatively, that Commerce should have included Drewry and Freightos Data in its ocean freight valuation because Jinko claims them to be "more reliable than Maersk and provide an all-in, fully loaded cost" of the ocean freight at issue. Jinko Mot. at 33–37; id. at 36. Risen also challenges Commerce valuation of ocean freight, claiming Commerce should rely only on the more specific Descartes data, which includes coverage of solar

panels and other solar products, unlike the Maersk data that reflects a "general category of electronic appliances." Risen Mot. at 25–26.[18] Defendant contends that Commerce reasonably relied on Maersk and Descartes data rather than Drewry and Freightos data because the data were publicly available, "inclusive of product-specific rates for similar shipping routes to those used by the respondents." Def. Resp. at 31, 36. For the following reasons, the Court sustains Commerce's determination.

Here, Commerce's use of the Descartes and Maersk Line data to value ocean freight is reasonable. First, Commerce's determination that the Descartes and Maersk Line data are specific is supported by the record. The Descartes data reflects rates for shipping monocrystalline modules, and the Maersk data reflects rates for the same type of containers and the same size of shipments for electronic goods— which Commerce considers comparable to monocrystalline modules. See [Risen's] Final [SV] Cmts. at Exh. SV2-7, PDs 321-323, bar code 4149250-01, (Aug. 3, 2021) ("Risen Final SV Cmts.") (containing Descartes ocean freight rate data as exhibits); Am. Alliance for Solar Mfg. Ocean Freight [SV] Data at Exh. 1, PD 393, bar code 4189032-01 (Dec. 8, 2021) ("Pet. SV Cmts.") (containing Maersk ocean freight rates data as exhibits); Final Decision Memo. at 23 ("[Commerce] believe[s] solar modules would correspond to items within the electronic goods shipment category").

---

[18] Plaintiffs Trina, JA Solar, and Shangluo BYD each support, incorporate, and adopt Jinko and Risen's arguments concerning Commerce's ocean freight valuations. See Trina Mot. at 53–54; JA Solar Mot. at 8; BYD Mot. at 13.

**PUBLIC VERSION**

Moreover, Commerce confirmed the data from Descartes excluded rates for shipments of hazardous materials and those in temperature-controlled containers—rates that are inapplicable to the merchandise at issue. Final Decision Memo. at 23. Commerce reached the same conclusion for the Maersk data based upon its "high level of detail" that similarly failed to include charges for hazardous material or temperature-controlled containers, which "would [be] expected[ed] if such charges were included."[19] Id. Commerce reasonably concluded that the shipping of modules does not incur special charges nor require special handling or containers in the absence of evidence to the contrary—a contention that Risen fails to rebut. See generally Risen Mot. Commerce thus justifies the use of both Descartes and Maersk data based on its finding both are specific.[20]

Although the Maersk data does not reflect actual transactions, it is reasonably discernable that Commerce viewed the data as reliable. In particular, Commerce explains that it relied upon Maersk data in part because the data reflected daily reported prices at which international ocean freight is offered by Maersk. See Final

---

[19] Both the Maersk and Descartes data include detailed information regarding the types of charges calculated in the total ocean freight rate, such as brokerage and handling charges. See Risen Final SV at Exh. SV2-7; Pet. SV at Exh. 1; see also Final Decision Memo. at 23.

[20] Commerce states it needs to value expenses for multiple routes, but Descartes rates for shipping monocrystalline modules apply to only a single route. See Risen Final SV at Exh. SV2-7; Final Decision Memo. at 23.

Decision Memo. at 24 (citing <u>Crystalline Silicon Photovoltaic Cells, Whether or Not</u> <u>Assembled Into Modules, from the People's Republic of China; 2011–2012</u>, 80 Fed. Reg. 1,021 (Dep't Commerce Jan. 8, 2021) (preliminary results) and accompanying preliminary decision memo. at 33; <u>Crystalline Silicon Photovoltaic Cells, Whether or</u> <u>Not Assembled Into Modules, From the People's Republic of China</u>, 81 Fed. Reg. 93,888 (Dep't Commerce Dec. 22, 2016) (preliminary results and determination) and accompanying preliminary decision memo. at 26).  Additionally, Commerce did not rely solely on the Maersk data.  Rather, because Commerce needed to value ocean freight expenses for multiple routes, using both the Descartes and Maersk rates provided the best information for the various routes they cover based on Commerce's finding that the sources are comparable in terms of specificity.[21]  Thus, the Descartes data combined with the Maersk data reasonably supports Commerce's determination that the data it relied upon reflected broad market averages.  <u>See</u> Final Decision Memo. at 23; Def. Resp. at 34–35.

---

[21] Risen claims Commerce did not properly consider contemporaneity when averaging the Maersk and Descartes data.  Risen Mot. at 26–27.  Risen argues that Commerce should have weighted the Descartes data, containing data from every month during the period of review, more than the Maersk data, containing four months of data.  <u>Id.</u> at 26.  Commerce considered both contemporaneity and specificity when it averaged the Descartes and Maersk data.  <u>See</u> Final Decision Memo. at 22–23, 25; Def. Resp. at 31–37.  Risen objects to Commerce's weighing of those concerns in averaging the data.  The Court will not reweigh the evidence.

