UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO. LTD., ET AL.,<br>　　　　　　　Consolidated Plaintiff,<br><br>　　and<br><br>RISEN ENERGY CO., LTD.,<br>　　　　　　　Consolidated Plaintiffs,<br><br>　　v.<br><br>UNITED STATES,<br>　　　　　　Defendant,<br><br>　　and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,<br>　　　　　　　Defendant-Intervenor. | Consol. Court No. 22-00219 |

## CONSOLIDATED PLAINTIFF'S REMAND COMMENTS

Gregory S. Menegaz
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*

Dated: October 30, 2024

# TABLE OF CONTENTS

I.    The Department's Glass Surrogate Value Is Not Supported by Substantial Evidence ................................................................................................. 1

II.   The Department's Determination to Rely Upon the Romanian Glass Value is Not Supported by Substantial Evidence ................................................. 1

      A.  The Court's Findings and Remand Instructions ............................. 1

      B.  Unit of Measurement ...................................................................... 2

      C.  The Department's Well-Established Practice Is to Rely on All Surrogate Values from the Primary Surrogate Country ................... 9

      D.  Reflective Glass ............................................................................. 13

III.  The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law ....................................................................... 15

IV.   Conclusion and Prayer for Relief ......................................................... 19

# TABLE OF AUTHORITIES

## CASES

*CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277 (2011)..........................................16

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)..........................................7

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983)..............4-5

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ............................................................................................................................................17

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016)..................................................................................................................10

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ..........................................13

*Michigan v. Bay Mills Indian Community*, Ed. 2d 1071 (U.S. 2014)............................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................5

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ................. 16-18

*NSK Ltd. v. United States*, 346 F. Supp. 2d 1312 (CIT 2004). .......................................................17

*Risen Energy*, 477 F. Supp. 3d 1378 (Ct. Int'l Trade 2021) ........................................................18

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)..............................................7, 16

## STATUTES & REGULATIONS

19 U.S.C. § 1677b(c)(1)(B) ...........................................................................................................16

19 C.F.R. 315.408(c)................................................................................................................. 9-10

## ADMINISTRATIVE DECISIONS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 46904 (Dep't Comm. 2016) ............................................................................8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (July 27, 2018)........................................................11

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019) ....................10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) .......................................................................................................15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021)........7

**OTHER AUTHORITIES**

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996) .......................................................................................................10

Consolidated Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files comments on the Department's Remand Results. *See* Remand Results (October 7, 2022); ECF 93; *see also* Slip Op. 24-53 (CIT May 1, 2024). The Court remanded to the Department three issues 1) valuation of solar glass using a Romanian import price, 2) valuation of air freight using Freightos data, and 3) the methodology for applying partial adverse facts available (AFA) to Risen's unreported FOPs. Despite the Court's remand instructions, the Department made no changes to its original Final Results. The Department claims that it followed the Court's remand instructions and offered further explanation based on substantial evidence to support its determinations for these two surrogate values and its AFA methodology. However, the Department's determination remains unsupported by substantial evidence. Risen did not use air freight, and thus only addresses the Department's determination with respect to glass and partial AFA below.

## I.  The Department's Determination to Rely Upon the Romanian Glass Value is Not Supported by Substantial Evidence.

### A.  The Court's Findings and Remand Instructions

The Court found that the Department failed to explain how the data from Malaysia, as the primary surrogate country, is unreliable such that departure from its standard practice of using the data from the primary surrogate country is justified." Slip Op. 24-53 at 23 citing 19 C.F.R. § 351.408(c)(2). The Court then went on to explain that Commerce had not explained its determination that the Romanian HTS was more specific. First, the Court found that the Department's "rationale that conversion considerations render the Malaysian data unreliable fails to acknowledge record information that detracts from its conclusion." *Id.* at 24. The Court discussed that the only reason the respondents submitted their solar glass purchases on a KG basis was at the Department's own instruction (Slip Op. 24-53 at 24) and just as reliably could, and did, submit information to value its purchases on a piece basis. Second, the Court found that

the Department "did not adequately address record evidence which detracts from its

determination that the Romanian HTS is specific to" the antireflective coated glass. *Id.* at 25.

