**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| ————————————————————x<br>:<br>JINKO SOLAR IMPORT AND EXPORT CO.,  :<br>LTD.; JINKO SOLAR CO., LTD.; JINKOSOLAR  :<br>TECHNOLOGY (HAINING) CO., LTD.;  :<br>YUHUAN JINKO SOLAR CO., LTD.;  :<br>ZHEJIANG JINKO SOLAR CO., LTD.;  :<br>JIANGSU JINKO TIANSHENG SOLAR CO.,  :<br>LTD.; JINKOSOLAR (CHUZHOU) CO., LTD.;  :<br>JINKOSOLAR (YIWU) CO., LTD.; and  :<br>JINKOSOLAR (SHANGRAO) CO., LTD.,  :<br>:<br>          Plaintiffs,  :<br>:<br>        v.  :<br>:<br>UNITED STATES,  :<br>        Defendant,  :<br>:<br>        and  :<br>:<br>AMERICAN ALLIANCE FOR SOLAR  :<br> MANUFACTURING,  :<br>:<br>        Defendant-Intervenor.  :<br>————————————————————x | **PUBLIC VERSION**<br><br>Consol. Court No. 22-00219 |

**PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

Ned H. Marshak
Dharmendra N. Choudhary*
Jordan C. Kahn*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import
and Export Co., Ltd., Jinko Solar Co., Ltd.,
Jinkosolar Technology (Haining) Co., Ltd.,
Yuhuan Jinko Solar Co., Ltd., Zhejiang
Jinko Solar Co., Ltd., Jiangsu Jinko
Tiansheng Solar Co., Ltd., Jinkosolar
(Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co.,
Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: October 30, 2024

# **TABLE OF CONTENTS**

I.   STANDARD OF REVIEW .................................................................................... 2

II.  COMMERCE IMPROPERLY RECALCULATED JINKO'S ADD RATE USING
     ROMANIAN HTS 7007.1980 ............................................................................. 2

  A.  COMMERCE'S HTS SELECTION METHODOLOGY WAS CONTRARY TO LAW .. 2

  B.  COMMERCE IMPROPERLY RELIED ON THE UNIT OF CONVERSION FACTOR
      AS ITS PRIMARY SELECTION CRITERION ................................................. 5

  C.  JINKO'S AR COATING GLASS DOES NOT FALL WITHIN ROMANIAN HTS
      7007.1980 .................................................................................................... 12

  D.  THE RECORD IN THIS CASE IS DISTINCTLY DIFFERENT FROM THE RECORD
      IN AR6 AND THE EU ADD ORDER ............................................................. 20

III. COMMERCE IMPROPERLY VALUED AIR FREIGHT .................................... 22

CONCLUSION ........................................................................................................ 24

## Table of Authorities

**Cases**

*Allied Tube & Conduit Corp. v. United States*,
   132 F. Supp. 2d 1087 (CIT 2001) ........................................................... 8

*Ass'n of American School Paper Suppliers v. United States*,
   32 CIT 1196 (2008) ........................................................................... 10

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*,
   515 U.S. 687 (1995) .......................................................................... 20

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ............................................................................ 2

*Diamond Sawblades Manufacturers' Coal. v. United States*,
   2015 WL 5603898 (CIT 2015) ............................................................... 8

*Hebei Metals and Minerals Import and Export Corp. v. United States*,
   366 F. Supp. 2d 1264 (2005) ................................................................. 4

*Jing Mei Automotive (USA) v. United States*,
   682 F. Supp. 3d 1354 (CIT 2023) ......................................................... 18

*Jinko Solar Import and Export Co. v. United States*,
   701 F. Supp. 3d 1367 (CIT 2024) .............................................. 1, 2, 4, 12

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ........................................................................ 2

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (CIT 2015) ........................................................... 8

*Nakornthai Strip Mill Pub. Co. v. United States*,
   32 CIT 1272 (2008) ............................................................................ 2

*Russel Motor Car Co. v. United Sates*,
   261 U.S. 514 (1923) .......................................................................... 20

*RZBC Grp. Shareholding Co. v. United States*,
   100 F. Supp. 3d 1288 (CIT 2015) ........................................................... 8

*Taian Ziyang Food Co. v. United States*,
   783 F. Supp. 2d 1292 (CIT 2010) ........................................................... 4

**Statutes**

19 U.S.C. § 1516a ................................................................................. 2

**Regulations**

19 C.F.R. § 351.408 ............................................................................... 4

**Federal Register Notices & Publications**

*Circular Welded Carbon Steel Pipes and Tubes from Turkey: Final Results of Countervailing*
   *Duty Administrative Review; Calendar Year 2015*,
   82 Fed. Reg. 47,479 (October 12, 2017) ..................................................... 8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the*
   *People's Republic of China: Final Results of Antidumping Duty Administrative Review and*
   *Final Determination of No Shipments; 2016-2017*,
   Fed. Reg. 36,886 (July 30, 2019) ............................................................ 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review,*
87 Fed. Reg. 48,621 (Aug. 10, 2022)....................................................................................... 1, 8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018,*
85 Fed. Reg. 62,275 (Oct. 2, 2020).......................................................................................... 21

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020,*
87 Fed. Reg. 38,379 (June 28, 2022) .......................................................................... 1, 5, 8, 17

Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd. (collectively, "Jinko") submit comments on the Final Results of Redetermination Pursuant to Remand (Aug. 29, 2024), ECF 89, C.R.R. 4, P.R.R. 10 ("Remand"), filed by the U.S. Department of Commerce ("Commerce"), in response to this Court's ruling, *Jinko Solar Import and Export Co. v. United States,* 701 F. Supp. 3d 1367 (CIT 2024), in the eighth, 2019-2020 administrative review ("AR8") of the antidumping duty ("ADD") order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from the People's Republic of China ("China"), with the period of review ("POR") spanning December 1, 2019, through November 30, 2020.

This Court ordered remand because Commerce had unlawfully valued Jinko's anti-reflective ("AR") coated glass and air freight when calculating Jinko's AR8 ADD rate. *Id.* at 1381-83, 1386-89, 1397; *see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 38,379 (June 28, 2022), P.R. 464 ("*AR8 Final Results*"), Issues and Decision Memorandum, P.R. 455 ("IDM"), Comments 3, 9, as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*, 87 Fed. Reg. 48,621 (Aug. 10, 2022), P.R. 473 ("*AR8 Amended Final Results*"). In its Remand, Commerce continued to value Jinko's AR coated glass and air freight in the same manner as it did in the underlying AR8 proceeding, and, as discussed below, Commerce's Remand – like its initial determination – is unsupported by substantial

1

evidence and contrary to law.

## I.      <u>STANDARD OF REVIEW</u>

"The court reviews remand determinations for compliance with the court's remand order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274 (2008). As with all Commerce ADD determinations, this Court must hold unlawful remand redeterminations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). In accordance with *Loper Bright Enterprises v. Raimondo*, courts are now required to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S. Ct. 2244, 2273 (2024).

## II.     <u>COMMERCE IMPROPERLY RECALCULATED JINKO'S ADD RATE USING ROMANIAN HTS 7007.1980</u>

### A.      COMMERCE'S HTS SELECTION METHODOLOGY WAS CONTRARY TO LAW

In its remand order, this Court agreed with Jinko's analysis and questioned Commerce's choice of Romanian Harmonized Tariff Schedule ("HTS") 7007.19.80 data over Malaysian HTS 7007.19.90 data to value anti-reflective coated glass. According to the Court, Commerce failed to explain: (1) "how the data from Malaysia, as the primary surrogate country, is unreliable such that departure from its standard practice of using the data from the primary surrogate country is justified"; and (2) how Romanian HTS 7007.19.80 is the best available surrogate value ("SV") choice when "the record indicates that the function of Jinko's anti-reflective glass places it within both Commerce's definition of 'absorbent' and also the Romanian HTS exclusion." *Jinko Solar*, 701 F. Supp. 3d at 1382-83.

Commerce failed to address these concerns in its Remand and adhered to Romanian HTS 7007.19.80. Remand at 3-12, 27-38. For its Remand, Commerce was confronted with two arguably imperfect choices: (1) Malaysian HTS 7007.19.90 and (2) Romanian HTS 7007.19.80. Although the Malaysian HTS is reported in square meters ("sqm") rather than kilogram ("kg"), it is from the primary surrogate country and is product specific. In contrast, even though the Romanian HTS data is reported in kg., such data is neither from the primary surrogate country nor product specific. Commerce was required to conduct a faithful side-by-side conjunctive analysis of these two sources, but it continued to rely on a faulty disjunctive analysis in its Remand.

First, Commerce analyzed the Malaysian import data in isolation and rejected it as a source of SV by accentuating its allegedly imperfect per sqm unit of reporting. Commerce ignored two key and controlling aspects of SV selection criteria – product specificity and primary surrogate country. Then, Commerce analyzed the Romanian import data, which was the only surviving choice, and unlawfully classified Jinko's AR glass under Romanian HTS 7007.19.80 even though it is expressly excluded therefrom. In this manner, the Remand ignored Commerce's obligation to faithfully compare the two data sets.

Under Commerce's established practice, product characteristics such as the AR coating on Jinko's solar glass input control the choice of the HTS provision selected for surrogate values. **Product specificity** is the most important factor among Commerce's six traditional SV selection criteria:

> "product specificity" logically must be the primary consideration in determining "best available information." If a set of data is not sufficiently "product specific," it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1.

3

*Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (CIT 2010) (citing *Hebei Metals and Minerals Import and Export Corp. v. United States*, 366 F. Supp. 2d 1264, 1273-74 (2005)).

Moreover, Commerce by regulation "normally will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2). Consequently, "it is Commerce's well-established practice to rely upon the primary surrogate country for all surrogate values, whenever possible, and to **only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable**." *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017,* Fed. Reg. 36,886 (July 30, 2019), IDM Comment 13 (emphasis added).

In this case, Commerce selected Malaysia as the primary surrogate country, not Romania. The record contains the following AR8 SV choices to value the solar glass input for Jinko:

1.  Malaysia HTS 7007.19.90 reported on a per sqm basis–

    "Safety glass, consisting of toughened (tempered) or laminated glass, Toughened (tempered) safety glass: Other than Of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels: Other than Suitable for machinery of heading 84.29 or 84.30."; and

2.  Romania HTS 7007.19.80 reported on a per kg as well as per sqm basis –

    "Toughened (Tempered) Safety Glass (**Excl.** Enamelled, Coloured Throughout The Mass, Opacified, Flashed Or **With An Absorbent** Or Reflecting **Layer**, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Vehicles)."

*Jinko Solar*, 701 F. Supp. 3d at 1381 (emphases added); Jinko Redacted Case Brief (May 27, 2022), C.R. 494, P.R. 446, at 8, 25, and 30.

It is undisputed that Jinko's AR coated glass is covered by the Malaysian HTS provision. Malaysian HTS 7007.19.90 is also from the primary surrogate country. The only issue

4

Commerce raised regarding the Malaysian import data is with its unit of reporting, which is in sqm instead of kg.

In contrast, Jinko established by substantial evidence on the record that Romanian HTS 7007.19.80 is not product specific. Therefore, Commerce should not have selected Romanian HTS 7007.19.80 to value Jinko's AR coated glass even though Romanian HTS 7007.19.80 import data is reported in kg. As explained below, Commerce's proffered rationale does not withstand scrutiny.

### B.    COMMERCE IMPROPERLY RELIED ON THE UNIT OF CONVERSION FACTOR AS ITS PRIMARY SELECTION CRITERION

In rejecting the Malaysian HTS 7007.19.90 import data, Commerce rehashes its "unit of conversion" argument from *AR8 Final Results*, 87 Fed. Reg. 38,379, IDM at 18-19. Commerce states, "because the thickness of the glass imported into Malaysia was not reported in the import statistics, it is not possible to use the conversion formula that is on the record to convert the Malaysian import quantities that are in square meters into kilograms." Remand at 5.

Specifically, Commerce rejected Jinko's proposed conversion formula of 7.19 kg/sqm that was based on Jinko's glass consumed in the production of merchandise under consideration, reasoning as follows:

> Jinko's conversion ratio is also dependent upon the thickness of the glass that it consumed and will vary based on the thickness. However, there is no basis for concluding that the thickness of the glass consumed by Jinko during the POR matches the thickness of the glass imported into Malaysia during the POR.

*Id.* at 6.

Commerce improperly elevated the absence of thickness information of the glass in Malaysian HTS 7007.19.90 import data over product specificity by sidestepping the fact that Jinko's conversion factor of 7.19 kg/sqm is corroborated by two independent data sources – 7.88 kg/sqm reported in Romania HTS 7007.19.80 import data and [    ] kg/sqm for glass consumed

during the POR by the other mandator respondent, Risen Energy Co., Ltd. ("Risen"). Jinko

Redacted Case Brief at Attachments 4-5; Risen Case Brief (Jan. 28,2022), C.R. 481, P.R. 421,

Attachment 1. Notably, **all three conversion factors on the record corroborate each other as**

**they fall within a narrow range of 10 percent**. This outcome is unsurprising given the

undisputed fact that all four glasses in question – (1) Jinko's AR coated glass, (2) Risen's glass,

(3) Malaysian HTS 7007.19.90 and (4) Romanian HTS 7007.19.80 – fall under the identical six-

digit HTS 7007.19.

      The fact that three independent comparable types of glasses classified in HTS 7007.19

yield three different conversion factors that are in the same range constitutes substantial evidence

that the fourth type of comparable glass, *i.e.*, Malaysian HTS 7007.19.90 also would exhibit a

similar conversion factor. Consequently, that all four glasses share similar physical attributes

such as dimensional specifications is supported by record evidence. Therefore, for converting the

originally reported per sqm Malaysian HTS 7007.19.90 import data to per kg, any one of the

three conversion factors could be reliably applied. Jinko's dimensional conversion factor of 7.19

kg/sqm yields the highest per kg SV of 2.95 RMB/kg and, accordingly, affords a conversative

choice. Jinko Redacted Case Brief at 28.

      Commerce unpersuasively exaggerates the absence of thickness information in the

product specific Malaysian import data. Reasoning that "Risen noted in the sixth administrative

review of this proceeding that tempered glass can range from 3 to 19 mm thick . . . {which} is a

much larger thickness range than that of Jinko and Risen's solar glass, which ranges in thickness

from [   ] to [   ] mm," Commerce speculates that "there is no basis for concluding that

conversion ratios that are based on the glass used by Jinko and Risen apply to imports of glass

under Malaysian HTS category 7007.19.90." Remand at 31-32. This reasoning, however, is

without merit because Jinko and Risen's conversion factors – 7.19 and [    ] kg/sqm – represent averages of a large set of purchased glass data that span a range of thicknesses. The weighted average conversion factor of Romanian HTS 7007.19.80 import data also corroborates Jinko's conversion factor of 7.19 kg/sqm.  A number computed by weight averaging multiple numbers, by definition, will be different from the numbers situated at the lowest and highest bookends of the numbers used to calculate the weighted average. Therefore, the mere fact that tempered glass spans a range of thicknesses does not undermine the discrete weighted average thickness of glass Jinko and Risen consumed or the weighted average of Romanian HTS 7007.19.80 imports. Consequently, the resulting conversion factors of 7.19, [    ], and 7.88 kg/sqm, which are a function of the weighted average thicknesses of glass, are reliable.

Commerce's claims about "a number of flaws in Jinko's square meters to kilograms conversion analysis," *id*. at 31, are speculative and unsupported by record evidence for the reasons set forth below.

First, Commerce states that "Malaysian HTS category 7007.19.90 is not limited to solar glass but covers all types of 'safety glass, consisting of toughened (tempered) or laminated glass.'" *Id.* While this statement is accurate, it does not undermine the more important fact that Jinko's AR coated glass is categorized in this HTS subheading, while Romanian HTS 7007.19.80,  is not product specific, as established *infra*.

Second, Commerce attempts to negate the significance of  the fact that Jinko's conversion factor of 7.19 kg/sqm is corroborated by those of Risen and Romanian HTS 7007.19.80. Commerce states, "if we use a consistent calculation methodology, namely averaging each individual conversion ratio from the entire data set, the overall average conversion ratios are 7.19 $kg/m^2$ for Jinko, [    ] $kg/m^2$ for Risen, and 10.11 $kg/m^2$ for the Romanian HTS data . . .

PUBLIC VERSION

span{ning} a range of 45 percent. *Id.* at 32. This reasoning, however, is fallacious because it improperly attaches identical weights to individual data points reported by Risen and Romanian HTS 7007.19.80. Jinko's conversion factor of 7.19 kg/sqm is based on a simple average of individual purchases only because the record does not have the weights for each of Jinko's glass purchases. Furthermore, Jinko proposed 7.19 kg/sqm as a conservative conversion factor since it yields a higher SV than the conversion factors of Risen and Romanian HTS 7007.19.80 imports. Given a choice, Commerce and reviewing courts rely on weighted averaging ("WA") -over simple averaging ("SA").[1] In this case, Commerce's glass SV from Romanian import data was computed by a weighted average instead of a simple average of the average unit values reported from the partner countries. U.S. Department of Commerce Preliminary Surrogate Value Memorandum (Apr. 6, 2021), P.R. 403-04 ("Prelim SV Memo"), Attachment I.[2] Therefore, Commerce errs by adopting a simple average thickness for glass used by Risen and those

---

[1] *See, e.g.*, *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1359–64 (CIT 2015) (holding that relying on an SA, rather than a WA, was "unreasonable in light of the statute's clear preference for the accuracy enhancing value of weight-averaging and the particular facts of this case."); *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1096 (CIT 2001) (rejecting Commerce's unreasoned reliance on simple average data in lieu of more accurate weighted average data); *Diamond Sawblades Manufacturers' Coal. v. United States*, 2015 WL 5603898 at *5 (CIT 2015), *aff'd* 866 F.3d 1304 (Fed. Cir. 2017) (holding that simple averaging was permissible only because "the record contained no information about what portion of the PRC-wide entity ATM comprised."); *RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1308-09 (CIT 2015) (reasoning that "the choice to take simple averages was not just arbitrary in the abstract, however. The method also caused real distortions in the benchmarks Commerce created. A simple average, unlike a weighted average, gives equal weight to all prices regardless of the quantities sold. High prices from small transactions can balloon the average to absurd proportions, and that seems to be what happened here."); *Circular Welded Carbon Steel Pipes and Tubes from Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2015*, 82 Fed. Reg. 47,479 (Oct. 12, 2017), IDM Comment 4 ("We find the use of a weighted -average price ensures that outlier prices do not skew the benchmark.").

[2] The total usable value of imports, 44172174 Euro is divided by 21977.42 Tons to result in an AUV of 2.009888968 Euro/Kg. *See* Prelim SV Memo, P.R. 406, Tab: "Attach I Jinko SVs" (unchanged in *AR8 Final Results*, 87 Fed. Reg. 38,379, and *AR8 Amended Final Results*, 87 Fed. Reg. 48,621).

reported in Romanian HTS 7007.19.80 when both datasets afford weighted average thickness information.

To further support the reliability of the Romanian HTS 7007.19.80 conversion factor, Jinko provided a standard deviation ("SD") analysis through a normal distribution curve for all of the reported line items in the Romanian import data, correlating their weight (kg) with the associated conversion factor (7.88 kg/sqm). This analysis is revealing, because it shows that the predominant proportion of imports is clustered around the weighted average mean of 7.88 kg/sqm. Notably, the weighted average conversion factor of 7.88 kg/sqm also falls within one SD, in fact, quite close to the peak point of 9.834. Further, the imports covered within one half of one SD around the peak point of the bell-shaped curve (*i.e.*, one SD in total) accounts for 71.94 + 17.49 = 89.43 percent of the total quantity of imports.

In a normally distributed database, data points within one SD on either side of the mean are representative of the typical behavior of the data population. Here, data points within one-half of the SD on either side of the mean account for about 90 percent. A large majority of imports have conversion factors proximate to the peak point as well as the weighted average mean point of 7.88 kg/sqm. This establishes that a predominantly large proportion of imports had conversion factors around the mean of 9.834 kg/sqm and the weighted average mean of 7.898 kg/sqm. In sum, the 7.88 kg/sqm conversion factor computed from the Romanian import data is not only reliable and representative of the overall Romanian import data but also constitutes substantial evidence in support of Jinko's 7.19 kg/sqm conversion factor.

In prior decisions, Commerce has applied the standard deviation methodology to test the reliability (and conversely, the outlier or aberrational character) of data, which this Court has affirmed:

**The court finds Commerce's 23.17 percent rate was reasonable**. . . . For Commerce, the rate it selected, although not calculated using Navneet and Aero's data, "is indicative of the respondents' customary selling practices and is rationally related to the transactions to which the adverse facts available rates are being applied" because it was calculated in the POR for a company in the same business . . . . That is, Commerce selected a rate it perceived to be "within the mainstream of Kejriwal's transactions (*i.e.*, transactions that reflect sales of products that are representative of the broader range of models used to determine {normal value})." . . . Further, having concluded that the 110.43 percent rate was aberrational because it was "from a single sale with a sales quantity that is less than two percent of the average sales quantity," **Commerce determined that "the second highest margin is not aberrational because its quantity . . . is within one standard deviation of the mean {quantity of merchandise in Kejriwal's reported transactions}**

Thus, here, . . . Commerce . . . used a transaction that was of an adequate quantity of subject merchandise, and . . . confirmed that the quantity was appropriate with standard deviation analysis.

*Ass'n of American School Paper Suppliers v. United States*, 32 CIT 1196, 1202-03 (2008)

(emphases added) (citations omitted).

Likewise, here, "the {Romanian HTS 7007.19.80's conversion factor of 7.88 kg/sqm} is not aberrational because {it} . . . is within one standard deviation of the mean." *Id*. Conversely, the two outlier conversion factors – 0.05 kg/sqm and 72.50 kg/sqm – are aberrational and, therefore, unrepresentative and unreliable. Commerce's retort that "86 percent of the individual entry conversion ratios that Jinko calculated for the Romanian data fall within one standard deviation of the mean conversion ratio (excluding zero entries) and those 'non-aberrational' conversion ratios vary from 0.25 kg/m$^2$ to 20.01 kg/m$^2$" errs by equating the weighted average mean of 7.88 kg/sqm that is based on the entire population with the conversion factors of individual imports based on a tiny quantity. Remand at 33. Moreover, the mere fact that 0.25 kg/sqm or 20.01 kg/sqm fall within one SD of the mean does not elevate them to the level of the weighted average mean.

Commerce also attempts to impeach the conversion factor underlying the Romanian import data. Commerce reasons that "the ratio varies from 0.05 kg/m$^2$ to 72.50 kg/m$^2$ . . .this indicates that the weight of glass can vary significantly per square meter." Remand at 7. Commerce ignores the fact that these bookends are outliers based on infinitesimal quantities. For example, 0.05 kg/sqm and 72.50 kg/sqm are for tiny shipments of 0.141 and 0.145 tons, respectively, and each account for merely 0.0012 percent of the total imported quantity of 11,868.44 tons. Therefore, these outlier conversion factors are unrepresentative of the average conversion factor or average thickness level of the glass imported in the Romanian HTS 7007.19.80 and fail to impeach the weighted average Romanian conversion factor of 7.88 kg/sqm.

Finally, Commerce reasons that during the POR for the sixth administrative review ("AR6"), "Jinko used a conversion ratio of 15.63 kg/m$^2$ to calculate an SV based on POR imports under Malaysian HTS category 7007.19.90" *Id.* at 34. This conversion factor, however, is based on non-contemporaneous imports in Malaysia, and the record is devoid of contemporaneous evidence extending this outdated conversion factor to imports for the AR8 POR. Conversely, Jinko's proposed 7.19 conversion factor is contemporaneous with the AR8 POR and is corroborated by two independent contemporaneous conversion factors – Risen's glass purchases and Romanian HTS 7007.19.80 imports.

In sum, the well-corroborated conversion factor of 7.19 kg/sqm can be reasonably applied to the product specific per sqm Malaysian HTS 7007.19.90 import data to yield an equivalent per kg SV of 2.95 RMB/kg, a reliable per unit price to value Jinko's AR coated glass. Consequently, the Remand's rationale to continue to rely upon the absence of conversion factors as its primary

rationale to reject the product specific Malaysian HTS 7007.19.90 import data from the primary

surrogate country is unsupported by substantial record evidence.

### C.    JINKO'S AR COATING GLASS DOES NOT FALL WITHIN ROMANIAN HTS 7007.1980

Commerce's proffered rationale to continue to support Romanian HTS 7007.19.80 for the

Remand is not supported by substantial record evidence, as discussed below.

In its remand order, this Court agreed with Jinko's arguments "that the function of

Jinko's anti-reflective glass places it within both Commerce's definition of 'absorbent' and also

the Romanian HTS exclusion." *Jinko Solar*, 701 F. Supp. 3d at 1383. This Court questioned:

(1) Commerce's conclusion that "Jinko's glass, which has an 'anti-reflective,' layer was not

encompassed by the exclusion" in Romanian HTS 7007.29.80; and (2) "how Commerce can

reasonably view the list of exemplars in Romanian HTS 7007.19.80 as light limiting." *Id.* The

Remand's reiteration of Commerce's prior rationale with only minor window-dressing is

misplaced and unsupported by substantial record evidence. Specifically, Commerce's red herring

interpretation of the excluded exemplar – glass with an "absorbent layer" – to somehow separate

it from Jinko's AR coated glass lacks support in the record.

Jinko's master purchase agreement with its glass suppliers contains the key information

relevant to the proper classification of Jinko's AR coated glass. Jinko Redacted Case Brief

Attachment 4. The agreement pinpoints the specific attributes of Jinko's AR coated glass as:

(a) "**Anti-reflective coating, high transmission** of light." The agreement then proclaims AR

coated glass' performance under low light conditions: (b) "Advanced glass technology improves

**light absorption** and **retention**." *Id*. (emphases added). This evidence confirms that Jinko's AR

coated glass input is characterized by the following salient properties: (1) anti-reflective coating,

(2) improved light absorption, (3) improved light retention, and (4) higher transmission of light.

These properties are interrelated and complementary. When read in conjunction, stipulations (a) and (b) of the master purchase agreement state: "**Anti-reflective coating** improves **light absorption** and **retention** and **results in high transmission** of light." *Id*. (emphases added). Record evidence establishes that Jinko's AR coated glass augments the absorption and retention of light and, accordingly, is synonymous with an absorbent layered glass – an excluded exemplar of Romanian HTS 7007.19.80.

The Remand, however, persists with the misguided attempt to separate Jinko's AR coated glass from absorbent layered glass. As explained below, Commerce's rationale is flawed.

First, Commerce reiterates that "the plain meaning of 'absorbent' is to take in without releasing{,} thus, glass with an absorbent layer takes in light without releasing it, *i.e.*, the light enters the glass but does not pass through the glass." Remand at 8. This rationale is not only illogical but also lacks evidentiary support. Even if Commerce's definition of "absorbent" – takes in without releasing – in the context of an absorbent layered glass is credited. Commerce's conclusion that light enters the glass but does not pass through the glass is a *non sequitur* and is unsupported by any record evidence. Under Commerce's one-size -fits-all definition of "absorbent," this absorbent layer should take in light and thereafter should not release it further into the glass. In other words, based on Commerce's understanding of the term "absorbent," **the absorbent layer on the glass surface should trap the light photons within it**. This conclusion, however, is inconsistent with Commerce's presumption that light is trapped within the glass. Commerce's threshold premise is that the glass body instead of the chemical layer applied to a glass surface has absorbent properties, but there is no record evidence that either Jinko's AR coated glass or the Romanian HTS 7007.19.80's excluded exemplar, *i.e.*, glass with an absorbent layer, has an absorbent glass body. Absorbent glass is a separate category of glass and is

13

recognized as such in the commercial world. Oral Argument Recording (Feb. 28, 2024), ECF 73, at 0:59-1:01. Plain glass with an absorbent layer is not absorbent glass. *Id*. Therefore, Commerce's analysis, based on a faulty presumption, is flawed and irrelevant in the context of plain glass coated with a layer of absorbent material.

Similarly, Commerce errs by analogizing an absorbent layered glass with a sponge: "a sponge could not be said to be absorbent if liquid simply passes through the sponge without being retained in the sponge." Remand at 11. This is a false equivalence. Commerce fails to explain how the essential characteristics of absorbent sponge material are comparable to absorbent chemical layer applied to a glass surface. The correct interpretation of the term "absorbent" associated with a chemical material applied to a glass surface must be based on context. When interpreted in a context-specific manner, an absorbent chemical layer would drag light in and increase the absorption of light photons by the absorbent layer. The record lacks any evidence that the increased amount of absorbed light photons by the chemical layer would thereafter not travel onwards through the glass onto the underlying cells, thereby improving the performance of solar panels.

Jinko's bill of materials show "Glass/high permeability coating," which supports the conclusion that an absorbent layer on a glass surface increase the permeability of light photons through the glass after initial absorption of light. Jinko First Supp. Response (July 27, 2021), C.R. 365-91, P.R. 277-88, Exhibit SA-2D. Additionally, Jinko's master purchase agreement evidences a direct correlation between higher absorption and retention of light by the anti-reflective coating and the resulting enhanced transmission of light through the glass, as demonstrated *supra*.

Commerce asserts that "the phrase 'advanced glass technology that improves light absorption and retention,' which was used to describe Jinko's solar modules, cannot mean the same thing with respect to the glass as the phrase 'absorbent layer' that is used in Romanian HTS category 7007.19.80," because "if it did mean that same thing, that would mean that the glass used in Jinko's solar modules would absorb light, not let it pass through to the solar cells, and the solar module would not function." Remand at 9. As discussed above, this rationale is based on an erroneous interpretation of the term "absorbent" that is directly contracted by record evidence.

The Remand also vainly attempt to create daylight between Jinko's AR layer and Romanian HTS 7007.19.80's absorbent layer. Commerce reasons that "there is no evidence that an 'anti-reflective' layer drags in light, which implies that it is absorbent" and that Jinko's "advanced glass technology that improves light absorption and retention,' may simply refer to an anti-reflection layer in the glass that reduces the amount of light that bounces off the surface so that more light passes through the glass." *Id.* at 10-11, 38. Commerce claims "this is not the same as an absorption layer in the glass which takes in light without releasing it, which is the plain meaning of the word absorb." *Id.* at 11. In other words, Commerce acknowledges that the anti-reflection layer improves light absorption and retention and results in more light passing through the glass; however, it, thereafter, without explanation, claims that an absorbent layer on a glass surface absorbs light but does not release it. This rationale fails to reconcile an anti-reflection layer's higher transmission of light arising from the absorption and retention of light with an absorbent layer's alleged absorption of light without its further release. Therefore, this rationale is without merit.

Furthermore, record evidence contradicts the Remand's assertion that "Jinko described the glass used in its solar modules as high transmission glass . . . {which} is the opposite of glass

that takes in light without releasing it (glass with an absorbent layer)." *Id.* at 9. The record establishes, and Commerce acknowledges, that Jinko's AR coated glass causes higher absorption and retention of light, which results in a higher transmission of light through the glass. The prerequisite condition for the higher light transmission of Jinko's glass is higher absorption and retention of light by the anti-reflective layer. Contrary to Commerce's claim, the two processes of absorption and transmission of light are not in opposition. Instead, they complement one another. As such, Commerce erred by impermissibly divorcing the **ultimate purpose** of Jinko's glass – its **higher transmission** of light – from the **underlying process** of **absorption and retention** of light by its anti-reflective or absorbent layer.

As explained above, **anti-reflection, absorption, retention, permeability and transmission of light are complementary processes**. As such, glass with an absorbent layer as specified in Romanian HTS 7007.19.80 would be characterized by a higher permeability and transmission of light. Contrary to Commerce's presumption, Jinko's AR coated glass is not the opposite of glass with an absorbent layer as specified in Romanian HTS 7007.19.80.

Citing to the final results of the ninth administrative review, Commerce states that "Romanian HTS category 7007.19.80 explicitly covers solar glass, which is high transmission glass (glass which light passes through to a high degree)." *Id.* at 35. Commerce then reasons that "if we accept Jinko's argument that glass with an absorbent layer includes high transmission glass with an anti-reflective layer, then that means that Romanian HTS category 7007.19.80 covers high transmission solar glass and at the same time excludes high transmission solar glass . . . {which} is illogical." *Id.* at 35-36. This rationale, however, was already debunked by Jinko, demonstrating that "solar glass" covered in Romanian HTS 7007.19.80 is of a precisely defined technical specification (in terms of iron content and transmittance level) that lacks absorbent or

anti-reflective coating. Jinko Memorandum of Law in Support of 56.2 Motion for Judgment on the Agency Record (Mar. 24, 2023), ECF 37, at 12-13. Jinko's glass input is not covered in HTS 7007.19.80 because it has an absorbent or AR coating. In addition, Commerce fails to prove that Jinko's glass satisfies the precise technical specifications required for solar glass covered in Romanian HTS 7007.19.80.

The Remand vainly employs another excluded exemplar – glass with a reflective layer – to separate anti-reflective coated glass from absorbent layered glass. Commerce reasons that "the glass that Jinko uses is the antithesis of glass with a reflecting layer that is excluded from coverage under Romanian HTS category 7007.19.80." Remand at 11. The fact that anti-reflective layered glass is the antithesis of reflective glass is not controlling. As demonstrated above, an anti-reflective layer is synonymous with an absorbent layer.

In sum, the Remand fails to distinguish Jinko's anti-reflective coated glass from glass with an absorbent layer, which is expressly excluded from Romanian HTS 7007.19.80. Consequently, record evidence supports Jinko's position that its AR coated glass is not categorized in Romanian HTS 7007.19.80.

Additionally, the Remand continues to employ the red herring rationale of "light limiting" property to support its improper interpretation of absorbent layered glass unpersuasively used by Commerce in the underlying *AR8 Final Results*, 87 Fed. Reg. 38,379, IDM at 17-18; Remand at 37-38. Specifically, Commerce clubbed absorbent layered glass with the other five exemplars excluded from Romanian HTS 7007.19.80 and characterized all of them as having "light limiting" characteristics. Commerce reasoned "glass with an absorbent layer was one of a number of types of glass excluded from coverage under Romanian HTS category 7007.19.80 all of which have characteristics which limit light transmission compared to clear

17

glass (*e.g.*, glass that is enameled (covered with an opaque vitreous composition applied by fusion to the surface of the glass), glass colored throughout the mass, opacified glass, flashed glass (flash means to coat (glass) with a thin layer (as of metal or a differently colored glass)), and glass with a reflecting layer)." Remand at 8-9. As set forth below, this rationale is flawed and unsupported by substantial record evidence.

The above rationale implicitly invokes a canon of construction, *noscitur a sociis*, which means that "the meaning of an unclear or ambiguous word (as in a statute or contract) should be determined by considering the words with which it is associated in context," but *noscitur a sociis* is a permissible interpretive aid only when context permits. *Jing Mei Automotive (USA) v. United States*, 682 F. Supp. 3d 1354, 1381 (CIT 2023) ("In accordance with the canon *noscitur a sociis*, '{i}n order to ascertain the meaning of any word or phrase that is ambiguous or susceptible to more than one meaning, the court may properly resort to the other words with which the ambiguous word is associated in the statute.") To trigger the application of *noscitur a sociis*, two criteria must be fulfilled: (1) the word must be ambiguous; and (2) the other surrounding words should share a common attribute. Neither of the two criteria is satisfied on this record.

First, as demonstrated *supra*, the word "absorbent" in the context of an absorbent layered glass is not ambiguous or obscure. It simply means a plain glass layered with an absorbent material so that the glass, through the absorbent layer, absorbs and retains a higher amount of light photons, which results in a higher transmission of light through the glass onto the underlying cells. As such, absorbent layered glass is equivalent to and synonymous with an anti-reflective glass used by Jinko.

Second, there is no record evidence that the remaining five exemplars and absorbent layered glass in Romanian HTS 7007.19.80 share a common "light limiting" property. All six

glasses are subject to disparate physical or chemical treatments. For example, "glass colored throughout the mass" is **treated internally** with a coloring matter (*i.e.*, by adding coloring matter within the body of the glass) while the remaining five exemplars, including absorbent layered glass, appear to have been **treated externally** (*i.e.*, only on the outer surface of glass). The Remand sidesteps this issue. Furthermore, there is no record evidence showing a correlation between a glass' colored appearance and its property of light transmission. Likewise, there is no record evidence that compares enameled or flashed glass vis a vis plain glass in terms of their light transmission property. Indeed, one of the excluded types, glass with a reflecting layer, is the polar opposite of glass with an absorbent layer with regard to their interaction with light beam, which undermines Commerce's threshold premise. Therefore, the record is devoid of any evidentiary support for Commerce's summary assumption that all other excluded glass types share the attribute of "light limiting" glass treatment.

Yet, the Remand advances an extraordinary rationale to support the alleged light limiting property of the excluded exemplars, claiming that as compared to clear glass "each of the other types of glass (the other types of glass excluded from Romanian HTS category 7007.19.80 in addition to glass with an absorbent layer) has light limiting features." Remand at 38. This rationale is baseless. Even if Commerce's presumption is credited, it is akin to surmising that since 53, 59, 61, 67 and 71 are more than 50, the sixth unknown number must also be above 50 whereas it could be 37, a prime number less than 50. In other words, it is likely that all the excluded exemplars in Romanian HTS 7007.19.80 have some other common unspecified feature. This inference is plausible especially because Commerce's attempt to ascribe a light limiting attribute to the exemplars is speculative rather than based on substantial record evidence. It is equally likely that there is no common underlying feature tying all of the excluded exemplars.

The U.S. Supreme Court has specifically cautioned against an untrammeled application of the

*noscitur a sociis* maxim:

> That a word may be known by the company it keeps is, however, not an
> invariable rule, for the word may have a character of its own not to be submerged
> by its association. Rules of statutory construction are to be invoked as aids to the
> ascertainment of the meaning or application of words otherwise obscure or
> doubtful. They have no place, as this court has many times held, except in the
> domain of ambiguity. . . . They may not be used to create but only to remove
> doubt.

*Russel Motor Car Co. v. United Sates*, 261 U.S. 514, 519 (1923); *see Babbitt v. Sweet Home*

*Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 702 (1995). Absent the factual premise for

its application, the Remand improperly relies on the principle of *noscitur a sociis*.

In sum, the Remand errs on both counts – it improperly separates the absorbent layered

glass from anti-reflective glass and improperly ties it with the other five excluded glass types

based on their presumed shared attribute of "light limiting" property of which there is no record

evidence.

### D.    THE RECORD IN THIS CASE IS DISTINCTLY DIFFERENT FROM THE RECORD IN AR6 AND THE EU ADD ORDER

The Remand invokes Commerce's decision in AR6, reasoning that "Commerce

previously found that 'Romanian HTS 7007.19.80 covers tempered glass used in solar panels.'"

Remand at 11. However, the AR6 decision is not controlling on this AR8 record. As explained

below, the instant record is different than the AR6 record and requires a different analysis since

Jinko is raising a critical scope issue in AR8 that was not brought to Commerce's attention in the

earlier review.

First, Commerce, in AR6, summarized its product specificity rationale as follows:

Bulgaria and Romania HTS 7007.19.80 covers tempered glass used in solar
panels; the specific type of glass used by solar panel producers. In contrast,
Malaysia HTS 7007.19.9000 is broader, covering all types of tempered glass other
than automotive glass.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 62,275 (Oct. 2, 2020), IDM Comment 3.

In this rationale, Commerce uncritically endorsed the interested parties' submission regarding the scope of this tariff heading – "solar glass consisting of tempered soda-lime-flat-glass. . . having no more than 4.5 millimeters (mm) of thickness." *Id.* However, as established *supra*, Romanian HTS 7007.19.80, in fact, has a diametrically opposite scope since it expressly excludes Jinko's anti-reflective coated glass input.

Finally, Commerce relies on the European Union ("EU") ADD Order on solar glass from China, reasoning that "Commerce found that the European Union maintains trade remedy orders against solar glass imports from China which specifically reference HTS category 7007.19.80 as the HTS category for solar glass." Remand at 11. This rationale is without merit because Jinko's input is not a generic input, solar glass, but rather is a specific grade, anti-reflective coated glass. As demonstrated *supra*, Jinko's anti-reflective coated glass, being synonymous with the excluded exemplar, absorbent layered glass, is excluded from Romanian HTS 7007.1980. Commerce's retort that "Jinko has not pointed to any evidence to demonstrate that antireflective coating, in general or its particular antireflective coating, is not a common feature of solar glass such that Jinko's glass should be included in a separate HTS category from that used for all other imports of solar glass" is contradicted by record evidence. Risen's M_TGLASS (Tempered glass) used in dual glass modules is a solar glass, albeit without a coating. Jinko's 56.2 Brief at 19, fn. 2. This fact shows that not all solar glass are characterized by an AR or absorbent coating.

In sum, Commerce erred in adhering to Romanian HTS 7007.1980 and rejecting Malaysian HTS 7007.1990 for valuing Jinko's AR coated glass.

## III.    <u>COMMERCE IMPROPERLY VALUED AIR FREIGHT</u>

In its Remand, Commerce continues to reject the fully contemporaneous and route-specific Shanghai-Atlanta International Air Transportation Association ("IATA") data, presuming that "other than monthly averages of the IATA freight rates, the IATA data were treated as business proprietary information ("BPI") on the record of the review" and that the "details supporting the averages, and information about how that data were obtained, was treated as BPI in the review." Remand at 12. However, contrary to Commerce's presumption, the totality of route-specific Shanghai-Atlanta monthly air freight data was publicly disclosed on this record. Therefore, "the issue regarding the public availability of the route specific Shanghai-Atlanta data is moot since **Jinko has publicly disclosed the entire POR 8 Shanghai-Atlanta monthly air freight data on this record.**" Jinko Redacted Case Brief at 57-58 (emphasis in original).

To clarify, besides the monthly Shanghai-Atlanta air freight data, there are no more detailed Shanghai-Atlanta data in the IATA database. The remaining BPI IATA data are monthly air freight for other routes, which are irrelevant for valuing Jinko's air freight.

Yet the Remand completely ignores Jinko' comments on the draft remand, regurgitating the same rational it espoused originally in AR8: "The only public IATA information on the record is a monthly average of IATA rates. This public information contains no details about the rates and no details about how the data were obtained.  Thus, almost none of the underlying IATA data and information regarding the IATA data collection are publicly available." Remand at 40; *see* Jinko Comments on Draft Results of Redetermination (July 30, 2024), C.R.R. 2, P.R.R. 7, at 19-22; IDM Comment 9. The Remand also speculates that "whether the

{IATA} data are inclusive of airline surcharges." Remand at 40. Such rationale is without merit and unsupported by record evidence which establishes that the route specific Shanghai-Atlanta data is complete and reflects full freight amount.

Commerce also incorrectly placed reliance on its findings from the seventh administrative review ("AR7") where it "rejected the IATA data because the record only contained public summaries of freight rates and 'all of the underlying data on which the public summaries are based are proprietary.'" Remand at 17. Unlike AR7 where the record contained only four monthly air freight data (one for each quarter), the instant record provides the full set of 12 month data for the Shanghai-Atlanta route. To reiterate, there are no further details of the Shanghai-Atlanta data that are buried under the BPI IATA data. Therefore, Commerce's concerns in this regard are misplaced.

Further, the Remand – without comparing Freightos with the IATA data – summarily concludes that Freightos data is the best available information. Jinko already impeached this conclusion in the underlying proceeding by demonstrating that the IATA data affords the best available, most robust and reliable SV data for valuing Jinko's air freight expenses. Specifically, Jinko established that IATA data constitute the fair market value of bulk cargo air freight rates in AR8 since IATA is the trade association for the world's airlines, representing 290 airlines, responsible for 82 percent of total air traffic. Jinko Final SV Submission (Aug. 3, 2021), C.R. 404-16, P.R. 304-35, Exhibit 5F.

Further, contrary to Commerce's conclusion, the record provides information about the IATA data collection methodology. In his Expert Report, Jesse Cohen of SASI, discussed IATA data as follows.

> There are a limited number of data sources on air freight costs for heavier
> weight shipments in the China-U.S. market. In my professional experience, the

best of those currently available is the CargoIS data provided by the International Air Transport Association (IATA). That data is sourced from IATA's clearinghouse where nearly all freight forwarders and airlines settle charges in net prices on thousands of air freight shipments each month. These include nearly all of the major China market participants such as large multinational freight forwarders such as DHL Global Forwarding (DGF) Expeditors International, Kuehne and Nagel, DSV Panalpina, DB Schenker, UPS Supply Chain, and Flexport, as well as regional China logistics specialists such as Sinotrans, Apex Logistics and Kerry Logistics.

IATA's CargoIS data represents the **broadest coverage of the entire market of air cargo buyers and suppliers**, including both contract and spot market rates, especially considering that for air cargo the spot market may represent up to 50% of the cargo moving at times. CargoIS also provides the desired **granular detail at the lane level** for Shanghai (PVG) – Atlanta (ATL), while other sources may deal with less precise Shanghai-US composites. As a former United Cargo managing director, I relied upon CargoIS as the primary tool to manage our business and determine overall market pricing levels and trends, especially at the origin-destination level.

Jinko First SV Submission (June 28, 2021), C.R. 314-49, P.R. 201-41, Exhibit 9N.

Thus, IATA possesses the single largest air freight database. The IATA data, unlike the Freightos data, provides the total number, total weight and total value of shipments made per month. Jinko Final SV Submission Exhibit 5A. As such, IATA provides significantly greater detail than Freightos data, which merely provides the air freight rates unaccompanied by any underlying information. The IATA data, published by a reputed international body, is accordingly superior to the Freightos data, provided by a private publisher.

In sum, the entire route-specific and contemporaneous IATA air freight data is fully disclosed on this record along with its data collection methodology. Thus, the Remand errs by adhering to the Freightos data and rejecting the superior quality and route-specific IATA data. *Id.*

## CONCLUSION

For the foregoing reasons, Jinko respectfully requests that this Court again remand Commerce's valuation of Jinko's AR coated glass and air freight, because the justifications articulated in the Remand to maintain such valuation from the *AR8 Final Results* remain

unsupported by substantial evidence and otherwise not in accordance with law.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak
Dharmendra N. Choudhary*
Jordan C. Kahn*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import
and Export Co., Ltd., Jinko Solar Co., Ltd.,
Jinkosolar Technology (Haining) Co., Ltd.,
Yuhuan Jinko Solar Co., Ltd., Zhejiang
Jinko Solar Co., Ltd., Jiangsu Jinko
Tiansheng Solar Co., Ltd., Jinkosolar
(Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co.,
Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: October 30, 2024

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of Rule 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 7,645 words—less than the 10,000 word limit.

*/s/ Dharmendra N. Choudhary*

*Counsel for Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: October 30, 2024