# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD., ET AL., | ) |
| Plaintiffs, | ) |
| and | ) |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., ET AL., | ) |
| Plaintiff-Intervenors, | ) |
| v. | ) Consol. Court No. 22-00219 |
| UNITED STATES, | ) Public Version |
| Defendant, | ) |
| and | ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | ) |
| Defendant-Intervenor. | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
JACK DUNKELMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
  Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

KARA M. WESTERCAMP
Senior Trial Attorney
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 305-7571
Email: kara.m.westercamp@usdoj.gov

January 8, 2025

*Attorneys for Defendant*

## TABLE OF CONTENTS

**PAGE**

BACKGROUND .......................................................................................................... 2

    I.      Commerce's Final Results .................................................................. 2

    II.     The Court's Remand Order ................................................................ 3

    III.    Commerce's Remand Redetermination ............................................. 5

          A.     Valuation of Solar Glass ........................................................ 5

          B.     Air Freight ............................................................................. 9

          C.     Facts Available With An Adverse Inference Methodology ..................... 11

          D.     JA Solar And BYD's Separate Rate ...................................... 14

ARGUMENT ............................................................................................................... 14

    I.      Standard Of Review ......................................................................... 14

    II.     Commerce's Selection Of Romanian HTS 7007.19.80 To Value Solar Glass Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence .......................................................................... 15

          A.     Substantial Evidence Supports Commerce's Determination That Malaysian HTS Category 7007.19.90 Is Reliable .................................... 15

          B.     Substantial Evidence Supports Commerce's Determination That Jinko's Glass Falls Within Romanian HTS 7007.19.80 .......................... 19

    III.    Commerce Use Of The Freightos Data To Value Air Freight Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence .......................................................................... 22

    IV.    Commerce's Calculation Of Risen's Adverse Inference Rate Is In Accordance With The Court's Remand Order .......................................................... 24

    V.     Commerce's Separate Rate Is Supported By Substantial Evidence And Is In Accordance With Law ......................................................................... 28

CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**                                                                            **PAGE(S)**

*Ass'n of Am. School Paper Suppliers v. United States*,
  32 C.I.T. 1196 (2008) ............................................................................... 18

*Carbon Activated Tianjin Co. v. United States*,
  547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ........................................... 15

*Dillinger France S.A. v. United States*,
  651 F. Supp. 3d 1294 (Ct. Int'l Trade 2023) ........................................... 26

*Jiangsu Zhongji v. United States*,
  396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019) ........................................... 23

*Jiaxing Brother Fastener Co., Ltd. v. United States*,
  11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) *aff'd*,
  822 F.3d 1289 (Fed. Cir. 2016) ................................................................ 15

*Jing Mei Automotive (USA) v. United States*,
  682 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) ........................................... 20

*Jinko Solar Import and Export Co., Ltd. v. United States*,
  701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ................................... passim

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................... 14

*Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*,
  753 F.3d 1227 (Fed. Circ. 2014) .............................................................. 25

*Nan Ya Plastics Corp. v. United States*,
  810 F.3d 1333 (Fed. Cir. 2016) ................................................................ 26

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................ 14

19 U.S.C. § 1677a(c)(2)(A) ................................................................................. 3

19 U.S.C. § 1677e(a) .......................................................................................... 26

19 U.S.C. § 1677e(a)(1) ...................................................................................... 25

19 U.S.C. § 1677e(b)(1) ...................................................................................... 24

19 U.S.C. § 1677e(b), (c) ................................................................................................... 5

## REGULATIONS

19 C.F.R. § 351.105(a) .................................................................................................... 9

19 C.F.R. § 351.408(c) .................................................................................................... 22

19 C.F.R. § 351.408(c)(2) ............................................................................................... 15

## ADMINISTRATIVE DETERMINATIONS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022) DM) (P.R. 455), *as amended by*
  87 Fed. Reg. 48,621 (Dep't of Commerce Aug. 10, 2022). ....................................................... 2

*Certain Aluminum Foil from the People's Republic of China*,
  83 Fed. Reg. 9,292 (Dep't of Commerce Mar. 5, 2018) ........................................................... 23

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD., *ET AL.*, | ) |
| Plaintiffs, | ) |
| and | ) |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *ET AL.*, | ) |
| Plaintiff-Intervenors | ) |
| v. | ) Consol. Court No. 22-00219 |
| UNITED STATES, | ) Public Version |
| Defendant, | ) BPI Information Bracketed |
| and | ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | ) |
| Defendant-Intervenor. | ) |

_____

**DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully responds to comments filed by consolidated

plaintiffs Jinko Solar Import and Export Co., Ltd. (Jinko), ECF Nos. 98-99, and Risen Energy

Co., Ltd. (Risen), ECF No. 97, as well as plaintiff-intervenors JA Solar Technology Yangzhou

Co., Ltd. (JA Solar), ECF No. 101, and BYD (Shangluo) Industrial Co., Ltd. (BYD), ECF No.

100, concerning the Department of Commerce's remand redetermination filed in accordance

with this Court's remand order in *Jinko Solar Import and Export Co., Ltd. v. United States*, 701

F. Supp. 3d 1367 (Ct. Int'l Trade 2024) (Remand Order).  *See* Final Results of Redetermination

Pursuant to Court Remand, Aug. 29, 2024 (Remand Redetermination), ECF Nos. 89-90.  For the

reasons explained below, we respectfully request that the Court sustain Commerce's remand

redetermination and enter final judgment for the United States.

## BACKGROUND

### I.    Commerce's Final Results

In October 2020, Commerce published the final results of the 2019-2020 administrative

review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or

not assembled into modules (solar cells) from the People's Republic of China.  *Crystalline*

*Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic*

*of China*, 87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022) (P.R. 464) (Final Results),

and the accompanying Issues and Decision Memorandum (IDM) (P.R. 455), *as amended by* 87

Fed. Reg. 48,621 (Dep't of Commerce Aug. 10, 2022) (P.R. 473) (Am. Final Results).  In the

preliminary results, Commerce had selected Malaysia as the primary surrogate country and

selected Jinko and Risen as mandatory respondents.  *See* Resp. Selection Memo (Feb. 25, 2021)

(P.R. 43; C.R. 5); Preliminary Decision Memorandum (PDM) at 16-19, 23-28 (P.R. 396).

In the final results, Commerce relied on Romanian import data to value solar glass using

the same Harmonized Tariff Schedule (HTS) subheading as it did in the preliminary results,

because Commerce determined that import data under Romanian HTS 7007.19.80 were the best

information to value the respondents' solar glass as they were more specific to that input.  *See*

IDM at 13-19; Prelim. Surrogate Value Memo at 3 (Apr. 16, 2021) (P.R. 403).  Commerce

otherwise used Malaysian HTS date to value Jinko and Risen's ethylene vinyl acetate (EVA) and

backsheet using the Malaysian HTS data corresponding to "sheet" rather than "film" because

Commerce determined that it was the subheading most specific to those inputs.  IDM at 44-47.  Commerce also used Malaysian data to value electricity but excluded certain rates and regions.  *Id.* at 58-60.  Additionally, Commerce relied on the Freightos data to value air freight, IDM at 40-44; *see also* PDM at 27, and Descartes and Maersk Line data to value ocean freight.  IDM at 22-25, 41-44.  To value the surrogate financial ratios, Commerce selected a Malaysian solar cell and module producer.  *Id.* at 37-39.

With respect to non-surrogate value issues, Commerce applied facts available with an adverse inference in calculating Risen's dumping margin because Commerce determined that Risen, in addition to its suppliers, had failed to cooperate to the best of its ability by refusing to provide requested factors of production (FOP) information.  IDM at 6-12; *see also* PDM at 15-16.  Commerce rejected Trina's untimely separate rate certifications and denied Trina a separate rate.  IDM at 67-71.  Finally, Commerce deducted Section 301 duties from U.S. prices when calculating dumping margins pursuant to 19 U.S.C. §1677a(c)(2)(A).  *Id.* at 73-74.

Commerce calculated antidumping duty margins of 20.99 percent for Jinko, 12.24 percent for Risen, 14.79 percent for separate rate companies, and 238.95 percent for the China-wide entity (including Trina).  Am. Final Results, 87 Fed. Reg. at 48,621-22.

## II.    The Court's Remand Order

On July 7, 2023, the Court sustained in part, and remanded in part, Commerce's final results.  *See Jinko Solar*, 701 F. Supp. 3d at 1397.  The Court sustained Commerce's determinations concerning (1) Trina's separate rate status, (2) valuations of respondents' electricity, ocean freight, backsheet, and EVA, (3) use of the Malaysian company's financial statements to calculate surrogate financial ratios, (4) deduction of Section 301 duties, and (5) use of facts available with an adverse inference against Risen.  *Id.*

However, the Court directed Commerce to reconsider or further explain its (1) valuation of Jinko and Risen's solar glass using Romanian HTS 7007.19.80, (2) valuation of air freight based on Freightos data, and (3) calculation of the rate for facts available with an adverse inference. *See id.* The Court also instructed Commerce to recalculate the separate rate for JA Solar and BYD following Commerce's redetermination. *Id.*

Specifically, with respect to valuation of solar glass, the Court held that Commerce had failed to explain how the data from Malaysia, the primary surrogate country, was unreliable to warrant a departure from the standard practice of using the data from the primary surrogate country. *Id.* at 1381-83. The Court explained that Commerce failed to acknowledge that Jinko's proposed conversion methodology based on factors in the record, such as the dimensional specifications of Jinko's coated glass input grades, could establish reliable conversion using the Malaysian data. *Id.* at 1382. Additionally, the Court held that Commerce did not sufficiently address record evidence undermining its determination that the Romanian HTS heading is specific for valuing Jinko's glass, particularly given Jinko's contention that the Romanian HTS heading excludes its anti-reflective coated glass. *Id.* at 1382-83.

As for Commerce's determination regarding valuation of air freight services used by Jinko, Commerce used Freightos data, rejecting International Air Transport Association (IATA) data because portions of the IATA data were designated as confidential, and thus, not on the public record of the review. *Id.* at 1386. The Court held that it was unclear why the information must be not only publicly available but also on the public record. *Id.* at 1386-87. Accordingly, the Court remanded to Commerce to "further consider or explain how publicly available information on the confidential record fails to promote accuracy, fairness, and predictability," which underlies Commerce's preference for publicly available information. *Id.* at 1388.

Further, regarding the rate that Commerce used for its facts available with an adverse inference calculation methodology, the Court held that Commerce failed to select reasonably from among the facts otherwise available in the current review, and instead "created facts by manipulating evidence on the record" with regard to missing information for FOPs.  *Id.* at 1396. The Court remanded Commerce's determination for reconsideration or further explanation, citing a need for Commerce to explain why the "grouping" Commerce selected for its calculation methodology was "logical, how the formula worked, and how any of the choices made serve the purpose of the statute to promote accuracy and deterrence."  *Id.* (citing 19 U.S.C. § 1677e(b), (c)).  Correspondingly, the Court instructed Commerce to recalculate the separate rate for JA Solar and BYD consistent with Commerce's redeterminations.  *Id.* at 1397.

III.    **Commerce's Remand Redetermination**

    A.    **Valuation of Solar Glass**

On remand, Commerce further explained its decision to value solar glass using Romanian HTS 7007.19.80 instead of Malaysian HTS 7007.19.90.  Remand Redetermination at 3-12. Commerce clarified that, although its "practice is to rely, where possible, on the primary surrogate country for all SVs {surrogate values}, it will use SVs from another surrogate country where SVs from the primary country," here Malaysia, "are unavailable or unreliable."  *Id.* at 8.

The Malaysian HTS data, reported in square meters, required conversion to kilograms, which required information regarding the thickness of glass.  *Id.*  Commerce explained that "{b}ecause the thickness of the glass imported into Malaysia was not reported in the import statistics, it is not possible to use the conversion formula that is on the record to convert the Malaysian import quantities that are in square meters into kilograms," rendering the Malaysian HTS unreliable.  *Id.* at 5-6.  Commerce elaborated that it therefore could not use the Malaysian

import data to value the respondent's glass. *Id.* at 6. Commerce explained that, conversely, the Romanian HTS, reported in kilograms, provided a more reliable SV because "both Jinko and Risen reported the consumption quantities of their FOPs {factors of production}, including glass, by weight (kilograms)." *Id.* at 5.

Commerce additionally addressed Jinko and Risen's proposed conversion formulas, which both relied on multiplying the area of the glass in square meters by its thickness and density to calculate the weight. *Id.* at 6-7. Both Jinko and Risen derived the thickness values from their production records and calculated a conversion factor specific to the glass they consumed. *Id.* Commerce found that these thickness values, although reflective of the respondents' own glass inputs, were not demonstrated to be representative of the glass imported into Malaysia during the period of review. *Id.* at 7. For example, for Jinko, Commerce explained that its "conversion ratio is also dependent upon the thickness of the glass that it consumed and will vary based on the thickness" and no record evidence supports "that the thickness of the glass consumed by Jinko during the {period of review} matches the thickness of the glass imported into Malaysia during the {period of review}." *Id.* Risen's calculation was also unreliable because "Risen calculated this ratio by dividing the total square meters of the glass that it consumed when producing modules (which it recorded in its records) by the total weight of that glass," but the total weight of the glass did not come from Risen's records. *Id.* at 6. "Rather, Risen calculated the weight of each piece of glass that it consumed by multiplying the density of the glass in kilograms per cubic meter by the cubic meters of the glass consumed (*i.e.*, the product of the length, width, and thickness of each piece of glass consumed)." *Id.* Both calculations were dependent on the thickness of glass consumed, but "the thickness of the glass imported into Malaysia during the {period of review} is unknown." *Id.* at 6-7.

Further, Commerce emphasized that the conversion ratio that Jinko calculated showed a wide variability in glass weight per square meter, ranging from 0.05 kilograms per square meter to 72.50 kilograms per square meter, indicating "that the weight of the glass can vary significantly per square meter." *Id.* at 7. Given such variability, Commerce determined that "there is insufficient basis to conclude that either Risen or Jinko's square meters to kilograms conversion ratio is a sufficiently accurate estimate of the ratio for the Malaysian import data when the thickness of the glass that was imported into Malaysia during the POR is not known." *Id.*

Next, Commerce addressed the specificity of the Romanian HTS to Jinko's glass. *Id. at* 8. The Romanian HTS covers "{Tempered} Safety Glass (Excl. Enameled, Colored Throughout the Mass, Opacified, Flashed or With An Absorbent Or Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Vehicles." *Id.* In its Remand Order, the Court raised concerns about how Commerce could reconcile the exclusion of glass with an "absorbent layer" with the description of Jinko's glass as incorporating "advanced glass technology that improves light absorption and retention." *Jinko Solar*, 701 F. Supp. 3d at 1383. The Court suggested that this description might place Jinko's anti-reflective glass within the scope of the exclusion for glass with an absorbent layer. *Id.*

However, in the remand results, Commerce explained that the term "absorbent layer" is not defined on the record, but that its plain meaning denotes a material that takes in light without releasing it, preventing light from passing through the glass. Remand Redetermination at 9. Commerce elaborated that this characteristic aligns with other types of excluded glass under the Romanian HTS, such as glass that is enameled, colored throughout the mass, opacified, flashed or with an absorbent or reflecting layer, all of which are designed to limit light transmission. *Id.*

Commerce further clarified that Jinko's solar modules, described as using "advanced glass technology that improves light absorption and retention," "cannot mean the same thing with respect to the glass as the phrase 'absorbent layer' that is used in Romanian HTS category 7007.19.80," because "if it did mean the same thing, that would mean that the glass used in Jinko's solar modules would absorb light, not let it pass through to the solar cells, and the solar module would not function." *Id.* Instead, Jinko's glass, which Jinko describes as "high transmission" is explicitly designed to allow light to pass through efficiently to the solar cells. *Id.* at 10. Commerce explained that, by definition, high transmission glass enables a high degree of light passage, which directly contrasts with glass containing an absorbent layer that traps light. *Id.* Commerce further discussed other features of Jinko's glass that suggest that the glass has characteristics opposite of glass with an absorbent layer, which would take in light without releasing it. *Id.* at 10-11.

Commerce also observed that the phrase "advanced glass technology that improves light absorption and retention" likely refers to the anti-reflective layer on Jinko's glass, which reduces the amount of light reflected off the surface, allowing more light to pass through. *Id.* at 11. This functionality is distinct from the exclusion under the Romanian HTS for glass with an absorbent layer, which is glass that prevents light transmission. *Id.* Moreover, Commerce highlighted that Jinko's glass "has an anti-reflective layer, not a reflective layer," further distinguishing it from the types of glass excluded under the Romanian HTS. *Id.*

Finally, Commerce explained that in the sixth administrative review of the Order, Commerce determined that the Romanian HTS covers tempered glass used in solar panels. *Id.* at 12. Commerce also referenced that in the previous administrative review, Commerce found that the European Union's trade remedy orders against solar glass imports from China explicitly cite

Romanian HTS category 7007.19.80.  *Id.*  As Commerce explained, "{t}here is no information

on the record of the underlying administrative review demonstrating a change in the coverage of

Romanian HTS category 7007.19.80 since Commerce made those findings."  *Id.*

B.    **Air Freight**

On remand, Commerce reaffirmed its reliance on Freightos data, providing further

explanation as to why "publicly available" means on the "public record," and additionally, how

placing publicly available information for valuing FOPs on the confidential record fails to

promote accuracy, fairness, and predictability.  *Id.* at 12-19.  Commerce discussed that under 19

CFR 351.408(c), Commerce normally uses publicly available information to value factors.  *Id.* at

13.

Commerce explained that, although the term "publicly available information" is not

explicitly defined in the regulations, Commerce interprets the term to mean information placed

on the public record of the proceeding, consistent with the ordinary meaning of being available

to the public.  *Id.*  Commerce elaborated that this interpretation aligns with 19 C.F.R.

§ 351.105(a), which categorizes information in antidumping or countervailing duty proceedings

into four categories, two of which are "public" and "business proprietary."  *Id.*  Commerce

explained that simply referencing a public data source, such as IATA, while treating the detailed

data as BPI, "does not allow the public to see exactly what Commerce saw on its record and

relied upon to make its determination{.}"  *Id.* at 14.  Thus, Commerce found that "publicly

available" means "on the public record," because otherwise, "the public will not know the

precise information that Commerce considered when evaluating SV data, and the precise data

that Commerce relied upon to value the FOPs."  *Id.*

Next, Commerce discussed how relying on information on the confidential record to value air freight "would fail to promote accuracy, fairness, and predictability." *Id.* Commerce first explained how reliance on publicly available information aligns with the regulatory goals of accuracy and fairness, because "limiting access to relevant SV information to only parties with access to the proprietary record of a proceeding segment will limit the input that Commerce receives regarding the applicability of the surrogates to the factors being valued," and such limitation "could result in Commerce selecting surrogates that are not the best available information for valuing the factors." *Id.* at 15. Commerce also explained that reliance on public information promotes broader participation, and thus fairness, because it allows interested parties without access to confidential information to evaluate such publicly available information for valuing FOPs. *Id.* And, in this particular review, counsel for three of the parties had access to only the public record, and *not* the BPI record. *Id.*

Moreover, reliance on the confidential record rather than the public record for valuing FOPs undermines predictability. *Id.* at 16. Interested parties who are not involved in a specific segment of a proceeding, or related non-market economy antidumping cases, cannot access business proprietary information filed in those segments. *Id.* This limits their ability to fully understand Commerce's recent SV selections or what types of data Commerce deems acceptable. *Id.* This is crucial information to both domestic parties who are considering filing an antidumping duty petition and to exporters of merchandise subject to a non-market economy antidumping duty order setting prices as to not sell below normal value. *Id.* Specifically, Commerce recognized that this information being on the confidential record would "make it more difficult for some interested parties to predict the exact type of information that Commerce may accept as an SV in future proceedings (*e.g.*, which SV information Commerce will accept in

petitions for the imposition of antidumping duties) or predict the exact type of information that Commerce may accept as a SV in future segments of existing proceedings (*e.g.*, it may be more difficult for parties in administrative reviews to know which SVs they should place on the record in response to Commerce's request for SV information." *Id.* at 16-17; *see also id.* at 17 (explaining that Commerce had previously selected Freightos data over IATA data in the seventh administrative review of the proceeding because Freightos data were publicly available).

Finally, Commerce continued to rely on Freightos data rather that IATA data to value air freight because Freightos data meets key SV selection criteria, including being publicly available, contemptuous with the period of review, broad-market averages, tax- and duty-exclusive, and specific to the inputs being valued. *Id.* at 18-19. Commerce found that the only public IATA data on the record consisted of "monthly averages of its rates," which lacked "details about the rates or how the data were obtained," and "almost none of the underlying IATA data and information regarding the IATA data collection are publicly available." *Id.* at 18. In contrast, Commerce highlighted that Freightos data provide weekly rates from a vast majority of service providers, and further noted that Freightos data are specific to air cargo shipments over 1,000 kilograms from Shanghai to Atlanta International Airport, making them highly relevant to the inputs being valued. *Id.* at 18-19. Additionally, the Freightos rates include "all airline surcharges, such as fuel, security, or COVID-19, and exclude origin and destination surcharges, duties, and taxes (which is one of {Commerce's} SV selection criteria - being tax and duty-exclusive." *Id.* at 19.

**C.**     **Facts Available With An Adverse Inference Methodology**

On remand, Commerce further explained its methodology for calculating the adjustment that it applied to missing FOP data not reported by Risen's unaffiliated solar cells and solar

module producers. *Id.* at 19-27. Commerce explained that Risen had reported quantities of its input on a control number (CONNUM)-specific basis for solar modules. *Id.* at 21-22. "For each reported input with missing data, Commerce calculated a ratio for each monocrystalline solar module CONNUM by dividing the per-unit consumption quantity of the input reported for the CONNUM by the highest per-unit consumption quantity reported for that input" across all solar modules. *Id.* at 22. All CONNUM-specific ratios that Commerce calculated for that input were then averaged to derive a single input ratio for each input. *Id.*

Next Commerce explained that it calculated (1) a simple average of all the input ratios for all the inputs (*i.e.*, which include direct materials, direct and indirect labor, electricity, gas, and water) that were used to produce solar modules (including, when applicable, input ratios for inputs, other than solar cells, that were used to produce components in the solar module), (2) another simple average of all the input ratios for all the inputs (*i.e.*, which include direct materials, direct and indirect labor, electricity, gas, and water) that were used to produce solar cells, and (3) a third simple average of all the input ratios for all the material inputs that were used in packing solar modules. *Id.* Commerce then applied the multiplicative inverse of each of these averages "(*i.e.* 1 divided by the applicable simple average input ratio)" to increase the reported per-unit consumption quantities for the respective input categories. *Id.*

Commerce provided the table below to illustrate its calculation:

|  | Module Input 1 (Per-Unit Qty.) | Module Input 1 Ratio | Module Input 2 (Per-Unit Qty.) | Module Input 2 Ratio | Cell Input 1 (Per-Unit Qty.) | Cell Input 1 Ratio | Cell Input 2 (Per-Unit Qty.) | Cell Input 2 Ratio |
|---|---|---|---|---|---|---|---|---|
| CONNUM A | 0.55 | 0.70 | 0.40 | 0.95 | 0.65 | 0.76 | 0.25 | 0.63 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CONNUM B | 0.65 | 0.85 | 0.45 | 0.97 | 0.75 | 0.88 | 0.35 | 0.88 |
| CONNUM C | 0.75 | 1.00 | 0.50 | 1.00 | 0.85 | 1.00 | 0.40 | 1.00 |
| Input Ratio | | 0.78 | | 0.96 | | 0.82 | | 0.75 |
| Simple Average Input Ratio | | | | 0.87 | | | | 0.79 |
| Adverse Adjustment (Inverse of the Simple Average Input Ratio) | | | | 1.15 | | | | 1.27 |

*Id.* at 23.

Commerce further explained the "logic behind the averaging groups." *Id.* For example, "the average input ratio {in the table above} results in a 15 percent increase in the reported per-unit consumption quantities, compared to a 4 percent increase in those quantities based on the inputs specific ratio," thus, resulting in a "greater incentive for cooperation." *Id.* at 24. Commerce further explained "that it was not reasonable to use a simple of average of all input ratios to calculate one overall adverse adjustment multiplier for several reasons." *Id.* First, the inputs and production processes for solar cells differ significantly from those for solar modules and packing materials, making it inappropriate to combine input ratios from unrelated categories into a single average multiplier. *Id.* By maintaining a separate multiplier for each category, Commerce avoided applying adjustments that lacked a meaningful connection to the specific inputs and production processes involved, resulting in a more accurate calculation of an adverse inference multiplier. *Id.*

Second, Commerce explained that it "did not find it appropriate to include input ratios for packing together with input ratios for solar cells and solar modules in the pool of ratios from which it calculated a simple average ratio" because packing inputs constituted a relatively minor portion of the FOPs.  *Id.* at 25.  Commerce explained that, again, calculating a single average input ratio for all three items (solar cells, solar modules, and packing) would have "inappropriately skewed the adverse adjustment multiplier for solar cells and solar modules."  *Id.* Based on the above, Commerce stated that "averaging groups are logical, their use promotes accuracy, and average ratios and overall adverse adjustment multipliers, rather than input-specific ratios and input-specific adverse adjustment multipliers, enhance deterrence."  *Id.* Finally, the use of this methodology also promoted accuracy because it applied to only the missing information and "relied on facts otherwise available that are specific to Risen, namely Risen's FOP consumption quantities, to derive the adverse inference multipliers for Risen."  *Id.*

### D.    JA Solar And BYD's Separate Rate

Given the above, Commerce did not revise the dumping margins for the mandatory respondents, Jinko and Risen.  *Id.* at 27.  Because Commerce based the separate rate that it assigned to JA Solar and BYD in the underlying administrative review on the dumping margins of the mandatory respondents, Jinko and Risen, Commerce did not make any changes to those dumping margins in this remand redetermination.  *Id.* at 27, 47.

## ARGUMENT

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in

accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

## II. Commerce's Selection Of Romanian HTS 7007.19.80 To Value Solar Glass Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence

### A. Substantial Evidence Supports Commerce's Determination That Malaysian HTS Category 7007.19.90 Is Reliable

Although Commerce generally prefers to value all FOPs using data from a single surrogate country pursuant to 19 C.F.R. § 351.408(c)(2), Commerce must also calculate dumping margins as accurately as possible. *See Carbon Activated Tianjin Co. v. United States,* 547 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2021) (discussing Commerce's preference to value all factors of production in a single surrogate country). Nevertheless, Commerce will use surrogate sources outside of the primary surrogate country only when reliable SVs in the primary surrogate country are not available on the record. *Jiaxing Brother Fastener Co., Ltd. v. United States*, 11 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014), *aff'd*, 822 F.3d 1289 (Fed. Cir. 2016). As explained below, Commerce determined that Malaysian HTS 7007.19.90 was not reliable to value Jinko and Risen's glass and therefore, on remand, Commerce continued to rely on Romanian HTS 7007.19.80.

On this record, import data for solar glass from Malaysia, the primary surrogate country, was reported in price per square meter, but Risen and Jinko reported their consumption in weight per kilograms. Remand Redetermination at 4-8. In its remand redetermination, Commerce thoroughly explained that to use the Malaysian import prices, Malaysian import prices would need to be converted to a per-kilogram price. *Id.* at 7-8, 30.

First, Jinko and Risen argue that Commerce should still use the Malaysian import price and propose that Commerce should convert the square meters of glass imported into Malaysia

into kilograms using conversion ratios based on their own glass consumption.  *See* Jinko's Cmts. at 5; Risen's Cmts. at 9.  The main problem with this approach is that the thickness of the glass imported into Malaysia during the period of review is not known, as Commerce explained in the remand redetermination.  Remand Redetermination at 7, 31-33.  Therefore, rather than utilize the approach that Jinko and Risen offered, which assumes the thickness of the glass imported into Malaysia is the same as the thickness of the glass used by Jinko and Risen, Commerce found it more accurate to rely on Romanian HTS category 7007.19.80, which already values per kilogram of glass, rendering a conversion unnecessary.  *Id.* at 5.

Second, Jinko and Risen assert that the ratios they offered to convert square meters of glass imported into Malaysia into kilograms are acceptable.  *See* Jinko's Cmts. at 2-19; Risen's Cmts. at 2-13.  However, Commerce found no basis to rely on their proposed ratios, which are based on averages and assumptions, when average unit values for imports of glass into an acceptable surrogate country with actual recorded weights are already on the record.  Remand Redetermination at 6-8, 31-34.

For example, Jinko calculated three square meter-to-kilogram conversion ratios based on the glass that it uses, the glass that Risen uses, and Romanian HTS data, respectively.  Jinko's Cmts. at 5-6.  Jinko claims that all three conversion factors corroborate each other because they allegedly fall within a narrow range of 10 percent.  *Id.* at 6.  Therefore, Jinko contends, these ratios should be used to convert the square meters of glass imported into Malaysia into kilograms.  *See id.*

Although the record in the underlying proceeding does not contain information about the thickness of the glass imported under the Malaysian HTS (which is the looming elephant in the room with the conversion ratios), Commerce observes that Risen stated in the sixth

administrative review of this proceeding that tempered glass can range from three to 19 millimeters thick.  Remand Redetermination at 31.  "This is a much larger thickness range than that of Jinko and Risen's solar glass, which ranges in thickness from [█] {millimeters} to [█] {millimeters}."  *Id.*  Because the glass imported under the Malaysian HTS could be significantly thicker than the glass used by Jinko and Risen, Commerce explained that "there is no basis" on this record to conclude that "conversion ratios that are based on the glass used by Jinko and Risen apply to imports of glass under Malaysian HTS category 7007.19.90."  *Id.* at 32.

Further, Jinko's suggested ratios are also undermined because "Jinko did not calculate each of the conversion ratios in the same way."  *Id.*  For example, the ratio Jinko suggested for its own data was "an overall average of specific conversion ratios for each glass input used," but Jinko "calculated overall square meter to kilogram conversion ratios for Risen and the Romanian HTS data by dividing the total square meters of glass by the total weight of the glass."  *Id.*  Commerce explained that the "conversion ratios span a range of 45 percent, which is a larger range than the range of conversion ratios alleged by Jinko."  *Id.*  Therefore, Commerce did not find it appropriate to use ratios based on "respondents' own inputs to convert units of measure that are used in import statistics," because the thickness of the glass, an important input characteristic that affects the conversion ratio, varies between the respondents' inputs and the imported products.  *Id.*

Third, Jinko argues that 89.43 percent of the total quantity of Romanian imports falls within one standard deviation of the mean conversion ratio (9.834), including the weight-average conversion ratios calculated by using the data of Jinko, Risen, and the Romanian HTS category.  Jinko Cmts. at 9.  From this, Jinko attempts to draw the conclusion that the weighted-average conversion ratios that it calculated are reasonable and non-aberrational conversion ratios for the

Malaysian import data. *See id.* However, as Commerce explained, 86 percent of the individual entry conversion ratios that Jinko calculated for the Romanian data "fall within one standard deviation of the mean conversion ratio (excluding zero entries) and those 'non-aberrational' conversion ratios vary from 0.25 {kilograms per square meter} to 20.01 {kilograms per square meter}." *Id.* at 33. Because "such a large number of conversion ratios" fall within a wide non-aberrational range, Commerce explained that "it is not reasonable to conclude that one weighted-average conversion ratio could be used to accurately convert the square meters of glass imported into Malaysia into kilograms of glass," especially given the fact that there is no evidence that the thickness of glass imported during the period of review into Malaysia and Romania are similar. *Id.*

Jinko argues that Commerce has applied the "standard deviation method" to test the reliability of data in prior decisions, citing *Ass'n of Am. School Paper Suppliers v. United States*, 32 C.I.T. 1196, 1202-03 (2008). Jinko Cmts. at 10. In that case, Commerce used standard deviation from a mean involving transaction quantities to determine whether a specific transaction supporting an adverse facts available rate was aberrational. *Ass'n of Am. School Paper Suppliers*, 32 C.I.T. at 1203. However, that case is inapposite to the reality of evaluating the reliability of solar glass conversion ratios, as Commerce extensively explained in the remand results. Transaction quantities are a uniform and directly reported metric. *See id.*

In contrast, conversion factors for solar glass are derived values influenced by multiple variables, including weight, length, width, and thickness, making their reliability dependent not only on statistical clustering, but also on the specific physical characteristics of the products being valued. Remand Redetermination at 5-7. Even if a large proportion of conversion ratios cluster around a mean within one standard deviation, the wide range of conversion ratios within

18

that interval reflects a variability in glass, undermining the reliability of the Malaysian data for accurately valuing Jinko and Risen's glass.  *Id.* at 32-34.  As Commerce explained, "such inexactitude is unnecessary" because the record includes a "product-specific per-kilogram SV on the record based on Romanian HTS data that permits {Commerce} to more precisely and reliably account for different thickness of glass."  *Id.* at 34.  Therefore, Commerce continued to find that using Romanian import data was the best available source of information for valuing solar glass.  *Id.*

### B.    Substantial Evidence Supports Commerce's Determination That Jinko's Glass Falls Within Romanian HTS 7007.19.80

Romanian HTS category 7007.19.80 excludes glass that is enameled, colored throughout the mass, opacified, flashed or that has an absorbent or reflecting layer.  Remand Redetermination at 8-12, 34-39.  In the remand redetermination, Commerce continued to find that Jinko's glass, which has an "advanced glass technology that improves light absorption and retention" is not a glass with an absorbent layer that is excluded from the Romanian HTS category 7007.19.80.  *Id.* at 34.  Jinko's arguments to the contrary are meritless, as we explain below.

First, Jinko continues to rely on speculative arguments to assert that its glass with an anti-reflective layer is somehow synonymous with glass with an absorbent or reflective layer, which is excluded under the Romanian HTS.  Jinko's Cmts. at 12-20.  Notably, Jinko fails to identify *any* record evidence to show that its definition of glass with an absorbent layer is the same as the definition under the Romanian HTS.  *See id.*  Given that there was no definition of "glass with an absorbent layer" on the record, Commerce reasonably looked to the context in which "absorbent layer" is used in the HTS category.  *See* Remand Redetermination at 9.

In its remand redetermination, Commerce explained that all other glass types excluded under the Romanian HTS are treated in ways that limit the amount of light transmitted through the glass. *See id.* at 9-12, 36-37.  Commerce also explained that, contrary to Jinko's claim and regardless of whether the glass was treated internally or externally, each of these types of excluded glass share the common attribute of being light-limiting.  *Id.* at 38.  Accordingly, Commerce reasonably determined that glass excluded under the Romanian HTS–glass with an absorbent layer–is glass that limits the amount of light transmitted through itself.  *Id.* at 37.

Jinko takes exception to Commerce deriving this definition based on the context in which the phrase "absorbent layer" was used.  Jinko's Cmts. at 18.  As Jinko points out, under the canon of *noscitur a sociis*, "{i}n order to ascertain the meaning of any word or phrase that is ambiguous or susceptible to more than one meaning, the court may properly resort to the other words with which the ambiguous word is associated in the statute."  *Id.* at 18 (citing *Jing Mei Automotive (USA) v. United States*, 682 F. Supp. 3d 1354, 1381 (Ct. Int'l Trade 2023)).  Jinko asserts that Commerce may only use this canon of construction when (1) the word is ambiguous, and (2) the other surrounding words share a common attribute.  *Id.*

In this case, both criteria are met.  First, the fact that parties contest the definition of "glass with an absorbent layer" in litigation supports the conclusion that the phrase is ambiguous.  This is bolstered by the fact that no definition of the phrase is on the record.  Remand Redetermination at 37.  Second, the other surrounding words *do* share a common attribute, namely, that they have features that limit light transmission through the glass.  *Id.* at 37-38.  Accordingly, Commerce reasonably relied on the context of the HTS exclusion language to determine the meaning of "absorbent layer."  *See id.*

Moreover, Jinko's own descriptions of its glass support that it is *not* glass with an absorbent layer under the Romanian HTS because Jinko's glass does not limit  but rather enhances light transmission.  Jinko's Cmts. at 12.  Jinko characterizes its glass as high transmission and anti-reflective which are characteristics that maximize the amount of light that can pass through the glass.  *Id.*  Jinko's glass is also characterized as having technology that improves "light absorption" and "retention," and these properties do not align with the Romanian HTS exclusion's intent of addressing materials that limit or obstruct light.  An anti-reflective coating reduces the amount of light that is reflected from the surface of the glass, allowing more light to penetrate the glass and reach the solar cells in the module.  Remand Redetermination at 38; *see also* IDM at 17.  Similarly, the reference to "light absorption" in Jinko's purchase agreement is not indicative of a light-limiting characteristic, but instead reflects a complementary function of the anti-reflective coating, without which, light transmission would be lost from reflecting off the surface of the glass.  Remand Redetermination at 7.  These factors, combined with the fact that the glass is described as having high permeability, all support the conclusion that (which Jinko itself asserts) Jinko's solar glass facilitates high transmission of light.  *See* Jinko's Cmts. at 16.  For the reasons outlined above, this distinguishes Jinko's glass from the light-limiting materials contemplated by the Romanian HTS exclusion for "glass with an absorbent layer."

In sum, Jinko's characterization of its coated glass as having absorbent or reflective properties refers to the glass's ability to enhance light transmission.  *See* Remand Redetermination at 10; Jinko Cmts. at 12.  In contrast, the Romanian HTS exclusion for "glass with an absorbent layer" targets materials that obstruct or reduce light transmission.  Remand Redetermination at 9.  Although Jinko's glass and the Romanian HTS exclusion exhibit

superficial similarities in phrasing, the underlying concepts that they respectively describe are fundamentally different, underscoring that Jinko's glass does not fall within the scope of the exclusion under Romanian HTS 7007.19.80.  *Id.* at 35-39.  Therefore, Commerce reasonably determined that the Romanian HTS was the best available information and "specific to the type of glass used by Risen and Jinko to produce solar modules during the {period of review}."  *Id.* at 12.

### III.    Commerce Use Of The Freightos Data To Value Air Freight Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence

Commerce's remand redetermination complies with the Court's remand order because Commerce explained in detail (1) why "publicly available" reasonably means "on the public record'" and (2) how placing publicly available information for valuing FOPs on the confidential record of a review fails to promote accuracy, fairness, and predictability, in accordance with Commerce's regulations.  *Id.* at 13-19.  Accordingly, given Commerce's practice and regulatory preference under 19 C.F.R. § 351.408(c) to use publicly available SVs to value FOPs and non-market economy movement expenses, Commerce continued to rely on Freightos data to value air freight, *Id.* at 40, and Jinko's comments to the contrary are meritless.

First, Jinko continues to not comment on Commerce's explanations and offers the mere assertion that the totality of route-specific Shanghai-Atlanta Monthly air freight data was publicly disclosed.  Jinko Cmts. at 22.  This is incorrect.  As Commerce recognized, "the only public IATA information on the record is a monthly average of IATA rates," and this "information contains no details about the rates and no details about how the data were obtained."  Remand Redetermination at 40.  "Thus, almost none of the underlying IATA data and information regarding the IATA data collection are publicly available."  *Id.*  The Court recognized this fact in its Remand Order, stating that "{a}lthough Jinko placed the IATA data on

the record, much of it is designated as {BPI} and is thus on the confidential record rather than the public record of this review." *Jinko Solar*, 701 F. Supp. 3d at 1386.

The Court should reject Jinko's arguments asserting that IATA provides greater detail than Freightos data. The Freightos data satisfied a number of Commerce's selection criteria, including being contemporaneous with the period under consideration, broad-market averages, tax- and duty-exclusive, specific to the inputs being valued, and importantly, publicly available. Remand Redetermination at 18-19. Commerce reasonably considered the fact that portions of the IATA data were not on the public record. *See id.* For example, as stated in the final results, Freightos has the world's largest global database of multimodal freight rates, with more than two billion price points. *See* IDM at 43 (citing Jinko First SV Cmts. at Ex. 9H (P.R. 233; C.R. 342)). Specifically, Freightos provided weekly rates for air-cargo shipments of more than 1,000 kilograms from Shanghai to Atlanta, which is specific to Jinko's air freight. *Id.* at 43-44.

Although Jinko argues that the IATA data afford the "best available, most robust and reliable SV data for valuing Jinko's air freight expenses," Jinko Cmts. at 23, as previously explained above, the Freightos data satisfy Commerce's preference for public availability of data. In *Certain Aluminum Foil from the People's Republic of China*, 83 Fed. Reg. 9,292 (Dep't of Commerce Mar. 5, 2018) (final LTFV determ.), and accompanying IDM at Comment 2, Commerce rejected a prospective SV data source, Xeneta, despite it containing more robust data, because it was designated as BPI. Remand Redetermination at 18. In *Jiangsu Zhongji v. United States*, 396 F. Supp. 3d 1334, 1352 (Ct. Int'l Trade 2019), the Court affirmed Commerce's decision in *Aluminum Foil from China*, although two proposed datasets for valuing international freight (Descartes and Xeneta) had "advantages and disadvantages" in terms of meeting Commerce's SV selection criteria. The Court found that "{a}lthough the Xeneta data are

contemporaneous and rely on more data points, they are proprietary and therefore not publicly available." *Id.* at 1352. Accordingly, the Court held that Commerce's decision to "weigh these factors in favor of the Descartes data, in light of the regulatory preference for publicly available data, is reasonable and therefore affirmed." *Id.* Similarly in the underlying review, Commerce considered the fact that Freightos data were on the public record and IATA data were not and reasonably selected Freightos data to value air freight. Remand Redetermination at 18-19.

The Court should sustain this determination because substantial evidence supports Commerce's explanation that the Freightos data are the best available information. *Id.*

## IV.    Commerce's Calculation Of Risen's Adverse Inference Rate Is In Accordance With The Court's Remand Order

In its remand order, the Court held that Commerce did not adequately explain "why it grouped various inputs together or why it chose the formula it did" when it came to selecting an adverse inference among facts otherwise available. *Jinko Solar*, 701 F. Supp. 3d at 1396. In the remand redetermination, Commerce explained its rationale behind this methodology for calculating an adverse rate for Risen. *See* Remand Redetermination at 19-27, 44-47. Risen's arguments challenging the explanation are meritless.

First, 19 U.S.C. § 1677e(b)(1) provides for the application of facts available with an adverse inference whenever an "interested party" has failed to cooperate to the best of its ability with a request for information. Commerce explained that the statute provides Commerce with discretion when implementing the facts available and adverse inference provisions as long as its approach applying these provisions is reasonable. Remand Redetermination at 21, 44. In its remand redetermination, Commerce provided a detailed explanation for its use of the adverse inference in calculating Risen's dumping margin given that Risen's unaffiliated suppliers failed to provide their FOP data. *Id.* at 21-27. Commerce described how the adjustment rate was

derived from the facts on the record, resulting in a reasonable methodology. Pursuant to the Remand Order, Commerce also explained why the groupings that it selected were logical, how the formula worked, and how Commerce's methodology served the purpose of the statute to promote accuracy and deterrence. *See id.*

Risen argues first that, in using calculated figures as facts available with an adverse inference rate, Commerce manipulated facts and, in doing so, impermissibly interpreted the plain language of the statute to mean "something broader" than permitted by the statute under 19. U.S.C. § 1677e(a)(1) and (b)(2). Risen Cmts. at 16. Citing *Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed. Circ. 2014), Risen urges the Court to find that the adverse rate applied to "Risen has no legitimate effect to incentivize these suppliers to cooperate." *Id.* at 17. Contrary to Risen's claims, Commerce fully explained how its facts available with an adverse inference methodology complies with the concerns outlined in *Mueller*, namely, that the methodology fosters accuracy and induces compliance. *See* Remand Redetermination at 19-27. Commerce not only explained why the adverse rate should be CONNUM specific, but also explained all of the calculations that it used for each input ratio. *See id.* Regarding accuracy and compliance, Commerce explained that "the adverse inference multipliers" were used only "with respect to the missing information." *Id.* at 26.

Risen also asserts that the application of an adverse inference to Risen has no legitimate effect to incentivize its suppliers to cooperate. Risen Cmts. at 17-18. In an effort to ameliorate the lack of cooperation from its unaffiliated suppliers, Risen additionally argues that it exercised its best and maximum efforts under the business reality of their situation. *Id.* at 18. However, the Court previously rejected these arguments when it held that "Risen essentially concedes that its attempts to induce its suppliers' participation in this review amounted to empty threats," *Jinko*

*Solar*, 701 F. Supp. 3d at 1393, and Risen cannot revive this argument in its challenge to the remand redetermination.

Second, Risen argues that Commerce's methodology does not comply with *Mueller's* requirement that applying an adverse inference will lead to an accurate rate. Risen's Cmts. at 18. Risen stretches *Mueller* too far. The Federal Circuit has explained that a determination is "accurate" if it is correct as a mathematical and factual matter and supported by substantial evidence. *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016). This Court has recognized that, given that Commerce has broad discretion in selecting the facts otherwise available under 19 U.S.C. § 1677e(a), Commerce's selection of the facts otherwise available need only be "reasonable under the circumstances" and not necessarily be the "best alternative information." *Dillinger France S.A. v. United States*, 651 F. Supp. 3d 1294, 1319 (Ct. Int'l Trade 2023).

Contrary to Risen's arguments, Commerce's facts available with an adverse inference methodology produces a reasonably accurate estimate of the respondent's actual rate and is mathematically and factually grounded. Indeed, Commerce relied on Risen's own reported FOP data to derive an adverse adjustment, thereby eliminating any potential distortions that might arise from using information from another source that may not align with Risen's operations. Remand Redetermination at 46. Additionally, Commerce calculated separate adverse adjustments for solar modules, solar cells, and packing based solely on the inputs used to produce those products or for packing, ensuring that the adverse adjustment pertains specifically to the missing inputs for those items. *Id.* Furthermore, Commerce applied the adverse inference multipliers with respect to only the missing information. *Id.* at 26. Although Risen argues that Commerce's "normal" facts available methodology is already adverse, *see* Risen's Cmts. at 18,

as previously discussed, Risen failed to exert its maximum effort to induce compliance from suppliers and the Court sustained that point. *Jinko Solar*, 701 F. Supp. 3d at 1393. This, therefore, necessitated that Commerce had to use a sufficiently adverse inference rate. Remand Redetermination at 45. Commerce's methodology reasonably incorporated a built-in increase intended as a deterrent to noncompliance as envisioned by *Mueller*. As Commerce explained in its remand redetermination, Commerce did not opt to use the highest CONNUM-specific consumption quantity for individual inputs as an adverse adjustment because there was very little difference between the CONNUM-specific consumption quantities reported for certain inputs. *Id.* at 22-27. Thus, using the highest CONNUM-specific consumption quantity for individual inputs as an adverse inference would essentially result in applying facts available without an adverse inference. *Id.* Accordingly, contrary to Risen's argument, the "normal methodology" of applying an input-specific adverse adjustment to each input was not sufficiently adverse. Remand Redetermination at 45.

Finally, substantial evidence supports Commerce's determination that Commerce's approach to calculating Risen's adverse inference rate "adequately furthers the goal of calculating accurate dumping margins" for two reasons. *Id.* at 46. First, Commerce used Risen's own reported FOP data "to derive an adverse adjustment which eliminates any potential distortion that could be caused by using information from another source that could involve operations that are dissimilar to Risen's operations" and, second, because "Commerce calculated separate adverse adjustments for solar modules, solar cells, and packing based only on the inputs used to produce those products used in packing which ensures that the adverse adjustment only relates to the missing inputs for those items." *Id.* Accordingly, the Court should sustain Commerce's calculation of an adverse facts available rate.

**IV.    Commerce's Separate Rate Is Supported By Substantial Evidence And Is In Accordance With Law**

As we explained above, because Commerce based the separate rate that it assigned to JA Solar and BYD in the underlying administrative review on the dumping margins of the mandatory respondents, Jinko and Risen, and Commerce did not make any changes to those dumping margins in this remand redetermination, the Court should sustain the separate rate that Commerce assigned to JA Solar and BYD.  Remand Redetermination at 27, 46-47.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's Remand Redetermination, and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    /s/ Kara M. Westercamp
JACK DUNKELMAN                          KARA M. WESTERCAMP
Attorney                                          Senior Trial Attorney
U.S. Department of Commerce          United States Department of Justice
Office of the Chief Counsel for Trade    Civil Division
  Enforcement and Compliance           Commercial Litigation Branch
1401 Constitution Avenue, NW           P.O. Box 480
Washington, D.C. 20230                    Ben Franklin Station
                                                    Washington, D.C. 20044
                                                    (202) 305-7571
                                                    Email: kara.m.westercamp@usdoj.gov

January 8, 2025                               *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's

Standard Chamber Procedures, and the Court's scheduling order in that it contains 8,042 words,

including text, footnotes, and headings.

/s/Kara M. Westercamp
 KARA M. WESTERCAMP

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                                      )
JINKO SOLAR IMPORT AND EXPORT          )
CO., LTD., ET AL.,                                     )
                                                      )
                    Plaintiffs,                       )
                                                      )
          and                                         )
                                                      )
JA SOLAR TECHNOLOGY                      )
YANGZHOU CO., LTD., ET AL.,                )
                                                      )
                    Plaintiff-Intervenors             )
                                                      )
          v.                                          )          Consol. Court No. 22-00219
                                                      )
UNITED STATES,                             )
                                                      )
                    Defendant,                        )
                                                      )
          and                                         )
                                                      )
AMERICAN ALLIANCE FOR SOLAR             )
MANUFACTURING,                           )
                                                      )
                    Defendant-Intervenor.             )
_____)

**<u>ORDER</u>**

Upon consideration of the Department of Commerce's final results of redetermination

pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is

hereby

ORDERED that the remand results are sustained in their entirety.


Dated: _____, 2025          _____
          New York, NY                                      JUDGE