NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JINKO SOLAR IMPORT AND EXPORT CO. LTD.,** *et al.,* | **Before:** Hon. Claire R. Kelly, Judge |
| Plaintiffs, | Consol. Court No. 22-00219 |
| **TRINA SOLAR CO., LTD.,** *et al.,* | <u>**NON-CONFIDENTIAL VERSION**</u> |
| Consolidated Plaintiffs, and | **Business Proprietary Information Removed From Page 11** |
| **JA SOLAR TECHNOLOGY YANGZHOU CO., LTD.,** *et al.,* | |
| Plaintiff-Intervenors, | |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,** | |
| Defendant-Intervenor. | |

<u>**DEFENDANT-INTERVENOR AMERICAN ALLIANCE FOR SOLAR MANUFACTURING'S COMMENTS IN SUPPORT OF THE REMAND RESULTS**</u>

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Paul A. Devamithran, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the American Alliance for Solar Manufacturing*

Dated: January 8, 2025

Consol. Ct. No. 22-00219                          NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................... 1

II.    ARGUMENT ........................................................................................ 2

    A.    Commerce's Selection of the Solar Glass Surrogate Value Was
    Supported by Substantial Evidence and Otherwise Lawful ..................................2

        1.    Commerce Reasonably Found the Romanian HTS Data to
        Be Superior as to Product Specificity and Reasonably
        Departed from the Primary Surrogate Country for Solar
        Glass Surrogate Values ................................................................3

        2.    Commerce Reasonably Found that Jinko's Solar Glass Is
        Not Excluded from Romanian HTS 7007.19.80..........................7

        3.    Commerce Reasonably Found the Romanian HTS Data to
        Be Superior Because It Did Not Require a Distortive Unit of
        Measure Conversion ....................................................................9

    B.    Commerce's Valuation of Air Freight is Lawful and Supported by
    Substantial Evidence ...........................................................................12

    C.    Commerce Applied a Lawful Methodology When Using AFA to Fill
    the Gaps in the Record Resulting from Risen's Failure to Report
    Certain Factors of Production................................................................14

III.    CONCLUSION ................................................................................... 17

Consol. Ct. No. 22-00219                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Calgon Carbon Corp. v. United States,*
    145 F. Supp. 3d 1312 (Ct. Int'l Trade 2016) ...............................................5

*Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,*
    37 CIT 1116, 929 F. Supp. 2d 1352 (2013) ............................................5, 6

*Catfish Farmers of Am. v. United States,*
    33 CIT 1258, 641 F. Supp. 2d 1362 (2009) ................................................14

*Coal. v. United States,*
    No. 17-00167, slip op. 18-146 (Ct. Int'l Trade Oct. 23, 2018).................5

*Jinko Solar Import and Export Co., Ltd. et. al. v. United States,*
    No. 22-00219, slip op. 24-53 (May 1, 2024) ..............................................1

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017)...................................................................16

*Peer Bearing Co.-Changshan v. United States,*
    35 CIT 103, 752 F. Supp. 2d 1353 (2011) ...................................................5

*Shandong Huarong Gen. Corp. v. United States,*
    25 CIT 834, 159 F. Supp. 2d 714 (2001) ..............................................12, 14

*Sigma Corp. v. United States,*
    117 F.3d 1401 (Fed. Cir. 1997)...................................................................14

**Statutes**

19 U.S.C. § 1677b(c)(1)...................................................................................6

19 U.S.C. § 1677e(b) .....................................................................................16

19 U.S.C. § 1677e(b)(2)..................................................................................16

Trade Preferences Extension Act of 2015, P.L. 114-27 Sec. 502, 129 Stat. 362,
    383-84 (June 29, 2015) ...............................................................................16

NON-CONFIDENTIAL VERSION

**Administrative Materials**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*
    *From the People's Republic of China,*
        85 Fed. Reg 62,275 (Dep't Commerce Oct. 2, 2020) .............................................................3

*Whether or Not Assembled Into Modules, From the People's Republic of China,*
        86 Fed. Reg. 58,871 (Dep't Commerce Oct. 25, 2021) .........................................................13

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
    No. 103-316, vol. I (1994), *reprinted in* 1994 ........................................................................16

## I.     <u>INTRODUCTION</u>

On behalf of the defendant-intervenor in this action, the American Alliance for Solar Manufacturing ("Defendant-Intervenor"), we hereby submit the following comments in support of the August 29, 2024 remand redetermination issued by the U.S. Department of Commerce ("Commerce").  Letter from Mitch Purdy, Att'y, Off. of the Chief Counsel for Trade Enf't & Compl., to Mario Toscano, Clerk of the Court, U.S. Court of Int'l Trade, re: *Redetermination Pursuant to Ct. Remand Order in Jinko Solar Import and Export Co., Ltd., et. al. v. United States, Consol. Court No. 22-00219* (Aug. 29, 2024), ECF No. 89 ("Remand Redetermination"). Commerce continues to properly value glass using import prices under Romanian Harmonized Tariff Schedule ("HTS") category 7007.19.80, to properly value air freight using publicly available Freightos data, and to properly base Risen Energy Co., Ltd.'s ("Risen") dumping margin, in part, on facts available with adverse inferences.  Commerce provided additional explanation for each of these determinations.  In this regard, Commerce's remand results are consistent with the Court's May 1, 2024 opinion.  *Jinko Solar Import and Export Co., Ltd. et. al. v. United States*, No. 22-00219, slip op. 24-53 (May 1, 2024), ECF No. 76. Therefore, the Court should reject arguments to the contrary made in comments in opposition to the remand results by Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinksolar (Shangrao) Co., Ltd. (collectively, "Jinko"); JA Solar Technology Yangzhou Co., Ltd. and Shanghai JA Solar Technology Co., Ltd. (collectively, "JA Solar"); Risen; and BYD (Shangluo) Industrial Co., Ltd. ("Shangluo BYD").[1]

---

[1]     JA Solar's and Shangluo BYD's comments in opposition to the Remand Redetermination simply support and incorporate by reference the arguments in Jinko's and Risen's comments. Thus, Defendant-Intervenor does not separately respond to Shangluo BYD's and JA Solar's

*See* Pl.'s Comments on Commerce's Remand Redetermination (Oct. 30, 2024), ECF No. 98-99 ("Jinko Opp. Cmts."); Comments on Final Remand Redetermination of Plaintiff-Intervenors JA Solar Technology Yangzhou Co., Ltd. and Shanghai JA Solar Technology Co., Ltd. (Oct. 30, 2024), ECF No. 101 ("JA Solar Opp. Cmts."); Plaintiff-Intervenor BYD (Shangluo) Industrial Co., Ltd.'s Comments on Final Results of Remand Redetermination (Oct. 30, 2024), ECF No. 100 ("Shangluo BYD's Opp. Cmts."); Consolidated Plaintiff's Remand Comments (Oct. 30, 2024), ECF No. 97 ("Risen Opp. Cmts."). The Court should instead sustain Commerce's Remand Redetermination as it is supported by substantial evidence and in accordance with law.

## II.  **ARGUMENT**

### A.  **Commerce's Selection of the Solar Glass Surrogate Value Was Supported by Substantial Evidence and Otherwise Lawful**

Plaintiffs challenge Commerce's remand results concerning the selection of solar glass surrogate values on three grounds. First, Plaintiffs argue that Malaysian surrogate values for solar glass are superior to Romanian surrogate values because Malaysia is the primary surrogate country and Malaysian surrogate values are more product specific. Jinko Opp. Cmts. at 2-5; Risen Opp. Cmts. at 9-13. Second, Plaintiffs argue that Jinko's glass with an anti-reflective coating does not fall within the Romanian HTS 7007.19.80. Jinko Opp. Cmts. at 12-20; Risen Opp. Cmts. at 13-15. Third, Plaintiffs argue that Commerce improperly evaluated the unit of measurement or conversion factor when determining that Malaysian surrogate values were not the best available. Jinko Opp. Cmts. at 5-12; Risen Opp. Cmts. at 2-9. However, as described in more detail below, Commerce effectively addressed each of these arguments in its remand results, and the agency acted both lawfully and reasonably in continuing to value respondents' solar glass input using Romanian HTS number

---

arguments in these comments, but the responses herein to Jinko's and Risen's comments also apply in response to Shangluo BYD and JA Solar.

7007.19.80. *See* Remand Redetermination at 4-12. As a result, the Court should uphold the agency's remand results.

           **1.**      **Commerce Reasonably Found the Romanian HTS Data to Be Superior as to Product Specificity and Reasonably Departed from the Primary Surrogate Country for Solar Glass Surrogate Values**

Plaintiffs argue that, when confronted with "two arguably imperfect choices" for solar glass surrogate values ("SV"), *i.e.*, Romanian HTS 7007.19.80 and Malaysian HTS 7007.19.90, Commerce erroneously chose the Romanian SVs. Jinko Opp. Cmts. at 3; *see also* Risen Opp. Cmts. at 1-2. Plaintiffs claim that the Malaysian SVs were the better choice because they are purportedly more product specific and because Malaysia is the primary surrogate country. *See* Jinko Opp. Cmts. at 3-5; Risen Opp. Cmts. at 1-2; 9-13.

As explained by Commerce in its remand results, however, Romanian HTS 7007.19.80 specifically covers the glass used to manufacture solar panels, unlike Malaysian HTS 7007.19.90. *See* Remand Redetermination at 35 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 85 Fed. Reg 62,275 (Dep't Commerce Oct. 2, 2020) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2017-2018) and accompanying Issues and Decision Memorandum at cmt. 3 ("AR6 Final Results")). The agency further explained that the European Union ("EU") maintains trade remedy orders against solar glass imports from China, which specifically identify HTS 7007.19.80 as the applicable HTS subheading for solar glass. Remand Redetermination at 36; *see also* Commission Regulation 471/2014, art. 15, 2014 O.J. (L 142) 23, 65. Jinko reported that it purchased its solar glass input from Chinese suppliers, and the EU's AD/CVD orders confirm that such solar glass produced in China specifically falls under HTS number 7007.19.80 of the EU/Romanian schedule. Letter from Grunfeld, Desiderio, Lebowitz, Silverman, and Klestadt

LLP, to Sec'y Commerce, re: *Jinko Section D, E, Appendices XIII Additional Section D, and Double Remedies in the 8th Administrative Review of the Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China (A-570-979)* (May 4, 2021), P.R. 148-152, C.R. 186-268 at Exhibit D-6; Letter from Grunfeld, Desiderio, Lebowitz, Silverman, and Klestadt LLP, to Sec'y Commerce, re: *Jinko Solar's Redacted Case Brief: in the 8th Administrative Review of the Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China (A-570-979)* (May 27, 2022), P.R. 446-450, C.R. 494-499 at Attachment 4.  The record does not contain similar evidence showing that the Malaysian HTS subheading 7007.19.90 contained solar glass.

In light of the record evidence that glass for use in solar manufacturing is classified under Romanian HTS 7007.19.80, and because the Romanian data used the same unit of measure as respondents' data, as discussed further below, Commerce correctly determined data under that subheading to be the best available information to value respondents' solar glass.  Because there was no data available under that subheading from the primary surrogate country, Malaysia, Commerce appropriately decided to value the input using import data from Romania under the correct subheading.  Commerce acted—and continues to act—reasonably in determining that Romanian HTS 7007.19.80 is more product specific than Malaysian HTS 7007.19.90, despite Plaintiffs' arguments to the contrary.

Jinko and Risen further argue that Commerce improperly departed from its regulatory practice by selecting a solar glass surrogate value from a source outside of the primary surrogate country of Malaysia.  *See* Jinko Opp. Cmts. at 4-5; Risen Opp. Cmts. at 9-13.  However, while Commerce will normally value all factors of production in a non-market economy case in a single surrogate country,

the agency's long-established practice is to turn to a secondary country for surrogate values if surrogate value data from the primary surrogate country are unavailable or unreliable, or when surrogate value data from another country constitute the best information available. *See* Remand Redetermination at 8.

As the Court has explained, Commerce's regulatory preference for a single surrogate country may be relied on when it is used to support the selection of one set of data where the other available data are fairly considered to be equal. *See Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327-28 (Ct. Int'l Trade 2016). However, "it is not sufficient . . . to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate country may not provide the best available information for a particular FOP." *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 37 CIT 1116, 1120, 929 F. Supp. 2d 1352, 1355 (2013). *See also, e.g.*, *Diamond Sawblades Mfrs.' Coal. v. United States*, No. 17-00167, slip op. 18-146 at 25 (Ct. Int'l Trade Oct. 23, 2018) ("The regulatory preference for valuing inputs for an NME respondent's production using data from a single 'primary' surrogate country has been held insufficient to explain decisions to reject data from a non-primary surrogate country if questions remain unanswered as to the suitability of the primary surrogate country data"). Indeed, to rely on the primary surrogate country's data based on this preference notwithstanding the data's shortcomings would run contrary to Commerce's statutory obligation to rely on the best available information in valuing the factors of production ("FOP") in a non-market economy. *See Peer Bearing Co.-Changshan v. United States*, 35 CIT 103, 124-25, 752 F. Supp. 2d 1353, 1373 (2011), *vacated on other grounds*, 766 F.3d 1396 (Fed. Cir. 2014). *See also* 19 U.S.C. § 1677b(c)(1).

Here, prioritizing the statutory obligation to rely on the best available information for surrogate values and calculate the most accurate dumping margin possible, Commerce justifiably

departed from the primary surrogate country of Malaysia to value respondents' solar glass inputs using Romanian import data.  As Commerce explained in its remand results, and as discussed further below,

> because {Commerce} lacked an appropriate formula to convert Malaysian imports of glass during the POR from square meters to kilograms, {Commerce} determined that the Malaysian import data were not usable or reliable for purposes of valuing the glass that the respondents used in their solar modules. Therefore, {Commerce} selected an SV from outside the primary surrogate country to value glass, namely Romanian HTS category 7007.19.80.

Remand Redetermination at 8.

Risen argues that the conversion issue affecting Malaysian import data under HTS category 7007.19.90 did not impact the reliability of the Malaysian import data and therefore did not justify a departure from Malaysian surrogate values.  Risen Opp. Cmts. at 11-12.  Risen attempts to narrow the agency's analysis to a simple assessment of the reliability of the import data and ignores its relevance (*i.e.*, does the FOP fall within this HTS category?) and the reliability of any resulting surrogate value (*i.e.*, does using this HTS category distort surrogate values due to conversion errors?). In so doing, Risen misses the point of the exercise. Commerce's goal is to choose the best information available for surrogate values in order to reach the most accurate dumping margin possible, and the agency had "reason to believe that the primary surrogate country may not provide the best available information for a particular FOP," *i.e.*, solar glass.  *See Camau Frozen Seafood*, 37 CIT at 1120, 929 F. Supp. 2d at 1355.

Risen's attempt to discredit Romanian surrogate values because "Romania has no known solar industry," *see* Risen Opp. Cmts. at 13, is unfounded and unpersuasive.  As noted in pre-remand briefing, respondent Jinko, in its initial surrogate country comments, submitted data on exports and imports of solar products from each proposed surrogate country.  Based on this data, Jinko concluded with regard to all proposed surrogate countries, including Romania: "all of them had significant

exports {of subject merchandise} during the POR." Letter from Grunfeld, Desiderio, Lebowitz, Silverman, and Klestadt LLP, to Sec'y Commerce, re: *Jinko Solar's Surrogate Country Comments: Administrative Review of the Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules (A-570-979) (POR: 12/1/18 – 11/30/19)* (June 2, 2021), P.R. 165-166 at 5 ("Jinko Surrogate Country Comments"). Indeed, Jinko explained that, "to determine whether these countries are significant producers," Commerce typically looks at trade data for subject merchandise, as exports from a potential surrogate country are understood to represent production of the subject merchandise in that country. *Id*. at 4. Romania exported approximately $36.2 million in solar cells and modules during the period of review ("POR"), indicating that it does, in fact, have a solar manufacturing industry. Risen's claims to the contrary contradict the record.

Thus, Commerce's determination that the Romanian data was superior to the Malaysia data was supported by substantial evidence for the reasons discussed above. Having so determined, Commerce was justified in its decision to depart from its primary surrogate country and value the solar glass input using Romanian data, and the respondents' arguments to the contrary should be rejected.

### 2.    Commerce Reasonably Found that Jinko's Solar Glass Is Not Excluded from Romanian HTS 7007.19.80

Jinko and Risen argue that Commerce's surrogate value selection was not supported by substantial evidence because the solar glass Jinko uses in production is a coated, tempered glass. *See* Jinko Opp. Cmts. at 12-20; Risen Opp. Cmts. at 13-15. The Plaintiffs claim that the "anti-reflective" coating of its glass required valuation of its solar glass under Malaysian HTS 7007.19.90, despite the lack of evidence that solar glass is actually captured under this subheading (unlike the Romanian HTS data). *See* Jinko Opp. Cmts. at 12-20; Risen Opp. Cmts. at 13-15. Plaintiffs note that Romanian HTS subheading 7007.19.80 specifically excludes glass with an

"absorbent or reflective layer" and argue that Jinko's solar glass with an "anti-reflective coating" falls within this excluded categorization. *See* Jinko Opp. Cmts. at 12-20. The controversy therefore centers on whether "absorbent layer" equates to "anti-reflective coating" for purposes of interpreting Romanian HTS category 7007.19.90. Commerce continues to reasonably find that "absorbent layers" and "anti-reflective coating" and are not synonymous.

Specifically, Commerce reasonably finds that "{a}ll of the other glass that is excluded from Romanian HTS category 7007.19.80 have treatments that limit the amount of light that is transmitted through the glass," and that it is therefore "reasonable to conclude that glass with an absorbent layer limits that amount of light transmitted through the glass." Remand Redetermination at 36-37. Based on this context, Commerce explains that:

> {t}he glass that Jinko uses in its solar modules is high transmission glass, which is the opposite of light limiting glass. Thus, based on the context in which the phrase "glass with an absorbent layer" was used, it is logical to conclude that glass with an absorbent layer does not refer to Jinko's high transmission glass.

*Id* at 37.

Plaintiffs claim that Commerce is not permitted to interpret the phrase "absorbent layer" within the context of the other excluded exemplars in 7007.19.80 because the phrase is not ambiguous and because the surrounding words do not share a common attribute. Jinko Opp. Cmts. at 18. Both claims are false.

First, as Commerce notes, "{t}he Romanian HTS definition of glass with an absorbent layer is not on the record, and thus, the phrase is open to interpretation." Remand Redetermination at 37. Furthermore, while arguing that the phrase "absorbent layer" is unambiguous, *see* Jinko Opp. Cmts. at 18, Jinko itself argues that the word "absorbent" requires context to interpret, stating that "{t}he correct interpretation of the term 'absorbent' associated with a chemical material applied to a glass surface <u>must be based on context</u>." *Id.* at 14 (emphasis added). If the phrase

were truly unambiguous, Jinko's own calls for context would be unnecessary as would the substantial number of pages Plaintiffs dedicated to defining, illustrating, and/or contextualizing the term in the manner most favorable to their position.

Second, when examining the words' context within Romanian HTS 7007.19.80, it is clear—and Commerce clearly demonstrated in its remand results—that the surrounding words <u>do</u> share a common attribute.  As Commerce rightly noted, each of the six exemplars listed as exceptions to HTS 7007.19.80 share the fundamental characteristic of being light-limiting. Remand Redetermination at 37-38.  Jinko seeks to distinguish the six exemplars from each other by arguing that some are "internally treated" versus "externally treated," *see* Jinko Opp. Cmts. at 19, but this is irrelevant.  The surrounding words do not need to share identical meanings; they need only share "a common attribute."  Commerce plainly illustrates that common attribute and reasonably explains that the "absorbent layer" included in Romanian HTS 7007.19.80 is also light-limiting.  Remand Redetermination at 37-38.  Commerce then reasonably concludes that this feature, common to the other exemplars in 7007.19.80, is not the same as Jinko's anti-reflective coating which is not light-limiting and is instead designed to heighten light transmission.  *Id.*

### 3.    Commerce Reasonably Found the Romanian HTS Data to Be Superior Because It Did Not Require a Distortive Unit of Measure Conversion

It is an undisputed fact that Malaysian import data under HTS 7007.19.90 were reported in square meters, while respondents' FOP data – and the Romanian import data under HTS 7007.19.80 – were both reported in kilograms.  Remand Redetermination at 5-8.  Given the nature of solar glass, the accuracy of its valuation requires reporting unit consistency between the surrogate value and respondents' per-unit consumption rates.  As Commerce recognized in its remand results and has recognized in prior reviews, the thickness, and thus the weight, of a square meter of solar glass varies.  *See* AR6 Final Results at cmt. 3.  Thus, calculating the weight of the square meters of solar

glass imported into Malaysia using a conversion factor would require the individual weights of the actual imports into Malaysia. This would be necessary to accurately calculate the per-kg surrogate value to apply to a per-kg glass FOP. However, such weight data was not available on the record. As such, any conversion of the Malaysian data would necessarily be estimated, and the significance of the distortion in the converted data would be impossible to measure. Commerce therefore acted reasonably in its remand results by continuing to use Romanian HTS data to value solar glass surrogate values.

Jinko and Risen argue that Commerce should have selected the Malaysian HTS 7007.19.90 data, despite it being reported using a different unit of measure than the respondents' reporting. *See* Jinko Opp. Cmts at 5-12; Risen Opp. Cmts. at 2-9. Many of respondents' arguments here again center around the alleged lack of specificity of the Romanian data, which, as discussed above, is not supported by the record. Jinko also provides conversion factors based on Jinko's glass, Risen's glass, and Romanian HTS 7007.19.80 and argues that "for converting the originally reported per sqm Malaysian HTS 7007.19.90 import data to per kg, any one of the three conversion factors could be reliably applied." Jinko Opp. Cmts. at 6. This is incorrect. These conversion factors are based on the dimensional specifications of the glass inputs that the respondents' used or the dimensional specifications of imports under Romanian HTS 7007.19.80. But this is not the information that is required for an accurate conversion. What is needed is not the details of the respondents' glass, not even of the Romanian glass, but the details of the glass imported into Malaysia under HTS 7007.19.90, in order to convert that data from square meters to kilograms. There was no information on the weight of those Malaysian glass imports that would establish any correlation between the respondents' proposed conversion factors and the Malaysian data.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Furthermore, as Commerce notes in its remand results, "Jinko did not calculate each of the conversion ratios the same way," and if a consistent calculation methodology was used, the resulting ratios would be significantly different, "span{ning} a range of 45 percent." Remand Redetermination at 32. As noted in pre-remand briefing, the [

] further demonstrate the distortion that would result from converting the Malaysian data to kilograms without details on the dimensions of the specific glass covered by that data. Although Jinko later proposed a new conversion factor [

], Jinko Case Br. at 27, [                                           ] made evident the potential for distortion through an estimated solar glass conversion methodology.

Similarly, the unexplained and substantial discrepancies between the conversion factor submitted in a prior review and the one submitted in this review further illustrate the potential for distortion. The Plaintiffs offer no explanation for this discrepancy, noting only that "the record is devoid of contemporaneous evidence extending {the AR6} outdated conversion factor to imports for the AR8 POR." Jinko Opp. Cmts. at 11. Jinko misses the point. The AR6 data illustrates that the same category, *i.e.* imports under Malaysian HTS 7007.19.90, from two different PORs—both purportedly including imports of solar glass—yield substantially different conversion factors. Clearly, more detail regarding the composition of each data set is necessary to properly calculate an accurate surrogate value. It was the Plaintiffs' responsibility, not Commerce's, to populate the record with all relevant information concerning Plaintiffs' proposed surrogate values, and the record is devoid of data specific to Malaysian import volumes under HTS 7007.19.90 that explains the significant difference between the conversion factors—a difference which further illustrates the potential for distortion when resorting to an estimate.

Jinko's argument that its later-proposed conversion factor is "in the same range" as the conversion factor for the Romanian data (*i.e.*, 7.88 kg per m2 for the Romanian data and 7.19 kg per m2 for Jinko) is similarly unavailing. Jinko Opp. Cmts. at 6. If anything, the similar weight to surface area correlation of Jinko's glass and the glass imported under Romanian HTS 7007.19.80 serves to further prove that the Romanian data accurately reflects respondents' inputs. *See id*. It provides no information about the glass captured under Malaysian HTS 7007.19.90.

In light of the significant discrepancies between the various conversion factors that the Plaintiffs offered, Commerce reasonably found that relying on "such inexactitude is unnecessary because we have a product-specific per kilogram SV on the record based on Romanian HTS data that permits us to more precisely and reliably account for different thicknesses of glass." Remand Redetermination at 34. Commerce's reasonably concluded that it is "more accurate to {rely} on actual reported weights, particularly given that Romania meets all of Commerce's requirements for use as a surrogate country, and the Romanian HTS category covers glass similar to the glass covered by the Malaysian HTS category and used by the respondents." *Id*. at 30. The Court should uphold this finding.

**B.    Commerce's Valuation of Air Freight is Lawful and Supported by Substantial Evidence**

Plaintiff Jinko argues that Commerce should have used IATA data instead of Freightos data to calculate air freight surrogate values. Jinko Opp. Cmts. at 22-24. As this Court has found, Commerce is granted broad authority when choosing FOPs for surrogate value calculations, Commerce's determination must simply be reasonable. *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 839, 159 F. Supp. 2d 714, 720 (2001) (noting that the court's role when reviewing Commerce's FOP surrogate value calculations is to "judge whether Commerce's selection was reasonable" not whether Commerce's selection was the "absolute best available.").

Consol. Ct. No. 22-00219                         NON-CONFIDENTIAL VERSION

As detailed below, Commerce's determination to use Freightos data and to reject IATA was reasonable and in accordance with law.

Commerce reasonably declined to use IATA data in its remand results because Freightos data met several of Commerce's criteria and was the appropriate choice, and because "{n}ecessary IATA data for valuing air freight were not on the public record of the underlying review." Remand Redetermination at 40.

Plaintiffs argue that the relevant data was publicly available, *i.e.*, the Shanghai-Atlanta monthly air freight data, and that the remaining BPI IATA data are irrelevant. Jinko Opp. Cmts. at 22. But Commerce's established practice is to consider only surrogate value data that are <u>wholly</u> public, and the agency has once again acted in accordance with this practice in the remand results. For example, in AR7, Commerce rejected the use of even public averages based on proprietary data points:

> The underlying Maersk data are not publicly available on the record of this review. While the petitioner urged Commerce to use the public average of the Maersk route-specific ocean freight rates in its calculations, or to aggregate the Maersk route-specific ocean freight rates in a manner that it deems appropriate to derive public rates, manipulating the data to produce public rates does not change the fact that the underlying Maersk ocean freight rates are not publicly available on the record of this review. Having the Maersk data publicly available on the record would have increased transparency in the selection of surrogate values. The public availability standard is aimed at promoting transparency.

*See* Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 86 Fed. Reg. 58,871 (Dep't Commerce Oct. 25, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018–2019) at cmt. 10.

Because Commerce and the interested parties cannot publicly evaluate the details of the IATA data in general or the details that underlie the compilation of specific rates – to include the

13

rates Jinko made public – the overall transparency of the data and its source is critically limited. Furthermore, there is a lack of transparency inherent to partially public data sets like that Jinko provided for IATA, which opens the door to potential manipulation. Were Commerce to accept such data, respondents would be able to cherry pick which data points to make public and which data points to keep proprietary, thereby ensuring only the most favorable data are made public on the record. Commerce correctly and reasonably excluded the IATA data from the air freight surrogate value calculation in its final results.

Again, Commerce reasonably determined that Freightos data was appropriate and the preferred dataset for Commerce's air freight surrogate value calculations, and Plaintiffs fail to demonstrate otherwise. As detailed above, Commerce is afforded significant discretion when selecting FOPs for surrogate values as well as its surrogate value calculation methodology. *Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009); *Shandong Huarong*, 25 CIT at 840, 159 F. Supp. 2d at 721; *Sigma Corp. v. United States*, 117 F.3d 1401, 1407-08 (Fed. Cir. 1997) (recognizing Commerce's discretion given that "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise"). Commerce gave multiple reasoned explanations for its determination, *see* Remand Redetermination at 13-19, and therefore Commerce's remand results must be upheld.

### C. Commerce Applied a Lawful Methodology When Using AFA to Fill the Gaps in the Record Resulting from Risen's Failure to Report Certain Factors of Production

Risen acknowledges that the Court upheld Commerce's application of partial AFA to Risen for unreported FOPs from its unaffiliated cell suppliers but argues that the agency did not comply with the Court's remand order when continuing to use the agency's chosen methodology. Risen Opp. Cmts. at 15-19. In the underlying review, rather than utilizing the input-specific highest

consumption amount, Commerce calculated average ratios of the reported consumption quantities to the highest consumption quantities for three separate groups of inputs (all solar module FOPs, all solar cell FOPs, and all packing FOPs). It then multiplied the reported per-unit consumption quantity of each solar module FOP, each solar cell FOP, and each packing FOP, by the relevant average adjustment ratio to increase the reported quantities, as AFA. *See* AR6 Final Results at cmt. 1. Commerce continued to use this methodology in its remand results. Remand Redetermination at 20-27.

Risen's objection to Commerce's chosen methodology is that the otherwise-available facts Commerce is using are calculations and did not already exist on the record. Risen Opp. Cmts. at 15-16. But as Commerce explained, the agency routinely uses calculations as facts available, and this practice is statutorily prescribed. For example, Section 776(d)(1)(B) of the Act allows for the use of calculated dumping margins from prior segments of the proceeding as AFA. Remand Redetermination at 42. Furthermore, in the agency's remand results, Commerce provided several examples of administrative reviews wherein Commerce used calculations such as average rebate percentages, simple averages of U.S. inland-freight expenses, and weighted averages from cooperative suppliers as AFA. *Id*. at 43-44. Thus, Commerce's continued use of a calculations as AFA is lawful and consistent with established practice.

Risen also objects to Commerce's methodology because "the application of AFA to Risen has no legitimate effect to incentivize {its} suppliers to cooperate." Risen Opp. Cmts. at 17. But Risen admits that "{o}ver the course of several reviews {} Risen obtained new suppliers from review to review when suppliers refused to cooperate. . . ." *Id*. at 18. While the Plaintiff complains that it is Risen, a cooperative party, and not Risen's uncooperative suppliers, that are penalized through the use of AFA (*see id*. at 18), the fact remains that Risen would have no reason

to even attempt forcing its suppliers to comply and no incentive to switch suppliers when they don't comply if not for Commerce's use of an AFA rate with actual bite. The legislative history explains that Commerce's ability to apply AFA allows it "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. Put differently, "{t}he purpose of the adverse facts statute is to provide respondents with an incentive to cooperate with Commerce's investigation." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017). With no actual adverse impact, there is no incentive to cooperate. Thus, Commerce reasonably developed an alternative calculation methodology that was sufficiently adverse to have an impact.

The statute grants Commerce a significant amount of discretion in choosing among information to use to apply AFA. 19 U.S.C. § 1677e(b); *see also* Sec. 502 of the Trade Preferences Extension Act of 2015, P.L. 114-27, 129 Stat. 362, 383-84 (June 29, 2015). Indeed, the statute states that "{a}n adverse inference under paragraph (1)(A) may include reliance on information derived from . . . any other information placed on the record." 19 U.S.C. § 1677e(b)(2). Commerce appropriately exercised its discretion in the remand results to select information on which to base its AFA rate that would result in an actual adverse impact and effectuate the statutory intent of applying AFA, and the Court should uphold Commerce's exercise of that discretion.

## III.    <u>CONCLUSION</u>

For the reasons detailed above, the Alliance respectfully submits that this Court should affirm in full the remand results of Commerce's eighth administrative review of the Solar I antidumping duty order.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Paul A. Devamithran, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the American Alliance for Solar Manufacturing*

Dated: January 8, 2025

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Comments in Support of the Remand Result, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 5,056 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

American Alliance for Solar Manufacturing
(Representative Of)

January 8, 2025
(Date)