Slip Op. 25-67

## UNITED STATES COURT OF INTERNATIONAL TRADE

JINKO SOLAR IMPORT AND EXPORT
CO., LTD., ET AL.,

      Plaintiffs,

and

JA SOLAR TECHNOLOGY YANGZHOU
CO., LTD., ET AL.,

      Plaintiff-Intervenors,

v.

UNITED STATES,

      Defendant,

and

AMERICAN ALLIANCE FOR SOLAR
MANUFACTURING,

      Defendant-Intervenor.

Before: Claire R. Kelly, Judge

Consol. Court No. 22-00219
PUBLIC VERSION

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's redetermination.]

Dated: May 30, 2025

Ned H. Marshak, Dharmendra N. Choudhary, Jordan C. Kahn, Brandon M. Petelin,
and Elaine F. Wang, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of
New York, NY and Washington, D.C., for plaintiffs Jinko Solar Import and Export
Co. Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan
Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar

Consol. Court No. 22-00219                                                    Page 2
**PUBLIC VERSION**

Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd.

Robert G. Gosselink, Jonathan M. Freed, and Kenneth N. Hammer, Trade Pacific PLLC, of Washington D.C., for consolidated plaintiffs Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., Trina Solar (Hefei) Science & Technology Co., Ltd., Changzhou Trina Hezhong Photoelectric Co., Ltd.

Jeffrey S. Grimson, Sarah M. Wyss, Bryan P. Cenko, Jill A. Cramer, Kristin H. Mowry, and Yixin (Cleo) Li, Mowry & Grimson, PLLC, of Washington D.C., for consolidated plaintiffs and plaintiff-intervenors JA Solar Technology Yangzhou Co., Ltd., and Shanghai JA Solar Technology Co., Ltd.

Craig A. Lewis, Lindsay K. Brown, and Nicholas W. Laneville, I, Hogan Lovells US LLP, of Washington D.C., for plaintiff-intervenor BYD (Shangluo) Industrial Co., Ltd.

Gregory S. Menegaz, Alexandra H. Salzman, and Vivien J. Wang deKieffer & Horgan, PLLC, of Washington D.C., for consolidated plaintiff-intervenors Risen Energy Co., Ltd.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for the defendant United States. On the brief were Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General. Of counsel were Fee Pauwels, Jack Dunkelman, and William M. Purdy, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill, Laura El-Sabaawi, Stephanie M. Bell, and Paul A. Devamithran, Wiley Rein, LLP, of Washington D.C., for defendant-intervenor American Alliance for Solar Manufacturing.

Kelly, Judge: Before the Court is the U.S. Department of Commerce's ("Commerce") redetermination in the eighth administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("China"). See Jinko

**PUBLIC VERSION**

Solar Import and Export Co., v. United States, 701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ("Jinko I"); see also Final Results of Remand Redetermination Pursuant to Court Remand, Aug. 29, 2024, ECF No. 89 ("Remand Results").

On remand, Commerce provided further explanation of its determinations to: (1) value solar glass using Romanian Harmonized Tariff Schedule ("HTS") data, Remand Results at 30—39, (2) value air freight using Freightos data, Remand Results at 12–19, and (3) calculate Risen's rate using its methodology for selecting among facts available with an adverse inference based on a lack of data from Risen's unaffiliated solar cell suppliers. Remand Results at 19–27. Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenors challenge Commerce's decision to make no changes following the Court's Remand Order. See generally Pl. Jinko Solar's Cmts. on Final Results of Redetermination Pursuant to Court Remand, Oct. 30, 2024, ECF No. 98 ("Pl. Cmts."); Consol. Pl's. Remand Cmts. on Final Results of Redetermination Pursuant to Court Remand, Oct. 30, 2024, ECF No. 97 ("Consol. Pl. Cmts."); Pl. Intervenor BYD Cmts. on Final Results of Redetermination Pursuant to Court Remand, Oct. 30, 2024, ECF No. 100 ("BYD Cmts."); Cmts. on Final Remand Redetermination of Pl. Intervenors JA Solar Technology Yangzhou CO., Ltd. and Shanghai JA Solar Technology Co., Ltd., Oct. 30, 2024, ECF No. 101 ("JA Solar Cmts."). For the reasons that follow, the Court sustains Commerce's redetermination regarding its use of Freightos data to value air freight but remands Commerce's

redetermination with respect to its selection of Romanian HTS 7007.19.80 to value solar glass, and its calculation of an adverse inference using facts otherwise available.

## BACKGROUND

The Court presumes familiarity with the facts as set forth in Jinko I and will only recount those pertinent to the instant matter. See generally Jinko I. On December 7, 2012, Commerce published the antidumping duty ("ADD") order on solar cells from China. See generally Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination). On February 4, 2021, Commerce initiated the eighth administrative review of the ADD order. See generally Initiation of Antidumping and Countervailing Duty Administrative Reviews, 86 Fed. Reg. 8,166, 8,168–69 (Dep't Commerce June 8, 2020). Commerce chose Plaintiffs Jinko[1] and Risen[2] as mandatory respondents in the eighth ADD review. Respond. Select. Memo. at 1–5, PD 53, CD 5, bar code 4092029-01 (Feb. 25, 2021).[3] On December 23, 2021, Commerce published its preliminary determination. See generally Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

---

[1] "Jinko" refers to Plaintiffs Jinko Solar Import and Export Co., Ltd.; Jinko Solar Co., Ltd.; Jinkosolar Technology (Haining) Co., Ltd.; Yuhuan Jinko Solar Co., Ltd.; Zhejiang Jinko Solar Co., Ltd.; Jiangsu Jinko Tiansheng Solar Co., Ltd.; Jinkosolar (Chuzhou) Co., Ltd.; Jinkosolar (Yiwu) Co., Ltd.; and Jinkosolar (Shangrao) Co., Ltd.
[2] "Risen" refers to Risen Energy Co., Ltd.
[3] Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "CD" to denote public or confidential documents.

Consol. Court No. 22-00219                                                    Page 5
**PUBLIC VERSION**

Modules, from the People's Republic of China; 2019–2020, 86 Fed. Reg. 72,923 (Dep't

Commerce Dec. 23, 2021) (preliminary results and partial rescission) ("Preliminary

Results") and accompanying preliminary issues and decision memo. ("Prelim.

Decision Memo."). On August 10, 2022, Commerce issued its final results. See

generally 87 Fed. Reg. 38,379 (Dep't Commerce June 28, 2022), as amended by

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From

the People's Republic of China, 87 Fed. Reg. 48,621 (Dep't Commerce Aug. 10, 2022)

(amended final results) ("Final Results") and accompanying Issues and Decision

Memo, Oct. 5, 2022, ECF No. 24-5 ("Final Decision Memo.").

Commerce determined the surrogate value ("SV") of the respondents' entries

of subject merchandise using data from a surrogate country to value the factors of

production ("FOP"), because Commerce identifies China as a nonmarket economy

("NME"). See Section 773(c)(4) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1677b(c)(4).[4] Commerce chose Malaysia as the primary surrogate country for

valuing all FOPs. Prelim. Decision Memo. at 16–19, 23–28; Final Decision Memo. at

18. Commerce also determined import data under Romanian HTS 7007.19.80 was

the best information to value the respondents' solar glass because it was more

specific, reliable, and accurate to that input. [Commerce] Prelim. [SV] Memo. at 3,

PD 403, bar code 4194750-01 (Apr. 16, 2021) ("Commerce Prelim. SV Memo."); Final

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.

Decision Memo. at 15.  Commerce selected Freightos data to value air freight.  SV Memo. at 8; Prelim. Decision Memo. at 27; Final Decision Memo. at 22–25, 41–44.[5]

Commerce chose to apply partial facts available with an adverse inference to value Risen's missing data because it determined Risen failed to cooperate to the best of its ability by continuing to use suppliers that had not cooperated with Commerce's requests.  Prelim. Decision Memo. at 15–16; Final Decision Memo. at 8–13.  Commerce calculated a rate using facts otherwise available with an adverse inference that was "sufficiently adverse[,]" to incentivize cooperation.  Prelim. Decision Memo. at 15–16; Final Decision Memo. at 8–13.  The parties challenged various issues in the Final Decision Memo. before this Court, and on May 1, 2024, the Court issued Jinko I.[6]

On August 29, 2024, Commerce filed its Remand Results.  See Remand Results.  On October 30, 2024, Risen, Jinko, BYD (Shangluo) Industrial Co., Ltd.

---

[5] Commerce granted Jinko's request to be excused from reporting its FOP data for some of its solar module and solar cell suppliers, reasoning that Jinko had a limited amount of missing data that could be substituted with evidence already on the record.  Prelim. Decision Memo. at 15.  Thus, Commerce did not use an adverse inference in place of the missing FOP data for Jinko.  Prelim. Decision Memo. at 15.

[6] In Jinko I this Court sustained Commerce's determinations concerning: (1) Consolidated Plaintiffs' Trina Solar Co., Ltd.; Trina Solar (Changzhou) Science & Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; Trina Solar (Hefei) Science & Technology Co., Ltd.; and Changzhou Trina Hezhong Photoelectric Co., Ltd. ("Trina") separate rate status; (2) valuations of Plaintiffs' electricity, ocean freight, backsheet, and EVA; (3) use of JA Solar Malaysia's financial statements to calculate surrogate financial ratios; (4) deduction of Section 301 duties; and (5) use of facts available with an adverse inference against Plaintiffs.  Jinko I, 701 F. Supp. 3d at 1397.

("BYD"), and JA Solar Technology Yangzhou Co., Ltd. and Shanghai JA Solar Technology Co., Ltd. ("JA Solar") filed their comments on the <u>Remand Results</u>.  <u>See</u> Consol. Pl. Cmts.; Pl. Cmts.; BYD Cmts.; JA Solar Cmts.   On January 8, 2025, Defendant filed its reply to comments on the <u>Remand Results</u> and Defendant-Intervenor filed its comments in support of the <u>Remand Results</u>.  <u>See</u> Def.'s Resp. [Pl. Cmts. on Commerce's Remand Redetermination], Jan. 8, 2025, ECF No. 107 ("Def. Reply"); Def.-Intv. American Alliance for Solar Manufacturing's Cmts. Supp. [Remand Results], Jan. 8, 2025, ECF No. 106 ("Def. Intv. Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an administrative review of an ADD order. The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Huaiyin Foreign Trade Corp. (30) v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).   "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l

Trade 2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272,

1274 (Ct. Int'l Trade 2008)).

## DISCUSSION

## I.    Valuation of Solar Glass

Jinko, Risen, and Plaintiff-Intervenors argue that Commerce's decision to use

Romanian HTS 7007.19.80 import data to value their solar glass FOPs is not

supported by substantial evidence because (1) Commerce's definition of "absorbent

layer" as glass that "takes in light without releasing it" is unsupported by substantial

evidence and as a consequence Jinko's and Risen's glass does not fall within

Romanian HTS 7007.19.80 and (2) Commerce ignored record evidence related to the

unit of measurements in which Jinko and Risen reported their glass, which would

have allowed Commerce to convert Jinko and Risen's glass consumption to a quantity

expressed in square meters.  Pl. Cmts. at 2—24; Consol. Pl. Cmts. at 2—19; BYD

Cmts.; JA Solar Cmts.    Defendant and Defendant-Intervenor respond that

Commerce's decision to value solar glass using Romanian HTS 7007.19.80 import

data is supported by substantial evidence and in accordance with this Court's remand

order.  See Def. Resp. at 15—22; Def. Intv. Cmts. at 2—12.  For the reasons that

follow, Commerce's valuation of solar glass FOPs is remanded for further

consideration consistent with this opinion.

Consol. Court No. 22-00219                                              Page 9
**PUBLIC VERSION**

When Commerce determines whether and to what extent merchandise "is being, or is likely to be sold in the United States at less than fair value," Commerce compares the "normal value" of the merchandise to the U.S. price.   19 U.S.C. § 1677b(a).   Normal value is the price for which a producer or exporter sells the subject merchandise in the ordinary course of trade in its home country or, in certain circumstances, a third country.   19 U.S.C. § 1677b(a)(1).   When a review or investigation involves an NME, Commerce bases normal value not on sales, but on "the value of the factors of production utilized in producing the merchandise . . . [together with] an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."   19 U.S.C. § 1677b(c)(1).   To value a respondent's FOPs and expenses, Commerce uses data from surrogate market economy countries that are: "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."   19 U.S.C. § 1677b(c)(4).   To the extent possible, Commerce's regulatory preference is to "value all factors in a single surrogate country."   19 C.F.R. § 351.408(c)(2).

When valuing FOPs, Commerce does so "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."   19 U.S.C. § 1677b(c)(1); see also Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).   Commerce selects the best available information by evaluating data sources based on their: (1) specificity to the input; (2) tax and import duty

exclusivity; (3) contemporaneity with the period of review; (4) representativeness of

a broad market average; and (5) public availability.  See Import Admin., [Commerce],

[NME] Surrogate Country Selection Process, Pol'y Bulletin 04.1 at 1 (Mar. 1,

2004), available https://access.trade.gov/Resources/policy/bull04-1.html (last visited

May 27, 2025) ("Policy Bulletin 04.1").[7]

In this review, Commerce chose to value the FOPs for solar glass using

Romanian HTS 7007.19.80 because Commerce determined that (1) using Malaysian

HTS 7007.19.90 to value solar glass would be inexact as it is reported in square

meters while the respondents' glass was reported in kilograms, and (2) Romanian

HTS 7007.19.80 does not exclude the glass used by the respondents.  Final Decision

Memo. at 15—19.  Jinko I remanded Commerce's determination; first, the Court

found Commerce's conclusion that the Malaysian data was unreliable not supported

by substantial evidence on the record.  Jinko I, 701 F. Supp. 3d at 1382—83.  The

respondents purchase glass on a per piece basis, but Commerce required respondents

to convert their per piece purchases to a quantity expressed in weight.  Jinko I, 701

F. Supp. 3d at 1382 (citing [Jinko] Sect. D, E, App'xs XIII, Add'l Sect D, & Doubl.

Remedies Resps. At App'x XIII:8, PDs 148–52, CDs 186–68 (May 4, 2021) ("Jinko

_____

[7] When choosing a primary surrogate country, Commerce considers: (1) each country's
economic comparability with the NME country; (2) each country's production of
comparable merchandise; (3) whether the potential surrogate countries that produce
comparable merchandise are significant producers of comparable merchandise; and
(4) the quality and availability of FOP data for the countries.  Policy Bulletin 04.1.

DEQR"); [Risen's] Sect. D Questionnaire Resp. at App'x XIII:7, PD 147, CD 122, bar

code 4116609-01 (Apr. 30, 2021) ("Risen Sect. D Resp.")).   The Court determined

Commerce failed to acknowledge record evidence that respondents argued would

support a reliable conversion of Jinko and Risen's data from per piece to square

meters or from kilograms to square meters.   Jinko I, 701 F. Supp. 3d at 1382 (citing

Risen Sect. D Resp. at Exh. D-34; Jinko DEQR at Exh. AD-9) (containing the

dimensions and conversion ratios of Risen's and Jinko's glass).   Second, the Court

remanded Commerce's decision to value solar glass using Romanian HTS 7007.19.80

because Commerce did not address Jinko's arguments which detracted from its

conclusion that the Romanian HTS heading at issue was not specific to the glass.

Jinko I, 701 F. Supp. 3d at 1383.   The Court asked Commerce to address how the data

from Malaysia, as the primary surrogate country, is unreliable such that departure

from its standard practice of using the data from the primary surrogate country is

reasonable, or how the Romanian data was specific to the glass at issue.   Jinko I, 701

F. Supp. 3d at 1382 (citing 19 C.F.R. § 351.408(c)(2)).

On remand, Commerce has not addressed the record evidence which detracts

from its determination.   Commerce fails to address concerns regarding the specificity

of the Romanian HTS.   Remand Results at 34—39.   Because the term "absorbent

layer" as used in Romanian HTS 7007.19.80 is not defined on the record, Commerce

contends the plain meaning of this term is that "glass with an absorbent layer takes

in light without releasing it, i.e., the light enters the glass but does not pass through

the glass." Remand Results at 9. Commerce argues that the other excluded glass in

Romanian HTS 7007.19.80 reinforces its interpretation because each includes

characteristics "which limit light transmission." Remand Results at 9. Indeed,

Commerce in the Remand Results proclaims "[a]ll of the other glass that is excluded

from Romanian HTS 7007.19.80 have treatments that limit the amount of light that

is transmitted through the glass." Remand Results at 36. Yet, Commerce proceeds

to explain how some, but not all, the exemplars excluded from Romanian HTS

7007.19.80 limit light. Remand Results at 36. Romanian HTS 7007.19.80 reads:

> Toughened (Tempered) Safety Glass (Excl. Enamelled, Coloured
> Throughout The Mass, pacified, Flashed Or With An Absorbent Or
> Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation
> In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other Vehicles).

Remand Results at 30—31 n.97. Commerce explains how enamelled, coloured,

pacified, flashed glass or glass with a reflecting layer limit light. Remand Results at

9. However, Commerce ignores the remaining exemplars in HTS 7007.19.80, i.e.,

glass suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and

other vehicles. Remand Results at 9. It is unclear how Commerce can contend that

all of the exemplars support the interpretation of glass with an absorbent layer as

light limiting, when it does not address all of the exemplars. Jinko and Risen both

argue that the processes of absorption and light transmission complement each other,

and do not conflict. Pl. Cmts. at 16; Consol. Pl. Cmts. at 14. Although Commerce is

entitled to weigh the record evidence, here the Romanian HTS heading, Commerce

cannot ignore that which detracts from its determination. <u>CS Wind Vietnam Co. v.</u>
<u>United States</u>, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting <u>Gerald Metals, Inc. v.</u>
<u>United States</u>, 132 F.3d 716, 720 (Fed. Cir. 1997)).

        Commerce also fails to confront evidence supporting the reliability of the
Malaysian data, especially considering Commerce's preference for using data from a
primary surrogate country to value FOPs.  Commerce explains in its <u>Remand Results</u>
that the respondents, Jinko and Risen, reported their values by weight and "[t]hus,
Commerce required an SV expressed in kilograms in order to value the kilograms of
glass that each respondent reported in their FOP databases." <u>Remand Results</u> at 5—
6.  However, as noted in <u>Jinko I</u>, "the respondents reported their glass consumption
in kilograms because Commerce specifically requested Jinko and Risen's
consumption measurements to be based on weight in their Section D responses for
this review." <u>Jinko I</u>, 701 F. Supp. 3d at 1382 (citing Jinko DEQR; Risen Sect. D
Resp.).  Therefore, to use Malaysian HTS 7007.19.90, Commerce would either need
to convert the Malaysian data from square meter values to kilogram values or convert
the respondents' data from per piece values to square meter values.  On remand,
Commerce has adequately explained why it cannot reasonably convert the reported
kilograms to square meters.  Commerce explains "the square meters to kilogram ratio
that Risen calculated depends on the thickness of the glass consumed and will vary
based on the thickness. Yet, the thickness of the glass imported into Malaysia during

the POR is unknown."[8]  Remand Results at 6.[9]  But Commerce fails to address why

it cannot convert the respondents' raw data from per piece to square meters using the

record evidence.  Commerce acknowledges that both Jinko and Risen purchase glass

on a per piece basis, Remand Results at 4 (citing Jinko DEQR at Exh. AD-9; Risen

Sec. D Resp. at Exh. D-34), but focuses its analysis for why it chooses to reject the

---

[8] Risen argues it has demonstrated that it is Commerce's "normal practice" to, when needed, rely on a conversion ratio for the surrogate value based on the respondents' own data.  Consol. Pl. Cmts. at 8—9 (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46904 (Dep't Commerce 2016) and accompanying IDM at Cmt. 6).  However, Commerce reasonably explains that using a conversion ratio based on respondents' own inputs "would not be appropriate here given that an important input characteristic that affects the conversion ratio (the thickness of the glass) varies between the respondents' inputs and the imported products."  Remand Results at 32.

[9] Commerce addresses respondents' proposed conversion ratios to convert kilograms to square meters.  Remand Results at 6—7 (explaining that both Jinko's and Risen's conversion ratios use calculations that include the thickness of the glass consumed, and there is no basis to conclude that the thickness of Jinko's and Risen's glass matches the thickness of the Malaysian glass).  Jinko argues that all three conversion factors are based on a weighted average of a large set of glass data that span a range of thicknesses, and thus the conversion factor accounts for the variability of glass thickness.  Pl. Cmts. at 6—7.  Jinko also argues that the conversion factor based on the Romanian data is reliable because: (i) a standard deviation analysis of the Romanian HTS data showed that data points within one-half of the standard deviation on either side of the mean account for about 90 percent; and (ii) the outliers in the Romanian HTS data are for tiny shipments that account for merely 0.0012% of the total imported quantity of 11,868.44 tons.  Pl. Cmts. at 9–11. Commerce adequately explains none of the three proposed conversion ratios are accurate to apply to the Malaysian HTS data because (i) the thickness of the solar glass imported into Malaysia during the period of review is unknown; and (ii) Jinko's conversion ratio has a wide variability in glass weight per square meter, and because of this variability, all three proposed conversion ratios are not sufficiently accurate.  Remand Results at 7; Def. Resp. at 6–7.

Malaysian data on Commerce's perceived inaccuracies with the conversion ratios. Remand Results at 5—6. Jinko and Risen converted their glass consumption to, and reported their glass consumption in, kilograms because they were requested to do so by Commerce. Remand Results at 4—5. As both Jinko and Risen have noted, the record contains the measurements of their glass so that their consumption can be converted to square meters, to match the Malaysian data which is reported in square meters only. See Jinko Solar's Redacted Case Br.: in the 8th Administrative Review of the Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China (A-570-979), PD 446, CD 494, bar code 4246241-01 (May 27, 2022) ("Jinko Case Br."). Thus, while Romanian HTS 7007.19.80 would appear to be specific and reliable on this record, so too would Malaysian HTS 7007.19.90. Given Commerce's preference to value all FOPs from the same primary surrogate country, see 19 C.F.R. § 351.408(c)(2), which here is Malaysia, and Commerce's failure to address why it could not reasonably convert Jinko's and Risen's glass consumption data directly from per piece to square meters, Commerce's determination is unsupported by substantial evidence on this record, and is therefore remanded for further explanation consistent with this opinion.

## II.    Commerce's Air Freight Valuation For Exports Of Solar Glass

In its Remand Results Commerce selected Freightos data to value air freight because the Freightos data, is publicly available, represents a broad market average,

Consol. Court No. 22-00219                                                          Page 16
**PUBLIC VERSION**

is specific, and the details of the source of the Freightos data, unlike the International

Air Transport Association (IATA) data, is on the public record.  Final Decision Memo.

at 43—44; see also Remand Results at 41.  Commerce explained it did not value air

freight using the IATA data because "almost none of the underlying data and

information regarding IATA data collection are publicly available."  Final Decision

Memo. at 44.  Jinko I remanded to Commerce to "further consider or explain how

publicly available information on the confidential record fails to promote accuracy,

fairness and predictability."  Jinko I, 701 F. Supp. 3d at 1388.  On remand, Commerce

again selects Freightos data to value air freight.  Remand Results at 40—41.  Jinko

argues "the totality of route specific Shanghai-Atlanta monthly air freight data was

publicly disclosed," Pl. Cmts. at 22, all the IATA data available is on the record, and

the IATA data is more robust than the Freightos data chosen by Commerce.  Pl. Cmts.

at 23—24.  For the reasons that follow, Commerce's selection of the Freightos data is

supported by substantial evidence on this record.

    As discussed, as a matter of practice Commerce evaluates potential SV data by

assessing whether it is specific to input, publicly available, contemporaneous with

the period of review, and tax and duty exclusive.  See Policy Bulletin 04.1.  Commerce

has, as a matter of practice, previously concluded that information on the confidential

record can be considered publicly available under certain circumstances.   For

example, Commerce has indicated that it considers information publicly available

where that information "has intentionally been made available, through paid

subscription or otherwise, to the general public by its publisher." Issues and Decision

Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value

Investigation of Mattresses from the People's Republic of China, 84 ITADOC 56,761

(Dep't Commerce Oct. 23, 2019) (internal citations and quotations omitted).

Conversely, Commerce "would consider information to be not publicly available in

instances where only a select limited group is permitted to have access to this

information by its publisher." Issues and Decision Memorandum for the Final

Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses

from the People's Republic of China, 84 ITADOC 56,761 (Dep't Commerce Oct. 23,

2019) (internal citations and quotations omitted).   Similarly, Commerce has

reiterated that "[w]e consider the appropriate indication of public availability to be

whether any entity can obtain the data." Issues and Decision Memorandum for the

Final Affirmative Countervailing Duty Determination: Laminated Woven Sacks from

the People's Republic of China, 73 ITADOC 35,639 (Dep't Commerce Jun. 24, 2008).

Commerce has further stated that "at the very least, public availability should enable

any interested party to obtain the same information." Issues and Decision

Memorandum for the Final Affirmative Countervailing Duty Determination:

Laminated Woven Sacks from the People's Republic of China, 73 ITADOC 35,639

(Dep't Commerce Jun. 24, 2008); but see Jiangsu Zhongji Lamination Materials Co.,

(HK)Ltd. v. United States, 396 F. Supp. 3d 1334, 1352—53 (Ct. Int'l Trade 2019)

(acknowledging Commerce's discretion to weigh publicly availability of data where there was no apparent challenge to the data being non-public data).

In its Final Decision Memo., Commerce stated that "the data were treated as proprietary information on the record of this review" implying that "underlying data and information regarding IATA data collection" was on the confidential record but not on the public record. Final Decision Memo. at 43. Jinko I remanded Commerce's determination for further explanation as to why information had to be on the public record to be publicly available if the information was available to the public to purchase. Jinko I, 701 F. Supp. 3d at 1387—88. The Remand Results and oral argument revealed that the information concerning the IATA data collection was absent from the record altogether, not merely absent from the public record. Remand Results at 18, 40—41; Oral Arg. Rec. at 1:15:40—1:16:20, Apr. 30, 2025, ECF No. 131 ("Oral Arg. Rec.") (Plaintiffs' counsel noting, "There is no back up data . . . The most granular data [IATA] provides is at the monthly level . . . there is no further breakdown). When questioned about information on the confidential record attached to the monthly averages, Plaintiffs' counsel indicated that much of that information was information from the prior POR, not source information from this review. See Oral Arg. Rec. at 1:14:00—1:16:00; 1:18:56—1:19:11.

It is reasonably discernible from the Final Decision Memo. and the Remand Results that Commerce's assertion that the back-up data was not on the public record shows that Commerce mistakenly believed the data on the confidential record which

related to the prior POR, was the back-up data for this POR.  Final Decision Memo.

at 43; <u>Remand Results</u> at 18, 40—41 ("The only public IATA information on the record

is a monthly average of its rates."); <u>see also</u> Oral Arg. Rec. at 1:18:56—1:19:11

(Plaintiffs' counsel explaining that the business proprietary pages on the record are

related to the prior POR and not the current POR in this review).  Nonetheless, it is

reasonably discernable that Commerce considered the availability of information

concerning the source of the data critical in determining and assessing the reliability

of the data.  <u>See</u> Final Decision Memo. at 43—44; see also <u>Remand Results</u> at 19; 40—

41 (noting that the details supporting the Freightos data is publicly available).

Further, it is also reasonably discernible that Commerce's preference for the

Freightos data is not only based on its specificity, broad market average, and public

availability, but also that the source data for the Freightos data renders the data

reliable.  <u>See</u> Final Decision Memo. at 43—44 (noting the Freightos data, and the

details regarding the source of the data, are publicly available, and comprised of

weekly rates from "the world's largest global database of multimodal freight rates,

with more than 2 billion price points").  There is no information on either the public

or confidential record that would provide the source data for IATA to detract from

Commerce's determination.  Oral Arg. Rec. at 1:15:30—1:15:58; <u>see also</u> <u>Remand</u>

<u>Results</u> at 40—41.  Therefore, Commerce's selection of Freightos data to value air

freight is supported by substantial evidence on this record.

**PUBLIC VERSION**

### III.  Commerce's Methodology For Calculating Facts Available With An Adverse Inference Rate

In calculating a rate using facts available with an adverse inference due to Risen's missing FOP data, Commerce created a formula based on a subset of data that Risen reported for its solar modules.  Remand Results at 22–24; Def. Cmts. at 12–13.  Commerce did not use the highest consumption quantity, or a ratio based on a consumption quantity or group of consumption quantities that was reported for a particular input for any CONNUM, as a substitute for the missing FOP inputs, because these options were "not sufficiently adverse."  Remand Results at 26–27.  Instead, Commerce calculated a consumption ratio for three categories of inputs using simple averages of the highest ratio for each item in each category, and multiplied each input ratio by the multiplicative inverse of the simple average input ratio.  Remand Results at 21—22.[10]  Jinko I remanded to Commerce, concluding that

---

[10] Commerce explained that it

> calculated: (1) a simple average of all the input ratios for all the inputs (i.e., which include direct materials, direct and indirect labor, electricity, gas, and water) that were used to produce solar modules (including, where applicable, input ratios for inputs, other than solar cells, that were used to produce components in the solar module); (2) another simple average of all the input ratios for all the inputs (i.e., which include direct materials, direct and indirect labor, electricity, gas, and water) that were used to produce solar cells; and (3) a third simple average of all the input ratios for all the material inputs that were used

(footnote continued)

Commerce's methodology was contrary to law because the statute required Commerce to select among the facts available and, even if Commerce had derived facts to select from the record, Commerce needed to explain why its methodology was reasonable. Jinko I, 701 F. Supp. 3d at 1396—97. On remand, Commerce contends that it derived facts from the record using calculations, explains its methodology, and contends that its methodology is reasonable. Remand Results at 21—27, 41—43. Risen argues that: (a) Commerce's methodology is unsupported by the record and contrary to law, and (b) Commerce is unfairly penalizing Risen by applying an even more adverse rate when Risen is powerless to compel its suppliers to cooperate with Commerce's requests.[11] See Consol. Pl. Cmts. at 15–18. For the following reasons,

---

in packing solar modules. Commerce then multiplied each reported per-unit consumption quantity by the multiplicative inverse of the applicable simple average input ratio (i.e., 1 divided by the applicable simple average input ratio) to increase all the reported consumption quantities as an adverse inference.

Remand Results at 22.

[11] Risen's argument that the Court should limit Commerce's discretion because its suppliers were uncooperative while it was not, is misplaced for several reasons. First, this Court has already found that Risen was uncooperative. Jinko I, 701 F. Supp. 3d at 1392—95 (concluding that Risen did not cooperate because it did not use its maximum efforts to secure the needed information). Thus, the use of an adverse inference here is authorized, not by 19 U.S.C. § 1677e(a), but rather by 19 U.S.C. § 1677e(b). Jinko I, 701 F. Supp. 3d at 1392—95; compare Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, 753 F.3d 1227, 1232—36 (Fed. Cir. 2014) (holding that Commerce may incorporate an adverse inference under Section 1677e(a) in calculating a cooperative respondent's margin, if doing so will yield an

(footnote continued)

Commerce's decision to apply its alternative methodology is remanded as contrary to

law and unsupported by substantial evidence.

The legal framework for using facts otherwise available when information

requested by Commerce is withheld or unavailable is set forth in 19 U.S.C. § 1677e.

Section 1677e(a) provides:

(a) In general
    If--
    (1) necessary information is not available on the record, or
    (2) an interested party or any other person--
        (A) withholds information that has been requested by the
            administering authority or the Commission under this
            subtitle,
        (B) fails to provide such information by the deadlines for
            submission of the information or in the form and manner
            requested, subject to subsections (c)(1) and (e) of section
            1677m of this title,
        (C) significantly impedes a proceeding under this subtitle, or
        (D) provides such information but the information cannot be
            verified as provided in section 1677m(i) of this title,

---

accurate rate, promote cooperation, and thwart duty evasion); see also Canadian
Solar Int'l Ltd. v. United States, 415 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2019).
Second, Risen misreads the way in which Commerce employs SKF USA Inc. v. United
States, 29 C.I.T. 969, 970 (Ct. Int'l Trade 2005) ("SKF"), the case on which Commerce
relies upon in its remand. In its Remand Results Commerce invokes SKF, which is
not binding on this Court in any event, for the proposition that Commerce has
discretion in calculating an adverse inference. Remand Results at 21. Further as
SKF points out, Commerce has discretion in calculating an adverse inference, but it
does not, as Risen suggests, differentiate between uncooperative respondents who fail
to supply their own information and those that fail to supply their unaffiliated
supplier's information. Consol. Pl. Cmts. at 16. Risen is correct that SKF "reiterates
that the statute must not impose, punitive . . . margins." Consol. Pl. Cmts. at 16
(citing SKF, 29 C.I.T. at 1336). However, the non-punitive nature of Section 1677e(b)
makes clear that Commerce does not punish parties by evaluating behavior, rather
it serves to encourage cooperation by employing an adverse inference derived from
record evidence. See 19 U.S.C. § 1677e(b)(2).

> the administering authority and the Commission shall, subject to
> section 1677m(d) of this title, use the facts otherwise available in
> reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a) (emphasis added). That is, Section 1677e states, inter alia, that

if "necessary information is not available on the record," Commerce shall "use the

facts otherwise available." 19 U.S.C. § 1677e(a). Accordingly, in Section 1677e(a) the

phrase "use the facts otherwise available" requires Commerce to look to the record

for facts, which can be substituted for the missing information. See 19 U.S.C.

§ 1677e(a). Section 1677e(b)(1)(A) provides that if an interested party does not

comply with a request for information, then Commerce "may use an inference that is

adverse to the interests of that party in selecting from among the facts otherwise

available." 19 U.S.C. § 1677e(b)(1)(A). Consequently, 19 U.S.C. § 1677e(a)-(b)

requires that the source of the information, whether as facts otherwise available or

facts otherwise available with an adverse inference, must be facts from the record.

Commerce cannot select facts not on the record, as doing so would be contrary to law.

See 19 U.S.C. § 1677e(a)-(b).

Nonetheless, Commerce has some discretion in calculating a rate using

adverse inferences. Section 1677e(b) states that an adverse inference may include

information "derived" from four potential sources of information:

> (2) Potential sources of information for adverse inferences
> An adverse inference under paragraph (1)(A) may include reliance
> on information derived from--
>     (A) the petition,
>     (B) a final determination in the investigation under this subtitle,

      (C) any previous review under section 1675 of this title or
          determination under section 1675b of this title, or
      (D) any other information placed on the record.

19 U.S.C. § 1677e(b)(2). The meaning of the word "derived" in Section 1677e(b)(2) is "to take, receive, or obtain especially from a specified source," Derive, Merrian-Webster's Dictionary, https://www.merriam-webster.com/dictionary/derive (Last visited May 27, 2025); "to trace from a source or origin," Derive, https://www.dictionary.com/browse/derive (Last visited May 27, 2025). Further, the Statement of Administration Action for the Uruguay Round Agreements Act ("SAA") explains that "using" record information to make an adverse inference is permissible. SAA, H.R. Rep. No. 103-316 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("SAA") ("Information used to make an adverse inference" includes "the petition, other information placed on the record, or determinations in a prior proceeding regarding the subject merchandise"). Thus, both the statute and the SAA reveal that Commerce can use an adverse inference by relying on "information derived from" the record, but Commerce cannot create information not rooted in record evidence. Deriving information requires a logical connection between the source, i.e., the record evidence, and the result. This logical connection furthers the purpose of Section 1677e(b), i.e., to apply an adverse inference, not to punish a respondent but, to ensure "the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 4199. The framework provides that the rate will be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-

in increase intended as a deterrent to non-compliance." F.lli De Cecco Di Filippo Fara

S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("De Cecco").

Further, when using an adverse inference Commerce must act reasonably. See

Vincentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1342 (Ct. Int'l Trade 2019)

(noting that even though Commerce has discretion to select a calculation methodology

in a determination, that methodology must nonetheless be reasonable), aff'd, 42 F.4th

1372, 1382 (Fed. Cir. 2022). Commerce must explain how the facts it selects based

on its use of an adverse inference prioritizes cooperation, not punishment. Bio-Lab,

Inc. v. United States, 435 F. Supp. 3d 1361, 1368 (Ct. Int'l Trade 2020); De Cecco, 216

F.3d at 1032; Gallant Ocean (Thailand) Co., Ltd. v. United States, 602 F.3d 1319,

1323 (Fed. Cir. 2010).

In Jinko I the Court concluded that Commerce's determination was contrary

to law and unsupported by substantial evidence. Jinko I, 701 F. Supp. 3d at 1396.

The Court reasoned that "Commerce failed to select among the facts available" and

had instead created new facts. Jinko I, 701 F. Supp. 3d at 1396. Further, the Court

explained even if the statute were capacious enough to allow Commerce to derive new

facts from the facts on the record, Commerce would need to explain how it derived

those facts and why its methodology was reasonable. Jinko I, 701 F. Supp. 3d at

1396—97.

On remand, Commerce explains its methodology but fails to show how its

derivation is logically related to record information, and therefore in accordance with

law, or supported by substantial evidence. Commerce explains the mechanics of its

methodology. Commerce starts with Risen's consumption data and derives a

consumption rate for each input using facts on the record.[12] Remand Results at 21—

22. Commerce then derives three separate ratios by placing all the inputs into three

categories and calculating the simple average of the ratios for all the inputs in each

category.[13] Remand Results at 22. One might question why creating the three

categories is reasonable, see e.g., Consol. Pl. Cmts. at 16—19, and therefore whether

the determination is supported by substantial evidence; however, up to this point in

its calculations Commerce is using information on the record in accordance with the

statute.[14]

---

[12] Commerce calculated a ratio for each monocrystalline solar module CONNUM by dividing the per-unit consumption quantity of the input reported for the CONNUM by the highest per-unit consumption quantity reported for that input for any monocrystalline solar module. Remand Results at 22. Commerce then averaged all the CONNUM-specific ratios that it calculated for that input to derive one single ratio for the input (the input ratio). Remand Results at 22.

[13] Commerce calculated: (1) a simple average of all the input ratios for all the inputs (i.e., which include direct materials, direct and indirect labor, electricity, gas, and water) that were used to produce solar modules (including, where applicable, input ratios for inputs, other than solar cells, that were used to produce components in the solar module), Remand Results at 22, (2) another simple average of all the input ratios for all the inputs (i.e., which include direct materials, direct and indirect labor, electricity, gas, and water) that were used to produce solar cells; Remand Results at 22, and (3) a third simple average of all the input ratios for all the material inputs that were used in packing solar modules. Remand Results at 22.

[14] Risen contends that Commerce "should calculate individual adjustment factors as it had done in the past" to promote accuracy. Risen Comments on Draft Remand Results at 15, bar code 4606003-01 (Jul. 30, 2024); Consol. Pl. Cmts. at 17. It appears

(footnote continued)

However, finding that the resulting ratios were not "sufficiently adverse[,]" Commerce multiplied each reported per-unit consumption quantity by the "multiplicative inverse of the applicable simple average input ratio[,]" meaning it divided the number 1 by the simple average input ratio to create a multiplicative inverse and then multiplied each input ratio by the multiplicative inverse of the simple average input ratio. Remand Results at 22. It is at this step of Commerce's methodology, creating a multiplicative inverse, where Commerce stops relying on "information derived from" the record, and starts creating facts without the requisite link to the evidence on the record. Id. at 21—22.

Specifically, Commerce acts contrary to law when it creates the "multiplicative inverse" to use in its calculations. The multiplicative inverse is the number 1 divided by the simple average input ratios that Commerce calculated for the three input

---

that Commerce decided not to calculate individual adjustment factors because it believes doing so would not have created a rate with an incentive for cooperation. See Remand Results at 26—27 (explaining that using individual inputs, not grouped together, would have essentially resulted in applying a rate using facts otherwise available without an adverse inference). As discussed more fully below, Commerce does not explain why this choice is reasonable on this record. Although Commerce explains its reasoning for grouping the input ratios by category rather than using input-specific ratios, or creating one simple average input ratio, it does not explain why the input specific ratios were not sufficiently adverse. See Remand Results at 24—25 (stating input-specific ratios were not "sufficiently" adverse and explaining "calculating one simple average input ratio for all three items (solar cells, solar modules, and packing) would have inappropriately skewed the adverse adjustment multiplier for solar cells and solar modules because of the disproportionately [[ ]] effect of the [[        ]] packing input ratio compared to the relative insignificance of the packing FOP").

categories.  Id. at 22.  Thus, it is a number that has been created by Commerce as the

number 1 is not record evidence, nor is it derived from record evidence.[15]  Commerce

multiplies each reported per-unit consumption quantity the multiplicative inverse to

"increase all the reported consumption quantities as an adverse inference."  Id. at

22—23.

Commerce offers no explanation as to the connection, if any exists, between the

multiplicative inverse and the facts on the record to argue its final calculation is

derived from record evidence.  That Commerce creates a variable by using calculated

consumption ratios is of no moment.  Commerce could have decided to multiply the

ratio by the numerical value of the last digit of the ratio, it could have multiplied the

ratio by the number of inputs, it could have multiplied the ratio by a random number.

Each option, if lacking a logical connection to the facts on the record, would be

contrary to law.

The examples Commerce gives to support its approach illustrate that here

Commerce is not relying on "information derived from" the record, but rather creating

facts.  See Remand Results at 41—43.  Commerce cites several determinations to

support its view that it has acted in accordance with law.  See Notice of Final

---

[15] Additionally, Commerce says "the methodology described above promotes accuracy
because Commerce relied on facts otherwise available that are specific to Risen,
namely Risen's FOP consumption quantities, to derive the adverse inference
multipliers for Risen."  Remand Results at 25.  However, Commerce uses the number
1 to create the multiplicative inverse.  The number 1 is not on the record and is not
specific to Risen.

Determination of Sales at Less Than Fair Value and Affirmative Critical
Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers
from Mexico, 77 Fed. Reg. 17,422 (Dep't Commerce Mar. 26, 2012) ("Bottom Mount
Refrigerator Freezers from Mexico"); Notice of Final Determination of Sales at Less
Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount
Combination Refrigerator-Freezers From the Republic of Korea, 77 Fed. Reg. 17,413
(Dep't Commerce Mar. 26, 2012) ("Bottom Mount Refrigerator Freezers from Korea"),
and accompanying IDM at Comment 12; Polyethylene Retail Carrier Bags from
Thailand: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg.
1,982 (Dep't Commerce Jan. 17, 2007) ("Polyethylene Bags from Thailand"), and
accompanying IDM at Comment 2; Final Determination of Sales at Less Than Fair
Value: Certain Activated Carbon from the People's Republic of China, 72 Fed. Reg.
9,508 (Dep't Commerce Mar. 2, 2007) ("Certain Activated Carbon from China"), and
accompanying IDM at Comment 20.  However, in each of these examples Commerce
used record evidence to derive information. [16]

---

[16] In Bottom Mount Refrigerator Freezers from Mexico, Commerce Determined an
average rebate percentage based on data in the respondent's sales listing, using that
number as a floor.  Bottom Mount Refrigerator Freezers from Mexico at cmt. 4.  In
Bottom Mount Refrigerator Freezers from Korea, Commerce used the lowest sell-out
percentage observed at verification, which was also stated in the verification report.
Bottom Mount Refrigerator Freezers from Korea at cmt. 10.  In Polyethylene Bags
from Thailand, Commerce applied a "total AFA" rate to the respondent.  Polyethylene
Bags from Thailand at cmt. 10.  In Certain Activated Carbon from China, Commerce
applied a "total AFA" rate to the respondent.  Certain Activated Carbon from China
at cmt. 27.

**PUBLIC VERSION**

It is possible that Commerce's use of the multiplicative inverse may be its attempt at adding a "built-in increase intended as a deterrent to non-compliance." De Cecco, 216 F.3d at 1032.  If Commerce's use of the multiplicative inverse is meant to build in an increase as contemplated by De Cecco, Commerce must explain that it is doing so and further explain why that built in increase should be considered a derivation from record evidence, and therefore in accordance with the statute.  As Commerce currently explains its method for calculating an adverse inference, the Court does not view it as permitted by the statute.

Additionally, although the statute permits Commerce to rely on information derived from the record when employing an adverse inference, Commerce's determinations must still be supported by substantial evidence, i.e., they must be reasonable on this record.  See 19 U.S.C. § 1516a(b)(1)(B)(i); Gallant Ocean, 602 F.3d at 1325.  Commerce fails to explain how its determination is reasonable on this record.  As a preliminary matter, Commerce asserts that the input-specific ratios resulted in an increase that was not a "sufficiently adverse inference," Remand Results at 23, however Commerce's use of the word sufficiently is irrelevant.  The word "sufficiently" is not in the statute; the statute references an inference that is "adverse."  See 19 U.S.C. § 1677e(b).  However, it is reasonably discernible that when Commerce uses the phrase "sufficiently adverse," it simply means the rate is not

adverse.[17]   It would appear that Commerce considers the missing information
indicative of rates higher than those calculated using the highest consumption
quantity that was reported for a particular input for any CONNUM on the record.
Remand Results at 26—27 (explaining that simply using the highest consumption
quantity that was reported for a particular input for any CONNUM on the record
would not produce an adverse rate); see also SAA at 4199.

However, Commerce does not explain why it believes the rate it calculated
using the highest consumption quantity that was reported for a particular input for
any CONNUM would not be adverse. Commerce rejects the four percent rate increase
in the reported per unit consumption quantities as not adverse in favor of a fifteen
percent inference rate increase in the reported per unit consumption quantities
without any explanation as to why the four percent rate increase in the reported per
unit consumption quantities is not adverse. See Remand Results at 23—24.  Further,
Commerce does not explain why the rate it applies, which imposes a fifteen percent
rate increase in the reported per unit consumption quantities is reasonable.  Id. at
24—27.  Thus, even if Commerce calculated its rate based on an adverse inference by

---

[17] If during the review, Commerce believed the rate was not adverse it could have
requested additional information from the parties, given the parties an opportunity
to comment on the new information, and calculated a rate using that new
information.  Additionally, Commerce in a remand may reopen the record to ask for
additional information.  See, e.g., Tropicana Prods., Inc. v. United States, 484 F.
Supp. 2d 1330, 1354 (2007) ("If it finds it necessary or efficacious, the Commission
may reopen the record").

deriving information from the record, its determination would still be unsupported by substantial evidence. Commerce must explain why its determination is reasonable, specifically why: (1) missing information is indicative of rates higher than those calculated using the highest consumption quantity that was reported for a particular input for any CONNUM on the record, (2) the rate it chose is reasonable.

## IV. Recalculation of the Separate Rate.

Jinko I remanded to Commerce to recalculate the separate rate for BYD and JA Solar. Jinko I, 701 F. Supp. 3d at 1397. Commerce argues that because it did not make any changes to the dumping margins for Jinko and Risen there is "no basis to change the separate rate that Commerce assigned to JA Solar and BYD." Remand Results at 27. Plaintiff-Intervenors argue that the margins determined for Jinko and Risen are not supported by substantial evidence, and therefore the separate rate calculation should be remanded to Commerce again to make revisions consistent with its redetermination. BYD Cmts. at 7; JA Solar Cmts. at 1. On remand, Commerce will necessarily reconsider whether it must recalculate the separate rate for JA Solar and BYD following its redetermination.

## CONCLUSION

For the foregoing reasons, Commerce's redetermination with respect to its decision to use Freightos data to value air freight is sustained as it is supported by substantial evidence on the record and in accordance with the law and this Court's remand order. Commerce's redetermination with respect to its valuation of solar

**PUBLIC VERSION**

glass and its methodology for calculating facts available with an adverse inference are remanded for further explanation or consideration consistent with this opinion. In light of the foregoing, it is

**ORDERED** that Commerce's valuation of air freight is sustained; and it is further

**ORDERED** that Commerce's determination with respect to its valuation of solar glass under Romanian HTS 7007.19.80 is remanded for reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's methodology for calculating facts available with an adverse inference is remanded for reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's determination of the review specific rate applicable to JA Solar and BYD is remanded for reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its redetermination with the Court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the redetermination; and it is further

Consol. Court No. 22-00219                                                      Page 34
**PUBLIC VERSION**

      **ORDERED** that the parties shall file the joint appendix, including the entire

confidential record, within 14 days after the filing of replies to the comments on the

redetermination; and it is further

      **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing its redetermination.


/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:     May 30, 2025
            New York, New York