A-570-979
Remand
Slip Op. 25-67
POR: 12/01/2019–11/30/2020
**Public Version**
E&C/IV:  HS

*Jinko Solar Import and Export Co., Ltd., et. al v. United States*
**Consol. Court No. 22-00219, Slip Op. 25-67 (CIT 2025)**
**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the May 30, 2025, remand order of the U.S. Court of International

Trade (CIT) in *Jinko Solar Import and Export Co., Ltd., et. al. v. United States*.[1]  *Jinko II*

concerns the final results of the 2019-2020 administrative review of the antidumping duty (AD)

order on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar

cells), from the People's Republic of China (China).[2]  In *Jinko II*, the CIT sustained Commerce's

use of Freightos data to value air freight but remanded to Commerce to further explain or

reconsider its valuation of solar glass and its methodology for applying adverse facts available

(AFA) to Risen.[3]  The CIT also ordered that Commerce reconsider the dumping margins that it

---

[1] *See Jinko Solar Import and Export Co., Ltd., et. al. v. United States*, WL 1604598 (CIT 2025) (*Jinko II*).
[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 FR 38379 (June 28, 2022) (*AR8 Final Results*), and accompanying Issues and Decision Memorandum (IDM), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Amended Final Results of Antidumping Duty Administrative Review, 2019-2020*, 87 FR 48621 (August 10, 2022) (*Amended AR8 Final Results*).
[3] *Id*. Risen refers to the following companies which Commerce collapsed and treated as a single entity:  Risen Energy Co. Ltd.; Risen (Wuhai) New Energy Co., Ltd.; Zhejiang Twinsel Electronic Technology Co., Ltd.; Risen (Luoyang) New Energy Co., Ltd.; Jiujiang Shengzhao Xinye Technology Co., Ltd.; Jiujiang Shengzhao Xinye Trade

determined for JA Solar Technology Yangzhou Co., Ltd. and Shanghai JA Solar Technology Co., Ltd. (collectively JA Solar) and BYD (Shangluo) Industrial Co., Ltd. (BYD) based on its remand redetermination.  Consistent with the Court's opinion, Commerce has provided more explanation on its valuation of solar glass when computing the dumping margins for JA Solar and BYD and also further explained its AFA methodology.

## II.    BACKGROUND

On June 28 and August 10, 2022, Commerce published the *AR8 Final Results* and *Amended AR8 Final Results*, respectively, in the *Federal Register*.[4]  Mandatory respondents Jinko[5] and Risen and certain separate rate respondents subsequently challenged Commerce's *AR8 Final Results* at the CIT.  On August 29, 2024, Commerce filed its first remand redetermination.[6]  On May 30, 2025, the CIT sustained, in part, and remanded, in part, the *AR8 Final Results/Amended AR8 Final Results* to Commerce for further explanation or reconsideration.[7]

On August 19, 2025, Commerce released a draft of its redetermination to interested parties and provided them with an opportunity to comment on the draft.[8]  On August 25, 2025,

---

Co., Ltd.; Ruichang Branch/Risen Energy (HongKong) Co., Ltd.; Risen Energy (Changzhou) Co., Ltd.; and Risen Energy (YIWU) Co., Ltd.

[4] *See AR8 Final Results; see also Amended AR8 Final Results*; and *Jinko Solar Import and Export Co., v. United States*, 701 F. Supp. 3d 1367 (CIT 2024) (*Jinko I*)

[5] Jinko refers to the following companies which Commerce collapsed and treated as a single entity:  1) Jinko Solar Import and Export Co., Ltd.; 2) Jinko Solar Co., Ltd.; 3) Jinkosolar Technology (Haining) Co., Ltd.; 4) Yuhuan Jinko Solar Co., Ltd.; 5) Zhejiang Jinko Solar Co., Ltd.; 6) Jiangsu Jinko Tiansheng Solar Co., Ltd.; 7) Jinkosolar (Chuzhou) Co., Ltd.; 8) Jinkosolar (Yiwu) Co., Ltd.; and 9) Jinkosolar (Shangrao) Co., Ltd.

[6] *See Final Results of Redetermination Pursuant to Court Remand*, *Jinko Solar Import and Export Co., Ltd., et. al v. United States*, Court No. 22-00219, Slip Op. 24-53 (CIT May 1, 2024), dated August 29, 2024 (*Jinko I* Final *Redetermination*), available at https://access.trade.gov/public/FinalRemandRedetermination.aspx.

[7] *See Jinko II*.

[8] *See* Draft Results of Remand Determination, *Jinko Solar Imports and Export Co., Ltd., et. al v. United States* Court No. 22-00219, Slip Op. 25-67, dated August 18, 2025 (*Jinko II* Draft Redetermination).

JA Solar,[9] BYD,[10] Jinko,[11] and Risen[12] commented on the Draft Remand.  On August 29, 2025, the American Alliance for Solar Manufacturing (the petitioner) commented on the Draft Remand.[13]  We address these comments below.

## III.    REMANDED ISSUES

### A.  Valuation of Solar Glass

**Background**

In the *Jinko I* Final Redetermination, Commerce continued to value solar glass using the value of imports under Romanian Harmonized System (HS) number 7007.19.80, rather than the value of imports under Malaysian HS 7007.19.90, even though Malaysia is the primary surrogate country, because:  (1) imports under Malaysian HS number 7007.19.90 are reported in square meters while the respondents reported their consumption of solar glass in kilograms, and (2) contrary to respondents' claims, Romanian HS number 7007.19.80 does not exclude imports of the solar glass used by the respondents.[14]  The CIT held that Commerce:  (1) failed to address why it could not convert the respondents' per-piece glass consumption quantities into square meters using record evidence; and (2) failed to address some of the examples of excluded products listed in the Romanian HS description of imports under number 7007.19.80 in its explanation of why the respondent's glass is not excluded from that HS category.[15]

---

[9] *See* JA Solar's Letter, "Comments on Draft Results of Remand Redetermination," dated August 25, 2025 (JA Solar's Comments).
[10] *See* BYD's Letter, "Shangluo BYD's Comments on Draft Results of Redetermination," dated August 25, 2025 (BYD's Comments).
[11] *See* Jinko's Letter, "Comments on Draft Remand," dated August 25, 2025 (Jinko's Comments).
[12] *See* Risen's Letter, "Comments on 2nd Draft Remand," dated August 25, 2025 (Risen's Comments).
[13] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated August 29, 2025 (Petitioner's Comments).
[14] *See Jinko I* Final Redetermination.
[15] *See Jinko II*.

**Analysis**

In the *Jinko II* Draft Redetermination, we found that upon further review, the record contained the necessary information to determine Jinko and Risen's solar glass consumption in square meters, which is the unit of measure used to report import values under Malaysian HS number 7007.19.90. Specifically, we found the record contained inventory records for Jinko and Risen that show the number of pieces of each type of glass withdrawn from inventory for production during the POR and the length and width of each piece of glass, in millimeters.[16] Using this information, we calculated the total square meters of glass consumed in production by each respondent during the POR. Because each respondent already converted their total glass consumption in pieces to total glass consumption in kilograms for reporting to Commerce in the underlying review, we used the ratio of the total glass consumption in square meters to the total glass consumption in kilograms to calculate the number of square meters of glass used for each kilogram of glass consumed in production. We multiplied this square-meter per kilogram conversion ratio by the number of kilograms of glass consumed per watt of finished product, which was reported to Commerce on a control number (CONNUM)-specific basis, to calculate the square meters of glass consumed per watt of finished product for each CONNUM reported in the FOP database.[17] Given that we had glass consumption in square meters for both respondents, in the *Jinko II* Draft Redetermination we used import values under Malaysian HS number 7007.19.90, which are reported in Malaysian Ringgits (RM) per square meter, to value the respondents' consumption of solar glass. Therefore, consistent with the CIT's opinion, Commerce's selection of Malaysia and the primary surrogate country, and Commerce's

---

[16] *See* Risen's Letter, "Case Brief," dated January 28, 2022, at Attachment 1; *see also* Jinko's Letter, "Case Brief," dated May 27, 2022, at Attachment 4.
[17] *See* Memoranda, "Draft Remand Redetermination Analysis Memorandum for Risen Energy Co., Ltd," and "Draft Remand Redetermination Analysis Memorandum for Risen Energy Co., Ltd," dated August 19, 2025.

preference to value all FOPs using SVs from a single surrogate country, in the *Jinko II* Draft Redetermination we recalculated the value of Jinko and Risen's solar glass consumption using the value of imports during the POR under Malaysian HS number 7007.19.90.  Because we based the surrogate value for solar glass on the value of imports under Malaysian HS number 7007.19.90 rather than Romanian HS number 7007.19.80, in the *Jinko II* Draft Redetermination we did not discuss the additional examples of excluded products under Romanian HS number 7007.19.80.

However, in response to petitioner's comments, for reasons explained below, we have revised our position on this issue in the *Jinko II* Draft Redetermination and in this final redetermination we are using import prices under Romanian HS number 7007.19.80 to value the glass used by the respondents to produce solar modules.  We have determined to rely on import prices under Romanian HS number 7007.19.80 as the solar glass SV because we find that the factor used in the *Jinko II* Draft Redetermination to convert the respondents' solar glass consumption quantities into a unit of measure that was compatible with the Malaysian import prices for solar glass did not take into account the varying thicknesses of the respondents' solar glass, and thus, results in distorted consumption quantities for solar glass.  Our full explanation for this position is provided in Section IV of this redetermination, where we address issues raised by parties in response to our draft redetermination.

### B.  The Methodology Used to Apply Partial AFA to Risen

**Background**

In the underlying administrative review, Commerce based Risen's dumping margin, in part, on facts available with an adverse inference because Risen's unaffiliated solar cell and

module suppliers failed to provide their FOP data.[18]  *See Jinko Solar Import and Export Co., Ltd. v. United States*, 701 F.Supp.3d 1367, 1394 (CIT 2024) (*Jinko I*) (sustaining Commerce's determination to apply facts available with an adverse inference).  In *Jinko II*, the CIT held that Commerce acted contrary to law when it created the "multiplicative inverse" that it used to apply an adverse inference.[19]  The CIT stated that section 776(b)(2) of the Tariff Act of 1930, as amended (the Act) permits Commerce to "use an adverse inference by relying on "information derived from" the record, but Commerce cannot create information not rooted in record evidence."[20]  Specifically, the CIT held that:

> {t}he number 1 is not on the record and is not specific to Risen … it is a number that has been created by Commerce as the number 1 is not record evidence, nor is it derived from record evidence. … Commerce offers no explanation as to the connection, if any exists, between the multiplicative inverse and the facts on the record to argue its final calculation is derived from record evidence. [21]

In addition, the CIT held that Commerce:  (1) failed to explain why its AFA methodology is reasonable; (2) failed to explain why using the highest consumption quantity that was reported for a particular input for any CONNUM would not be adverse; (3) why it rejected a four percent rate increase in the reported per unit consumption quantities as not adverse and applied a 15 percent rate increase in those quantities; and (4) why imposing a 15 percent rate increase in the reported per-unit consumption quantities is reasonable.[22]  In sum, the CIT ordered that Commerce must explain "why:  (1) missing information is indicative of rates higher than those calculated using the highest consumption quantity that was reported for a particular input for any CONNUM on the record, {and} (2) the rate it chose is reasonable."[23]

---

[18] *See AR8 Final Results* IDM at 11.
[19] *See Jinko II* at 27.
[20] *Id.* at 24.
[21] *Id.* at 28.
[22] *Id.* at 31.
[23] *Id.* at 32.

**Draft Redetermination Methodology**

In the *Jinko II* Draft Redetermination we addressed the two aspects of Commerce's AFA methodology remanded to it by the CIT, namely use of the digit "1" in the multiplicative inverse and Commerce's failure to adequately explain why its AFA methodology is reasonable.

Specifically, in the *Jinko II* Draft Redetermination we explained that in our AFA calculation we determined (using Risen's CONNUM-specific per-unit consumption quantities for FOP) that the per-unit consumption quantities that Risen reported for solar cell inputs, solar module inputs, and packing inputs for each CONNUM that did not have the highest per-unit consumption of the input were, on average, [                                        ] respectively, of the highest CONNUM-specific per-unit consumption quantity reported for each input. We derived these percentages entirely from information on the record. We then used formulas that did not rely on a multiplicative inverse to determine the number by which we needed to multiply the reported CONNUM-specific per-unit consumption quantities of the inputs to increase them, on average, to the highest CONNUM-specific per-unit consumption quantity of the input, as AFA.

In *Jinko II,* the CIT found that Commerce's use of the digit "1" in the multiplicative inverse is contrary to law because "1" is not record information. Moreover, the CIT noted that:

> {i}t is possible that Commerce's use of the multiplicative inverse may be its attempt at adding a "built-in increase intended as a deterrent to non-compliance" and that if that is the case, "Commerce must explain that it is doing so and further explain why that built in increase should be considered a derivation from record evidence, and therefore in accordance with the statute.[24]

In the *Jinko II* Draft Redetermination we explained that the multiplicative inverse is just one step in the process of calculating a built-in increase. We explained that the multiplicative

---

[24] *Id*. at 30.

inverse is more appropriately considered as a mathematical tool that we used to answer the following question:  by what number do we need to multiply CONNUM-specific per-unit consumption quantities for inputs that are an average, [

            ] of the highest reported CONNUM-specific per-unit consumption quantities of the inputs to adjust them, on average, to the highest reported CONNUM-specific per-unit consumption quantities for those inputs?  Given the CIT's concern over use of the digit "1," in the *Jinko II* Draft Redetermination we used formulas in which we did not introduce the number "1" to derive the same three AFA multipliers (one for solar cell inputs, one for module inputs, and one for packing inputs) that we previously calculated using the multiplicative inverse.

In the *Jinko II* Draft Redetermination we explained that with this approach we have not introduced "1" or used a multiplicative inverse but we started with only one figure, [      ], the simple average of the input ratios for solar cell inputs, which we derived directly and solely from the record using the reported consumption quantities.  We explained that the CIT held that up to the point when Commerce derived the "three separate ratios by placing all the inputs into three categories and calculating the simple average of the ratios for all the inputs in each category," Commerce was "using information on the record in accordance with the statute."[25]  In the *Jinko II* Draft Redetermination we explained that because we are now only using the simple average of the ratios for all the inputs in each category to derive the multiplier that we used in our revised AFA calculation, our revised AFA calculation is based on only figures derived from record information consistent with *Jinko II*.  In the *Jinko II* Draft Redetermination we then addressed the second aspect of the AFA methodology that must be addressed in this redetermination, namely why the AFA methodology is reasonable.

---

[25] *See Jinko II* at 26.

**Calculation Methodology**

On remand, Commerce is calculating its adverse inference without applying any multiplicative inverse according to the following approach:  As the only facts on the record for consumption quantities, we used the variation of consumption quantities contained within the reported consumption data to estimate the difference between Risen's reported consumption quantities and the unreported consumption quantities.

To do this, we first isolated the highest reported consumption quantity for a given input in any CONNUM.  Then, we averaged the reported consumption quantities for the remaining CONNUMs. From there, we calculated the percentage difference between the highest reported consumption quantity and the average of the other reported consumption quantities for each input.

Though these numbers are illustrative, the following table provides a brief overview of the first step of this calculation.

|  | Reported Consumption of Input #1 |
|---|---|
| CONNUM 1 | 7 |
| CONNUM 2 | 8 |
| CONNUM 3 | 9 |
| CONNUM 4 | 10 |
| Highest CONNUM | 10 |
| Average of other CONNUMs | (7+8+9)/3 = 8 |
| Difference Between Highest and Average | 10-8 = 2 |
| Difference as Percentage of Average | 2/8 = 25% |

In this example, we rely on the variation in reported consumption quantities to find that

the difference between the highest reported consumption and its average of its other reported consumption quantities is 25 percent of the value of its highest reported consumption quantities. As an adverse inference, we find it appropriate to add this quantity to the highest reported consumption quantity for Input #1 when Input #1 was not reported. Commerce then replicated this calculation for each of the hundreds of inputs.

However, because there are hundreds of inputs, Commerce next grouped each of the inputs into three categories: solar modules, solar cells, and material inputs for packing solar modules. Then, within each of these three categories, Commerce averaged the percentage adjustments calculated for each input in step one. Thus, if solar modules contained three inputs, and Input #1 required a 25% adjustment (as shown above); Input #2 required a 17% adjustment; and Input #3 required a 15% adjustment, then Commerce would average these percentages, which is 19%.

From there, Commerce would, as AFA, add 19% to the reported cost of each input for each CONNUM from solar modules as its AFA plug for unreported inputs. So, for example, our AFA plug for the hypothetical Input #1 above would be as follows:

|  | Reported Consumption of Input 1 | AFA Plug Consumption of Input 1 |
|---|---|---|
| CONNUM 1 | 7 | 7*(1+.19) = 8.33 |
| CONNUM 2 | 8 | 8*(1+.19) = 9.52 |
| CONNUM 3 | 9 | 9*(1+.19) = 10.71 |
| CONNUM 4 | 10 | 10*(1+.19) = 11.9 |

Because Risen reported its actual consumption quantities for some of its production, these AFA plug rates were only applied to account for the share of the total solar cells and modules produced by Risen that were supplied by the uncooperative suppliers.

**Analysis**

In *Jinko II,* the CIT stated that Commerce must explain "why: (1) missing information is indicative of rates higher than those calculated using the highest consumption quantity that was reported for a particular input for any CONNUM on the record, {and} (2) the rate it chose is reasonable."[26] In the *Jinko II* Draft Redetermination we explained that section 776(d)(3)(A) of the Act provides that in applying AFA and selecting from among the facts otherwise available, Commerce is not required to estimate what the dumping margin would have been if the uncooperative interested party had cooperated. Thus, in selecting an AFA methodology we explained that we have not attempted to replicate the dumping margin that we would have calculated if we had the missing FOP consumption quantities. Rather, we are using the facts otherwise available to fill in the missing information and add a "built-in increase intended as a deterrent to non-compliance." Hence, under both our AFA methodology and when basing AFA on the highest CONNUM-specific per-unit input consumption quantities, we start at the same place by using Risen's consumption quantities as facts available. In the *Jinko II* Draft Redetermination we explained that this is a reasonable starting point because this is the best information available on the record as to the types and quantities of inputs required to manufacture the models of solar cells and modules sold by Risen during the POR.

In the *Jinko II* Draft Redetermination we explained that the second step in applying AFA is to add a "built-in increase intended as a deterrent to non-compliance."[27] We explained that in

---

[26] *Id*. at 32.
[27] *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

this step, as in the first step, we have not employed an adverse inference based on a belief as to what the dumping margin would have been if we had the missing FOP consumption quantities. Rather, we are selecting an adverse inference to deter non-compliance and ensure that uncooperative parties do not obtain a more favorable result by not cooperating than if they had cooperated.  In the *Jinko II* Draft Redetermination we explained that Risen's actions during this proceeding justify using an AFA methodology that differs from the one that Commerce applied to Risen in past segments of the proceeding.

In the *Jinko II* Draft Redetermination we explained that in the three previous administrative reviews of the AD order, Risen failed to provide FOP data from its unaffiliated suppliers.  In the *2016-2017 Final Results*, Commerce used Risen's highest consumption quantities as AFA and explained that "{b}y resorting to partial AFA, … Risen {is} incentivized to source from and conduct business with cooperative suppliers, and the uncooperative suppliers are affected by their own non-cooperation."[28]  Moreover Commerce placed interested parties on notice as to the approach that it would take in such situations in the future by stating that:

> Commerce's experience in this proceeding, as evidenced by this administrative review, has been that a mandatory respondent may not report all of its FOPs as a result of its unaffiliated suppliers' failure to provide the requested information. … We have previously concluded, as we do here, that the application of partial AFA serves to incentivize the respondent to conduct business with cooperative suppliers, and that the respondent has the potential to induce cooperation by its suppliers in that it has the ability to not purchase solar cells and modules from suppliers that do not cooperate with Commerce's request for information. We would anticipate that respondents for whom we used partial AFA to calculate their weighted-average dumping margin would take the necessary steps to avoid exposure to enhanced antidumping duties as a result of their suppliers' failure to cooperate, such as declining to purchase from the supplier in the future, or making their purchases contingent on guarantees of cooperation in any potential administrative review.  As such, in future administrative reviews, we intend to examine whether respondents who have been individually examined (if a review of such companies is requested),

---

[28] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 36886 (July 30, 2019) (*2016-2017 Final Results*), and accompanying IDM at Comment 1.

including Chint Solar and Risen, continue to do business with suppliers who have previously failed to cooperate in providing FOP information. Evaluating the circumstances of the business relationship between the respondent and its supplier in such circumstances is appropriate because it is the respondent who is subject to the review, and thus it is the responsibility of the respondent to provide requested information that is necessary for Commerce's antidumping duty analysis. Depending on the circumstances, continued purchases of merchandise from unaffiliated suppliers who have previously failed to cooperate, and who continue to be uncooperative in response to Commerce's information requests, may indicate that the respondent has failed to take the appropriate steps to ensure that it is able to cooperate with Commerce's requests for information in the event that it is examined in an administrative review.[29]

Yet, in the next three administrative reviews of the AD order, including the review underlying this litigation, Risen failed to use only cooperative suppliers. In the 2016-2017 and 2017-2018 administrative reviews of the AD order, Commerce used Risen's highest reported consumption quantities as AFA to induce cooperation.[30] Commerce published the *2016-2017 Final Results*, in which it explained the actions that it would take with respect to uncooperative suppliers in future reviews, almost five months before the beginning of the 2019-2020 POR.[31] In the *Jinko II* Draft Redetermination we explained that despite this background, in the 2019-2020 review, Risen continued to use uncooperative suppliers. Based on this history, we found in the *Jinko II* Draft Redetermination that it was reasonable to use an AFA methodology other than the one used in the past (*i.e.*, the highest reported consumption quantities) that will add a "built-in increase" that will deter non-cooperation. We explained in the *Jinko II* Draft Redetermination that we consider the AFA methodology that we used to be reasonable because we based it entirely on Risen's consumption quantities and we used the variation in Risen's CONNUM-

---

[29] *Id.*

[30] *Id.*; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017– 2018*, 85 FR 62275 (October 2, 2020) (*2017-2018 Final Results*), and accompanying IDM at Comment 1.

[31] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 8166 (February 4, 2021).

specific per-unit consumption quantities to calculate the amount by which the uncooperative

supplier's consumption quantities could exceed those of Risen.  We explained our AFA plug is

reasonable because it adds a "built-in increase" that will deter non-cooperation.  We further

explained it is reasonable because there exists a real possibility that the uncooperative suppliers

could obtain a more favorable result by not cooperating because the uncooperative suppliers'

consumption rates could be higher than Risen's consumption rates.  In *SKF USA*, the CIT stated

that:

> {i}n the case of uncooperative respondents, it is within Commerce's discretion to
> choose the secondary bases on which it will rely to support its use of adverse
> inferences; {p}articularly in the case of an uncooperative respondent, Commerce is
> in the best position, based on its expert knowledge of the market and the individual
> respondent, *to select adverse facts that will create the proper deterrent to
> noncooperation* with its investigations and assure a reasonable {dumping} margin"
> (emphasis added).[32]

In the *Jinko II* Draft Redetermination we explained that we have exercised Commerce's

discretion to select an AFA methodology wherein we start with reasonable consumption rates

and increase them based on record information to address the pattern of non-compliance that has

not changed despite the use of AFA in prior segments of the proceeding.

In the *Jinko II* Draft Redetermination we explained that the AFA methodology that we

selected is reasonable because it addresses situations where there is no highest consumption

quantity for an input.  For example, Risen used [

] Thus, we explained that we do not have multiple CONNUM-specific per-unit

consumption quantities for [                                    ] from which to select the highest

consumption quantity as AFA for this input.  Therefore, we found in the *Jinko II* Draft

Redetermination that it is not clear how we would increase the reported consumption of [

---

[32] *See SKF USA Inc., SKF France S.A., and Sarma v. United States*, 391 F. Supp. 2d 1327, 1335 (*SKF USA*).

] to address non-compliance if we based AFA on the highest consumption quantity for an input. However, under the AFA methodology that we applied, we calculated a percentage increase, based on variation's in Risen's own reported data, as described above, that we used to apply an adverse inference to all cell inputs, including [                    ].

Lastly, the CIT directed Commerce to: (1) explain why it rejected a four percent rate increase in the reported per-unit consumption quantities as not adverse and applied a 15 percent rate increase in those quantities; and (2) explain why imposing a 15 percent rate increase in the reported per-unit consumption quantities is reasonable.[33] In the *Jinko II* Draft Redetermination we explained that Commerce based the four percent and 15 percent increases that it calculated in the *First Redetermination* on consumption quantities that Commerce created to illustrate how the use of averaging groups in its AFA methodology resulted in a greater percentage increase in quantities than if it had used input-specific ratios. Risen did not report any of the quantities in the Table on page 23 of the *First Redetermination* that Commerce used to calculate the four percent and 15 percent increases, and Commerce did not use any of these quantities, nor did it use a four or 15 percent increase in those quantities, in calculating Risen's dumping margin. In the *Jinko II* Draft Redetermination we explained that because all the figures at issue are merely examples and are not data reported in the underlying review, Commerce neither rejected a four percent increase, nor imposed a 15 percent increase, when determining the adverse inference to apply to Risen.

---

[33] *See Jinko II* at 31-32.

### C. Recalculation of the Separate Rate for JA Solar and BYD

**Background**

The CIT remanded to Commerce for reconsideration consistent with the CIT's opinion, the separate rate that Commerce assigned to JA Solar and BYD in the underlying administrative review.[34]

**Analysis**

Commerce based the separate rate that it assigned to JA Solar and BYD in the underlying administrative review on the dumping margins that it calculated for the mandatory respondents Jinko and Risen. In the *Jinko II* Draft Redetermination we explained that because we recalculated those dumping margins to reflect the new surrogate value that we selected for solar glass, we revised the separate rate assigned to JA Solar and BYD.

However, as noted above, in this final redetermination we did not value solar glass using a new surrogate value and thus we have not revised the dumping margins that we calculated for the mandatory respondents Jinko and Risen. Therefore, we have not changed the separate rate assigned to JA Solar and BYD.

### IV. INTERESTED PARTIES' COMMENTS

**Issue 1:    Valuation of Solar Glass**

*Petitioner's Comments:*

The following is the petitioner's summary of its arguments. For further details, *see* Petitioner's Comments at Comment 1.

> {Commerce} should not use Malaysian import data under HS 7007.19.90 as the surrogate value for the solar glass consumed by respondents but should instead use the Romanian HS data under subheading 7007.19.90 that it used in its final determination. First, values for solar glass reported in square meters are inherently distortive given the physical properties of solar

---

[34] *See Jinko I* at 56.

glass. Second, {Commerce}'s calculation of the conversion factor to determine Jinko and Risen's solar glass in meters squared is distortive. Finally, the Romanian surrogate value data is more specific to the solar glass consumed by respondents than the Malaysian data.[35]

*Jinko's Comments:*

The following is a summary of the comments submitted by Jinko.  For further details, *see* Jinko's Comments.

The Draft Remand complies with the CIT's instruction regarding the valuation of solar glass and Commerce should continue to value solar glass in the same manner in the final results of redetermination.

*JA Solar and BYD's Comments:*

The following is a summary of the comments submitted by JA Solar and BYD.  For further details, *see* JA Solar and BYD's Comments.

We concur with, support, and incorporate by reference the arguments made by Risen and Jinko.

**Commerce's Position:**

<u>Conversion</u>

In *Jinko II*, the CIT stated that on remand Commerce adequately explained why it cannot reasonably convert the Malaysian import values per-square meter to values per kilogram but " … fails to address why it cannot convert the respondents' raw data {for glass consumption} from per piece to square meters using the record evidence."[36]  Specifically, the CIT noted that:

…the record contains the measurements of {respondents'} glass {consumption,} so that their consumption can be converted to square meters, to match the Malaysian data which is reported in square meters … Given Commerce's preference to value all FOPs from the same primary surrogate country, *see* 19 C.F.R. § 351.408(c)(2), which here is Malaysia, and Commerce's failure to address why it could not reasonably convert

---

[35] Additionally, the petitioners argue that in the *Jinko II* Draft Redetermination Commerce made certain ministerial errors with respect to the valuation of the respondents' solar glass consumption.  However, as discussed below, in this final redetermination we are reverting to our valuation calculation from the underlying review as it regards solar glass, and therefore the petitioner's ministerial error allegation is moot. *See* Petitioner's Comments at 7-8.
[36] *See Jinko II* at 14.

Jinko's and Risen's glass consumption data directly from per piece to square meters, Commerce's determination is unsupported by substantial evidence on this record, and is therefore remanded for further explanation consistent with this opinion.[37]

In the *Jinko II* Draft Redetermination, Commerce stated that:

the record contains the necessary information to determine Jinko and Risen's solar glass consumption in square meters, which is the unit of measure used to report import values under Malaysian HS number 7007.19.90. .. Given that we now have glass consumption in square meters for both respondents, we can use import values under Malaysian HS number 7007.19.90, which are reported in Malaysian Ringgits (RM) per square meter, to value the respondents' consumption of solar glass.[38]

Hence, in the *Jinko II* Draft Redetermination we used import values under Malaysian HS number

7007.19.90 to value Jinko and Risen's solar glass consumption.

However, after considering the petitioner's comments, we agree with the petitioner that

using Malaysian import values expressed in RM per square meter to value glass is distortive on a

CONNUM-specific basis.[39]  Commerce uses surrogate values to calculate the value or cost of

each FOP, which it adds together to calculate normal value.  Commerce constructs normal value

on a model or control number (CONNUM)-specific basis.  If a respondent used glass with the

same surface area (same number of square meters) but very different thicknesses in two solar

modules with different CONNUMs, it is reasonable to conclude that the thicker glass would cost

more and thus, all else being equal, the normal value for the CONNUM with the thicker glass

would be greater than the normal value of the CONNUM with the thinner glass.  During the

POR, Jinko and Risen used glass with varying thicknesses in their solar modules.[40]  Thus,

---

[37] *Id*. at 15.
[38] *See Jinko II* Draft Redetermination at 3-4.
[39] *See* Petitioner's Comments at 2-7.
[40] *See* Jinko's Letter, "Jinko Solar's Redacted Case Brief," dated May 27, 2022, at Attachment 4; *see also* Risen's Letter, "Case Brief," dated January 28, 2022, at Attachment 1.

valuing the glass using Malaysian import values in square meters ignores the varying thicknesses of the glass and results in the same glass value in the normal value for both CONNUMs, which is inaccurate and distortive.  Since we compare normal values to U.S. prices to calculate dumping margins, this approach would result in distorted dumping margins contrary to Commerce's statutory mandate to calculate dumping margins as accurately as possible.[41]

Moreover, there is nothing on the record demonstrating that the overall average value of glass per square meter calculated from the Malaysian import data is accurate for Risen or Jinko since there is no information on the record showing that the glass imported into Malaysia during the POR had the same thicknesses (and the same quantities of glass for each thickness) as the glass used by Risen and Jinko.  Therefore, even on an overall average basis, and not a CONNUM-specific basis, we have no reason to conclude that including a glass value in normal value based on Malaysia import data is accurate.

Additionally, we agree with the petitioner that the factor that Commerce used in the *Jinko II* Draft Redetermination to convert the respondents' glass consumption in square meters introduces distortions to CONNUM-specific glass values.[42]  In the *Jinko II* Draft Redetermination, we converted the kilogram per watt glass consumption figures reported by the respondents to square meters of glass per watt by multiplying the kilogram per watt figures reported for each CONNUM by the ratio of each respondent's total POR glass consumption in square meters to its total POR glass consumption in kilograms.  Specifically, we used conversion ratios of [      ] $M^2$/kg for Risen and [      ] kg/$M^2$ for Jinko.  However, our conversion ratios are average ratios that are not specific to any CONNUM.  The CONNUM-specific conversion ratios

---

[41] *See Timken U.S. Corporation and Timken Nadellager, GmbH, v. United States*, 318 F.Supp.2d 1271, 1279 (CIT 2004) (stating "{i}n the interest of implementing the overarching principle of the antidumping statute, that is, to determine dumping margins as accurately as possible …").
[42] *See* Petitioner's Comments at 4-5.

will differ from the average conversion ratio for each respondent depending on the pieces of glass used to produce solar modules that are assigned a particular CONNUM.

For example, Jinko reported using three pieces of glass each with the same square meters ([                              ]) but with different thicknesses ([                    ]) and significantly different weights ([                              ]).[43]  Risen reported using pieces of glass that are [                        ] with three different thicknesses ([                      ] and significantly different weights ([                    ]).[44]  Using these figures, the conversion ratios for Jinko's three pieces of glass are [                              ], respectively compared to the average conversion ratio of [      ] kg/M$^2$ used in the *Jinko II* Draft Redetermination.[45]  The conversion ratios for Risen's three pieces of glass are [                              ], respectively compared to the average conversion ratio of [      ] M$^2$/kg used in the *Jinko II* Draft Redetermination.[46]  These conversion ratios differ from the average conversion ratio used by Commerce in the *Jinko II* Draft Redetermination by approximately [            ] percent for Jinko and [          ] percent for Risen.  Thus, we find the conversion ratios that we used in the *Jinko II* Draft Redetermination do not result in accurate CONNUM-specific glass consumption figures in square meters.

In *Jinko II*, the CIT noted Jinko and Risen's claim that glass dimensions are on the record to convert their glass consumption expressed in number of pieces of glass to square meters and held that Commerce failed to explain why it could not use these data to convert the respondents'

---

[43] *See* Jinko's Letter, "Jinko Solar's Redacted Case Brief," dated May 27, 2022, at Attachment 4.
[44] *See* Risen's Letter, "Case Brief," dated January 28, 2022, at Attachment 1.
[45] *See* memorandum "Draft Remand Redetermination Analysis Memorandum for Jinko Solar Import and Export Co., Ltd.," dated August 19, 2025, at 2.
[46] *See* memorandum "Draft Remand Redetermination Analysis Memorandum for Risen Energy Co., Ltd.," dated August 19, 2025, at 2.

glass consumption into square meters.[47]  When Commerce prepared the *Jinko II* Draft Redetermination, it interpreted the CIT's decision as requiring Commerce to convert the respondents' glass consumption into square meters, if any data to do so were on the record, and use Malaysian import prices to value the glass.  However, upon further reflection, and considering the petitioner's comments, we note that the CIT also held that Commerce "failed to address why it could not *reasonably* convert Jinko's and Risen's glass consumption data directly from per piece to square meters ..."  (emphasis added).  Given the complexities of determining CONNUM-specific conversion rates, in the *Jinko II* Draft Redetermination, we determined that it was reasonable to use an average conversion rate.  However, we have now concluded that this approach would not be reasonable due to the distortions noted above both in using average conversion ratios and in using a surrogate value expressed in square meters to value glass whose value also depends on its thickness.  Based on the distortions explained above that are caused by converting the respondents' glass consumption into square meters using an overall average conversion ratio (the only ratio that we determined was practical to calculate from record information) and the distortions caused by valuing glass with a surrogate value expressed in square meters, we have concluded in this final redetermination that it would not be appropriate to use Malaysian import values as a surrogate for the value of glass.  Thus, we find it appropriate to continue to value the respondents' glass using the value of Romanian imports during the POR under Romanian HS number 7007.19.80, as the best available information on the record as a surrogate for the value of glass.

---

[47] *See Jinko II* at 15.

*Exclusion*

While the CIT stated in *Jinko II* that "Romanian HTS 7007.19.80 would appear to be specific and reliable on this record…,"[48] it found that Commerce failed to address record evidence that detracts from its determination to use the price of imports classified under Romanian HTS 7007.19.80 to value the glass used by the respondents.[49]  Specifically, the CIT stated that Commerce supported its use of imports prices under Romanian HTS 7007.19.80 to value glass by noting that all the glass excluded from coverage under Romanian HTS 7007.19.80 has light limiting characteristics (unlike the glass used by the respondents), yet it did not explain how one type of excluded glass, namely "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" has light limiting characteristics.[50]  The CIT stated that "Commerce cannot ignore that which detracts from its determination."[51]

Commerce's explanation in the *Jinko I Final Redetermination* of the types of glass excluded from coverage under Romanian HTS 7007.19.80, was in response to Jinko's claim that the glass that it uses in its solar modules is excluded from Romanian HTS 7007.19.80 and thus Commerce should not use this import category to value Jinko's glass.[52]  In its explanation in *Jinko I Final Redetermination*, Commerce focused on the exclusions for glass that is enameled, colored throughout the mass, opacified, flashed or that has an absorbent or reflecting layer.[53]

---

[48] *See Jinko II* at 15.

[49] *Id*. at 11-13.

[50] *Id*. at 12.

[51] *Id*. at 12-13.

[52] *See Jinko I* Final *Redetermination* at 29.

[53] *Id*. at 9 ("Glass with an absorbent layer was one of a number of types of glass excluded from coverage under Romanian HTS category 7007.19.80 all of which have characteristics which limit light transmission compared to clear glass (*e.g.*, glass that is enameled (covered with an opaque vitreous composition applied by fusion to the surface of the glass), glass colored throughout the mass, opacified glass, flashed glass (flash means to coat (glass) with a thin layer (as of metal or a differently colored glass)) and glass with a reflecting layer)" and at 34 ("{a}s

After providing a detailed explanation of why the glass used by Jinko is not covered by the exclusion for glass with an absorbent layer,[54] Commerce stated that "{a}ll of the other glass that is excluded from Romanian HTS category 7007.19.80 has treatments that limit the amount of light that is transmitted through the glass …"[55]  The phrase "all of the other glass that is excluded from Romanian HTS category 7007.19.80" refers to the other exclusions in the group of exclusions that Commerce was discussing the *Jinko I Final Redetermination*, namely glass that is enameled, colored throughout the mass, opacified, flashed or that has a reflecting layer. Commerce was not claiming that glass covered by the exclusion for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" has light limiting characteristics.  The exclusion under Romanian HTS category 7007.19.80 for glass of a particular size and shape noted by the CIT in *Jinko II* is based on the suitability of the glass for certain applications (*e.g.*, use in certain craft), rather than the light limiting characteristics of the glass.

Nevertheless, it is clear from the record that Jinko's glass is also not covered by the exclusion under Romanian HTS category 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles."  Malaysian HTS category 7007.19.90, which Jinko advocates using to value its solar glass, also excludes glass "of a size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels."[56]   With respect to Malaysian HTS category 7007.19.90, Jinko contends that:

> Since the scope of harmonized 6-digit HTS 7007.19 is "Safety glass, consisting of toughened (tempered) or laminated glass. Toughened (tempered) safety glass: Other than Of size and shape suitable for

---

noted above, Romanian HTS category 7007.19.80 excludes glass that is enameled, colored throughout the mass, opacified, flashed or that has an absorbent or reflecting layer.").

[54] *Id*. at 8-11 and 34-35.

[55] *Id*. at 36.

[56] *See* Jinko's Letter, "Final Surrogate Value Submission by Jinko," dated August 3, 2021, at Exhibit 1.

> incorporation in vehicles, aircraft, spacecraft or vessels", the residual subheading 7007.19.9000 under HTS 7007.19 covers tempered glass excluding two categories (a) those used in vehicles *etc.* and (b) those suitable for machinery of heading 84.29 or 84.30. Jinko's coated tempered glass input is neither used in vehicles nor used for specified machineries. As such, Jinko's tempered absorbent layer coated glass used in solar panels is properly covered in HTS 7007.19.9000.[57]

Thus, Jinko acknowledges that the glass that it uses in its solar modules is not glass of a "size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels."  Consequently, the exclusion under Romanian HTS category 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" does not apply to the glass used by Jinko in its solar modules.  Hence, the presence of an exclusion under Romanian HTS category 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" does not detract from Commerce's conclusion that none of the exclusions under Romanian HTS category 7007.19.80 cover Jinko's solar glass but rather supports this conclusion.

For the above reasons, we have continued to use the prices of imports under Romanian HTS category 7007.19.80 to value the glass used by the respondents during the POR to produce solar modules, as it remains the best available information on the record as a surrogate for the value of glass.

**Issue 2:**          **AFA Methodology Commerce Applied to Risen**

*Petitioner's Comments:*

The following is the petitioner's summary of its arguments.  For further details, *see* Petitioner's Comments at Comment 2.

> {Commerce} has broad discretion to choose what record evidence to rely on when selecting information to use to apply an adverse inference against non-cooperating parties. Here, {Commerce} relied on record evidence in

---

[57] *See* Jinko's Letter, "Jinko Solar's Redacted Case Brief," dated May 27, 2022, at 25-26.

applying an adverse inference for Risen's failure to report the factors of production ("FOPs") of its unaffiliated solar cell and module suppliers. {Commerce} also provided a reasoned explanation for departing from its past methodology of applying adverse inferences for this failure to report FOPs, explaining that its previous methodology had not induced cooperation and, thus, {Commerce} needed to add a "built-in increase" to deter non-compliance. Such an approach is consistent with the statute and the purpose of the AFA provision.

*Risen's Comments:*

The following is Risen's summary of its arguments. For further details, *see* Risen's

Comments.

{Commerce} has failed to justify its new methodology for calculating partial AFA for Risen's unreported FOPs. As found by the Court, {Commerce}'s methodology manipulates the facts, which is not permitted under the plain language of the statute. {Commerce} claims they are not introducing a multiplicative inverse anymore, yet has not changed their methodology so it is unclear how that is the case. {Commerce} also has not properly explained why its prior methodology is not sufficiently adverse. {Commerce} ignores the case law on weighing the interests of deterrence and accuracy instead of punishment. {Commerce}'s new methodology in this review is less accurate than its normal methodology, and creates an AFA rate divorced from the reality of the usage of the unreported inputs.

*JA Solar and BYD's Comments:*

The following is a summary of the comments submitted by JA Solar and BYD. For

further details, *see* JA Solar and BYD's Comments.

We concur with, support, and incorporate by reference the arguments made by Risen and Jinko.

**Commerce's Position:**

In *Jinko II*, the CIT stated that Commerce appropriately used record information in its

AFA methodology up through its calculation of average input ratios for three categories of inputs

(*i.e.*, solar cells, solar modules, and packing inputs). However, the CIT stated that when

Commerce used a multiplicative inverse to calculate partial AFA adjustments for these three

categories of inputs, it inappropriately stopped relying on information derived from the record, as provided under section 776(b)(2) of the Act, and started creating facts without the requisite link to record evidence.[58]  Specifically, the CIT stated that Commerce used the number "1" to create the multiplicative inverse and the number "1" is not record information specific to Risen.[59]

Risen contends that in this remand redetermination Commerce again is inappropriately using "1" followed by a number of digits as its multiplier to increase the reported FOP consumption quantities, as AFA.[60]  Thus, Risen claims that it is unclear how Commerce has addressed the CIT's concern.[61]  However, Risen fails to recognize that in this remand redetermination, Commerce derived its multiplier (*e.g.*, the AFA adjustment) entirely from Risen's reported FOP consumption quantities.

As explained above, our AFA adjustment relies on a series of steps.  In this final redetermination, to facilitate the Court's understanding, we restate those steps here using actual data for one of Risen's FOPs.[62]

1. First, for each input reported for a monocrystalline solar module CONNUM, we identified the highest consumption quantity.  Thus, using the M_EVA (ethylene vinyl acetate sheet) FOP as an example, step one is as follows:

| CONNUM (for Monocrystalline Solar Module) | M_EVA |
|---|---|
| [          ] | [          ] |
| [          ] | [          ] |
| [          ] | [          ] |
| [          ] | [          ] |
| Highest Consumption Quantity (CONNUM [                    ]) | [          ] |

---

[58] *See Jinko II* at 27.
[59] *Id*. at 28.
[60] *See* Risen's Comments at 3.
[61] *Id*.
[62] See Memorandum, "Preliminary Results Analysis Memorandum – Risen," dated December 16, 2021 (Risen's Preliminary Analysis Memorandum), at Attachment III.

2. We divided the input consumption quantity for each CONNNUM by the highest consumption quantity reported for the input for each CONNUM (*e.g.*, [                    ]):

| CONNUM (for Monocrystalline Solar Module) | M_EVA |
|---|---|
| [                    ] | [          ] |
| [                    ] | [          ] |
| [                    ] | [ ] |
| [                    ] | [          ] |

3. We calculated the average difference between the CONNUM with the highest consumption quantity and the other CONNUMs:

[                                                                  ]

4. We repeated steps 1 through 3 above for each FOP in the dataset.

5. We assigned each FOP into one of three groups:  a module group, a cell group, or packing group.

6. We calculated a simple average of the values derived in step 3 for each group listed in step 5.  In our calculations, the simple average for each group is as follows:

Module:        [      ]
Cell:            [      ]
Packing:       [      ]

7. We then took the reciprocal of the values in step 6 to arrive at the following values:

Module:        [      ]
Cell:            [      ]
Packing:       [      ]

The values in step 7 serve as the basis of the AFA adjustment that we applied to the cells and

modules that Risen acquired from its unaffiliated suppliers.  We note that our derivation of the

AFA adjustments in step 7 does not use a methodology that relies on the multiplicative inverse.[63]

---

[63] Where the per-unit consumption quantity of the inputs for each CONNUM that did not have the highest per-unit consumption of the input is on average [                ] of H which is the highest CONNUN-specific per-unit consumption quantity of the input: [                        ].  Solving this equation for X, we found that X = [          ].  Thus, we explained that the equation becomes [                                            ] and the multiplier is [                    ] which is the same multiplier, except for a slight difference due to rounding, that we derived in our original methodology using the multiplicative inverse of [                                        ].

So, as the steps above indicate, we have relied on ratios that are derived from data on the record, specifically Risen's reported consumption quantities. As opposed to an alternative methodology that, for example, replaces Risen's reported consumption quantities with consumption quantities that were increased for each FOP by the absolute difference between the highest and lowest consumption quantity reported for that FOP.

Thus, we have linked the multiplier (*e.g.*, the AFA adjustment) to record information specific to Risen in accordance with the CIT's decision.[64]  Therefore, we have used record information specific to Risen to create the multipliers and have not introduced any new information that is not derived directly from record information to calculate the multiplier, consistent with the CIT's opinion.

Additionally, Risen contends that:  (1) it is illogical to use averages of FOP consumption quantities to calculate the AFA adjustment rather than using the highest CONNUM-specific consumption quantity of a FOP as AFA for that FOP; (2) Commerce failed to explain why using the highest CONNUM-specific consumption quantity of a FOP as AFA for the FOP would not result in an appropriate adverse inference; (3) Commerce's AFA methodology does not promote accuracy and results in punishment, rather than an inducement to cooperate with Commerce.[65]  We have addressed each of these arguments below.

There are numerous reasons why Commerce used a broader average AFA adjustment rather than using FOP-specific AFA adjustments.  First, it is not possible to use an FOP-specific AFA adjustment for every FOP.  Risen sold solar modules with [     ] different CONNUMs

---

[64] Specifically, we used the following formulas to create the multipliers for solar cell inputs, module inputs, and packing inputs, respectively:  (1) [                              ];  (2) [                              ];  and (3) [                    ].  We derived each number in these formulas entirely from the FOP consumption quantities reported by Risen (each number is the simple average of the FOP-specific input ratios that we calculated using the reported CONNUM-specific FOP consumption quantities).  *See* Risen's Preliminary Analysis Memorandum, at Attachment III.
[65] *See* Risen's Comments at 4-6.

during the POR.[66]  Risen reported consuming monocrystalline wafers for [                    ] CONNUMs and multi-crystalline wafers for [     ] of the [      ] CONNUMs.[67]  Thus, [                                                                ] from which we could select the highest consumption quantity to apply as AFA for this FOP.  In addition, we cannot use the highest of the consumption quantities reported for [

] as AFA because each of these quantities is [

].  Hence, we cannot apply a FOP-specific AFA adjustment to [                                          ].  This is a significant limitation to a FOP-specific AFA adjustment given that Risen's solar modules [

] of the solar modules that it produced during the POR.[68]

    Second, using a broader average AFA adjustment allowed Commerce to build in an increase to the adjustment, as contemplated in *De Cecco*,[69] given that the consumption quantities that Risen reported for a number of FOP [

].  For example, Risen reported the following per-watt CONNUM-specific consumption quantities for the inputs listed below for its [                            ]:[70]

    1. Silver Paste - [                                  ].
    2. Monocrystalline Wafers - [                                  ].
    3. Ethylene Vinyl Acetate (EVA) - [                                  ].

---

[66] *See* Risen's Letter, "Fifth Supplemental Questionnaire Response" dated October 4, 2021, (SQR5) at Exhibit  SQ5-1.
[67] *Id*. at Exhibit SQ5-2.
[68] *Id*.
[69]*See F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)(*De Cecco*)("we are convinced that it is within Commerce's discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative" but that Congress "intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance."
[70] *See* SQR5 at Exhibit SQ5-2.

4. Tempered Glass - [                                        ].
5. Aluminum Extrusions - [                                    ].

With rounding, the per-watt CONNUM-specific consumption quantities listed above for a

particular input [

                                                                    ].

Thus, replacing the CONNUM-specific consumption quantities for each of these inputs with the

highest CONNUM-specific consumption quantity for the input (the FOP-specific AFA

adjustment advocated by Risen) results in [

                                    ], depending on the input.  Consequently,

the approach suggested by Risen is not adverse [

    ] for these very important inputs.[71]  Moreover, for some of these inputs, [

                                                        ].  For example,

replacing the second and third highest CONNUM-specific consumption quantities with the

highest CONNUM-specific consumption quantity results in percentage increases of

approximately [              ] percent for silver paste, [                ] percent for

monocrystalline wafers, and [            ] percent for EVA.  When viewed in terms of the purpose

of applying AFA, which is to select facts available with an adverse inference, the record

demonstrates that the broader average AFA adjustment is logical.

---

[71] *See, e.g., Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 FR 57419 (August 23, 2023) and accompanying IDM at Comment 21 where Commerce identifies solar glass as well as silver paste, wafers, EVA, and aluminum frames as "major solar cell/module inputs."

Risen also argues that Commerce failed to explain why using the highest CONNUM-specific consumption quantity for each FOP as AFA is not an appropriate adverse inference.[72] While using the highest CONNUM-specific consumption quantity for each FOP as AFA would increase the CONNUM-specific consumption quantities reported for the FOPs, [

], as illustrated above.  We do not find this appropriate given Risen's history in this proceeding.

Risen failed to use cooperative solar cell and module suppliers in four consecutive administrative reviews, ending with the 2019-2020 administrative review of the order which is the review under litigation.[73]  In two of these four administrative reviews Commerce used Risen's highest reported consumption quantities as AFA to induce cooperation.[74]  Despite Commerce's application of this AFA methodology, in the 2019-2020 review, Risen continued to use uncooperative suppliers.[75]  It would not be in keeping with the purpose of the AFA provision, which is to induce respondents to provide Commerce with the information that it requires to calculate an accurate dumping margin, to continue to use an AFA methodology (*i.e.*, using the highest reported consumption quantities as AFA) that failed to induce cooperation.

Risen states that it found Commerce's use of the highest reported consumption quantities as AFA in prior administrative reviews to be adverse such that it needed to challenge

---

[72] *See* Risen's Comments at 4.
[73] *See 2016-2017 Final Results* and accompanying IDM at Comment 1, *2017-2018 Final Results* and accompanying IDM at Comment 1, and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018– 2019*, 86 FR 58871 (October 25, 2021) and accompanying IDM at Comment 1.
[74] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 36886 (July 30, 2019), and accompanying IDM at Comment 1; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017– 2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM at Comment 1.
[75] *See AR8 Final Results* and accompanying IDM at Comment 1.

Commerce's application of AFA to Risen in litigation.[76]  Risen's belief that a particular AFA methodology was "sufficiently" adverse to effectuate the statutory purpose of AFA is belied by the fact that Risen never changed its behavior in subsequent reviews by using cooperative solar cell and module suppliers.  Thus, the reality is that the prior AFA methodology used by Commerce failed to induce Risen to cooperate.

Risen also notes that Commerce could have taken the action mentioned by the CIT if it found the prior AFA methodology inadequate.[77]  Namely, the CIT stated that:

> If during the review, Commerce believed the rate was not adverse it could have requested additional information from the parties, given the parties an opportunity to comment on the new information, and calculated a rate using that new information. Additionally, Commerce in a remand may reopen the record to ask for additional information.[78]

We do not find it appropriate to reopen the record to obtain additional information for the application of AFA for several reasons.  To apply AFA, we require FOP consumption quantities, increased to induce cooperation, to use in place of the missing FOP consumption quantities.  We already have Risen's FOP consumption quantities that can be used as a starting point for partial AFA.  It is not clear what other information could be obtained to use as partial AFA, other than consumption quantities from other companies or average industry consumption quantities.  However, this information is not a better source of partial AFA, and is not more relevant to Risen, than Risen's own consumption quantities.  Moreover, if we were to reopen the record to obtain an AFA consumption quantity for each FOP, we would require consumption quantities for approximately 156 FOPs.[79]  It is unlikely that we could obtain all the required data for each FOP by reopening the record.

---

[76] *See* Risen's Comments at 4.
[77] *Id*.
[78] *See Jinko II* at footnote 17.
[79] *See* SQR5 at Exhibit  SQ5-1.

Risen contends that Commerce's AFA methodology does not promote accuracy and results in punishment, rather than an inducement to cooperate with Commerce. We disagree. Here, Commerce balanced the goal of calculating accurate dumping margins with the need to induce cooperation by calculating separate average input ratios for solar cells, solar modules, and packing inputs. While the use of FOP-specific AFA adjustments did not induce cooperation, using this grouping approach, as opposed to a broader average AFA adjustment, promotes accuracy. Specifically, this more specific approach promotes accuracy because the variability in the quantities of the different inputs that are used to manufacture solar cells and the corresponding production efficiencies have no apparent connection to module production since the same inputs and production processes are not used to produce these products.[80] Therefore, we grouped our calculations by production/processing stages to avoid distortion in the calculations. Hence, we disagree with Risen's claim that Commerce's AFA methodology is divorced from the concerns of accuracy.

Risen also argues that Commerce is punishing Risen simply by using an AFA methodology that results in a higher AFA adjustment.[81] The record shows otherwise. Given Risen's use of uncooperative suppliers in the previous three administrative reviews, it is clear that using an AFA methodology that results in a higher AFA adjustment was required to induce cooperation and was not an arbitrary action taken by Commerce to punish Risen.

**Issue 3:         Recalculation of the Separate Rate for JA Solar and BYD**

*JA Solar's Comments:*

The following is a summary of JA Solar's arguments. For further details, *see* JA Solar's

---

[80] *See* Risen's Letter, "Section D, Appendix VI, and Appendix XIII Questionnaire Responses" dated April 30, 2021, at Exhibit D-5; *see also* SQR5 at Exhibit SQ5-2.
[81] *See* Risen's Comments at 4.

Comments.

> Commerce should assign both JA Solar and Shanghai JA Solar
> Technology Co. Ltd. a separate rate equal to the dumping margin
> calculated for Jinko in the final results of the redetermination,

*BYD's Comments:*

The following is a summary of BYD's argument.  For further details, *see* BYD's

Comments.

> Commerce should revise BYD's separate rate consistent with the revisions
> to Jinko and Risen's dumping margins in the final results of the
> redetermination.

**Commerce's Position:**  In this final redetermination, we made no changes to the dumping

margins of 20.99 and 12.24%, that Commerce calculated in the *Amended AR8 Final Results*, for

Jinko and Risen, respectively.  Accordingly, we find that the separate rate applicable to JA Solar

and BYD is unchanged from the *Amended AR8 Final Results*.  On this basis, we have continued

to assign JA Solar and BYD a separate rate of 14.79%, which is equal to the weight average of

Jinko's and Risen's final dumping margins calculated in the *Amended AR8 Final Results.*

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with *Jinko II*, we have:  (1) relied on POR imports under Romanian HS

number 7007.19.80 to value the respondents' solar glass; (2) we only used information derived

from record evidence to calculate the partial AFA adjustment for Risen and explained why the

AFA methodology that we applied to Risen is reasonable; and (3) we assigned JA Solar and BYD a separate rate based on the dumping margins that we calculated for Risen and Jinko in the *Amended AR8 Final Results*.

If Commerce's final results of redetermination are sustained by the Court, Commerce intends to publish a *Timken* notice with the amended final determination in the *Federal Register* and issue appropriate customs instructions to CBP, consistent with the discussion above.

9/26/2025

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance