**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

```
_____x
                                        :
JINKO SOLAR IMPORT AND EXPORT CO.,      :
LTD.; JINKO SOLAR CO., LTD.; JINKOSOLAR :
TECHNOLOGY (HAINING) CO., LTD.;         :
YUHUAN JINKO SOLAR CO., LTD.;           :
ZHEJIANG JINKO SOLAR CO., LTD.;         :
JIANGSU JINKO TIANSHENG SOLAR CO.,      :
LTD.; JINKOSOLAR (CHUZHOU) CO., LTD.;   :
JINKOSOLAR (YIWU) CO., LTD.; and        :
JINKOSOLAR (SHANGRAO) CO., LTD.,        :
                                        :     PUBLIC VERSION
              Plaintiffs,               :
                                        :     Consol. Court No. 22-00219
           v.                           :
                                        :
UNITED STATES,                          :
              Defendant,                :
                                        :
              and                       :
                                        :
AMERICAN ALLIANCE FOR SOLAR            :
 MANUFACTURING,                         :
                                        :
              Defendant-Intervenor.     :
_____x
```

**PLAINTIFFS' COMMENTS ON COMMERCE'S
SECOND REMAND REDETERMINATION**

Ned H. Marshak
Dharmendra N. Choudhary*
Jordan C. Kahn*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import*
*and Export Co., Ltd., Jinko Solar Co., Ltd.,*
*Jinkosolar Technology (Haining) Co., Ltd.,*
*Yuhuan Jinko Solar Co., Ltd., Zhejiang*
*Jinko Solar Co., Ltd., Jiangsu Jinko*
*Tiansheng Solar Co., Ltd., Jinkosolar*
*(Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co.,*
*Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: January 5, 2026

## <u>TABLE OF CONTENTS</u>

I.   SOLAR GLASS BACKGROUND ........................................................................ 1

II.  STANDARD OF REVIEW .................................................................................. 4

III. THE SECOND REMAND IMPROPERLY VALUES SOLAR GLASS ............................. 5

   A.  ROMANIAN HTS 7007.19.80 FAILS THE PRODUCT SPECIFICITY CRITERION
      BECAUSE THE EXCLUDED EXEMPLAR – GLASS WITH AN ABSORBENT
      LAYER – COVERS JINKO'S AR-COATED GLASS ...................................................... 7

     1.  Commerce's Interpretation of the Tariff Term "Absorbent" is Contrary to Law and
        Record Evidence Based on the Word's Plain Meaning ........................................................ 9

     2.  The Other Excluded Exemplars Do Not Support Commerce's Interpretation of the
        Term "Glass With an Absorbent Layer" ............................................................................ 14

   B.  USING MALAYSIAN HTS 7007.19.90 SV PER SQM TO VALUE GLASS IS NOT
      DISTORTIVE ON A CONNUM-SPECIFIC BASIS ...................................................... 18

   CONCLUSION .......................................................................................................... 24

## Table of Authorities

**Cases**

*Blue Sky the Color of Imagination, LLC v. United States*, No. 2024-1710, 2025 WL 3481360 (Fed. Cir. Dec. 4, 2025) ............................................................................................. 5

*Compania Valenciana de Aluminio Baux, S.L.U. v. United States*, No. 23-00259, 2025 WL 2731823 (CIT Sept. 25, 2025) ............................................................... 4

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................ 4

*Hebei Metals and Minerals Import and Export Corp. v. United States*, 366 F. Supp. 2d 1264 (CIT 2005) ...................................................................................................... 5

*Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 794 F. Supp. 3d 1334 (CIT 2025) ...................................................................................................... 4

*Jinko Solar Import and Export Co. v. United States*, 701 F.Supp. 3d 1367 (CIT 2024) ............ 2, 3

*Jinko Solar Import and Export Co. v. United States*, 789 F.Supp. 3d 1275 (CIT 2025) ....... *passim*

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ......................................... 4

*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272 (2008) ............................ 4

*Nature's Touch Frozen Foods (W.) Inc. v. United States*, No. 2023-2093, 2025 WL 1354992 (Fed. Cir. May 9, 2025) .......................................................................................... 5

*NMB Sing. Ltd. v. United States,* 557 F.3d 1316 (Fed. Cir. 2009) ................................ 11

*Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292 (CIT 2010) ................... 5

*Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342 (CIT 2024) ................... 4

*Wind Tower Trade Coalition v. United States*, 741 F.3d 89 (Fed. Cir. 2014). ............... 13

**Statutes**

19 U.S.C. § 1516a ...................................................................................................... 4

**Regulations**

19 C.F.R. § 351.408 ................................................................................................... 6

**Federal Register Publications**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 38,379 (June 28, 2022) ........ 1

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017,* Fed. Reg. 36,886 (July 30, 2019) .............. 6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*, 87 Fed. Reg. 48,621 (Aug. 10, 2022) …………………….…………………………2

PUBLIC VERSION

Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd. (collectively, "Jinko") submit comments on the Final Results of Redetermination Pursuant to Court Remand (Sept. 29, 2025), ECF 148-49, 2RCR 14, 2RPR 16 ("Second Remand"), filed by the U.S. Department of Commerce ("Commerce"), in response to this Court's ruling, *Jinko Solar Import and Export Co. v. United States*, 789 F. Supp. 3d 1275 (CIT 2025) ("*Jinko II*"), in the eighth administrative review ("AR8") of the antidumping duty ("ADD") order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from the People's Republic of China ("China").

## I.  SOLAR GLASS BACKGROUND

In AR8, Commerce individually examined the sales of Jinko and Risen Energy Co. Ltd. ("Risen"), over the period of review ("POR"), December 1, 2019, through November 30, 2020, and assigned Jinko a final ADD rate of 20.99 percent. To value Jinko's anti-reflective ("AR") coated glass, Commerce relied on import values under Romanian Harmonized Tariff Schedule ("HTS") 7007.19.80 ("Toughened {Tempered} Safety Glass (Excluding Enamelled, Coloured Throughout The Mass, Opacified, Flashed Or With An Absorbent Or Reflecting Layer, Glass Of Size And Shape Suitable For Incorporation In Motor Vehicles, Aircraft, Spacecraft, Vessels And Other)"). *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 38,379 (June 28, 2022), P.R. 464 ("*AR8 Final Results*"), Issues and Decision Memorandum, P.R. 455 ("IDM"), Comment 3, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the*

*People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*, 87 Fed. Reg. 48,621 (Aug. 10, 2022), P.R. 473.

In selecting Romanian HTS 7007.19.80, Commerce rejected Jinko's arguments that its AR-coated glass is not covered by this HTS subheading and that the Malaysian HTS 7007.19.90 ("Safety glass, consisting of toughened (tempered) or laminated glass. Toughened (tempered) safety glass: Other than Of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels: Other than Suitable for machinery of heading 84.29 or 84.30") provides a more appropriate surrogate value ("SV"). IDM Comment 3. Commerce found that the "record indicates that the 'Absorbent Or Reflecting Layer' identified in the description of Romanian HTS 7007.19.80 is not the same as the anti-reflective coating on Jinko's glass which acts to increase the amount of light passing through the glass." *Id*. Commerce further stated: "we have concerns regarding reliability of SVs derived from Malaysian HTS 7007.19.90 compared to the SVs derived from the Romanian HTS 7007.19.80." *Id*.

Jinko subsequently initiated this appeal and claimed, *inter alia*, that Commerce's decision to value its AR-coated glass using Romanian HTS 7007.19.80 data was unsupported by substantial evidence and was otherwise contrary to law. Summons (July 27, 2022), ECF 1; Complaint (Aug. 6, 2022), ECF 9.

This Court in May 2024 agreed with Jinko that relying on Romanian HTS 7007.19.80 data was not supported by substantial evidence. *Jinko Solar Import and Export Co. v. United States*, 701 F. Supp. 3d 1367, 1381-83 (CIT 2024) ("*Jinko I*"). The Court reasoned that: (1) "Commerce fail{ed} to explain how the data from Malaysia, as the primary surrogate country, is unreliable such that departure from its standard practice of using the data from the primary surrogate country is justified"; (2) "Commerce's rationale that conversion considerations

render the Malaysian data unreliable fails to acknowledge record information that detracts from its conclusion."; (3) "Commerce fails to acknowledge Jinko's proposed conversion methodology based upon the factors contained in the record, such as the dimensional specifications of Jinko's coated glass input grades, that could establish reliable conversions using Malaysian data;"; and (4) "Commerce did not adequately address record evidence which detracts from its determination that the Romanian HTS is specific to valuing Jinko's glass." *Id*. at 1382.

In August 2024, Commerce, on remand, continued to value Jinko's AR-coated glass in the same manner as it did in the underlying AR8 proceeding. *See* Final Results of Redetermination Pursuant to Court Remand (Aug. 29, 2024), ECF 89, C.R.R. 4, P.R.R. 10 ("First Remand").

In its Comments to this Court, Jinko argued that (1) "Commerce' definition of 'absorbent layer' as glass that 'takes in light without releasing it' is unsupported by substantial evidence"; and (2) "Commerce ignored record evidence related to the unit of measurements in which Jinko and Risen reported their glass, which would have allowed Commerce to convert Jinko and Risen's glass consumption to a quantity expressed in square meters." *Jinko II*, 789 F. Supp. 3d at 1280. This Court agreed with Jinko as to the unreliability of the Romanian HTS 7007.19.80 SV data, and the reliability of the Malaysian HTS 7007.19.90 SV data. Consequently, this Court remanded for Commerce to reconsider its First Remand. *Id*. at 1284.

In its August 2025 draft second remand, Commerce "recalculated the value of Jinko and Risen's solar glass consumption using the value of imports during the POR under Malaysian HS number 7007.19.90." Second Remand at 5. This change reduced Jinko's AR8 ADD rate from 20.99 percent to 5.18 percent. Draft Remand Redetermination Analysis Memorandum for Jinko (Aug. 21, 2025) ("Draft Second Remand"), 2RCR 1, 2RPR 1, at 13. However, in finalizing its

Second Remand, Commerce reversed course: "in response to petitioner's comments . . . we have revised our position on this issue in the *Jinko II* Draft Redetermination and in the final redetermination we are using import prices under Romanian HS number 7007.19.80 to value the glass used by the respondents to produce solar modules." Second Remand at 5. As discussed below, Commerce's Second Remand – like its initial *Final Results* and First Remand – is unsupported by substantial evidence and contrary to law.

## II.    <u>STANDARD OF REVIEW</u>

"The court reviews remand determinations for compliance with the court's remand order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274 (2008). As with all Commerce ADD determinations, this Court must hold unlawful remand redeterminations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). In accordance with *Loper Bright Enterprises v. Raimondo*, courts are now required to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. 369, 412 (2024).

"When deciding the statutory meaning of a word or phrase, courts exercise their independent judgment." *Compania Valenciana de Aluminio Baux, S.L.U. v. United States*, No. 23-00259, 2025 WL 2731823, at *5 (CIT Sept. 25, 2025).[1] The "inquiry of classifying products 'collapses into a determination of the proper meaning and scope of the HTSUS terms, a

---

[1] *See also Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 794 F. Supp. 3d 1334, 1345 (CIT 2025) ("courts exercise their independent judgment in deciding statutory meaning."); *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1357 (CIT 2024) ("The statute contains no indication that Congress expressly delegated to Commerce the authority to give meaning to the word 'partners.'").

determination that is 'a matter of statutory construction {that} is a question of law'." *Blue Sky the Color of Imagination, LLC v. United States*, No. 2024-1710, 2025 WL 3481360, at *2 (Fed. Cir. Dec. 4, 2025).[2]

## III.    **THE SECOND REMAND IMPROPERLY VALUES SOLAR GLASS**

In *Jinko II*, this Court agreed with Jinko's analysis and again questioned Commerce's selection of Romanian HTS 7007.19.80 data over Malaysian HTS 7007.19.90 data to value anti-reflective coated glass. This Court reasoned that Commerce failed to: (1) "address concerns regarding the specificity of the Romanian HTS"; and (2) "confront evidence supporting the reliability of the Malaysian data, especially considering Commerce's preference for using data from a primary surrogate country to value {the factors of production ("FOPs")}. *Jinko II*, 789 F. Supp. 3d at 1282" *Id*. In its Second Remand, Commerce again bypasses these concerns. Second Remand at 4-5, 17-24.

The Second Remand ignores two critical SV selection factors that are fulfilled only by the Malaysian per square meter ("sqm") SV data:

1. product specificity;[3] and

---

[2] *See also Nature's Touch Frozen Foods (W.) Inc. v. United States*, No. 2023-2093, 2025 WL 1354992, *2 (Fed. Cir. May 9, 2025)* ("The proper meaning of the tariff provisions is a question of law, and the determination of whether the subject imports properly fall within the scope of the possible headings is a question of fact . . . .").

[3] **Product specificity** is the most important factor among Commerce's six traditional SV selection criteria:
> "product specificity" logically must be the primary consideration in determining "best available information." If a set of data is not sufficiently "product specific," it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1.

*Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (CIT 2010) (citing *Hebei Metals and Minerals Import and Export Corp. v. United States*, 366 F. Supp. 2d 1264, 1273-74 (2005)).

2. primary surrogate country.[4]

In rejecting the Malaysian SV data, the Second Remand engages in a cursory analysis of the scope of the Romanian HTS 7007.1980, overlooking its tell-tale flaws after presuming it to be the only surviving choice. It ignores that although reported on a per kilogram ("Kg") basis, Romanian HTS 7007.19.80 SV data is neither product specific nor from the primary surrogate country, resulting in a distorted and unreliable SV.

Commerce's rejection of Malaysian per sqm SV data for glass is equally flawed. Commerce reasons that "the factor used in the *Jinko II* Draft Redetermination to convert the respondents' solar glass consumption quantities into a unit of measure that was compatible with the Malaysian import prices for solar glass did not take into account the varying thicknesses of the respondents' solar glass, and thus, results in distorted consumption quantities for solar glass." Second Remand at 5. This conclusion is not supported by record evidence. Contrary to Commerce's assertion, Malaysian per sqm SV can be reasonably applied to value Jinko's CONNUM specific glass consumption in sqm, which is available on the record.

Commerce also reiterates misplaced concerns about the reliability of Jinko's proposed per sqm to Kg conversion factor for Malaysian SV. According to Commerce, "there is nothing on the record demonstrating that the overall average value of glass per square meter calculated from the Malaysian import data is accurate for Risen or Jinko since there is no information on the

---

[4] Pursuant to 19 C.F.R. § 351.408(c)(2), Commerce "normally will value all factors in a single surrogate country." Consequently, "it is Commerce's well-established practice to rely upon the primary surrogate country for all surrogate values, whenever possible, and to **only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable**." *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017,* Fed. Reg. 36,886 (July 30, 2019), IDM Comment 13 (emphasis added).

record showing that the glass imported into Malaysia during the POR had the same thicknesses (and the same quantities of glass for each thickness) as the glass used by Risen and Jinko." *Id*. at 19. This conclusion is wrong. The three independent glass' kg per sqm conversion factors reported by Jinko, Risen, and Romanian HTS 7007.19.80 fall within a close range, which constitutes substantial evidence that the average glass thickness of internationally traded comparable glass including those reported in Malaysian HTS 7007.19.90 should be comparable. Jinko First Remand Comments (Oct. 30, 2024), ECF 98-99, at 5-12.

Finally, assuming that both available data choices are imperfect, albeit to different degrees, Commerce was required to conduct a faithful side-by-side conjunctive analysis of their data quality. Instead, the Second Remand continues to resort to a faulty disjunctive analysis. As such, the Second Remand fails to address serious unresolved specificity concerns surrounding Romanian HTS 7007.19.80 SV data, and improperly rejects the product-specific Malaysian HTS 7007.19.90 SV data.

## A.    ROMANIAN HTS 7007.19.80 FAILS THE PRODUCT SPECIFICITY CRITERION BECAUSE THE EXCLUDED EXEMPLAR – GLASS WITH AN ABSORBENT LAYER – COVERS JINKO'S AR-COATED GLASS

Resolution of the issue as to whether Romanian HTS 7007.1980 is product-specific to Jinko's AR-coated glass input depends on the meaning of the excluded exemplar – glass "with an absorbent layer." In *Jinko II*, this Court ordered Commerce to revisit its analysis of this issue.

> On remand, **Commerce has not addressed the record evidence which detracts from its determination**. Commerce fails to address concerns regarding the specificity of the Romanian HTS. . . . Because the term "absorbent layer" as used in Romanian HTS 7007.19.80 is not defined on the record, Commerce contends the plain meaning of this term is that "glass with an absorbent layer takes in light without releasing it, i.e., the light enters the glass but does not pass through the glass." . . . Commerce argues that the other excluded glass in Romanian HTS 7007.19.80 reinforces its interpretation because each includes characteristics "which limit light transmission." . . .

> Commerce explains how enamelled, coloured, opacified, flashed glass or glass with a reflecting layer limit light. . . . However, **Commerce ignores the remaining exemplars in HTS 7007.19.80, i.e., glass suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles.** . . . It is unclear how Commerce can contend that all of the exemplars support the interpretation of glass with an absorbent layer as light limiting, when it does not address all of the exemplars.

*Jinko II*, 789 F. Supp. 3d at 1282 (emphases added).

Therefore, *Jinko II* asked Commerce to address all record evidence (and, by implication, arguments articulated in Jinko's First Remand Comments) that detracted from its conclusion in its First Remand. *Jinko II* also required that Commerce explain how the remaining excluded exemplars, specialty glasses used for different types of vehicles, exhibited light limiting property.

As set forth below, the Second Remand fails to address this Court's specificity concerns tied to the proper interpretation of the word "absorbent." Second Remand at 22-24. Additionally, faced with a pointed query from this Court, Commerce reversed course, conceding that the remaining excluded exemplars – a group of specialty vehicular glasses – in the Romanian HTS 7007.19.80 are "based on the suitability of the glass for certain applications (*e.g.*, use in certain craft), rather than the light limiting characteristics of the glass." *Id*. at 23-24. Commerce's admission that specialty vehicular glasses are similar only in terms of the class of products they are fitted into (*i.e.*, vehicles) rather than their common function (such as, light limiting characteristics) directly contradicts Commerce's rationale that all excluded exemplars in Romanian HTS 7007.19.80 have light limiting characteristics. This key concession undermines a critical linchpin of Commerce's conclusion that absorbent-layered glass also has light-limiting characteristics.

**1.    Commerce's Interpretation of the Tariff Term "Absorbent" is Contrary to Law and Record Evidence Based on the Word's Plain Meaning**

In the *Final Results*, Commerce interpreted the excluded exemplar – glass with an absorbent layer – based on the "plain meaning of absorbent (*i.e.*, something that takes in without releasing)." IDM at 17. Thereafter, in the First Remand, Commerce stated that "glass with an absorbent layer takes in light without releasing it, *i.e.*, the light enters the glass but does not pass through the glass." First Remand at 9. In its Comments on the First Remand, Jinko established that Commerce's plain meaning rationale and the associated explanations are illogical, divorced from requisite context, and unsupported by record evidence. Jinko First Remand Comments at 12-20. Jinko also demonstrated that Commerce's claim that the five excluded glass exemplars – enameled, opacified, flashed, colored throughout the mass and glass with a reflective layer – share light limiting properties, was unsupported by record evidence. *Id*.

The oral argument conducted on April 29, 2025, ECF 73 ("Oral Arg. II"), revealed myriad flaws in Commerce's assumptions, which compelled this Court to again order remand because "Commerce fails to address concerns regarding the specificity of the Romanian HTS." *Jinko II*, 789 F. Supp. 3d at 1282. As discussed below, the Second Remand fails to address these unresolved specificity concerns, is contrary to law and is unsupported by record evidence.

The sole record evidence that explains the meaning of the term "absorbent" is Jinko's master purchase agreement with its glass suppliers for purchase of the AR-coated glass input. Jinko First Remand Comments at 12. This agreement pinpoints the specific attributes of Jinko's AR-coated glass as: (a) "**{a}nti-reflective coating, high transmission** of light"; and (b) "{a}dvanced glass technology improves **light absorption** and **retention**." *Id*. (emphases added). When read in conjunction, stipulations (a) and (b) of the master purchase agreement state: "**{a}nti-reflective coating** improves **light absorption** and **retention** and **results in high**

9

**transmission** of light." *Id.* (emphases added). As discussed in Jinko's master purchase agreement and Bill of Materials ("BOM"), AR-coated glass' "absorption" of light is coterminous with its permeability, *i.e.*, absorption of light is followed by its onward transmission through the glass. Jinko SQR Exhibit SA-2D; Jinko Redacted Case Brief (May 27, 2022), C.R. 494, P.R. 446, Attachment 4.

Because the anti-reflective property is the polar opposite of the reflective property, an anti-reflective coating will pull in the light photons instead of reflecting them back. In other words, anti-reflective coatings will absorb more light photons. As such, an anti-reflective coating is synonymous with an absorbent coating or layer. Jinko's master purchase agreement shows that a higher absorption of light by an AR-coating (or, absorbent layer) on the surface of the plain glass is followed by a higher transmission of light through the glass body. This fact is corroborated by Jinko's BOM, which shows "{g{lass/high permeability coating," establishing that an AR-coating on a glass surface increases the permeability of light photons through the glass after the initial absorption of light. Jinko First Remand Comments at 14 (quoting Jinko First Supplemental Questionnaire Response (July 27, 2021), C.R. 365-91, P.R. 277-88 ("SQR"), Exhibit SA-2D).

In other words, the record reveals that the absorption of light by an absorbent layer and its permeability or transmission through the glass are complementary phenomena. *Id.* at 16. No record evidence detracts from this conclusion. An AR-coating, *i.e.*, an absorbent layer, triggers greater absorption of light photons and consequently, a higher transmission, as more photons pass through the glass and strike the underlying cells, thereby improving the performance of the solar panels.

PUBLIC VERSION

Notwithstanding record evidence establishing a direct correlation between absorption and transmission of light, Commerce, in its Second Remand, impermissibly retains its prior conclusion. Commerce does so by applying the plain meaning construction of "absorbent" used to describe the interaction of "water" and a "sponge" to the interaction of "light" and "absorbent layered glass". Following this simile – that an absorbent layer of glass should literally absorb light in the same manner as a sponge absorbs water – Commerce rigidly adheres to its "light limiting property" rationale. It asserts that absorbent-layered glass requires that light enters the glass but does not pass through it. In other words, Commerce maintains that light is not transmitted through but is trapped within the glass body. As explained below, Commerce's explanation is contradictory, illogical and unsupported by record evidence.

First, Commerce mis-constructs the plain meaning of "absorbent," analogizing absorbent layered glass with a sponge ("a sponge could not be said to be absorbent if liquid simply passes through the sponge without being retained in the sponge"). First Remand at 11. This construction is based on a false equivalence, divorcing the word "absorbent" from its proper context. Since absorbent layered glass and an absorbent sponge have different constituent materials (glass v. polymer), different end-uses, and interact with different external matter (light v. water), Commerce fails to explain how the essential characteristics of an absorbent chemical layer applied to a glass surface is comparable to absorbent sponge material. The two materials are vastly different.

Second, Commerce did not weigh any evidence in construing the term "absorbent". As such, since the record fails to establish any rational connection between the facts available on the record and Commerce's choice, Commerce's path of decision making is not "reasonably discernible to a reviewing court." *NMB Sing. Ltd. v. United States,* 557 F.3d 1316, 1319 (Fed.

Cir. 2009). As discussed at oral argument, while water absorbed by a sponge could be physically wrung out, Oral Arg. II at 23.27-30 – there is no record evidence that light photons could similarly be squeezed out of an absorbent layer or a glass body even if they were presumed to have been trapped therein. The Second Remand fails to explain these inherent contradictions and anomalies.

Third, Commerce asserts that "glass with an absorbent layer takes in light without releasing it, *i.e.*, the light enters the glass but does not pass through the glass." First Remand at 9. This is because if an absorbent layer on the glass surface were to absorb light (just like a sponge absorbs water) and not release it, light photons would remain trapped within the absorbent layer on the surface of the glass body. Consequently, light photons should not exit the absorbent layer and, therefore, should not enter into the glass body. As such, Commerce's claim that "light enters the glass" does not follow from its presumed interaction between the light photons and the absorbent layer. *Id*. Commerce fails to reconcile its contradictory and mutually exclusive conclusions that: (1) the absorbent layer shall absorb light photons without releasing it; and (2) light photons enter the glass body, which requires they are released by the absorbent layer.

Fourth, Commerce's assertion that light photon "does not pass through the glass" implies that the glass body is absorbent. *Id*. However, Commerce fails to point to any evidence that the plain glass in the excluded exemplar "glass with an absorbent layer" has any absorbent property; in fact, only the glass' outer surface chemical layer has such absorbent properties. As such, Commerce's claim is unsupported on this record. Indeed, unrebutted record evidence shows that absorbent glass, where the glass body itself has absorbent properties, constitutes a separate class of specialty glass found in the commercial world. Jinko First Remand Comments at 13-14.

Fifth, Commerce's unsupported conclusions are impeached by two muddled and contradictory premises:

1. how could a chemical layer on the glass surface that Commerce deemed as absorbent, (i.e., incapable of releasing light) behave like a non-absorbent layer that releases light into the glass body ?; and

2. how could plain glass, which is non-absorbent, behave like absorbent glass through which light could not pass through, as Commerce asserts?

Sixth, in Jinko's AR-coated glass, the outer anti-reflective or absorbent layer increases the initial absorption of light by dragging in the light photons. The light then passes through the absorbent layer, enters and passes through the glass body, and finally exits the glass body. Thus, Jinko's AR-coated glass, wherein absorption of light and transmission of light are complementary phenomena, constitutes the sole context-specific record evidence available for interpreting the meaning of the excluded exemplar, "glass with an absorbent layer" in the Romanian HTS 7007.19.80. Like Jinko's AR-coated glass, the absorbent layer in the excluded exemplar should increase the initial intake of light photons. Thereafter, contrary to Commerce's unsupported presupposition, the light photons should be released by the absorbent layer and should then enter the glass body. Thereafter again, contrary to Commerce's premise, light photons should pass through the glass body and exit from the rear. This context-specific interpretation, unlike Commerce's illogical and *inter se* contradictory interpretation, is supported by substantial evidence and common sense. "{E}ven in the law, common sense must prevail." *Wind Tower Trade Coalition v. United States*, 741 F.3d 89, 99 (Fed. Cir. 2014).

Finally, Commerce has not claimed that there exist two types of light absorption – one, leading to transmission of light through glass (evidenced in Jinko's AR-coated glass) and second, resulting in entrapment of light within glass (which Commerce presumes occurs in absorbent-layered glass). Therefore, Commerce's futile attempts to separate the process of "absorption"

13

exhibited by Jinko's AR-coated glass from the "absorbent" layer in the excluded exemplar, absorbent-layered glass, are unsupported by record evidence. Notably, "absorption" and "absorbent" are nouns that derive from the same verb, "absorb". "Absorption" refers to the process while "absorbent" refers to the material. In other words, based on its absorptive function, an anti-reflective coating is synonymous with an absorbent layer. The fact that the AR-coated glass, after the initial absorption of light photons, increases their transmission through the glass, constitutes substantial evidence that an absorbent-layered glass shall likewise increase, not limit, the transmission of light photons through the glass.

For these reasons, Commerce's conclusion that absorbent-layered glass limits transmission of light is contrary to law, unsupported by record evidence and its path of decision making is not discernible. As such, Jinko's construction of the term absorbent in the excluded exemplar, "glass with an absorbent layer"- glass that draws in or absorbs more light followed by its transmission through and out of the glass body - constitutes the best definition of this term. Since Jinko's solar glass falls within this exclusionary language, it does not fall within the scope of Romanian HTS 7007.1980.

## 2.   The Other Excluded Exemplars Do Not Support Commerce's Interpretation of the Term "Glass With an Absorbent Layer"

Commerce also fails to support its second basis for interpreting "absorbent layer", *i.e.* that the other excluded exemplars in Romanian HTS 7007.19.80 have light limiting properties. The Second Remand notes that "Commerce argues that the other excluded glass in Romanian HTS 7007.19.80 reinforces its interpretation because each includes characteristics 'which limit light transmission.'" *Jinko II*, 789 F. Supp. 3d at 1282. In its First Remand Comments, at 17-20, Jinko demonstrated that this rationale was not grounded in any record evidence. Specifically, Commerce's summary assumption inspired by the *noscitur a sociis* canon of interpretation is

14

speculative because the record is bereft of any evidence that the five excluded exemplars –

enameled, colored throughout the mass, opacified, flashed glass or glass with a reflecting layer –

share any light limiting properties. *Id*. at 18. To the contrary, the five excluded exemplars have

disparate interactions with light photons.

In glass with a reflecting layer, light photons strike the glass surface and are directly

reflected back from there. As a result, a minimal number of light photons are transmitted through

the glass in a straight line. Oral Arg. II at 43.53-44.02. In enameled glass, opacified glass, and

flashed glass, some light photons bounce off the glass surface, while the remaining light photons

are transmitted through the glass in a straight line, on account of coating of certain materials to

the glass surface. *Id*. at 44.06-44.29. In glass colored throughout the mass, the glass surface has

no layer or coating and further, there is no evidence that light photons are reflected back or

bounce off the glass surface. As such, light enters the glass, where it impinges on the coloring

matter spread around inside the glass body, and most light photons scatter in different directions.

*Id*. at 44.31-45.29.

Accordingly, the optical interactions of the five excluded exemplars are materially

different from one another, contradicting Commerce's premise that all five exemplars share the

same light limiting property. These differences detract from Commerce's conclusion that

absorbent-layered glass limits the transmission of light.

Moreover, Commerce in the *Final Results* reasoned that "the phrase **'absorbent** . . .

**layer'** . . . **is part of a larger exclusion** in the description of Romanian HTS 7007.19.80 which

reads, **in its entirety**, glass that is 'Enamelled, Coloured Throughout The Mass, Opacified,

Flashed Or With An Absorbent Or Reflecting Layer.'" IDM at 17 (emphases added). Commerce

then claimed that "{e}nameled, colored, opacified (made opaque), and flashed (colored) are all

treatments to the glass that limit the amount of light that passes through the glass." *Id*. In its First

Remand, Commerce reiterated this rationale that "**{a}ll of the other glass that is excluded** from

Romanian HTS 7007.19.80 have treatments that limit the amount of light that is transmitted

through the glass." First Remand at 36 (emphasis added). Commerce, in essence, invoked the

canon of construction, *noscitur a sociis*, which requires that all other words surrounding an

ambiguous word share a common attribute. Jinko First Remand Comments at 18.

In *Jinko II*, this Court held that Commerce's rationale was unsupported by substantial

evidence: "Commerce ignores the remaining exemplars in HTS 7007.19.80, *i.e.*, glass suitable

for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles." *Jinko II*, 789

F. Supp. 3d at 1282. This Court remanded, reasoning that "{i}t is unclear how Commerce can

contend that all of the exemplars support the interpretation of glass with an absorbent layer as

light limiting, when it does not address all of the exemplars." *Id.*

In its Second Redetermination, Commerce attempts to salvage its debunked claim of

"light limiting property" underlying all excluded exemplars, by reasoning that this common

attribute is restricted to only a subset of the excluded exemplars. Commerce claims that: "{t}he

phrase 'all of the other glass that is excluded from Romanian HTS category 7007.19.80' refers to

the **other exclusions** in the group of exclusions that Commerce was discussing the *Jinko I Final*

*Redetermination*, namely glass that is enameled, colored throughout the mass, opacified, flashed

or that has a reflecting layer." Second Remand at 23 (emphasis added). Commerce now concedes

that the excluded subset "glass of a size and shape suitable for incorporation in motor vehicles,

aircraft, spacecraft, vessels and other vehicles" is not characterized by a light limiting property.

*Id*. at 22-24. Commerce's reframing of its position that it "was not claiming that glass covered by

the exclusion for 'glass of a size and shape suitable for incorporation in motor vehicles, aircraft,

spacecraft, vessels and other vehicles' has light limiting characteristics" directly contradicts its prior unqualified "all inclusive" assertion. *Id.* Notably, Commerce's shrinkage of the excluded exemplars constitutes an inexplicable reversal of its position that all excluded exemplars, rather than a subset thereof, share a common light limiting property. Indeed, this premise was a prerequisite for Commerce's reliance on *noscitur a sociis* to conclude that "glass with an absorbent layer" must share the same light limiting properties.

In sum, Commerce's Second Remand rationale undermines rather than supports its conclusion. Reliance on *noscitur a sociis* requires that all exemplars share the same critical characteristic. When only a subset of exemplars share a characteristic, this principle does not apply. Moreover, even exemplars within the subset do not share light limiting property, as established *supra*. Consequently, the absence of *noscitur a sociis* rationale leaves Commerce with no support for its interpretation of the excluded exemplar, glass with an absorbent layer, in the Romanian HTS 7007.19.80.

Commerce fares no better with its additional explanation that "{t}he exclusion under Romanian HTS category 7007.19.80 for glass of a particular size and shape noted by the CIT in *Jinko II* is based on the suitability of the glass for certain applications (*e.g.*, use in certain craft), rather than the light limiting characteristics of the glass." *Id.* at 23. This statement detracts from Commerce's presupposition that the five exemplars in the narrower subset of "other exclusions" share light limiting properties. In the same manner as vehicular glass that Commerce concedes do not share any functional similarity but are simply "use{d} in certain craft," there is no record evidence that the "other exclusions" share a common functional attribute. *Id*. Instead, as this Court suggested and Defendant did not contest, all five excluded exemplars, along with the absorbent-layered glass, are specialty glasses, with no common underlying property. Oral Arg. II

at 22.46-22.54.

In sum, Commerce's admission that none of the excluded vehicular glasses is identified by any light-limiting property renders its conclusion that "absorbent-layered glass" has light-limiting property contrary to law and unsupported by substantial evidence.

**B.    USING MALAYSIAN HTS 7007.19.90 SV PER SQM TO VALUE GLASS IS NOT DISTORTIVE ON A CONNUM-SPECIFIC BASIS**

The Second Remand improperly reversed the "*Jinko II* Draft Redetermination {where Commerce} used import values under Malaysian HS number 7007.19.90 to value Jinko and Risen's solar glass consumption." Second Remand at 18. Commerce reasoned "that using Malaysian import values expressed in RM per square meter to value glass is distortive on a CONNUM-specific basis." *Id*. As set forth below, Commerce claims that there are two interrelated CONNUM-specific distortions of the glass' unit conversion factor, both of which are unsupported by substantial record evidence.

Commerce first claimed distortion because:

> if a respondent used glass with the same surface area (same number of square meters) but very different thicknesses in two solar modules with different CONNUMs, . . . valuing the glass using Malaysian import values in square meters ignores the varying thicknesses of the glass and results in the same glass value in the normal value for both CONNUMs, which is inaccurate and distortive.

*Id.* at 18-19. This rationale is directly contrary to record evidence for reasons explained in the Draft Second Remand methodology as follows:

> {T}he record contained inventory records for Jinko and Risen that show the number of pieces of each type of glass withdrawn from inventory for production during the POR and the length and width of each piece of glass, in millimeters. Using this information, we calculated the total square meters of glass consumed in production by each respondent during the POR. Because each respondent already converted their total glass consumption in pieces to total glass consumption in kilograms for reporting to Commerce in the underlying review, **we used the ratio of the total glass consumption in square meters to the total glass consumption in kilograms to calculate the number of square meters of glass used for each kilogram of glass consumed in production.** We multiplied this square-meter per

18

kilogram conversion ratio by the number of kilograms of glass consumed per watt of finished product, which was reported to Commerce on a control number (CONNUM)-specific basis, to calculate the square meters of glass consumed per watt of finished product for each CONNUM reported in the FOP database.

Second Remand at 4 (emphasis added).

Accordingly, the value of glass consumed for CONNUM-specific per watt production of solar panels for both respondents in the Draft Second Remand comports with its three-step methodology that:

1. computes the glass' conversion factors, sqm per kg, based on the total reported consumption of glass;

2. applies the conversion factor to the CONNUM-specific glass' kg per watt reported consumption to calculate the CONNUM-specific glass' sqm per watt equivalent consumption; and finally

3. applies the Malaysian per sqm glass SV to the calculated CONNUM-specific glass' sqm per watt consumption.

The weighted average conversion factors – "[      ] $M^2$/Kg for Risen and [      ] Kg/$M^2$ {i.e., 0.1391 $M^2$/kg} for Jinko" – obtained in the first step are based on the total actual weight of glass consumed. *Id.* at 19. Therefore, they already account for the average thickness of glass consumed by the respondents.[5] In the second step, these sqm per Kg conversion factors – constant numbers – are multiplied to CONNUM-specific glass' reported Kg per watt consumption to result in the equivalent CONNUM-specific glass' calculated sqm per watt consumption.

The above methodology results in <u>different calculated sqm surface areas</u> because two CONNUMs reporting glass with the same sqm surface area but with different thicknesses will have <u>different Kg weights</u>. Consequently, upon applying the Malaysian per sqm SV, the resulting

---

[5] Weight is obtained by multiplying volume with density. In turn, volume is obtained by multiplying glass' surface area with its thickness.

values of each glass would be different. Accordingly, contrary to Commerce's presumption, the Draft Second Remand methodology does not ignore differences between glass' thicknesses in two CONNUMs and, accordingly, does not result in equal valuation of two glasses having identical surface area but different thicknesses. To illustrate, assume that two CONNUMs have panels with equal power (100 watt) with glass having identical surface area of 10 sqm, but different thicknesses – 2 centimeter (*i.e.*, 0.02 meter) and 3 centimeter (0.03 meter), and consequently, proportionately different weights – 40 Kg and 60 Kg respectively. In this case, the glass FOPs initially reported are 0.4 Kg per watt and 0.6 Kg per watt.[6] Under Commerce's Draft Second Remand methodology, the sqm to Kg conversion factor calculated for all glass consumed will be 0.20 sqm per Kg.[7] This conversion factor will be applied to both reported FOPs (0.4 and 0.6 Kg per watt) to result in the equivalent FOPs of 0.08 sqm per watt and 0.12 sqm per watt.

As such, notwithstanding that each glass has an identical surface area of 10 sqm, the calculated sqm per watt is different. Consequently, when the same Malaysian SV reported in units of MYR per sqm, say, 50 MYR per sqm, is applied to the sqm per watt FOPs of each glass, the resulting values will be different, *i.e.*, 4 MYR and 6 MYR respectively.[8] Significantly, each glass value is directly proportional to the underlying thickness of the glass (2 and 4 centimeter). In other words, glass with the same sqm surface areas are valued differently, in proportion to their thickness or weight. The Second Remand, unlike the Draft Second Remand, errs by conflating glass' calculated sqm surface areas per watt, which are different from their actual surface areas per watt, and proportional to the thickness of glass, to which the per sqm SV is

---

[6] The data is obtained by dividing 40 Kg and 60 Kg by 100 watts.
[7] Obtained by dividing the total surface area of 10+10 = 20 sqm by total weight of 40+60 = 100 kg.
[8] Obtained by multiplying 0.08 sqm per watt and 0.12 sqm per watt by 50 MYR per sqm.

applied in order to compute their values per watt, with their actual sqm surface areas (which are equal) that are not used for their valuation.

The Second Remand further reasons that "the factor that Commerce used in the *Jinko II* Draft Redetermination to convert the respondents' glass consumption in square meters introduces distortions to CONNUM-specific glass values." *Id.* at 19. Commerce elaborates that "the CONNUM-specific conversion ratios will differ from the average conversion ratio for each respondent depending on the pieces of glass used to produce solar modules that are assigned a particular CONNUM." *Id.* at 19-20. In this regard, Commerce illustrates divergences among the sqm per Kg of individual glass pieces consumed by Jinko and Risen. *Id.* at 20.

Commerce's reasoning is flawed. First, Commerce's sqm per Kg comparison across individual glass pieces is inconsistent with its ADD margin computation methodology. Any CONNUM typically contains panels with glass with varying sqm per Kg. However, because Commerce's normal value and ADD margin methodology applies CONNUM level FOP data obtained by aggregating the total reported consumption of such input for a CONNUM instead of applying FOPs of individual solar panels, glass' sqm per kg divergences across individual solar panels falling within a CONNUM are irrelevant in the context of Commerce's broader CONNUM-based distortion analysis.

Moreover, Commerce's claim that there is a discrepancy between sqm per Kg of glass based on its total consumption and CONNUM-specific consumption is unsupported by record evidence. Jinko's CONNUM-specific glass' Kg per watt consumption summarized below show that for CONNUMs reporting significant consumption of glass,[9] the Kg per watt FOP (*i.e.*, glass

---

[9] Jinko reports FOPs in four CONNUMs. CONNUMs [                    ] and [                    ] consist of cells, in which there is no consumption of glass.

consumption) is nearly equal, with a mere [  ] variation.[10]

|  **CONNUM**  |  **FOP M_COATING_GLASS (kg/Watt)**  |
|:---:|:---:|
| [      ] | [      ] |
| [      ] | [      ] |

Draft Second Remand Analysis Memorandum for Jinko (Aug. 19, 2025), 2RCR 2, 2RPR 3,

attached NME Margin Calculation Program (Aug. 21, 2025), 2RCR 4, at 74.

The fact that Jinko reported nearly uniform glass consumption across CONNUMs

constitutes substantial evidence that the overall physical characteristics (surface areas and

thicknesses) of the underlying glass pieces are nearly uniform across CONNUMs. Accordingly,

the resulting CONNUM-specific glass' sqm per Kg conversion factor should be nearly equal to

the overall conversion factor based on Jinko's total glass consumption that Commerce relied on

in the Draft Second Remand. For this reason, Commerce's conclusion that "the conversion ratios

that we used in the *Jinko II* Draft Redetermination do not result in accurate CONNUM-specific

glass consumption figures in square meters" is not supported by substantial evidence. Second

Remand at 20; *see* First Remand at 5.

Commerce also states that "there is no information on the record showing that the glass

imported into Malaysia during the POR had the same thicknesses (and the same quantities of

glass for each thickness) as the glass used by . . Jinko." Second Remand at 19.  Commerce then

infers that "even on an overall average basis, and not a CONNUM-specific basis, we have no

reason to conclude that including a glass value in normal value based on Malaysia import data is

accurate." *Id.* Commerce is wrong. The three glass' conversion factors available on the record –

*i.e.*, Jinko's 7.19 Kg per sqm, Risen's [    ] Kg per sqm and Romanian HTS 7007.19.80 import

---

[10] The difference between [      ] and [     ] is [        ]. The percentage difference
obtained by dividing [     ] with [     ] yields [  ].

data's 7.88 Kg per sqm – are corroborated by substantial evidence. Jinko First Remand Comments at 5-12. This fact, in turn, constitutes substantial evidence that Malaysian HTS 7007.19.90 imported glass, being a part of the same pool of internationally traded glass, should share similar average physical characteristics, including average thickness.

In other words, substantial evidence supports a conclusion that the average thickness of Malaysian glass is in the same range as the thickness of Jinko and Risen glass. Consequently, Commerce is wrong to claim that applying the Malaysian glass' per sqm SV to Jinko's CONNUM-specific calculated glass sqm would be distortive on an overall basis. In this regard, we acknowledge that this Court previously agreed with Commerce that "all three proposed conversion ratios are not sufficiently accurate." *Jinko II*, 789 F. Supp. 3d at 1283 n.9. We ask that this Court revisit that conclusion in light of the analysis set forth in these Comments. We also submit that even if this Court reaffirms its prior decision on this particular issue, it nevertheless should not accept Commerce's blanket claim that Malaysia data cannot be used as the SV for glass merely because the record does not include Malaysian glass' thickness information.

In sum, Romanian HTS 7007.19.80 per Kg SV data fails both the product-specificity and primary surrogate country criteria and accordingly should be rejected in favor of the Malaysian HTS 7007.19.90 per sqm SV. The Malaysian SV data are product-specific, from the primary surrogate country, and can also be reasonably applied to Jinko's CONNUM-specific calculated glass' sqm per watt FOP. Therefore, even if the Malaysian per sqm SV data arguably is not completely accurate in relation to Jinko's glass absent glass thickness information, substantial evidence supports the fact that the Malaysian data are specific to Jinko's glass' absorbent (or, anti-reflective) properties and comparable to Jinko's glass' physical characteristics (*e.g.*, average

thickness). Consequently, Malaysian HTS 7007.19.90 SV is probative of the value of Jinko's

glass. In contrast, the alternative Romanian HTS 7007.19.80 SV data must be disqualified on

account of its threshold critical infirmities, rendering its application vastly distortive and,

therefore, unreliable.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Jinko respectfully requests that this Court again remand the

valuation of Jinko's AR-coated glass, because Commerce's Second Remand rationale remains

unsupported by substantial evidence and is otherwise not in accordance with law.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak
Dharmendra N. Choudhary*
Jordan C. Kahn*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jinko Solar Import
and Export Co., Ltd., Jinko Solar Co., Ltd.,
Jinkosolar Technology (Haining) Co., Ltd.,
Yuhuan Jinko Solar Co., Ltd., Zhejiang
Jinko Solar Co., Ltd., Jiangsu Jinko
Tiansheng Solar Co., Ltd., Jinkosolar
(Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co.,
Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: January 5, 2026

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of Rule 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 7,242 words—less than the 10,000 word limit.

<u>/s/ *Dharmendra N. Choudhary*</u>

*Counsel for Plaintiffs Jinko Solar Import and Export Co., Ltd., Jinko Solar Co., Ltd., Jinkosolar Technology (Haining) Co., Ltd., Yuhuan Jinko Solar Co., Ltd., Zhejiang Jinko Solar Co., Ltd., Jiangsu Jinko Tiansheng Solar Co., Ltd., Jinkosolar (Chuzhou) Co., Ltd., Jinkosolar (Yiwu) Co., Ltd., and Jinkosolar (Shangrao) Co., Ltd*

Dated: January 5, 2026