PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO. LTD., ET AL.,<br>               Consolidated Plaintiff,<br><br>   and<br><br>RISEN ENERGY CO., LTD.,<br>               Consolidated Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br>               Defendant,<br><br>   and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING,<br>               Defendant-Intervenor. | **PUBLIC VERSION**<br><br>Consol. Court No. 22-00219 |

## CONSOLIDATED PLAINTIFF
## RISEN ENERGY CO., LTD. 'S REMAND COMMENTS

Gregory S. Menegaz
Alexandra H. Salzman
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 868-0300
email:  gmenegaz@igtlaw.com
*Counsel to Consolidated Plaintiff*
*Risen Energy Co., LTD.*

Dated: January 5, 2026

1

PUBLIC VERSION

## TABLE OF CONTENTS

I.    The Department's Determination to Rely Upon the Romanian Glass Value is Not Supported by Substantial Evidence ................................................................. 1

    A.    The Court's Remands .......................................................................... 1

    B.    The Department's Second Remand ..................................................... 3

    C.    It is Not Inaccurate to Use the Malaysia Data .................................. 4

    D.    The Department Can Rely Upon CONNUM Specific M2 Data for Respondent's Solar Glass ................................................................... 5

    E.    Relying on the Single Average M2 Conversion Ratio is Reliable ................. 8

    F.    Reflective Glass ................................................................................ 10

II.   The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law ................................................................. 13

III.  Conclusion and Prayer for Relief ............................................................... 17

# TABLE OF AUTHORITIES

**CASES**

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ..........................................10

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ................................................................................................................................16

*Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ......................................................................................................................................3

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016) .........................13

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) .......................16

*NSK Ltd. v. United States*, 346 F. Supp. 2d 1312 (CIT 2004). ....................................................16

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ...........................................10, 16

**REGULATION**

19 C.F.R. 315.408(c) ................................................................................................................11

**ADMINISTRATIVE DECISIONS**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 46904 (Dep't Comm. 2016) ........................................................................10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019) ...................13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) ....................................................................................................................12

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021).......10

**OTHER AUTHORITIES**

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308 (Dep't Commerce Feb. 27, 1996) ......................................................................................................................................11

Consolidated Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files comments on the Department's Remand Results. *See* Second Remand Results (September 29, 2025); *see also* Slip Op. 25-67 (CIT June 6, 2025).  The Court remanded to the Department two issues 1) valuation of solar glass using a Romanian import price and 2) the methodology for applying partial adverse facts available (AFA) to Risen's unreported FOPs.  Despite the Court's remand instructions on this second remand, the Department has still made no changes to its original Final Results.  The Department claims that it followed the Court's remand instructions, however, the Department's determination remains unsupported by substantial evidence.  With respect to glass, the Department (1) failed to rely upon the conversion of the respondents' consumption data from per piece to per square meter, based on the respondents' data on the record, as specifically requested by the Court; and (2) repeated already rejected arguments on inaccuracies introduced by conversions.  With respect to AFA, Commerce continued to rely upon information not rooted in record evidence in its calculation.

I.    **The Department's Determination to Rely Upon the Romanian Glass Value is Not Supported by Substantial Evidence.**

A.    **The Court's Remands**

In *Jinko I*, the Court remanded the Department's conclusion that the Malaysian data was unreliable, finding it was not supported by substantial evidence on the record.  The Court found that the Department had "failed to acknowledge record evidence that respondents argued would support a reliable conversion of Jinko and Risen's data from per piece to square meters or from kilograms to square meters." Slip. Op. 25-67 at 11 (summarizing *Jinko I*).  The Court specifically asked the Department to address "how the data from Malaysia, as the primary surrogate country, is unreliable such that departure from its standard practice of using the data from the primary surrogate country is reasonable, or how the Romanian data was specific to the glass at issue." *Id*.

In the first remand, the Department nonetheless continued to rely upon the Romanian glass. In Jinko II, the Court found that the Department "fails to confront evidence supporting the reliability of the Malaysian data, especially considering Commerce's preference for using data from a primary surrogate country to value FOPs" and "fails to address why it cannot convert the respondents' raw data from per piece to square meters using the record evidence." *Id*. at 13-14.

As acknowledged by the Department and the Court in *Jinko II*, both Jinko and Risen purchase glass on a per piece basis. Slip. Op. 25-67 at 14-15. The Respondents converted their glass consumption to KG at the Department's request, but the record contains the full information to convert to M2 instead. *Id.* Thus, "the record contains the measurements of their glass so that their consumption can be converted to square meters, to match the Malaysian data which is reported in square meters only." *Id*. at 15. Based on these facts, the Court concluded in *Jinko II*:

> Thus, while Romanian HTS 7007.19.80 would appear to be specific and reliable on this record, so too would Malaysian HTS 7007.19.90. Given Commerce's preference to value all FOPs from the same primary surrogate country, see 19 C.F.R. § 351.408(c)(2), which here is Malaysia, and Commerce's failure to address why it could not reasonably convert Jinko's and Risen's glass consumption data directly from per piece to square meters, Commerce's determination is unsupported by substantial evidence on this record, and is therefore remanded for further explanation consistent with this opinion.

*Id*.

In both of these opinions, the Court has:

(1)    Rejected the Department's argument that Malaysia's data was unreliable because it is in the unit of square meter due to Commerce's perceived inaccuracies with the conversion; and

(2)    Specifically requested the Department to reasonably convert Jinko's and Risen's glass consumption data directly from per piece to square meters, so that the Department can rely upon Malaysia's value in square meter, and

(3)    Repeatedly emphasized that the Department's regulatory preference is to value all factors in a single surrogate country as the Department had not demonstrated that Malaysia's data is unreliable to justify deviation from this established preference.

Thus, in order to implement the Court's specific decisions, Commerce needed to convert Respondents' glass consumption data directly from per piece to square meters, in a reasonable way, and apply the Malaysia's value in square meter. Any repetition by Commerce of prior rejected arguments regarding inaccuracies or applying a conversion ratio are not implementing the court's specific findings and should be rejected.

**B.    The Department's Second Remand**

In the draft remand results, the Department converted Jinko's and Risen's glass consumption to M2 and applied the Malaysia glass surrogate value. The Department chose to use an average overall KG/M2 or M2/KG conversion for this conversion for Jinko and Risen's glass consumption. However, in the final remand, the Department reversed course. In the final remand, the Department stated that due to the "complexities of determining CONNUM-specific conversion rates" it had determined that it was reasonable to use an average conversion rate, and that this was the "only ratio that we determined was practical to calculate from record information." Second Remand Results at 20-21. But then in consideration of this, in the final second remand, instead of finding this was a reasonable approach as it had in the draft, the Department now found that there are distortions using an overall average conversion ratio because it does not result in CONNUM-specific glass consumption figures. The Department also repeated concerns that there were distortions caused by valuing glass with a surrogate value expressed in square meters. *Id*.

The Department's remand results failed to follow the Court's instructions and is unsupported by substantial evidence in several respects. First, the Department repeated rejected arguments on supposed inaccuracies in using M2 data and a conversion. Second, the Department claims without support that the only "reasonable" method to convert the Respondent's glass consumption to M2 was using an average conversion. The Department fails to address that the record does contain the complete M2 information to convert glass on a CONNUM basis for Risen. Third, the Department analysis that relying on the Romanian KG glass data is more reliable than relying on the Malaysia M2 glass data, even if using an average conversion (instead of CONNUM conversion) is not supported by the record. The average ratio is reliable and consistent with Department practice. The Department also failed to consider other distortions with relying upon the Romania glass data. Lastly, we support Jinko's analysis and argument that the Romanian HTS is not specific.

### C.    It is Not Inaccurate to Use the Malaysia Data.

With regard to the first issue, this is repeated from prior arguments that have been rejected. Commerce states that "there is nothing on the record demonstrating that overall average value of glass per square meter calculated from the Malaysian import data is accurate for Risen or Jinko" and that "we have no reason to conclude that including a glass value in normal value based on Malaysia import data is accurate." Second Remand Results at 19. The Department generally concludes that "using a surrogate value expressed in square meters to value glass whose value also depends on its thickness" would not be reasonable. *Id*. at 21.

This is not different from the reasons the Department had already presented to the Court, i.e., conversion would lead to inaccuracies, which was rejected in both remands by the Court as explained above. *See also* Slip Op. 24-53 at 24 ("Commerce's rationale that conversion

considerations render the Malaysian data unreliable fails to acknowledge record information that detracts from its conclusion. Risen purchases solar glass "on a 'piece' basis," meaning that its glass consumption measured in kilograms, relied upon by Commerce in its determination, was itself a conversion."). The Court has no reason to reassess these same arguments already addressed in both opinions, and it should be simply rejected. With no way to present to the Court an argument that the Malaysian SV is not reliable or reasonable, Commerce cannot depart from the primary surrogate country to cherry pick a different, higher unit vale that was also a conversion and does not take into account glass size.

**D.     The Department Can Rely Upon CONNUM Specific M2 Data for Respondent's Solar Glass.**

Commerce appears to have understood that the Court specifically requested it to make a conversion in a reasonable way based on the Respondents' data, but the Department's implementation essentially amounts to refusing to implement the Court's clear instruction.

As quoted above, the Department claimed in the final remand that it was complex to convert the glass to M2 on a CONNUM basis. This implies that Commerce tried to develop a CONNUM-specific conversion, but whether this was actually the case was notably never explained and never even included in the draft remand, such that the parties could have commented upon, or assisted with, that exercise. This was only stated conclusively in the final remand without any actual explanation alongside the statement that the Department had found in the draft remand that it was thus only reasonable to calculate an average conversion. Then, in the final remand, the Department rejected its own average conversion ratio, finding that relying on it rather than a CONNUM-specific created a distortion and was not reliable. Rather than turning back to calculate a CONNUM-specific conversion, the Department gave up the effort to follow the Court's instructions and rejected relying on a conversion at all.

We submit below that using the average conversion is not actually unreliable, but is a reasonable method, as directed by the Court, to convert to M2 and apply the Malaysian surrogate value. But, critically, the record also contains all information to convert the glass to M2 on a CONNUM-specific basis. The Department's dismissal of this approach because it was complex is not only not explained on this record, but is not an accurate reflection of the record before the Department.

It is not "complex" for Commerce to calculate a CONNUM-specific conversion ratio based on Respondents' data on the record. As already explained at length before the Court, the Respondents purchased glass on a per piece basis. Thus, the Respondents had to convert from per piece to KG, at the Department's instruction. This was done on a per CONNUM basis. *Id*. In the same cost reconciliations, the Respondents not only submitted weight data, but also submitted dimensions. Thus, the same CONNUM specific worksheets used to convert to KG could be used easily to convert to M2 on a CONNUM specific basis. Risen Case Brief (January 28, 2022) at Attachment 1, **CR481-482 PR421** (Containing the worksheet filtered to glass only from Risen's Section D Exhibit D-34, Step 8.1 of Risen cost reconciliation containing information to convert between pieces, M2, and KG); *see also* Jinko Redacted Case Brief (May 27, 2022) at Attachment 4, **CR494-495 PR442** (Containing the worksheet with relevant glass information from Jinko's Section D original Exhibit AD-9 with conversion data between prices, M2, and KG).

Risen's data on the record identifies the specific thickness of glass inputs used on a CONNUM-specific basis and thus provides for CONNUM-specific conversion ratios if the Department chose to conduct conversion on a CONNUM-specific basis. In Step 8.1 of Risen's cost reconciliation, there is a column titled "Job order No.", so the specific types of glass

6

including the thickness and conversion ratio for the glass inputs used in each job orders are reported on the record. Risen Sec. D Resp. (April 30, 2021) at Exh. D-34, **CR122-185, PR147**. In Step 8.2 of the same cost reconciliation, Risen reported both the CONNUM in column titled "CONNUM" and the matching job orders in column titled "job order", and therefore the job orders in which the specific CONNUMs are produced in are reported on the record. Commerce only needs to do two steps to identify the CONNUM-specific thickness of glass consumed and also the CONNUM-specific glass conversion ratio. The first step is to used Step 8.2 to identify the five CONNNUMs with POR sales to the United States and their matching job orders; and the second step is to use such job orders to search Step 8.1 to identify the thickness of glass used in these job orders and in turn in each of the five CONNUMs. How Risen's reconciliation works and how it could be adjusted for M2 is clear in their Section D response, but Risen would also have easily explained it again to the Department if they had mentioned any concern of "complexities" in the agency remand.

For the Court's clearer understanding, we also submit relevant exhibits to this comment. Please see **Exhibit 1** for excerpts from the Step 8.1 and Step 8.2 from the cost reconciliation, filtered to glass, and **Exhibit 2** for the table of the result of the CONNUM-specific thickness of glass input and conversion ratio. The table shows that for each of the five specific CONNUMs with POR exports to the United States, there is exclusively or almost exclusively, only one single thickness of glass used in the production for each CONNUM. Thus, the CONNUM-specific conversion ratio is easily and clearly identifiable, and on the record before the Department from Risen.

DOC only presented that identifying each CONNUM-specific conversion ratio is allegedly "complex" in the final remand redetermination, and has not presented this in the draft

PUBLIC VERSION

remand redetermination a reasonable explanation in support of its conclusion or sought the assistance from Risen to identify such conversion ratio based on Risen's data on the record. The concept that this is too complex for the Department is not supported by the calculations the Department already does and Respondents have already on the record. The Department does numerous complex calculations to calculate the margin, including the AFA calculations, which were done entirely by the Department. Further, the Respondents already had to go through the process of converting to KG on a per CONNUM basis, thus it is not more complex to do so on a per M2 basis. The information is all already on the record. Why is it "practical" to use the detailed conversion to KG but not "practical" to use the detailed conversion to M2 in the same worksheets?

If the Department had raised this concern below, indeed it was not even raised in the draft remand where parties could have commented, then Risen could also have done this full conversion itself for the Department, using the information on the record.

### E. Relying on the Single Average M2 Conversion Ratio is Reasonable and Reliable.

In the draft remand, the Department used the conversion ratio from each Respondent's total POR glass consumption in M2 and its total POR glass consumption in KG. The Department then applied this average conversion ratio to each CONNUM. As explained above, in the final second remand, the Department states that their methodology creates distortions because it is applying an average ratio to each CONNUM, rather than a CONNUM specific ratio to each CONNUM. Second Remand Results at 19-20. While we submit it is easy for Commerce to use CONNUM-specific conversion, as explained immediately above, we also submit that the Department's draft methodology also fulfilled the Court's instruction to make a "reasonable" conversion.

As an example of the supposed distortion, the Department compared that Risen and Jinko purchased glass with different weights and sizes, and thus each type of glass would have a different ratio and applying a single one would be less accurate. *Id*. at 20. But the Department's analysis misrepresents the scope of any supposed distortion, overlooks its normal practice of relying on a single conversion ratio, and lastly fails to consider the distortion in using the Romania data in considering which surrogate value is the best available information. The fact that the overall conversion method might not be as accurate as the CONNUM-specific conversion is not an excuse for the Department not to implement the Court's instruction at all.

The Respondents did purchase glass of different weights, but they are not "significantly different", especially when considered on the whole. The Department used a ratio of [      ] kg/M2 for Jinko and [      ] M2/kg for Risen. *Id*. For ease of reference, we have simply converted Risen's conversion the other way to also be on an M2/Kg, which would be [      ] kg/M2. *See* **Exhibit 1**. Jinko's weighted average conversion was [      ]. The Department is correct that there was a range overall, Jinko had conversions per purchase between [      ] kg/M2. *See* Jinko Case Brief at Attachment 4. However, the vast majority of their purchases had a conversion ratio around [   ]. *Id*. Similarly, Risen's weighted average conversion was [      ]. Risen had conversion per purchase between [      ] kg/M2, but the vast majority of their purchases had a conversion ratio around [   ]. *See* **Exhibit 1**. And critically, the CONNUMs that Risen exported to the U.S. had only two different ratios, [      ] kg/M2. *See* **Exhibit 2**. The Department's analysis only highlights that there were differences, but fails to demonstrate that they actually resulted in a distortion or that it is reasonable to find that they would. The Respondents had some purchases with higher or lower conversions, but this would not materially impact the margin as the overall purchases are actually very similar in weight and dimensions

such that using the average ratio is not unreliable.  Further, both Risen and Jinko have a conversion ratio that is very similar to each other, also supporting the reasonableness of this ratio in the solar industry at large.

Second, we remind the Court that the Department regularly relies upon one average conversion ratio rather than calculating a CONNUM specific one per input.  In this particular review, for many inputs that needed conversion, the Department did rely on one single conversation ratio per input from the respondents' own data. Dep't Prelim. SV Memo at Attachment II, **CR468 PR403** (relying on conversion for argon, alcohol, gas, hydrochloric acid, nitrogen, oxygen, diode, wood board, wood case, wood corner, and wood pallet).  In the history of this Order, the Department has regularly used such ratios from the respondents' own data in both the AD and CVD reviews.  Risen Final SVs (August 3, 2021) at Exhibit SV2-2 (SV summaries for AR1 through AR5, showing the need for conversions) **PR321**; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 46904 (Dep't Comm. 2016) and accompanying IDM at Comment 6 (discussing the use of the respondents' own single conversion ratio when comparing to world benchmarks that are on a KG basis) *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58871 (October 25, 2021) and accompanying IDM at Comment 11 ("while the weight of a square meter of the glass imported into Malaysia during the POR is not on the record of this review, we have a very complete and accurate measurement of the weight of a square meter of the solar glass consumed by Risen.").

Risen cited to comparable examples in other Orders as well of this practice. Risen R56.2 brief at 16-18.  Thus, the Department actually relies upon a single conversion rate from respondents' data for inputs frequently in its normal practice, including for solar glass, without finding it distorts the margin.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice.").

Lastly, the Department analysis that there may be distortions from using an average conversion in Malaysia fails to weigh this hypothetical against its practice and policy of concluding that use of a secondary surrogate country introduces inaccuracies and inconsistencies. The Department has a practice of relying on the primary surrogate country for all inputs.  19 C.F.R. 315.408(c) directs that the Department "normally will value all factors in a single surrogate country."  It is also not a mere preference, but was specifically included in the regulation "to prevent parties from 'margin shopping': i.e., to prevent parties from arguing that the Department combine input prices from different surrogates to achieve the highest or lowest valuations of those inputs."  *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996).  The Department's practice flows from the basis of the surrogate country process, which is a foundational part of the nonmarket economy methodology for determining normal value.  The Department is seeking costs in a market economy cost center, and the costs work together.  One economy may have advantages in some raw materials or some financial costs, but not in other areas.  Valuing costs in different cost centers, rather than one,

introduces potential distortions that are greatly reduced if relying on one single economy's market costs.

Indeed, the fact that Malaysia also has a robust solar industry, unlike Romania, is also important. There is no evidence that Romania has a solar industry at all, while Malaysia is a significant player in the global solar market. Thus, the glass imports into Malaysia under the HTS would contain actual solar glass used by manufacturers of solar modules in Malaysia (by the presence of a robust Malaysian solar module industry), while glass imports into Romania under the HTS would not contain solar glass because there is no evidence of any solar module production in Romania at all. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 62,275 (Dep't Commerce October 2, 2020) and accompanying IDM at Cmt 4. ("The importance we place on the fact that Malaysia produces solar cells and panels, and no other surrogate country does so, is that the surrogate data provided by Malaysia will consist of actual inputs used in producing subject merchandise, as opposed to the data of the other surrogate countries which have no reason to import inputs used specifically to produce solar cells and panels.").

The higher price of glass in Romania also supports that there is a distortion introduced by not only relying on a country that is not the primary surrogate country, but a country that is not a producer of solar panels. Notably, when using the Malaysian glass value in the draft remand, the Department calculated a 0% margin for Risen and a 5.17% margin for Jinko. *See* Second Draft Remand at 13; 2REM.PD1. These margins are consistent with prior solar margins in the China solar reviews that are final. But when relying on the Romanian glass value, Risen's margin is 12.24% and Jinko's margin is 20.99%.

The Department has not considered at all that relying on a Romanian surrogate value for glass introduces other distortions.  Due to the substantial justification to rely on a single surrogate country, the Department has found that "it is Commerce's well-established practice to rely upon the primary surrogate country for all surrogate values, whenever possible, and to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 36,886 (Dep't Commerce July 30, 2019) and accompanying IDM at Cmt. 2; *see also Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) ("A reasonable mind could likewise conclude that Commerce's regulatory preference to value all inputs from a single surrogate country favors using Thai data to value all of Plaintiffs' inputs despite some apparent relative superiority of the Philippine financial and HC1 data.") *affirmed Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 2016 U.S. App. LEXIS 7196 (Fed. Cir., Apr. 21, 2016).

The Department has not said that the Malaysian surrogate value for glass itself is unreliable.  As discussed above, the  Department has all information needed to rely upon the Malaysian M2 surrogate value.  Thus, the Department must not distort the margin by departing from its practice and resorting to a secondary, non-solar producing surrogate country; and doing so was not supported by substantial evidence and otherwise was arbitrary and capricious.

### F.  Reflective Glass

The Court also remanded to the Department to explain how the Romanian HTS is specific to the solar anti-reflective glass.  We support and incorporate by reference the arguments made by Jinko with regard to the Romanian HTS description and coverage.  The Department

13

continues to speculate on the meaning of anti-reflective glass, contrary to the Court's instruction.

We also again note that while the Court and the Department discussed only Jinko's glass

specifications, the arguments made would also apply to Risen's glass. Risen's glass is solar

glass, standard to the industry, that is anti-reflective and absorbs light. *See* Risen Sec D at

Exhibit D-30 (glass specification sheets), **CR122-185, PR147**.

## II.    The Department's New Calculation Methodology for Applying Adverse Facts Available to Risen's Unreported FOPs is Not Supported by Substantial Evidence and Contrary to Law.

The Court, while upholding that the Department could apply partial AFA to Risen for

unreported FOPs from its unaffiliated cell suppliers, has remanded now for the second time the

Department's brand new methodology for calculating AFA. The Court found that the

methodology was contrary to law and unsupported by substantial evidence in the first remand.

Slip Op. 24-53 at 54. In the second remand instructions, the Court continued to find that the

methodology was unlawful. The Department has still not changed this methodology.

The Court discussed the legality of using adverse facts available, finding "both the statute

and the SAA reveal that Commerce can use an adverse inference by relying on 'information

derived from' the record, but Commerce cannot create information not rooted in record evidence.

Deriving information requires a logical connection between the source, i.e., the record evidence,

and the result." Slip Op. 25-67 at 24. The Court also discussed the Department's steps in

calculating AFA consumption for Risen's unreported inputs. The Court criticized the

Department's method noting any option "if lacking a logical connection to the facts on the

record, would be contrary to law" and concluding that "Commerce acts contrary to law when it

creates the 'multiplicative inverse' to use in its calculations." *Id*. at 28 & 27. The Court cautions

that "Commerce uses the number 1 to create the multiplicative inverse. The number 1 is not on the record and is not specific to Risen." *Id*. at nt. 15.

In the remand, the Department again explained its three multipliers, again stating that the multiplier is "1+" or "1." Followed by a particular figure. Second Remand Results at 27. Thus, it is unclear how the Department is not using "1" or multiplicative inverse anymore, as it claims. Nonetheless, even if this is the case, the Court's other concerns are not addressed properly by the Department.

The Court found that the Department had not explained why the grouping of the inputs into three categories was reasonable or lawful. Specifically, the Department calculated one single average AFA adjustment factor for all solar cell inputs, one AFA factor for solar modules, and another one AFA factor for packing materials. The Court states that this grouping is not explained to be reasonable on this record. Slip Op. 25-67 at 26, nt 14. Indeed, inputs have significantly different reported factors of production and have significantly different surrogate values assigned to them. There is no logic for this much broader calculation.

The Court goes on to hold that even if "Commerce explains its reasoning for grouping the input ratios by category rather than using input-specific ratios, or creating one simple average input ratio, it does not explain why the input specific ratios were not sufficiently adverse. *Id*.; *see also Id*. at 31 ("Commerce does not explain why it believes the rate it calculated using the highest consumption quantity that was reported for a particular input for any CONNUM would not be adverse."). Risen took appeal of not only this particular AFA calculation, but even of the former method of AFA. Thus, Risen certainly found that the original form of applying AFA was sufficiently adverse. The Court also noted that, "if during the review, Commerce believed the rate was not adverse it could have requested additional information from the parties, given the

parties an opportunity to comment on the new information, and calculated a rate using that new information." *Id*. at nt. 17. The Department did not take this approach, but rather continues to apply the very same inaccurate methodology after two remands.

This methodology is divorced from the concerns of accuracy, and has effectively resulted in punishment instead of inducing cooperation. The Court specifically warned against this, "Commerce must explain how the facts it selects based on its use of an adverse inference prioritizes cooperation, not punishment." *Id*. at 25 citing to *Bio-Lab, Inc. v. United States*, 435 F. Supp. 3d 1361, 1368 (Ct. Int'l Trade 2020); *De Cecco*, 216 F.3d at 1032; *Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010).

The Department dismisses these concerns, stating again that it needed to induce cooperation and be sufficiently adverse. Remand Results at 12 & 32. The Court in *SKF* reiterates that that the Department must not impose punitive, aberrational, or uncorroborated margins and that the AFA rate must still be related to respondent's actual dumping margin. *SKF USA Inc v. United States*, 391 F. Supp. 2d 1327, 1336 (Ct Int'l Trade 2004) quoting *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *NSK Ltd. v. United States*, 346 F. Supp. 2d 1312, 1335, 28 Ct. Int'l Trade 1535 (CIT 2004).

The Department admits that its calculation, which is less specific and more adverse, was specifically used because it did not believe its normal methodology was adequately adverse. However, this still fails to properly consider the concerns of *Mueller*, as also raised by the Court. *Mueller* discussed the concerns of deterrence and accuracy:

> This result is wholly consistent with our precedents applying subsection (b) itself, which is properly directed to non-cooperating parties. This Court's decision in F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000), required that, even for a non-cooperating party, subsection (b) be applied to arrive at "a reasonably accurate estimate of the respondent's

actual rate, albeit with some built-in increase intended as a deterrent to noncompliance."

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1234 (Fed. Cir. 2014).

*Mueller*'s accuracy interests are certainly not met by using the highest FOP consumption rates. *Risen Energy*, 477 F. Supp. 3d 1343-44 ("Commerce also fails to adhere to Mueller's emphasis on accuracy above all else. *See Mueller*, 753 F.3d at 1233… Commerce does not cite record evidence that using the highest FOP consumption rates on the record results in accurate dumping margins for Risen."). Inputs have significantly different reported factors of production and have significantly different surrogate values assigned to them. There is no justification for calculating and applying AFA on a much broader basis than the record allows. It serves only to distort the AFA factors and the resulting dumping margin. Applying an input-specific AFA more accurately reflects the permissible AFA for each input.

In sum, the Department's new methodology for calculating AFA to Risen's unreported FOPs remains unsupported by the record and contrary to law. The Department has not followed the Court's instructions.

### III.    Conclusion and Prayer for Relief

In light of the foregoing, the Department's Second Remand Results are not supported by substantial evidence and are an otherwise contrary to law.  Risen respectfully requests that this Court remand the determination to the Department and order the Department to rely on the Malaysian glass value in accordance with its normal practice and policy and apply its normal AFA methodology for missing cell FOPs.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 868-0300
email:  gmenegaz@igtlaw.com
Date: January 5, 2026                *Counsel to Consolidated Plaintiff*
                                     *Risen Energy Co., LTD.*

PUBLIC VERSION

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **5,361** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 Fifteenth Street., N.W.  20005
*Counsel to Consolidated Plaintiff*
*Risen Energy Co., LTD.*

1

Exhibit 1

EXHIBIT NOT SUSCEPTIBLE TO
PUBLIC SUMMARY

Exhibit 2

EXHIBIT NOT SUSCEPTIBLE TO
PUBLIC SUMMARY