IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JINKO SOLAR IMPORT AND EXPORT CO., LTD., *ET AL.*, | ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *ET AL.*, | ) ) ) |
| Plaintiff-Intervenors | ) ) |
| v. | ) Consol. Court No. 22-00219 ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING, | ) ) ) |
| Defendant-Intervenor. | ) ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON**
**COMMERCE'S REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

JACK DUNKELMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
    Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230


February 25, 2026

AN HOANG
Trial Attorney
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-3226
An.Hoang@usdoj.gov

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

Page

BACKGROUND .................................................................................................................. 2

   I.    The Administrative Proceeding ................................................................................ 2

   II.   The Court's First Remand Order ............................................................................. 3

   III.  Commerce's First Remand Redetermination ......................................................... 5

   IV.  The Court's Second Remand Order ......................................................................... 5

   V.   Commerce's Second Remand Redetermination ...................................................... 6

      A.   Solar Glass Valuation ..................................................................................... 6

      B.   AFA Methodology ........................................................................................... 8

      C.   Recalculation of the Separate Rate ............................................................... 10

ARGUMENT ..................................................................................................................... 10

   I.    Standard of Review................................................................................................ 10

   II.   Commerce's Selection of Romanian HTS 7007.19.80 To Value Solar Glass Is In
        Accordance With Court's Remand Order And Is Supported by Substantial Evidence .... 10

      A.   Substantial Evidence Supports Commerce's Determination That Malaysian HTS
           Category 7007.19.90 Is Less Reliable Than Romanian HTS Category 7007.19.80 .... 10

      B.   Substantial Evidence Supports Commerce's Determination That Jinko's Glass Falls
           Within Romanian HTS 7007.19.80 ............................................................... 17

   III.  Commerce's AFA Methodology Is Accordance With the Court's Remand Order, Is
        Supported By Substantial Evidence, And Is in Accordance With Law........................... 19

   IV.  Commerce's Separate Rate Is Supported By Substantial Evidence And Is In Accordance
        With Law ............................................................................................................... 27

CONCLUSION................................................................................................................... 27

# **TABLE OF AUTHORITIES**

Cases                                                                                                      Page(s)

*Filippo Fara S. Martino S.p.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000) ................................................................. 23

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*,
   651 F. Supp. 3d 1348 (Ct. Int'l Trade 2023) ............................................. 11

*Jinko Solar Import and Export Co., Ltd. v. United States*,
   701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ......................................... 3, 4

*Jinko Solar Import and Export Co., Ltd. v. United States*,
   789 F. Supp. 3d 1275 (Ct. Int'l Trade 2025) ................................... passim

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ............................................. 10

*Olympia Indus., Inc. v. United States*,
   7 F. Supp. 2d. 997 (Ct. Int'l Trade 1998) ................................................. 11

*Qingdao Sea-Line Trading Co., Ltd. v. U.S.*,
   766 F.3d 1378 (Fed. Cir. 2014) ................................................................. 11

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990) ................................................................. 11

Statutes

19 U.S.C. § 1677b(c)(1)............................................................................... 11
19 U.S.C. § 1677e(b), (c).............................................................................. 4

Regulations

19 C.F.R. 351.408(c)(2)............................................................................... 11

Administrative Determinations

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the
People's Republic of China*,
   87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022), *as amended by*
   87 Fed. Reg. 48,621 (Dep't of Commerce Aug. 10, 2022) ....................... 2

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

———————————————————————
                                                              )
JINKO SOLAR IMPORT AND EXPORT                )
CO., LTD., *ET AL.*,                                          )
                                                              )
                        Plaintiffs,                           )
                                                              )
            and                                               )
                                                              )
JA SOLAR TECHNOLOGY                                           )
YANGZHOU CO., LTD., *ET AL.*,                                 )
                                                              )
                        Plaintiff-Intervenors                 )
                                                              )
            v.                                                )            Consol. Court No. 22-00219
                                                              )
UNITED STATES,                                                )
                                                              )
                        Defendant,                            )
                                                              )
            and                                               )
                                                              )
AMERICAN ALLIANCE FOR SOLAR                                   )
MANUFACTURING,                                                )
                                                              )
                        Defendant-Intervenor.                 )
———————————————————————)

**DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully responds to comments filed by consolidated

plaintiffs Jinko Solar Import and Export Co., Ltd. (Jinko), ECF Nos. 160–61, and Risen Energy

Co., Ltd. (Risen), ECF Nos. 164–65, as well as plaintiff-intervenors JA Solar Technology

Yangzhou Co., Ltd. (JA Solar), ECF No. 159, and BYD (Shangluo) Industrial Co., Ltd. (BYD),

ECF No. 163, concerning the Department of Commerce's remand redetermination filed in

accordance with this Court's remand order in *Jinko Solar Import and Export Co., Ltd. v. United*

*States*, 789 F. Supp. 3d 1275 (Ct. Int'l Trade 2025) (*Jinko II*).  *See* Final Results of

Redetermination Pursuant to Court Remand, Sep. 26, 2025 (Second Redet.), ECF Nos. 147–48.

For the reasons explained below, we respectfully request that the Court sustain Commerce's

remand redetermination and enter final judgment for the United States.

## BACKGROUND

### I.    The Administrative Proceeding

In December 2012, Commerce published the antidumping duty ("ADD") order on solar

cells from the People's Republic of China (China).  *Crystalline Silicon Photovoltaic Cells,*

*Whether or Not Assembled Into Modules from the People's Republic of China,* 77 Fed. Reg.

73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination).  In February 2021,

Commerce initiated the eighth administrative review of the ADD order and selected Jinko and

Risen as mandatory respondents.  *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 86 Fed. Reg. 8,166, 8,168–69 (Dep't Commerce Feb. 4, 2021); Resp.

Selection Memo. (Feb. 25, 2021) (P.R. 43; C.R. 5).

In December 2021, Commerce published the preliminary results.  *Crystalline Silicon*

*Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 86 Fed. Reg. 72,923

(Dep't of Commerce Dec. 23, 2021) (P.R. 408) (Preliminary Results), and accompanying

Preliminary Decision Memorandum (P.R. 396) (PDM).  In October 2022, Commerce published

the final results.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, From the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't of Commerce June

28, 2022) (P.R. 464) (Final Results), and the accompanying Issues and Decision Memorandum

(P.R. 455) (IDM), *as amended by* 87 Fed. Reg. 48,621 (Dep't of Commerce Aug. 10, 2022) (P.R.

473) (Am. Final Results).

In the final results, as Commerce had previously selected Malaysia as the primary surrogate country for valuing all factors of production (FOP), Commerce continued to rely on Malaysian data to determine surrogate values for certain solar cell inputs, such as ethylene vinyl acetate (EVA), backsheet, and electricity.  IDM at 44–47, 58–60; PDM at 16–19, 23–28. Commerce, however, continued to rely on Romanian import data to value solar glass using the same Harmonized Tariff Schedule (HTS) subheading as it did in the preliminary results because the import data under Romanian HTS 7007.19.80 was more specific, reliable, and accurate to that input and therefore the best information to value the respondents' solar glass.  IDM at 13–19.

On non-surrogate value issues, Commerce continued to apply facts available with an adverse inference in calculating Risen's dumping margin because Risen, in addition to its suppliers, had failed to cooperate to the best of its ability by refusing to provide requested FOP information.  IDM at 6–12; *see also* PDM at 15–16.

Commerce calculated antidumping duty margins of 20.99 percent for Jinko, 12.24 percent for Risen, 14.79 percent for the separate rate companies, and 238.95 percent for the China-wide entity.  Am. Final Results, 87 Fed. Reg. at 48,621–22.

## II.    The Court's First Remand Order

In July 2023, the Court sustained in part, and remanded in part, Commerce's final results. *See Jinko Solar Import and Export Co., Ltd. v. United States*, 701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) (*Jinko I*).  The Court sustained a number of Commerce's determinations, including the valuations of certain solar cell inputs and the use of facts available with an adverse inference against Risen.  *Id.*  However, the Court directed Commerce to reconsider or to further explain its: (1) valuation of Jinko and Risen's solar glass using Romanian HTS 7007.19.80, (2) calculation

of the rate for facts available with an adverse inference, and (3) valuation of air freight. *See id*. at 1397.

Regarding solar glass valuation, the Court held that Commerce had "fail{ed} to explain how the data from Malaysia, as the primary surrogate country, {wa}s unreliable such that departure from its standard practice of using the data from the primary surrogate country {wa}s justified." *Id.* at 1382. The Court explained that "Commerce fail{ed} to acknowledge that Jinko's proposed conversion methodology based on factors contained in the record, such as the dimensional specifications of Jinko's coated glass input grades, that could establish reliable conversion using the Malaysian data." *Id.* And the Court found that Commerce did not sufficiently address record evidence undermining its determination that the Romanian HTS heading is specific for valuing Jinko's glass, particularly given Jinko's contention that the Romanian HTS heading excludes its anti-reflective coated glass. *Id*. at 1382–83.

Regarding Commerce's adverse facts available (AFA) methodology, the Court held that Commerce's determination to apply facts available with an adverse inference was reasonable. Commerce, however, "failed to select among the facts otherwise available in the instant review, and instead created facts by manipulating evidence on the record" to substitute for the necessary FOP information that Risen failed to provide to Commerce. *Id.* at 1396. The Court remanded Commerce's determination for reconsideration or further explanation of its AFA methodology, including "why the grouping it selected was logical, how the formula worked, and how any of the choices made serve the purpose of the statute to promote accuracy and deterrence." *Id.* (citing 19 U.S.C. § 1677e(b), (c)). Accordingly, the Court instructed Commerce to recalculate the separate rate for JA Solar and BYD consistent with its redeterminations. *Id.* at 1397.

### III.    Commerce's First Remand Redetermination

In August 2024, Commerce issued its first remand redetermination.  Final Results of Redetermination Pursuant to Court Remand, August 29, 2024 (First Redet.), ECF Nos. 89–90. In its redetermination, Commerce further explained its decision to value solar glass using Romanian HTS 7007.19.80 instead of Malaysian HTS 7007.19.90.  First Redet. at 3–12. Commerce additionally addressed Jinko and Risen's proposed conversion formulas that relied on multiplying the area of the glass in square meters by its thickness and density to calculate the weight.  *Id*. at 6–7.  Further, Commerce addressed the specificity of the Romanian HTS to Jinko's glass.  *Id.* at 8.  Additionally, Commerce further explained its methodology for calculating the adjustment that it applied to missing factors of production (FOP) data not reported by Risen's unaffiliated solar cell and solar module producers.  *Id.* at 19–27.

### IV.    The Court's Second Remand Order

In May 2025, the Court sustained Commerce's valuation of air freight, but held that Commerce (1) "fail{ed} to address concerns regarding the specificity of the Romanian HTS" and "fail{ed} to confront evidence supporting the reliability of the Malaysian data" in its valuation of solar glass, and (2) "create{ed} facts without the requisite link to the evidence in the record" in its adverse inference calculation methodology.  *See Jinko II*, 789 F. Supp. 3d 1275.

Regarding solar glass valuation, the Court found that Commerce had not addressed all the exemplars listed by the Romanian HTS with regard to light transmission, and thereby failed to address Jinko's argument that the Romanian HTS expressly excludes its anti-reflective coated glass.  *Jinko II*, 789 F. Supp. 3d at 1282.  Furthermore, the Court held that Commerce did not address the reliability of using the Malaysian data, which are expressed in square meters of glass, because Commerce did not explain why it could not reasonably convert the respondents' raw data "from per piece to square meters" using record evidence.  *Id.* at 1284.

5

Regarding the rate that Commerce used for facts available with an adverse inference, the Court held that, while Commerce had explained its methodology, it had failed to show how its methodology used facts derived from record evidence. *Id.* at 1289–90. Specifically, the Court held that Commerce failed to explain any connection between the "multiplicative inverse" used in its calculation and "the facts on the record" in order to demonstrate that its final calculation is derived from record evidence. *Id.* Moreover, Commerce failed to explain why missing information is indicative of rates higher than those calculated using the highest consumption quantity that was reported for a particular input for any control number (CONNUM) on the record, and why the rate it chose is reasonable. *Id.* at 1291–92. The Court also instructed Commerce to again recalculate the separate rate for JA Solar and BYD consistent with its redeterminations. *Id.* at 1292.

**V.**     **Commerce's Second Remand Redetermination**

  A.  Solar Glass Valuation

In its draft remand redetermination, Commerce initially found appropriate to determine Jinko and Risen's solar glass consumption in square meters. Second Redet. at 4. Specifically, Commerce stated that the record contained inventory records for Jinko and Risen that showed the number of pieces of each type of glass withdrawn from inventory for production during the period of review (POR) and the length and width of each piece of glass. *Id.* From this information, Commerce calculated the total square meters of glass consumed in production by each respondent during the POR. *Id.* Commerce then used a ratio of the total glass consumption in square meters to the total of glass consumption in kilograms to calculate the number of square meters of glass used for each kilogram of glass consumed in production. *Id.* Commerce multiplied this square-meter per kilogram conversion ratio by the number of kilograms of glass consumed per watt of the finished product, which was reported on a CONNUM-specific basis, to

calculate the square meters of glass consumed per watt of finished product for each CONNUM reported in the FOP database. *Id.* Commerce explained that, because it had the glass consumption in square meters for both respondents, it was able to use import values under Malaysian HTS number 7007.19.90, which are reported in Malaysian Ringgits (RM) per square meter, to value the respondents' consumption of solar glass. *Id.*

However, after reviewing the parties' comments on the draft remand redetermination, Commerce revised its position in its final redetermination and returned to using import prices under Romanian HTS number 7007.19.80 to value glass used by respondents to produce solar modules. *See* Second Redet. at 5, 17–24. Commerce explained that its method used to value the respondents' solar glass in the draft remand redetermination was flawed for several reasons. First, the factor used to convert solar glass consumption quantities into a unit of measure that was compatible with the Malaysian import prices for solar glass (*i.e.*, square meters) did not properly account for variance in glass thickness. *Id.* at 5, 18–19. Accordingly, valuing the glass using Malaysian import values in square meters would generate the same normal value for two CONNUMS with different glass thicknesses, though in reality, "the normal value for the CONNUM with the thicker glass would be greater than the normal value of the CONNUM with the thinner glass." *Id.* at 18–19. Because normal values are compared to U.S. prices to calculate dumping margins, using Malaysian import values would therefore "result in distorted dumping margins contrary to Commerce's statutory mandate to calculate dumping margins as accurately as possible." *Id.* at 19. Second, Commerce noted that "there is no information on the record showing that the glass imported into Malaysia during the POR had the same thicknesses (and the same quantities of glass for each thickness) as the glass used by Risen and Jinko." *Id.*; *see also* First Redet. at 6 ("the thickness of the glass imported into Malaysia during the POR is

unknown"). Therefore, Commerce had "no reason to conclude that including a glass value in normal value based on Malaysia import data is accurate." *Id*. Third, the method used in the draft remand redetermination used an average conversion ratio, not specific to any CONNUM, as "the only ratio . . . that was practical to calculate from record information." *Id*. at 19, 21. But both Jinko and Risen reported using glass pieces consisting of three different thicknesses and weights. *Id*. at 20. Commerce therefore found that the method used in the draft remand redetermination "d{id} not result in accurate CONNUM-specific glass consumption figures in square meters" because the average conversion ratio differed from the true CONNUM-specific conversion rates. *Id*. at 20–21. In view of these issues, Commerce concluded that "it would not be appropriate to use Malaysian import values as a surrogate for the value of glass." *Id*. at 21. Rather, Commerce continued to use Romanian HTS 7007.19.80 "as the best available information on the record." *Id*.

### B. AFA Methodology

On remand, Commerce further explained its methodology for calculating the adjustment that it applied to missing FOP data not reported by Risen's unaffiliated solar cell and solar module producers. Specifically, Commerce addressed two issues identified by the Court: the use of the digit "1" in the multiplicative inverse and Commerce's failure to adequately explain why its AFA methodology was reasonable. Second Redet. at 6.

With regard to the use of the digit "1,"[1] Commerce stated that the multiplicative inverse is simply a mathematical tool to determine by what number must Commerce multiply

---

[1] In *Jinko II*, this Court held that Commerce's use of the multiplicative inverse was contrary to law because the number "1" was not derived from record information. Specifically, the Court stated, "{i}t is possible that Commerce's use of the multiplicative inverse may be its attempt at adding a "built-in increase intended as a deterrent to non-compliance" and that if that is the case, "Commerce must explain that it is doing so and further explain why that built in

CONNUM-specific per-unit consumption quantities to adjust them to the highest reported CONNUM-specific per-unit consumption quantities for those inputs. *Id.* at 8. But on remand, Commerce explained that it calculated the applied adverse inference without applying a multiplicative inverse. *Id*. Instead, Commerce first identified the "highest reported consumption quantity for a given input in any CONNUM." *Id.* at 9. Then, Commerce averaged the reported consumption quantities for the remaining CONNUMs. *Id*. Next, Commerce calculated the percentage difference between the highest reported consumption quantity and the average of the other reported consumption quantities for each input. *Id*. Commerce then explained that, because there were "hundreds of inputs," it grouped the inputs into three categories: solar modules, solar cells, and material inputs for packing solar modules. *Id*. Within each category, Commerce averaged the percentage adjustments calculated for each input. *Id*. Finally, Commerce added the appropriate average percentage adjustment to the reported cost of each input "as its AFA plug for unreported inputs," which "account{s} for the share of the total solar cells and modules produced by Risen that were supplied by {its} uncooperative suppliers." *Id*. at 10–11.

Additionally, Commerce explained that its AFA methodology was reasonable because it "us{ed} Risen's consumption quantities as facts available" to substitute for missing FOP consumption quantities. *Id*. at 11. Additionally, Commerce's AFA methodology addresses situations where there are not "multiple CONNUM-specific per-unit consumption quantities . . . from which to select the highest consumption quantity as AFA." *Id*. at 14, 29. Under the applied AFA methodology, Commerce could "calculate a percentage increase, based on variation{s} in Risen's own reported data . . . to apply an adverse inference to all cell inputs," including those

_____

increase should be considered a derivation from record evidence, and therefore in accordance with the statute. *Jinko II*, 789 F. Supp. 3d at 1275.

used in only one CONNUM. *Id.* at 15, 29.  Moreover, Commerce explained that, because "in the three previous administrative reviews of the AD order, Risen failed to provide FOP data" and "continued to use uncooperative suppliers," it was "reasonable to use an AFA methodology other than the one used in the past (*i.e.*, the highest reported consumption quantities)." *Id.* at 12–13, 31–32.  Using the variation in Risen's CONNUM-specific per-unit consumption quantities, Commerce calculated "the amount by which the uncooperative supplier's consumption quantities could exceed those of Risen" to "add{} a 'built-in increase' that will deter non-cooperation." *Id.* at 13–14, 29–31.

     C.  Recalculation of the Separate Rate

Commerce assigned a separate rate to JA Solar and BYD based on the dumping margins calculated for the mandatory respondents, Jinko and Risen. *Id.* at 16.  Because Commerce did not value solar glass using a new surrogate value, it did not revise the dumping margins or change the separate rate assigned to JA Solar and BYD. *Id.* at 16, 34.

## ARGUMENT

### I.    Standard of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

### II.   Commerce's Selection of Romanian HTS 7007.19.80 To Value Solar Glass Is In Accordance With Court's Remand Order And Is Supported by Substantial Evidence

    A.  Substantial Evidence Supports Commerce's Determination That Malaysian HTS Category 7007.19.90 Is Less Reliable Than Romanian HTS Category 7007.19.80

Commerce values factors of production (FOPs) "based on the best available information

regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1). "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao Sea-Line Trading Co., Ltd. v. U.S.*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). Although Commerce generally prefers to value all FOPs using data from a single surrogate country pursuant to 19 C.F.R. 351.408(c)(2), Commerce also considers reliability and accuracy. *Olympia Indus., Inc. v. United States*, 7 F. Supp. 2d. 997, 1001 (Ct. Int'l Trade 1998) ("accuracy is the touchstone of the antidumping statute." (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))). Consequently, Commerce may use surrogate sources outside of the primary surrogate country when reliable surrogate values in the primary surrogate country are not available on the record. *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 651 F. Supp. 3d 1348, 1355 (Ct. Int'l Trade 2023).

The Court's remand order recognizes that Commerce adequately explained why it could not reasonably convert reported kilograms to square meters. *Jinko II*, 789 F. Supp. 3d at 1283. However, the Court held that Commerce failed to address why it cannot convert the respondents' raw data from per piece to square meters using the record evidence. *Id.* The Court further stated that, although Romanian HTS 7007.19.80 appeared to be specific and reliable on the record, so too did Malaysian HTS 7007.19.80. *Id.* at 1284.

In its draft remand redetermination, Commerce used Malaysian HTS 7007.19.90 to value Jinko and Risen's solar glass. Second Redet. at 4. In doing so, Commerce used the total glass consumption in square meters and kilograms to calculate a conversion ratio between kilograms and square meters for each company. *Id.* Then, Commerce used the conversion ratio to calculate the square meters of glass consumed per watt of finished product for each control

number (CONNUM) reported in the FOP database.  *Id.*  However, after considering the

petitioner's comments, in the final redetermination, Commerce agreed with the petitioner that

using Malaysian import values expressed in RM per square meter to value glass is distortive on a

CONNUM-specific basis.  *Id.* at 5, 17–21.

Commerce uses surrogate values to calculate the value or cost of each FOP, which it adds

together to calculate normal value.  *Id.* at 18.  Commerce constructs normal value on a model or

CONNUM specific basis.  *Id.*  If a respondent used glass with the same surface area (same

number of square meters) but very different thicknesses in two solar modules with different

CONNUMs, Commerce explained that it is reasonable to conclude that the thicker glass would

cost more and thus, all else being equal, the normal value for the CONNUM with the thicker

glass would be greater than the normal value of the CONNUM with the thinner glass.  *Id.*

During the POR, Jinko and Risen used glass with varying thicknesses in their solar modules.  *Id.*

at 18.  Thus, Commerce explained that valuing glass using Malaysian import values in square

meters ignores the varying thicknesses of the glass and results in the same glass value in the

normal value for both CONNUMs, even though the thickness of the glass differed between

CONNUMs, which is inaccurate and leads to a distortive normal value.  *Id*. at 19.  Because

Commerce compares normal values to U.S. prices to calculate dumping margins, Commerce

explained that this approach would result in distorted dumping margins contrary to Commerce's

statutory mandate to calculate dumping margins as accurately as possible.  *Id*.

Risen argues that Commerce can rely on CONNUM-specific square meter data for the

respondents' solar glass.  Risen's Cmts. at 5–8.  Risen proposes a two-step methodology:  (1) use

Step 8.2 of Risen's cost reconciliation to identify the five CONNUMs reported for sales of

subject merchandise during the POR and their corresponding job order numbers, (2) find those

job order numbers in Step 8.1 of the cost reconciliation and identify the thickness of glass used for those job orders. *Id.* at 7. In its comments, Risen provides excerpts from Step 8.1 and 8.2 of the cost reconciliation filtered for glass inputs. Risen's Cmts. Ex. 1. In Exhibit 2 of its comments, Risen lists the thickness of the glass and the number of kilograms per square meter for each of the five CONNUMs reported for its POR sales of subject merchandise. Risen's Cmts. Ex. 2.

Although Risen contends that Commerce could follow the above two-step methodology to derive CONNUM-specific kilogram to square meter conversion ratios, there are several issues with Risen's argument. First, [  ] of the five CONNUMs reported for sales of subject merchandise during the POR are not listed in Step 8.2 of Risen's cost reconciliation (CONNUMs [                                                     ]). Risen's Cmts. Ex. 1. (Step8.2). Thus, Commerce cannot use Step 8.2 of Risen's cost reconciliation to find the corresponding job order numbers for those CONNUMs, to identify the size (including the thickness) of the glass used to produce products assigned to those CONNUMs, or to calculate kilogram to square meter conversion ratios for those [  ] CONNUMs. And these [  ] CONNUMs account for approximately [        ] of U.S. sales, by quantity. *See* Risen's Fifth Supplemental Questionnaire Response at Exhibit SQR5-1. (C.R. 445, P.R. 372).

Furthermore, Risen's proposed methodology does not address the fact that Risen's affiliates produced products with the same CONNUMs as the subject merchandise. *See* Risen's Section D, Appendix VI, and Appendix XIII Questionnaire Responses at D-2 and D-3. (C.R. 122, P.R. 147).[2] Risen consolidated its FOP with those of its affiliates when reporting

---

[2] Risen stated "{d}uring this POR, three of Risen's affiliated companies, Changzhou, Yiwu and Twinsel, produced solar modules falling under CONNUMs that Risen exported and entered the United States during this POR. . . . Risen has reported both the single company FOPs and consolidated FOPs.").

CONNUM-specific FOP.  *Id.* at D-3.  Steps Step 8.1 and 8.2 are part of Risen's cost reconciliation and do not relate to the affiliated producers.  Risen's Cmts. Ex. 1. Therefore, Risen's proposed methodology, and resulting conversion rates, do not account for the size and thickness of glass consumed in production by these affiliates.  As Commerce explained in its draft remand redetermination, deriving multiple CONNUM-specific conversion ratios is more complicated.  Second Redet. at 21.  This is particularly true if different thicknesses of glass were used for a particular job order.

Risen and Jinko also argue that it was reasonable to use a single average square meter conversion ratio as Commerce had done in its Draft Remand.  Risen Cmts. at 8–13; Jinko Cmts. at 18–24.  As Commerce explains in its Final Remand Redetermination, the average conversion ratios that Commerce used for Jinko and Risen in the Draft Remand are distortive on a CONNUM-specific basis.[3]  Second Redet. at 19–20.  Commerce explains that the CONNUM-specific ratio will differ from the average conversion ratio for each respondent depending on the pieces of glass used to produce solar modules that are assigned a particular CONNUM.  *Id*.  In its explanation, Commerce observes that the average conversion ratio used by Commerce in the Draft Redetermination differs by approximately [                ] percent for Jinko and [

] percent for Risen from conversion ratios that Commerce calculated using three different sizes of glass used by each company.  *Id*. at 20.  Therefore, Commerce reasons that the overall average conversion ratios used in the Draft Remand do not result in accurate CONNUM-specific glass consumption figures in square meters.  *Id.* at 20.

_____

[3]  In the draft remand redetermination, Commerce used conversion ratios of [        ] M2/kg for Risen and [        ] kg/M2 for Jinko.  *See* Second Redet. at 20.

Jinko also argues that using an overall average kilograms to square meter conversion ratio is not distortive on a CONNUM-specific basis because the reported kilograms of glass consumed reflects thickness differences in the glass used for various CONNUMs. Jinko's Cmts. at 19–23. Jinko illustrates its point with an example of how two pieces of glass with the same number of square meters but with different thicknesses would have different weights per watt in the FOP database. Jinko's Cmts. at 20–21. When Commerce uses an overall average kilograms to square meter conversion ratio to convert the reported weights to square meters per watt, the thicker glass will have a greater weight and thus more square meters per watt. Thus, the thicker, heavier glass will have a greater cost when valued using the Malaysian import prices per square meters, which is what one would expect for thicker glass.

However, Jinko's illustration shows that the result of its calculation is not accurate for the actual square meters of glass consumed (in which case the cost of the glass for each CONNUM would be the same) and is not necessarily accurate for the kilograms of glass consumed because the Malaysian SV is not on a per kilogram basis. Jinko's Cmts. at 20. There is no reason to go through this conversion process when it results in less accurate costs rather than simply using the Romanian import prices per kilogram and the actual kilograms of glass consumed.

Jinko also argues that an overall average kilograms to square meter conversion ratio is not distortive on a CONNUM-specific basis because Commerce averages FOP across products classified within a particular CONNUM and thus divergence across the thickness of individual glass panels within a CONNUM are irrelevant. Jinko's Cmts. at 21. However, Commerce is concerned with thickness divergence across glass used in products with different CONNUMs, not thickness divergence across glass used in products within the same CONNUM. *See* Second Redet. at 19–20. Differences in the thickness of glass used in products across CONNUMs may

not be properly reflected if Commerce applies one overall average kilograms to square meter conversion ratio to all CONNUMs. *Id.*

Furthermore, Jinko contends that the fact that it reported nearly uniform kilogram per watt glass consumption across CONNUMs means that the physical characteristics of the glass used in products with different CONNUMs is nearly uniform, and thus the kilogram per square meter conversion ratio for each CONNUM should be nearly equal to the overall average kilograms to square meter conversion ratio used by Commerce. Jinko's Cmts. at 22–23. Consequently, Jinko concludes that the average conversion ratio is not distortive on a CONNUM-specific basis. *Id.*

However, other factors such as production efficiencies affect the kilogram per watt consumption of glass. *See* Second Redet. at 33. The kilogram per-watt glass consumption for one CONNUM may be similar to that of another CONNUM even if the glass used to produce products assigned the first CONNUM is much thinner than the glass used to produce products assigned the second CONNUM if it took more pieces of glass per watt to produce products within the first CONNUM (production was less efficient). Thus, similar kilogram per watt glass consumption across CONNUMs does not necessarily mean that glass with the same thickness was used to produce the products classified under those CONNUMs or that an overall average kilograms to square meter conversion ratio is necessarily accurate for each CONNUM. *See* Second Redet. at 20–21.

Additionally, Jinko contends that conversion ratios based on its consumption of glass, Risen's consumption of glass, and import data under Romanian HTS 7007.19.80 demonstrate that glass imported into Malaysia during the POR is similar in thickness to the glass consumed by Risen and Jinko in producing subject merchandise. Jinko's Cmts. at 22–23. Commerce

addressed this argument in detail in the first remand and the Court has already found that Commerce "adequately explain{ed} none of the three proposed conversion rations are accurate to apply to the Malaysian HTS data." *Jinko II*, 789 F. Supp. 3d at 1283 n.9; *see also* First Redet. at 31–34.

B.  Substantial Evidence Supports Commerce's Determination That Jinko's Glass Falls Within Romanian HTS 7007.19.80

In *Jinko II*, the Court found that "Romanian HTS 7007.19.80 would appear to be specific and reliable on this record . . . ," but the Court held that Commerce failed to address record evidence that detracts from its determination to use the price of imports classified under Romanian HTS 7007.19.80 to value the glass used by the respondents.  789 F. Supp. 3d at 1284. The Court stated that Commerce supported its use of imports prices under Romanian HTS 7007.19.80 to value glass by recognizing that all the glass excluded from coverage under Romanian HTS 7007.19.80 has light limiting characteristics (unlike the glass used by the respondents).  *Id.* at 1282.  Commerce, however, did not explain how one type of excluded glass, namely "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" has light limiting characteristics.  *Id.*  ("Commerce cannot ignore that which detracts from its determination.").

In its Second Remand Redetermination, Commerce explains that its explanation of the types of glass excluded from coverage under Romanian HTS 7007.19.80 responds to Jinko's claim that the glass that it uses in its solar modules is excluded from Romanian HTS 7007.19.80 and thus Commerce should not use this import category to value Jinko's glass.  *See* Second Redet. at 22 (citing First Redet. at 29).   In the First Remand Redetermination, Commerce focused on the exclusions for glass that is enameled, colored throughout the mass, opacified, flashed or that has an absorbent or reflecting layer.  *Id.* (citing First Redet. at 9).  After providing

17

a detailed explanation of why the glass used by Jinko is not covered by the exclusion for glass with an absorbent layer, Commerce explains that "{a}ll of the other glass that is excluded from Romanian HTS category 7007.19.80 has treatments that limit the amount of light that is transmitted through the glass. . . . " *Id.* at 23. In its Second Remand Redetermination, Commerce explains that the phrase "all of the other glass that is excluded from Romanian HTS category 7007.19.80" refers to the other exclusions in the group of exclusions that Commerce was discussing the First Remand Redetermination — *i.e.*, glass that is enameled, colored throughout the mass, opacified, flashed or that has a reflecting layer. *Id.* at 23. Commerce did not claim that glass covered by the exclusion for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" has inherent light limiting characteristics. *Id.* The exclusion under Romanian HTS category 7007.19.80 for glass of a particular size and shape noted by this Court in *Jinko II* is based on the suitability of the glass for certain applications (*e.g.*, use in certain craft), rather than the light limiting characteristics of the glass. *Id.*

Nevertheless, as Commerce explains in the Second Remand Redetermination, the record supports the conclusion that Jinko's glass is not excluded under Romanian HTS category 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles." *Id.* at 23. Malaysian HTS category 7007.19.90, which Jinko advocates using to value its solar glass, also excludes glass "of a size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels." *Id.* With respect to Malaysian HTS category 7007.19.90, Jinko contended in its case brief during the administrative proceeding that,

> Since the scope of harmonized 6-digit HTS 7007.19 is "Safety glass, consisting of toughened (tempered) or laminated glass. Toughened (tempered) safety glass: Other than Of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels", the residual subheading 7007.19.9000 under HTS 7007.19

> covers tempered glass excluding two categories (a) those used in vehicles *etc*. and (b) those suitable for machinery of heading 84.29 or 84.30. Jinko's coated tempered glass input is neither used in vehicles nor used for specified machineries. As such, Jinko's tempered absorbent layer coated glass used in solar panels is properly covered in HTS 7007.19.9000.57

*Id.* at 23–24. Thus, Jinko acknowledges that the glass that it uses in its solar modules is not glass of a "size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels." Consequently, the exclusion under Romanian HTS category 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" does not apply to the glass used by Jinko in its solar modules. Hence, the presence of an exclusion under Romanian HTS category 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" does not detract from Commerce's conclusion that none of the exclusions under Romanian HTS category 7007.19.80 cover Jinko's solar glass but rather supports this conclusion.

## III.   Commerce's AFA Methodology Is Accordance With the Court's Remand Order, Is Supported By Substantial Evidence, And Is in Accordance With Law

In *Jinko II*, the Court held that Commerce appropriately used record information in its adverse facts available (AFA) methodology up through its calculation of average input ratios for three categories of inputs (solar cells, solar modules, and packing inputs). 789 F. Supp. 3d at 289. However, the Court found that when Commerce used a multiplicative inverse to calculate partial AFA adjustments for these three categories of inputs, Commerce inappropriately stopped relying on information derived from the record, as provided under section 776(b)(2) of the Act, and started creating facts without the requisite link to record evidence. *Id.* Specifically, the Court explained that Commerce used the number "1" to create the multiplicative inverse and the number "1" is not record information specific to Risen. *Id.* at 1290.

Risen contends that in this remand redetermination Commerce again is inappropriately

19

using "1" followed by a number of digits as its multiplier to increase the reported FOP

consumption quantities, as AFA.  Risen Cmts. at 15.  Thus, Risen claims that it is unclear how

Commerce has addressed the Court's concern.  *Id.*  However, Commerce explains that Risen

fails to recognize that in this remand redetermination, Commerce derived its multiplier (the AFA

adjustment) entirely from Risen's reported FOP consumption quantities.  Second

Redetermination at 26.

In its redetermination, Commerce explains that its AFA adjustment relies on a series of

steps, stating those steps using actual data for one of Risen's FOPs as follows:

1. First, for each input reported for a monocrystalline solar module CONNUM, Commerce
   identified the highest consumption quantity. Thus, using the M_EVA (ethylene vinyl
   acetate sheet) FOP as an example, step one is as follows:

| CONNUM (for Monocrystalline Solar Module) | M_EVA |
|---|---|
| [                    ] | [                    ] |
| [                    ] | [                    ] |
| [                    ] | [                    ] |
| [                    ] | [                    ] |
| Highest Consumption Quantity (CONNUM [                    ]) | [                    ] |

2. Next, Commerce divided the input consumption quantity for each CONNNUM by the
   highest consumption quantity reported for the input for each CONNUM (*e.g.,*
   [                    ]):

| CONNUM (for Monocrystalline Solar Module) | M_EVA |
|---|---|
| [                    ] | [                    ] |
| [                    ] | [                    ] |
| [                    ] | [ ] |
| [                    ] | [                    ] |

3. Commerce calculated the average difference between the CONNUM with the highest consumption quantity and the other CONNUMs:

   [                                                                    ]

4. Commerce repeated steps 1 through 3 above for each FOP in the dataset.

5. Commerce assigned each FOP into one of three groups: a module group, a cell group, or packing group.

6. Commerce calculated a simple average of the values derived in step 3 for each group listed in step 5. In Commerce's calculations, the simple average for each group is as follows:

   Module: [      ]
   Cell: [          ]
   Packing: [       ]

7. Commerce then took the reciprocal of the values in step 6 to arrive at the following values:

   Module: [       ]
   Cell: [            ]
   Packing: [       ]

*See* Second Redet. at 26–28. Commerce explains that the values in step 7 serve as the basis of the AFA adjustment applied to the cells and modules that Risen acquired from its unaffiliated suppliers. *Id.* at 27. Commerce explains that its derivation of the AFA adjustments in step 7 does not use a methodology that relies on the multiplicative inverse. *Id.*

Commerce explains that, as the steps above indicate, it relied on ratios that are derived from data on the record. Specifically, Commerce used Risen's reported consumption quantities, rather than an alternative methodology that, for example, replaces Risen's reported consumption quantities with consumption quantities that were increased for each FOP by the absolute difference between the highest and lowest consumption quantity reported for that FOP. *Id.* at 28. Thus, Commerce links the multiplier (the AFA adjustment) to record information specific to Risen in accordance with the Court's decision. *Id.* Commerce explains that, therefore, it used

record information specific to Risen to create the multipliers and did not introduce any new information that is not derived directly from record information to calculate the multiplier, consistent with the Court's opinion. *Id*.

Additionally, Risen contends that (1) it is illogical to use averages of FOP consumption quantities to calculate the AFA adjustment rather than using the highest CONNUM-specific consumption quantity of a FOP as AFA for that FOP, (2) Commerce failed to explain why using the highest CONNUM-specific consumption quantity of a FOP as AFA for the FOP would not result in an appropriate adverse inference, and (3) Commerce's AFA methodology does not promote accuracy and results in punishment, rather than an inducement to cooperate with Commerce. *See* Risen's Cmts. at 15–17. In its redetermination, Commerce addressed each of these arguments.

Commerce explains that there are numerous reasons why Commerce used a broader average AFA adjustment rather than using FOP-specific AFA adjustments. Second Redet. at 29. First, Commerce explains that it is not possible to use an FOP-specific AFA adjustment for every FOP. *Id.* Risen sold solar modules with [    ] different CONNUMs during the POR. *Id.* Risen reported consuming monocrystalline wafers for [    ] of the [        ] CONNUMs and multi-crystalline wafers for [    ] of the [    ] CONNUMs. *Id.* Thus, [

] from which it could select the highest consumption quantity to apply as AFA for this FOP. *Id.* In addition, Commerce explains that it cannot use the highest of the consumption quantities reported for

[                                                    ] as AFA because each of these quantities is [                                                    ]. *Id.* Hence, Commerce cannot apply a FOP-specific AFA adjustment to [

]. *Id.* That is a significant limitation to a FOP-specific AFA adjustment given that Risen's solar modules [                                                    ] of the solar modules that it produced during the POR. *Id.*

Second, Commerce explains that using a broader average AFA adjustment allowed Commerce to build in an increase to the adjustment, as contemplated in *Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000),[4] given that the consumption quantities that Risen reported for a number of FOP [

]. *Id.* For example, Risen reported the following per-watt CONNUM-specific consumption quantities for the inputs listed below for its [                    ]:

1. Silver Paste - [                                          ].
2. Monocrystalline Wafers - [
        ].
3. Ethylene Vinyl Acetate (EVA) - [
        ].
4. Tempered Glass - [                                       ].
5. Aluminum Extrusions - [                                    ].

*See* Second Remand Redetermination at 30 (citing SQR5 at Exhibit SQ5-2.)

Commerce explains that with rounding, the per-watt CONNUM-specific consumption quantities listed above for a particular input [

]. *Id.* at

---

[4] *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("{W}e are convinced that it is within Commerce's discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative" but that Congress "intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.")

30.  Thus, replacing the CONNUM specific consumption quantities for each of these inputs with
the highest CONNUM-specific consumption quantity for the input (the FOP-specific AFA
adjustment advocated by Risen) results in [

                                                                    ], depending on the input.  *Id.*  Consequently, the approach
suggested by Risen is not adverse [                                                        ] for these very
important inputs.  *Id.*  Moreover, for some of these inputs, [


                                    ].  *Id.*  For example, replacing the second and third highest CONNUM-
specific consumption quantities with the highest CONNUM-specific consumption quantity
results in percentage increases of approximately [            ] percent for silver paste, [
] percent for monocrystalline wafers, and [            ] percent for EVA.  *Id.* at 30–31.  When
viewed in terms of the purpose of applying AFA, which is to select facts available with an
adverse inference, the record demonstrates that the broader average AFA adjustment is logical.
*Id.* at 31.

      Risen also argues that Commerce fails to explain why using the highest CONNUM-
specific consumption quantity for each FOP as AFA is not an appropriate adverse inference.
Risen Cmts. at 15.  Commerce explains that using the highest CONNUM-specific consumption
quantity for each FOP as AFA would increase the CONNUM-specific consumption quantities
reported for the FOPs, [                                                                    ], as
illustrated above.  Second Redet. at 31.

      Commerce further explains that Risen has failed to use cooperative solar cell and module
suppliers in four consecutive administrative reviews, including the 2019-2020 administrative
review of the order which is the review under litigation.  *Id.*  In two of these four administrative

reviews, Commerce used Risen's highest reported consumption quantities as AFA to induce

cooperation. *Id.* Despite Commerce's application of that AFA methodology, however, in the

2019-2020 review, Risen continues to use uncooperative suppliers. *Id.* Commerce explains that

it would not be in keeping with the purpose of the AFA provision, which is to induce

respondents to provide Commerce with the information that it requires to calculate an accurate

dumping margin, to continue to use an AFA methodology (*i.e.*, using the highest reported

consumption quantities as AFA) that fails to induce cooperation. *Id.* at 31–32.

Risen states that it found Commerce's use of the highest reported consumption quantities

as AFA in prior administrative reviews to be adverse such that it needed to challenge

Commerce's application of AFA to Risen in litigation. Risen's Cmts. at 15. But Risen's belief

that a particular AFA methodology was "sufficiently" adverse to effectuate the statutory purpose

of AFA is belied by the fact that Risen has not changed its behavior in subsequent reviews by

using cooperative solar cell and module suppliers. Second Redetermination at 32. The reality is

that the prior AFA methodology used by Commerce has failed to induce Risen to cooperate. *Id.*

Risen also asserts that Commerce could have taken the action mentioned by the Court if

Commerce found the prior AFA methodology inadequate. Namely, the Court stated that:

> If during the review, Commerce believed the rate was not adverse it could have
> requested additional information from the parties, given the parties an opportunity
> to comment on the new information, and calculated a rate using that new
> information. Additionally, Commerce in a remand may reopen the record to ask for
> additional information.

Risen's Cmts. at 15. Commerce explains that it did not find it appropriate to reopen the record to

obtain additional information for the application of AFA for several reasons. Second Redet. at

32. To apply AFA, Commerce requires FOP consumption quantities, increased to induce

cooperation, to use in place of the missing FOP consumption quantities. *Id.* Commerce explains

it already had Risen's FOP consumption quantities that can be used as a starting point for partial AFA. *Id.* It is not clear what other information could be obtained to use as partial AFA, other than consumption quantities from other companies or average industry consumption quantities. *Id.* However, this information is not a better source of partial AFA, and is not more relevant to Risen than Risen's own consumption quantities. *Id.* at 32–33. Moreover, Commerce explains that if it were to reopen the record to obtain an AFA consumption quantity for each FOP, Commerce would require consumption quantities for approximately 156 FOPs. *Id.* at 33. Accordingly, Commerce explains that it is unlikely that it could obtain all the required data for each FOP by reopening the record. *Id.*

Risen contends that Commerce's AFA methodology does not promote accuracy and results in punishment, rather than an inducement to cooperate with Commerce. Risen's Cmts. at 16. Contrary to Risen's assertion, Commerce balances the goal of calculating accurate dumping margins with the need to induce cooperation by calculating separate average input ratios for solar cells, solar modules, and packing inputs. In its redetermination, Commerce explains that using FOP-specific AFA adjustments did not induce cooperation, and using this grouping approach, as opposed to a broader average AFA adjustment, promotes accuracy. Second Redetermination at 33. Specifically, this more specific approach promotes accuracy because the variability in the quantities of the different inputs that are used to manufacture solar cells and the corresponding production efficiencies have no apparent connection to module production because the same inputs and production processes are not used to produce these products. *Id.* Therefore, Commerce grouped its calculations by production/processing stages to avoid distortion in the calculations. *Id.*

Risen also argues that Commerce is punishing Risen simply by using an AFA

methodology that results in a higher AFA adjustment.  Risen's Cmts. at 16.  The record establishes otherwise.  Given Risen's use of uncooperative suppliers in the previous three administrative reviews, Commerce explains that using an AFA methodology that results in a higher AFA adjustment is clearly required to induce cooperation and is not an arbitrary action taken by Commerce to punish Risen.  Second Redetermination at 33–34.

## IV.    Commerce's Separate Rate Is Supported By Substantial Evidence And Is In Accordance With Law

In the Second Remand Redetermination, Commerce made no changes to the individual dumping margins of 20.99 and 12.24 percent that Commerce calculated in the Amended Final Results, for Jinko and Risen, respectively.  Second Redet. at 16, 34; *see* Am. Final Results, 87 Fed. Reg. at 48,621–22.  Accordingly, Commerce correctly found that the separate rate applicable to JA Solar and BYD remains unchanged from the Amended Final Results.  Second Redet. at 16, 34.  On this basis, Commerce continued to assign JA Solar and BYD a separate rate of 14.79%, which is equal to the weighted average of Jinko's and Risen's final dumping margins calculated in the Amended Final Results.  *Id*.; *see* Am. Final Results, 87 Fed. Reg. at 48,621–22.  Accordingly, the Court should sustain the separate rate that Commerce assigned to JA Solar and BYD.  Second Redet. at 16, 34.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's Second Remand Redetermination, and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

27

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

/s/ An Hoang
AN HOANG
Trial Attorney

JACK DUNKELMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
   Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-3226
An.Hoang@usdoj.gov

February 25, 2026

Attorneys for Defendant

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's Standard Chambers Procedures in that it contains 8,301 words, including text, footnotes, and headings.

/s/ An Hoang
AN HOANG

## CERTIFICATE OF SERVICE

I hereby certify that, on this 25th day of February 2026, I caused this filing to be served, on the attorneys of record, electronically via the Department of Justice's secured electronic service JEFS.

/s/ An Hoang
AN HOANG

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                                    )
JINKO SOLAR IMPORT AND EXPORT       )
CO., LTD., *ET AL.*,                                )
                                                    )
                    Plaintiffs,                     )
                                                    )
          and                                       )
                                                    )
JA SOLAR TECHNOLOGY                     )
YANGZHOU CO., LTD., *ET AL.*,               )
                                                    )
                    Plaintiff-Intervenors           )
                                                    )
          v.                                        )          Consol. Court No. 22-00219
                                                    )
UNITED STATES,                              )
                                                    )
                    Defendant,                      )
                                                    )
          and                                       )
                                                    )
AMERICAN ALLIANCE FOR SOLAR          )
MANUFACTURING,                          )
                                                    )
                    Defendant-Intervenor.           )
_____)

## **ORDER**

Upon consideration of the Department of Commerce's final results of redetermination

pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is

hereby

ORDERED that the remand results are sustained in their entirety.


Dated: _____, 2025          _____
          New York, NY                                      JUDGE