A-570-979
Remand
Slip Op. 26-30
POR: 12/01/2019–11/30/2020
**Public Document**
E&C/IV: HS

***Jinko Solar Import and Export Co., Ltd., et. al v. United States***
**Consol. Court No. 22-00219, Slip Op. 26-30 (CIT 2026)**
**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the March 30, 2026, remand order of the U.S. Court of International Trade (CIT) in *Jinko Solar Import and Export Co., Ltd., et. al. v. United States*.[1] The CIT's *Remand Order III* concerns the final results of the 2019-2020 administrative review of the antidumping duty (AD) order on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the People's Republic of China (China).[2] In the *Remand Order III*, the CIT sustained Commerce's methodology for calculating facts available with adverse inferences but remanded to Commerce to reconsider its valuation of solar glass consistent with the CIT's opinion.[3] The CIT also ordered that Commerce reconsider the separate rates that it determined for JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co.,

[1] *See Jinko Solar Import and Export Co., Ltd., et. al. v. United States*, 829 F.Supp.3d 1247 (CIT 2026) (*Remand Order III*).
[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 FR 38379 (June 28, 2022) (*AR8 Final Results*), and accompanying Issues and Decision Memorandum (IDM), as amended in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review, 2019-2020*, 87 FR 48621 (August 10, 2022) (*Amended AR8 Final Results*).
[3] *See Remand Order III* at 1262.

Ltd. (JA Solar Companies) and BYD (Shangluo) Industrial Co., Ltd. (BYD) based on its remand redetermination. Consistent with the CIT's opinion, on remand, Commerce has reconsidered its valuation of solar glass and the separate rates determined for the JA Solar Companies and BYD.

## II. BACKGROUND

On June 28 and August 10, 2022, Commerce published the *AR8 Final Results* and *Amended AR8 Final Results*, respectively, in the *Federal Register*.[4] Mandatory respondents Jinko and Risen and certain separate rate respondents subsequently challenged Commerce's *AR8 Final Results* at the CIT.[5] On May 1, 2024, the CIT sustained, in part, and remanded, in part, Commerce's *AR8 Final Results* for further explanation or reconsideration.[6] On August 29, 2024, Commerce filed its *First Redetermination*.[7] On May 30, 2025, the CIT sustained, in part, and remanded, in part, Commerce's *First Redetermination* for further explanation or reconsideration.[8] On September 26, 2025, Commerce filed its *Second Redetermination*.[9] On March 30, 2026, the CIT sustained, in part, and remanded, in part, the *Second Redetermination* to Commerce for further explanation or reconsideration.[10]

---

[4] *See AR8 Final Results; see also Amended AR8 Final Results*.
[5] Risen refers to the following companies which Commerce collapsed and treated as a single entity: Risen Energy Co. Ltd.; Risen (Wuhai) New Energy Co., Ltd.; Zhejiang Twinsel Electronic Technology Co., Ltd.; Risen (Luoyang) New Energy Co., Ltd.; Jiujiang Shengzhao Xinye Technology Co., Ltd.; Jiujiang Shengzhao Xinye Trade Co., Ltd.; Ruichang Branch/Risen Energy (HongKong) Co., Ltd.; Risen Energy (Changzhou) Co., Ltd.; and Risen Energy (YIWU) Co., Ltd. Jinko refers to the following companies which Commerce collapsed and treated as a single entity: 1) Jinko Solar Import and Export Co., Ltd.; 2) Jinko Solar Co., Ltd.; 3) Jinkosolar Technology (Haining) Co., Ltd.; 4) Yuhuan Jinko Solar Co., Ltd.; 5) Zhejiang Jinko Solar Co., Ltd.; 6) Jiangsu Jinko Tiansheng Solar Co., Ltd.; 7) Jinkosolar (Chuzhou) Co., Ltd.; 8) Jinkosolar (Yiwu) Co., Ltd.; and 9) Jinkosolar (Shangrao) Co., Ltd.
[6] *Jinko Solar Import and Export Co., Ltd. v. United States*, 701 F.Supp.3d 1367, 1373 (CIT 2024) (*Remand Order I*).
[7] *See Final Results of Redetermination Pursuant to Court Remand*, *Jinko Solar Import and Export Co., Ltd., et. al v. United States*, Court No. 22-00219, Slip Op. 24-53 (CIT 2024), dated August 29, 2024 (*First Redetermination*), available at https://access.trade.gov/FinalRemandRedetermination, under ACCESS barcode: 4623033-01.
[8] *See Jinko Solar Import and Export Co., Ltd. v. United States*, 789 F.Supp.3d 1275 (*Remand Order II*).
[9] *Final Results of Redetermination Pursuant to Court Remand*, *Jinko Solar Import and Export Co., Ltd., et. al v. United States*, Court No. 22-00219, Slip Op. 25-67 (CIT 2025), dated September 26, 2025 (*Second Redetermination*), available at https://access.trade.gov/FinalRemandRedetermination, under ACCESS barcode: 4832799-01.
[10] *See Remand Order III*.

In this remand redetermination, we requested, and Jinko and Risen provided, control number (CONNUM)-specific kilogram per square meter glass conversion factors. On July 28, 2026, we released and provided interested parties with an opportunity to comment on Commerce's Draft Remand.[11] On August 3, 2026, Commerce received comments on the Draft Remand from Jinko,[12] BYD,[13] and the JA Solar Companies.[14] We have responded to those comments below. No other party submitted comments.

## III. REMANDED ISSUES

### A. Valuation of Solar Glass

**Background**

In the *First Redetermination*, Commerce continued to value solar glass using the value of imports under Romanian Harmonized System (HS) code 7007.19.80, rather than the value of imports under Malaysian HS code 7007.19.90, even though Malaysia is the primary surrogate country. Commerce used the Romanian import data to value solar glass instead of the Malaysian import data because: (1) imports under Malaysian HS code 7007.19.90 are reported in square meters while the respondents reported their consumption of solar glass in kilograms, and (2) contrary to respondents' claims, Commerce determined that Romanian HS code 7007.19.80 does not exclude imports of the solar glass used by the respondents.[15]

The CIT held that, in its *First Redetermination*, Commerce: (1) failed to address why it could not use record evidence to convert the respondents' per-piece glass consumption quantities

---

[11] *See Draft Results of Redetermination Pursuant to Court Remand*, *Jinko Solar Import and Export Co., Ltd., et. al v. United States*, Court No. 22-00219, Slip Op. 26-30 (CIT 2026)(Draft Remand).
[12] *See* Jinko's Letter, "Comments on Draft Third Remand," dated August 3, 2026 (Jinko's Remand Comments).
[13] *See* BYD's Letter, "Shangluo BYD's Comments on Draft Results of Redetermination," dated August 3, 2026 (BYD's Remand Comments).
[14] *See* JA Solar Companies' Letter, "Comments on Draft Results of Remand Redetermination," dated August 3, 2026 (JA Companies' Remand Comments).
[15] *See First Redetermination*.

into square meters of glass consumed; and (2) failed to address certain excluded products listed in the description of Romanian HS code 7007.19.80 when explaining why the respondent's glass is not excluded from that HS category.[16]

In the *Second Redetermination*, Commerce continued to value solar glass using the value of imports under Romanian HS code 7007.19.80. Commerce explained that the factors available for converting the respondents' solar glass consumption quantities into a unit of measure that is compatible with the unit of measure for Malaysian imports of glass does not account for the varying thicknesses of the respondents' solar glass.[17] Thus, Commerce explained that this conversion results in distorted square meter consumption quantities for solar glass.[18] Commerce also explained that the exclusion under Romanian HS code 7007.19.80 for "glass of a size and shape suitable for incorporation in motor vehicles, aircraft, spacecraft, vessels and other vehicles" does not cover the glass used by the respondents because Jinko acknowledged that it used glass in solar modules that is not of a size or shape suitable for incorporation in these items.[19]

The CIT held that, in its *Second Redetermination*, Commerce: (1) failed to provide a reasonable explanation for why converting the respondents' glass consumption from pieces of glass consumed to square meters of glass consumed is distortive;[20] (2) failed to explain why it is too complex to derive CONNUM-specific glass consumption conversion factors from the information on the record;[21] (3) failed to address Jinko's evidence that the glass imported into Malaysia shares physical characteristics that are similar to those of the glass used by Jinko;[22] (4)

[16] *See Remand Order II*.
[17] *Second Redetermination* at 5.
[18] *Id.*
[19] *Id.* at 23-24.
[20] *See Remand Order III* at 1258.
[21] *Id.*
[22] *Id.* at 1259.

failed to reasonably explain why glass with an "absorbent layer" listed in the exclusions for Romanian HS code 7007.19.80 does not encompass the solar glass at issue, given that record evidence indicates that Jinko's solar glass has a coating that absorbs light;[23] and (5) illogically divided the list of exclusions for Romanian HS code 7007.19.80 into two general categories of excluded glass (one based on purpose and one based on possessing light limiting characteristics), which contradicts Commerce's original premise that all the glass excluded from Romanian HS code 7007.19.80 has light limiting characteristics.[24] The CIT found Commerce's approach is an unreasonable interpretation of the exclusions for Romanian HS code 7007.19.80 that cannot overcome the plain meaning of the term "absorbent."[25] Therefore, the CIT ruled that:

> {b}ecause the record contains evidence that the Romanian {HS} classification excludes anti-reflective solar glass, Commerce cannot reasonably rely on the Romanian {HS} to calculate the normal value of Jinko's solar glass. On remand, if necessary, Commerce may reopen the administrative record to obtain additional information needed to select a surrogate value for solar glass.[26]

**Analysis**

*Unit of Measure Conversion*

The CIT specifically held that Commerce failed to reasonably explain why varying thicknesses of glass rendered any conversion of the respondents' glass consumption from pieces to square meters distortive given that CONNUM-specific glass weight, length, and width data are on the record.[27] The CIT stated that this information is sufficient to account for thickness when converting respondents' glass consumption into square meters even when using an overall conversion factor because the overall "conversion factor is based on both area and weight," and

[23] *Id*. at 1255.
[24] *Id*. at 1254-1255.
[25] *Id*. at 1255.
[26] *Id*. at 1256.
[27] *Id*. at 1258.

thus "it necessarily captures differences in glass thickness";[28] (2) failed to identify or explain the complexities that prevented it from calculating CONNUM-specific glass consumption rates in square meters using record information;[29] and (3) failed to address Jinko's arguments that the square meter to kilogram glass conversion factors on the record that Jinko calculated from its own glass consumption data, Risen's glass consumption data, and Romanian import data corroborate each other and indicate that glass imported under Malaysian HTS 7007.19.80, would likely be physically similar to the glass used to calculate those conversion factors (thus Malaysian import data would yield a similar conversion factor).[30]

Because Jinko and Risen did not explicitly report glass weight, length, and width data on a CONNUM-specific basis, we reopened the record and obtained CONNUM-specific kilogram per square meter glass conversion factors from both companies. We required CONNUM-specific glass conversion factors because using an overall average kilogram-to-square meters glass conversion factor does not yield the actual quantity of glass consumed in square meters where there are variations in the thickness, and thus the weight, of the glass used for different CONNUMs (*e.g.*, multiplying the overall average kilogram-to-square meters glass conversion factor by the kilograms of glass consumed for two CONNUMS that each used the same square meters of glass, but different thicknesses of glass, and thus having different kilogram-to-square meter ratios, will not result in the actual square meters of glass consumed for each CONNUM). Because we now can determine the square meters of glass consumed on a CONNUM-specific basis, we no longer have the accuracy issues that are present when using an overall average kilogram-to-square meter glass conversion factor, which is the accuracy issue that the CIT

---

[28] *Id*.
[29] *Id*.
[30] *Id*. at 1259.

directed Commerce to further explain. Variations in the thickness of glass between CONNUMs, and thus variations in glass conversion factors between CONNUMs, are now taken into account by using CONNUM-specific kilogram per square meter glass conversion factors. Moreover, because we now have CONNUM-specific kilogram per square meter glass conversion factors on the record, we no longer need to calculate those factors. Thus, the complexities that prevented Commerce from calculating CONNUM-specific glass conversion factors,[31] which the CIT directed Commerce to identify and explain, are no longer an issue. Lastly, Jinko's support for its overall kilogram to square meter glass conversion factor (*i.e.*, its claim that Risen's overall glass conversion factor and the glass conversion factor calculated from Romanian import data corroborate Jinko's overall glass conversion factor), which the CIT found Commerce failed to address, is no longer relevant because we are now using CONNUM-specific factors to convert Jinko's glass consumption in kilograms to glass consumption in square meters.

Consequently, in these final results of redetermination, we have converted the respondents' glass consumption in kilograms to glass consumption in square meters using their reported CONNUM-specific kilogram per square meter glass conversion factors, valued their glass consumption using import values under Malaysia HS code 7007.19.90, and recalculated their dumping margins based on these changes.

**Romanian HS Exclusions**

As noted above, the CIT found that Commerce: (1) failed to reasonably explain why glass with an "absorbent layer" which is excluded from coverage under Romanian HS number

---

[31] For example, Risen's proposed methodology for using existing record information to determine CONNUM-specific glass conversion factors does not account for the size and thickness of glass consumed by its affiliates that produced products with the same CONNUMs as the subject merchandise. Weighting together the glass consumption of multiple affiliates increases the complexity that Commerce faced in calculating a glass conversion factor for each CONNUM.

7007.19.80 does not include solar glass that has a coating that absorbs light; and (2) illogically divided the list of exclusions for Romanian HS code 7007.19.80 into two general categories of excluded glass (one based on purpose and one based on possessing light limiting characteristics), which contradicts Commerce's original premise that all the glass excluded from Romanian HS code 7007.19.80 has light limiting characteristics. Therefore, the CIT ruled that Commerce cannot reasonably rely on the Romanian HS to calculate the value of Jinko's solar glass but "may reopen the administrative record to obtain additional information needed to select a surrogate value for solar glass."

Consistent with the CIT's ruling, we reopened the record and obtained CONNUM-specific kilogram per square meter glass conversion factors from Jinko and Risen which allow us to use import values under Malaysian HS code 7007.19.90 as the surrogate value for solar glass.

## B. Recalculation of the Separate Rate for the JA Solar Companies and BYD

**Background**

The CIT remanded to Commerce for reconsideration consistent with the CIT's opinion, the separate rate that Commerce assigned to the JA Solar Companies and BYD in the underlying administrative review.[32]

**Analysis**

Because Commerce based the separate rate that it assigned to the JA Solar Companies and BYD in the underlying administrative review on the dumping margins that it calculated for the mandatory respondents Jinko and Risen, in this remand redetermination, we also assigned a separate rate to JA Solar Technology Yangzhou Co., Ltd. and BYD based on the dumping margins that we calculated for Jinko and Risen. In these final results of redetermination, we

[32] *See Remand Order III* at 1262.

calculated a dumping margin of 4.76 percent for Jinko and a *de minimis* dumping margin for Risen.

Commerce's practice is to determine the dumping margin for non-individually examined companies granted a separate rate by weight averaging the weighted-average dumping margins calculated for the individually-examined respondents, excluding rates that are zero, *de minimis*, or based entirely on facts available.[33] Accordingly, we assigned a separate rate to JA Solar Technology Yangzhou Co., Ltd., and BYD equal to the weighted-average dumping margin calculated for Jinko, namely 4.76 percent.

## IV. INTERESTED PARTY COMMENTS

*Jinko's Comments*

The following is Jinko's summary of its argument. For further details, *see* Jinko's Remand Comments at 1-2.

> {Commerce} should finalize the Draft Third Remand that properly uses Jinko-specific data to recalculate its dumping margin. This result is supported by substantial evidence and in accordance with law, in contrast to the prior solar glass valuation for Jinko that was unlawful – as Jinko demonstrated on appeal and in prior remand proceedings.

*BYD's Comments*

> BYD agrees with, and incorporates by reference, Jinko and Risen's comments regarding valuing solar glass and agrees that Commerce should base BYD's dumping margin on the dumping margins that Commerce calculates for Jinko and Risen in this remand redetermination.[34]

*JA Solar Companies' Comments*

> The JA Solar Companies concur with, and incorporate by reference, Jinko and Risen's comments on the Draft Remand. The JA Solar Companies also urge Commerce to assign Jinko's remand redetermination dumping margin not only to

---

[33] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part*, 73 FR 52823, 52824 (September 11, 2008), and accompanying IDM at Comment 16.

[34] *See* BYD's Remand Comments at 2.

> JA Solar Technology Yangzhou Co., Ltd., but also to Shanghai JA Solar Technology Co., Ltd., because Shanghai JA Solar Technology Co., Ltd. received a separate rate in the underlying administrative review and is a party to this litigation.[35]

**Commerce's Position:** We agree with the interested parties.[36] In these final results of remand redetermination, we have continued to use Jinko and Risen's CONNUM-specific kilogram to square meter glass conversion factors and import values under Malaysian HS code 7007.19.90 to value solar glass and calculate Jinko and Risen's dumping margins. Consistent with Commerce's practice, because we calculated a *de minimis* dumping margin for Risen, we assigned the dumping margin that we calculated for Jinko, namely 4.76 percent, to JA Solar Technology Yangzhou Co., Ltd. and BYD. We also assigned the 4.76 percent dumping margin to Shanghai JA Solar Technology Co., Ltd. because Shanghai JA Solar Technology Co., Ltd. received a separate rate in the underlying administrative review and is a party to this litigation.

## V. FINAL RESULTS OF REDETERMINATION

Consistent with *Remand Order III*, we have: (1) used the respondent's CONNUM-specific glass conversion factors to calculate their solar glass consumption on a square meter basis and valued that consumption using the value of imports during the period of review under Malaysian HS code 7007.19.90; and (2) recalculated the separate rate assigned to JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and BYD. Specifically, we calculated a dumping margin of 4.76 percent for Jinko and a *de minimis* dumping margin for Risen. Accordingly, we assigned a separate rate to JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and BYD equal to the weighted-average dumping margin calculated for Jinko, namely 4.76 percent.

---

[35] *See* JA Companies' Remand Comments at 2-3.

[36] Although BYD and the JA Solar Companies incorporated by reference Risen's comments, Risen did not comment on the Draft Remand.

Because Commerce determined weighted-average dumping margins in these final results of remand redetermination that are different from those calculated for Jinko, Risen, JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd. and BYD, in the underlying *AR8 Final Results*, we intend to issue a *Timken*[37] notice with amended final results for the 2019-2020 administrative review of the AD order on solar cells from China should the CIT sustain these final results of redetermination. Additionally, we will issue relevant instructions, as appropriate, to U.S. Customs and Border Protection.

8/13/2026

X

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance

[37] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).