Commerce also sufficiently explained its decision to reject the Drewry and Freightos data.  Commerce explains the Drewry and Freightos data fail to identify the types of materials shipped and whether the materials were hazardous, and further that the Freightos data does not identify whether the containers were temperature controlled.  Final Decision Memo. at 23.  In contrast to the Descartes data, the Drewry and Freightos data fails to include a precise itemized breakdown identifying specific rates.  Compare Risen Final SV Cmts. at Exh. SV2-7, and Pet. SV Cmts. at Exh. 1, with Jinko First SV Cmts. at Exh. 10C–10D (containing Drewry and Freightos ocean freight rates data as exhibits); see also Final Decision Memo. at 23. Indeed, a review of the data reflected in Drewry and Freightos reveals the sources include only the dates of shipment, the ports of origin and destination, the container types, the canonical loads, and the price statistics and rates—but not the type of merchandise shipped—and therefore is not sufficiently specific.  See Jinko First SV Cmts. at Exh. 10C–10D. Accordingly, Commerce's decision to value ocean freight based on Maersk and Descartes data is reasonable, and its determination on the issue is sustained.

## V.    Air Freight

Jinko argues that Commerce should value air freight using data from the International Air Transport Association ("IATA") because it is publicly available and

Consol. Court No. 22-00219                                                Page 34
**PUBLIC VERSION**

route specific.[22] Jinko Mot. at 30−33.  Defendant counters that Commerce reasonably

relied on the Freightos data to value air freight rates because Freightos data is

publicly available, represents broad-market averages, and is specific to the inputs

being valued.  Def. Resp. at 37.  For the reasons that follow, the Court remands

Commerce's determination for further explanation or consideration.

Commerce reasons that the Freightos data satisfied several of its criteria,

stating it was "publicly available, contemporaneous with the period under

consideration, broad-market averages, tax and duty-exclusive and specific to the

inputs being valued."   Final Decision Memo. at 43.  Commerce rejected the IATA

data because portions of it were not on the public record of this review.  Id.  Commerce

states that:

> The only public IATA information on the record is a monthly average of
> its rates.  The public information contains no details about the rates and
> no details about how the data were obtained.  Thus, almost none of the
> underlying IATA data and information regarding the IATA data
> collection are publicly available.

Id.

Although Jinko placed the IATA data on the record, much of it is designated

as business proprietary information ("BPI") and is thus on the confidential record

rather than the public record of this review.  Commerce appears to view the

preference for publicly available information as one that requires information to be

---

[22] Jinko's challenge to air freight is joined by Trina, JA Solar, and BYD.  See Jinko
Mot. at 30–33; Trina Mot. at 53–54; JA Solar Mot. at 8; BYD Mot. at 14.

Consol. Court No. 22-00219                                                          Page 35
**PUBLIC VERSION**

placed on the public record.[23]  Id. at 43–44 (emphasizing "publicly available" nature

of the Freightos data when rejecting the IATA data).  Commerce's regulations and

policy bulletin do not appear to mandate that information be on the public record;

rather, Commerce prefers data that is "publicly available."  See 19 C.F.R. § 351.408(c)

(stating normally Commerce will use publicly available information); Policy Bulletin

04.1 (noting Commerce's stated practice is to use publicly available data).

It is unclear why "publicly available" reasonably means "on the public record."

Indeed, Commerce's regulation governing calculations of normal value in NMEs, see

19 C.F.R § 351.408(c), was modified in 1996 to indicate a preference of using "publicly

available information" from the pre-modification preference of "published

information."  Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,344

(Dep't Commerce Feb. 27, 1996).  In the modification's promulgation, Commerce shed

light on the balance sought in preferencing publicly available information:

> Two important practices have arisen to promote the accuracy,
> fairness and predictability of the factor valuation process.  First, the
> Department has developed a preference for using publicly available,
> published information ("PAPI") to derive factor prices.  This practice,
> along with the practice of attempting to use data derived from a single
> surrogate country, clearly enhances the transparency and predictability
> of our determinations.  However, based on experience, the Department
> has concluded that a preference for PAPI also can result in decreased
> accuracy.  This is particularly true where surrogate country trade

---

[23] Jinko also claims that although the route specific Shanghai-Atlanta data was
originally submitted as BPI, it was subsequently disclosed and put on the public
record.  Jinko Mot. at 31.  Commerce nonetheless found the public data insufficient
because it only included monthly average rates and no details about how the data
was obtained.  Final Decision Memo. at 43.

> statistics are used and the import/export categories used to derive unit values are broad.
>
> In order to strike a better balance between the goals of accuracy and transparency, paragraph (c)(1) drops the preference for published information, limiting the preference to publicly available information. The public availability standard is aimed at promoting transparency, while the deletion of the published information standard enables the Department to achieve greater accuracy when information on the specific factor can be derived outside of published sources. Paragraph (c)(1) is not meant to preclude the Department from using published information. Instead, it is intended to reflect the Department's preference for input specific data over the aggregated data that frequently appear in published statistics.

Id. (internal citations omitted). Thus, it would appear that Commerce prefers publicly available information to foster accuracy, fairness, and predictability.

Given the nature of the administrative proceeding in which Commerce assesses data to determine whether it is the best information available, it is unclear from Commerce's explanation why the information must not only be publicly available, albeit through a subscription, but also on the public record. Presumably, Commerce and interested parties can debate the accuracy or relevance of information on the confidential record. Interested parties would also presumably be able to subscribe to the data to ascertain whether there were concerns of the type that might arise with other non-publicly available information, i.e., price quotes. See e.g., An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, 179 F. Supp. 3d 1256, 1277–78 (Ct. Int'l Trade 2016) (noting sometimes the origin of price quotes may be unclear). If Commerce is concerned with verifying the accuracy of the data and its origin, it can do so with reference to the confidential data. Thus, Commerce should

further consider or explain how publicly available information on the confidential

record fails to promote accuracy, fairness and predictability.

## VI.    Backsheet

Risen[24] contends that its backsheet should be categorized as film instead of

sheet, and thus should be valued by Commerce using Malaysian HTS 3920.62.90[25]—

covering film—rather than Malaysian HTS 3920.62.10—covering sheet.[26] Risen Mot.

at 23−25; Def. Resp. at 27.    Defendant argues that Commerce supports its

determination to value backsheet using the HTS heading 3920.62.10, covering sheet,

rather than HTS 3920.62.90, covering film, because ASTM specifications provide that

film would be less than 0.25mm thick, and the backsheet at issue is greater than

0.25mm thick.    Def. Resp. at 26−27.    For the reasons that follow Commerce's

determination is sustained.

Here, Commerce reasonably relies on the use of the Malaysian HTS 3920.62.10

to value Risen's backsheet.    Commerce placed the ASTM abstracts on record and

determined that Risen's backsheet is sheet rather than film, and thus classifiable

under HTS 3920.62.10 rather than HTS 3920.62.90.[27]    Final Decision Memo. at 45.

---

[24]  Risen's challenge to the backsheet SV is joined by Trina, JA Solar, and BYD.  See
Risen Mot. at 23−25; Trina Mot. at 53−54; JA Solar Mot. at 8; BYD Mot. at 14.
[25]  The description Malaysian HTS 3920.62.90 is: "Polyethylene Terephthalate: Other
than plates and sheets."  Final Decision Memo. at 48 n.268.
[26]  The description for Malaysian HTS 3920.62.10 is: "Polyethylene Terephthalate:
plates and sheets."  Final Decision Memo. at 48 n.269.
[27]  The Malaysian HTS itself does not distinguish "sheet" and "film."  See Final
Decision Memo. at 48 nn.268−69.

The ASTM abstracts explain that plastic film is less than 0.25mm thick, while plastic sheet is 0.25mm thick or greater.  See [Commerce] Memo.: Placing [SV] Info on the Rec. at Attachs. IV, VI, PD 78–79, bar codes 4096146-01–02 (Mar. 8, 2021) ("Commerce SV Memo.").  ASTM is an "authoritative standards organization," and the ASTM abstracts offer a definition of the term "film."  Commerce SV Memo. at Attach. IV:2 ("Film is defined in Terminology D883 as an optional term for sheeting having a nominal thickness no greater than 0.25mm[.]").  As Risen argues, the ASTM abstracts "is not focused on film compared to sheet or providing definitive, necessary differences between the two terms."  Risen Mot. at 24.  Nonetheless, Commerce reasonably infers the parameters of film and sheet from these standards.  See Commerce SV Memo. at Attach IV:2.

Risen further claims that its backsheet conforms to industry standards that would recognize it as film.  Risen Mot. at 24–25 (first citing Risen Sect. D Resp. at Exh. D-32; and then citing Risen Final SV at Exh. SV2-4, 2-5).  Risen's argument is unpersuasive.  Commerce considered and discounted Risen's position that 3M's specifications refer to backsheet as film.  The record lacks evidence that 3M's characterization "is based on the technical definition [of film] . . . [or] correspond to the term 'film' used in the Malaysian HTS or in other generally recognized authoritative sources."  Final Decision Memo. at 46; see generally Risen Final SV Cmts. at Exh. SV2-5 (containing 3M's backsheet information).  Risen's other two submissions of solar manufacturer data are similarly lacking in this regard and

devoid of any indication they are based on technical definitions or authority.  See

Risen Final SV at Exh. SV2-5.  Accordingly, Commerce's decision on the issue is

sustained.

## VII.   EVA

Similar to the dispute over Commerce's backsheet SV determination, Risen[28]

argues that Commerce should have valued Risen's EVA—claimed to be recognized by

both 3M and Chinese national standards as "film"—under Malaysian HTS

3920.10.90.[29]  Risen Mot. at 23–25.  Defendant counters that Commerce properly

selected Malaysian HTS 3920.10.19[30] covering "sheet" based on the ASTM standards

concerning thickness of the materials.  Def. Resp. at 29–30 (citing Commerce SV

Memo. at Attach. IV, VI); Final Decision Memo. at 46–47.  Consistent with the

determination on backsheet, Commerce's decision on EVA SV is sustained.

As previously discussed, the ASTM abstracts provides a description of "sheet"

and "film" on the record.  ASTM describes plastic film as being less than 0.25mm

thick.  Commerce SV Memo. at Attach. IV:2 (citing Terminology D883).  Conversely,

plastic sheet is 0.25mm thick or even thicker.  Compare id. at Attach IV:2 ("film is

defined . . . as an optional term for sheeting having a nominal thickness no greater

---

[28]  Risen's challenge to the EVA SV is joined by Trina, JA Solar, and BYD.  See Risen
Mot. at 23–25; Trina Mot. at 53–54; JA Solar Mot. at 8; BYD Mot. at 14.
[29]  The description for HTS 3920.10.90 is "Polymers of ethylene: other than plates and
sheets."  Final Decision Memo. at 46 n.256.
[30]  The description for HTS 3920.10.19 is: "Polymers of ethylene: plates and sheets
(other than rigid)."  Final Decision Memo. at 46 n.257.

than 0.25 mm"), <u>with</u> Commerce SV Memo. at Attach. VI:1 ("standard specification for polyethylene sheeting in thickness of 0.25 mm [] and greater").

Here, Commerce's decision to value Risen's EVA using HTS 3920.10.19 data is reasonable. Record evidence supports Commerce's conclusion that Risen's EVA is over 0.5mm thick and thus Commerce properly determined that Risen's EVA is categorized as sheet rather than film pursuant to the ASTM abstracts' description. Furthermore, the 3M and Chinese national standards fail to contain any authoritative definition of "film" or "sheet" or references to any other definitions of these terms submitted to the record. As discussed, it is unclear if the specifications and standards offered by Risen are supported by "other generally recognized authoritative sources". <u>See generally</u> Risen Final SV at Exh. SV2-5 (containing 3M's specifications); [Commerce] Suppl. Questionnaire To [Risen] at Attach. II, Exhs. SQ-8, PD 255, CD 354–55, bar code 4140187-02 (July 7, 2021) (containing EVA Film Chinese National Standard). The Court will not re-weigh the evidence on the record. Therefore, it was reasonable for Commerce to rely on ASTM abstracts and Malaysian HTS 3920.10.19 to value Risen's EVA. Accordingly, Commerce's decision on the matter is sustained.

## VIII. Financial Statements

Jinko challenges Commerce's financial ratios calculation, arguing that Commerce should have included Flextronics Shah Alam SDN. BHD.'s ("Flextronics") financial statements in addition to JA Solar Malaysia's when calculating surrogate

**PUBLIC VERSION**

financial ratios used in this review.[31]  Jinko Mot. at 37–41.  Jinko reasons that doing

so (i) creates a broader market average, and (ii) makes the surrogate financial ratio

more specific.  Id.  Defendant responds that Commerce properly excluded Flextronics'

financial statements from the calculations, reasoning that its statements are less

specific than JA Solar Malaysia's because Flextronics does not produce identical

merchandise.  See Final Decision Memo. at 37–39; Def. Resp. at 43.

When selecting the best available information to calculate surrogate financial

ratios, see 19 U.S.C. § 1677b(c)(1); Policy Bulletin 04.1, Commerce gives preference

to financial statements from companies that produce identical merchandise rather

than merely comparable merchandise.  Final Decision Memo. at 37; see also Def.

Resp. at 44 (citing Antidumping Duties; Countervailing Duties, 61 Fed. Reg. at 7,345–

45 (expressing preference for identical merchandise in the interest of specificity)).

Here, Commerce's decision to use JA Solar Malaysia's financial statements

rather than Flextronics' for calculating surrogate financial ratios is reasonable.

Respondents produce solar cells and solar modules.  The record evidence confirms

that JA Solar Malaysia produces both solar cells and solar modules—merchandise

that is exactly identical to what is being considered in the underlying review.  See

Jinko First SV Cmts. at Exhibit 11A; Risen First SV Cmts. at Exh. SV-11.  Despite

---

[31]  Jinko's challenge to Commerce's surrogate financial ratio calculations is joined by
Trina, JA Solar, and BYD.  See Jinko Mot. at 37–41; Trina Mot. at 53–54; JA Solar
Mot. at 8; BYD Mot. at 13–14.

Jinko's claims, the record does not support the assertion that Flextronics produces identical merchandise.  See Jinko First SV Cmts. at Exh. 11C.  Rather, Flextronics engages in "contract manufacturing for electronic products and trading of electronic goods and related products."  See id.  Further, Jinko's challenge amounts to an improper request for the Court to re-weigh the evidence on the record.  See Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015).  Thus, surrogate financial ratios produced from JA Solar Malaysia's financial statements are more representative and specific than those of Flextronics.  For the above reasons, Commerce's determination on the matter is reasonable and thus sustained.

## IX. Deductibility of 301 Duties

Jinko claims Commerce improperly deducted Section 301 duties from U.S. prices, arguing that the Section 301 duties are special duties and not "United States import duties."[32]  See Jinko Mot. at 41–45 (citing 19 U.S.C.§ 1677a(c)(2)(A)).  Defendant contends that Commerce appropriately treated the Section 301 duties as U.S. import duties.  Def. Resp. at 50–59.  The Court sustains Commerce's determination.

Commerce calculates a dumping margin equal to "the amount by which the normal value exceeds the export price or constructed export price."  U.S. Steel Corp. v. United States, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)).

---

[32] Plaintiffs Trina, JA Solar, and BYD adopt and incorporate Jinko's challenge to the deductibility of 301 duties.  See Trina Mot. at 53–54; JA Solar Mot.; 9; BYD Mot. 14.

Congress has provided for certain adjustments to the export price. See 19 U.S.C.

§ 1677a(c). Pertinent here, 19 U.S.C. §1677a(c)(2)(A) provides:

> The price used to establish export price and constructed export price
> shall be reduced by . . . the amount, if any, included in such price,
> attributable to any additional costs, charges, or expenses, and United
> States import duties, which are incident to bringing the subject
> merchandise from the original place of shipment in the exporting
> country to the place of delivery in the United States[.]

Congress provided for the deduction of U.S. import duties from the export price or

U.S. price as part of the normal cost of importation in order to maintain an "apples

with apples" comparison between U.S. price and normal value. Smith-Corona Group

v. United States, 713 F.2d 1568, 1578 (Fed. Cir. 1983). Antidumping duties are not

deducted from the U.S. price because they are considered special duties—rather than

U.S. import duties—which avoids a "circularity problem in which the imposition of

antidumping duties would itself result in increased antidumping duties." Shanghai

Tainai Bearing Co., Ltd. & Precision Components, Inc., 658 F. Supp. 3d 1269, 1292

(Ct. Int'l Trade 2023).

Beyond antidumping duties, the Court of Appeals concluded that Section 201

duties are akin to antidumping duties as remedial measures and therefore not

deductible as U.S. import duties. Wheatland Tube Co. v. United States, 495 F.3d

1355, 1362 (Fed. Cir. 2007) (finding that under step two of Chevron U.S.A., Inc. v.

Natural Resources Defense Council, 467 U.S. 837 (1984), Commerce's interpretation

of Section 201 safeguard duties as remedial duties was reasonable). More recently,

**PUBLIC VERSION**

the Court of Appeals in <u>Borusan Mannesmann Boru Sanayi v. Ticaret A.S.</u>
emphasized the character of the "authorized governmental action that actually
prescribed the duty on imports at issue" to determine whether a duty is an import
duty.  63 F.4th 25, 34 (Fed. Cir. 2023) (holding that certain duties imposed under
Section 232 were U.S. import duties and deductible).  As recently explain in <u>Shanghai</u>
<u>Tainai</u>, the "Federal Circuit cited language in Proclamation [No.] 9705[, 83 Fed. Reg.
11,625 (Mar. 8, 2018) ("Proclamation 9705")] declaring that the duties are to be
imposed 'in addition to any other duties' and that '[a]ll anti-dumping, countervailing,
or other duties and charges applicable to such goods shall continue to be imposed.'"
658 F. Supp. 3d at 1292 (quoting Proclamation 9705).  If the duties were not deducted
from U.S. price, the antidumping margin would offset the effect of the Section 232
duties.[33]  <u>Id.</u>

      <u>Borusan Mannesmann</u> also clarified that the Court of Appeals' holding was
consistent with its prior decision in <u>Wheatland Tube</u>, 495 F.3d 1355, because it did
not make a statute-wide categorical determination but rather focused on the
government action imposing the duties:

---

[33]  In <u>Wheatland</u>, the Court of Appeals concluded that the Section 201 duties, unlike
U.S. duties, were subject to termination provisions and were thus more akin to
antidumping duties.  495 F.3d at 1362.  In <u>Borusan Mannesmann</u>, the Court of
Appeals invoked <u>Wheatland</u> to affirm that a proclamation-specific approach to import
duties was consistent with <u>Wheatland</u> because in that case, the Court's approval of
Commerce's determination "relied in part on specifics of the particular proclamation
at issue[.]"  <u>Borusan Mannesmann</u>, 63 F.4th at 34 (citing 495 F.3d at 1363–64).

> Thus, we need not make a statute-wide categorical determination regarding all duties imposed on imports by presidential action under [Section] 232. We will focus on the character of Proclamation 9705 specifically—the authorized governmental action that actually prescribed the duty on imports at issue. This proclamation-specific approach is consistent with our decision in the [Section] 201 setting in <u>Wheatland</u>, where . . . our approval of Commerce's determination relied in part on specifics of the particular proclamation at issue there and on Commerce's own declaration that it is for the President, in the duty-creating action under the [Section] 201 regime, to determine the duty's relationship to antidumping duties.

<u>Borusan Mannesmann</u>, 63 F.4th at 34.

Here, and as this Court concluded in <u>Shanghai Tanai</u>, the Section 301 duties were enacted to be an "additional duty of 25 percent on a list of products of Chinese origin[.]" <u>See</u> 658 F. Supp. 3d at 1293 (citing <u>Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation</u>, 83 Fed. Reg. 14,906 (Off. U.S. Trade Rep. Apr. 6, 2018) ("<u>Notice of Determination Pursuant to Section 301</u>")). Although, Jinko contends that <u>Borusan Mannesmann</u> involved Section 232 duties concerning national security, Jinko Mot. 44, <u>Borusan Mannesmann</u> rejects such statute-wide distinctions. Rather, it is the text of the order imposing the duty that controls. 63 F.4th at 34. Here, the text of the notice of determination pursuant to Section 301 indicates that the Section 301 duties imposed are to be in addition to normal duties. <u>See</u> <u>Notice of Determination Pursuant to Section 301</u>, 83 Fed. Reg. at 14,907. Accordingly, Commerce's determination is reasonable, and its decision on the issue is sustained.

## X.    Application of Facts Available with an Adverse Inference

Risen argues that Commerce's resort to partial facts available with an adverse inference is unsupported by the record because market realities prevented Risen from obtaining the withheld FOP information despite multiple requests from its unaffiliated producers of solar cells and solar modules.[34]   Risen Mot. at 27–28. Defendant counters that Risen failed to act to the best of its ability in responding to requests for the missing information by choosing to do business with previously uncooperative suppliers.   Def. Resp. at 61–65.   For the reasons that follow, Commerce's determination to apply facts available with an adverse inference is sustained.

Commerce normally seeks to calculate a dumping margin based on information submitted by parties.   See Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1321 (Fed. Cir. 2010) (explaining that Commerce calculates a dumping margin after requesting information from the interested parties).   Where information necessary to calculate a respondent's dumping margin is not available on the record, Commerce shall use "the facts otherwise available" in place of the missing information.   19 U.S.C. § 1677e(a).   Typically, when using the facts otherwise available, Commerce selects neutral facts from the record.   See 19 U.S.C. § 1677e(b)

---

[34]   Risen's challenge to Commerce's application of facts available with an adverse inference is joined by Plaintiffs Trina, JA Solar, and BYD.   See Trina Mot. at 53–54; JA Solar Mot. at 9; BYD Mot. at 13.

(outlining criteria for when Commerce may use an adverse inference when selecting among the facts available).

In certain circumstances, Commerce may use "an inference that is adverse to the interests of that party in selecting among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A). However, Section 1677e(b) requires Commerce to first "find[] that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information[.]" 19 U.S.C. § 1677e(b)(1). A respondent cooperates to the "best of its ability" when it "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Use of an adverse inference is normally not warranted against a cooperative party. See Canadian Solar Int'l Ltd. v. United States, 378 F. Supp. 3d 1292, 1319 (Ct. Int'l Trade 2019) (citing Mueller Comercial de Mexico S. De R.L. de C.V. v. United States, 753 F.3d 1227, 1236 (Fed. Cir. 2014) ("Canadian Solar I")). But see Mueller, 753 F.3d at 1234 (indicating that under certain limited circumstances, Commerce may select adverse facts against a cooperative party); see also Risen Energy Co. v. United States, 477 F. Supp. 3d 1332, 1342–43 (Ct. Int'l Trade 2020) (noting Commerce failed to point to record evidence to demonstrate that a party had leverage over its supplier).

Thus, to use an adverse inference when selecting among the facts otherwise available under Section 1677e(b), Commerce must assess whether the party used its maximum efforts to secure the missing information. See Nippon Steel Corp., 337 F.3d at 1382. Where the party seeks information from an uncooperative supplier, Commerce must "consider record evidence concerning the practical ability of a respondent to induce the supplier's cooperation." Venus Wire Industries Pvt. Ltd. v. United States, 471 F. Supp. 3d 1289, 1309 (Ct. Int'l Trade 2020).

Commerce's determination to use an adverse inference in selecting among the facts otherwise available is reasonable on this record. The parties do not dispute that Risen failed to provide the necessary FOP information to Commerce, caused by Risen's unaffiliated producers' failure to cooperate. Final Decision Memo. at 8–9; Risen Mot. at 29. Risen's claim that it "used maximum market leverage" to induce cooperation of its producers by threatening to cease business relationships rings hollow. See Risen Mot. at 28. Risen indicates it threatened repercussions affecting business relationships with its suppliers if the suppliers failed to disclose FOP data to Commerce. See Risen Sect. D Resp. at Exh. D-16 (containing letter to suppliers requesting FOP data and indicating that Risen "would be forced to refuse to purchase any products" if the supplier does not cooperate); id. at App'x XIII:14 (claiming that in the first, second, and third rounds of emailed requests for FOP data, Risen "stated clearly" that it would "cease purchasing from uncooperative suppliers"). However, Risen argues in its brief that "it is not a viable business option for Risen to simply

stop purchasing cells" from uncooperative producers.  Risen Mot. at 28.  Risen

essentially concedes that its attempts to induce its suppliers' participation in this

review amounted to empty threats.

Furthermore, Risen's reliance on market realities do not excuse it from its duty

to use its maximum efforts to secure missing information.  Risen complains it could

not "stop purchasing solar cells from whichever unaffiliated producer refuses to

provide FOP data."  Risen Mot. at 28.  But as Commerce explains, Risen could have

attempted to secure compliance before doing business with these suppliers.  Final

Decision Memo. at 9 (noting that Risen could have taken steps to pre-emptively avoid

non-compliance given the history of noncompliance).  Even if Risen had no retroactive

market leverage over uncooperative suppliers in past reviews, Risen certainly had

leverage over suppliers that had previously been found uncooperative.  Although

Risen may contend that it cannot sever relationships with every single uncooperative

supplier, it certainly could sever relationships with some.  Risen could undertake

efforts to incentivize compliance with suppliers, i.e., offer to pay more or establish an

agreement to keep information confidential.

This Court's role is not to imagine efforts Risen could have made to try to

secure compliance; Risen is tasked with putting forth its maximum effort.  Nippon

Steel Corp., 337 F.3d at 1382.  But it is not hard to imagine efforts that could have

been taken.  Risen offers nothing.  Certainly, for Risen to cooperate to the "best of its

ability" and "put forth its maximum effort" does not require complete success in every

instance, but it does require that Risen show that it has tried to do something more than that which has failed in the past.  Because Risen was aware that it was dealing with uncooperative suppliers, its inaction fails to demonstrate that it has put forth its best effort to induce cooperation.

Risen cites prior opinions of this Court to argue that an adverse inference is not warranted in cases where a respondent has no control over an uncooperative supplier.  Risen Mot. at 30–31 (first citing <u>Canadian Solar I</u>, 378 F. Supp. 3d 1292; and then citing the Court's discussion of <u>Mueller</u> in <u>Risen Energy Co.</u>, 477 F. Supp. 3d at 1343–44).  Risen extends these cases passed what their holdings permit.[35] Whether a party has put forth the maximum effort is necessarily case and context specific.  A party asked to retroactively secure compliance over a non-cooperative supplier in the absence of market leverage is different from a respondent who purchases from a supplier who it knows has been non-compliant in the past.  Risen's past efforts threatening termination of business arrangements proved unsuccessful.  Final Decision Memo. at 9 (explaining that Risen was aware that its suppliers had been uncooperative in the past). Given its past inability to secure information from its suppliers, it is not unreasonable to expect Risen to demonstrate that it put forth

---

[35]  The cases cited by Risen also involved Commerce's invocation of 19 U.S.C. § 1677e(a) as prescribed by <u>Mueller</u>.  Risen Mot. at 30–31. The Court of Appeals concluded in <u>Mueller</u> that Commerce may incorporate an adverse inference under Section 1677e(a) to calculate a cooperative respondent's margin in certain circumstances.  753 F.3d at 1233.

its maximum effort in advance of this review.  [Risen] Supp. Questionnaire Resp. at

17–19, Exh. SQ-8, PD 179, CDs 294, 296, bar code (June 21, 2021) (listing

uncooperative suppliers with whom Risen has continued doing business despite

failure to comply with Commerce's requests); see also Risen Sect. D Resp. at Exh. D-

20, D-24 (listing length of supplier relationships). Commerce's determination to apply

facts available with an adverse inference is therefore reasonable and sustained.

## XI.    Calculation of Rate for Facts Available with an Adverse Inference

Risen argues that Commerce should follow the methodology it used in previous

segments of this proceeding, entailing use of facts available with an adverse inference

to adjust each reported FOP quantity, rather than averaging quantities from three

separate groups of input data as used in the instant review.[36]  Risen Mot. at 31–34.

Defendant argues that continued use of the previous methodology would fail to yield

a consumption rate that is "sufficiently adverse" for Risen, and thus it appropriately

elected to use a different methodology under the circumstances. Def. Resp. at 65–70.

For the reasons that follow, Commerce's final determination to apply this alternative

methodology is remanded for further explanation or reconsideration.

As previously discussed, Commerce is instructed by statute to "use the facts

otherwise available" in reaching its determination in certain circumstances where

---

[36] Risen's challenge to Commerce's calculation methodology is adopted and
incorporated by Plaintiffs Trina, JA Solar, and BYD.  See Trina Mot. at 53–54; JA
Solar Mot. at 9; BYD Mot. at 13.

"necessary information is not available on the record" 19 U.S.C. § 1677e(a). Once

Commerce decides to use the facts otherwise available, Section 1677e(b) allows

Commerce to impose "an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available[.]" 19 U.S.C. § 1677e(b)(1). An

adverse inference "may include reliance on information derived from," inter alia, any

information placed on the record. 19 U.S.C. § 1677e(b)(2).

Although the statute permits Commerce to rely on an adverse inference,

Commerce is still obligated to base its determinations on substantial evidence. See

19 U.S.C. § 1516a(b)(1)(B)(i); Gallant Ocean, 602 F.3d at 1325. The purpose of

determining a rate using an adverse inference in selecting facts available is to

incentivize cooperation, rather than imposition of "punitive, aberrational, or

uncorroborated margins." F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United

States, 216 F.3d 1027, 1032 (Fed. Cir. 2000); Uruguay Round Agreements Act,

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 835 (1994),

reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("[Under 19 U.S.C. § 1677e(b), Commerce]

may employ adverse inferences about the missing information to ensure that the

party does not obtain a more favorable result by failing to cooperate than if it had

cooperated fully"). Although Commerce may include a built-in increase for

deterrence, "Commerce cannot impose a deterrence factor far beyond the amount

sufficient to deter respondents from future non-compliance." Dongguan Sunrise

Furniture Co. v. United States, 37 CIT 1404, 1407–08 (2013) (citing Gallant Ocean,

602 F.3d at 1324), superseded on other grounds by statute, Trade Preferences

Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, as recognized in Deacero

S.A.P.I. de C.V. v. United States, 456 F. Supp. 3d 1263, 1271 n.13 (Ct. Int'l Trade

2020).

Here, Commerce, noting that the record is missing FOP data (including the

quantities of inputs consumed in producing solar cells and solar modules), explains

its methodology in its Preliminary Results Analysis Memorandum at 3, PD 398, CDs

462–69, bar code 4194623-01 (Dec. 16, 2021) ("Commerce Prelim. Results Memo. For

Risen"): [37]

> We based the [facts otherwise available with an adverse inference]
> adjustment on the average of ratios that we calculated for each input by
> dividing the average of the consumption figures for that input that were
> reported for multi-crystalline CONNUMs, other than the multi-
> crystalline CONNUM with the highest per-unit consumption of the
> input, by the highest consumption figure reported by Risen for that
> input for any multi-crystalline CONNUM (or in the case of by-products,
> the lowest reported consumption figures reported for these CONNUMs).
> We divided the average of all of these ratios into 1 to derive [facts
> otherwise available with an adverse inference] adjustments . . . [38]

Commerce then explained its methodology in the Final Decision that it:

---

[37] Data was missing for [[        ]] percent of the solar cells that were used in the
solar modules that Risen produced during the period of review (POR) and [[        ]]
percent of the solar modules that Risen produced during the POR.  Commerce Prelim.
Results Memo. For Risen at 3.

[38] The specific adjustment rates are [[        ]] for solar cells, [[        ]] for solar
modules, and [[        ]] for packing.  Commerce Prelim. Results Memo. For Risen at
3.

> applied [facts otherwise available with an adverse inference] by
> calculating average ratios of the reported consumption quantities to the
> highest consumption quantities for three separate groups of inputs, all
> solar module FOPs, all solar cell FOPs, and all packing FOPs. . . . then
> multiplied the reported per-unit consumption quantity of each solar
> module FOP, each solar cell FOP, and each packing FOP, by the relevant
> average adjustment ratio to increase the reported quantities, as [facts
> otherwise available with an adverse inference].

Final Decision Memo. at 11. Commerce determined that applying this increase to each "per-unit consumption quantity" was a reasonable methodology to calculate a rate because simply selecting the most adverse facts available would not have been sufficiently adverse in Commerce's view. Id. at 11–12. Defendant argues that Commerce's approach is permitted under the statute, which allows it to "base [a facts otherwise available with an adverse inference] rate on any other information placed on the record." Def. Resp. at 67 (internal citation and quotations omitted).

Commerce's methodology is contrary to law and unsupported by substantial evidence. Commerce failed to select among the facts otherwise available in the instant review, and instead created facts by manipulating evidence on the record. Defendant argues that Commerce "base[d] a[] [facts otherwise available with an adverse inference] rate" on record facts and thus derived the rate from record information. Id. Even if the statute were capacious enough to allow Commerce to derive facts by manipulating factual information, the random manipulation of data to construct an adjustment ratio cannot be considered a derivation under 19 U.S.C. § 1677e(b)(2). Commerce offers no explanation of why it grouped various inputs together or why it chose the formula it did.

Further, assuming that the statute allows Commerce to manipulate record data to construct an adjustment ratio, the methodology would need to be reasonable. Vincentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1342 (Ct. Int'l Trade 2019) (noting that even though Commerce has discretion to select a calculation methodology in a determination, that methodology must nonetheless be reasonable), aff'd, 42 F.4th 1372, 1382 (Fed. Cir. 2022). Commerce would need to explain why the grouping it selected was logical, how the formula worked, and how any of the choices made serve the purpose of the statute to promote accuracy and deterrence. See 19 U.S.C. § 1677e(b), (c). Commerce's statement that selecting from the facts available is not "sufficiently adverse" does not explain why its new methodology is reasonable. Here, Commerce created three categories of inputs and manipulated the consumption ratios for the inputs in the categories to arrive at a consumption adjustment rate. Final Decision Memo. at 11. Even if Commerce could argue that it "derived" the adjustment rate from facts on the record, it fails to explain why its methodology in doing so is reasonable or promotes accuracy. See Mueller, 753 F.3d at 1233; Vincentin S.A.I.C., 404 F. Supp. 3d at 1342. Accordingly, Commerce's determination on the issue is remanded for reconsideration or further explanation.

## XII.    Recalculation of the Separate Rate

Trina, JA Solar, and BYD argue that as the separate rate is derivative of the mandatory respondent's rate, that the Court should instruct Commerce to recalculate the separate rate consistent with its redeterminations. Trina Mot. at 54; JA Solar

Mot. at 7–8; BYD Mot. at 12–13.  Commerce will necessarily recalculate the separate

rate for JA Solar and BYD following its redetermination.[39]

## CONCLUSION

Commerce's determinations concerning: (1) Trina's separate rate status; (2)

valuations of Plaintiffs' electricity, ocean freight, backsheet, and EVA; (3) use of JA

Solar Malaysia's financial statements to calculate surrogate financial ratios; (4)

deduction of Section 301 duties; and (5) use of facts available with an adverse

inference against Plaintiffs are sustained.  Commerce's determinations involving its

solar glass and air freight valuations and its methodology for calculating facts

available with an adverse inference rate are remanded for further explanation or

consideration consistent with this opinion.  In light of the foregoing, it is

**ORDERED** that the final results, see ECF No. 24-4, are remanded for further

explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's determination of the review specific rate

applicable to JA Solar and BYD is remanded for reconsideration consistent with this

opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the

Court within 90 days of this date; and it is further

---

[39] Trina is not entitled to assignment of a recalculated separate rate given the Court's
determination that Commerce reasonably denied assigning Trina a separate rate in
the instant review.

**PUBLIC VERSION**

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing its remand redetermination.


                                                     /s/ Claire R. Kelly
                                                     Claire R. Kelly, Judge

Dated:          May 1, 2024
                New York, New York