Given these two issues, the Department's solar glass valuation was found to be unsupported and

was remanded for reconsideration. On remand, the Department has added supposed further

explanation, but its justification still fails in light of the full record of evidence and the

Department's strong regulatory preference to value all inputs in the primary surrogate country,

absent significant reasons to depart from its normal practice not in play with respect to this

record. Further, the Department's justification is essentially only repeating arguments already

presented to the Court and found deficient. Accordingly, the Department's remand is not in

accordance with the Court's instructions to provide "further explanation."

    **B.**    **Unit of Measurement**

    The Department acknowledges that both Risen and Jinko recorded glass consumption

during the period of review on a per-piece basis. Remand Results at 4. The record also contains

accurate information from both respondents to convert their per piece consumption to KG or M2,

and to convert from reported KG to M2. *See* Risen Sec D at Exhibit D-34 (Step 8.1 of Risen cost

reconciliation containing information to convert between pieces, M2, and KG); Jinko Sec D at

Exhibit AD-9; *see also* Remand Results at 5-6 (the Department discussing the ratios provided by

respondents from their own books and records). These conversions are based on their own

purchases, which are precise to thickness and weight. *Id*. Both respondents used the conversion

to KG in their FOP database, however, it would have been equally as accessible and accurate for

respondents to have used the conversion to M2 in their FOP database for glass, and for the

Department to convert the reported KG in the FOP database to M2 to apply the surrogate value

as recorded in Malaysian import data.

The Department oddly criticizes the respondents for reporting the consumption quantities of glass in kilograms. Remand Results at 5. The Department states that respondents reported in kilograms, instead of "providing the weight of one unit in which the company normally records its glass consumption." *Id*. Then the Department concludes that "thus, Commerce required an SV expressed in kilograms in order to value the kilograms of glass that each respondent reported in their FOP databases." The Department's reasoning and conclusions are illogical and contrary to record evidence.

Respondents reported their glass FOP on a KG basis, rather than a piece or M2 basis, because of the Department's *own* instructions that respondents must report the database on a weight basis. Initial Questionnaire (February 25, 2021) at Appendix XIII "Additional Section D Questions" item 9 under "Reporting Consumption Amounts" ("For any material input reported in your section D FOP database for which consumption is not reported in weight, please report the weight of the unit in measure in which you reported consumption."); **PR54**. The Department appears to be saying however, that the respondents should have reported the consumption in the database in piece, the unit of measurement in their normal business, and then provided the conversion ratio from piece to KG per the Department's instructions.

First, this is not the normal understanding of these instructions and respondents reported their database in the same manner as they always had been done in the reviews of this Order, where respondents already converted to KG in the database itself but provided the supporting calculations in their cost reconciliation. Second, even if this was the way the Department wanted it reported, the database would include the reported unit consumption in piece and a conversion ratio, for the Department to convert to KG. This is absolutely no different than what is actually before the Department in this review. The Department has each respondent's per piece

3

consumption, and a conversion to KG, and a conversion to M2.  The respondents merely already used this data to report the KG consumption in the FOP database, using the conversion formula from pieces to KG (and again, if the Department had asked for M2 basis instead of weight, respondents would have just as easily used that conversion formula on the record and reported glass in M2 in the database).  The court has explicitly acknowledged, based on the same records relied upon by the Department in its redetermination, that the reported consumption in KG by the respondent "because Commerce specifically requested" so, and "was itself a conversion". Slip Op. 24-53 at 24.

The Department's supposed complaint has no record support because all the record information is there.  Thus, the Department cannot create an unjustified explanation that there is a measurable difference to the selection or reliability of the surrogate value.  In no way was the Department "required" to use a surrogate value expressed in kilograms because the respondents reported glass in kilograms in their FOP database.  First, as explained further below, the Department has never taken the position that it must find a surrogate value that matches the same unit of measurement as the respondents' FOP database.  Second, such logic must fail when in fact respondents actually purchased on a per piece basis.  As explained above and acknowledged by the Department, the respondents already used a conversion to report their glass in KG in their database.  The idea that this mere choice, which is no more accurate than reporting in M2, controls the surrogate value is not supported by past practice or substantial evidence.

The respondents chose to report in KG at the Department's instructions, but the record fully contains information from both respondents on their consumption in M2 or pieces.  The Department's conclusion that it must use a KG surrogate value because the database was reported in KG, ignores the evidence on the record of both respondents' accurate consumption

on an M2 basis. *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (Ct. Int'l Trade 1983) ("In searching the entire record for substantial evidence, a reviewing court must take into account whatever in the record fairly detracts from the ITA's fact finding as well as evidence that supports it.").  Indeed, if the Department was obligated to perfectly match a surrogate value to a respondent's same purchase unit of measurement, then the Department would actually have required a per <u>piece</u> glass surrogate value—which of course has never been the Department's position.  In this review, for example, there were numerous other inputs that had to be converted to KG from their original unit.  Risen Sec D at Exhibit D-34 (Step 8.1); Jinko Sec D at Exhibit AD-9; **CR126-185**, **PR147.**

Notably, in response to comments on these issues before the Department, the Department gave absolutely no further support or argumentation.  Remand Results at 28-34.  While including Risen's summary of its argument, the Department failed to give any further response to the fact that both respondents actually consumed glass on a piece basis.  Instead, the Department hollowly repeated again "Risen and Jinko reported the consumption of glass in kilograms per watt. Thus, Commerce sought a SV for glass expressed in a price per kilogram".  *Id*. at 29 (Followed by repeating that therefore it needs to know the thickness of the glass in Malaysia). The Department ignores an important aspect of the problem.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").  This avoidance is marked and the Department cannot continue to repeat the farce that it required a KG

surrogate value due to the respondent's reporting, or that relying on a KG surrogate value would increase the accuracy **at all**.

Ultimately, not only is the Department's conclusion contrary to practice and the record, but it fails to raise any concerns about the reliability of the Malaysia surrogate value.  The record contains information on both respondents' consumption in M2.  Remand Results at 5-7 (Where the Department itself acknowledges that both respondents provided the conversion ratio from their own records to easily convert[1] their glass consumption from KG to M2).  In this way, the reported consumption would be in the same unit of measurement of the surrogate value in Malaysia, the primary surrogate country, and the Department's supposed issue would be resolved.  This definitively shows the Malaysian import data was never "unusable" or "unreliable."  There are no reliability concerns with the Malaysian surrogate value, and no reliability concerns with applying the surrogate value, as it would be the same to apply the Malaysian M2 surrogate value to the respondents' M2 glass FOP consumption.

Further, the Department's conclusion that it was "required" to use a surrogate value expressed in kilograms because of the respondents' FOP reporting is utterly contrary to past practice.  The Department goes on to discuss that Risen and Jinko provided conversion based on their own purchases, but then says it "is not possible to use" to convert the Malaysian import quantities and "Commerce cannot use the Malaysian import data."  Remand Results at 5.   We reiterate again, as explained above, that there is actually no need to convert the Malaysian surrogate value as the Department can instead just use the respondents'' M2 consumption.

---

[1] Notably, the only issue the Department raises with this conversion is in applying it to the Malaysia surrogate value directly.  The Department raises no concern, and indeed cannot, that the conversion ratios are inaccurate to convert each respondent's own purchases to M2.  Indeed, both respondents could have reported in M2 if requested by the Department.

However, the Department's statements that it could not have used the respondents' conversion ratios to convert the Malaysian surrogate value is arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice.").

In the very prior review, the Department relied on the Malaysian surrogate value for glass reported in M2 and used the respondent's conversion of M2 or KG--- the exact same information the Department has on this record. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021) and accompanying IDM at Comment 11 ("while the weight of a square meter of the glass imported into Malaysia during the POR is not on the record of this review, we have a very complete and accurate measurement of the weight of a square meter of the solar glass consumed by Risen."). The record of this review is different with the inclusion of the Romanian data, such that there is the consideration of which data is better (the prior review only had the Malaysian value for glass and no alternative), but given the Department could and did rely on the Malaysian surrogate value using Respondent's conversion ratio--- the Department certainly cannot say it is "not possible" to do so in this review. In addition, the Department applied the wrong standard when it compared the surrogate value in the primary surrogate country with the non-primary surrogate country surrogate value for which source is "better" on an input-by-input basis. As explained above and in the briefs already before this Court, this has

not been the Department's practice.  If this were the standard or practice, the entire concept of

selecting a primary surrogate country would be meaningless.  This is precisely the type of

margin-shopping meant to be avoided by strongly favoring a primary surrogate country per

Department regulation and practice.

Risen demonstrated in depth that it is actually the Department's normal practice to rely

on a conversion ratio for the surrogate value, when needed, based on the respondents' own data.

Risen R56.2 brief (March 24, 2023) at 16-18.   In this particular review, for many inputs that

need conversion, the Department did rely on respondents' own conversion. Dep't Prelim. SV

Memo at Attachment 1 (relying on conversion for argon, alcohol, gas, hydrochloric acid,

nitrogen, oxygen, diode, wood board, wood case, wood corner, and wood pallet).  In the history

of this Order, the Department has regularly used such ratios from the respondents' own data in

both the AD and CVD reviews.  Risen Final SVs (August 3, 2021) at Exhibit SV2-2 (SV

summaries for AR1 through AR5, showing the need for conversions) **PR321**; *see also*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the*

*People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*,

81 Fed. Reg. 46904 (Dep't Comm. 2016) and accompanying IDM at Comment 6 (discussing the

use of the respondents' own conversion ratio when comparing to world benchmarks that are on a

KG basis).  Risen cited to other examples in other Orders as well of this practice. Risen R56.2

brief at 16-18.  Thus, the Department actually relies upon conversion rates from respondents'

data for inputs frequently in its normal practice, including for solar glass, without finding it

impacts the quality or selection of the surrogate value or benchmark.

The Department's position on remand is basically that if the unit of a surrogate value in

the primary country is different from respondents' reporting unit, and there is no import data in

the primary country to make the conversion or no evidence that the conversion ratio based on the records of the respondents precisely reflects the conversion ratio in that import data, the surrogate value data in the primary country for this input would be "unreliable."  But, as shown below and already before this Court, this has not been the Department's position in the past numerous situations where it has needed a conversion for a surrogate value.  Indeed, such a position would be impractical and cause chaos in investigations/reviews where conversions are frequently needed and the import data is almost always only reported in one unit of measurement. Using the respondents' conversion ratio based on the respondents' books and records is specific to the experience of the respondents and it is the normal practice of the Department to rely on such conversion ratios when needed.  It is certainly not impossible to use such data.

In sum, the unit of measurement of the surrogate value has no bearing on the reliability of the Malaysian glass surrogate value and no bearing on the Department's ability to calculate a reliable surrogate value using the Malaysia glass surrogate value.  Thus, with no reliability concerns to impugn the Malaysian data, the Department must follow its well-established practice of relying on all surrogate values in the primary surrogate country, i.e. the Department must rely on the Malaysian glass surrogate value.  The Department should have instead relied on the M2 glass consumption for both respondents and apply the Malaysian M2 glass surrogate value. Alternatively, the Department could rely on the Malaysian surrogate value and convert it to KG based on the respondents' conversion ratios, consistent with past practice.

### C.    The Department's Well-Established Practice Is to Rely on All Surrogate Values from the Primary Surrogate Country.

The Department has a practice of relying on the primary surrogate country for all inputs. 19 C.F.R. 315.408(c) directs that the Department "normally will value all factors in a single

surrogate country."  It is also not a mere preference, but was specifically included in the

regulation "to prevent parties from 'margin shopping': i.e., to prevent parties from arguing that

the Department combine input prices from different surrogates to achieve the highest or lowest

valuations of those inputs." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308,

7,345 (Dep't Commerce Feb. 27, 1996).

Moreover, the Department's practice flows from the basis of the surrogate country

process, which is a foundational part of the nonmarket economy methodology for determining

normal value.  The Department is seeking costs in a market economy cost center, and the costs

work together.  One economy may have advantages in some raw materials or some financial

costs, but not in other areas.  Valuing costs in different cost centers, rather than one, introduces

potential distortions that are greatly reduced if relying on one single economy's market costs.

Due to the substantial justification to rely on a single surrogate country, the Department

has found that  "it is Commerce's well-established practice to rely upon the primary surrogate

country for all surrogate values, whenever possible, and to only resort to a secondary surrogate

country if data from the primary surrogate country are unavailable or unreliable." *See

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the

People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019) and

accompanying IDM at Cmt. 2; *see also Jiaxing Brother Fastener Co. v. United States*, 11 F.

Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ("A reasonable mind could likewise conclude that

Commerce's regulatory preference to value all inputs from a single surrogate country favors

using Thai data to value all of Plaintiffs' inputs despite some apparent relative superiority of the

Philippine financial and HC1 data.") *affirmed Jiaxing Brother Fastener Co. v. United States*, 822

F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016); *see also* Risen R56.2 Brief at

5-8 (discussing precedent to only depart when a surrogate value is unreliable or unusable).  The Department only departs from the primary surrogate country for a particular surrogate value when the surrogate value is unreliable or unavailable, not because of specificity concerns.  *See*, e.g., *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (July 27, 2018) and accompanying IDM at Comment 9 (finding the nitrogen value in the primary surrogate country was unreliable because of a large disparity and contradiction in prices for nitrogen in the primary surrogate country and instead relying on a secondary country for this input).  The Department's dismissal of this regulatory practice is not supported by the record.

The only reason the Department provides for relying on the Romanian surrogate value for glass instead of the Malaysian surrogate value is that the unit of measurement of the Romanian surrogate value matches the unit of measurement in the respondents' FOP database.  However, as explained above, this is not an accurate characterization of the entire record.

Nonetheless, this has no bearing on whether the Malaysian surrogate value is reliable and usable.  There is nothing on this record suggesting that the Malaysian glass import value from Malaysian HTS 70071990 is unreliable in the least.  The Department's analysis only addresses the potential thickness of the glass in Malaysia, suggesting it may vary in thickness.  Remand Results at 31-34.  But that is entirely separate from whether the surrogate value is unreliable or inaccurate.  The Department, and no party, has argued that the Malaysian surrogate value is aberrant, etc. such that it cannot be relied upon.  Indeed, there is no evidence to make this argument at all.

To the extent that the Department conflates accuracy with the unit of measurement, its analysis of the unit of measurement is misplaced. We reiterate again that no conversion of the Malaysian data is needed, rather the Department can use the respondents' glass reporting on an M2 basis and apply the Malaysian M2 value with no conversion. In this way, any potential ranging thickness in the Malaysian data would have no impact on the surrogate value as applied. However, as the Department wrongly purports it needs to rely on a KG surrogate value, we also briefly address the Department's analysis that it could not use the respondent's conversion to convert the M2 Malaysian surrogate value to KG. Remand Results at 32-34. As explained with numerous examples in the opening brief, the Department has a long-standing practice of converting surrogate values using a conversion rate from the respondents' own data. Risen R56.2 Br. at 16-18. Indeed, this is particularly true for solar glass in both the antidumping review and countervailing reviews of this Order. *Id.*

The Department focuses its analysis on the fact that the Romanian imports show varying thicknesses and that Jinko and Risen purchase glass with different thicknesses and weights, arguing this entails that the Malaysian import data may also have a large range of thickness and weight of glass. Remand Results at 32. First, this is not relevant to whether the Malaysian data is reliable. No party has put forth information that the value is aberrant or incorrect, such that it cannot be relied upon. As already explained, the Department's practice is to select a primary surrogate country with the best available information and rely on all surrogate values in that country unless there is a reliability issue or absence of data. The potential need to convert a surrogate value is not part of this analysis. Second, the range of glass purchased by Jinko and Risen is not large, but rather is a small range, and a similar range for each respondent, because they are in the same industry. Third, and relatedly, Malaysia also has a robust solar industry,

unlike Romania.  If the Romanian imports have varying glass thicknesses, this has no bearing on whether Malaysia does.  There is no evidence that Malaysian import data has a large and varied range of  thicknesses.  The Department surmises that Malaysia may be different than these sources, but provides absolutely no support for this on the record.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute substantial evidence.").  Further, the fact that Malaysia has a robust solar industry only further corroborates that the glass imported in Malaysia would be similar to respondents because Malaysia solar manufacturers are importing glass used for the precise same merchandise production in Malaysia.  Romania has no known solar industry and the varying thickness of imports into that country have no bearing on Malaysia's imports.

### D.    Reflective Glass

The Court also remanded to the Department to explain how the Romanian HTS is even specific to the solar anti-reflective glass.  The Department would not need to reach this issue if it properly determined to rely on the Malaysian glass value because there are no reliability issues with the Malaysian glass value, and thus Malaysia should be relied upon as sourced from the primary surrogate country.  However, there is also additional evidence that the Romanian HTS may not even include solar anti-reflective glass.

Romanian HTS 7007.19.80 specifically excludes glass with an absorbent layer.  The Department defined absorbent to mean "something that takes in without releasing."  The function of solar glass is to take in or absorb light and then convert it to energy.  Slip. Op. at 26.  The Department continues on remand to attempt to draw a distinction between anti-reflective solar glass and absorbent glass, saying that anti-reflective glass reduces the amount of light that bounces off surface so more light may pass through the glass but absorbent glass would let in

light without releasing it.  Remand Results at 10-11.  But this is contrary to the basic commercial point of the glass and solar glass: anti-reflective solar glass does reduce the light bouncing off of it exactly so that more light may be absorbed and converted to energy.  Being anti-reflective and absorbent are not contrary terms.  Thus, the Department has still not adequately explained how this Romanian HTS would not exclude the respondents' solar glass, which is intended to absorb light.

We also submit that while the Court and the Department discussed only Jinko's glass specifications, the arguments made would also apply to Risen's glass.  Risen's glass is solar glass, standard to the industry, that is anti-reflective and absorbs light.  *See* Risen Sec D at Exhibit D-30 (glass specification sheets).

Lastly, the question of whether the Romanian HTS even covers the solar glass used by Respondents should also consider the lack of a solar industry in Romania.  There is no evidence on the record of any solar manufacturing industry in Romania. There is no evidence otherwise demonstrating that Romanian glass imports would actually reflect the costs of the solar glass used in solar production by Risen or any solar glass at all.  In contrast, Malaysia is a significant world producer of solar cells and solar modules.  For example, one report on the record discussing the global supply chain of solar cells and modules, lists Malaysia, China, and South Korea as the most dominant in the world market for the production of solar modules.  Risen Prelim. SVs (June 28, 2021) at Exhibit 12 (NREL Report) (making no mention of Romania); **PR197-198**.  The record also contains financial statements from several Malaysian manufacturers of solar cells and modules that actively manufacture identical merchandise in Malaysia.  Jinko Prelim. SVs at Exhibit 11; **PR201-241**.  Therefore, only the costs in Malaysia are reasonably connected to the costs that an actual producer of solar modules and cells would

pay.  Accordingly, the established preference to source surrogate data from countries that actually produce identical merchandise is also only fulfilled by relying on the Malaysia surrogate value for glass.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) and accompanying IDM at Cmt 4. ("The importance we place on the fact that Malaysia produces solar cells and panels, and no other surrogate country does so, is that the surrogate data provided by Malaysia will consist of actual inputs used in producing subject merchandise, as opposed to the data of the other surrogate countries which have no reason to import inputs used specifically to produce solar cells and panels.").  The record does not support a finding that the Romanian HTS is specific to the solar glass used my respondents, both because of the exclusion of absorbent glass and because of the lack of a solar industry in Romania, such that glass imported into Romania is likely not used in the solar industry.  In contrast, the Malaysian glass HTS includes solar glass used by respondents and has a robust solar industry, such that solar glass would definitively have been imported into Malaysia during the POR.

## II.    The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law.

The Court, while upholding that the Department could apply partial AFA to Risen for unreported FOPs from its unaffiliated cell suppliers, remanded the Department's brand new methodology for calculating AFA.  The Court found that the methodology was contrary to law and unsupported by substantial evidence.  Slip Op. 24-53 at 54.  The Court found first that it was contrary to law because rather than selecting among facts otherwise available, Commerce "created facts by manipulating evidence on the record."  *Id*.  The Court continued that even if

this was permissible under the law, the ratio used was contrary to 19. U.S.C. 1677e(b)(2) and failed to explain how the groupings to make the ratio were at all logical or served to promote accuracy and deterrence.  *Id*. at 55; citing to *Mueller*, 752 F.3d at 1233.  On remand, the Department maintains that it could manipulate facts and also that its ratio was permissible because a more adverse facts available was warranted.  However, none of these positions are supported by law or fact.

In response to the Court's direction that the statutory direction to fill the gap does not allow Commerce to manipulate facts, the Department merely says that it does "not explicitly require Commerce to use the facts otherwise available 'as is' as a direct substitute in place of the missing information, but simply directs Commerce to use the facts otherwise available." Remand Results at 20.  The Department is impermissibly interpreting plain language to mean something broader.  *Michigan v. Bay Mills Indian Community*, Ed. 2d 1071, 1086 (U.S. 2014) (Congress wrote the statute it wrote--meaning, a statute going so far and no further; "This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that … Congress 'must have intended' something broader."); *citing CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011).  The statute directs the Department use facts otherwise available, not to use adverse inferences in deciding what those facts are.  Further, the Department's citation to *SKF* is misplaced.  *SKF* did not give a roving license to the Department, and was specifically discussing uncooperative respondents, unlike here.  In the sentences following the Department's quotation, the Court actually reiterates that the statute must not impose punitive, aberrational, or uncorroborated margins and that the AFA rate must still be related to respondent's actual dumping margin.  *SKF USA Inc v. United States*, 391 F. Supp. 2d 1327, 1336 (Ct Int'l Trade 2004) quoting *F.Lii de Cecco di Filippo Fara*

16

*S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *NSK Ltd. v. United States*, 346 F. Supp. 2d 1312, 1335, 28 Ct. Int'l Trade 1535 (CIT 2004).

The Department then goes on to explain its reasons for not applying one overall AFA ratio, but instead justifies its reasoning for using three, one single average AFA adjustment factor for all solar cell inputs, one AFA factor for solar modules, and another one AFA factor for packing materials. Remand Results at 23. However, all of these reasons concern accuracy and only all the more justify that the Department should calculate individual adjustment factors as it had done in the past. The Department admits that its calculation, which is less specific and more adverse, was specifically used because it did not believe its normal methodology was adequately adverse. The Department falsely asserts that their normal methodology would be "applying facts available without an adverse inference." *Id*. at 45. But Risen's margin would be lower if there was no AFA at all, even under the former methodology.

Further, this fails to properly consider the concerns of *Mueller*, as also raised by the Court. *Mueller* discussed the concerns of deterrence and accuracy:

> This result is wholly consistent with our precedents applying subsection (b) itself, which is properly directed to non-cooperating parties. This Court's decision in F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000), required that, even for a non-cooperating party, subsection (b) be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." All the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix. Moreover, this Court's decision in Changzhou made clear that, in the case of a cooperating party, Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies. Changzhou, 703 F.3d at 1379.

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1234 (Fed. Cir. 2014).

The application of AFA to Risen has no legitimate effect to incentivize these suppliers to cooperate. These suppliers have not cooperated because they simply do not have to. They are

not dependent on Risen for their business.  Risen is not in a position in the market to demand their cooperation, rather the suppliers have numerous customers to choose from and it would not impact their business to lose Risen as a customer.  Rather, Risen would be the one to lose business.  Risen has put forth its best efforts to warn the unaffiliated suppliers of the possibility of ceasing purchasing if the suppliers refused to cooperate, so any unaffiliated suppliers that did value Risen's purchasing would be induced to cooperate.

Further, in instances where it was possible to stop purchasing from certain uncooperative unaffiliated suppliers of cells and modules, Risen stopped purchasing from them.  *See* Risen Supp Qre (June 21, 2021) at 17-18; **CR294-296**, **PR179**.  Over the course of several reviews while Risen obtained new suppliers from review to review when suppliers refused to cooperate with this request and fully intended to follow through on this plan, it became impossible to obtain inputs and Risen had to make the business decision to still purchase from some.  Risen has exercised its best and maximum efforts under the business reality of their situation.  The Department is already applying an adverse rate in its normal methodology.  The facts do not warrant a more adverse methodology given the suppliers are not incentivized to cooperate and it is Risen, a cooperative party, being penalized.

Further, *Mueller*'s accuracy interests are certainly not met by using the highest FOP consumption rates.  *Risen Energy*, 477 F. Supp. 3d 1343-44 ("Commerce also fails to adhere to Mueller's emphasis on accuracy above all else. *See Mueller*, 753 F.3d at 1233… Commerce does not cite record evidence that using the highest FOP consumption rates on the record result in accurate dumping margins for Risen.").  Inputs have significantly different reported factors of production and have significantly different surrogate values assigned to them.  There is no justification for calculating and applying AFA on a much broader basis than the record allows.  It

serves only to distort the AFA factors and the resulting dumping margin.  Applying an input-specific AFA more accurately reflects the permissible AFA for each input.

In sum, the Department's new methodology for calculating AFA to Risen's unreported FOPs remains unsupported by the record and contrary to law.  The Department has not followed the Court's instructions.

## III.    Conclusion and Prayer for Relief

In light of the foregoing, the Department's Remand Results are not supported by substantial evidence and are an otherwise contrary to law.  Risen respectfully requests that this Court remand the determination to the Department and order the Department to rely on the Malaysian glass value in accordance with its normal practice and policy and apply its normal AFA methodology.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth Street N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com

Date: October 30, 2024                    *Counsel to Consolidated Plaintiff*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **6,039** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth Street., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiff*